C3qdcar1                          Trial

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     ARTURO CARAVANTES and
3    FRANCISCO SOTARRIBA
                      Plaintiffs
4
              v.                        09 CV 7821 (RPP)
5    53RD STREET PARTNERS, LLC
     d/b/a REMI RESTAURANT and
6    OSCAR VELANDIA
                      Defendants
7    ------------------------------x
                                        New York, N.Y.
8                                       March 26 2012
                                        10:08 a.m.
9
     Before:
10                   HON. ROBERT P. PATTERSON, JR.

11                                        District Judge

12                            APPEARANCES
     PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
13        Attorneys for Plaintiffs
     1285 Avenue of the Americas
14   New York, NY 10019
     AARON S. DELANEY
15   MAYUR P. SAXENA
     MOIRA KIM PENZA
16
     URBAN JUSTICE CENTER
17        Attorney for Plaintiffs
     123 William Street 16th Floor
18   New York, NY 10038
     NICOLE HALLETT
19
     EPSTEIN BECKER & GREEN PC
20        Attorneys for Defendants
     KERRY M. PARKER
21   ALKIDA KACANI

22        - also present -

23   CARLOS CRUZ - Spanish Interpreter
     LILIANA HALAC - Spanish Interpreter
24   RANDALL CARTER - Plaintiff AV Tech

25

C3qdcar1                          Trial

1            THE CLERK:  Arturo Caravantes versus 53rd Street

2    Partners.

3            Is the plaintiff ready for trial?

4            MR. DELANEY:  Yes, we are, your Honor.

5            THE CLERK:  And defendant ready for trial?

6            MR. PARKER:  Yes, your Honor.

7            THE COURT:  All right.  I understand Mr. Delaney,

8    Ms. Hallett and Mr. Saxena are going to represent the

9    plaintiff?

10           MR. DELANEY:  Yes, your Honor, and Ms. Penza at the

11   end of the table here.

12           THE COURT:  And who?

13           MR. DELANEY:  Ms. Moira Kim Penza.

14           THE COURT:  And it is rather unusual to have four

15   trial counsel.

16           MR. DELANEY:  Yes, your Honor.  Ms. Nicole Hallett is

17   co-counsel with the Urban Justice Center.  We have been

18   co-counsel in this case, and we have been working a

19   collaborative effort on the case.

20           THE COURT:  But there are four; I am talking about the

21   number four.

22           MR. DELANEY:  Yes, your Honor.  It has been a group

23   effort for all of us.

24           THE COURT:  How is it going to be divided?

25           MR. DELANEY:  To try the case, your Honor?  I will be

C3qdcar1                    Trial

```
 1   taking the lead role, and I will do the direct of the two main

 2   plaintiffs and I will be crossing most of the defendants'

 3   witnesses.  But each at the counsel table will be directing a

 4   witness or two as well.

 5          THE COURT:  Well, I have to know how they are going to

 6   be broken down.

 7          MR. DELANEY:  Sure.  I am going to be doing the

 8   directs of the two main plaintiffs over the next two days.

 9          THE COURT:  I am talking about the witnesses.

10          MR. DELANEY:  Sir, I guess I am not understanding your

11   question, your Honor.

12          THE COURT:  I have to have one counsel for each

13   witness.

14          MR. DELANEY:  Oh, absolutely, your Honor.

15          THE COURT:  I want to know who is going to be doing

16   the direct on direct and who is going to be doing the

17   cross-examination.

18          MR. DELANEY:  Sure.

19          THE COURT:  They have got to be the same person.

20          MR. DELANEY:  Yes.  There are only going to be one

21   counsel for each witness.

22          THE COURT:  Which witnesses?

23          MR. DELANEY:  I will be doing the directs for

24   Mr. Caravantes and Mr. Sotarriba.  Ms. Kim Penza will be doing

25   the directs for Mr. Sergio Pastor; he is one of the witnesses.
```

C3qdcar1                        Trial

1    Ms. Hallett will be doing the direct of Martina Caravantes,

2    Mr. Caravantes' wife.  Mr. Saxena will be doing the direct of

3    our expert, Dr. Jessica Pearson.

4                THE COURT:  I see.  All right.

5                And I gather that Mr. Parker and Miss Kacani, is that

6    right?

7                MS. KACANI:  Yes.

8                THE COURT:  You are going to split your witnesses

9    also, or not?

10               MR. PARKER:  Your Honor, I will be --

11               THE COURT:  You just have to keep them straight.

12               MR. PARKER:  Understood.

13               (Pause)

14               Your Honor, I will be handling the cross-examinations

15   of all of the plaintiffs' witnesses, and I have not yet decided

16   whether or not Ms. Kacani will handle any directs of our

17   witnesses, but I will be handling the bulk of them as well.

18               THE COURT:  All right.  And then -- I've got to take a

19   call.

20               (Pause)

21               THE CLERK:  All rise.

22               THE COURT:  Please be seated.

23               Now, with respect to the in limine motions, I'm not in

24   a position to fully decide the issue about the testimony of

25   Sergio Pastor and Moises Pastor.  So I'll hear it and may

C3qdcar1                         Trial

1   strike it.

2           With respect to Mr. Pastor's NYEHR complaint, I don't

3   think it should be admitted in evidence.

4           MR. DELANEY:  Your Honor, may we be heard on that?

5           THE COURT:  Well, if we are going to argue these

6   things -- no.

7           MR. DELANEY:  OK.

8           THE COURT:  It is over.  I am just reiterating what is

9   written.

10          And Michele Pauldi, I want to hear her expertise and

11  her background before I make a final decision on that.

12  Otherwise, it seems that she should be admitted.

13          On the physical injuries, it seems to me that the

14  defense is right, that there has not been a sufficient notice

15  for anyone to be a medical expert on that issue, and,

16  accordingly, that part of the damages would be excluded.

17          With respect to the Dr. Goldstein, he cannot testify

18  on the credibility of Buendia.

19          I don't recall what type of drug Moises Pastor is

20  using or the extent, but, of course, if he testifies that he is

21  using heroin and states that he just used it, that would

22  impeach his -- it could be used to impeach his testimony, but

23  otherwise it would not.

24          I don't think the witnesses' immigration status is

25  relevant to the case.

C3qdcar1                              Trial

1              With respect to marital communications, I think that

2        depends on the testimony of Mrs. Caravantes.  I think the

3        defense can cross-examine with respect to observations.  She

4        can testify as to observations she made, but not as to -- and

5        that she could testify as to individual statements he made; I

6        think that opens the door to the defense questioning him about

7        other individual statements that he made.  So it depends on how

8        you present the case, like most cases.

9              I think that covers the motions and I am ready to hear

10       the opening.  I think that covers all the motions.

11             MR. DELANEY:  Your Honor, before the openings, we had

12       some administrative matters we wanted to raise with the Court.

13             THE COURT:  Yes.

14             MR. DELANEY:  Mr. Saxena is going to speak to that.

15             MR. SAXENA:  Your Honor, we will be -- plaintiffs will

16       be presenting their case in chief one witness via deposition

17       testimony designations.  There is no video.  We request that

18       the testimony be allowed to be read in open court.

19             THE COURT:  You can read it.

20             MR. SAXENA:  The parties have made designations,

21       counterdesignations and objections to the deposition testimony

22       of several witnesses.  As far as hearing the objections,

23       plaintiffs respectfully submit that those objections be heard

24       in writing, should the Court deem any of the testimony -- deem

25       it needs to rely on any of the testimony for maybe at the close

C3qdcar1                        Trial

1    of the case rather than during the reading of the testimony.

2                    THE COURT:  Why is that?

3                    MR. SAXENA:  Just for the purposes of efficiency, to

4    keep the proceedings moving.  Unless there is an objection as

5    to -- you know, most of the objections are going to be about

6    whether the testimony can be admitted or hearsay, or things

7    like that, and since we don't have a jury here, we are just

8    thinking that it would be better to get the testimony out.

9                    THE COURT:  What does the defense say?

10                   MR. PARKER:  I oppose that, Judge.  Just one quick

11   example is in some of the testimony -- it seems the mic cut out

12   again.  I'll speak up.

13                   (Pause)

14                   Just one quick example is that in one of the

15   depositions that the plaintiffs propose to read, there are

16   several proposed designations where it is just rank hearsay,

17   and my position is the Court should rule on those and not let

18   the testimony be read into the record.

19                   THE COURT:  I am inclined to agree with the defense,

20   because it is going to be very hard for me to go back and then

21   strike out testimony, and I don't know how I will keep track of

22   it.

23                   MR. SAXENA:  That is fine, your Honor.

24                   Just on designations, we will have prepared binders to

25   submit to the Court so that you can read along.

C3qdcar1                         Trial

1            We wanted to ask if the Court will permit a rebuttal

2     case?  We are planning on calling just one or two rebuttal

3     witnesses concerning the defendant's affirmative defenses.

4            THE COURT:  You want to go do what?

5            MR. SAXENA:  Call witnesses in rebuttal following the

6     defendants' case concerning the defendants' affirmative

7     defenses.

8            THE COURT:  Yes, you can call rebuttal witnesses.

9            MR. SAXENA:  The plaintiffs were also planning to

10    present adverse witnesses in their case in chief, and we were

11    just wondering how the Court envisioned the exam happening,

12    whether it would be all the testimony at once or whether the

13    witness would be recalled again in the defendants' case?

14           THE COURT:  It is up to the defendant as to what they

15    are going to do.  I can't rule on that in advance.

16           MR. SAXENA:  So on a case-by-case basis?

17           THE COURT:  I don't know what issue is going to be --

18    would call for it or not.

19           MR. SAXENA:  OK.  So the Court would permit the

20    defendants to recall the witness if --

21           THE COURT:  Sometimes; sometimes not.  Sometimes if

22    all you are doing is reiterating a "No, she didn't," or "No, he

23    did it," which has already been testified to.

24           MR. SAXENA:  To the extent that a witness is being

25    called as an adverse witness, we just wanted to clarify whether

C3qdcar1                          Trial

1    the scope of the -- what the scope of the examination of that

2    witness is going to be, whether it will be restricted --

3    assuming that the witness is recalled in defendants' case,

4    would we be restricted on cross-examination of that witness to

5    the scope of defendants' direct examination?

6         THE COURT:  I don't understand your question.  You are

7    saying you want to call someone who is an adverse witness?  You

8    call someone as an adverse witness, then you're the one that

9    takes the lead.  You can't be limited by their scope because

10   they haven't had any scope.

11        MR. SAXENA:  Right.  Then let's say that defendants

12   stand up and do a limited examination and reserve the rest of

13   their examination for their own case and then they recall the

14   witness and examine them.  We're wondering on cross there will

15   we be limited to the scope of defendants' direct in their own

16   case in chief?

17        THE COURT:  I don't know.  I've never -- these are all

18   hypothetical questions.  I am not used to dealing with these

19   hypothetical questions.

20        MR. SAXENA:  That's fine, Judge.  We'll take it

21   case-by-case.

22        THE COURT:  I would expect a witness would testify to

23   everything that that witness is supposed to testify at the time

24   he is called or she is called, not in bits and pieces.  I would

25   expect them to finish their testimony.

C3qdcar1                              Trial

1                    MR. SAXENA:  OK.  Understood, Judge.

2                    We also have a protective order in this case Judge.  I

3       have copies if you would like me to hand it up.

4                    THE COURT:  You had better refresh me.

5                    MR. SAXENA:  Why don't I give you copies.  I have

6       copies for counsel, too.

7                    Here you go.

8                    (Handing to the Law Clerk)

9                    MR. SAXENA:  Actually.

10                   (Handing)

11                   MR. SAXENA:  I submit that the relevant paragraphs are

12      1 and 10.

13                   (Pause)

14                   THE COURT:  As I read the -- just from your -- I mean,

15      as to those paragraphs, as I read the stipulation, it only

16      relates to information and documents during discovery and that

17      you reserve the right regarding trial to seek guidance from the

18      Court.  But how do you propose to do that?

19                   MR. SAXENA:  Right.  So the plaintiffs would propose

20      that, to the extent that material that has been designated

21      confidential under this Order comes up in the proceedings --

22      for example, a medical record is identified as an exhibit that

23      has been marked confidential -- that an attorney be able to

24      request that this portion of the proceedings be also designated

25      confidential pursuant to the Protective Order.

C3qdcar1                          Trial

1              THE COURT:  Well, what does the defense say?

2              MR. PARKER:  The defense objects to that, Judge.  At

3      this point this is a public proceeding, and protections that

4      may have applied during discovery for purposes of discovery no

5      longer exist.

6              THE COURT:  How do you feel about the issues -- the

7      credit card information of customers of Remi, does that apply

8      to that?

9              MR. PARKER:  I don't believe that there is any

10     sensitive information contained in those documents that would

11     require it.

12             THE COURT:  I tried to raise one I thought you might

13     object to.

14             MR. PARKER:  I would if that were the case.  I don't

15     think that is for sure.  I guess I can draw the distinction,

16     Judge, between what information relates to the parties

17     specifically, and Mr. Saxena is using medical records as an

18     example.

19             You come to court.  You put on your case.  You speak

20     to the public about what your claims are, and the records are

21     admitted into evidence.  I don't know how at that point the

22     Court could entertain an application to maintain its secrecy.

23     I've never had that happen before, but I guess there is a first

24     time for everything.  But I don't see that that is an issue

25     that is an appropriate one.

C3qdcar1                          Trial

1              MR. SAXENA:  Judge, the plaintiffs understand that

2       this could be a case-by-case issue like the others, but we

3       would just like a procedure to be in place to the extent that

4       there is any such confidential information.

5              THE COURT:  Well, you don't have any particular

6       interest in any of it being confidential, that's what you're

7       telling me?

8              MR. SAXENA:  Are you addressing the plaintiffs, Judge?

9              THE COURT:  Yes.

10              MR. SAXENA:  I think, again, it will depend on a

11       case-by-case basis.  Certain of the medical records, that's

12       correct.

13              THE COURT:  You don't give me an example or anything

14       else.  You know, I deal with facts; I don't deal with

15       generalities.

16              MR. SAXENA:  So, Judge, I suggest that --

17              THE COURT:  Do you have any particular notice in any

18       particular document?

19              MR. SAXENA:  I suggest that, to the extent that that

20       fact arises, we revisit the issue, your Honor.

21              THE COURT:  If you don't know what it is now, I am

22       going to deny your application.

23              MR. SAXENA:  OK, Judge.

24              The next question was about the procedure for

25       admitting exhibits into evidence, whether you would like that

C3qdcar1                    Trial

1    to happen during testimony or at the close of the case --

2              THE COURT:  As they are offered, admit them or admit

3    them subject to connection.

4              MR. SAXENA:  OK.  The last point, Judge, Mr. Delaney

5    will address.

6              MR. DELANEY:  Your Honor, I just wanted your guidance

7    on one issue.

8              There was a deposition taken in this case by an

9    individual from my law firm who we subsequently found out was

10   not admitted to the Southern District of New York.  She was

11   admitted to the New York Bar, and she was supervised by

12   somebody who was admitted to the Southern District of New York.

13   But we discussed with our ethics people in house at Paul Weiss,

14   and while we found no clear rule on whether we could use such a

15   deposition transcript, we wanted the guidance from your Court.

16             We didn't want to potentially put deposition testimony

17   in front of the Court that the Court did not wish to hear

18   because of this issue.  So we wanted to seek guidance from the

19   Court in advance.

20             THE COURT:  What is the defense position?

21             MR. PARKER:  Your Honor, I don't take a position, your

22   Honor.  I understand things happen.  I am not going to take a

23   position on that.

24             THE COURT:  OK.  I will allow the deposition.

25             MR. DELANEY:  Thank you, your Honor.

C3qdcar1                         Trial

1          I think that concludes the housekeeping matters, your

2   Honor.

3          THE COURT:  All right.

4          MR. PARKER:  Your Honor, I just have one, and it has

5   to do with witness scheduling and availability.  I have one

6   witness who is a resident of Maryland, works in Washington,

7   D.C.  I'm just -- I'm trying to work his schedule out.  We

8   estimated in the Pretrial Order that the case would take two

9   weeks.  It will not be an issue for him to get here next week.

10  But I'm concerned enough that I just want to mention to the

11  Court that there may be a gap.  And then, as well, my expert

12  witness is returning from a trip next Monday and is available

13  next Tuesday.  I don't think it will be a problem because I

14  think the case will go to that point, but I wanted to bring it

15  to the Court's attention.

16         THE COURT:  Do you think the case will be over this

17  week?

18         MR. PARKER:  I do not.  At least that's --

19         THE COURT:  I should tell you that I got that call; I

20  cannot be present this afternoon.

21         MR. PARKER:  Oh, OK.

22         THE COURT:  I've got to go see a doctor.

23         MR. PARKER:  Very well.  Thank you.

24         THE COURT:  All right.  Then let's hear the openings.

25         MR. DELANEY:  Yes, your Honor.

C3qdcar1                    Opening - Mr. Delaney

1          We will have a couple of slides for the opening, your

2    Honor.

3          Your Honor, let me reintroduce myself.  My name is

4    Aaron Delaney.  I have the privilege of representing the

5    plaintiffs, Mr. Arturo Caravantes and Mr. Francisco Sotarriba.

6          As your Honor knows, this case is about same-sex

7    sexual harassment.  Claims are brought by the plaintiffs

8    against the defendants Mr. Oscar Velandia and 53rd Street

9    Partners, which is also known as Remi Restaurants.

10          I would like to start today, your Honor, with what I

11    consider one of the most striking parts of this case, and that

12    is the defendants have admitted that the core sexual conduct at

13    issue in this case happened.  Mr. Velandia has admitted to

14    doing this conduct to the plaintiffs.  He has admitted to it

15    happening on the premises of Remi Restaurants.

16          Now, the defendants, your Honor, and Mr. Velandia will

17    testify that this conduct that you see here was not sexual

18    harassment because it was a game; it was a game -- a sexual

19    game that was played at Remi Restaurant during business hours.

20    You will hear Mr. Velandia testify that it was not sexual

21    harassment because it was part of the daily routine at Remi

22    Restaurant.  And you will hear, your Honor, from Mr. Velandia

23    that with respect to Mr. Caravantes, the sexual conduct was not

24    sexual harassment because it was part of a consensual sexual

25    relationship.

C3qdcar1                          Opening – Mr. Delaney

1           But, your Honor, you will hear from the plaintiffs

2     that that is simply not true.  You will hear from the

3     plaintiffs that they continually told Mr. Velandia "No" and

4     that he didn't listen; that they told Mr. Velandia, your Honor,

5     and they pushed him away, they physically pushed him away but

6     he always came back.

7           You will hear, your Honor, from the plaintiffs that

8     they tried to avoid Mr. Velandia in the restaurant but that he

9     always found them.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C3qQcar2                        Opening – Mr. Delaney

1          MR. DELANEY:  (Continued) Your Honor, with respect to

2    plaintiff Francisco Sotarriba, the sexual advances by

3    Mr. Velandia started two years after he started working at the

4    restaurant in 1999.  It started with touching of

5    Mr. Sotarriba's genitals.

6          I'm going to show you a map of Remi Restaurant because

7    the physical locations of the harassment are important in this

8    case, your Honor.  I am going to ask to show a photo of what's

9    called the middle server station, your Honor.  It's right

10   there.  These servers stations, your Honor, are in the middle

11   of the dining room.

12         They're used by workers such as Mr. Sotarriba,

13   busboys, food runners.  They are used to provide the level of

14   customer service that recommend me expected.  They contained

15   linens and napkins, glasses and cups the things that make the

16   day-to-day restaurant work.

17         Your Honor, you are going to hear testimony from

18   Mr. Sotarriba that when he had to use this server station, for

19   example -- and he had to use it multiple times during his

20   shifts -- you will hear that Mr. Velandia would be standing at

21   that computer, for example, and Mr. Sotarriba would come into

22   the server station trying to perform his job.  And he would,

23   for example, reach -- your Honor, you can see above the

24   computer there, there's linens -- he use would reach for those

25   linens so he could go re-set the table.  While he was reaching

C3qQcar2                    Opening - Mr. Delaney

1   up, your Honor, in a vulnerable position, Mr. Velandia would

2   reach back and grab his genitals without his permission.

3        You will hear, your Honor, for example, that

4   Mr. Sotarriba would come into the server station and try to

5   maneuver around Mr. Velandia to do his job.  He you will hear

6   Mr. Velandia would grind his buttocks into Mr. Sotarriba again

7   without his permission.  You will hear Mr. Sotarriba tried to

8   push him away.

9        You will hear as Mr. Velandia was given more power and

10  more authority in the restaurant by the defendants 53rd Street

11  Partners, the management, you will hear that the conduct, the

12  sexual advances got more aggressive, your Honor; that his

13  comments became more aggressive.  You will hear that he started

14  demanding oral sex and anal sex from Mr. Sotarriba.  Again, you

15  will hear that Mr. Sotarriba said no.

16       Your Honor, you will hear that in approximately

17  December 2007, Mr. Velandia's sexual touching and his comments

18  towards Mr. Sotarriba stopped, but you will also hear your

19  Honor that the harassment did not stop.  You will hear that he

20  continued to harass Mr. Sotarriba through assigning him work

21  tasks that were normally done by multiple workers, by

22  threatening repeatedly to fire him, and you will hear, your

23  Honor, that this harassment was because Mr. Sotarriba would not

24  give in to Mr. Velandia's advances.

25       Now, with respect to Mr. Caravantes, your Honor, you

C3qQcar2                        Opening – Mr. Delaney

1    will hear that his experience at Remi was far worse and more

2    severe; that the physical space where Mr. Caravantes worked was

3    also important, your Honor, when talking about the sexual

4    conduct in this case.

5          Mr. Caravantes works in the middle of the restaurant,

6    it's called the coffee area, your Honor.  The important thing

7    about this area, your Honor, is it's isolated from the rest of

8    the restaurant.  You cannot see it from the main dining hall,

9    and you cannot see it -- from the main dining room, sorry --

10   and you cannot see it from the Rialto Room at the bottom of the

11   map there, which is also called the private party room.  The

12   coffee area is physically isolated from the restaurant.  This

13   is where Mr. Caravantes would spend the vast majority of his

14   shifts at Remi Restaurant.

15         This, your Honor, is the coffee area where

16   Mr. Caravantes worked.  You can see, your Honor, physically

17   it's got three walls and a narrow entrance; it's a narrow

18   space.  This is important, your Honor, because Mr. Velandia

19   would use the isolation of the plaintiffs.  He would use this

20   physical space to make the sexual advances.

21         You will hear, your Honor, that he would come into

22   this coffee area and corner Mr. Caravantes before sexually

23   touching him.  You will hear, your Honor, that Mr. Caravantes

24   regarded Mr. Velandia's sexual advances as ugly.  You will hear

25   that the sexual acts Mr. Velandia performed on Mr. Caravantes

C3qQcar2                        Opening – Mr. Delaney

1   were rough, and that Mr. Caravantes would have to send his mind

2   somewhere else to get through them.  You will hear, your Honor,

3   that Mr. Caravantes submitted to these sexual acts not because,

4   as defendants will testify, that it was an act of a lover but

5   because it was an act of surrender, your Honor.

6           You will hear from two additional witnesses, your

7   Honor, Mr. Pastor, Mr. Moises Pastor and Mr. Sergio Pastor, two

8   brothers.  You will hear that they experienced the same thing

9   as the plaintiffs.  They experienced the sexual touching, the

10  unwanted sexual touching by Mr. Velandia.  And you will hear

11  from these two plaintiffs, who, your Honor, were minors at the

12  time; they were underage when they were working at the

13  restaurant.  They were underage when Mr. Velandia made the

14  sexual advances towards them.  You will hear that Mr. Velandia

15  pressured them into oral sex, to performing oral sex on them.

16          Your Honor, when you hear all this, the natural

17  question that arises is why didn't the plaintiffs say anything?

18  Because they didn't say anything, your Honor.  They did not

19  complain to Remi Restaurant until very late.  Their answer,

20  your Honor, is because of the power and authority that I

21  mentioned earlier that Remi Restaurant gave Mr. Velandia.  They

22  were simply afraid of Mr. Velandia.  They were afraid of losing

23  their jobs.  But, your Honor, you will also hear about the

24  shame and humiliation they felt after being subjected to this

25  conduct repeatedly shift after shift, day after day, month

C3qQcar2                          Opening – Mr. Delaney

1    after month.

2              You will hear, your Honor, from Mr. Caravantes that he

3    did not speak up because of his fear, because he was afraid of

4    losing his job, and that he loved his job, your Honor.  You

5    will hear in his voice when he testifies about Remi Restaurant.

6    You will hear how much he loved his job.  He worked there for

7    17 years, and it was part of his identity.  You will hear from

8    the defendants, your Honor, you will hear them try to use this

9    against him.  You will hear them suggest that the reason he

10   filed this lawsuit is because he lost his job at Remi

11   Restaurant.  You will hear that is his motive for filing this

12   lawsuit.

13             Your Honor, Mr. Caravantes lost the job at Remi he

14   loved far before he stopped working at the restaurant.  He lost

15   the job he loved at Remi in 2005 when Mr. Velandia started

16   making his sexual advances towards him.

17             Your Honor, what you will also hear is that eventually

18   Mr. Caravantes found his voice.  He was finally able to tell

19   Mr. Velandia to stop and make him stop.  You will hear that he

20   finally complained to Remi Restaurant in October 2007 about

21   sexual harassment at the restaurant.  You will hear, your

22   Honor, that in March 2008 he complained again about sexual

23   harassment at Remi to the Division of Human Rights.  Both of

24   those times he did not complain, your Honor, about

25   Mr. Velandia's conduct.  Plaintiffs admit that, because he was

C3qQcar2                              Opening - Mr. Delaney

1    not ready.  It was too shameful for him, what he endured.  You

2    will also hear your Honor when he made these complaints about

3    sexual harassment, there is no dispute they are complaints

4    about sexual harassment, you will hear, your Honor, that Remi

5    did nothing.

6              Your Honor, that leads to the next question:  While

7    all of this was going on, because Mr. Velandia will testify it

8    was part of the daily routine at Remi, what was Remi doing

9    while this was happening?  The answer, your Honor, is nothing.

10   Remi had no sexual harassment policies.  Mr. Deldonne, the

11   owner, has admitted that.  They had no training, your Honor.

12   No training regarding sexual harassment for either the

13   employees or for the management.  They had no safe and formal

14   complaint procedure to raise issues of sexual harassment at the

15   restaurant.  So, your Honor, the answer is Remi did nothing to

16   protect the plaintiffs.

17             Your Honor, what are the consequences of this admitted

18   sexual conduct?  Well, your Honor, for Mr. Caravantes the

19   consequences have been devastating.  You are going to hear from

20   both experts, your Honor, from experts on both sides of this

21   case that he is suffering from a major depressive disorder.

22   That's been diagnosed.  It's been confirmed by health care

23   practitioners not connected with this case.  You are going to

24   hear, your Honor, that Mr. Caravantes has been diagnosed with

25   posttraumatic stress disorder because of the conduct; and that

C3qQcar2                        Opening - Mr. Delaney

1    has also been confirmed by health care practitioners not

2    connected with this case.

3            But, most importantly, you are going to hear testimony

4    from the plaintiff himself.  You are going to hear that when he

5    tries to have intimate relations with his wife, he cannot

6    because the voice he hears in his head, your Honor, is what he

7    calls the ugly voice of Mr. Velandia, and he cannot get close

8    to his wife.  You are going to hear, your Honor, about his

9    depression.  You are going to hear about his thoughts of

10   suicide.  You are going to hear about when he stands on the

11   subway platform and the train is approaching, you are going to

12   hear how he wonders if he can fly across.  You are going to

13   hear from both plaintiffs how Mr. Velandia's conduct made them

14   feel dead inside.  You are going to hear how they withdrew from

15   their families and their friends.

16           Your Honor, as a result of this, at the end of this

17   case, we are going to ask you to return a verdict for the

18   plaintiffs.  The plaintiffs are going to ask that you give them

19   compensatory damages for what they suffered, and that you gave

20   them punitive damages against Remi Restaurant.  But, your

21   Honor, when we reach that point, when we reach the point of

22   asking you for a verdict, the plaintiffs will have already won

23   because, your Honor, when plaintiffs rest their case, they will

24   have already won because they will finally have had a chance to

25   tell their story.  They will have finally had a chance to speak

C3qQcar2                          Opening - Mr. Delaney

1    about what was done to them at Remi Restaurant.

2              Thank you, your Honor.

3              THE COURT:  Thank you.

4              MR. PARKER:  Thank you, your Honor.  May I use the

5    podium?

6              THE COURT:  Sure.

7              MR. PARKER:  Your Honor, my name is Kerry Parker,

8    again.  I represent 53rd Street Partners and Oscar Velandia in

9    this case.  It's my privilege to do so.

10             Remi Restaurant is an Italian restaurant on 53rd

11   Street in New York.  53rd Street Partners has been the owner

12   and operator of the restaurant since April 2005.  Oscar

13   Velandia, has worked at Remi since 1997.  He started as a

14   dishwasher.  He moved up the ranks before the current owners

15   owned the restaurant and ultimately was promoted to position of

16   waiter, and today he is a head waiter at Remi Restaurant.

17             He has had a -- Mr. Velandia has had a successful

18   career at Remi.  He's worked hard.  He has the respect of his

19   co-workers.  He is not, as the plaintiffs will attempt to

20   prove, your Honor, however, a supervisor or a manager at Remi

21   Restaurant.  He has no hiring authority.  He has no firing

22   authority.  He has no authority to discipline employees.  He

23   does not make employees' schedules.  He does not supervise

24   employees.  He has none of the typical emoluments that a

25   supervisor or a manager in a business would have.

C3qQcar2                         Opening – Mr. Delaney

1              What this case is about, Judge, is the taking by

2       plaintiffs of a basic set of facts as to which there is no

3       dispute and fabricating that statement of facts into a

4       construct that has no credibility whatsoever.  The plaintiffs

5       and Velandia worked together in the restaurant for years before

6       53rd Street Partners took over.

7              Caravantes at one point in time, frankly, initiated

8       sexual contact and a sexual relationship with Velandia.  Now

9       Caravantes says I'm a heterosexual man, I'm not bisexual, and I

10      didn't initiate anything, and I did not enjoy it, and I did not

11      have any interest in it.  In fact, it was forced on me.

12             You are going to hear testimony from Mr. Velandia,

13      detailed testimony, about how Caravantes went about initiating

14      this relationship with Velandia, and carried on that

15      relationship with him over the course of approximately two

16      years, two and a half years.  During that time, Mr. Caravantes

17      made no complaints about Mr. Velandia.  He complained about

18      other employees, but never once did he mention anything about

19      Velandia.  And he claims now that in June of 2009 when he filed

20      an amended complaint with the New York State Division of Human

21      Rights, that it was only then, some ten months after he left

22      his employer, that he finally had the courage to complain about

23      Velandia.

24             But what actually happened, as the evidence will show,

25      your Honor, is that Caravantes wanted an easy route to a

C3qQcar2                    Opening - Mr. Delaney

1   promotion to become a waiter at the restaurant, and he was told

2   early in 2008 that his position as the coffee operator was

3   going to be eliminated, as was the other coffee operator's

4   position.  You will hear testimony about that as well.  And

5   that he was given multiple opportunities over the course of

6   2008 to train to become a waiter, to go into other positions.

7   He had one-on-one discussions with the then general manager,

8   Francesco Pistorio, whose testimony you will hear where

9   Mr. Pistorio discussed with him several opportunities within

10  Remi.  Velandia would not be deterred.  The only acceptable

11  position that he sought was as a waiter

12          THE COURT:  Velandia would not be deterred?

13          MR. PARKER:  I'm sorry, Caravantes.  Caravantes wanted

14  to be a waiter.  Nothing else.  He would not accept anything

15  else despite multiple conversations over the course of seven

16  months in 2008.  His position finally was eliminated in August

17  of 2008.  He was then again given the chance to remain with the

18  restaurant, but he demanded only a waiter position; and when

19  that wasn't delivered, he left.

20          You will hear testimony, some of which relates to the

21  sexual relationship that -- the welcome voluntary and

22  consensual relationship -- that Caravantes and Velandia had

23  during 2006 to 2008.

24          Mr. Sotarriba, contrary to what plaintiff's counsel

25  said, did not testify that the sexual touching of him by

1    Velandia intensified after Velandia gained more power.  In

2    fact, what he said was Velandia started this conduct, allegedly

3    in about the year 2000, and that it carried on for seven years.

4    And if you do the math, based on his testimony, Judge,

5    Sotarriba claims that Velandia, between making sexually related

6    comments and sexual touching, did this approximately at least

7    20,000 times.  And that there is not a shred of evidence -- and

8    it's admitted that Sotarriba said nothing about this until

9    several months after he left the employ.

10        Now, it's admitted that there was this -- you will

11   hear the term -- game.  We can call it horseplay.  We can

12   denominate it in a number of ways, but you will hear testimony

13   that there was voluntary conduct at the restaurant that

14   involved touching of a sexual nature, and it was among

15   employees who were consenting to that conduct.  Sotarriba and

16   Caravantes, you will hear testimony from other employees, that

17   they themselves voluntarily participated in it.  Laughed while

18   they did it.  Enjoyed it and carried on in that fashion the

19   same way as other employees.

20        Now the story is different.  Now they claim it was

21   unwelcome.  Now they claim it was upsetting.  But their conduct

22   during the time completely belies these assertions.

23        In the end, what we have is some conduct which we

24   probably could say is something that should not occur in a

25   professional working atmosphere.  And by that I mean this

C3qQcar2                        Opening - Mr. Delaney

1   voluntary touching and fooling around while people are working.

2   But it was welcomed, and it was participated in, not only by

3   the plaintiffs but by other employees.

4        It was not condoned by management.  In fact, you will

5   hear testimony that management conducted meetings with

6   employees and told them to stop.  Management had an open-door

7   policy.  Caravantes himself had several one-on-one discussions

8   with the general manager over the course of time.  The door was

9   open.  People had the opportunity to complain if they wished,

10  and there were no complaints.

11       So, at end of this case, we will ask, Judge, for you

12  to enter a verdict in favor of 53rd Street Partners and in

13  favor of Oscar Velandia finding that plaintiffs have failed to

14  prove a case of hostile work environment.

15       Thank you.

16       THE COURT:  Call your first witness.

17       MR. DELANEY:  Plaintiffs are going to call plaintiff

18  Francisco Sotarriba.

19                        (Interpreter sworn)

20       THE DEPUTY CLERK:  Please state your name and spell it

21  for the record slowly.

22       THE INTERPRETER:  Carlos Cruz, C-A-R-L-O-S.  Cruz,

23  C-R-U-Z.

24

25

C3qQcar2                              Opening – Mr. Delaney

1      FRANCISCO SOTARRIBA,

2            called as a witness by the Plaintiff,

3            having been duly sworn, testified through the Spanish

4      interpreter as follows:

5      DIRECT EXAMINATION

6      BY MR. DELANEY:

7                  THE DEPUTY CLERK:  Please state your name.

8                  THE WITNESS:  My name is Francisco Sotarriba.

9                  MR. DELANEY:  Your Honor, just before we get started,

10     I have a binder of exhibits that will be used with these

11     witnesses.

12     BY MR. DELANEY:

13     Q.   Good morning, Mr. Sotarriba.

14     A.   Good morning.

15     Q.   Could you please state your name again for the record?

16     A.   My name is Francisco Sotarriba.

17     Q.   How old are you?

18     A.   39 years old.

19     Q.   What's your primary language?

20     A.   Spanish.

21     Q.   Do you speak English?

22     A.   Very little.

23     Q.   Do you read English?

24     A.   No.

25     Q.   Do you write English?

C3qQcar2                       Sotarriba - Direct

1    A.   Neither.

2    Q.   Are you more comfortable using a translator today?

3    A.   Yes.

4    Q.   Where were you born, Mr. Sotarriba?

5    A.   I was born in Mexico.

6    Q.   Where did you grow up?

7    A.   I was raised in Mexico City.

8    Q.   Where do you live now?

9    A.   I live at 1425 College Point Boulevard.

10   Q.   In which city?

11   A.   Queens.

12   Q.   Does anyone live with you?

13   A.   I live with my wife and our daughter.

14   Q.   What's your daughter's name?

15   A.   My name's name is Yezennia.  She's 19 years old.

16   Q.   What does she do?

17   A.   She is a student in high school.  She is going to go to

18   university.  She wants to study to be a pediatrician.

19   Q.   What's your wife's name?

20   A.   My wife's name is Liliana.

21   Q.   How long have you been married?

22   A.   We've been married for approximately four years.

23   Q.   How long have you known her for?

24   A.   We've lived together for six years.

25   Q.   Mr. Sotarriba, are you gay?

1  A.  No.

2  Q.  Other than the conduct you allege in this lawsuit, have you

3  ever had sexual relationships with other men?

4  A.  No, never.

5  Q.  Mr. Sotarriba, does your wife work?

6  A.  Yes, she works at a company, but every year about three or

7  four months, she's out of work, and then I have to pay all the

8  bills and rent.

9  Q.  Who supports your family financially?

10  A.  When she is working, we both do; but when she's not

11  working, I do.

12  Q.  Mr. Sotarriba, did you work at Remi Restaurant?

13  A.  Yes, I worked at Remi Restaurant.

14  Q.  Can you describe Remi Restaurant for the Court?

15  A.  It's a big restaurant.  Elegant.  In the rear of the

16  restaurant there's a space for private parties.  It's called

17  Rialto.  It's also a very elegant space.

18  Q.  What year did you begin working at Remi Restaurant?

19  A.  I began to work at Remi at about '99.

20  Q.  Are you working there today?

21  A.  No.

22  Q.  When did you finish working at Remi?

23  A.  2008.

24  Q.  What jobs did you have when you worked at Remi Restaurant?

25  A.  When I began to work at Remi Restaurant, I started as a

C3qQcar2                         Sotarriba - Direct

 1   busboy.  Later I was given the opportunity to work as a food
 2   runner.
 3   Q.  Do you remember approximately when you became a food
 4   runner?
 5   A.  Like in 2004.
 6   Q.  Can you describe for the Court what a busboy does at Remi
 7   Restaurant?
 8   A.  The work of a busboy is to bring the bread to the table,
 9   place water, and keep it clean.  After the people are done, to
10   set up the table again.
11   Q.  When you worked as a busboy at Remi Restaurant from
12   approximately 1999 through 2004, what were your hours like?
13   A.  Up until 2004, I would work around 45 to 48 hours.
14   Q.  How many days a week would you work?
15   A.  Four or five.
16   Q.  How many shifts would that be approximately?
17   A.  I worked six shifts.  One day I could work a double.  One
18   day I might work dinner.  One day I might work lunch.
19   Q.  You testified previously you became a food runner in 2004?
20   A.  Yes.
21   Q.  Did you change jobs after 2004?
22   A.  I don't understand your question.
23   Q.  Were you still a food runner in 2008 when you left Remi
24   Restaurant?
25   A.  Yes.

C3qQcar2                              Sotarriba - Direct

1    Q.   Between 2004 and 2008, did you have any other jobs at Remi

2    Restaurant?

3    A.   No.

4    Q.   Can you tell the Court what a food runner does at Remi

5    Restaurant?

6    A.   The food runner brings the food from the kitchen to the

7    table because the kitchen is below in the basement.  Just wait

8    for the food to be ready and bring it up to the table.

9    Q.   What would you do when you brought the food to the table?

10   A.   I would serve the food.  I could offer them pepper.  If a

11   customer asked what the food was prepared with, I had to give

12   them a small explanation.  And then return to the kitchen and

13   get more food.

14   Q.   What were your hours like as a food runner at Remi

15   Restaurant?

16   A.   Well, you could say with the older company it didn't

17   change.  I still worked 45 to 48 hours.  But not with the new

18   company, because I could work up to 50 hours with them or more,

19   sometimes more.

20   Q.   Can you tell the Court what you mean by old company and new

21   company?

22   A.   Well, the new company took over in 2005.  The owner now is

23   Roberto Deldonne.

24   Q.   Is the new company one of the defendants in the lawsuit?

25   A.   Yes.

C3qQcar2                        Sotarriba - Direct

1   Q.  How many days a week did you work as a food runner after

2   the new company took over?

3   A.  Sometimes I could work double shifts for three days.  Then

4   I could work a lunch and then a dinner.

5   Q.  So approximately how many shifts per week would that be?

6   A.  Eight, nine.

7   Q.  Mr. Sotarriba, how did you feel about your job at Remi?

8   A.  I don't understand.

9   Q.  Did you like your job at Remi?

10  A.  I liked it because I made money.  I made good money.

11  Q.  Are you working now?

12  A.  Yes.

13  Q.  Where are you working?

14  A.  I'm working at DB Bistro.  It's on 44th between 6th and

15  Fifth Avenue.  I also work at another restaurant called Lucy

16  Anteroom (ph).  That's on 56th between 7th and 6th Avenue.

17  Q.  Just for the record, I believe that's Russian Tea Room?

18  A.  Yes.

19  Q.  What job do you work at DB Bistro?

20  A.  At DB Bistro I work as a busboy.  And I also work as a

21  busboy at the Russian Tea Room.

22  Q.  What are your hours like at those restaurants?

23  A.  I work Tuesdays, Wednesdays and Thursdays at DB Bistro.  At

24  the other location I work Fridays, Saturdays and Sundays.

25  Q.  Again, my question is, do you like your job at those

C3qQcar2                        Sotarriba - Direct

1   restaurants?

2   A.  Well, I don't have any other choice.  I have to work hard.

3   I have to work like this in order to make the money that I used

4   to make at Remi and be able to help my family.

5   Q.  Mr. Sotarriba, do you know the defendant, Oscar Velandia?

6   A.  Yes.

7   Q.  How do you know him?

8   A.  Well, he's seated back there.

9   Q.  When did you meet him?

10  A.  I met him when I began to work at Remi Restaurant.  He was

11  already working there at the time.  He worked as a waiter.

12  Q.  Did he have any other jobs?

13  A.  Not that I'm aware of.

14  Q.  When you worked as a busboy at Remi Restaurant, did you

15  work with Mr. Velandia?

16  A.  Yes, because he worked as a waiter, and I worked as the

17  busboy.

18  Q.  Can you describe your interaction with Mr. Velandia during

19  one of your shifts as a busboy?

20  A.  Well, just like any other normal job, we worked together;

21  and after about a year or a year and a half, he began to touch

22  me.

23          THE COURT:  Let's stay with the question.  The answer

24  is not responsive to the question.

25  Q.  Mr. Sotarriba, let me ask you a question again.  During

C3qQcar2                          Sotarriba – Direct

1    your shift as a busboy at Remi Restaurant, can you just

2    describe your interactions with Mr. Velandia, your work

3    interactions?

4    A.   Well, yes, we worked together.

5    Q.   So how typically would a busboy and waiter work together at

6    Remi Restaurant?

7    A.   Well, every day there's a busboy and a waiter that works

8    together.

9    Q.   How would they work together?

10   A.   Well, the waiter explains the specials.  I had to tend to

11   the table, placing water.  If they needed something, he could

12   tell me bring them more bread, remove a dirty cup.  That's

13   basically the interaction that exists between a waiter and a

14   busboy.

15   Q.   In your testimony you said they and he, who did you mean by

16   that?

17   A.   I was talking about Oscar Velandia.

18   Q.   Approximately when you were working as a busboy,

19   approximately how many times a shift would you come in contact

20   with Mr. Velandia?

21   A.   Well, if I worked six, it could have been five.

22   Q.   Are you saying how many shifts you would have worked per

23   week with Mr. Velandia?

24   A.   I mean, if I worked six or seven shifts in a week, we would

25   probably interact for five of those.

C3qQcar2                          Sotarriba - Direct

1   Q.  So during one of your shifts, just one of your shifts, how

2   often would you interact with Mr. Velandia?

3   A.  The whole shift, the length of the whole shift.

4          THE COURT:  How many waiters do you interact with?

5          THE WITNESS:  Well, there would be four or five

6   waiters in one shift, and there were also four or five busboys.

7   So there was interaction with other waiters as well as other

8   busboys.

9   Q.  Can you describe for the Court how the busboys would be

10  assigned during any particular shift?

11  A.  I don't understand.

12  Q.  Were busboys assigned a specific area at the restaurant

13  during a shift?

14  A.  Yes.

15  Q.  Can you describe that to the Court?

16  A.  OK.  The manager would prepare a map and with a black line

17  he would divide the map into what they called stations, and

18  every station one busboy and one waiter would be responsible

19  for that station of that area.

20  Q.  When you were assigned to a station with a waiter, would

21  you interact with that waiter primarily during a shift?

22  A.  Yes, because it would be the responsibility of that waiter

23  and that busboy to serve and tend to that area and to keep it

24  clean.

25  Q.  Were you assigned to one station per shift or more than one

C3qQcar2                          Sotarriba - Direct

1   station?

2   A.   One station.  However, amongst the busboys we would help

3   each other out.

4   Q.   So were you assigned to one waiter per shift or more than

5   one waiter?

6   A.   Per shift there were five or six waiters and five or six

7   busboys.

8   Q.   So you were not assigned to any specific waiter?

9   A.   Yes.

10  Q.   So were you assigned to one waiter per shift?

11  A.   Yes.

12  Q.   So how many shifts per week would you be assigned to

13  Mr. Velandia on average?

14  A.   During the week I could have worked one or two shifts with

15  him.

16  Q.   When you became a busboy in 2004 -- sorry, a food runner in

17  2004, how many shifts per week would you work with

18  Mr. Velandia?

19  A.   I didn't understand the question.

20  Q.   It was a bad question.  When you worked as a food runner,

21  did you work with Mr. Velandia?

22  A.   Well, as a food runner I worked below downstairs at

23  stations in the kitchen, and then I would bring the food up,

24  but there was a little contact or communication.

25  Q.   Can you describe that to the Court, the work contact?

1  A.  Well, I would come up, and if a table needed something, and

2  if he happened to be the waiter for that table, I would ask the

3  waiter, do you want a drink, do you want anything?  That was

4  the interaction.

5  Q.  How many shifts per week when you worked as a food runner

6  would Mr. Velandia also be working as a waiter on average?

7  A.  I'd say maybe four.

8  Q.  After the new owners took over in 2005, did that change?

9  A.  I didn't understand.

10 Q.  Did you work more shifts after the new owners took over in

11 2005?

12 A.  Yes.

13 Q.  So when you worked more shifts, did you work more or less

14 with Mr. Velandia?

15 A.  I worked more because when the new company took over, I was

16 working more.  Mr. Pistorio made him the head waiter.  So he

17 had more responsibility then because he had to be there more.

18 Q.  So I understand you worked more under the new owners.  Just

19 to be clear, did you work more or less with Mr. Velandia after

20 the new owners took over?

21 A.  Yes, more.

22 Q.  I am going to put a map.

23         THE COURT:  Why did you work more?  Why would you work

24 more with Mr. Velandia when he was the head waiter than when he

25 wasn't?

C3qQcar2                          Sotarriba - Direct

1           THE WITNESS:  Well, Mr. Pistorio told him he was

2    making him the head waiter because he had more knowledge about

3    the restaurant, and that he needed someone with experience, and

4    that's why he was there more.

5           THE COURT:  But why would you have contact with him

6    more when he was the head waiter than when he was a waiter?

7           THE WITNESS:  I don't understand.

8           THE COURT:  Neither did I, that's why I asked the

9    question.  Please go ahead, Mr. Delaney.  You can expand on

10   that if you want to.

11          MR. DELANEY:  Sure.

12   Q.  I just want to understand your testimony, Mr. Sotarriba.

13   Is your testimony that you worked more with Mr. Velandia when

14   he became a head waiter?

15          MR. PARKER:  Objection.  Leading.

16          THE COURT:  Objection sustained.

17   Q.  How often did you work with Mr. Velandia when he was just a

18   waiter?

19   A.  Maybe four shifts.

20   Q.  How often did you work with him after he became a head

21   waiter?

22   A.  I'd say about the same.

23   Q.  Did you interact with Mr. Velandia more or less on each

24   shift when he was a head waiter?

25   A.  No, the same.

C3qQcar2                        Sotarriba - Direct

1   Q.  Mr. Sotarriba, do you recognize the floor plan in this

2   diagram I put up on the screen?

3   A.  Yes, I'm familiar -- this is the plan of Remi Restaurant.

4   I'm familiar with it because I worked there for a long time.

5   Q.  Do you see on the map -- and I know you don't read much

6   English -- but do you see the words on the map middle server

7   station?

8   A.  Yes, I see it.

9   Q.  Can you tell the Court what that is?

10  A.  That's a station.  It's called a station.  That's where we

11  have the linens, the cups, the knives, forks, jars of water,

12  everything you could need is there.

13  Q.  Did you use this station --

14          THE COURT:  Is that the restaurant or is that just

15  part of the restaurant?

16          THE WITNESS:  That's the restaurant.

17          THE COURT:  What is over there?  What's that space

18  where they have this designations middle server station, back

19  server station?  Where's the kitchen?

20          THE WITNESS:  The kitchen is in the basement.

21          THE COURT:  Is it underneath the middle station and

22  back server station?

23          THE WITNESS:  It's underneath the Rialto room.

24          THE COURT:  Well, I don't understand the sketch.

25          MR. DELANEY:  OK.

C3qQcar2                         Sotarriba - Direct

1          THE COURT:  I see atrium.  I don't understand the

2    sketch.  What's the building?  All I see is the things that

3    would be devoted to serving, and the dots are off to the side.

4    They seem to be outside the building.  I don't understand your

5    layout.

6          MR. DELANEY:  I am going to ask Mr. Sotarriba to help

7    explain it to the Court.

8          THE COURT:  All right.

9    Q.  Mr. Sotarriba, starting from the top of the diagram, can

10   you just explain to the Court the layout of Remi Restaurant?

11   Just move down the diagram and explain each location for the

12   Court.

13   A.  Well, first is the entrance.  To one side is the bar.  On

14   the opposite side is the rest rooms and the coat check.

15         MR. DELANEY:  Your Honor, would it be helpful to the

16   Court if Mr. Sotarriba had a laser pointer and he could show it

17   on the diagram?

18         THE COURT:  Are you telling me the coat check is not

19   outside the building, but is one of those little squares?

20   There is no arrow or anything indicating that it's there,

21   right?

22         THE WITNESS:  Yes.

23         THE COURT:  Is that it?

24         MR. DELANEY:  I apologize, there is a line right there

25   on the map, your Honor, that's indicating where the coat check

C3qQcar2                        Sotarriba - Direct

1    is in the restaurant, so it's pointing to that area.

2              THE COURT:  I can't see.

3              MR. DELANEY:  I apologize.  I should have made that

4    clearer.

5              THE COURT:  All right.  Now I'm beginning to

6    understand.  Then in the middle the building has an area way

7    down the middle?

8              THE WITNESS:  First in the middle is the middle

9    station where things are kept.

10             THE COURT:  Is there an area way in the building?

11             MR. DELANEY:  Correct, your Honor.  Where the word

12   atrium is, that's a breezeway between two buildings in the

13   town.

14   Q.  After the middle server station, Mr. Sotarriba, what comes

15   next?

16             THE COURT:  I'm all right now that you've explained it

17   as an area way.

18   Q.  For the Court's benefit though, is there a second floor to

19   Remi, or a basement, I should say?

20   A.  Yes, that's where the kitchen is, downstairs.  The offices

21   are downstairs.  There's also another private room called the

22   Chef's Table, and that's for smaller private parties.  There's

23   also the locker room where we can change.

24             THE COURT:  That's downstairs?

25             THE WITNESS:  Yes, your Honor, downstairs in the

C3qQcar2                          Sotarriba – Direct

1    basement.

2    Q.  So other than the downstairs area and what you see here, is

3    there any other levels to Remi?

4    A.  No.  Just the rear space which is the Rialto room, but it's

5    the same level.

6    Q.  So, I believe we were talking about the middle servers

7    station.  Did you use that server station when you were a

8    busboy?

9    A.  Yes, I did use that station, because after the people would

10   leave, in order to change the linens, I would have to go into

11   that station to get the linens, the knives, everything, and so,

12   yes, I did use that station.

13   Q.  How often per shift when you were a busboy?

14   A.  I'd say ten times, 15 times.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

C3qdcar3                    Sotarriba - direct

1   Q.  Would you use that service station when you were a food

2   runner after 2004, during your shifts?

3   A.  Yes, but less.

4   Q.  How often per shift when you were a food runner?

5   A.  I'd say five, five times.

6   Q.  And what would you use it for when you were a food runner?

7   A.  Because that's where the pepper was.  That's what I used it

8   for.

9   Q.  And what about the back server station; do you see that on

10  the map?

11  A.  Yes, I see it.

12  Q.  Would you use that when you were a busboy?

13  A.  Yes, I also used that.

14  Q.  And how would you use that when you were a busboy?

15  A.  Because there are also linens in that station.  There are

16  also knives, cups, forks.  That's what I would use it for.

17  Q.  How often would you use the back server station when you

18  were a busboy? Per shift.  Sorry.  Per shift.

19  A.  I would say maybe 10 times, 10 to 15 times.

20  Q.  Would you use it when you were a food runner?

21  A.  Yes, but less.

22  Q.  And by "it" I meant the back server station.

23  A.  Yes.  This one.

24          THE INTERPRETER:  Indicating the back server station.

25  Q.  Correct.

C3qdcar3                          Sotarriba - direct

1    A.  Yes.

2    Q.  And how often would you use it as a food runner?

3    A.  I'd say five times or six times during a shift.

4    Q.  And as a busboy?

5    A.  More, because I could go in there 10 to 15 times.

6    Q.  Do you see the area marked "Coffee Area" on this map?

7    A.  Yes, I see it.

8    Q.  What is that?

9    A.  That's the coffee maker area.

10   Q.  And what happened there at Remi Restaurant in terms of

11   work?

12   A.  That's where the coffee is made, all teas, anything else

13   that might be needed.

14        I also used it as a busboy because I would have to get

15   coffee and take it to the tables.

16   Q.  What about when you were a food runner, did you use the

17   coffee area when you were a food runner?

18   A.  Sometimes.

19   Q.  Why would you use it as a food runner?

20   A.  Because there were parties in the Rialto, so I would come

21   up with the food and I would put it in that area, at the coffee

22   maker area, on the tables there.  There were tables.

23   Q.  Did you take breaks there at Remi Restaurant?

24   A.  With the old owners, yes -- with the old company, yes, I

25   did get breaks.  But not any more, not when the new company

C3qdcar3                          Sotarriba - direct

1    took over.

2    Q.  Did you ever take a break at the coffee area?

3    A.  No.

4    Q.  I want to pull up a picture of the middle server station.

5            Mr. Sotarriba, do you recognize this photo, what is

6    depicted in this photo?

7    A.  Yes, I do recognize it.

8    Q.  How do you recognize it?

9    A.  Because I used it when I worked there for many years, and I

10   went in there many times.

11   Q.  And is it a fair and accurate representation of the middle

12   server station when you worked there?

13   A.  Yes.

14   Q.  Can you just describe briefly for the Court what the Court

15   is seeing here, each of the components of the middle server

16   station that you see in this photo?

17   A.  Above are the linens.  In the middle there are some paper

18   there that they keep for the printer that you see there.  The

19   box to the side, that's full of the teas, the small teas.

20   Q.  Are you speaking about the shelves up at the top of the

21   photo there?

22   A.  The box on the shelf.  Right below it, yes.  Then the

23   computer.

24   Q.  What else?

25   A.  The computer that you see there, to the side, that's where

C3qdcar3                          Sotarriba - direct

1   all the cups are.

2   Q.   Who would use the computer?

3   A.   The waiters, Oscar.

4   Q.   Were you ever in the server station with Mr. Velandia?

5   A.   Yes.

6   Q.   How often per shift when you were a busboy, on average?

7   A.   Five, six times.

8   Q.   How about when you were a runner, how often were you in the

9   service station with Mr. Velandia?

10  A.   Three times.  It was less.

11  Q.   And what would happen when you were in the service station

12  with Mr. Velandia?

13  A.   Well, when I was a busboy in that station, if I would go in

14  to get linens, he would reach back and grab my private parts.

15  And sometimes he would push his rear end into me and move

16  around.  Other times he would grab my shirt and pull me closer

17  to him as he did that.

18          Other times he made comments.  He would say, "Let me

19  suck it.  Let me touch it.  I want to see -- I want to see how

20  big it is."  Those were comments that he made to me.

21  Q.   And how -- the touching you described, how did it happen?

22  A.   Well, I will repeat again.  I would reach for the linens,

23  and he would push his rear end into me and would move around.

24  Sometimes he would pull my shirt to pull me closer to him and

25  do the same thing.

C3qdcar3                          Sotarriba - direct

1              He would grab me with his hand at times in my private

2      parts.  Sometimes he made the comments.

3      Q.  What would he do with his hand when he grabbed your private

4      parts?

5      A.  When he would push his rear end into me, I would push him

6      away.  When he tried to grab me, I would push his hand and I

7      would leave.

8      Q.  Did this touching, when he grabbed your private parts, did

9      that happen when you were a busboy?

10     A.  Yes.

11     Q.  How often would that happen?

12     A.  I'd say 10 times, or seven times, eight a day, maybe.

13     Q.  Did this touching you described happen when you were a food

14     runner?

15     A.  As a food runner with the new company, he just made

16     comments.

17     Q.  And you described him rubbing his buttocks into you.  Would

18     that happen when you were a busboy?

19     A.  As a busboy, yes.

20     Q.  Would it happen every shift?

21     A.  Yes.

22     Q.  How often per shift?

23     A.  I'd say five times.

24     Q.  And would this rubbing you described, would it happen when

25     you were a food runner?

C3qdcar3                         Sotarriba - direct

1    A.  No.  Because half of my time was spent downstairs and the

2    other half upstairs, and then I would just go into the station

3    to get peppers and he would just make comments.

4    Q.  And would the comments that you described, would they

5    happen when you were a busboy?

6    A.  Yes.

7    Q.  How often?

8    A.  I'd say maybe three, four, five times a day.

9    Q.  Would these comments happen when you were a food runner?

10   A.  Yes.

11   Q.  How often?

12   A.  Less but I'd say three to four times also.

13   Q.  Mr. Sotarriba, can you physically describe the space of the

14   middle server station that you see in the photograph?

15   A.  It's small.  I'd say maybe two or three people could go in

16   there, where you have to move sideways because it is so small.

17   Q.  Can you see into the server station from the restaurant

18   floor?

19   A.  Into the station?  You can't see there.  It is a private

20   station.

21   Q.  Why can't you see into it from the restaurant dining room?

22   A.  Because there is a wall.

23   Q.  How did it make you feel when Mr. Velandia touched you as

24   you described?

25   A.  It made me feel ashamed because he would just suddenly grab

C3qdcar3                          Sotarriba - direct

1    me, and I didn't want Oscar to grab me.

2    Q.  How did it make you feel when he rubbed against you as you

3    described?

4                MR. PARKER:  Objection.

5                THE COURT:  I will allow it.

6                MR. PARKER:  Judge --

7                THE COURT:  You were about to give me a reason?

8                MR. PARKER:  Judge, yes.

9                The reason, Judge, is that the testimony about that

10   particular aspect related only to when Mr. Sotarriba was

11   working for the, quote-unquote, old company prior to 2005.  It

12   has nothing to do with this case.

13               MR. DELANEY:  Your Honor, Mr. Velandia is named as an

14   individual defendant, and under New York City law he can be

15   held personally liable.

16               THE COURT:  I don't know what the statute is.  What is

17   the statute of limitations?

18               MR. PARKER:  The case was filed in September of 2009;

19   a three-year statute of limitations.

20               MR. DELANEY:  Your Honor, but it is a continuing

21   course of conduct.  It is relevant to the hostile environment

22   that Mr. Sotarriba suffered for the seven years when he worked

23   at Remi Restaurant.  We're not saying that he's liable

24   necessarily for the acts, but it is relevant in terms of the

25   entire course of conduct and the environment.

C3qdcar3                        Sotarriba - direct

1          THE COURT:  I will allow it as background.

2     BY MR. DELANEY:

3     Q.  How did you feel when Mr. Velandia rubbed into you as you

4     described in your testimony?

5          THE COURT:  Well, wait a minute.  Maybe that isn't

6     relevant.  Damages seems to be limited to the period within the

7     statute.

8          MR. DELANEY:  Your Honor, it is not intended to be a

9     damages question, but I can rephrase the question.

10         MR. PARKER:  If it is not intended to be a damages

11    question, what is the point of the question?

12         MR. DELANEY:  I can rephrase it.

13         MR. PARKER:  It relates to a time period during which

14    there is no potential liability of either defendant.

15         THE COURT:  I think Mr. Parker is suggesting you

16    should answer that question.

17         MR. DELANEY:  I want to answer it, your Honor, but I

18    don't want to suggest the answer to the witness.

19         THE COURT:  Oh, all right.  Then I'll just sustain the

20    objection.

21    BY MR. DELANEY:

22    Q.  Did you want Mr. Velandia to rub into you like this, as you

23    described in the testimony?

24    A.  No, I never wanted that.

25    Q.  And how did you feel about the comments that Mr. Velandia

C3qdcar3                          Sotarriba - direct

 1  made to you that you described?
 2  A.  I felt bad.  I would get upset.  Because I didn't like
 3  that; I didn't like those comments.
 4  Q.  And when you were a busboy, did you want him to touch you
 5  as you described?
 6  A.  No, didn't want that either.  I never wanted that.
 7  Q.  What about when you were a food runner, did you want him to
 8  touch you as you described?
 9  A.  No, neither.
10  Q.  What about the comments, did you ever want him to make
11  those comments to you that you described?
12  A.  No.  I did not.
13  Q.  Did you ever touch Mr. Velandia on his private parts?
14  A.  No.  Never.  When he would back his rear end into me, I
15  would push him away.  I never touched him.
16  Q.  Did you make comments to Mr. Velandia, sexual comments, as
17  you described them?
18  A.  No.  Never.
19  Q.  Mr. Sotarriba, this conduct that you described that
20  occurred in this middle server station, did you complain about
21  it to anyone at Remi Restaurant?
22  A.  No, I did not complain.
23  Q.  Why not?
24  A.  Because when the new company came in -- well, six months
25  after the new company came in, Mr. Pistorio, at a party, he

C3qdcar3                              Sotarriba – direct

1    introduced him as a manager.

2    Q.  Who is "him"?

3    A.  Mr. Velandia, Oscar Velandia.  He was introduced as a

4    manager.  So he was automatically a manager, and then I was

5    afraid.

6    Q.  Do you remember anything else about that meeting that you

7    just described?

8    A.  Well, he described him as a manager and he said we had to

9    respect him.

10   Q.  Who described him as a manager?

11   A.  Mr. Pistorio.

12   Q.  What kind of meeting was it?

13   A.  It was a party that we had.  In like five or ten minutes

14   before the start of the party, the manager had a meeting to

15   give all the waiters their instructions as well as the bus

16   boys, all the personnel that was working.  And he showed up

17   with a suit.  And Pistorio called him over and said, "This is

18   the manager now and he has to be respected."

19   Q.  Who showed up with a suit?

20   A.  Oscar Velandia.

21   Q.  And do you recall -- looking at this map, do you recall

22   where this meeting happened?

23   A.  Yes, I do remember.

24   Q.  Would you tell the Court.

25   A.  It was this area here.

C3qdcar3                          Sotarriba – direct

 1          THE INTERPRETER:  Indicating the main dining room.
 2   A.  Yes.  Right around there.
 3   Q.  You testified about a Mr. Pistorio a few times.  Can you
 4   tell the Court who that is?
 5   A.  Pistorio is the gentleman that came in as the general
 6   manager with the new company.
 7   Q.  Was he the general manager the entire time you worked there
 8   at the new company?
 9   A.  Yes.
10   Q.  Do you remember approximately when this meeting happened
11   you just described where Mr. Pistorio announced that
12   Mr. Velandia was going to be a manager?
13   A.  No, I don't remember, but I do recall that he was
14   introduced that way.
15   Q.  Do you remember approximately when it was?
16   A.  Maybe six or seven months after the new company came in.
17   Q.  Were there any other reasons that you didn't complain to
18   anyone at Remi about the conduct you described by Mr. Velandia?
19   A.  Well, I was afraid of losing my job because I made good
20   money there.  And as a manager, he had the power of firing and
21   hiring people.  So I was very fearful because of that.
22   Q.  Who had the power, Mr. Sotarriba?
23   A.  Oscar Velandia.
24   Q.  Why?
25   A.  And I was afraid of being fired.  Because at the meetings

C3qdcar3                          Sotarriba - direct

1   that Pistorio held at the restaurant, there was a meeting in

2   the morning, another in the afternoon before the service

3   started, like explaining the specials and offering instruction

4   to the personnel, to the waiters.  He would say at those

5   meetings, "Oscar has the power to hire and fire people."

6   Q.  Who would say?

7   A.  Mr. Pistorio said that Oscar had the power, and that's why

8   I was afraid; that's why I never complained.

9   Q.  Were you at one of the meetings where Mr. Pistorio said

10  this?

11  A.  Yes.  Myself and everyone else that was working their

12  shift -- waiters, busboys, Oscar was there, Mr. Pistorio was

13  there.

14  Q.  Did Mr. Pistorio say that Mr. Velandia had the power to

15  hire and fire at only one meeting or more than one meeting?

16            THE COURT:  Objection sustained to the form of the

17  question.

18            Put a new question.

19  Q.  How often did Mr. Pistorio say that Mr. Velandia had the

20  power to hire and fire?

21  A.  He always said it.

22  Q.  Did he say that at every meeting?

23  A.  In some meetings he said it.

24  Q.  How many meetings were you present at where he said it,

25  approximately?

C3qdcar3                        Sotarriba - direct

1   A.  I'd say at least three a week.

2   Q.  And do you recall approximately -- sorry, go ahead.

3   A.  And there are examples, if you want an example, where he

4   fired someone, where Oscar fired someone.

5   Q.  That's OK.  Do you remember approximately when the first

6   meeting happened when he said these things, if you remember?

7   A.  That he had that power?

8          (Pause)

9          It was after that party, when he introduced him that

10  way, the following day he began to say that, that Oscar had

11  that power.

12  Q.  Mr. Sotarriba, you testified earlier about some of the

13  conduct by Mr. Velandia in the middle server station.  Did you

14  ever say anything to him when he touched you?

15  A.  Yes.  On some occasions I told him to calm down or that I

16  was going to hit him in the face because I didn't like that.

17  But he didn't stop; he continued.

18  Q.  Anything else?

19  A.  I said that I'm not gay and that I didn't like gay men.

20  Q.  I'm going to put up a photo of the back server station on

21  the map.

22          Do you recognize what is on this photo?

23  A.  Yes.

24  Q.  What is it?

25  A.  That's the station, like it says there, the back server

C3qdcar3                         Sotarriba - direct

1   station.  I'm familiar with it as well because I went in there

2   many times.

3   Q.  Were you in there with Mr. Velandia?

4   A.  Well, yes.

5   Q.  What happened?

6           THE COURT:  Could we have a date?

7   Q.  When were you in the station with Mr. Velandia?

8   A.  During my shifts at work that would happen.

9   Q.  Were you in there with him when you were a busboy?

10  A.  Yes, because when I would go in there he would be there

11  using the computer.

12  Q.  Were you in there with him after you became a food runner

13  in 2004?

14  A.  Yeah, sometimes.  Less but yes.

15  Q.  Were you in the station with Mr. Velandia after 2005, when

16  the new owners took over?

17  A.  Yes.

18  Q.  Can you tell the Court what happened with Mr. Velandia

19  after -- I'm sorry, when you were a busboy?

20  A.  When I worked as a busboy, I would have to go to that

21  station to get linens when I was changing them, and there were

22  times that Oscar would be using that computer.  And the same

23  way, he would reach back with his hand and grab me and would

24  make comments as well.  The same way:  "Let me suck it.  I want

25  to suck it.  I want to feel it.  I want to see how big it is.

C3qdcar3                    Sotarriba - direct

1   Let me touch you."

2          And I would always reject him.  When he tried to grab

3   me, when Oscar would try to grab me with his hand by reaching

4   back, I would push his hand.

5   Q.  Mr. Sotarriba, can you describe for the Court the physical

6   space of this back server station?

7   A.  It's small.  Also, maybe two or three people fit there, but

8   you also have to move sideways in order to avoid touching

9   anyone.  It's small.  But you can't see inside the station from

10  outside of it.

11  Q.  To be clear, can you describe the walls you see in this

12  photo?

13  A.  Well, it's a wall about this high.

14  Q.  How high?  Can you tell us for the record?

15  A.  It's about up to here (Indicating).

16          MR. DELANEY:  Let the record indicate that the witness

17  is indicating eye level.

18  A.  Yes.

19  Q.  So what could you see from the restaurant floor -- sorry.

20  If you were standing outside the server station and someone was

21  standing inside, what could the person outside see?

22  A.  You could just see part of the head; that's it.

23  Q.  After the new company took over in 2005, would you be in

24  this station with Mr. Velandia?

25  A.  Yes, because he used it.

C3qdcar3                           Sotarriba - direct

1    Q.  What would happen?

2    A.  He would reach back and grab my private parts with his

3    hand, and I would push his hand away and I would leave.  But it

4    happened less because I was working as a food runner.

5    Q.  Did you want him to grab you in the way you described?

6    A.  No, I never wanted him to grab me, but he would just

7    surprise me and grab me.  And I felt ashamed.

8    Q.  Do you recognize this photo, Mr. Sotarriba?

9    A.  Yes.  This is the coffee maker area, and I'm familiar with

10   it because I went there many times, yes.

11   Q.  Is it a fair and accurate representation of the coffee area

12   that you worked at in Remi Restaurant?

13   A.  Yes.

14   Q.  And when you were a busboy, were you ever in this area with

15   Mr. Velandia?

16   A.  No.

17   Q.  When you were a food runner, were you ever in this area

18   with Mr. Velandia?

19   A.  Yes.

20   Q.  What happened?

21   A.  I would be there.  He would pass by.

22   Q.  Who would pass by?

23   A.  Oscar would pass by and grab me.  And he would say, "Oh,

24   let me touch it," and then leave.

25   Q.  Where would he grab you?

C3qdcar3                          Sotarriba - direct

1    A.   My private parts.

2    Q.   Why would you be in that area when you were a food runner?

3    A.   Because at the close of the meetings that were held before

4    the start of the service, I would go there to drink coffee.

5    That's why I went there.

6    Q.   And how often did Mr. Velandia grab you in the way you just

7    described, or touch you in the way you just described?

8    A.   As a food runner?

9    Q.   Yes.

10   A.   It was less.

11   Q.   Can you approximate how many times he did that here in the

12   coffee area?

13   A.   Two or three times.

14   Q.   In total?

15   A.   Yes.

16   Q.   How would you --

17             THE COURT:  Who was there with you and Velandia?

18             THE WITNESS:  One time Caravantes saw it.  He was

19   there when he passed by and grabbed me.  And other occasions

20   there were other busboys there; I don't remember their names.

21   But they would also go to drink coffee and we would just be

22   there.

23             THE COURT:  So there were other people present during

24   these --

25             THE WITNESS:  Yes.

C3qdcar3                           Sotarriba – direct

1   BY MR. DELANEY:

2   Q.  And how did you react when Mr. Velandia touched you in the

3   way you just described?

4   A.  I would feel ashamed because I didn't want him to touch me,

5   and I would leave.

6   Q.  Did you say anything?

7   A.  No, because he would pass by, grab me, and leave himself.

8   Q.  And you testified that Mr. Caravantes saw one of these

9   incidents?

10  A.  Yes.

11  Q.  What, if anything, did you say during that incident?

12  A.  Manuel said, "Hey, what's happening?"  And I said, "He's

13  the manager.  What can I do?"  I took my coffee and left.

14          THE COURT:  You are talking about the busboy?

15          MR. DELANEY:  Sorry.  For clarification --

16          THE COURT:  The busboy?

17  BY MR. DELANEY:

18  Q.  Carlos, the Translator, said "Manuel."  If you would just

19  clarify that for the record?

20  A.  Caravantes.

21  Q.  So I will ask the question again.

22  A.  Arturo Caravantes.

23  Q.  What, if anything, did you say during the incident you just

24  described when Mr. Caravantes saw one of these incidents?

25  A.  He said, "Hey, what's happening?  He touched you."  And I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C3qdcar3                          Sotarriba - direct

1    said, "He's the manager.  What can I do?"

2            I grabbed my coffee and I left, and I didn't make any

3    additional comments.

4            THE COURT:  I'm sorry, I have to stop now, I guess,

5    for the day.

6            We will come back tomorrow at 9:30.

7            (Adjourned to 9:30 a.m., Tuesday, March 27, 2012)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      INDEX OF EXAMINATION

2    Examination of:                        Page

3    FRANCISCO SOTARRIBA

4    Direct By Mr. Delaney  . . . . . . . . . . . .29

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```