C3sdcar1                        Trial

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     ARTURO CARAVANTES and
 3   FRANCISCO SOTARRIBA
                     Plaintiffs
 4
            v.                        09 Civ. 7821 (RPP)
 5   53RD STREET PARTNERS, LLC
     d/b/a REMI RESTAURANT and
 6   OSCAR VELANDIA
                     Defendants
 7   ------------------------------x
                                      New York, N.Y.
 8                                    March 28 2012
                                      9:36 a.m.
 9
     Before:
10                   HON. ROBERT P. PATTERSON, JR.

11                                    District Judge

12                        APPEARANCES
     PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
13        Attorneys for Plaintiffs
     1285 Avenue of the Americas
14   New York, NY 10019
     AARON S. DELANEY
15   MAYUR P. SAXENA
     MOIRA KIM PENZA
16
     URBAN JUSTICE CENTER
17        Attorney for Plaintiffs
     123 William Street 16th Floor
18   New York, NY 10038
     NICOLE HALLETT
19
     EPSTEIN BECKER & GREEN PC
20        Attorneys for Defendants
     KERRY M. PARKER
21   ALKIDA KACANI

22        - also present -

23   CARLOS CRUZ - Spanish Interpreter
     LILIANA HALAC - Spanish Interpreter
24   RANDALL CARTER - Plaintiff AV Tech

25
```

C3sdcar1                        Trial

1              (Trial resumed)

2              THE COURT:  Please be seated.

3              Call your witness.

4              MR. PARKER:  Your Honor, may we continue with the

5     cross-examination of Mr. Sotarriba, please?

6              THE COURT:  Yes, you may.

7              We should have a full day today.

8              MR. PARKER:  Pardon?

9              THE COURT:  You should have a full day today.

10             MR. PARKER:  Thank you.

11    FRANCISCO SOTARRIBA,

12         Resumed, and testified further (through the Interpreter)

13         as follows:

14             THE COURT:  Mr. Sotarriba, you are reminded you are

15    still under oath.

16             THE WITNESS:  Yes.

17             THE COURT:  Thank you.  Please proceed.

18    CROSS-EXAMINATION (Resumed)

19    BY MR. PARKER:

20    Q.  You remember yesterday that Mr. Delaney showed you your

21    EEOC charge, marked as P20, and asked you some questions about

22    that?

23    A.  Yes, I remember.

24    Q.  Could you open the book, the exhibit book, please, to

25    Exhibit P20?

C3sdcar1                    Sotarriba – cross

 1              Again, this is the charge of discrimination that you

 2    signed under oath in January 2009, correct?

 3    A.   Yes, I did sign this.

 4    Q.   And yesterday Mr. Delaney pointed out one sentence to you

 5    in the document that you admitted was not true, correct?

 6    A.   Yes.

 7    Q.   That was the sentence that reads, "The last time Velandia

 8    touched or propositioned me was in June 2008."  That was the

 9    sentence you agreed was not true, correct?

10    A.   Yes.

11    Q.   Now, let's look at the last sentence in that paragraph, and

12    it reads, "In September 2008, I was fired by the restaurant."

13              Now, Mr. Sotarriba, that sentence is also not true,

14    correct?

15    A.   Could you repeat that?

16    Q.   The sentence that reads "In September 2008, I was fired by

17    the restaurant" is not true; is that correct?

18    A.   Yes.

19    Q.   Now, you testified yesterday that Mr. Velandia was ordering

20    you to carry cases of wine from the basement in Remi up to the

21    restaurant; is that true?

22    A.   Yes.

23    Q.   Now, as a runner you were responsible for transporting wine

24    from the basement to the first floor of the restaurant during

25    the entire time you were a runner, correct?

C3sdcar1                          Sotarriba - cross

1   A.  Yes, but OK.

2   Q.  And at Remi, in the building, there is a loading dock, is

3   there not?

4   A.  I don't understand what that is.

5   Q.  There is an elevator that's used to transport material from

6   the basement of the building up to the ground level; is there

7   not?

8   A.  Yes.

9   Q.  And when food runners transport cases of wine, they take

10  them on hand trucks to the basement elevator, use that elevator

11  to bring them up to the first floor, correct?

12  A.  Yes, but....

13  Q.  And there were many occasions where you personally used

14  that elevator to transport cases of wine or cases of water

15  bottles up to the first floor of the restaurant, correct?

16  A.  Yes.

17  Q.  And you used the hand truck to bring the wine and the water

18  from the basement area to the freight elevator to bring it up

19  to the first floor, right?

20  A.  Yes, sometimes.

21  Q.  And, in fact, if you walked up the stairs with a case of

22  wine in your hands, you would have to -- in order to bring it

23  to the bar, you would have to walk through the dining room,

24  correct?

25  A.  Yes.

C3sdcar1                        Sotarriba - cross

1   Q.  And there was a rule at the restaurant that workers were

2   not supposed to walk through the dining room during meals

3   carrying cases of wine, correct?

4   A.  I don't know that.

5   Q.  OK.  Let's talk about your testimony about Sergio Pastor

6   and when he was in the dispute with the other employee and when

7   he was thereafter fired.

8          You testified yesterday that Mr. Velandia came down

9   the stairs and said to Pastor to come to the office with him;

10  was that your testimony?

11  A.  Yes.

12  Q.  But you were not present when that happened, were you?

13         (Pause)

14  A.  Present when he was called?

15  Q.  Present when Oscar Velandia came down the stairs and said

16  to Pastor, according to you, to come to the office with him.

17  A.  Yes, I was present.

18  Q.  You were present.

19         Let's turn to page 53 of your deposition,

20  Mr. Sotarriba.

21         Now, beginning on line 15 and ending on line 21, were

22  you asked these questions and did you give these answers, under

23  oath, on September --

24         THE COURT:  I have got to locate the testimony.

25         MR. PARKER:  -- 13, 2010?

C3sdcar1                          Sotarriba – cross

1              Page 53, your Honor.

2              THE COURT:   Thank you.

3              MR. PARKER:   (Reading)

4    "Q   Now, you said that Oscar came down the stairs and said that

5    he wanted to see Sergio Pastor in the office, correct?

6    "A   Yes.

7    "Q   And you say that you were present at the time that that

8    statement was made?

9    "A   No."

10             Did you give that testimony in your deposition under

11   oath, Mr. Sotarriba?

12   A.   I don't remember.

13   Q.   And at the time that Sergio Pastor was terminated from his

14   job at Remi, you were not present when he was told he was being

15   terminated, were you?

16   A.   No.

17   Q.   OK.   Let's talk about the incidents that you claim happened

18   in the locker room where you say Velandia and Jose Ortiz tried

19   to lower your pants.

20             You said that happened twice, right?

21   A.   Yes.

22   Q.   And you said the same thing happened both times, right?

23   A.   Yes.   But part of my pants were broken.

24   Q.   But you said both times involved Velandia and Ortiz trying

25   to take your pants down; is that right?

C3sdcar1                    Sotarriba – cross

1   A.  Yes.

2   Q.  And this is different from your claims about touching your

3   genital area; this was a different type of touching, correct?

4   A.  Yes.

5   Q.  And you said both times that this occurred you were

6   changing your pants, right?

7   A.  Yes.

8   Q.  You said both times you fell on the floor, right?

9   A.  Yes.

10  Q.  The first time it happened there were no other witnesses

11  present, correct?

12  A.  I didn't understand.

13  Q.  The first time that this occurred with the pants in the

14  locker room, there were no other witnesses present besides you,

15  Ortiz and Velandia, correct?

16  A.  No.

17  Q.  Are you saying there were witnesses present?

18  A.  Yes, there were other persons.

19  Q.  And did you say yesterday that the very same witnesses who

20  were there the first time they tried to take your pants down

21  were there the second time they tried to take your pants down?

22  A.  I don't remember.

23        THE COURT:  Well, were they the same witnesses?

24  Q.  Were they the same or were they different?

25  A.  Some were the same; others were different.

C3sdcar1                         Sotarriba - cross

1    Q.  Who was a witness the first time?

2    A.  The first time I remember Paco being there; Luis, he's a

3    cook.

4           The second time Sergio was there and Paco, Luis, and

5    someone else that's called Chaparro, something like that.  I

6    don't know what his name is.

7           THE COURT:  Is he a cook or a runner or a busboy?

8           THE WITNESS:  He's a cook.

9    Q.  So when was the first time this happened?

10   A.  I don't recall.

11   Q.  When was the second time it happened?

12   A.  It was after the first time but I don't remember when.

13   Q.  How much time passed in between the two times that you say

14   this happened?

15   A.  It was quickly.

16   Q.  What does that mean?

17   A.  Maybe five/ten minutes, it was quick.

18   Q.  So both incidents occurred on the same day?

19   A.  No.

20   Q.  How much time passed between when the first time they tried

21   to lower your pants until the second time?  Was it days?  Was

22   it weeks?  Was it months?  How much time?

23   A.  I don't remember.

24          THE COURT:  Was it the same year?

25          THE WITNESS:  Yes.

C3sdcar1                          Sotarriba – cross

1                THE COURT:  Which year?

2    Q.   What year?

3    A.   It was before 2007.

4    Q.   Now, at that time Jose Ortiz was a bartender, correct?

5    A.   I don't remember.

6    Q.   Well, Jose Ortiz was never a manager of Remi, was he?

7    A.   No.

8    Q.   And the locker room is in the basement close to the office,

9    correct?

10   A.   It's behind the office.

11   Q.   But they're close by, right?

12   A.   No.

13   Q.   So what would it take you, 30 seconds to walk from the

14   locker room to the office?

15   A.   A minute, two minutes.

16   Q.   And you said yesterday that Pistorio was in the office when

17   this event happened, did you not?

18   A.   Yes.

19   Q.   But you did not go to the office to let him know, or to

20   complain, that this had happened to you, did you?

21   A.   No.

22   Q.   In fact, you never complained to anyone at Remi about any

23   of the conduct while you were employed there, correct?

24   A.   No.

25                THE COURT:  No?

C3sdcar1                    Sotarriba - cross

1    Q.  Did you ever complain to Remi --

2              THE COURT:  That is not correct?

3              THE WITNESS:  No, I didn't complain to anyone.

4    Q.  And you never complained to the prior owners of Remi about

5    any of the conduct that you claim Oscar Velandia did to you

6    while you were there working, correct?

7    A.  I don't understand.

8              THE COURT:  When you use "is that correct," it has a

9    problem with it.

10             MR. PARKER:  You are right, Judge.  Thank you.

11   Q.  Did you ever complain to the prior owners of Remi, before

12   the new company came in, about any conduct of Oscar Velandia?

13   A.  No.

14   Q.  Now, let's turn again, Mr. Sotarriba, to page -- to

15   Plaintiff's Exhibit 20.

16             Now, you say that the two events where Velandia and

17   Ortiz tried to lower your pants occurred in -- before 2007,

18   correct?

19   A.  Yes.

20   Q.  So when you filled this form out, when you signed this

21   form, under oath, in 2009, you were aware about those events,

22   right?

23   A.  I don't speak English and I don't....

24   Q.  All right.  Let me read -- I'm going to read the first

25   sentence of the --

C3sdcar1                         Sotarriba - cross

1           THE COURT:  Who made out the -- was this writing in

2      the middle of the page on the page when you signed it?

3           Would you put it on the screen.

4           THE WITNESS:  Where it says "The Particulars," your

5      Honor?

6           (Document projected on the screen)

7           THE COURT:  Point to the portion that is --

8           MR. PARKER:  Would you highlight under "The

9      Particulars Are."

10          THE COURT:  Was that writing on the page when you

11     signed it?

12          THE WITNESS:  It was there but I didn't read it; I

13     don't read English.

14          THE COURT:  Was it read to you?

15          THE WITNESS:  I don't recall.

16          THE COURT:  You don't recall whether someone read that

17     to you?

18          THE WITNESS:  No, I don't recall.

19          THE COURT:  Who was there when you signed it?

20          (Pause)

21          Who was there when you signed it?

22          THE WITNESS:  I don't remember.

23          THE COURT:  You don't remember when you signed this?

24          THE WITNESS:  I see the date here but I don't

25     remember.

C3sdcar1                        Sotarriba - cross

1              THE COURT:  Do you remember -- what about the X above,

2       was that there when you signed it?

3              THE WITNESS:  I don't remember.

4              THE COURT:  Who was there when the -- going up -- the

5       rest of it up at the top, was that writing there when you

6       signed it?

7              THE WITNESS:  Yes, it was there.

8              THE COURT:  What writing?  Which writing was there

9       when you signed it?

10             THE WITNESS:  All of this.

11             THE INTERPRETER:  Indicating the top part.

12             THE COURT:  Not "all of it."  Specifically what was

13      there?

14             THE WITNESS:  This.

15             THE COURT:  What is "this"?  Point with the laser.

16             (Pause)

17             MR. DELANEY:  We are getting the laser for him, your

18      Honor.

19             THE COURT:  Someone has a laser?

20             MR. DELANEY:  Yes.

21             THE COURT:  Give him the pointer.

22             MR. DELANEY:  Permission to approach?

23             THE COURT:  Yes.

24             (Handing laser pointer to the witness)

25             THE WITNESS:  (Indicating).  All of this.

C3sdcar1                    Sotarriba - cross

1              THE COURT:  Wait a minute.  I don't see it.  You have

2      got to point someplace.

3              All of what?

4              THE WITNESS:  That whole area.

5              THE COURT:  Did someone read that to you?

6              THE WITNESS:  No, I don't remember.

7              THE COURT:  Who was present when you read that?

8              THE WITNESS:  Carmela -- I don't remember her last

9      name.

10             THE COURT:  Who is Carmela?

11             THE WITNESS:  UAC, something like that.

12             THE COURT:  What?  Where were you when you signed it?

13             THE WITNESS:  At that office, at that justice office.

14             THE COURT:  Urban Justice?

15             THE WITNESS:  I don't remember the name.

16             THE COURT:  You don't remember whether it was Urban

17     Justice?

18             THE WITNESS:  Yes, Urban Justice, at that office, yes.

19             THE COURT:  Who was present -- who gave you the form?

20             THE WITNESS:  Carmela.

21             THE COURT:  Was it already filled out?

22             THE WITNESS:  Yes, it was already filled out.

23             THE COURT:  Had you been there before?

24             THE WITNESS:  Yes, once.

25             THE COURT:  Who did you see then?

C3sdcar1                          Sotarriba - cross

1              THE WITNESS:  Carmela.

2              THE COURT:  And did you talk to Carmela then?

3              THE WITNESS:  I spoke with her with an interpreter.

4              THE COURT:  Do you remember the interpreter?

5              THE WITNESS:  No.

6              THE COURT:  So she doesn't speak Spanish?

7              THE WITNESS:  No.

8              THE COURT:  And who was there the second time?

9              THE WITNESS:  She was also there.

10             THE COURT:  Anyone else?

11             THE WITNESS:  I don't remember.

12             THE COURT:  All right.  Did you see the form filled

13   out the first time you were there?

14             THE WITNESS:  The first time, no.  The second time,

15   that's when I saw it completed and signed it.

16             THE COURT:  All right.

17   BY MR. PARKER:

18   Q.  Carmela was Carmela Huang, who was your attorney, correct?

19   A.  I didn't understand that.

20   Q.  The Carmela that you identified, that is Carmela Huang,

21   your attorney, correct?

22   A.  Yes.

23   Q.  The handwriting at the bottom of the document, where it has

24   a date on the right-hand side, the signature, and then there is

25   a date to the right of the signature, it looks like 1/20/09,

C3sdcar1                    Sotarriba - cross

1   that's your handwriting, correct?

2   A.  Yes.

3           THE COURT:  The 1/20/09 is your handwriting?

4           THE WITNESS:  Yes.

5   Q.  And your name printed to the left of that, under -- where

6   it says "Signature of Complainant," that's your writing,

7   correct?

8   A.  Yes.

9   Q.  And to the left of that, where it says, "I declare under

10  penalty of perjury that the foregoing is true and correct,"

11  underneath that, that's your signature, correct?

12  A.  Yes.

13  Q.  And if you go up the page, to where it says -- towards the

14  top of the page, to where it says "Date of Birth," it says

15  "3/20/71."  That's your date of birth, correct?

16  A.  Yes.

17  Q.  And that's your handwriting, too, isn't it?

18  A.  Yes.

19          THE COURT:  After you signed it, did someone else come

20  into the room?

21          THE WITNESS:  Yes.  Benjamin.  I can't remember his

22  last name.

23          THE COURT:  Who was he with?

24          THE WITNESS:  He just entered the office.

25          THE COURT:  Who was he with?

C3sdcar1                          Sotarriba – cross

1              THE WITNESS:  With the same place, Urban Justice.

2              THE COURT:  Do you know his last name?

3              THE WITNESS:  No, I don't remember.

4              THE COURT:  Anyone else besides him?

5              THE WITNESS:  No, I don't recall.

6              THE COURT:  Do you recall or not?

7              THE WITNESS:  No, I don't remember.

8              THE COURT:  You say, "No."  You don't remember anyone

9     else?

10             THE WITNESS:  No.

11             THE COURT:  He only came in with the stamp, to stamp

12    the pages?

13             THE WITNESS:  Yes.  He entered.  He stamped it.  And

14    left.

15             THE COURT:  Who did that?

16             THE WITNESS:  I think that was done by a lady,

17    actually, I think.

18             THE COURT:  You do remember that, right?

19             THE WITNESS:  Yes.  A little.  I'm trying to remember.

20             THE COURT:  OK.

21    BY MR. PARKER:

22    Q.  Mr. Sotarriba, Ben, was that Ben Holt, another attorney

23    with the Urban Justice Center that you mentioned?

24    A.  If that's Benjamin, then yes.

25    Q.  OK.  Mr. Sotarriba, have you ever observed Oscar Velandia

C3sdcar1                          Sotarriba - cross

1    touching anyone else besides you?

2              (Pause)

3              I'm sorry.  Let me rephrase it.

4              Have you ever observed Mr. Velandia touching anyone

5    else in a sexual manner, on the genitals, besides you?

6    A.  No, not that I could remember.

7    Q.  Have you ever witnessed Mr. Velandia making sexual comments

8    to anyone else besides you?

9    A.  No, not that I can recall.

10   Q.  Now, in your testimony here in court, you testified that

11   Mr. Velandia touched you in two ways.  One was with his hand on

12   your genital area and the other was by rubbing or grinding his

13   buttocks up against you, correct?

14   A.  Yes.

15   Q.  And you testified that while you were a busboy at Remi

16   before 2004, Velandia touched you in those two ways seven to

17   eight times per day, correct?

18   A.  Could you repeat that?

19   Q.  You testified that while you were a busboy, prior to

20   becoming a food runner in 2004, Mr. Velandia touched you seven

21   to eight times a day in those two ways we just mentioned?

22              THE COURT:  Objection sustained.  It could be seven or

23   eight times each way or it could be seven or eight times total.

24              MR. PARKER:  I will rephrase, your Honor.

25   Q.  Mr. Sotarriba, you testified that in total, Mr. Velandia,

C3sdcar1                         Sotarriba - cross

1    during the time you were a busboy at Remi, touched you seven to

2    eight times per day in a sexual way, correct?

3    A.   Yes.

4    Q.   Then you said -- you testified that after you became a

5    runner, Velandia just made sexual comments to you and the

6    touching did not continue, correct?

7            MR. DELANEY:  Objection.

8            THE COURT:  Objection overruled.

9    A.   He made comments and touched me less.

10   Q.   So the touching after you became a runner, you say,

11   decreased?

12   A.   Yes.

13   Q.   Didn't you testify on Monday that it stopped, that the

14   sexual touching stopped after you became a food runner?

15           MR. DELANEY:  Objection.

16           THE COURT:  Overruled.

17   A.   Before 2007.

18           THE COURT:  Before 2007 what?

19           THE WITNESS:  In December of 2007, that's when he

20   stopped touching me.

21   BY MR. PARKER:

22   Q.   So now your testimony is that Velandia continued to touch

23   you sexually until 2007 December; is that your testimony?

24   A.   No.

25   Q.   So that the touching then stopped before -- sometime before

C3sdcar1                    Sotarriba - cross

1    December 2007, correct?

2    A.  I don't understand.

3    Q.  When did the sexual touching stop, Mr. Sotarriba?

4    A.  In 2007, December.

5    Q.  All right.  So now you're saying that it was seven to eight

6    times in total a day while you were a busboy, and then it

7    decreased -- the sexual touching, that is -- decreased after

8    you became a food runner, correct?

9    A.  Yes.

10   Q.  When did it start to become -- when did the touching start

11   to total seven to eight times a day?  Was it immediately after

12   he started touching you in 2000 or 2001, or was it sometime

13   later?

14            MR. DELANEY:  Objection.

15            THE COURT:  Objection sustained.  The form of the

16   question.

17   Q.  When did the sexual touching begin to total seven to eight

18   times per day?

19   A.  After he began to touch me with his hand.

20   Q.  How long after?

21   A.  I don't recall.

22            THE COURT:  When was that that he began to touch you

23   with his hand?

24            THE WITNESS:  Approximately 2001.

25            THE COURT:  Where did he touch you with his hand in

C3sdcar1                          Sotarriba - cross

1    2001?

2              THE WITNESS:  He would pass his hand through my

3    private parts in the front.

4    BY MR. PARKER:

5    Q.  And once -- and so you're saying you don't recall when the

6    total amount of sexual touches began to reach seven to eight

7    times a day?

8    A.  Could you repeat that?

9    Q.  Do you recall when the total number of sexual touches began

10   to reach seven to eight times per day?

11   A.  Yes.

12   Q.  When?

13   A.  After he began to rub me with his hand.  I don't remember

14   how long after.

15   Q.  Well, was it soon after in 2001, or was it a long time

16   after 2001?

17   A.  Maybe a few weeks might have passed.  I don't recall.

18   Q.  So now what you're saying is, as I understand it, after the

19   first time Velandia touched you in 2000 or 2001, a few weeks

20   later he began to touch you seven to eight times a day in

21   total, correct?

22   A.  Yes.

23              THE COURT:  When did you tell him you would hit him if

24   he did that?

25              THE WITNESS:  The first time that he tried to grab me

C3sdcar1                          Sotarriba – cross

1    with his hand, I pushed his hand down.

2                THE COURT:  And you told him that you'd hit him?

3                THE WITNESS:  Yes.  At that time I said that.

4                THE COURT:  Where did you say that you'd hit him?

5                THE WITNESS:  In his face.

6                THE COURT:  Did you say that ever again to him?

7                THE WITNESS:  Yes.  I told him two times.  I don't

8    remember when the next time was that I said that.

9                THE COURT:  Only two times in six years, seven years?

10               THE WITNESS:  Yes, just twice.

11               THE COURT:  Just at the beginning?

12               THE WITNESS:  Yes.

13   BY MR. PARKER:

14   Q.   OK.  So now we've established that, according to you,

15   within a few weeks after Velandia began to touch you in 2000 or

16   2001, the touching totaled seven to eight times a day until you

17   became a food runner in 2004, correct?

18   A.   Yes.

19   Q.   And then in 2000 -- beginning in 2004, the touching became

20   a total of three to four times a day; is that your testimony?

21   A.   I didn't understand.  I'm sorry.

22   Q.   In 2004, and after that, after you became a food runner,

23   the touching decreased to three to four times a day in total,

24   correct?

25   A.   Yes.

SOUTHERN DISTRICT REPORTERS, P.C.

C3sdcar1                    Sotarriba - cross

1   Q.  Now, before today, before this trial, you gave testimony at

2   a deposition in September 2010, correct?

3   A.  Could you repeat that?

4   Q.  Yes.  You have your deposition in front of you.  You gave

5   that deposition in September 2010, right?

6   A.  Yes.

7   Q.  And you also signed an affidavit in June of 2011 in this

8   case, is that correct?

9   A.  Yes.

10  Q.  And in each of those three times that you had given sworn

11  testimony about Oscar Velandia's touching -- in your deposition

12  in 2010, in your affidavit in 2011, and here in this trial --

13  you've given different testimony about that touching, haven't

14  you?

15  A.  No.  I don't remember that.

16  Q.  OK.  Let's go to your deposition at page 69.

17          Beginning at line 11 on page 69, and continuing

18  through page 71, line 15, did you give these answers to my

19  questions at that time, Mr. Sotarriba?

20  "Q  While the old company was still at Remi, how frequently did

21  Oscar touch you in your private parts in the front?

22  "A  When he began, he would touch me with his hand two or three

23  times a day.  Afterwards it happened many times because he

24  would grab me.  He would move his rear end.

25  "Q  You used the word "afterwards."  After what?

C3sdcar1                         Sotarriba - cross

1    "A   After he would touch me with his hand, after he started

2    doing that.

3    "Q   You said it started two to three times per day?

4    "A   Yes.

5    "Q   Did that change?

6    "A   Yes.

7    "Q   When?

8    "A   I don't know.  Days later.

9    "Q   So after Oscar began first touching you, did he then

10   continue every day at work to touch you at work?

11   "A   Yes.

12   "Q   And you said it started out as two to three times a day?

13   "A   That's how it started, and then it would happen 10/15

14   times.

15   "Q   When did it start to become 10 to 15 times per day?

16   "A   A few days after he began to touch me with his hand.

17   "Q   After he started to touch you 10 to 15 times per day, did

18   Oscar continue to touch you that frequently every day?

19   "A   Yes.

20   "Q   So within about a little more than a year after you started

21   working at Remi, Oscar -- you say that Oscar was touching your

22   genital area 10 to 15 times per day, is that correct?

23   "A   Yes.

24   "Q   For how long did that last where you say that Oscar was

25   touching you with his hand on your genital area 10 to 15 times

C3sdcar1                        Sotarriba - cross

1    per day?

2    "A   That ended in, like, in 2007.  Like December of 2007, he

3    didn't touch me.  However, the sexual harassment stopped; I

4    mean, as far as him touching me.  However, the general

5    harassment did continue until the day I left."

6              That was your testimony on September 13, 2010,

7    correct, Mr. Sotarriba?

8    A.   Yes.

9              THE COURT:  Was that testimony true when you gave it?

10             THE WITNESS:  Yes, that's what happened.

11   BY MR. PARKER:

12   Q.   Let's turn to your affidavit.  Turn to Exhibit Plaintiff's

13   92.

14             Do you recognize this as an affidavit that you signed

15   under oath on June 17, 2011?

16   A.   Yes.  That's my signature.

17   Q.   And did your attorneys at Paul Weiss prepare this document?

18   A.   Well, I gave the information, but yes.

19   Q.   You gave the information to your attorneys at Paul Weiss?

20   A.   Yes.

21   Q.   And when you signed this, was it interpreted for you?

22   A.   Yes.

23   Q.   Let's look at --

24             THE COURT:  Did the interpreter read it to you?

25             THE WITNESS:  Yes.

C3sdcar1                          Sotarriba - cross

1    Q.  Let's look at paragraph 5.

2              THE COURT:  After the interpreter read it to you, did

3    you sign it?

4              THE WITNESS:  Yes.

5    Q.  I'm going to read paragraph 5 in English, Mr. Sotarriba.

6    Mr. Cruz can translate.

7              It reads:  "From approximately late 2000/early 2001 to

8    April 2005, Velandia's grabbing of my genitals occurred a few

9    times per day.  In April 2005, when the new owners bought Remi,

10   the frequency with which Velandia would grab my genitals

11   increased to up to 10 to 15 times per day."

12             Do you see that, Mr. Sotarriba?

13   A.  Yes, I can see that.

14             THE COURT:  He doesn't see anything.

15             MR. PARKER:  I understand, Judge.

16   Q.  That paragraph was in the affidavit when you signed it,

17   right?

18   A.  I think so.

19   Q.  And here in this trial you testified that -- you testified

20   differently than what this paragraph says, did you not?

21   A.  I don't think it's different.  I mean, it happened 10 to 15

22   times a day.

23   Q.  Didn't you testify both under Mr. Delaney's examination and

24   with me, under my questioning, that the frequency of the

25   touching by Mr. Velandia decreased after you became a food

C3sdcar1                          Sotarriba - cross

1   runner in 2004?

2            (Pause)

3   A.  Yes, it did reduce.

4   Q.  But your paragraph 5 in your affidavit states that the

5   frequency of Mr. Velandia's touching increased in April of

6   2005.  That's what you said, correct?

7            (Pause)

8   A.  I don't understand this too well -- paragraph 5.

9            THE COURT:  Did you have the interpreter read this

10  affidavit to you when you signed it?

11           THE WITNESS:  Yes.

12           THE COURT:  Did you listen to it carefully, listen to

13  the interpreter carefully?

14           THE WITNESS:  Yes.

15           THE COURT:  Everything that he said was true, to your

16  knowledge?

17           THE WITNESS:  Yes.

18           THE COURT:  I mean, when he read it, everything he

19  said was true, to your knowledge?

20           THE WITNESS:  Yes.

21           THE COURT:  After that you signed the affidavit?

22           THE WITNESS:  Yes.

23  BY MR. PARKER:

24  Q.  OK.  Let's talk about your testimony about sexual comments.

25           Now, you testified at trial that Mr. Velandia made

C3sdcar1                    Sotarriba - cross

1   sexual comments to you while you were employed at Remi, one of

2   which was "Let me suck you," correct?

3   A.   Yes.

4   Q.   Were those comments made on the same occasions when

5   Mr. Velandia touched you on the genitals, or were they made at

6   different times?

7   A.   Sometimes on different occasions; other times when he

8   grabbed me.

9   Q.   Let's turn to your deposition, Mr. Sotarriba, at page 77,

10  beginning at line 6:

11  "Q   Did he make those kind of comments to you more than 10

12  times per day?

13  "A   10 to 15 times.

14  "Q   Did he make these comments at the same time he was touching

15  you, or were these separate occasions?

16  "A   Different occasions."

17          Did you give that testimony on September 13, 2010?

18  A.   Yes, that was what I said.  But sometimes when he touched

19  me and other times not.

20  Q.   So your testimony today is different than it was a year and

21  a half ago, correct?

22          (Pause)

23  A.   I can't answer that.

24  Q.   Now, with regard to the sexual comments you said

25  Mr. Velandia made to you, your testimony is that Velandia made

C3sdcar1                      Sotarriba - cross

1   sexual comments to you while you were a busboy a total of three

2   to five times per day, correct?

3   A.  I don't remember.

4   Q.  Well, how many times a day while you were a busboy did

5   Mr. Velandia make sexual comments to you?

6   A.  He made comments but I don't remember.

7   Q.  And as a runner, you saw Mr. Velandia less, you had less

8   contact, correct?

9   A.  Yes.

10  Q.  So the sexual comments -- let me rephrase.

11          So the number of sexual comments that Mr. Velandia

12  directed at you after you became a runner decreased from the

13  total that he made to you while you were a busboy, correct?

14  A.  Could you repeat that?

15  Q.  OK.  After you became a runner --

16          THE COURT:  We could have the court reporter read it

17  back.

18          (Question read)

19  A.  Yes.

20  Q.  That's not consistent, however, with what you testified to

21  in your deposition, is it?

22          (Pause)

23  A.  I can't read where that is.

24  Q.  OK.  Let's turn to page 76, beginning at line 4:

25  "Q  You've testified to a number of different comments that

C3sdcar1                          Sotarriba - cross

1   Oscar made to you at work.  Please describe how frequently

2   Oscar made such comments to you.

3   "A   What comments he made?

4   "Q   No.  You've testified to a number of comments that he made

5   to you.  My question is, how frequently did he make those

6   questions to you?

7   "A   Many times.

8   "Q   Every day?

9   "A   Every day that I worked.

10  "Q   On all of those days that you worked, did Oscar make such

11  comments to you more than once per day?

12  "A   Yes.

13  "Q   About how many times per day did Oscar make those types of

14  sexual comments to you?

15  "A   More than one.

16  "Q   Did he make those comments to you more than five times per

17  day?

18  "A   Yes.

19  "Q   Did he make those kind of comments to you more than 10

20  times per day?

21  "A   10 to 15 times."

22          Was that your testimony in your deposition?

23  A.  Yes.

24          MR. PARKER:  I have no further questions.

25          THE COURT:  Redirect.

C3sdcar1                        Sotarriba – cross

```
1    REDIRECT EXAMINATION

2    BY MR. DELANEY:

3    Q.  Mr. Sotarriba, do you recall testifying in response to

4    Mr. Parker's questions about the pepper mills in the service

5    stations?

6    A.  Pepper mills?

7    Q.  Pepper mills in the service stations.

8    A.  Yes.

9    Q.  When you were a food runner, did you use those pepper mills

10   in the server stations?

11   A.  Yes.

12   Q.  What else did you use in the server stations?

13   A.  The pepper, some cheese containers and there are some other

14   small containers that have red peppers, crushed peppers, I

15   think, something like that.

16   Q.  Randall, can I ask you to put up a photo of the middle

17   server station for me.  Do you recognize this is a photo of the

18   middle server station?

19   A.  Yes.

20   Q.  Do you see on the left side of the screen in the middle --

21            THE COURT:  No leading.

22   Q.  Do you see anything else in that photo that you used when

23   you were a food runner?

24   A.  Sometimes I would use the tea in the box.  I would come up

25   with the food, and if a customer, for example, asked for tea, I
```

C3sQcar2                     Sotarriba - Redirect

1    had to go into the box and take them tea.

2              THE COURT:  Do you see the tea in the picture?

3              THE WITNESS:  This box, when I was there, that's the

4    box where the tea was kept.

5              THE COURT:  What box?  Which one?

6              (Indicating)

7              THE COURT:  The witness is pointing to the red box in

8    the upper left-hand side shelf in the rear of the station.

9    Q.  Do you recall in the station where the cheese was kept when

10   you were a food runner?

11   A.  Within the station, yes.  It was in this corner here.

12             THE COURT:  The witness is pointing to the left-hand

13   side here of the foremost -- of the upper shelf above the

14   faucet area.

15   Q.  When, for example, you had to get the tea in the box when

16   you were a food runner, how would you enter the station?

17   A.  I didn't understand.

18   Q.  Would you have to go into the station to get the tea?

19   A.  On some occasions, yes.

20   Q.  How far into the station?

21   A.  Up to there because that's where it always was.

22   Q.  Could you reach that tea from the door of the server

23   station?

24   A.  No.  The only thing that I could reach from close to the

25   door was the peppers.

1    Q.  Could you reach the cheese that you used as a food runner

2    from the door of the server station?

3    A.  Sometimes we would leave it close by.  There were two

4    containers of the cheese.  So whenever it was too busy, we

5    would leave a container here.  We would place one there, but

6    when that was out, we would have to reach for the other one

7    that was kept over there.

8    Q.  When you had to reach for the other one as you just

9    described, would you have to go into the server station?

10   A.  Yes.  Yes.  I had to enter.  And also to reach the red

11   peppers, I had to go all the way in because it was kept back

12   there as well.

13           THE COURT:  The witness is pointing to the shelf above

14   the computer.

15   Q.  Randall, could you put up a photo of the back server

16   station, please?

17           Was cheese kept in this back server station.

18   A.  Yes, also.

19   Q.  Where was it kept?

20   A.  It was kept around here, this side but further that way in

21   the corner.

22   Q.  Would you have to go into the server station to get that

23   cheese?

24   A.  Yes, at that station I did have to enter to get the cheese.

25   Q.  Was a box of tea kept in the server station?

1   A.  Yes, it's there.

2   Q.  Let the record reflect the witness is pointing to the red

3   box.

4            THE COURT:  Where were you pointing to?

5            (Indicating)

6            THE COURT:  The witness is pointing to a shelf below

7   the circular object on the top shelf.

8   Q.  As a food runner, would you have to go into the server

9   station to reach that box of tea you just pointed to?

10  A.  If a customer asked for a bag of tea, I would have to go in

11  there to reach the box or take them the box so they could

12  select the one they wanted to use.

13  Q.  Did Mr. Velandia make comments to you while you were in the

14  server station, sexual comments?

15  A.  Sometimes he did.

16  Q.  When you were a food runner?

17  A.  Yes, sometimes he did.

18  Q.  Could you hear Mr. Velandia's comments even if you were

19  standing at the edge of the server station?

20  A.  You mean when I went in and out?

21  Q.  Let me ask you a different question.  Did you have to go

22  into the server station to hear Mr. Velandia's comments?

23  A.  Yes, I would enter.

24  Q.  But could you hear his comments when you were standing at

25  the door of the server station?

C3sQcar2                         Sotarriba - Redirect

1   A.  Yes.

2            THE COURT:  Is there a door to the server station, or

3   is it open?

4            THE WITNESS:  It's open.  It's --

5            THE COURT:  There's no door, right?  Am I right?

6            THE WITNESS:  No, there's no door.

7   Q.  I apologize.  It was the entrance to the server station,

8   correct?

9   A.  Yes.

10  Q.  What about the middle server station, was there an entrance

11  or a door?

12  A.  An entrance also.

13           THE COURT:  How far is the door from the computer, the

14  doorway?  How far is the doorway from the computer?

15           THE WITNESS:  It's close.  It's very small.

16           THE COURT:  How far?  Five feet?  Ten feet?  15 feet,

17  20 feet?

18           THE WITNESS:  Maybe two or three.

19           THE COURT:  Two or three feet?

20           THE WITNESS:  Yes.

21           THE COURT:  That's the back server station?

22           THE WITNESS:  Yes.

23  Q.  Could you put up a photo of the middle server station?

24           How far is the entrance of this server station to the

25  computer, Mr. Sotarriba?

C3sQcar2                         Sotarriba - Redirect

1    A.   I don't know how long a foot is.

2    Q.   In meters.

3    A.   Might have been two meters or a meter and a half, perhaps.

4    Q.   When you were standing at the entrance of this server

5    station, the middle server station, could you hear

6    Mr. Velandia's sexual comments?

7    A.   Yes.

8    Q.   Do you recall Mr. Parker was showing you your affidavit

9    from June 2011?  I am going to ask you to flip to it.  It's

10   Exhibit P-92 in your binder.

11          THE COURT:  Did you ever use the front server station?

12   I'm sorry.

13          THE WITNESS:  No.

14          THE COURT:  I'm sorry.  I'll wait.

15   Q.   What was the front server station?

16   A.   The front station, it was just like a wall and a computer,

17   and that was it.

18   Q.   Can you indicate on the map with the laser pointer, please?

19                        (Indicating)

20          MR. DELANEY:  Let the record reflect the witness is

21   pointing to the space just below the bar on the floor plan.

22          THE COURT:  I don't see a -- I don't see a mark, is

23   that right?

24          MR. DELANEY:  Correct, your Honor, it's not marked on

25   the floor plan.

1          THE COURT:  Is it a table?

2          THE WITNESS:  It's a stand, like this, and with a

3   computer.

4          THE COURT:  Who stands there?

5          THE WITNESS:  The waiters that work towards the front

6   use that, like in this area here, the waiters that work there,

7   they use the computer there in that area.

8          THE COURT:  Where do they get the pepper and salt?

9   Where do they get the raw peppers?

10          THE WITNESS:  To get salt and peppers, they would have

11   to come to this station.  However, sometimes we do have some

12   here.  It's like some shelves there with cups, and sometimes

13   there in that station we have cheese and peppers.

14          THE COURT:  So you would work sometimes in the front

15   server station, sometimes in the center server station, and

16   sometimes in the rear server station?

17          THE WITNESS:  Yes, sometimes in front, sometimes in

18   the middle, other times in the back.

19   Q.  Was the front server station visible to the customers at

20   Remi?  I'm sorry, let me rephrase the question.  If you were

21   standing at the computer in the front server station, could the

22   customers at Remi see you?

23   A.  Yes.

24   Q.  So the front server station was exposed?

25   A.  Yes, it just had almost like a curtain, like a plastic, but

C3sQcar2                          Sotarriba – Redirect

1    the people could see.

2              THE COURT:  The middle server station, where is the

3    door to the middle server station?  No, on the chart.

4              THE WITNESS:  That's where you enter, this part here.

5              THE COURT:  What's on either side of it?  What are

6    those two little lines?  What do they represent?  The ones on

7    top and one below, parallel.

8              THE WITNESS:  It's similar to this here.

9              MR. DELANEY:  Let the record reflect the witness is

10   pointing to the edge of your bench, your Honor.

11             THE WITNESS:  It's similar to this on either side as

12   you enter.

13             THE COURT:  Two short walls?

14             THE WITNESS:  Yes.

15             THE COURT:  About how high?

16             THE WITNESS:  Like to about here.

17             THE COURT:  About where?

18             THE WITNESS:  Like here.

19             THE COURT:  About chest high?

20             THE WITNESS:  Yes.

21             THE COURT:  And where is the entrance to the rear

22   server station?

23             THE WITNESS:  That's here.

24             THE COURT:  That doesn't have the two walls?

25             THE WITNESS:  No, it has one like this.

C3sQcar2                          Sotarriba - Redirect

1    Q.  How high was the wall in the back server station?

2    A.  High, about to here.

3    Q.  About to eye level?

4    A.  Yes.  You could say yes.

5    Q.  Eye level when you're standing up or sitting down?

6    A.  Standing.

7               THE COURT:  Where were the tables?

8               THE WITNESS:  The tables are after that wall.

9               THE COURT:  On either side?

10              THE WITNESS:  This is the station, and there are

11   tables here and others close to this wall here, and others

12   here.

13              THE COURT:  So the tables are alongside either wall

14   and tables down the middle?

15              THE WITNESS:  Yes, down the middle also.

16   Q.  Let me show a photo of the main dining room.  Is that what

17   you're describing, Mr. Sotarriba?

18   A.  Yes.

19   Q.  Do you see any part of the back server station in this

20   photo?

21   A.  Yes.  This (indicating).  This is the wall that I was

22   referring to.

23              THE COURT:  That isn't shown on the chart, is it?

24              MR. DELANEY:  The table setup, your Honor?

25              THE COURT:  No, the wall he's pointing to.

C3sQcar2                          Sotarriba - Redirect

1          MR. DELANEY:  I believe we tried to represent it on

2     the chart.

3          THE COURT:  Let me see the chart.

4          MR. DELANEY:  It's hard.  Randall, can we blow it up

5     or we can't do it on this chart?  You see it kind of jogs?

6     It's like an L-shape, your Honor.  That part there is what's

7     seen in the photo.

8          THE COURT:  The entrance isn't where they show it?

9     The entrance isn't there?

10         MR. DELANEY:  The entrance is right where the pointer

11    is right now.

12         THE COURT:  But there's a wall beyond it, is that

13    right?

14    Q.  Mr. Sotarriba, you know it better than I do.

15         THE COURT:  I am asking him, not you.  Is the wall you

16    pointed out outside the back server station, so you enter from

17    either side to the back server station?

18         THE WITNESS:  No, there's just one entrance.

19         THE COURT:  There's an entrance in the middle?

20         THE WITNESS:  This is the entrance here.  This is the

21    wall here.

22         THE COURT:  Let's see the picture.  The picture shows

23    a wall.

24         THE WITNESS:  This is the long wall here.

25         THE COURT:  What is the thing to the very right-hand

C3sQcar2                          Sotarriba - Redirect

1    side?

2              THE WITNESS:  This is the small wall where the station

3    is.

4              THE COURT:  And that's parallel to the tables that are

5    running along it?

6              THE WITNESS:  Yes, to these tables.

7              THE COURT:  So you push that wall to get into the

8    station, you say?

9              THE WITNESS:  No, it has an opening, an entrance.

10             THE COURT:  That's not shown, the opening, is it?

11             THE WITNESS:  Not in the picture.  It's here.  It's

12   here.

13             THE COURT:  OK.  It's in the center of the station?

14             THE WITNESS:  It's not really centered.  It's like to

15   a side of it.

16             THE COURT:  It's what?

17             THE WITNESS:  It's to a side of the entrance.

18             THE COURT:  I see.  To the right-hand side looking at

19   the picture?

20             THE WITNESS:  In that photo, it's to the right.

21             THE COURT:  It's not shown on the photo?

22             THE WITNESS:  No, you can't see it.

23             THE COURT:  OK.

24             MR. DELANEY:  Would it assist the Court if I asked the

25   witness to draw a diagram of the station?  Draw it out?

C3sQcar2                          Sotarriba - Redirect

1              THE COURT:  I'm sorry?

2              MR. DELANEY:  Would it assist the Court if I asked the

3      witness to draw a diagram of the station?

4              THE COURT:  No.  No.  I am beginning to understand

5      now.  Go head.

6      Q.  So with respect to Exhibit 92, your affidavit that you

7      signed in June 2011, was there ever -- sorry, let me rephrase.

8              Did Mr. Velandia ever touch you ten times a day after

9      you became a food runner?

10             MR. PARKER:  Objection.  Leading.

11             THE COURT:  It's redirect.  I'll allow it.

12     A.  Well, he did touch me, he did, but I don't remember if it

13     did happen ten to 15 times at that time.  I mean, it was busy

14     at times.

15     Q.  I'm sorry, sir.  My question is very specific.  Do you

16     remember any shift where you ever touched you ten times a day?

17             THE COURT:  While he was a -- when?

18             MR. DELANEY:  I'm just trying to make sure the witness

19     understands I'm asking about a particular shift, not the

20     frequency over a period of time.

21             THE COURT:  All the way back to 2001?

22             MR. DELANEY:  No.  No.

23     Q.  After April 2005 when the new owners took over, do you

24     remember any shift, any one shift when Mr. Velandia touched you

25     ten times per day or ten times?

C3sQcar2                                     Sotarriba - Redirect

1    A.  Yes.

2    Q.  And after April 2005, do you remember any one shift when

3    Mr. Velandia touched you 15 times?

4    A.  Yes, he touched me a lot.

5              THE COURT:  When was that?

6              THE WITNESS:  I just -- I can't remember.

7              THE COURT:  What time of year -- what year was it?

8              THE WITNESS:  I'm just confused.

9              THE COURT:  Well, what year was it when he touched you

10   15 times in the genitals?

11             THE WITNESS:  That was between 2004 and 2005.

12   Q.  Do you ever recall Mr. Velandia touching you 15 times in

13   one shift when he was wearing a suit?

14             MR. PARKER:  Objection.

15             THE COURT:  Objection sustained.

16   Q.  Did Mr. Velandia ever touch you while he was wearing a

17   suit?

18   A.  Yes.

19   Q.  Did he touch you 15 times in one shift when he was wearing

20   a suit?

21             MR. PARKER:  Objection.

22             THE COURT:  I'll allow the question.

23   A.  Well, when I was a runner, he touched me lots.

24   Q.  Do you recall submitting an update to your EEOC charge --

25   let me start again.  Can I ask you to turn to Plaintiff's

C3sQcar2                          Sotarriba - Redirect

1    Exhibit 20.  Do you recall updating information in this EEOC

2    charge?

3               THE COURT:  Objection sustained.  I don't understand

4    the question as phrased.

5    Q.  Did you ever submit any additional information to the EEOC

6    regarding the allegations you made in Plaintiff's Exhibit 20?

7    A.  I don't remember.

8    Q.  Is there anything I can do to refresh your recollection?

9    A.  Possibly.

10              MR. DELANEY:  Permission to approach, your Honor?

11              THE COURT:  No.  Anything is possible.

12   Q.  Is there any specific document I can show you that would

13   refresh your recollection?

14   A.  It's possible, yes.

15              THE COURT:  Anything's possible.

16   Q.  Do you recall submitting any additional information in

17   August 2010 to EEOC?

18              MR. PARKER:  Objection.

19              THE COURT:  Objection overruled.

20   A.  August 20?

21   Q.  August 10, 2010.

22   A.  Yes.

23   Q.  Do you recall what that was?

24   A.  At this moment I don't remember.

25   Q.  Do you recall submitting or --

C3sQcar2                        Sotarriba – Redirect

 1            THE COURT:  How do you know it was August 10, 2010?

 2            THE WITNESS:  I know that I went to see my attorneys.

 3            THE COURT:  That doesn't answer it.  That doesn't

 4       answer my question.  Do you know why you went to see your

 5       attorneys in August 2010?

 6            THE WITNESS:  I remember that I went to see them about

 7       this, but I don't remember the date.

 8            THE COURT:  See them about what?

 9            THE INTERPRETER:  I'm sorry, your Honor?

10            THE COURT:  See them about what?

11            THE WITNESS:  About the complaint that I had filed,

12       this complaint.

13       Q.  By "this complaint," you mean Exhibit 20?

14       A.  I'm just confused.

15            THE COURT:  What do you mean by your attorneys?

16            THE WITNESS:  Carmela or maybe them.

17       Q.  By "them," do you mean Paul Weiss?

18       A.  Yes, Paul Weiss.

19            THE COURT:  Who was it?

20            THE WITNESS:  That's what I'm confused about.

21       Q.  Do you recall updating any of the information in your EEOC

22       charge at or about that time in August 2010?

23            MR. PARKER:  Objection.  Asked and answered.

24            THE COURT:  Objection sustained.

25       Q.  Do you recall Mr. Parker read the sentence to you from

C3sQcar2                        Sotarriba - Redirect

1   Plaintiff's Exhibit 20:  "The last time Velandia touched or

2   propositioned me was in June 2008"?

3   A.  Yes.

4   Q.  And that was inaccurate, correct?

5   A.  Yes.

6   Q.  Do you recall ever correcting this statement with the EEOC?

7           MR. PARKER:  Objection.

8           THE COURT:  Objection sustained.  The question calls

9   for a conclusion.

10  Q.  Do you recall ever correcting this statement?

11  A.  Yes.

12  Q.  How did you correct it?

13  A.  Stating that that, that that part there, that that was not

14  the last time that he had touched me.

15          THE COURT:  Where did you change it?  Where were you

16  when you changed it?

17          THE WITNESS:  I think it was or might have been at

18  Paul Weiss's office.

19          THE COURT:  Where was it?  Which office was it?

20          THE WITNESS:  Paul Weiss's.

21  Q.  Do you recall how you corrected it?

22  A.  I remember that I stated that the last time he touched me

23  was in 2007, and that this information was incorrect, at least

24  that the date was incorrect.

25          THE COURT:  Who said the date was incorrect?

1          THE WITNESS:  I said that that date was incorrect.

2          THE COURT:  Why did you tell them the date was

3     incorrect?

4          THE WITNESS:  Because the last time that he touched me

5     was in 2007, December of 2007.

6          THE COURT:  What caused you to say that to them?

7          THE WITNESS:  But here it says June of 2008.

8          THE COURT:  What caused you to say that to them?

9          THE WITNESS:  I don't remember too well, but I think

10    it might have been read to me.

11         THE COURT:  Who do you think read it to you?

12         THE WITNESS:  I think the interpreter did.

13         THE COURT:  Who was present when the interpreter did?

14         THE WITNESS:  Well, I was with my attorneys.

15         THE COURT:  Who was your attorney?

16         THE WITNESS:  Paul Weiss attorneys.

17         THE COURT:  I thought you went to their office?

18         THE WITNESS:  Paul Weiss's office.

19         THE COURT:  Did you have a conversation with your

20    attorney before the interpreter read to you?

21         MR. DELANEY:  Caution the witness not to reveal any

22    privileged information.

23         THE COURT:  It's a yes-or-no question.

24         MR. DELANEY:  Just a yes or no, Mr. Sotarriba.

25         THE WITNESS:  Yes.

C3sQcar2                           Sotarriba - Redirect

          MR. DELANEY:  Your Honor, may I approach and hand the

witness an exhibit that we can talk about that might help

clarify this?

          THE COURT:  I don't know what you're handing him.  You

may first show it to Mr. Parker.

          MR. PARKER:  Judge, I'm going to object to the use of

the exhibit.

          THE COURT:  Do you want a sidebar?

          MR. PARKER:  Yes, please.

          THE COURT:  All right.

          (At the sidebar)

          MR. PARKER:  Your Honor, the exhibit was apparently

submitted to the EEOC August 10, 2010.  The EEOC charge that

Sotarriba filed was in January of 2009.  It was dismissed by

the EEOC on August 7, '09.  The case was closed.  The lawsuit

was filed in September of 2009, and the EEOC had closed its

file and given him a right to sue.  So the fact that he may

have sent this document in, or his counsel did, is really of no

moment.

          MR. DELANEY:  Your Honor, it just goes to my witness

made good faith efforts to correct the record once it came to

his attention and our attention that at least part of his EEOC

charge as originally done was inaccurate.  It doesn't go to the

basis of EEOC or the making of it.  It simply goes to

rehabilitating the truth of this witness.

1          MR. PARKER:  Well, I don't think there's been any

2   testimony that it was his initiation that caused this.  I

3   suspect it was counsel's.

4          MR. DELANEY:  Your Honor, there was a statement that

5   it was read to him before he signed it.  There were words on

6   the page when he signed it.  I think Mr. Parker clearly has

7   been trying to impugn the credibility of my witness.

8          THE COURT:  Of course.

9          MR. DELANEY:  My client is not sophisticated, your

10  Honor.  He didn't understand, and as you can see over the last

11  two days, translations sometimes don't come across clearly.  So

12  I think it was -- this letter reflects that once he realized

13  what had been put on that paper, he made good faith efforts to

14  correct it with our offices.  And it was copied to Mr. Parker

15  at the time.

16         MR. PARKER:  I'm not saying it wasn't copied.  I had

17  it.

18         THE COURT:  Let me ask him a question first.

19         MR. DELANEY:  Yes.

20         (In open court)

21         THE COURT:  Mr. Sotarriba, on that date, what caused

22  you to go to Paul Weiss's office?

23         THE WITNESS:  To discuss this document.

24         THE COURT:  I understand.  Did someone call you?

25         THE WITNESS:  No, I went in.

C3sQcar2                           Sotarriba - Redirect

 1              THE COURT:  You went without an appointment?

 2              THE WITNESS:  I went with Carmela.

 3              THE COURT:  So you went with Carmela.

 4              THE WITNESS:  Yes.

 5              THE COURT:  Why did you go with Carmela?

 6              THE WITNESS:  So that we could discuss the charge.

 7              THE COURT:  Did you contact Carmela or did Carmela

 8       contact you?

 9              THE WITNESS:  Carmela contacted me, well, through the

10       interpreter.

11              THE COURT:  She asked you to go to Paul Weiss's

12       office?

13              THE WITNESS:  Yes.

14              THE COURT:  Did she tell you why?

15              THE WITNESS:  No, we just showed up and discussed the

16       charge.

17              THE COURT:  She didn't tell you why you should go to

18       Paul Weiss's office?

19              THE WITNESS:  I don't remember.

20              THE COURT:  You don't remember your conversation with

21       Carmela?

22              MR. DELANEY:  Just yes or no, Mr. Sotarriba.

23              THE WITNESS:  No, I don't remember.

24              THE COURT:  I'm not going to allow it.

25       BY MR. DELANEY:

C3sQcar2                         Sotarriba – Redirect

1   Q.  Mr. Sotarriba, did you ever threaten to hit Mr. Velandia?

2   A.  No.

3   Q.  Did you testify in response to Mr. Parker's question

4   earlier today that at least on one occasion you threatened to

5   hit Mr. Velandia?

6   A.  I told him, but I never tried.

7   Q.  Why not?

8   A.  If I did that, I would lose my job.  Even though even just

9   saying that to him I was afraid.

10  Q.  Did you ever see anyone else hit Mr. Velandia?

11  A.  Yes.

12  Q.  Who?  Who hit Mr. Velandia?

13  A.  A runner.

14  Q.  What was his name?

15  A.  I don't remember his name, but I know they called him Cruz.

16  I don't know if that was his first name or his surname.

17  Q.  What happened?

18  A.  I was coming out of the restaurant door in the rear where

19  the schedule is posted when Cruz ran up and he seemed upset,

20  and Oscar was standing there right by where the schedule was

21  posted, and it seemed to me like he punched him.  But I was

22  behind him.  I was arriving.

23  Q.  Did you hear anything they said?

24  A.  Cruz said, "Hey, faggot" or something like that, and then

25  he struck him.  And then Oscar ran down, I believe he went to

C3sQcar2                           Sotarriba - Redirect

1   the office, and then someone said that the owner was going to

2   speak to him --

3                  MR. PARKER:  Objection.

4                  THE COURT:  Objection sustained.  When was this?

5                  THE WITNESS:  That was with the old company.

6                  THE COURT:  What year did it happen?

7                  THE WITNESS:  I had just started working there

8   maybe -- the same year that I started working there.  I don't

9   remember too well though.

10                 THE COURT:  As a waiter, you know that fighting

11  amongst employees is cause for discharge, don't you?

12                 THE WITNESS:  Yes, and Cruz was fired.

13                 MR. DELANEY:  I have no further questions, your Honor.

14  But I have one exhibit to enter in connection with this

15  witness, but I would just ask for a second.  Do you want me to

16  do it now or ...

17                 THE COURT:  Keep going.  Now is better than later.

18                 MR. DELANEY:  Your Honor, it's Exhibit P-97 in your

19  binder.

20                 THE DEPUTY CLERK:  Plaintiff's 97?

21                 MR. DELANEY:  Correct.

22                 THE DEPUTY CLERK:  Plaintiff's 97.

23                 MR. DELANEY:  In Mr. Sotarriba's, the binder we gave

24  the witness.  Your Honor, we move to admit P-97 into evidence

25  as a public record.

C3sQcar2                          Sotarriba - Redirect

1              THE COURT:  Any objection?

2              MR. PARKER:  Judge, I know that the letter is

3   directed -- it appears to be an EEOC letter.  I know that it is

4   directed to 53rd Street Partners.  I also know that there would

5   be testimony that this letter was never received.  I don't

6   dispute that it is what it is, but I have to object nonetheless

7   because it was never received by my client.

8              MR. DELANEY:  Your Honor, the admissibility of the

9   letter is not by receipt of the letter.  It's a statement by an

10  agency.  Under 803, it's admissible as a public record.

11             THE COURT:  Are you offering it for the fact that it's

12  public record?

13             MR. DELANEY:  Correct.

14             THE COURT:  Anything else?

15             MR. DELANEY:  Mostly for the fact that Mr. Sotarriba's

16  charge was filed as stated by the EEOC in this letter.  It goes

17  to the exhaustion requirement of the statute.

18             THE COURT:  Are there any objections for those

19  purposes?

20             MR. PARKER:  No, Judge.

21             THE COURT:  It's admitted for those purposes.

22             (Plaintiff's Exhibit 97 received in evidence)

23             MR. DELANEY:  No further questions, your Honor.

24             MR. PARKER:  Would it be appropriate to take a five

25  minute break for me to use the men's room?

C3sQcar2                        Sotarriba - Redirect

```
 1                THE COURT:  Are you done with this witness?

 2                MR. PARKER:  No.

 3                THE COURT:  All right.  Take a five minute break.

 4                MR. DELANEY:  Do you want to instruct the witness,

 5   your Honor?

 6                THE COURT:  No, because he's done with redirect.  He's

 7   going on cross.

 8           (Recess)

 9   RECROSS EXAMINATION

10   BY MR. PARKER:

11   Q.  Mr. Sotarriba, just a few questions about the server

12   stations that we have been discussing.  You talked about the

13   middle station and the back station.  With regard to the middle

14   station, people sitting at tables in the restaurant near the

15   middle station can see into the server station from their

16   tables, correct?

17   A.  Could you repeat that?

18                MR. PARKER:  Could you read that back?

19                           (Read back)

20   A.  They can't see inside, no.

21   Q.  There's no door there, is there?

22   A.  No, there is not.

23   Q.  And there are tables in front of that -- outside the door

24   across the -- across the restaurant from the station itself,

25   aren't there?
```

C3sQcar2                         Sotarriba - Recross

1    A.  Yes.

2    Q.  And the back station, you said that there's an entryway

3    into the back station with no door, right?

4    A.  No.

5                THE COURT:  There's no door?

6                THE WITNESS:  No.

7    Q.  No door, right?

8    A.  No.

9    Q.  Across from the entry way is a guest table, right?

10   A.  What?

11   Q.  Across from the entryway into the back station, there is a

12   guest table, right?

13   A.  Yes.

14   Q.  You talked about occasionally having to go into a server

15   station to get tea or pepper or cheese?

16               MR. DELANEY:  Objection.

17               THE COURT:  Objection sustained to the form of the

18   question.

19               (Continued on next page)

20

21

22

23

24

25

C3sdcar3                          Sotarriba - recross

1    Q.  Mr. Sotarriba, I want to direct your attention to your

2    testimony about the use of the server stations by food runners.

3         You testified that you used the server stations to

4    obtain tea bags, correct?

5    A.  Sometimes.

6    Q.  Sometimes because the tea at Remi is served by the busboys

7    typically, correct?

8    A.  Could you repeat that?

9    Q.  If a guest orders tea, it's the job of the busboys to bring

10   the water -- the hot water to the tables, correct?

11   A.  Yes.

12   Q.  And either the busboy or the waiter are the ones who

13   usually bring the tea bags to the tables, correct?

14   A.  Yes.

15   Q.  So it was not the regular day-to-day job of a food runner

16   to serve tea, correct?

17   A.  No.  But if the guest asks for it, I have to get it for

18   them.

19   Q.  And tea was kept at the three server stations in the dining

20   room, right?

21   A.  Yes.

22   Q.  And tea was also kept at the coffee station, correct?

23   A.  I don't know.  I don't remember.

24   Q.  OK.  And food runners were not assigned to a particular

25   server station, were they?

C3sdcar3                          Sotarriba - recross

1    A.  Yes.

2              THE COURT:  Yes what?

3    Q.  Yes what?

4    A.  Well, yes, we had a station in the basement.

5    Q.  OK.  Let me refer to the server stations in the dining

6    room.

7              Food runners were not assigned to a specific server

8    station during their shifts, correct?

9    A.  No.

10   Q.  So during your shift as a food runner --

11             THE COURT:  It is not correct?

12             THE WITNESS:  No.

13             THE COURT:  They were assigned to a specific table --

14   server station?

15             THE WITNESS:  Well, there was also a stand next to the

16   stations that we used in order to place the food.

17   BY MR. PARKER:

18   Q.  But if you're working as a food runner, you were allowed to

19   use any of the server stations in the dining room to do your

20   job, right?

21   A.  Yes.

22   Q.  There were occasions where you called Mr. Velandia a

23   faggot, were there not?

24   A.  Yes.

25             MR. PARKER:  I have nothing further.

C3sdcar3                          Sotarriba - recross

1          THE COURT:  All right.

2          You are excused.

3          Next witness.

4          MS. PENZA:  The plaintiffs call Sergio --

5          THE COURT:  Well, I do have a question.

6          Mr. Sotarriba, when you worked at the Russian Tea

7     Room, did you get a booklet?

8          THE WITNESS:  Not exactly a booklet but next to the

9     locker room, the whole wall there is covered by different forms

10    about sexual harassment and many other policies.  You can see

11    it all there.

12         THE COURT:  It is on the wall?

13         THE WITNESS:  So you could see it all along the wall.

14         THE COURT:  This is in English and Spanish?

15         THE WITNESS:  They have them in both.

16         THE COURT:  Any other languages?

17         THE WITNESS:  I haven't paid attention to that, but --

18         THE COURT:  Italian?

19         THE WITNESS:  No.

20         THE COURT:  Now, what about BS80?

21         THE WITNESS:  They have them as well, but I'm not sure

22    exactly if it's in the lower level, along the hallway walls.

23         THE COURT:  Where is it?  You still work there, right?

24         THE WITNESS:  Yes, but we use another doorway.

25         THE COURT:  So you don't see it?

C3sdcar3                         Sotarriba - recross

 1              THE WITNESS:  Sometimes we pass by there and you can

 2    see it.

 3              THE COURT:  Does anyone hand you or give you a -- hand

 4    you anything to read?

 5              THE WITNESS:  At DVR I was given a booklet.

 6              THE COURT:  A booklet?

 7              THE WITNESS:  Yes.  It's like this many pages, to read

 8    it all.

 9              THE COURT:  What did the booklet tell you?

10              THE WITNESS:  Many moves.  I just haven't had the

11    opportunity to read it.

12              THE COURT:  So do you know what's on the wall?

13              THE WITNESS:  It's like forms from the Labor

14    Department, things like that.

15              THE COURT:  Anything about sex harassment?

16              THE WITNESS:  I hardly go down there because that's

17    where they do the preparations, but everything is there.

18              THE COURT:  How do you know?

19              THE WITNESS:  Because there are many there.

20              THE COURT:  How do you know if it is anything about

21    sex harassment?

22              THE WITNESS:  Well, I haven't paid complete attention

23    to that.

24              THE COURT:  So you don't know, is that right?

25              THE WITNESS:  Yes, I don't know.

C3sdcar3                          Sotarriba - recross

1         THE COURT:  You don't know whether there is anything

2    about sex harassment in the booklet, is that right?

3         THE WITNESS:  I don't know that either.

4         THE COURT:  No one has given you any instructions

5    about sex harassment at the dbB, right?

6         THE WITNESS:  No.

7         THE COURT:  Not right?  They have given you?

8         THE WITNESS:  No, I have not been given anything.

9         THE COURT:  That's all.

10        I may have opened up something.  You are entitled

11   to --

12        MR. DELANEY:  No.  We were just preparing something.

13        THE COURT:  I will ask one other question.

14        Have you worked at other restaurants besides Remi and

15   Russian Tea Room and dbB?

16        THE WITNESS:  Yes.

17        THE COURT:  What other restaurants?

18        THE WITNESS:  Before working at Remi, I worked at one

19   called Aja something; it has an A, a J and an A.

20        THE COURT:  Did they have any -- give you any

21   instructions about sex harassment at that restaurant?

22        THE WITNESS:  No.

23        THE COURT:  Either in writing or orally?

24        THE WITNESS:  No.

25        THE COURT:  Was that a big or a small restaurant?

C3sdcar3                          Sotarriba - recross

1           THE WITNESS:  It's small.  It wasn't too big.

2           THE COURT:  All right.  Thank you.

3           You can go ahead.

4           MR. DELANEY:  OK.  You are done, Mr. Sotarriba.  You

5      are done.

6           (Witness excused)

7           MR. DELANEY:  Yes, your Honor.

8           I thought, when I was discussing one of the documents,

9      I had mentioned that the parties had stipulated to the

10     foundation and business records of it, and you said, oh, maybe

11     that should be into evidence.  So the factual stipulation as to

12     those documents are in the Joint Pretrial Order.

13          So I have it here and I am prepared to move it into

14     evidence, and Mr. Parker doesn't have any objections.  I didn't

15     know if that was the way you wanted to proceed.

16          THE COURT:  That is fine with me.

17          Let's have the next witness.

18          MR. DELANEY:  I can do it two ways.

19          THE COURT:  That is something about 50 pages.

20          MR. DELANEY:  No, this is the Joint Pretrial Order.

21          THE COURT:  OK.

22          MR. DELANEY:  I can also pull out just the factual

23     stipulation and mark that.  It is just whatever is more

24     convenient to the Court.

25          THE COURT:  Well, just -- I don't want you to tear

C3sdcar3

1    your thing apart.

2            MR. DELANEY:  I will move this in.

3            THE COURT:  Somehow you ought to put it in a

4    stipulation so that we know what part of it you are referring

5    to.  Maybe you could do it by pages of the stipulation,

6    stipulate that --

7            MR. DELANEY:  It is not crucial we do it now.

8            THE COURT:  You could do that and work that out with

9    Mr. Parker during lunch.

10           MR. DELANEY:  OK.

11           THE COURT:  Let's get on with the witnesses.

12           MS. PENZA:  The plaintiffs call Mr. Sergio Pastor.

13    SERGIO PASTOR GARCIA,

14        called as a witness by the plaintiffs,

15        having been duly sworn (through the interpreter),

16        testified as follows:

17           THE CLERK:  Please be seated.

18           If you can pull that chair as far forward as you can.

19    Just keep your voice up.  The microphone will pick you up.

20           THE WITNESS:  Yes.

21           THE CLERK:  Please state your name.  Spell your first

22    and your last name slowly for the record, please.

23           THE WITNESS:  My name is Sergio Pastor Garcia,

24    S-e-r-g-i-o P-a-s-t-o-r.

25    DIRECT EXAMINATION (through the Interpreter)

C3sdcar3                           Pastor - direct

1   BY MS. PENZA:

2   Q.   Good morning, Mr. Pastor.

3        What is your address?

4   A.   2644 Marion Avenue.

5   Q.   Where is that?

6   A.   In the Bronx.

7   Q.   What's your date of birth?

8   A.   3/30/88.

9   Q.   So how old are you today?

10  A.   I'm 23.  I will be 24 in two days.

11  Q.   Happy birthday.

12  A.   Thank you.

13  Q.   Are you married?

14  A.   Yes.

15  Q.   What's your wife's name?

16  A.   Lucerna BiBiana Martinez Martinez.

17  Q.   How long have you been married?

18  A.   Seven years.

19  Q.   Do you have any children?

20  A.   Yes.

21  Q.   How many?

22  A.   Two.

23  Q.   How old are they?

24  A.   My daughter is five years old and my son is two.

25  Q.   Where were you born, Mr. Pastor?

C3sdcar3                        Pastor - direct

1    A.   In Mexico.

2    Q.   When did you come to America?

3    A.   July 15, 2003.

4    Q.   How old were you when you came to America?

5    A.   14 years old.

6    Q.   What grade had you completed in school before you came to

7    America?

8    A.   I finish the sixth grade.

9    Q.   When you came to America, did you continue your education?

10   A.   No.

11   Q.   What did you do?

12   A.   I began to work.

13   Q.   Had you worked when you were in Mexico?

14   A.   Yes.

15   Q.   What had you done in Mexico?

16   A.   I'm in children's shoes.

17   Q.   How long had you done that?

18   A.   Approximately five years.

19   Q.   So since you were about nine years old?

20   A.   Possibly, yes.

21   Q.   Where did you begin working when you came to America?

22   A.   I began to work around my house.

23   Q.   At what type of establishment?

24   A.   A restaurant.

25   Q.   And how long did you work at the restaurant around your

C3sdcar3                          Pastor - direct

1   house?

2   A.   Possibly two or three months.

3            THE COURT:  Did you live at the same place?

4            THE WITNESS:  No.

5   Q.   Where was that located?

6   A.   I used to live at 560 West 126th Street.

7   Q.   After you worked at the restaurant around the corner from

8   your house -- why did you stop working at that restaurant?

9   A.   Why?  Because my cousin called me about another job.

10  Q.   Where was the other job?

11  A.   At La Pequena Italia.

12  Q.   In Little Italy?

13  A.   Yes, in Little Italy by Canal Street.

14  Q.   Did you go to work at that restaurant in Little Italy?

15  A.   Yes.

16  Q.   How long did you work there?

17  A.   Possibly three to four months.

18  Q.   After that where did you work?

19  A.   After that I started to work at Remi Restaurant.

20           THE COURT:  Did you go to school in this country?

21           THE WITNESS:  No.

22           THE COURT:  At 14?

23           THE WITNESS:  No.

24  BY MS. PENZA:

25  Q.   How did you get the job at Remi Restaurant?

C3sdcar3                          Pastor - direct

1    A.  I walked until I reached Remi Restaurant.

2    Q.  When did you begin working at Remi Restaurant?

3    A.  February of 2004.

4    Q.  And how old were you at the time?

5    A.  I was possibly 15 years old -- 15.

6    Q.  And how long did you continue to work at Remi?

7    A.  I began to work in 2004.  It might have possibly been three

8    years.

9    Q.  How old were you when you left Remi?

10   A.  Possibly 18 or 19 years old.

11   Q.  While you were employed at Remi Restaurant for about three

12   years, what different jobs did you hold?

13   A.  First I started out as a white jacket.

14   Q.  And how long were you a white jacket?

15   A.  For about six months as a white jacket.

16   Q.  After that?

17   A.  After that I became a busboy.

18   Q.  And how long were you a busboy?

19   A.  Possibly a year.

20   Q.  And after that?

21   A.  After that I became a food runner.

22   Q.  Did you remain a food runner until you left Remi?

23   A.  Yes.

24   Q.  While you were working at Remi Restaurant, was a man named

25   Oscar Velandia also employed there?

C3sdcar3                          Pastor - direct

 1   A.  Yes.

 2   Q.  Do you see him in the courtroom?

 3   A.  Yes.

 4   Q.  Could you please identify something that he is wearing?

 5   A.  He is wearing a jacket with a tie.

 6   Q.  What color tie?

 7   A.  I can't see it.

 8   Q.  Will you please point to him?

 9   A.  (Indicating) Yes.  He's seated back there.

10   Q.  In the third row?

11   A.  Possibly, yes.

12          MS. PENZA:  Let the record reflect that the witness

13   has --

14          THE COURT:  I don't think you should lead on

15   identification.

16   Q.  What row is he sitting in?

17   A.  It seems like the second.

18   Q.  How many people are sitting in the row he's in?

19   A.  Possibly two but I can't really tell.

20   Q.  Who is sitting next to him?

21   A.  A gentleman is seated next to him.

22   Q.  Do you know who that gentleman is?

23   A.  He's the owner of the restaurant.

24          THE COURT:  OK.

25   Q.  What color is that gentleman's hair?

C3sdcar3                          Pastor - direct

1   A.  Like gray, white.

2   Q.  And what color --

3          THE COURT:  The record will indicate that the witness

4   has identified Mr. Velandia.

5   BY MS. PENZA:

6   Q.  At some point while you were working at Remi Restaurant,

7   did Mr. Velandia ever start to make you feel uncomfortable?

8          MR. PARKER:  Objection.

9          THE COURT:  Objection sustained.

10  Q.  While you were working at Remi Restaurant --

11         THE COURT:  No leading questions.

12  Q.  When did you begin working with Mr. Velandia at Remi

13  Restaurant?

14  A.  Possibly when I began to work as a busboy.

15  Q.  What happened when you were working as a busboy with

16  Mr. Velandia?

17  A.  I felt uncomfortable.

18  Q.  How did you feel uncomfortable?

19  A.  Because he would gesture with his lips and indicate my

20  parts.

21  Q.  When did this first start happening?

22         MR. PARKER:  Your Honor, I just want the record to

23  reflect that this was part of the application I made in advance

24  of trial, and there is a continuing objection to this

25  testimony.

1          MS. PENZA:  Your Honor, the Second Circuit has held

2     that testimony by nonparty witnesses as to a hostile work

3     environment is relevant in sexual harassment cases.

4          THE COURT:  Is he going to testify about hostile work

5     environment?

6          MS. PENZA:  I'm sorry.  It is about the environment in

7     which the sexual harassment took place.  In the <u>Perry</u> case, it

8     was a case dealing with sexual harassment, and the testimony of

9     other women being sexually harassed was admissible.

10         THE COURT:  In some cases.

11         MS. PENZA:  Your Honor, Mr. Pastor was -- the

12    testimony will show that -- the testimony is directly relevant

13    to Mr. Velandia's action, which is similar to the allegations

14    that are being made by the plaintiffs in this action.

15         THE COURT:  I think you have to have time and place.

16    BY MS. PENZA:

17    Q.  Mr. Pastor, you said that Mr. Velandia's conduct began

18    while you were a busboy?

19    A.  Yes.

20    Q.  When were you a busboy at Remi Restaurant?

21    A.  While I worked as a white jacket for six months, but I

22    started to work in February of 2004.

23    Q.  So would it be correct that by August 2004, you were

24    working as a busboy?

25    A.  Yes.  Possibly, yes.

C3sdcar3                        Pastor - direct

1    Q.  When you were working at Remi Restaurant in August 2004,

2    were you aware of whether Mr. Caravantes or Mr. Sotarriba were

3    working at Remi Restaurant?

4            THE COURT:  Objection sustained.

5    Q.  Do you know --

6            THE COURT:  I'm sorry.  I will let you ask that

7    question.

8    A.  Could you repeat that, please?

9    Q.  While you were working at Remi Restaurant -- I'm sorry.

10           In August --

11           THE COURT:  You can't.  You've got two people in it.

12   That is one of the problems.

13   Q.  In August 2004, when you were a busboy at Remi Restaurant,

14   were Mr. Caravantes and Mr. Sotarriba --

15           THE COURT:  Objection sustained to the form of the

16   question.

17   Q.  Do you know Mr. Caravantes?

18   A.  Yes.

19   Q.  How do you know him?

20   A.  We worked at the restaurant.

21   Q.  When was he employed at Remi Restaurant?

22   A.  He was already working there when I started to work there.

23   Q.  And was he still working there when you left Remi?

24   A.  Yes.

25   Q.  How about Mr. Sotarriba?

C3sdcar3                          Pastor - direct

1   A.  Could you repeat the question again, please?

2                THE COURT:  I think you want to ask the question, not

3   "how about."

4   Q.  You just mentioned that -- you just described when

5   Mr. Caravantes was working at Remi in relation to while you

6   were working at Remi Restaurant.

7                Do you know Mr. Sotarriba?

8   A.  Yes.

9   Q.  How do you know Mr. Sotarriba?

10  A.  When I began to work the restaurant, Francisco Sotarriba

11  was already there.

12  Q.  And did he also continue working at Remi Restaurant until

13  you left?

14  A.  Yes.

15  Q.  You said that you were a busboy when Mr. Velandia first

16  made you feel uncomfortable.

17  A.  Yes.

18               MR. PARKER:  Your Honor, I'm going to object to the

19  questioning of this witness with regard to events that occurred

20  in 2004, in addition to the general objection that I have to

21  this witness' testimony of anything relating to this topic.

22  But 2004, certainly, as we know, has nothing to do with this

23  case from a liability standpoint.

24               MS. PENZA:  Your Honor, Mr. --

25               THE COURT:  I will allow it as background.

C3sdcar3                          Pastor - direct

1    Q.  Mr. Pastor, the conduct relating to Mr. Velandia, you said

2    it began in August 2004.  When did it end?

3              THE COURT:  Did it occur more than once?

4              THE WITNESS:  It occurred many times, various times.

5              THE COURT:  All right.

6    Q.  Until the end of your employment?

7    A.  Yes.

8    Q.  You said you were a busboy when Mr. Velandia first began

9    making you feel uncomfortable.

10             What was Mr. Velandia's position in the restaurant at

11   that point?

12   A.  At that time he was a waiter.

13   Q.  How old were you when Mr. Velandia began making these

14   gestures?

15   A.  15 years old.

16   Q.  Did Mr. Velandia begin to ever move beyond gestures?

17             MR. PARKER:  Objection.

18             THE COURT:  That is a leading question, the way you

19   phrased it.  You can ask him in a different way.  You can do

20   it.

21   Q.  How did Mr. Velandia's behavior change?

22             THE COURT:  What was that question?

23             (Pause)

24             THE COURT:  All right.

25             MR. PARKER:  I object to that, too.

C3sdcar3                        Pastor - direct

1                    THE COURT:  That is also a leading question.

2                    Did it?  Did he do anything else?  Just a simple

3       question.

4       Q.  Did he do anything else to you, Mr. Pastor?

5       A.  Yes.

6       Q.  What did he do?

7       A.  He performed oral sex on me.

8       Q.  Can you tell me when the first time was Mr. Velandia

9       performed oral sex on you?

10      A.  The first time was when I went to get some candles in the

11      basement.

12      Q.  When was this?  What time period?

13      A.  It was in 2004.

14      Q.  How old were you at this time?

15      A.  I was 15 years old.

16      Q.  Why were you going to the basement?

17      A.  I went to get some candles.

18      Q.  What room was it?

19      A.  It's a room next to the kitchen.  They call it the

20      mechanical room.

21      Q.  Can you describe what the mechanical room looks like?

22      A.  It's close to the kitchen.  It has two doors, one to enter

23      and there is another door at the rear of that room.

24                   THE COURT:  What time of day did this occur?

25                   THE WITNESS:  That was at about 5, 5 or 6.

C3sdcar3                        Pastor - direct

1           THE COURT:  Morning or afternoon?

2           THE WITNESS:  In the afternoon.

3   BY MS. PENZA:

4   Q.  And what happened?

5   A.  Well, when I went to get the candles, Oscar Velandia came

6   in after me and he closed the door.  And he lowered my zipper,

7   and he began to perform oral sex on me.

8   Q.  Did he say anything?

9   A.  When he finished, he said, "Don't tell my best friend Jose

10  Ortiz, or not to say anything to anyone about what happened."

11  Q.  Did you say anything to Mr. Velandia?

12          THE COURT:  Did he say both things or -- when you say

13  "or," did he say both things, don't tell my best friend Jose

14  Ortiz, and did he also say not to say anything to anyone else

15  about what happened?

16          THE WITNESS:  At that moment he said both things.

17  BY MS. PENZA:

18  Q.  Did you say anything to Mr. Velandia?

19  A.  No.

20  Q.  Why not?

21  A.  I was afraid.

22  Q.  How did it make you feel when Mr. Velandia performed oral

23  sex on you?

24          MR. PARKER:  Objection.

25          THE COURT:  Objection sustained.

C3sdcar3                          Pastor - direct

1   Q.  Prior to Mr. Velandia performing oral sex on you, what was

2   your sexual experience?

3   A.  I had no experience.

4   Q.  Had you ever had oral sex before?

5   A.  No.

6   Q.  Were you a virgin?

7   A.  Yes.

8   Q.  After that first time, did Mr. Velandia ever perform oral

9   sex on you again?

10  A.  Yes.

11  Q.  How long did the behavior continue in terms of him

12  performing oral sex on you?

13          THE COURT:  Objection sustained.

14  Q.  When was the last time Mr. Velandia performed oral sex on

15  you?

16  A.  Could you repeat the question again, please?

17  Q.  When was the last time Mr. Velandia performed oral sex on

18  you?

19  A.  The last time was in 2007.

20  Q.  Did you want Mr. Velandia to perform oral sex on you?

21  A.  No.

22  Q.  Did you ever want Mr. Velandia to perform oral sex on you?

23          (Pause)

24          I'm sorry.

25          Did you want Mr. Velandia to perform oral sex on you

C3sdcar3                         Pastor - direct

1    the first time it happened?

2    A.  No.

3    Q.  In any of the times that Mr. Velandia performed oral sex on

4    you, did you want it to happen?

5    A.  No.

6           THE COURT:  Did he perform oral sex on you in any

7    other room besides the mechanical room?

8           THE WITNESS:  Yes.

9           THE COURT:  What other rooms?

10          THE WITNESS:  It happened in the Rialto Room, at the

11   coat check, in the locker room.  There were some stairs that

12   were used to go -- that it was called Remi To Go; sometimes he

13   would send me there and it happened there.

14          THE COURT:  What time of day did it occur -- did it

15   occur in the Rialto Room?

16          THE WITNESS:  Sometimes on Sundays, when there was

17   nothing going on there, he would send me into the bathroom.

18          THE COURT:  Did you ever tell him you didn't want to

19   go there?

20          THE WITNESS:  I wouldn't say anything.

21   BY MS. PENZA:

22   Q.  How frequently would -- over the course of the three years,

23   how frequently would Mr. Velandia perform oral sex on you?

24   A.  It would happen every week two or three times.

25   Q.  Other than oral sex, did Mr. Velandia do anything else to

C3sdcar3                         Pastor - direct

1    you?

2    A.  Yes.

3    Q.  What did he do?

4    A.  Sometimes he would catch me at the station and put his hand

5    down onto my parts, and then he would take his hand out and

6    smell it.  He would kiss me on the cheek.  He would hug me.

7    Q.  When you said in the station, where in the restaurant would

8    this take place?

9    A.  It happened at the station in the back.  It happened in --

10   at the coffee station.

11          THE COURT:  Were other people present during any of

12   these times?

13          THE WITNESS:  At the moment when he would touch me

14   like that, there weren't other people that could see it.

15   BY MS. PENZA:

16   Q.  Other than what happened to you, did you ever witness

17   anybody else being touched by Mr. Velandia?

18   A.  Yes.

19   Q.  Who?

20   A.  Sometimes he touched Francisco Sotarriba.

21   Q.  When would he touch him?

22   A.  I don't remember when but I know he would touch him in the

23   locker room when he was changing.

24   Q.  What did you see happen?

25   A.  Well, I would see that Francisco would just -- just take

C3sdcar3                          Pastor - direct

1   his pants off, and then Oscar Velandia and Jose Ortiz would

2   grab him.

3   Q.  Who is Jose Ortiz?

4   A.  Well, he's a friend of Oscar's -- of Oscar Velandia's.

5   Q.  What was Mr. Sotarriba's reaction when this was going on?

6   A.  He would get serious.  And he would wait for them to leave.

7   Q.  What do you mean by --

8          THE COURT:  When you say they would go -- what would

9   Velandia and Ortiz do to him?

10         THE WITNESS:  They would grab his parts.

11         THE COURT:  Anything more?

12         THE WITNESS:  I saw that there, and I saw that also at

13   the restaurant stations.

14         THE COURT:  In the locker room?  Are you talking about

15   in the locker room first?

16         THE WITNESS:  First, yes.

17         THE COURT:  You told us that they would take his -- he

18   would take his pants off, is that right?

19         THE WITNESS:  Yes.  He would be taking his pants off

20   to change for work.

21         THE COURT:  And then what happened?

22         This is in the locker room?

23         THE WITNESS:  When he would be changing for work

24   there, Oscar Velandia and Jose Ortiz would grab his parts.

25         THE COURT:  In the locker room?

C3sdcar3                          Pastor - direct

1              THE WITNESS:  Yes.

2              THE COURT:  Did they do anything else to him?

3              THE WITNESS:  That's all I saw.

4              THE COURT:  Did you see him pull his pants down?

5              THE WITNESS:  Yes, I did.

6              THE COURT:  Who pulled the pants down?

7              THE WITNESS:  Well, like I said, what I saw was he was

8    taking his pants off to change for work.

9              THE COURT:  Who is "he"?

10             THE WITNESS:  I'm sorry, your Honor.  I'm referring to

11   Mr. Francisco.

12             THE COURT:  That happened in the locker room?

13             THE WITNESS:  Yes.

14             THE COURT:  Then what happened after he was taking his

15   pants off?

16             THE WITNESS:  Well, Francisco would get serious after

17   that.

18             THE COURT:  What else did they do, if anything, after

19   he took his pants off?

20             THE WITNESS:  They would grab his parts.

21             THE COURT:  Now, you said also -- what happened in the

22   stations with Francisco Sotarriba?

23             THE WITNESS:  There I would see that Oscar would pass

24   by and grab him.

25             THE COURT:  Do you remember when?

C3sdcar3                              Pastor - direct

1               THE WITNESS:  No, sir, I don't remember.

2               THE COURT:  How often did you see this?

3               THE WITNESS:  Two or three times.

4               THE COURT:  In the whole time you were there?

5               THE WITNESS:  Yes.

6               THE COURT:  And each time he would grab his private

7      parts?

8               THE WITNESS:  Yes.

9               THE COURT:  Did he do anything else besides that?

10              THE WITNESS:  Well, he will grab me.

11              THE COURT:  But did he do anything else to

12     Mr. Sotarriba?

13              THE WITNESS:  No.  Mr. Sotarriba wouldn't do anything

14     other than just get serious.

15              THE COURT:  Did you hear him say anything?

16              THE WITNESS:  I didn't hear anything.

17              THE COURT:  How close were you at the time he would

18     grab his parts?

19              THE WITNESS:  I was close by, possibly two meters

20     away.

21              THE COURT:  Two meters away?  Also in the -- were you

22     also in the --

23              THE WITNESS:  I would be close to the station.  That's

24     the best I could describe it.

25              THE COURT:  All right.  OK.

C3sdcar3                        Pastor - direct

1    BY MS. PENZA:

2    Q.   While you were employed at Remi, did you ever see

3    Mr. Sotarriba touching anyone sexually?

4    A.   No, I never saw that.

5    Q.   While you were working at Remi Restaurant, did you ever see

6    Mr. Caravantes touch anyone sexually?

7    A.   No.  I never saw that.

8    Q.   And how many hours per week would you say you worked with

9    Mr. Caravantes?

10   A.   I worked about 10 hours but he only worked nights.

11           THE COURT:  Did you work nights too?

12           THE WITNESS:  Yes.

13           THE COURT:  How often?

14           THE WITNESS:  Like four days.

15   Q.   And how many hours --

16           THE COURT:  Four days a week you would work nights?

17           THE WITNESS:  I worked four days, and the other days I

18   worked lunch.

19           THE COURT:  How often did you work nights?

20           THE WITNESS:  Well, my days off were Sundays and

21   Mondays, so I could possibly work five dinners and work four

22   lunches.

23           THE COURT:  So you would work lunch and dinner four

24   days a week?

25           THE WITNESS:  Yes, four days.  And Saturdays perhaps I

C3sdcar3                        Pastor - direct

1    would only work the evening.

2              THE COURT:  And Mr. Caravantes only worked dinners?

3              THE WITNESS:  Yes.  He just worked dinners.

4    BY MS. PENZA:

5    Q.  How many hours per week did you work with Mr. Sotarriba?

6    A.  Together with Sotarriba, if we both worked together, we

7    usually worked doubles, maybe 10 or 12 hours.

8    Q.  You said earlier that when Mr. Velandia first began making

9    gestures to you, he was a waiter.

10             During your time at Remi, did his position at the

11   restaurant ever change?

12   A.  Yes, it did change.

13   Q.  When did it change?

14   A.  In 2005.

15   Q.  How did it change?

16   A.  He was manager.

17   Q.  How did you know he became manager?

18   A.  Because Francesco Pistorio announced it at a meeting.

19   Q.  Who was Francesco Pistorio?

20   A.  The general manager.

21   Q.  Can you tell me about the meeting, please?

22   A.  He said that he was introducing Mr. Velandia.  We called

23   him Oscar, but he said we couldn't call him Oscar from that

24   point, that he had to be Mr. Velandia -- "Mr. Velandia" because

25   he should be respected as the manager.

C3sdcar3                         Pastor - direct

1   Q.  What was Mr. Velandia wearing at that meeting?

2   A.  With a suit, shirt.  He was well-dressed, like a manager.

3   Q.  Prior to that meeting, what had Mr. Velandia worn?

4   A.  The same.  He had a jacket, tie, shirt.

5   Q.  Before he was manager, what would he wear?

6           MR. PARKER:  Objection.  She just asked him and he

7   answered that question.

8   Q.  Before he was a manager, would he wear a suit?

9           MR. PARKER:  Objection.

10          THE COURT:  I will allow the question.

11          What did he wear before he was a manager?

12          THE WITNESS:  He used like a black vest.

13  BY MS. PENZA:

14  Q.  What was Mr. Velandia's work relationship like with

15  Mr. Pistorio?

16          MR. PARKER:  Objection.

17          THE COURT:  Objection sustained.

18          You need a foundation question.

19  BY MS. PENZA:

20  Q.  Did Mr. Pistorio and Mr. Velandia work together?

21  A.  Yes.

22  Q.  How did they work together?

23  A.  They opened together.  I would see them together.

24          THE COURT:  When are we talking about?  What time?

25          THE WITNESS:  From the moment that he was made

C3sdcar3                         Pastor - direct

1   manager.

2   BY MS. PENZA:

3   Q.  What were Mr. Velandia's responsibilities as manager?

4   A.  Well, he could hire people; he could fire.

5   Q.  How did you know he could hire people?

6   A.  Well, because I spoke to him.  My cousin's friend's

7   girlfriend, her name is Lurdes, and I spoke to him and asked if

8   he needed a busgirl, and he said yes.  He said to bring her in

9   the next day and that she should be well dressed with a shirt,

10  black pants and black shoes.

11  Q.  Where was Mr. Pistorio when Lurdes was hired?

12  A.  Mr. Pistorio was on vacation.

13  Q.  Did Lurdes begin working at Remi?

14  A.  Yes.

15  Q.  What were Mr. Velandia's other responsibilities as manager?

16          MR. PARKER:  Objection.

17          THE COURT:  You need a foundation question.

18  Q.  Did Mr. Pistorio have other responsibilities as manager?

19  A.  Yes.

20  Q.  Sorry, excuse me.

21          Did Mr. Velandia have other responsibilities as

22  manager?

23  A.  Yes.

24  Q.  What other responsibilities?

25  A.  He also made the schedule.  He opened the restaurant.  He

C3sdcar3                    Pastor - direct

1  ran the meetings.  He could fire people.  He could send you

2  home.

3  Q.  How did you know he could fire people?

4  A.  Well, he fired me.

5  Q.  Other than you, did you hear about anyone being fired?

6          MR. PARKER:  Objection.

7          THE COURT:  Objection sustained.

8  Q.  Did you have any other knowledge that Mr. Velandia fired

9  people?

10          MR. PARKER:  Objection.

11          THE COURT:  Objection sustained.

12 Q.  Who else did Mr. Velandia fire?

13          MR. PARKER:  Objection.

14 Q.  Did Mr. Velandia fire anyone else?

15          MR. PARKER:  Objection.

16          THE COURT:  I didn't hear the objection.  I'm sorry.

17          (Pause)

18          Objection overruled.

19 A.  Could you repeat that question again?

20 Q.  Did Mr. Velandia fire anyone else?

21 A.  Yes.

22 Q.  How do you know?

23 A.  Because I saw the guy that he fired on the train.

24 Q.  Who was it?

25 A.  His name was Luis Sanchez.

C3sdcar3                          Pastor - direct

1    Q.   When did you see Luis Sanchez on the train?

2    A.   Possibly 2006.

3    Q.   What did Luis Sanchez say to you?

4              MR. PARKER:  Objection.

5              THE COURT:  Objection sustained.

6              MS. PENZA:  This goes to Mr. Velandia's --

7              THE COURT:  It is hearsay.

8              MS. PENZA:  But we are not offering it for the fact

9    that Mr. Velandia -- for the fact that Mr. Sanchez's statement

10   was that he was fired.  We're offering it for the effect it had

11   on Mr. Pastor and the other employees in the restaurant, for

12   their understanding that Mr. Velandia had this power to fire

13   people.

14             MR. PARKER:  Objection, your Honor.  Apparent

15   authority is of no --

16             THE COURT:  State of mind is relevant in this case, is

17   it?

18             MS. PENZA:  The apparent authority --

19             THE COURT:  He is not a party.  Why is it state of

20   mind?

21             MS. PENZA:  It is relevant to what the other

22   employees --

23             THE COURT:  It only goes to what he concluded.

24   BY MS. PENZA:

25   Q.   Did you ever tell anyone else -- may I ask him?

C3sdcar3                          Pastor - direct

1           THE COURT:  Yes, you could ask that.

2    Q.  Did you ever tell anyone at Remi Restaurant what

3    Mr. Sanchez told you?

4    A.  No.  I don't remember doing that.

5    Q.  Do you know whether any of the other employees at Remi

6    Restaurant knew about Mr. Sanchez?

7           MR. PARKER:  Objection.

8           THE COURT:  Sustained.

9    Q.  Do you know whether Mr. Caravantes knew that?

10          MR. PARKER:  Objection.

11          THE COURT:  Objection sustained.

12          MS. PENZA:  If he has personal knowledge of whether

13   Mr. Caravantes knew about --

14          THE COURT:  You may be right.  Let me think about it.

15          (Pause)

16          Objection sustained to the form of the question.  You

17   need foundation questions.

18   Q.  Do you know whether Mr. Caravantes or Mr. Sotarriba knew --

19          THE COURT:  No.  You've got to ask a foundation

20   question.

21   BY MS. PENZA:

22   Q.  Do you know whether Mr. Sanchez told anyone else that he

23   was fired?

24   A.  I don't remember.

25   Q.  Did anyone else tell you that Mr. Sanchez was fired?

C3sdcar3                          Pastor - direct

 1              MR. PARKER:  Objection.

 2              THE COURT:  Objection sustained.

 3              (Pause)

 4              I will allow that question.  Go ahead.

 5   A.  Could you repeat that question again, please?

 6   Q.  Did anyone else -- do you know whether anyone else --

 7   whether Mr. Sanchez told anyone else that he was fired?

 8   A.  The truth is I don't remember.

 9   Q.  You mentioned that you were fired.

10   A.  Yes.

11   Q.  How did that happen?

12   A.  It occurred because Oscar called me into the office.

13   Q.  What happened prior to Oscar calling you into the office?

14   A.  Well, supposedly the story was that there was a fight

15   with --

16              MR. PARKER:  Objection.

17              THE COURT:  She asked you what happened before he

18   called you into the office.  What happened?

19              THE WITNESS:  Well, I had an argument with someone by

20   the name of Julio that was a busboy.

21   BY MS. PENZA:

22   Q.  And what day of the week did the argument with Julio take

23   place on?

24   A.  That was on a Friday.

25   Q.  OK.  Can you tell me about what happened on that Friday?

C3sdcar3                        Pastor - direct

1   A.   I had cleaned the table at my station.  I removed the pan

2   from there.  And then Julio took the pan and put it back on the

3   table.  And I told him to clean it because I had already done

4   that.

5         And he didn't pay attention to me, but I stopped him.

6   When I stopped him, he grabbed me by the neck.  Then he

7   released me and he ran over to Francesco Pistorio.  Francesco

8   Pistorio sent over one of the busgirls, Mayra.  Mayra told me

9   that Francesco Pistorio wanted to talk to me.

10        Francesco Pistorio asked me what had happened.  He

11  said I want to speak to you on your break.

12        Then I took my break.  I saw that Francesco Pistorio

13  went down to the office.  And I told Francesco Pistorio, "Here

14  I am."  He was very relaxed and he told me, "Just take your

15  break, forget about this."

16  Q.   After your break, did you continue working?

17  A.   Yes.

18  Q.   And when did you work again?

19  A.   Saturday.

20  Q.   Was Mr. Pistorio working that Saturday?

21  A.   Yes.

22  Q.   Where was Oscar on Friday and Saturday?

23  A.   He was on vacation.

24  Q.   When did you work next?

25  A.   I had Saturday and Sunday off, and I went back to work on

1   Tuesday.  I worked Tuesday morning.  I went on my break.

2           When I came back from break, Oscar called me down.  He

3   said, "Pepito, what happened on Friday?"  He said, "Why didn't

4   you call me?  I could have helped you."  And I said, "Why do I

5   have to call you?"  And he said that Julio made a complaint

6   with the police.  And he said, "I'm going to fire you."

7           And then he called Francesco Pistorio at that moment.

8   Francesco Pistorio came down.  He called down Giovanni Pena as

9   a witness.  Francesco asked Pena to translate what he was about

10  to tell me.  And he said that Oscar had fired me, that he

11  didn't want any problems with the police in the restaurant.  He

12  said, "You're a good worker, you work hard, but Oscar made his

13  decision."

14  Q.  After you were fired, did you tell anyone?

15  A.  Yes.

16  Q.  Who did you tell?

17  A.  I told Francisco Sotarriba and Luis Ramos.

18  Q.  When did you tell them?

19  A.  I told them at that moment when Oscar Velandia fired me.

20  Q.  Where were you in the restaurant when you told them?

21  A.  I told them in the locker room.

22  Q.  Did you ever tell anyone else what happened?

23  A.  Outside, yes.

24  Q.  Who did you tell?

25  A.  I called 311.

C3sdcar3                          Pastor - direct

1   Q.  What did you do after you called 311?

2   A.  I said that I wanted help, that I had been fired, and I was

3   not feeling well.

4   Q.  What happened next?

5   A.  I was told to call Human Rights.

6   Q.  Did you call Human Rights?

7   A.  Yes.

8   Q.  Did you ever file a complaint?

9   A.  I went to Human Rights, to their offices.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C3sQcar4                          Pastor - Direct

1   A.  I went in and the lady that attended to me gave me a paper.

2   she had me write down what occurred in the restaurant.  She

3   said, "When you're finished, give it back to me."  And she

4   agreed to call me back but she never did.  And I called her

5   back.  When I called in, I was told that my case was being

6   cared for at the downtown human rights office.

7   Q.  Then what happened?

8   A.  Same thing.  I went into the human rights office.  The lady

9   there asked me write down what happened at the restaurant.  I

10  did.  I wrote it down.  I finished, and I spoke to her.  And

11  she said that she was going to translate it to English.  She

12  said she was going to get an attorney for me.

13  Q.  Did you ever receive a copy of what you had written down?

14  A.  I did receive it by mail.

15  Q.  After you went to the division of human rights, did you

16  ever have contact with anyone from Remi?

17  A.  Yes.

18  Q.  Who did you have contact with?

19  A.  With Ben Ranieri.

20  Q.  Who is Ben Ranieri?

21  A.  He was a waiter.

22  Q.  What was your conversation like with Mr. Ranieri?

23          MR. PARKER:  Objection.

24          THE COURT:  I'm sorry.  I couldn't hear the question.

25          MS. PENA:  I asked him about his conversation with

C3sQcar4                        Pastor - Direct

```
1    Mr. Ranieri.  It's relevant to his state of mind and apparent

2    thought and notice to Remi Restaurant.

3              MR. PARKER:  Objection.

4              THE COURT:  I think you have to ask what he said to

5    Mr. Ranieri before --

6    Q.  Did you call Mr. Ranieri?

7    A.  No.  He called me.

8    Q.  What did you say to Mr. Ranieri?

9              THE COURT:  Not what did he say.  Can you ask it a

10   different way?

11   Q.  Why did Mr. Ranieri call you?

12             MR. PARKER:  Objection.

13             THE COURT:  Sustained.  That calls for the state of

14   another person's mind.

15             What did you say after Mr. Ranieri said hello to you?

16             THE WITNESS:  I didn't say anything to him.  He just

17   told me to withdraw the complaint that I had made.

18             MR. PARKER:  Objection.

19             THE COURT:  Who was Mr. Ranieri?

20             THE WITNESS:  He worked as a waiter.

21             THE COURT:  Where?

22             THE WITNESS:  At Remi Restaurant.

23   Q.  Why did he say to withdraw your complaint?

24             MR. PARKER:  Objection.

25             THE COURT:  I'm not aware of any of this.
```

C3sQcar4                          Pastor - Direct

1              MS. PENA:  Your Honor, these are admissions by --

2              THE COURT:  I think we are getting off at a sideline

3       unless you can explain to me.

4              MS. PENA:  Your Honor, may we have a sidebar?

5              THE COURT:  Yes.

6              (At the sidebar)

7              MS. PENA:  Your Honor, the content of the conversation

8       with Mr. Ranieri is relevant to show -- is, first of all, an

9       admission by a party opponent.  He is an employee of Remi

10      Restaurant, and he was calling on behalf Remi Restaurant to

11      tell him to withdraw the complaint; that Remi's lawyers were

12      extremely powerful.

13             THE COURT:  I'm sorry, what?

14             MS. PENA:  That Remi's lawyers were extremely powerful

15      and that he could have his job back at Remi Restaurant if he

16      withdrew the complaint.

17             MR. PARKER:  Judge, it's by a waiter.  There is no

18      evidence here, and I'm sure there won't be that this was

19      authorized, if it ever took place, by the restaurant.

20             THE COURT:  There is a problem because often that sort

21      of advice is volunteered.  I'll allow the testimony subject to

22      connection.

23             (In open court)

24             THE COURT:  I will allow the testimony subject to

25      connection.

C3sQcar4                         Pastor - Direct

1  Q.  Mr. Pastor, can you please telling us the conversation with

2  Mr. Ranieri?

3  A.  He told me to withdraw my complaint, and that I should

4  worry about my two children, and he told me where am I going to

5  get money for attorneys.  He told me that Remi's attorneys were

6  very powerful, and that they had restaurants all around the

7  world.  He told me to withdraw the complaint and come speak to

8  Francesco Pistorio.  He said he'll give you your job back.

9  Q.  Other than that conversation with Mr. Ranieri, did you

10  speak to anyone else from Remi Restaurant?

11  A.  No, but the following day I did receive many phone calls

12  from Remi.

13  Q.  Did you pick up any of those phone calls?

14  A.  No.

15  Q.  How many phone calls would you say you received?

16  A.  Ten to 20 calls.

17          MS. PENA:  No further questions.

18          THE COURT:  How do you know they were from Remi

19  Restaurant?

20          THE WITNESS:  Because I had Remi Restaurant's number

21  as a contact on my phone.

22          THE COURT:  It would show on your phone?

23          THE WITNESS:  Yes.

24          THE COURT:  You don't know who called you from Remi

25  Restaurant?

C3sQcar4                          Pastor - Direct

1                 THE WITNESS:  No, I don't know who was calling me from

2       there.

3                 THE COURT:  All right.  Was the number you had the pay

4       phone or some other phone?

5                 THE WITNESS:  It was on my cell phone.

6                 THE COURT:  I understand, but what number would appear

7       on the cell phone?

8                 THE WITNESS:  Well, I had all the numbers of the

9       restaurant programmed into my phone so it would just so Remi

10      Restaurant.

11                THE COURT:  I see.

12                Cross-examination.

13      CROSS-EXAMINATION

14      BY MR. PARKER:

15                MR. PARKER:  Your Honor, permission to bring this to

16      the witness table?

17                THE COURT:  Sure.

18                MR. DELANEY:  Do you have a copy for us?

19                MR. NADLER:  This is Defendant's Exhibit binder?

20                MR. PARKER:  Yes.

21                MS. PENA:  Thank you.

22      Q.  Mr. Pastor, you testified that you worked at Remi beginning

23      in 2004, correct?

24      A.  Yes.

25      Q.  Did there come a point in time where the owners of the

C3sQcar4                        Pastor - Cross

1    restaurant changed?

2    A.  Yes.

3    Q.  When was that?

4    A.  In 2005.

5    Q.  At that time, were you asked to complete an application for

6    employment with the new company?

7    A.  Yes.

8    Q.  Turn to Exhibit 54 in the binder.

9          MS. PENA:  Objection, your Honor, just to the extent

10   this goes to any immigration status, we would ask to keep it

11   out based on our motion in limine that was granted prior to

12   trial.

13         THE COURT:  I haven't seen the Exhibit.  I have

14   Plaintiff's Exhibits.  Do I have Defendant's Exhibits?

15   Q.  Do you see Exhibit 54, Mr. Pastor?  That's your

16   handwriting, is it not?

17   A.  Yes, sir.

18   Q.  All of the handwriting on the first page is yours, right?

19   A.  Possibly, yes, but I don't recall.

20   Q.  Well, look at page 2.

21         MS. PENA:  Your Honor, page 2 refers to the U.S.

22   Department of Justice Immigration and Naturalization Service.

23         THE COURT:  Did you fill out page 2?

24         THE WITNESS:  I don't recall.

25         THE COURT:  That's not your handwriting?

1              THE WITNESS:  Possibly, yes.

2     Q.  You don't know your own handwriting, Mr. Pastor?

3     A.  I do recognize it, but it's been several years.

4     Q.  In the space that says date of birth it says 3/30/85, do

5     you see that?

6     A.  Yes.

7     Q.  That's not your date of birth, is it?

8     A.  No.

9     Q.  What's your date of birth?

10    A.  3/30/88.

11    Q.  On the next page there are two cards, copies of two cards,

12    one is a social security card.  One says resident alien.  Do

13    you see that?

14    A.  Yes.

15    Q.  Do you see where it says -- do you see the photograph?  Is

16    that your card?

17    A.  Yes.

18    Q.  You gave that to Remi when you applied for a job there,

19    right?

20              MS. PENA:  Objection, your Honor, this is directly on

21    point with our motion in limine.

22              THE COURT:  Objection overruled.

23    A.  Could you repeat the question, please?

24    Q.  This is a copy of a card you gave to Remi when you applied

25    for employment there, correct?

C3sQcar4                          Pastor - Cross

1   A.  Yes.

2   Q.  And next to the right of the photograph, it has the date

3   printed on the card of 3/30/85 as your birthday, does it not?

4   A.  Yes.

5   Q.  So the card was a fraud, was it not?

6           THE COURT:  Objection sustained.

7   Q.  The birthday printed on the resident alien card that you

8   gave to Remi was false, correct?

9   A.  Yes.

10  Q.  Now, you say that Oscar Velandia performed oral sex on you

11  two or three times a week for three years, is that your

12  testimony?

13  A.  Yes.

14  Q.  And all of those incidents took place at the restaurant?

15  A.  Yes, sir.

16  Q.  And he, according to you, also touched you on occasion and

17  put his hand down your pants, correct?

18  A.  Yes, he would touch me.

19          THE COURT:  He would touch you?  Did he put his hand

20  down your pants?

21          THE WITNESS:  He would touch me and he would put his

22  hand down my pants.

23          THE COURT:  The inside, right?

24          THE WITNESS:  Yes, inside, and then he would smile.

25  Q.  Now, I would like to refer to Plaintiff's Exhibit 18?

1           THE COURT:  I think this would be a good place to

2     stop.  It's about two minutes to 1:00.  I think we'd better

3     break for lunch until 2:00:  You are instructed that you are

4     not to talk to your counsel about the case or to the

5     co-defendants, or talk to anyone about the case during this

6     period.

7               (Luncheon recess)

8               (In open court)

9                         AFTERNOON SESSION

10                          2:00 P.M.

11          THE COURT:  Call the witness, please.

12    SERGIO PASTOR GARCIA, resumed.

13    CROSS-EXAMINATION CONTINUED

14    BY MR. PARKER:

15    Q.  Mr. Pastor, you testified earlier today that there were

16    times at stations when Mr. Velandia would pass by and grab

17    Sotarriba.  Do you recall that?

18    A.  Yes.

19    Q.  What station are you referring to?

20    A.  The back station at the restaurant.

21    Q.  Back server station?

22    A.  Yes.

23    Q.  You say you saw that two or three times in total, correct?

24    A.  Yes, sir.

25    Q.  When you say "pass by," do you mean that Sotarriba would

C3sQcar4                        Pastor - Cross

 1   walk by the station, and grab Sotarriba?  I'm sorry.

 2            THE COURT:  I think you misspoke.

 3   Q.  Let me rephrase.  Are you saying that when you saw this

 4   happen, Velandia would walk by the station and grab Sotarriba?

 5   A.  Yes, sir.

 6   Q.  Sotarriba at the time was inside the station?

 7   A.  Yes.

 8   Q.  When did those events occur?

 9            THE COURT:  Are you asking here a date, or --

10            MR. PARKER:  Yes.

11            THE COURT:  -- or time?

12   Q.  Year, date, month, year?

13   A.  I don't remember, but it did happen.

14   Q.  Now, in your testimony earlier, you testified about what

15   led up to your being terminated from Remi, do you recall that?

16   A.  Could you repeat that?  I don't understand.

17   Q.  Yes.  I am just referring back to your testimony from

18   earlier today where you talked about the events that led up to

19   your termination from Remi.  Do you recall testifying about

20   that?

21   A.  Yes, but what event?

22   Q.  Well, you said you had -- you said you had an argument with

23   Julio Cuellar, correct?

24   A.  Yes, sir.

25   Q.  Well, it was more than an argument, wasn't it?

C3sQcar4                          Pastor - Cross

1   A.  You could say so, but I don't remember.

2          THE COURT:  You don't remember whether you had more

3   than an argument?

4          THE WITNESS:  I don't understand when you say

5   argument.  Could you explain what you mean, please?

6   Q.  Mr. Pastor, I'm using your word from this morning.  You

7   described that event as an argument, did you not?

8   A.  Can I explain what happened with Julio or would you like --

9   Q.  No, I'm asking you.  You said it was an argument, correct?

10  A.  Yes.

11  Q.  But it wasn't just an argument, was it?

12  A.  An argument...

13  Q.  It became physical, did it not?

14  A.  Yes.

15  Q.  Then it was more than an argument, wasn't it?

16  A.  Yes.

17  Q.  You choked and punched Cuellar at that time, did you not?

18  A.  No, sir.

19  Q.  You know that that's what he reported that you had done,

20  correct?

21          MS. PENA:  Objection, your Honor.

22          THE COURT:  I'll allow the question.

23  A.  Could you repeat that, please?

24  Q.  You know that he had reported, Cuellar had reported that

25  you had choked and punched him on that day, correct?

C3sQcar4                          Pastor - Cross

1    A.  That is not correct.

2    Q.  You didn't know that?

3    A.  I didn't know.  But I didn't strike him.

4            THE COURT:  You didn't know that he said that, is that

5    right?

6            THE WITNESS:  I didn't know what he said.

7            THE COURT:  You were never told what he said, is that

8    right?

9            THE WITNESS:  No one had told me what happened.

10           THE COURT:  No one ever told you?

11           THE WITNESS:  No one.

12   Q.  So when you met with Mr. Pistorio several days later,

13   Mr. Pistorio didn't tell you what happened?

14   A.  He didn't say.

15   Q.  Now, that wasn't the first time you had been in a physical

16   altercation at Remi, was it?

17   A.  No, sir.

18   Q.  You had had a fight on one other occasion with another

19   employee?

20   A.  Possibly, yes.

21   Q.  Possibly?  You were suspended for it, weren't you?

22   A.  No.

23   Q.  You got in a fight with Hector Dominguez, did you not?

24   A.  No, sir, I didn't fight with him.

25           THE COURT:  Who did you fight with?

C3sQcar4                        Pastor - Cross

1    Q.  Then who did you fight with?

2    A.  Well, I actually defended myself from Hector.

3              THE COURT:  Hector who?

4              THE WITNESS:  I don't know if it's Hector Dominguez.

5              THE COURT:  You don't know his last name, is that it?

6              THE WITNESS:  I don't know the last name.

7    Q.  Mr. Pistorio spoke to you about that incident, correct?

8    Just please, did he speak to you about that incident?

9              THE COURT:  Which incident?

10   Q.  The incident with Hector.  Just yes or no.

11   A.  Yes, but something happened, there was something else.

12   Q.  When you returned -- I'll rephrase.  When you met with

13   Pistorio about the altercation with Cuellar, the Chef Giovanni

14   was there?

15   A.  He was not present.  The one who saw was Ronnie, the

16   pastry, the pastry chef.

17   Q.  Ronnie was a witness to the incident, correct?

18   A.  Yes, he saw it.

19   Q.  What I am asking you is several days later you had a

20   meeting with Pistorio, right?

21   A.  Yes.

22   Q.  At that meeting was the Chef Giovanni, correct?

23   A.  Yes.

24   Q.  And Oscar Velandia?

25   A.  Yes, sir.

 1              THE COURT:  Was that a meeting about Cuellar or was

 2    that a meeting about Giovanni -- Dominguez?  What is his first

 3    name?  Giovanni?  I may be wrong.

 4              MR. PARKER:  Hector, Judge.

 5    A.  Oh, Hector.

 6    Q.  Just to clarify it, what I am asking you about is after the

 7    incident with Cuellar, you had a meeting with Pistorio,

 8    Giovanni the chef, and Velandia, right?

 9    A.  But are you referring to the situation with Hector?

10    Q.  No.  I'm referring to the incident with Cuellar.  My

11    question is, after the incident with Cuellar, you had a meeting

12    with Pistorio?

13              MS. PENA:  Objection.  There was testimony as to two

14    meetings.

15              MR. PARKER:  May I finish my question before counsel

16    interrupts me?

17              MS. PENA:  You made the question three times.

18              THE COURT:  Objection overruled.

19    Q.  After the incident with Cuellar, you had a meeting with

20    Pistorio, Chef Giovanni and Oscar Velandia, correct?

21              MS. PENA:  Objection.

22    A.  Yes.

23    Q.  And it was at that meeting that you were told that your

24    employment with Remi was being terminated, correct?

25    A.  Yes, but Oscar Velandia is the one that fired me.

C3sQcar4                          Pastor - Cross

1              THE COURT:  What did he say when he fired you?

2              THE WITNESS:  I came back from my break --

3              THE COURT:  His exact words as you remember them.

4              THE WITNESS:  Your Honor, I'll tell you the exact

5     words.  Your Honor, when I came back from my break, it was on

6     Tuesday, Oscar Velandia went down --

7              THE COURT:  I just asked you for his exact words when

8     he fired you on that day.

9              THE WITNESS:  He said, "Poppy, what happened on

10    Friday?"  He said, "What happened?"  I told him what happened.

11    He said, "Why didn't you call me?  I could have helped you,

12    Poppy."

13             THE COURT:  And he said that in front of these other

14    people?

15             THE WITNESS:  No, he spoke to me alone.

16             THE COURT:  When did he fire you?  Didn't you just

17    tell us he fired you when these other people were in the room?

18             THE WITNESS:  But first he spoke to me in private and

19    then he called Francesco Pistorio.  First he fired me in

20    private, and then he called Francesco Pistorio.

21             THE COURT:  Where was he when he fired you?

22             THE WITNESS:  Where was who?

23             THE COURT:  Where was Oscar when he fired you?

24             THE WITNESS:  At the office.

25             THE COURT:  Where?

C3sQcar4                        Pastor - Cross

1           THE INTERPRETER:  In the office.

2           THE COURT:  Where in the office?  In the office

3  downstairs?

4           THE WITNESS:  Downstairs.  The office downstairs.

5           THE COURT:  And where was the meeting with the other

6  people that came later?

7           THE WITNESS:  There as well in the office.

8           THE COURT:  They were in the office?

9           THE WITNESS:  They hadn't yet come to the office, but

10  then Oscar Velandia called for them.

11           THE COURT:  And?

12           THE WITNESS:  He said, "I'm going to fire you because

13  Julio made a complaint to the police," and that they didn't

14  want to have any problems, and since I hadn't called him, if I

15  would have, he could have helped me, so I'm going to fire you.

16  At that moment he told me I was fired, and he called Francesco

17  Pistorio.

18           THE COURT:  What were his words?  What were his words?

19           THE WITNESS:  He said that because I had fought with

20  Julio on Friday --

21           THE COURT:  What did he say?  You said he was going to

22  fire you.  Then you said, "He told me I was fired."  I want to

23  know what his words were when he said that.  When he said it,

24  what were his words, not what you concluded he was saying.

25           THE WITNESS:  He said, "I'm going to fire you because

C3sQcar4                        Pastor - Cross

```
 1    I don't want problems with the police."  At that moment he

 2    said, "Let me call Francesco Pistorio."  Francesco Pistorio

 3    came down and then he said, "You already know Oscar fired you."

 4              THE COURT:  Who said that?

 5              THE WITNESS:  Francesco Pistorio, and then he called

 6    Chez Giovanni --

 7              THE COURT:  Were those his exact words?  Were those

 8    Pistorio's exact words?  What were his exact words?

 9              THE WITNESS:  Pistorio's words exactly were:  "You

10    already know Oscar fired you."  And I said yes.

11              THE COURT:  And how much later was that after your

12    conversation with Oscar?

13              THE WITNESS:  It was maybe five minutes after that

14    conversation.

15              THE COURT:  I'm sorry?

16              THE WITNESS:  It was maybe five minutes after that

17    conversation.

18              THE COURT:  And what happened in between?

19              THE WITNESS:  Well, like I said, he asked me why I

20    hadn't called him --

21              THE COURT:  You told me that.  What happened in

22    between that conversation that you had with Oscar and when

23    these men came into the room?

24              THE WITNESS:  Well, when everyone came in, Francesco

25    Pistorio asked Peña to translate because I was going to have to
```

1   leave because they didn't want any problems with the police.

2   He said I was a good worker.  He said I was responsible, but I

3   had to leave because Oscar fired me and that it was Oscar's

4   decision.  That's what Pistorio said.

5             THE COURT:  That's what he said; those were his exact

6   words, is that right?

7             THE WITNESS:  Yes.  Yes, sir.

8   Q.  When you're referring to Peña, are you exactly referring to

9   Chef Giovanni?

10  A.  Chef Giovanni and Peña.  I don't remember Peña's last name.

11  Q.  When you went into the room with -- with Pistorio, were you

12  already in --

13            THE COURT:  There were other people there?

14            MR. PARKER:  Well, that's what I'm trying to

15  ascertain.

16            THE COURT:  All right.

17  Q.  Let me go back.  You had your meeting with Oscar, and you

18  say that Oscar told you he was going to fire you at that time,

19  and you were in the office with him, correct?

20  A.  Yes, sir.

21  Q.  It was just the two of you; no other witnesses to that

22  conversation, right?

23  A.  It was just he and I.  We were there for about five

24  minutes, and then after that, he called Francesco Pistorio.

25            THE COURT:  How did he call him?

1          THE WITNESS:  He called him on the phone because he

2     was on the floor upstairs.

3          THE COURT:  What did he say on the phone?  What did

4     Oscar say on the phone?

5          THE WITNESS:  He said, "Mr. Pistorio, please come

6     down."

7          THE COURT:  Did he say anything else?

8          THE WITNESS:  No, sir, not that I remember.

9          THE COURT:  You can't remember anything else?

10         THE WITNESS:  No, sir.

11    Q.  So while you were waiting for Mr. Pistorio to come down,

12    did you stay in the office with Oscar?

13    A.  Yes, sir.

14    Q.  And then Giovanni came in?

15    A.  First Pistorio and then later Giovanni came in, and then

16    after that, Peña.  Francesco Pistorio told Giovanni to call

17    Peña in.

18    Q.  Did Mr. Pistorio ask you why you had not approached him

19    about the problem with Cuellar before it became physical

20    between the two of you?

21    A.  No, he didn't ask me anything else.

22    Q.  Did anyone else ask you anything in that meeting?

23         THE COURT:  Anyone else in the room?

24         MR. PARKER:  Yes.

25    A.  Francisco was the one that asked the question.  He asked

C3sQcar4                          Pastor - Cross

1    what happened in the kitchen -- I'm sorry -- in the office, not

2    in the kitchen.  I said, "Oscar fired me."

3    Q.  No.  No.  No.  Let's go back.  Talking about the meeting

4    with Pistorio, Velandia, Chef Giovanni, and you say Peña came

5    in as well.  I'm talking about that meeting.  Did anyone else

6    say anything in the meeting?

7    A.  No.  No, sir.  I don't remember.  I don't remember.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C3sdcar5                          Pastor - cross

1   Q.  And there was no discussion -- you say -- your testimony is

2   there was no discussion of the incident with Cuellar at that

3   time, is that correct?

4   A.  There was no conversation about the incident.  Just

5   Francesco Pistorio came in and said, "You already know Oscar

6   fired you."  And that was it.  We didn't discuss what happened

7   any more.

8   Q.  So the only person who spoke in that meeting was Pistorio;

9   is that what you're saying?

10             (Pause)

11             Just, Mr. Pastor, please answer yes or no.

12  A.  Francesco Pistorio was the only one that spoke there.

13  Q.  So what you're saying is this meeting was called with four

14  people from Remi, plus you, for the purpose of Francesco

15  Pistorio telling you what Oscar had already told you; is that

16  what you're saying?

17  A.  Yes, sir.

18  Q.  And the chef said nothing in the meeting, is that correct?

19  A.  No, sir.

20  Q.  And Velandia said nothing in the meeting, is that correct?

21  A.  At that moment, no, he didn't.

22  Q.  And Pena said nothing in the meeting, is that correct?

23  A.  He was just translating.

24             THE COURT:  Where does Pena come from?

25             THE WITNESS:  He's Dominican.

C3sdcar5                              Pastor - cross

 1                  THE COURT:  Dominican?

 2                  THE WITNESS:  Yes, sir.

 3                  THE COURT:  Do you have trouble understanding

 4     Dominican translation in Spanish?

 5                  THE WITNESS:  Yes.

 6     BY MR. PARKER:

 7     Q.  Now, a few days after your employment with Remi was

 8     terminated is when you went to the Division of Human Rights,

 9     correct?

10     A.  Yes, sir.

11     Q.  You went there to file a sexual harassment claim?

12     A.  Yes.

13     Q.  Up until that time, you had never told anyone at Remi about

14     any of the conduct that you now claim Oscar Velandia did to you

15     at Remi, right?

16     A.  No, sir.

17     Q.  Let me clarify.

18                  Did you ever tell anyone at Remi about any of the

19     conduct that you claim Oscar Velandia did to you?

20                  (Pause)

21                  Yes or no, Mr. Pastor?

22     A.  The first time I didn't know what sexual harassment was.

23     Q.  Yes or no?

24     A.  I told Julio and Julio --

25                  MR. PARKER:  Your Honor, I ask --

C3sdcar5                           Pastor - cross

1   A.  I told him that Oscar was bothering me a lot, that he would

2   touch my parts, and he said, "Call the police."

3   Q.  No one else, right?

4   A.  And Chef Giovanni, since he saw that Oscar would grab me,

5   Giovanni told me that it was sexual harassment what Oscar

6   Velandia was doing to me.

7   Q.  So you go to the Human Rights and you write out a

8   complaint, correct?

9   A.  Yes, sir.

10  Q.  If you could turn to Plaintiff's Exhibit 18.

11          THE COURT:  Plaintiff's Exhibit 18?

12          MR. PARKER:  Yes, your Honor.

13          THE COURT:  All right.

14  Q.  Do you have that in front of you, Mr. Pastor?

15  A.  Yes, sir.

16  Q.  This is a copy of the complaint that you filed with the New

17  York State Division of Human Rights, correct?

18  A.  Yes.

19  Q.  And you filled this out after your employment was

20  terminated by Remi, right?

21  A.  Yes, sir.

22  Q.  And on the second page of the document, is that your

23  handwriting?

24  A.  Yes, sir.

25  Q.  OK.  You remember up here what your handwriting looks like,

C3sdcar5                          Pastor - cross

1   right?

2   A.  Yes.

3   Q.  On the third page of the document, in the middle of the

4   page, there is a box next to the word "Sex," and there is a

5   line through it.  And then to the right there is a line through

6   the word "Male."  And to the right of that there is a line and

7   a box next to "Sexual Harassment."  Are they all your markings?

8   A.  Yes.

9   Q.  And then if you go to the next two pages beyond that, page

10  5 of 6 --

11          THE COURT:  I want to interrupt for a second because I

12  am not sure that -- on the second page, you are referring to

13  what?  Let me see the second page.

14          THE INTERPRETER:  This is the back of page 1.  This is

15  page 1 and the back is page 2.  It is marked on the bottom,

16  your Honor.

17          THE COURT:  All right.

18          All right, Mr. Parker.  Now I follow.  Go ahead.

19  Q.  The page marked as page 5 of 6, and in Section 5 --

20          THE COURT:  I only see 4 of 6.

21          THE INTERPRETER:  It actually says 5 of 7, Mr. Parker.

22          MR. PARKER:  Mine says 5 of 6.

23          THE COURT:  You are skipping a page.  You are skipping

24  4 and going on to page 5.

25          THE INTERPRETER:  (Indicating).

C3sdcar5                              Pastor - cross

1                MS. PENZA:  Plaintiff's 18.  That is 18T, I think, a

2       certified transcript.

3                THE COURT:  Go ahead.

4                THE CLERK:  It is Plaintiff's 18?

5                MR. PARKER:  18.

6       BY MR. PARKER:

7       Q.  And on page 5 of 6, do you see where it says "Description

8       of Discrimination"?

9       A.  Yes, sir.

10      Q.  And what follows in handwriting is your description that

11      you gave to Human Rights when you went there in August of 2007,

12      after your termination from Remi, correct?

13      A.  Yes, sir.

14      Q.  And if you look in that section, at the beginning of the

15      fifth line, and continuing onto the sixth line, up to the word

16      "No" -- do you see where I'm saying?

17               THE INTERPRETER:  The word "no" appears in the middle

18      of the sixth line?

19               MR. PARKER:  Yes.

20               THE INTERPRETER:  We're following you.

21      A.  Yes.

22      Q.  And that reads:  "The assistant manager wanted to have

23      sexual relations with me and I told him no."

24               Correct?

25      A.  Yes, sir.

C3sdcar5                        Pastor - cross

1   Q.  The assistant manager, you there were referring to Oscar

2   Velandia?

3   A.  Yes, I'm referring to Oscar Velandia.

4   Q.  And the statement that you submitted to Civil Rights says

5   nothing about any of the oral sexual relations that you had

6   with Oscar Velandia, does it?

7            (Pause)

8            Please, yes or no, Mr. Pastor, does it say anything

9   about the oral sexual relations that you had?

10           THE COURT:  Are you asking him to read it?  I think

11  you should start with a foundation question asking him to read

12  the paragraph to himself.

13           MR. PARKER:  Thank you, your Honor.  Yes.

14  Q.  Please read the paragraph to yourself.

15           (Pause)

16           Have you read it?

17           THE COURT:  Give him a chance.

18           MR. PARKER:  He looked up.

19           THE COURT:  He didn't.  It is four pages.

20           (Pause)

21  A.  I have read it, sir.

22  Q.  The description of discrimination that you submitted to the

23  Division of Civil Rights says nothing about the oral sexual

24  relations that you say Oscar Velandia performed on you during

25  your employment at Remi, correct?

C3sdcar5                          Pastor - cross

1           Thank you.

2    A.  Yes, but there was something else.  Because no one helped

3    me.  No one listened to me.  I wrote this on my own.  So no one

4    from Human Rights was listening to me there.  So these are

5    words that I didn't put down.

6           MR. PARKER:  Your Honor, the witness is responding to

7    my question.

8           THE COURT:  I will allow the question and answer.

9           He is answering.  You can still ask the other

10   question, if you want.

11   BY MR. PARKER:

12   Q.  Your Human Rights complaint later in 2007 was dismissed by

13   the Division of Human Rights, is that correct?

14          MS. PENZA:  Objection.  Foundation.

15          THE COURT:  I will allow the question.

16   A.  No, sir.  It was not dismissed.  I received a phone call --

17          MR. PARKER:  Your Honor, may I -- I mean, it really

18   calls for a "yes" or "no" answer.  If he says it wasn't

19   dismissed, we can move on.

20          THE COURT:  He says it wasn't dismissed.

21   Q.  Since you filed your Human Rights complaint, you also --

22   you filed another suit against Remi, did you not?

23   A.  I don't remember, sir.

24   Q.  Did you file a lawsuit seeking unpaid wages against Remi?

25          MS. PENZA:  Objection.

C3sdcar5                          Pastor - cross

1          THE COURT:  I am going to allow the question.

2    A.  I don't remember too well if I went or if I didn't.

3          MR. PARKER:  I have no further questions.

4          THE COURT:  Any redirect?

5          MS. PENZA:  Yes.  Briefly, your Honor.

6    REDIRECT EXAMINATION

7    BY MS. PENZA:

8    Q.  Mr. Pastor, when you applied for a job at Remi, why did you

9    write that you were born in 1988?

10   A.  Could you repeat that, please?

11   Q.  Excuse me.  Why did you write on your employment

12   application that you were born in 1988?

13   A.  Because I needed the job, that's why.

14   Q.  How old were you when you applied?

15         THE COURT:  We know how old he was.  We covered that

16   on direct.

17   A.  15.

18   Q.  Why didn't you file any complaint before you were fired

19   from Remi?

20   A.  Because I was afraid; I was afraid of Oscar Velandia.

21   Q.  Other than the written description that Mr. Parker showed

22   you, did you give any other descriptions to Human Rights?

23         THE COURT:  When?  Could we have a date?  Without

24   dates --

25         MS. PENZA:  Sorry --

C3sdcar5                           Pastor - redirect

 1          THE COURT:  So I know the dates.  It is very hard when

 2     you have got a number of years involved.

 3     BY MS. PENZA:

 4     Q.  When did you file your complaint with the Division of Human

 5     Rights?

 6     A.  That was in 2007, possibly.

 7     Q.  At that time, did you meet with someone from the Division

 8     of Human Rights?

 9     A.  No, just the lady that gave me the paper but nothing.  The

10     lady told me that she was going to get an attorney for me.

11     Q.  Why didn't you include in your written description that

12     Mr. Velandia had performed oral sex on you?

13     A.  I have no idea, ma'am.

14          MS. PENZA:  No further questions.

15          MR. PARKER:  I have nothing else, Judge.

16          THE COURT:  You are excused.

17          (Witness excused)

18          THE COURT:  Next witness.

19          MR. DELANEY:  The plaintiffs would call Arturo

20     Caravantes.  We are just going to get him.

21          THE COURT:  I'm sorry.  I thought you had a medical

22     opinion that he couldn't testify, that he wasn't fit to

23     testify.

24          MR. DELANEY:  Your Honor, that was our medical

25     opinion, but it is Mr. Caravantes' choice to go ahead and

C3sdcar5

 1   testify despite medical advice.

 2            THE COURT:  That what?

 3            MR. DELANEY:  It is Mr. Caravantes' choice to go ahead

 4   and testify despite medical advice.

 5            THE COURT:  All right.

 6    ARTURO CARAVANTES GARCES,

 7        called as a witness by the plaintiffs

 8        having been duly sworn (through the Interpreter),

 9        testified as follows:

10            THE CLERK:  Please be seated.

11            Pull that chair as far forward as you can.  Just keep

12   your voice up; the microphone will pick you up.

13            Please state your name.

14            THE WITNESS:  Arturo Caravantes Garces, G-a-r-c-e-s.

15   DIRECT EXAMINATION (through the Interpreter)

16   BY MR. DELANEY:

17   Q.  Good afternoon, Mr. Caravantes.

18   A.  Good afternoon.

19   Q.  How old are you, Mr. Caravantes?

20   A.  43 years old.

21   Q.  Do you speak English?

22   A.  About 50 percent.

23   Q.  What is your main language?

24   A.  Spanish.

25   Q.  Do you read English?

C3sdcar5                         Caravantes - direct

1    A.  I can read.  I just can't put things together.

2    Q.  Do you write English?

3    A.  No.

4    Q.  Do you read Spanish?

5    A.  Yes.

6    Q.  Do you write Spanish?

7    A.  Yes.

8    Q.  Are you more comfortable testifying today through a

9    translator?

10   A.  Yes.

11   Q.  Mr. Caravantes, are you currently taking any medication?

12   A.  Yes.

13   Q.  What are you taking it for?

14   A.  I don't remember the names, but they are prescribed by my

15   psychiatrist.

16   Q.  Where were you born, Mr. Caravantes?

17   A.  In Mexico, at Atlixco Puebla.

18   Q.  Maybe you can spell it for the Court.

19   A.  A-t-l-i-x-c-o, Atlixco.

20   Q.  Where do you currently reside?

21   A.  Here in New York, 3705 75th Street, Apartment 1B, in

22   Queens.  The zip code is 11377.

23            THE COURT:  In Brooklyn?

24            THE WITNESS:  In Queens.

25            THE COURT:  Queens.

C3sdcar5                     Caravantes - direct

1   BY MR. DELANEY:

2   Q.  Who lives there with you?

3   A.  My three daughters, myself, and my wife.

4   Q.  What are your daughters' names?

5   A.  My eldest daughter is Lizette Evelyn.  She is 17 years old;

6   she will be 18.

7          The second is Jocelyn America.  She's 12, going on 13.

8          And the youngest is Dana Paola.  She's 8.

9   Q.  Do they go to school?

10  A.  Yes.  Yes.  The oldest will be graduating high school.  The

11  middle child will be graduating from middle school.  And the

12  youngest is going to third grade.

13  Q.  What is your wife's name?

14  A.  Martina Huerta de Caravantes.

15  Q.  How long have you been married, Mr. Caravantes?

16  A.  Approximately 19 years.

17  Q.  Are you currently working?

18  A.  Yes.

19  Q.  Where are you working?

20  A.  I'm work at a Jewish restaurant.  It's on 85th Street and

21  Broadway.  It's a Jewish restaurant.

22  Q.  What do you do there?

23  A.  I work as a busboy there, as host, and whatever the manager

24  tells me to.

25  Q.  Does your wife work?

1   A.  No.

2   Q.  Has she worked regularly since you have been married?

3   A.  No.  When we first arrived in the country, she worked for a

4   few months but not any more.

5   Q.  Who supports your wife and three daughters financially?

6   A.  Me.  Myself, I work.  I like to work hard.

7   Q.  And how long have you done that for?  How long have you

8   supported your wife and three daughters?

9   A.  Since we married up to today.

10  Q.  Did you used to work at Remi Restaurant?

11  A.  Yes.  Yes, I did work at Remi.  I worked at Riviera Cafe.

12  Q.  When you worked at Remi Cafe, were you the sole source of

13  financial support for your wife and daughters?

14  A.  Yes.

15  Q.  The entire time you worked at Remi Restaurant?

16  A.  Yes.  When we first arrived into the country, I worked at

17  the Riviera and at Remi.

18  Q.  Mr. Caravantes, are you a homosexual?

19  A.  No.

20  Q.  Are you a bisexual?

21  A.  No.  I'm a man.

22  Q.  Did you work at Remi Restaurant in 2005 to 2008?

23  A.  I worked at Remi Restaurant from 1991 to 2008.

24  Q.  Can you describe for the Court what kind of restaurant Remi

25  Restaurant is?

C3sdcar5                          Caravantes - direct

1  A.  Yes.  It's a very pretty restaurant.  It's very luxurious.

2  It has a very big painted mural, very pretty.  It's expensive.

3  I've met several artists there, several players, actors.  I

4  made coffee for Joe Montana, and I believe before I had seen

5  Mr. Kerry there.

6  Q.  Do you know who the current owner of Remi Restaurant is?

7  A.  The new Remi, yes.  There are three -- there are three

8  owners.  One is Stefano Frittella, Pier Mario Del Rosso, and

9  Roberto Delledonne.

10 Q.  And when you say new owners, do you mean the owners that

11 took over in 2005?

12 A.  Yes.  Yes, they have been the owners -- or they were the

13 owners from 2005 up until 2008, when I was there.

14 Q.  And by "new owners," do you mean the defendants, one of the

15 defendants in this lawsuit?

16 A.  Yes.

17 Q.  How long, Mr. Caravantes, did you work at Remi Restaurant?

18 A.  Approximately 16/17 years.

19 Q.  Now, Mr. Caravantes, I want to focus just on the time

20 period after the new ownership took over.  So this is 2005

21 until you left the restaurant in 2008.

22 A.  Yes.

23 Q.  What job did you do at Remi during that time period?

24 A.  When they first took over, I worked at Remi To Go and at

25 the coffee station.  Then the Remi To Go was taken away from me

C3sdcar5                         Caravantes - direct

1    and I was left at the coffee station.

2    Q.  So after the new owners took over, which was after

3    April 2005, what job did you do?

4    A.  A coffee maker.

5    Q.  And what were your -- I want to keep focusing just on the

6    time period when the new owners took over.  This is after 2005.

7            What were your hours then?

8    A.  At first it was from 4 to 12.  Then it changed from 4 to 2

9    in the morning.

10   Q.  When did it change from 4 to 2 in the morning?

11   A.  I don't recall exactly.

12   Q.  In 2005?

13   A.  I don't remember exactly whether it was the end or the

14   beginning of 2006.

15   Q.  Sure.  Now, I'm going to put a floor plan up on the screen

16   here, Mr. Caravantes.

17   A.  Yes.

18   Q.  I'm going to ask you first, do you recognize this floor

19   plan?

20   A.  Yes.

21   Q.  What is it?

22   A.  This is the plan of Remi Restaurant.

23   Q.  Is there another level to Remi Restaurant other than what

24   is shown in this plan?

25   A.  Yes.  The basement is missing, and Remi To Go as well.

C3sdcar5                              Caravantes - direct

1              THE COURT:  Where is Remi To Go?

2              THE WITNESS:  It's to one side of the Rialto, in front

3    of it.

4              MR. DELANEY:  Let the record indicate that the witness

5    was pointing to the left side of the Rialto room.

6              THE COURT:  What does "the front" mean?

7              THE WITNESS:  Remi To Go is around here, more or less.

8              THE COURT:  In the restaurant or in front of the

9    restaurant?  In front of the floor plan or in the floor plan?

10             THE WITNESS:  You can't see it there because it is not

11   there.  But it was in the middle of the atrium, which is here.

12   And Remi To Go was here.

13             THE COURT:  Down at the bottom, where near where it

14   says "Coat Check"?

15             THE WITNESS:  Yes.

16             THE COURT:  Thank you.

17   BY MR. DELANEY:

18   Q.  Now, where on this floor plan did you work as a coffee

19   worker?

20   A.  In the middle of the restaurant.

21   Q.  Where it says "Coffee Area"?

22   A.  Yes, there.

23             MR. DELANEY:  Let the record indicate the witness was

24   pointing towards the coffee area, the area marked "Coffee Area"

25   on the diagram.

C3sdcar5                           Caravantes - direct

1           THE COURT:  Yes.  The record will so indicate.

2           MR. DELANEY:  Can you pick up AC.

3   Q.  Mr. Caravantes, can you see the screen here?

4   A.  Yes.

5   Q.  Do you recognize this area?

6   A.  Yes.

7   Q.  What is it?

8   A.  That's the hallway that connects the restaurant and the

9   Rialto and the coffee station is there.

10  Q.  What did we just see, Mr. Caravantes?

11  A.  That's the coffee station.  That's the --

12          THE COURT:  You are referring to just the last part of

13  the film as being the coffee station?  Is this what we are

14  looking at as the coffee station?

15  Q.  What are we looking at right now?

16          THE COURT:  Up on the left.

17  A.  Yes.  That is the coffee station.

18  Q.  And is this the station where you worked as a coffee

19  worker?

20  A.  Yes.  From what I could tell.  It changed a little bit

21  here.

22  Q.  How did it change?

23  A.  Well, there are some new coffee makers there.  Some new

24  boxes.  It's about the same.

25  Q.  Other than those changes you just mentioned, is it a fair

C3sdcar5                          Caravantes - direct

1   and accurate representation of the coffee station when you

2   worked there?

3   A.   Yes.

4   Q.   What percentage of your shift -- when you worked as a

5   coffee station worker, what percentage of your shifts would you

6   spend here?

7   A.   Almost 90 percent.

8   Q.   Of that time that you spent in the coffee station, how much

9   was spent alone?

10  A.   The same, about 90 percent.

11  Q.   Mr. Caravantes, do you know Mr. Oscar Velandia?

12  A.   Yes.  Yes, I do know him.

13  Q.   How do you know him?

14  A.   Because we worked together, and because he's also seated

15  here now.

16  Q.   Where is he seated here?

17  A.   Back there (indicating), the one that's back there.

18  Q.   Can you tell me which row, counting from the seat there

19  where Claire is sitting, backwards?

20  A.   I can't see too well, but I think he's seated between

21  either the second or third row.

22  Q.   How many other people in that row?

23  A.   I don't know if the lady that's seated back there is in the

24  same row, but it seems to be just two if she is not there.

25  Q.   Is Mr. Velandia a defendant in this lawsuit?

C3sdcar5                          Caravantes - direct

1   A.  Yes.

2   Q.  Now, when did you meet Mr. Velandia?

3           THE COURT:  The record will indicate the witness

4   seemed to indicate Mr. Velandia.

5           MR. DELANEY:  Thank you, your Honor.

6   A.  I don't remember exactly, but I think it was around '97,

7   '96, but I don't remember exactly.

8   Q.  Sure, that was a long time ago, but do you remember what

9   job he had when you met him?

10  A.  Yes.  When I started working at the coffee station, he was

11  a busboy.

12  Q.  Did he have any other jobs at Remi while you worked there?

13  A.  Yes.  After being a busboy he became a waiter.  After that

14  he was the head waiter, and then manager.

15  Q.  Now, when the new owners took over --

16          THE COURT:  Did he hold the position of runner, food

17  runner?

18          THE WITNESS:  Not that I remember, no.

19  BY MR. DELANEY:

20  Q.  When the new owners took over in April 2005, do you recall

21  then what Mr. Velandia's job was when they took over?

22  A.  When the new owners took over, he was the head waiter.

23  Q.  Did he have any other jobs under the new owners?

24  A.  Yes.  Manager.

25  Q.  Now, do you remember approximately when Mr. Velandia became

C3sdcar5                        Caravantes - direct

1   the head waiter?

2   A.  I don't remember exactly when he became head waiter.

3   Q.  Sure.  Not exactly, but generally.

4           THE COURT:  Let's have it as close as possible.

5   "Generally" gives you a wide scope.

6   A.  Like the middle of 2005, maybe.  I believe it was in 2005.

7   Q.  Was it after the new owners took over?

8   A.  With the new company, with the new Remi.

9   Q.  Before that time, before Mr. Velandia became the head

10  waiter, were there any other head waiters to Remi Restaurant?

11  A.  Not that I can recall, no.

12  Q.  Now, when you worked here in the coffee station -- are you

13  OK, Mr. Caravantes?

14          THE COURT:  Are you all right?

15          THE WITNESS:  Just my eyes are burning.

16          MR. DELANEY:  Do you have your eye drops,

17  Mr. Caravantes?

18          THE COURT:  Do you want to use it?  You can take the

19  time and use it.

20          (Pause)

21          THE COURT:  Are you OK now?

22          THE WITNESS:  Yes.

23          MR. DELANEY:  Would you like a glass of water?

24          THE WITNESS:  OK.  Yes.  Please.

25          (Pause)

C3sdcar5                              Caravantes - direct

1              Thank you.

2              MR. DELANEY:  OK?

3              THE WITNESS:  Yes.

4    BY MR. DELANEY:

5    Q.  Now, when you worked here in this coffee station as a

6    coffee worker, who would you interact with during your regular

7    workday?

8    A.  With the busboys -- mainly with the busboys.  Not too often

9    with the waiters.  They would just go get coffee and leave.  If

10   there were parties at the Rialto, perhaps a little with those

11   waiters and the busboys.  But when there was nothing in the

12   Rialto, the workers rarely went over there.

13   Q.  I apologize.  I forgot to ask you what your job actually

14   was.

15              Could you tell the Court what you actually did as a

16   coffee worker?

17   A.  I would prepare the coffee.  I had to clean my station.

18   That was it, mainly.  To make coffee for the restaurant.

19   Q.  Now, when you made the coffee for a customer, who was

20   responsible -- what workers were responsible -- sorry.  What

21   workers in the restaurant were responsible for picking up that

22   coffee?

23   A.  The busboys.  On certain occasions the food runners would

24   do that as well.

25   Q.  Was it the waiter's job to pick up the coffee?

C3sdcar5                        Caravantes - direct

1    A.  No.  But on some occasions they would do it as well,

2    although it wasn't their job.

3    Q.  How often per shift would you see one of the waiters?

4    A.  Very infrequently, very little.  Almost -- I mean, you'd

5    see the waiters very little.  They hardly went there.

6              THE COURT:  They hardly went in the coffee station?

7              THE WITNESS:  Yes, hardly.  They would just go for

8    their own coffee and leave.

9    Q.  Now, after Mr. Velandia became head waiter, how often per

10   shift would you see him at your station?

11   A.  More often.

12   Q.  Why did Mr. Velandia visit your station more than other

13   waiters?

14             (Pause)

15             MR. PARKER:  Objection.

16             THE COURT:  I think you could phrase it so that it

17   doesn't call for state of mind, Mr. Velandia's state of mind.

18   Q.  When Mr. Velandia would visit your station --

19             THE COURT:  Is there a reason in the operation of the

20   restaurant why Mr. Velandia would be there more than the other

21   waiters?

22             THE WITNESS:  The only reason that he went there more

23   was to grab my genitals, to harass me, to say things to me.

24             THE COURT:  So you know of no reason for him to go

25   because of the operation of the restaurant?

 1              THE WITNESS:  No.

 2              THE COURT:  I'm sorry.  I am having the same problem.

 3              No, there was no reason?

 4              THE WITNESS:  He didn't have any reason to go over

 5    there -- not to pick up any orders, not to take coffee.  As far

 6    as work, there was no reason for him to be there.

 7    BY MR. DELANEY:

 8    Q.  All right.  You testified Mr. Velandia would come to your

 9    station and touch you sexually.  Do you remember the first time

10    that happened?

11    A.  The first time that Oscar Velandia touched me, it was there

12    at the coffee station.  It was while the old company were the

13    owners.  That was also around in 2005.

14    Q.  Do you recall what happened during that incident?

15    A.  From what I remember, I was standing there and he grabbed

16    me.  And I said, "Don't touch me."  I said, "I don't like

17    that."  And he said, "Oh, I'm sorry.  I won't do it again."

18    Q.  Mr. Caravantes, did he do it again?

19    A.  Did he touch me again?  Yes.

20    Q.  When was the next time that he touched you, if you

21    remember?

22    A.  It was also in 2005.

23    Q.  Was it before or after the new owners took over?

24    A.  Under the new owners.

25    Q.  Do you recall where that happened, where in the restaurant?

1   A.  Also here in the coffee station.  He touched me and I said,

2   "Don't touch me."  At first he said, "I'm sorry, it was a

3   mistake."  And he left.

4   Q.  Now, was anyone else there?

5   A.  No.

6   Q.  And what did Mr. Velandia do during this incident you just

7   described?

8   A.  Nothing.  He just smiled, like he always smiled.

9   Q.  Looking at the picture of the coffee station, do you recall

10  where you were standing when this incident happened.

11  A.  Around here (indicating).

12          THE COURT:  The witness is indicating the corner of

13  the wall on the right-hand side of the picture.

14  Q.  Where was Mr. Velandia?

15  A.  To one side, around here.

16  Q.  How did he touch you --

17          THE COURT:  I'm sorry.  I can't see where.

18          (Witness indicating)

19  A.  Around here.

20          THE COURT:  It is my fault.  I can't see very well.

21          (Witness indicating)

22          THE COURT:  The witness has indicated a little further

23  to the right of the picture.

24  Q.  And the place in the photo you just indicated where

25  Mr. Velandia was standing, was he standing there when he

C3sdcar5                          Caravantes - direct

1    touched you?

2    A.   Yes.

3    Q.   And where on your body did he touch you?

4    A.   My private parts.   He touched me there.

5    Q.   Did you ask him to touch you there?

6    A.   No.

7    Q.   Did you want him to touch you there?

8    A.   No.

9    Q.   Did you ever tell him that you wanted him to touch you

10   there?

11   A.   No, I never did say that.

12   Q.   Now, this touching you just described, how often did it

13   occur after the new owners took over?

14   A.   At first in 2005, it was not too often.   In 2006, that is

15   when it increased.

16   Q.   How much did it increase in 2006?

17   A.   At first it was little, very little.   Then it began to

18   increase.   I don't remember exactly, but he harassed me many

19   times there.   I don't remember how many times a week but it was

20   almost daily.

21   Q.   Did he ever tell you why he started touching you more in

22   2006?

23   A.   No.

24   Q.   During this time period, did you ever form a belief as to

25   why he was touching you more?

C3sdcar5                            Caravantes - direct

1    A.  Yes.

2    Q.  What was that belief?

3    A.  Because he was the manager then.

4            THE COURT:  Did he touch you on the skin of your

5    private parts, or did he touch you on the outside of the pants?

6            THE WITNESS:  At first it was just outside my pants.

7    Then he began to touch me underneath, inside, under my pants.

8    Then he would put his hand down my pants and touch my penis,

9    touch my private parts.  Then he began to -- he began to

10   perform oral sex.  And then we began to have sex.

11   Q.  Now, Mr. Caravantes --

12   A.  Anal sex.

13   Q.  Are you OK, Mr. Caravantes?

14           (Pause)

15           THE COURT:  I think it is better if you start

16   examining.

17   BY MR. DELANEY:

18   Q.  Mr. Caravantes, I am going to keep asking you questions.

19   OK?  So just hang in there.

20           I want to talk now about when he reached inside your

21   pants and touched you on the skin of your private parts.

22           Where did this happen?  Where in the restaurant?

23   A.  I'm sorry.  I didn't hear your question.

24   Q.  When he would reach inside your pants, Mr. Velandia would

25   reach inside your pants and touch the skin of your private

C3sdcar5                        Caravantes - direct

1    parts, where in the restaurant would this happen?

2    A.  Part of everything that he did to me happened there in the

3    coffee station.

4    Q.  And would he say anything -- when he was touching you under

5    your clothes, would he say anything to you?

6    A.  He made obscene comments.  He said, "How big it is."  I

7    remember, he said, "Let me kiss it."  He said, "Let me suck

8    it."

9    Q.  What did he do after he finished touching you?

10   A.  He would smell his hand.  He would touch me and then he

11   would always smell his hand.  At times, I even saw him with his

12   hand in his mouth, in his nose.  And I thought that he might be

13   doing that to other people as well, because I knew he did it to

14   me.

15   Q.  Mr. Caravantes, did you ever ask him to touch you under

16   your clothes in the way that you just described?

17   A.  No.

18           THE COURT:  The witness is shaking his head no.

19   Q.  Did you want him to touch you like that?

20   A.  No.  I never wanted to be touched.

21   Q.  Did you ever tell him to stop?

22   A.  I told him not to touch me.  I told him to leave.  But he

23   wouldn't listen.  He would stay there.  I would move his hand,

24   tell him I didn't like that.  He didn't understand.

25           THE COURT:  When it happened at the coffee station,

C3sdcar5                          Caravantes - direct

1    were customers in the restaurant at the time?

2              THE WITNESS:  Yes.

3    Q.  Could any customers see into the coffee station during

4    business hours?

5    A.  No, no one.

6    Q.  Why not?

7    A.  Because I was there alone.

8    Q.  Could you show the floor plan again?

9    A.  The only time that there would be people passing by was if

10   they were going to the Rialto.

11   Q.  Now, on the floor plan, Mr. Caravantes, do you see the

12   Rialto room on the bottom of the floor plan?

13   A.  Yes.

14   Q.  Now, could you see into the coffee station from any point

15   in the Rialto room?

16   A.  No.

17   Q.  Why not?

18   A.  Because the coffee station is hidden.  You could only see a

19   little part, if at all, and just what's in the front.

20   Q.  What about, do you see where the main dining room is

21   indicated on the floor plan?

22   A.  Yes.

23   Q.  Could you see into -- sorry.

24              Was there customers in the main dining room?

25   A.  Yes.

C3sdcar5                              Caravantes - direct

1   Q.  Could anyone see from the main dining room into the coffee

2   station?

3   A.  No.

4           THE COURT:  Did any of the waiters ever surprise you

5   and him together when he was performing oral sex on you?

6           THE WITNESS:  Several times a waiter would come over.

7   As he was approaching, I don't know if he saw or not.  I don't

8   know.

9           THE COURT:  What waiter?

10          THE WITNESS:  Luis.  I don't remember his last name.

11          THE COURT:  Anyone else?

12          THE WITNESS:  On other occasions he would be

13  performing oral sex on me outside of the door of the Rialto,

14  and a busboy came out and he pushed hard and Oscar fell on his

15  knees.  I don't know if he saw because the door quickly closed.

16  That busboy's name is Hector.

17          THE COURT:  Where is the door of the Rialto?

18          THE WITNESS:  Hector Jimenez.

19          THE INTERPRETER:  I'm sorry.

20          THE COURT:  Where is the door of the Rialto?

21          THE WITNESS:  Right there.

22          (Indicating)

23          THE COURT:  I see.  OK.  So was he inside the Rialto

24  room?  He was inside the Rialto room, and the waiter came from

25  the door of the coffee station, or from the other way?

C3sdcar5                        Caravantes - direct

1        THE WITNESS:  I was standing at the door of the

2   Rialto.  Oscar came from the coffee station area.  He grabbed

3   me there.  And the busboy was coming from inside the Rialto out

4   towards the coffee station.

5        THE COURT:  I see.  Thank you.

6   BY MR. DELANEY:

7   Q.  Now, Mr. Caravantes, this touching under your clothes you

8   described, do you remember approximately when it started?

9   A.  That began approximately at the end of 2005 or the

10  beginning of 2006.  That was above my clothes.  Then he began

11  to put his hand underneath my clothes.

12  Q.  Mr. Velandia did?

13  A.  Oscar Velandia did all of that to me.

14  Q.  Did the amount of time to do that ever increase?

15  A.  Yes.

16  Q.  When did it increase?

17  A.  When he began to put his hand underneath my pants to grab

18  my penis.  He would lower my zipper.  He would put his hand

19  inside.  Then he would leave, smelling his hand.  A short while

20  later he would return and he would do the same thing again.

21        THE COURT:  When you say "a short time later," the

22  same day?

23        THE WITNESS:  The same day but at different times.

24  BY MR. DELANEY:

25  Q.  Do you recall what Mr. Velandia was wearing on any of these

C3sdcar5                          Caravantes - direct

1   occasions?

2              (Pause)

3              THE COURT:  Are you answering yes?

4   Q.  What was he wearing?

5   A.  I think at first he had a white jacket, and then he had a

6   blue jacket.

7   Q.  What do you mean by "blue jacket"?

8   A.  When he had a blue jacket, he was the assistant manager.  I

9   don't remember when he began to use that suit, but he took that

10  position when Brett was fired.

11  Q.  By "Brett," do you mean Brett Lockard?

12  A.  Yes, Brett Lockard.

13  Q.  Who was Brett Lockard?

14  A.  Brett Lockard was the manager's assistant.

15  Q.  When was Mr. Lockard the assistant manager?

16  A.  With the old company and with the new company for a period,

17  as well.

18              THE COURT:  OK.

19  Q.  Now, was Mr. Velandia wearing a suit, a blue suit, as you

20  described, when he touched you over your clothes?

21  A.  He had a gray -- he had gray pants on, gray or green.

22  Q.  Sure.

23  A.  And he had a blue jacket with gold buttons.

24  Q.  Did anyone else at Remi Restaurant wear a suit like that?

25  A.  Mr. Pistorio.

298

C3sdcar5                        Caravantes – direct

1    Q.  Who was Mr. Pistorio?

2    A.  The general manager.

3            And Tabossi.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  | BY MR. DELANEY:    (Continued)

2  | Q.   Who is Tabossi?

3  | A.   Miguel Tabossi, he was the Rialto manager.

4  | Q.   Did Mr. Tabossi wear that suit all the time?

5  | A.   Yes.  When he became the manager of the Rialto, he began to

6  | use that suit, that jacket.

7  | Q.   I think my original question was, was Mr. Velandia wearing

8  | the suit on any occasions that he touched you over your

9  | clothes?

10 | A.   Yes.

11 | Q.   Was he wearing the suit on any of the occasions when he

12 | touched you under your clothes and he touched the skin of your

13 | private parts?

14 | A.   Yes.

15 | Q.   Was he wearing the suit on any occasions when he performed

16 | oral sex on you in the coffee station?

17 | A.   Not just when he performed oral sex.

18 | Q.   I know, Mr. Caravantes.  Just please answer the question.

19 |          THE COURT:  I think you'd better repeat the question

20 | or ask it a different way.  Because I think it's lost by this

21 | time.  It will be hard to identify what question you mean.

22 | Q.   Did Mr. Velandia perform oral sex on you in the coffee

23 | station?

24 |          THE INTERPRETER:  I'm sorry?

25 | Q.   Did Mr. Velandia perform oral sex on you in the coffee

C3sQcar6                          Caravantes - Direct

1   station?

2   A.  Yes.

3   Q.  Was he ever wearing a suit when he did that, the suit you

4   just described?

5   A.  Yes.

6   Q.  Do you recall any of the incidents when he performed oral

7   sex on you in the coffee station?

8   A.  One of the incidents?  I didn't understand your question.

9   Q.  Any one of the incidents:  Let me ask the question a

10  different way.  Do you recall what happened when Mr. Velandia

11  performed oral sex on you in the coffee station?

12  A.  Yes.

13  Q.  What happened?

14  A.  I felt dead.  I couldn't respond.  I felt like I was being

15  injected with something that paralyzed me.  I responded by

16  trying to push him away but he would pull me closer.

17  Q.  How would he pull you closer?

18  A.  At first he would pull me from my pants.  Then when he

19  lowered my zipper, I would tell him to leave, and he would grab

20  me from inside the pants.  Having opened the zipper, he would

21  hold on to that part, he would hold on to my pants, and my

22  pants would move side ways, then he would grab my parts.  I

23  wanted to move away, I wanted to leave, but he would hold me

24  from my part hard and it would hurt.

25  Q.  What do you mean by part?

1           THE COURT:  Would he hold your penis or would he hold

2      your testicles?

3           THE WITNESS:  He would hold my penis.

4      Q.  Did he ever say anything to you?

5      A.  Many times he pulled my penis.  It hurt.  I would tell him

6      that it hurt but nothing mattered to him.

7      Q.  Did he ever say anything to you when he was doing this to

8      you?

9      A.  What I remember that he said was, "It's so big.  It's so

10     pretty.  What a pretty face."  That's what I remember he would

11     say.

12     Q.  How often did this happen?

13     A.  Every time he performed oral sex on me.  It was often.

14     Q.  Did he perform --

15     A.  The only time he didn't do that to me was when he didn't

16     work or if I was not at work.

17     Q.  Did he ever perform oral sex on you anywhere else in Remi

18     Restaurant?

19     A.  Yes.  He also performed oral sex on me in the coat check of

20     the Grand Canal.

21     Q.  Mr. Caravantes, I apologize.  Would you mind using a laser

22     pointer?

23          THE COURT:  The coat check of the Grand Canal?

24     Q.  What's the Grand Canal, Mr. Caravantes?

25     A.  Well, that's what we called the main dining area, the Grand

 1   Canal, the restaurant itself.

 2   Q.   Other than the coat check and the Grand Canal, anywhere

 3   else that he performed oral sex on you?

 4   A.   In the bathroom of the Rialto; also in the offices.

 5   Q.   Where are the offices?

 6   A.   Downstairs in the basement.  There were two offices there –

 7   Mr. Roberto's and the manager's.  And he would perform oral sex

 8   on me in the manager's office.

 9   Q.   Did you ask him to perform oral sex on you?

10   A.   I never said that.

11   Q.   Did you want him to perform oral sex on you?

12   A.   No, I did not want that.

13   Q.   Now, Mr. Caravantes, did you ever ejaculate when he

14   performed oral sex on you?

15   A.   Sometimes, yes, I did, but I would close my eyes when that

16   happened thinking about something else.  Sometimes I would not

17   orgasm, it wouldn't happen.  Sometimes I did.  And there was a

18   sink, and he would spit it out there.

19              THE COURT:  Where was the sink?

20              THE WITNESS:  Inside the coffee station next to the

21   wall.

22              THE COURT:  What about the coat room?

23              THE WITNESS:  Also in the coat check, he would finish

24   and then he would run to the bathroom from there.

25              THE COURT:  To where?

C3sQcar6                        Caravantes - Direct

```
 1            THE WITNESS:  Run to the bathroom from there.  When it
 2   happened in the Rialto, I don't remember if I climaxed there or
 3   not.
 4   Q.  If you recall, Mr. Caravantes, how did it feel physically
 5   when he was performing oral sex on you?
 6   A.  I felt dead.  I felt like there was no reaction.  I felt
 7   like when a prey is captured by a predator.  For me Oscar was
 8   like an anaconda, like he would just capture his prey and use
 9   it, and when he's done with it, he kills you.  That's what it
10   felt like to me.
11   Q.  How did it feel physically for you when you ejaculated?
12   A.  I felt dirty.  I felt bad.  I wouldn't want to leave my
13   station.  I wouldn't want to speak to anyone.  I felt dirty.
14   Q.  Mr. Caravantes, did you ever make any audio recordings
15   while you worked at Remi Restaurant?
16   A.  I did, yes.  I did several things.
17   Q.  Did you ever make any video recordings while you worked at
18   Remi Restaurant?
19   A.  Yes.
20   Q.  How did you make those recordings?  What device did you
21   use?
22   A.  My camera.  I brought a camera in.  I used my camera.  I
23   placed the camera.
24   Q.  When did you start making these recordings?
25   A.  I don't recall exactly.
```

C3sQcar6                          Caravantes - Direct

1    Q.  Was it before or after the new owners took over?

2    A.  It was after the new ownership with the new owners.

3    Q.  Was it before or after Mr. Velandia started touching you?

4    A.  It was after he was touching me at the end.

5    Q.  Mr. Caravantes, I am going to put something up on the

6    screen here.  Can you put up Plaintiff's 31, please?

7             MR. DELANEY:  Your Honor, this is in Plaintiff's

8    Exhibit binder, but it's a media file so in your binder it has

9    a slip sheet.  We will be providing the media file before the

10   end of the trial.

11            THE COURT:  I have to see it.

12            MR. DELANEY:  We are going to see it, your Honor.  I

13   just wanted to tell you that you will have a copy of this.

14   Randall, would you mind playing just the first few seconds of

15   this video?  Stop it there, please.

16   Q.  Mr. Caravantes, can you see this recording?

17   A.  Yes.

18   Q.  Do you recognize it?

19   A.  Yes.

20   Q.  Why do you recognize it?

21   A.  Because that's where I placed the camera.

22   Q.  Whose arm was that in the video we just saw?

23   A.  Mine.

24   Q.  Where are you placing the camera?

25   A.  Above in the station and on some boxes that were there.  I

C3sQcar6                          Caravantes - Direct

1   placed it there.

2              THE COURT:  Is that where the arrow is pointing?  It's

3   not there any more.

4   Q.  Do you want me to put the arrow back?

5              THE COURT:  Is that where it is, where that arrow is?

6              THE WITNESS:  Well, yes, the camera was pointing in

7   that direction.

8              THE COURT:  The place where the red -- that you did

9   with the red or the place that has the arrow?

10             THE WITNESS:  Around here.  I placed it around here.

11             THE COURT:  Is that a garbage can?

12             THE WITNESS:  No.  That was a box there that are

13  matches that I placed there.  I placed it above that.

14  Q.  What device did you use to make this recording?

15  A.  It was a Sony camera.

16  Q.  Randall, can you play it, please?

17             THE COURT:  A video camera?

18             THE WITNESS:  Yes.

19  Q.  Play it please, Randall.  Pause, please.

20             Who is that we're seeing in the video, Mr. Caravantes?

21  A.  That's me.

22  Q.  Play it, Randall.

23             Who did we just see in the video?

24  A.  That was me and Oscar Velandia.

25  Q.  What were you wearing?

1   A.  I had black pants and a white jacket that I always had to

2   use.

3   Q.  What was Mr. Velandia wearing?

4   A.  He had a blue jacket on.

5   Q.  Was he wearing the suit you described earlier in your

6   testimony?

7   A.  Yes.

8   Q.  Keep playing, Randall.

9        OK.  Mr. Caravantes, that was very dark and hard to

10  see.  So, Randall, I am going to ask you 0we excerpted part of

11  this video, and I am going to ask you to tell the Court what

12  we're seeing, OK?  Can you do that for me, Mr. Caravantes?  I

13  know it's very difficult.  OK.  Are you ready?  OK, Randall,

14  advance, please.

15        What's happening in the red circle, Mr. Caravantes?

16  Can you see your screen?  What is Mr. Velandia doing to you?

17  A.  He is placing his hand inside my pants.

18  Q.  Did you ask him to do this?

19  A.  No.

20  Q.  Did you want him to do this?

21  A.  No.

22  Q.  Keep going, Randall.  What just happened?  Pause, please.

23  A.  He removed his hand.

24  Q.  Keep going, Randall.  What is he doing?

25  A.  He's going to smell his hand.

1   Q.  Keep going.

2   A.  He's smelling his hand.

3   Q.  Thanks, Randall.

4           Now, is that consistent with what you described

5   earlier when Mr. Velandia would touch you under your clothes?

6   Is that how it happened?

7   A.  Yes.

8   Q.  And how often did it happen?

9           THE COURT:  What's happening here?

10          MR. DELANEY:  This is just the end of this clip, your

11  Honor.

12          THE COURT:  He's the one to testify; not you,

13  Mr. Delaney.

14          MR. DELANEY:  I'm sorry, your Honor.

15          THE WITNESS:  There?  I moved so that he wouldn't

16  touch me.  I moved to turn on the light.  And I was going to

17  throw the garbage away, and he went into the Rialto.  He called

18  me.  He wanted to speak to me.  And I said no.  And he called

19  me again.  He said, "Come over here, let's speak."  I went to

20  see what he wanted.

21          THE COURT:  That was afterwards?

22          THE WITNESS:  Yes.  And I turned the lights on.  In

23  all the time that he had done that to me, he had never turned

24  the lights off.

25          THE COURT:  Who turned the lights off?

1           THE WITNESS:  Oscar Velandia did.  He pretended as if

2    he was going to leave, and then he turned the lights off at

3    that point, and then he returned.

4           THE COURT:  And that was during working hours?

5           THE WITNESS:  Yes.

6           THE COURT:  Were customers in the restaurant?

7           THE WITNESS:  Yes, they still were.  He always did

8    that.  Oral sex --

9           THE COURT:  He always turned the lights off?

10          THE WITNESS:  No.

11          THE COURT:  He always did what?

12          THE WITNESS:  He always did that to me and performed

13   oral sex.  He did that to me at that station.

14          THE COURT:  In this video, does it show him performing

15   oral sex?

16          THE WITNESS:  No, I didn't allow him to touch me.

17   From what I remember, I asked him, "Why did you turn off the

18   lights?"  And I said, "If someone comes back here, why are we

19   going to say the lights are off?" and I moved.  And that's when

20   I turned the lights on.

21          THE COURT:  Next question.

22          MR. DELANEY:  Your Honor, plaintiff's move Plaintiff's

23   Exhibit 31 into evidence.

24          THE COURT:  31 is admitted in evidence.

25          (Plaintiff's Exhibit 31 received in evidence).

1       MR. PARKER:  Your Honor, there's no --

2       THE COURT:  Are you making an objection?

3       MR. PARKER:  I am going to object.

4       THE COURT:  On what grounds?

5       MR. PARKER:  The video was -- there's no audio.  He

6   testified he had a camera that was capable of audio.  The video

7   is truncated in spots.  It is not a -- it's not a

8   from-beginning-to-end video, and I don't know what was cut out.

9       THE COURT:  It goes to the weight, it seems to me.

10       MR. DELANEY:  The defense counsel has the full video.

11   This is just an excerpt for the convenience of the Court, and

12   there was audio in it; you can hear voices.

13       THE COURT:  Well, I am allowing the video for whatever

14   weight it is.  I am not making a decision about the weight of

15   the video or the witness's testimony.  The witness's testimony

16   is allowed, but I am not making any finding as to the weight

17   that's to be given to that.  They are both allowed.  The

18   witness's explanation is clear from the record what the witness

19   says occurred, what he says.  I haven't heard anyone else's

20   testimony, but it seems to me it's admissible.  They both

21   appear in the video.

22   Q.  Mr. Caravantes, did you ever complain about Mr. Velandia's

23   conduct to anyone at Remi Restaurant?

24   A.  Of what Oscar Velandia did to me?

25   Q.  Did you ever complain about what Mr. Velandia did to you to

1    anyone at Remi Restaurant?

2    A.  No.

3    Q.  Why not?

4    A.  Because no one did anything there.  There was one occasion

5    which I was seated at the bar.  Mr. Pistorio was coming back

6    from doing a report.  And he said, "Do you know why I fired

7    Antonio?"  I said, "No".  And he said, "Because he spoke to me

8    poorly of Oscar.  And anyone who speaks to me poorly of Oscar,

9    I will fire."  No one helped there.

10   Q.  Was anyone else there for that conversation?

11   A.  No.  Just Mr. Pistorio and myself.

12   Q.  Did this conversation happen before or after Mr. Velandia

13   started touching you?

14   A.  It was in the middle of when he had already been touching

15   me.

16   Q.  Was there any other reasons you didn't complain?

17   A.  For fear of losing my job.  Fear of retaliation.

18   Q.  Why were you afraid of losing your job?

19   A.  Because of what Mr. Pistorio had said to me.

20   Q.  What would have happened to you if you lost your job?

21        MR. DELANEY:  Your Honor, may we take a break?  This

22   testimony is very difficult for him.

23        THE COURT:  I don't think you've asked the question

24   properly.  I don't think he would understand.  It's what he

25   thought would happen to him.  I think you have to ask it that

C3sQcar6                         Caravantes - Direct

1    way.

2    Q.  What did you think would happen to you if you lost your

3    job?

4    A.  What did I think?  Practically -- I am where I am now.

5    Economically I'm not doing well.  I'm destroyed.

6            THE COURT:  All right.  We could break now.

7            MR. DELANEY:  Thank you, your Honor.

8            Thank you, Mr. Caravantes.  We will resume tomorrow.

9            THE COURT:  You are excused, Mr. Caravantes, until

10   tomorrow morning at 9:30.

11                       (Witness excused)

12           (Trial continued to March 29, 2012 at 9:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         INDEX OF EXAMINATION

2      Examination of:                                Page

3      FRANCISCO SOTARRIBA

4      Cross By Mr. Parker  . . . . . . . . . . . . 158

5      Redirect By Mr. Delaney  . . . . . . . . . . 186

6      Recross By Mr. Parker  . . . . . . . . . . . 209

7      SERGIO PASTOR GARCIA

8      Direct By Ms. Penza  . . . . . . . . . . . . 218

9      Cross By Mr. Parker  . . . . . . . . . . . . 251

10     Redirect By Ms. Penza  . . . . . . . . . . . 274

11     ARTURO CARAVANTES GARCES

12     Direct By Mr. Delaney  . . . . . . . . . . . 276

13                         PLAINTIFF EXHIBITS

14     Exhibit No.                                Received

15      97     . . . . . . . . . . . . . . . . . . . 208

16

17

18

19

20

21

22

23

24

25