C3tdcar1                        Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------x
ARTURO CARAVANTES and
FRANCISCO SOTARRIBA
                    Plaintiffs

            v.                          09 CV 7821 (RPP)
53RD STREET PARTNERS, LLC
d/b/a REMI RESTAURANT and
OSCAR VELANDIA
                    Defendants
-----------------------------x

                                        New York, N.Y.
                                        March 29 2012
                                        9:55 a.m.

Before:

                    HON. ROBERT P. PATTERSON, JR.

                                        District Judge

                            APPEARANCES
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
        Attorneys for Plaintiffs
1285 Avenue of the Americas
New York, NY 10019
AARON S. DELANEY
MAYUR P. SAXENA
MOIRA KIM PENZA

URBAN JUSTICE CENTER
        Attorney for Plaintiffs
123 William Street 16th Floor
New York, NY 10038
NICOLE HALLETT

EPSTEIN BECKER & GREEN PC
        Attorneys for Defendants
KERRY M. PARKER
ALKIDA KACANI

        - also present -

JOHN MATT - Spanish Interpreter
LILIANA HALAC - Spanish Interpreter
RANDALL CARTER - Plaintiff AV Tech

C3tdcar1                          Trial

1              (Trial resumed)

2              THE COURT:  The morning is about the only time I can

3    get some of the other cases organized.

4              Let's call Mr. Caravantes back.

5     ARTURO CARAVANTES GARCES,

6         Resumed, and testified (through the Interpreter) further

7         as follows:

8              THE COURT:  Mr. Caravantes, you are reminded you are

9    still under oath.

10             Please be seated.

11             MR. DELANEY:  Your Honor, may I approach the witness

12   just to hand him a binder?

13             THE COURT:  Yes.  What are you handing him?

14             MR. DELANEY:  Your Honor, I handed Mr. Caravantes a

15   binder full of exhibits that I may use during his examination.

16   Your Honor should already have that by now.

17             THE COURT:  Exhibits?

18             MR. DELANEY:  It starts with Exhibit 3, your Honor.

19             THE COURT:  3 through 112?

20             MR. DELANEY:  Correct.

21             THE COURT:  OK.

22   DIRECT EXAMINATION (Resumed through the Interpreter)

23   BY MR. DELANEY:

24   Q.  Mr. Caravantes, you testified yesterday that Mr. Velandia

25   was a manager under the new ownership, correct?

C3tdcar1                        Caravantes - direct

1   A.   Yes.

2   Q.   What, if you know, were his responsibilities as a manager

3   at Remi Restaurant?

4   A.   He was making meetings, suspending people, give directions

5   to employees, post schedules on the little box.

6           MR. PARKER:   Your Honor, may I ask if the interpreter

7   could speak a little louder?   I haven't heard a couple of

8   things so far.

9           THE INTERPRETER:   Sure.   I can speak up.   No problem.

10          MR. PARKER:   I didn't hear that last answer.

11          THE INTERPRETER:   OK.   I'll repeat.

12          Posting schedules in a little box, designate stations

13   and who was going to work with who, and at which station.

14   BY MR. DELANEY:

15   Q.   When did you learn that Mr. Velandia was a manager at Remi

16   Restaurant.

17   A.   He took that position as soon as they fired Brett Lockard.

18   Q.   And did anyone ever tell you that Mr. Velandia was a

19   manager?

20   A.   Yes.   Mr. Pistorio used to say that at the meetings.

21          MR. DELANEY:   Now, Randall, if you don't mind putting

22   up Plaintiffs' Exhibit 29 -- sorry, 28.   Sorry, Randall, 28.

23   Q.   Mr. Caravantes, you made audio recordings at Remi

24   Restaurant as well as the video recording we saw yesterday?

25   A.   The recordings from yesterday?

C3tdcar1                        Caravantes - direct

1  Q.  Did you make audio recordings at Remi Restaurant?

2  A.  Yes.

3  Q.  And how did you make those recordings?

4  A.  With my camera; several locations, such as meetings.

5         MR. DELANEY:  Randall, would you go ahead and play the

6  tape, please.

7         (Audio played)

8  BY MR. DELANEY:

9  Q.  Now, Mr. Caravantes, that was very hard to hear, but you

10  recognize that audiotape?

11  A.  Yes.

12  Q.  And what was -- what did you just hear?

13  A.  One of Mr. Pistorio's meetings.

14         THE COURT:  Who was speaking?

15         THE WITNESS:  General manager, Mr. Pistorio.

16         MR. DELANEY:  Randall, I am going to ask you to play

17  that again.

18         Your Honor, we've made a transcript of this.  It is in

19  your binder under Tab P28, under Exhibit 28.  So we can play

20  this tape again with the transcript so it is more

21  understandable.

22         Can you go ahead, Randall.

23         THE COURT:  I'm sorry.  Who made the transcript?

24         MR. DELANEY:  We had it transcribed by Merrill; it is

25  a transcription service.

C3tdcar1                        Caravantes - direct

1                 THE COURT:  By whom?

2                 MR. DELANEY:  Sorry, your Honor.

3                 THE COURT:  By whom?

4                 MR. DELANEY:  By Cynthia Romero, and her certification

5    is in the binder at page 4 of the transcript.

6                 THE COURT:  What exhibit is this?

7                 MR. DELANEY:  Exhibit 28, your Honor.

8                 THE COURT:  In what language is it?

9                 MR. DELANEY:  Your Honor, it's in English but it is

10   just very difficult to understand.

11                THE COURT:  What are the qualifications of the

12   translator?

13                MR. DELANEY:  They are a certified translation service

14   and they also prepare transcriptions of the record.

15                (Pause)

16                THE COURT:  Did anyone assist her in making the

17   interpretations?

18                MR. DELANEY:  I believe we reviewed them, your Honor,

19   for accuracy, as well.

20                THE COURT:  I think she has to testify as to how she

21   went about it.

22                MR. DELANEY:  We could call Ms. Romero to testify as

23   to the transcription, your Honor.

24                May I go ahead and play the recording?

25                THE COURT:  Yes.

C3tdcar1                          Caravantes - direct

1           MR. DELANEY:  Go ahead.

2           (Audio played)

3    BY MR. DELANEY:

4    Q.  Mr. Caravantes, that was Mr. Pistorio's voice, correct?

5    A.  Yes.

6    Q.  And what did he mean by "Senor Velandia is the guy in

7    charge"?

8           MR. PARKER:  Objection.

9           THE COURT:  Objection sustained.

10   Q.  What was Mr. Velandia discussing in the excerpt from the

11   recording we just heard?

12   A.  It's what he used to always say, that Oscar Velandia was

13   always in the front of everything.

14          (Audio played)

15   Q.  Now, Mr. Caravantes, you testified that one of the things

16   Mr. Velandia did when he was a manager was run meetings?

17   A.  Yes.

18   Q.  What meetings are you referring to?

19   A.  The same ones Mr. Pistorio used to do.

20   Q.  And which ones were those?

21   A.  Those were the meetings to talk about the specials and the

22   orders, because I used to work in the afternoon.

23   Q.  So did you attend any of these meetings?

24   A.  Yes.  Yes, I had to be there.

25   Q.  Did you attend any meetings that Mr. Velandia led?

C3tdcar1                        Caravantes - direct

1    A.  Yes.

2    Q.  Did you ever record any of those meetings that Mr. Velandia

3    led?

4    A.  Yes.

5              MR. DELANEY:  Randall, can you put P29 up, please?

6              THE CLERK:  This is Plaintiffs' 29?

7              MR. DELANEY:  Plaintiffs' 29, yes.

8              So, your Honor, again, this is an audio recording.  We

9    also have a transcript that we've placed in your binder.

10             Now, this one has both English and Spanish.  So the

11   translator both transcribed the English and also -- transcribed

12   the Spanish and then translated the Spanish into English.

13             THE COURT:  So this is the English version?

14             MR. DELANEY:  And, your Honor, just for my benefit, I

15   plan to move these into evidence.  Would you like me to wait

16   until Ms. Romero or the translator has had a chance to testify

17   later?

18             THE COURT:  Subject to that connection with her

19   testifying.

20             MR. DELANEY:  Randall, go ahead.

21             (Audio played)

22             MR. DELANEY:  Pause, Randall.

23   BY MR. DELANEY:

24   Q.  Mr. Caravantes, do you recognize this recording?

25   A.  Yes.

C3tdcar1                          Caravantes – direct

1    Q.   What is it?

2    A.   It is one of the meetings that Oscar used to have.

3    Q.   Did you make this recording?

4    A.   Yes.

5    Q.   And whose voice are we hearing on the audio recording?

6    A.   Well, that's the manager, Oscar Velandia.

7              (Audio played)

8              MR. DELANEY:  Pause it.

9              Your Honor, I am now switching to Spanish.  So this

10   will be a translation of the Spanish.

11             Go ahead.

12             (Audio played)

13   BY MR. DELANEY:

14   Q.   Now, whose voice did we hear speaking in Spanish there?

15   A.   Oscar Velandia's.

16   Q.   And where in the restaurant were you when you made this

17   recording?

18   A.   At the last station.

19   Q.   Do you have the laser pointer up there, Mr. Caravantes?

20             Could you indicate on the map, please, where you took

21   this recording.

22   A.   (Indicating) Right there.

23   Q.   Thank you.

24             MR. DELANEY:  Let the record indicate the witness

25   indicated the back server station on the floor plan.

C3tdcar1                          Caravantes - direct

1            Your Honor, I'll move P28, Plaintiffs' 28, and

2     Plaintiffs' 29 into evidence, subject to connection, as you

3     said.

4            THE COURT:  28 and 29 are admitted subject to

5     connection.

6            (Plaintiffs' Exhibits 28 and 29 received in evidence)

7            THE COURT:  Who is Pablo?

8            THE WITNESS:  Pablo was Oscar Velandia's right hand.

9            THE COURT:  What position did he hold?

10           THE WITNESS:  He used to distribute tips together with

11    Oscar Velandia.

12           THE COURT:  Was he a waiter?  Was he a front man?

13    What did he do?

14           THE WITNESS:  He was a waiter.  Then sometimes he used

15    to give him instructions, and then he would give it to the

16    busboys.

17           THE COURT:  Did he get in a lot of fights?

18           THE INTERPRETER:  I'm sorry.  I didn't understand

19    that, your Honor.

20           THE COURT:  Did Pablo get in a lot of fights?

21           THE WITNESS:  He had several fights inside there.

22           THE COURT:  What would they be over?

23           THE WITNESS:  Because he didn't want to work much, he

24    used to order busboys around.  All because he was a very good

25    friend of Oscar's, nobody could mess with him.

C3tdcar1                          Caravantes - direct

1          THE COURT:  What would the fights be over?

2          THE WITNESS:  I don't know exactly.

3          THE COURT:  Not money?

4          THE WITNESS:  No.  The money -- Paulo used to blame

5   Oscar for it.  Whenever we would go talk to Paulo, he would

6   say, "Go talk to Oscar Velandia."

7          THE COURT:  The fights would be with other waiters?

8          THE WITNESS:  As I can recall, he had a fight with one

9   of the waiters.

10          THE COURT:  He had a fight with the busboys, too?

11          THE WITNESS:  Yes.  I can recall he had a fight with a

12   busboy.  The busboy told me that he had taken him to the center

13   of the party and that's where he hit him.

14          MR. PARKER:  Your Honor, I have to object to the

15   testimony.  It is obvious hearsay.

16          THE COURT:  I just asked about fights.  I will

17   disregard the hearsay.

18   BY MR. DELANEY:

19   Q.  Now, Mr. Caravantes, you testified that when Mr. Velandia

20   was a manager, he had the power to suspend people.

21          THE COURT:  Now, I want to first:  When was this audio

22   taken?  When did you record that audio?

23          THE WITNESS:  I don't recall exactly when, but it was

24   in 2007.

25          MR. DELANEY:  Please read the question back.

C3tdcar1                          Caravantes - direct

1              (Question read)

2      A.   Yes.

3      Q.   What is the basis for your belief that he had the power to

4      suspend people?

5      A.   At one time there was a busboy who was very, very quick,

6      and from the time he would get there, 9/9:30, he wouldn't stop

7      until 12:30 --

8              MR. PARKER:  Your Honor, I am going to object.  I

9      believe this is hearsay.

10             Your Honor, I would ask that a foundation be laid as

11     to whether or not --

12             THE COURT:  Objection sustained.

13             MR. DELANEY:  Your Honor, we are not entering it in

14     for the truth of the matter but merely for Mr. Caravantes'

15     state of mind, for his awareness --

16             THE COURT:  Still, you have to lay a foundation.

17     BY MR. DELANEY:

18     Q.   Who was the name of this busboy?

19     A.   Hector Dominguez.

20     Q.   Did you work with Mr. Dominguez?

21     A.   Yes.

22     Q.   When did you work with Mr. Dominguez?

23     A.   At night, because I used to work at night.

24     Q.   Do you remember approximately what year you worked with

25     him?

C3tdcar1                            Caravantes - direct

1   A.  During 2007.

2   Q.  And how often did you work with him?

3   A.  Well, if he used to work the same five shifts as I used to,

4   it was the five days.

5   Q.  Did you ever have the opportunity to observe Mr. Dominguez

6   while he worked?

7   A.  Yes.

8   Q.  What did you observe?

9   A.  That he was quick.  And all of a sudden his speed went

10  down; that's when Oscar Velandia sent him home.

11  Q.  Now, did you see Mr. Velandia send him home?

12  A.  Yes.

13  Q.  What did you see?

14  A.  He was leaving from the Rialto, around the coffee station,

15  and he was walking very slowly.  And Oscar caught up to him and

16  asked him, "Can you just hurry up because it's busy?"

17  Q.  Were you close enough to hear him say that?

18  A.  Yes.  And after that he told him, "Move more."  And he

19  said, "I can't.  I have pain in the back."  And Oscar told him,

20  "Go home."

21  Q.  What happened next?

22  A.  He went home.

23  Q.  Did you see him go home?

24  A.  Not exactly.

25          And he used to also yell at us and the busboys.  He

C3tdcar1                        Caravantes - direct

1  yelled at me.

2           THE COURT:  Who is "he"?

3           THE WITNESS:  Mr. Velandia.

4           THE COURT:  Let's stick with the subject matter with

5  Mr. Velandia.

6  Q.  So on the night Mr. Velandia told Mr. Dominguez to go home,

7  after he said that, did you see Mr. Dominguez again during your

8  shift?

9  A.  Yes.  I saw him when he sent him home.  I saw him.

10 Q.  Did you see him after that on that shift?

11 A.  No.  I didn't see him there for the rest of the night.

12          THE COURT:  You didn't see who there?

13          THE WITNESS:  Hector Dominguez.

14          THE COURT:  And Mr. Velandia also sent Pablo home,

15 too, right, when he was angry?

16          THE WITNESS:  No.  No.  I don't recall.  I never saw

17 that.

18          THE COURT:  He told you that, didn't he?

19          THE WITNESS:  Oscar didn't tell me that directly.

20          THE COURT:  What did you record on the recording?

21          THE WITNESS:  He said that in general to all of the

22 employees.

23          THE COURT:  He said what in general to all the

24 employees?

25          THE WITNESS:  He told the employees who were working

C3tdcar1                          Caravantes - direct

1    there that shift that night.

2              THE COURT:  What did he tell them?

3              THE WITNESS:  I don't recall.

4              THE COURT:  You don't recall him saying that he sent

5    Pablo home when he was angry?

6              THE WITNESS:  No.  I don't recall.

7    BY MR. DELANEY:

8    Q.  Mr. Caravantes, do you know a Mr. Sergio Pastor?

9    A.  Yes.

10   Q.  How do you know Mr. Pastor?

11   A.  We used to work together.

12   Q.  Where did you work with Mr. Pastor?

13   A.  Remi Restaurant.

14   Q.  Was he still at the Remi Restaurant -- was he still working

15   at Remi Restaurant in 2008, when you left?

16   A.  No.

17   Q.  When did he stop working at Remi Restaurant?

18   A.  That was in 2007.

19   Q.  And do you know why Mr. Pastor stopped working at Remi

20   Restaurant?

21             THE COURT:  Objection to the form of the question.

22   A.  He made a comment.

23             THE COURT:  Objection to the form of the question.

24   Q.  Did you ever learn why Mr. Pastor --

25             THE COURT:  Objection sustained to the form of the

C3tdcar1                          Caravantes - direct

1   question.  You have to lay a foundation.

2   Q.  How did you know Mr. Pastor left the restaurant in

3   August 2007?

4   A.  He told me.  He made a comment to me.

5   Q.  Who told you?

6   A.  Sergio Pastor.

7   Q.  When did Mr. Pastor tell you he left the restaurant?

8            MR. PARKER:  Objection.

9            THE COURT:  Which Pastor are you talking about?

10  Q.  What did Mr. Pastor tell you?

11           THE COURT:  Which Mr. Pastor are we talking about?

12  There are two or three.

13  A.  Sergio Pastor.

14  Q.  What did Mr. Pastor tell you?

15           MR. PARKER:  Objection.  Hearsay.

16           MR. DELANEY:  Your Honor, we are not offering it for

17  hearsay.  We are offering it for Mr. Caravantes' state of mind

18  in terms of Mr. Velandia's power in the restaurant.

19           MR. PARKER:  Your Honor, I think the law is clear that

20  Mr. Caravantes' state of mind is not relevant to the issues in

21  the case.

22           MR. DELANEY:  Your Honor, it is directly relevant to

23  the issues in the case because --

24           THE COURT:  The standard isn't a standard of apparent

25  authority?

C3tdcar1                      Caravantes - direct

1          MR. PARKER:  No.  The standard, your Honor, is actual

2     authority.  The standard is whether or not in fact

3     Mr. Caravantes -- I mean, I'm sorry, whether or not

4     Mr. Velandia, as alleged by the plaintiffs, is in fact a

5     manager under the definition.

6          THE COURT:  What is your authority?

7          MR. PARKER:  It is in our conclusions of law that we

8     submitted as part of the --

9          THE COURT:  Let me ask the same thing of the

10    plaintiffs.

11         MR. PARKER:  -- as part of the Final Pretrial Order.

12         (Pause)

13         We submitted Proposed Findings of Fact and Conclusions

14    of Law, your Honor.  In paragraphs 24 and 25 of that document,

15    we discuss the standard for employer liability based upon acts

16    allegedly committed by a supervisor or manager.  And I can give

17    you -- I can tell you, it is in the document.

18         THE COURT:  The page is 24 and 25 of the report?

19         MR. PARKER:  It is Defendants Proposed Findings of

20    Fact and Conclusions of Law, paragraphs 24 and 25, pages 13

21    and, actually, paragraphs 27 and 28.  Pages 13 and 14.

22         THE COURT:  What is the Plaintiffs' authority?

23         MR. DELANEY:  Your Honor, two points.  First of all,

24    Mr. --

25         THE COURT:  Just phrase it as it appears because I

C3tdcar1                        Caravantes - direct

1   just want to have it.

2              MR. DELANEY:  Sure.  Pages 27 through 29 of

3   Plaintiffs' Proposed Conclusions of Law, and in particular the

4   apparent authority standard says even if the belief is

5   mistaken, a reasonable belief by the plaintiffs that the

6   harasser did have supervisory authority is sufficient under the

7   law.

8              THE COURT:  OK.

9              MR. DELANEY:  We offer this testimony for that

10  purpose, your Honor, to establish --

11             THE COURT:  I understand, under that theory.

12             Subject to my conclusions, I will reserve.

13             MR. DELANEY:  May I proceed, your Honor?

14             THE COURT:  Yes.

15  BY MR. DELANEY:

16  Q.  Mr. Caravantes, what did Mr. Pastor tell you?

17  A.  What he commented to me was that Oscar had fired him, and

18  then Mr. Pistorio came downstairs just to reaffirm what Oscar

19  had done.

20  Q.  Where did this conversation take place?

21             THE COURT:  Objection sustained.

22  Q.  Mr. Caravantes, I am a little confused.  Did Mr. Pastor

23  tell you that about Mr. Pistorio?

24             THE COURT:  You have to have his exact words.

25  A.  Yes.

C3tdcar1                      Caravantes - direct

1   Q.  And do you recall his exact words, the exact words

2   Mr. Sergio Pastor told you?

3   A.  As far as I can recall, that's what he told me.

4   Q.  Do you believe those were his exact words?

5   A.  As far as I can recall right now, those are the words he

6   used.

7            MR. DELANEY:  Randall --

8            THE COURT:  What about Mr. Pistorio's exact words?

9   What were the exact words that Mr. Pistorio used when he came

10  down and talked to you?

11           MR. DELANEY:  Your Honor, I believe those were

12  Mr. Pastor's words he just testified to.

13           THE COURT:  No.  You asked him about -- you asked him

14  about what Mr. Pastor had said.

15  BY MR. DELANEY:

16  Q.  What did Mr. Pastor say about Mr. Pistorio?

17  A.  Sergio told me that Mr. Pistorio came downstairs and that

18  he had finished firing him.  That's what he told me.

19  Q.  That's what Mr. Pastor told you?

20  A.  Yes.

21  Q.  As far as you recall, those are the exact words that

22  Mr. Pastor used?

23  A.  At this moment, that's what I recall regarding that.

24  Q.  Do you recall anything else about that conversation?

25           THE COURT:  You didn't talk to Mr. Pistorio himself

C3tdcar1                         Caravantes - direct

1    about this?

2              THE WITNESS:  No, not that I recall.

3    Q.  But this specific conversation with Mr. Pastor, do you

4    recall anything else about it?

5    A.  Mr. Pistorio commented -- made the comment to me that he

6    had fired Sergio because he had pressed the wrong buttons.

7    Q.  Now, wait a second, Mr. Caravantes.  Is this a different

8    conversation you are referring to now?

9    A.  Yes.

10   Q.  I just want to stay focused on the conversation Mr. Pastor.

11             Do you recall anything else about that conversation,

12   the one you had with Mr. Pastor?

13   A.  Not right now.

14   Q.  OK.  Now --

15             THE COURT:  Who had pressed the wrong buttons?

16             THE WITNESS:  Mr. Pistorio said it was Sergio.

17             THE COURT:  What did Sergio -- what wrong buttons had

18   Sergio pushed?

19             THE WITNESS:  Mr. Pistorio didn't tell me.  All he

20   said is that Sergio had pressed the wrong buttons.

21             THE COURT:  What's Sergio's last name?

22             THE WITNESS:  Sergio Pastor.

23             THE COURT:  What did you understand him to mean by

24   pressing the wrong buttons?

25             THE WITNESS:  I don't know what Mr. Pistorio was

C3tdcar1                        Caravantes – direct

1    referring to.

2    BY MR. DELANEY:

3    Q.  Now, Mr. Caravantes, one last question about the

4    conversation you had with Mr. Sergio Pastor.  I am referring to

5    that specific conversation.

6              I put the floor plan up again, Mr. Caravantes.  Do you

7    think you could use the laser pointer and indicate where this

8    conversation happened with Mr. Pastor?

9              (Pause)

10   A.  Right now I can't recall exactly where it was.

11   Q.  Is there anything I could do to refresh your recollection?

12   A.  Yes.

13             THE COURT:  What could refresh your recollection?

14             THE WITNESS:  The location, where it occurred?

15             THE COURT:  Objection sustained.

16   Q.  Do you recall whether it happened inside the restaurant?

17   A.  I don't recall right now.

18   Q.  OK.  We'll move on.

19             Now, Mr. Caravantes, what would happen at Remi

20   Restaurant when a customer did not want to pay for a meal?

21             MR. PARKER:  Objection.

22             MR. DELANEY:  A little leeway, your Honor.  I am going

23   to get there in a couple of questions.

24             THE COURT:  All right.  Subject to connection.

25   Q.  Mr. Caravantes, let me ask it in a different way.

C3tdcar1                         Caravantes - direct

1              Are you familiar with the term "voiding an order"?

2    A.   Yes.

3    Q.   Are you familiar with that term as it was used at Remi?

4    A.   Yes.

5    Q.   And how would that work at Remi?  How would an order be

6    voided at Remi?

7    A.   Only managers could cancel one.

8    Q.   How did a manager cancel an order at Remi?

9    A.   With a card.

10   Q.   What would they do with that card?

11   A.   They used to swipe it through the computer like this

12   (indicating).

13   Q.   How would you know an order had been voided at the

14   restaurant?

15   A.   Sometimes I would see Mr. Pistorio.  Other times I would

16   see Oscar Velandia.  Sometimes the invoices would come up in my

17   station.

18   Q.   What do you mean by "invoices"?

19   A.   That it was not going to -- that it wasn't going to be --

20   that it was not going to come out on the check.  It wasn't

21   going to be charged.

22   Q.   And who could void orders at Remi Restaurant?

23   A.   As far as I knew over there, only managers.

24   Q.   But who specifically?  What people, while you worked there,

25   after the new owners took over?  Be specific.

C3tdcar1                          Caravantes - direct

1   A.  At the beginning it was Mr. Pistorio and Brett Lockard.  I

2   don't recall whether one of the owners, too, used to do it,

3   Mario, and Oscar Velandia used to do it afterwards.

4   Francesco -- Michael Tabossi.

5   Q.  Was that just Michael Tabossi?

6   A.  Yes.

7            THE COURT:  Let me ask Mr. Caravantes, is it your

8   testimony that Oscar Velandia acted as manager when

9   Mr. Pistorio was absent?

10           THE WITNESS:  Yes.

11           THE COURT:  But when Mr. Pistorio was there,

12  Mr. Pistorio acted as manager?

13           THE WITNESS:  General manager.

14           THE COURT:  Yes?

15           THE WITNESS:  Yes.

16           THE COURT:  Otherwise, Oscar Velandia didn't act as

17  manager except when Mr. Pistorio was absent?

18           THE WITNESS:  No.

19           THE COURT:  No?  Why do you think --

20           THE WITNESS:  Oscar Velandia always acted as manager.

21           THE COURT:  Even when Mr. Pistorio was there?

22           THE WITNESS:  Yes.

23           THE COURT:  He would swipe the cards even when

24  Mr. Pistorio was there?

25           THE WITNESS:  I don't recall right now.  But the both

C3tdcar1                          Caravantes - direct

 1   of them used to sit down and eat together.

 2              THE COURT:  Yes.

 3              THE WITNESS:  Mr. Pistorio used to leave early

 4   sometimes and then Oscar would close.  And then, after --

 5   otherwise Mr. Pistorio would send Oscar away and then

 6   Mr. Pistorio would close.

 7   BY MR. DELANEY:

 8   Q.  Mr. Caravantes, when Mr. Pistorio was not in the

 9   restaurant, what was Mr. Velandia's role as a manager?

10              THE COURT:  I just asked that question.

11   A.  Give out orders.

12              MR. DELANEY:  I will be more specific.

13   Q.  When Mr. Pistorio was in the restaurant, did Mr. Velandia

14   act as assistant manager?

15   A.  Yes, because he had a blazer -- yes, he had the blue suit.

16   Q.  And when Mr. Pistorio was not in the restaurant, is it your

17   belief that Mr. Velandia acted as the general manager?

18   A.  No.  He used to act as manager.

19              THE COURT:  You judge it by the suits?

20              THE WITNESS:  And also because Mr. Pistorio used to

21   say it.  When Mr. Pistorio wasn't there, I spoke with Oscar

22   regarding a complaint because he was the one in charge.

23   BY MR. DELANEY:

24   Q.  Now, Mr. Caravantes, I want to show you a document.  If you

25   could turn to --

C3tdcar1                        Caravantes - direct

1        MR. DELANEY:  Your Honor, may I approach?

2        THE COURT:  If you are going to show him a document,

3   yes.  If you are going to show him a document, I need it.

4        What are you showing him?

5        (Pause)

6   Q.  Now, Mr. Caravantes, I have just handed you a document

7   that's been marked Plaintiffs' Exhibit 110.

8        Do you recognize this document?

9   A.  Yes.

10  Q.  What is it?

11  A.  A schedule from the restaurant.

12  Q.  And it has got multiple pages.  Plaintiffs' Exhibit 110 has

13  multiple pages.  Do you recognize the other pages in this

14  document?

15       THE COURT:  Didn't I see this before?

16  A.  Yes.

17       THE COURT:  I'm sorry.

18  Q.  And what are the other pages?

19  A.  The same thing.  They're schedules.

20  Q.  And did you see these schedules when you worked at Remi

21  Restaurant?

22  A.  Yes.

23  Q.  Where would you see them?

24  A.  A part of the restaurant, in the middle of the restaurant.

25  At times they used to stick them on my station.

C3tdcar1                           Caravantes - direct

1    Q.  Now, I'm going to ask you to look at page 1 of Plaintiffs'

2    Exhibit 110, and I'm going to direct your attention to about

3    two-thirds of the way down the page.  There is a heading called

4    "Coffee Area" on the left-hand side.  Tell me if you see that.

5    Do you see that?

6    A.  Yes.

7    Q.  Do you see underneath it, do you see your name there?

8    A.  Yes.

9    Q.  And that's your name, correct?

10   A.  Yes.

11   Q.  And now if you read across the schedule, there is "L" and

12   "D."  And that stands for lunch and dinner shift, correct?

13   A.  Yes.

14   Q.  And then do you see on the first page here, there is a "D"

15   in the row with your name?

16   A.  Yes.

17   Q.  What did that signify on the schedules?

18   A.  Dinner.

19   Q.  Dinner, that you worked the dinner shift?

20   A.  Yes, only dinner.

21   Q.  And if you go over to the right side of the row with your

22   name on it, you see "Off."  What did that signify on the

23   schedules?

24   A.  That I was off.

25   Q.  Do you recall working that day?

C3tdcar1                          Caravantes - direct

1   A.  No.

2   Q.  Now, if you go up to the top of the schedule.  Let me

3   direct your attention to the top.  Do you see where it says

4   "Servers" there, Mr. Caravantes?

5   A.  Yes.

6   Q.  All right.  Do you see Oscar Velandia's name there?

7   A.  Yes.

8   Q.  Now, if you read across to the right there, do you see the

9   letters MGR?

10  A.  Yes.

11  Q.  What did that signify to you?

12          THE COURT:  We know what it is.

13  A.  Manager.

14          MR. DELANEY:  Your Honor, I move Plaintiffs' Exhibit

15  110 into evidence.

16          THE COURT:  Didn't we put it in evidence with

17  Mr. Sotarriba?

18          MR. DELANEY:  It is a different -- I mean, there are

19  many, many schedules for every year, your Honor.  This is a

20  different set of schedules, but they are not cumulative of

21  Mr. Sotarriba's.  Or if they are, we'll clean it up.

22          THE COURT:  On these schedules, do you see

23  Mr. Pistorio's name?  Do you see Mr. Lockard's name?

24          THE WITNESS:  Not in the front.

25          THE COURT:  Do you see it anyplace?

C3tdcar1                          Caravantes - direct

1           THE WITNESS:  No.

2           MR. DELANEY:  Can I direct him?  There is --

3    Q.  Can I direct your attention to page 19 of 60?

4           THE COURT:  I'm sorry?

5    Q.  Can I direct your attention, Mr. Caravantes, to page 19 of

6    60?

7           THE COURT:  1950?

8           MR. DELANEY:  19 of 60.

9           (Pause)

10   Q.  And directing your attention to the top of this document.

11          Do you see, over on the top, on the right side, it

12   says "GM FV Pistorio"?

13   A.  Yes.

14          THE COURT:  Where is that?

15          MR. DELANEY:  It is very small, your Honor.  It is on

16   the very top on kind of the right side.

17   A.  GM.

18   Q.  Who do you understand that to be?

19   A.  General manager.

20   Q.  What was the name of Mr. Pistorio?

21   A.  FV Pistorio.

22          THE COURT:  Does that have the schedule for what days

23   and weeks he works?

24          THE WITNESS:  No.  His name would appear on the

25   schedule.  But as far as I can recall, it would appear on the

C3tdcar1                        Caravantes - direct

 1   schedule but he would work every day.  Whenever Mr. Pistorio

 2   would take a day off, Oscar Velandia was there, too.  When

 3   Mr. Pistorio would take vacations, Oscar Velandia would be in

 4   charge.

 5           MR. DELANEY:  Your Honor, I am going to move

 6   Plaintiffs' Exhibit 110 into evidence.

 7           MR. PARKER:  Your Honor, two things.  One is although

 8   these are not dated, I can tell that probably half of this

 9   exhibit, or close to it, are schedules from the time period

10   after Caravantes left Remi's employ.  I think those schedules

11   are at least not relevant for purposes --

12           THE COURT:  They are business records, I think.

13           MR. PARKER:  Business records, but they have nothing

14   to do with --

15           THE COURT:  They are admissible as business records,

16   aren't they?  You acknowledge that they are business records?

17           MR. PARKER:  I acknowledge that they are business

18   records, yes.  There is no dispute.

19           THE COURT:  So they stand for whatever they seem to

20   say.

21           MR. DELANEY:  Sorry.  Just for the record, is

22   Plaintiffs' 110 admitted?

23           THE COURT:  Yes.  110 is admitted.

24           (Plaintiffs' Exhibit 110 received in evidence)

25   BY MR. DELANEY:

C3tdcar1                          Caravantes - direct

1   Q.  Now, Mr. Caravantes, I am going to ask you to turn in your

2   binder -- the binder you have in front of you -- to Plaintiffs'

3   Exhibit 3.  It should be the first tab in your binder, as well

4   as yours, your Honor.

5   A.  Yes.

6   Q.  And I'm going to ask you to turn to page 3 of 5 of

7   Plaintiffs' Exhibit 3.

8   A.  Yes.

9   Q.  Do you recognize this document?

10  A.  Yes.

11  Q.  What is it?

12  A.  It is the map of the restaurant at Grand Canal and the

13  tables.

14  Q.  Did you see this document -- this type of document when you

15  worked at Remi Restaurant?

16  A.  Yes.

17          THE COURT:  With all the markings on it?

18          THE WITNESS:  Excuse me?  I didn't understand.

19          THE COURT:  With all the writing on it?

20          THE WITNESS:  Yes.  Sometimes whenever there was less

21  people or guests there, there were less workers and there was

22  less letters in there.

23  Q.  Now, I'm going to direct your attention to the bottom left

24  corner of this document, and there is the word "Coffee Area."

25          And do you see on the bottom left corner, the coffee

C3tdcar1                          Caravantes - direct

1    area?  And do you see your name there?

2    A.  Yes.

3    Q.  What would that mean when your name appeared on this

4    document?

5    A.  That means that I was at the cafeteria.

6    Q.  Would you see this document -- if your name was on it,

7    would you see this document during your shift?

8    A.  Yes.  That one.

9    Q.  And when was this document made during your shift?

10          MR. PARKER:  Your Honor, I am going to object to that.

11          THE COURT:  Objection sustained.  You need a

12   foundation.  You need a foundation question for that question.

13   Q.  In general, when you saw this type of document, who would

14   put the handwriting on the document?

15          THE COURT:  You need a present foundation question.

16   Q.  Did you ever see anyone put the handwriting like you see on

17   this document on a similar document?

18   A.  Yes.  Mr. Pistorio.

19   Q.  Anyone else?

20   A.  Only the managers would do them.  When Mr. Pistorio was not

21   around, Oscar Velandia would do them.

22   Q.  Did you ever see the closing waiter write on this document?

23          THE COURT:  This is very tentative.

24          MR. DELANEY:  All right.  Let me ask you more direct

25   questions, Mr. Caravantes.

C3tdcar1                        Caravantes - direct

1   Q.  Do you know who put the handwriting on this document?  Did

2   you see the person who put the handwriting on this document?

3               THE COURT:  Objection sustained.

4               On this particular document?

5               MR. DELANEY:  Yes, your Honor.  I am being very

6   specific.

7   Q.  Did you see who put the handwriting on page 3 of

8   Plaintiffs' Exhibit 3?

9   A.  On this one?  No.  No, I don't recall.

10  Q.  But on documents like this, did you see who put the

11  handwriting on them in general?

12  A.  Yes.

13              THE COURT:  Objection sustained.

14              I think you've gone over this.  This is just so

15  cumulative.  You are keeping this witness on the stand.  You

16  know he has a condition.

17              MR. DELANEY:  I understand, your Honor.  The

18  defendants have objected to this document not only as business

19  records, and I am trying to lay a foundation.

20              THE COURT:  It is not a crucial document anyway.

21              Please.  I don't want to cut you short if there is

22  something important, but, you know that the witness has a

23  certain disability, and take easy on him.

24              MR. DELANEY:  I understand, your Honor.

25              I'm going to move this into evidence under the

C3tdcar1                        Caravantes - direct

 1   business record exception.

 2              THE COURT:  Excuse me.

 3              MR. DELANEY:  I would like to move Plaintiffs' Exhibit

 4   3 into evidence under the business records exception.

 5   Hearsay --

 6              THE COURT:  There is no objection to you putting it in

 7   evidence, is there?

 8              MR. PARKER:  Your Honor, there is an objection.

 9   Although this type of document was prepared at Remi, the

10   objection is that this particular document is unidentified and

11   the handwriting is unidentified, and, thus --

12              THE COURT:  You mean, it doesn't have a date?

13              MR. PARKER:  There is no date.

14              MR. DELANEY:  Your Honor, these documents were

15   produced in a package.  There is a date on the rest of the

16   documents.

17              And the foundation testimony I was attempting to lay

18   was that these documents were packaged together at the end of

19   the night by the closing waiter to determine tips at the end of

20   the shift, and so the date is presumed to be date on the front,

21   page 1 of 5 of Exhibit 3.  And that this map was made by the

22   closing waiter or some other employee at Remi Restaurant, and,

23   therefore, it is admissible as a business record.  Although --

24              THE COURT:  Is this a single record?

25              MR. DELANEY:  It was produced to us in this way, and

C3tdcar1                            Caravantes - direct

1  we have other examples like this that were produced to us in

2  this way, as a package like this.

3            THE COURT:  In this order?

4            MR. DELANEY:  Correct.

5            THE COURT:  Is there any real quarrel, Mr. Parker?

6            MR. PARKER:  Only with respect to this page.  The

7  other pages we have no issue with.  We have not been able to

8  identify how this document came to be and no one recognizes the

9  handwriting.  So we --

10           MR. DELANEY:  Your Honor, why they are's quarreling

11 with this is because it says "Oscar Velandia, manager on duty."

12 That is the only reason why they want to keep this document

13 out, even though they know these documents were created every

14 night.

15           THE COURT:  Would you repeat what you just said?

16           MR. DELANEY:  Your Honor, I said the only reason the

17 defendants are trying to keep this document out of evidence is

18 because it says "Manager on duty, Oscar Velandia."  They know

19 these documents are created every night during every shift.

20           THE COURT:  It is in 2008?

21           MR. DELANEY:  March 2008, correct.

22           THE COURT:  That is during the period of whose

23 employment?

24           MR. DELANEY:  It is during the period of

25 Mr. Caravantes' employment.

C3tdcar1                          Caravantes - direct

1          THE COURT:  There is no issue -- as I understand it,

2     there is no issue in this case about misallocation of tips or

3     anything of that sort?

4          MR. DELANEY:  No.

5          MR. PARKER:  No, your Honor.

6          THE COURT:  Now, what's on the back, though?  A chart

7     is on the back of the tip distribution form dated March 20th.

8          MR. DELANEY:  Correct, your Honor.  With

9     Mr. Sotarriba, that's why I was attempting to show that on page

10    3 of 5 --

11         THE COURT:  Just wait.

12         I will allow what reason did each employer have to

13    believe that the chart reflects the information on the next

14    page, as opposed to the information on the preceding pages?

15         MR. DELANEY:  Your Honor, if I may?  The chart under

16    the food runners, the testimony I was attempting to elicit from

17    Mr. Sotarriba yesterday, it says "Julio Vega, no show up."

18         THE COURT:  I am sorry.  Who is speaking?

19         MR. DELANEY:  I'm sorry, it is Mr. Delaney, your

20    Honor.

21         On page 3 of 5, on the left side of the map, it says,

22    "Julio Vega no show up."

23         Randall, can you highlight that for me, please?

24         THE COURT:  On page 5?

25         MR. DELANEY:  On page 3 of 5, with the map, your

C3tdcar1                        Caravantes - direct

1    Honor.

2              THE COURT:  OK.

3              MR. DELANEY:  Now, on the preceding page --

4              THE COURT:  Let me just see it.

5              MR. DELANEY:  Yep.

6              (Pause)

7              THE COURT:  Yes.

8              MR. DELANEY:  OK.  Now, your Honor, on the preceding

9    page, on page 2 of 5 -- Randall, can you highlight the runners

10   again?  It is on the left side in the middle, your Honor.

11             On row three, it says "Julio."  It is struck through.

12   And beside it it says, "Home."  So, again, we believe that is

13   consistent with the chart.  It says, "Julio Vega, no show up."

14             THE COURT:  What does it say about Russo?

15             MR. DELANEY:  That all the other -- the names are

16   consistent, your Honor.  In other words, if the map says "Food

17   runner, Miguel Garcia" on this attendance chart, under the

18   runners, it says "Miguel."  So the names line up, your Honor,

19   between the two documents.

20             THE COURT:  I am just looking for Russo.

21             (Pause)

22             I don't see a Russo on page 3 of 5.  Counsel can show

23   it to me if it is there.

24             What about Ivan?

25             MR. DELANEY:  You are correct, your Honor, Russo and

C3tdcar1                          Caravantes – direct

1   Ivan do not show up on the chart.

2           THE COURT:  Let me look at the next, the following

3   page.

4           (Pause)

5           I see Ivan.  I see Julio.

6           Again under these circumstances, the documents should

7   be admitted in the order in which they are placed in the

8   exhibit binder.

9           MR. DELANEY:  Thank you, your Honor.

10          Are you OK, Mr. Caravantes?

11          THE WITNESS:  Yes.

12  BY MR. DELANEY:

13  Q.  Now, Mr. Caravantes, did there come a time that you wanted

14  to be a waiter at Remi Restaurant?

15  A.  Yes.

16  Q.  When did you want to be a waiter?

17  A.  When I was working at Remi Restaurant, right around 2007.

18  Q.  Do you recall why you wanted to become a waiter in 2007?

19  A.  Yes.

20  Q.  Why?

21  A.  Because I used to see how waiters used to earn.  They used

22  to make a lot of money.

23  Q.  Did you make this desire -- your desire to become a waiter

24  known to anyone at Remi Restaurant during this time period?

25  A.  Yes.

C3tdcar1                         Caravantes - direct

1    Q.   Who?

2    A.   Mr. Pistorio.

3    Q.   How did you make your desire to become a waiter known to

4    Mr. Pistorio?

5    A.   I spoke with him approximately three or four times.  I

6    don't recall well how many times.

7    Q.   Do you recall the first conversation you had with him about

8    becoming a waiter?

9    A.   Yes.

10   Q.   What do you recall about that conversation?

11   A.   I spoke with Mr. Pistorio because I saw how he was

12   promoting Julio.  They used to work in the cafeteria as a

13   waiter.  And I asked him one night if he could help me promote

14   to become a waiter.

15   Q.   And do you recall the second conversation you had with

16   Mr. Pistorio about becoming a waiter?

17   A.   Yes.

18   Q.   What do you recall about that conversation?

19              THE COURT:  Was this before the new management took

20   over?

21              THE WITNESS:  Well, the new management.  It was under

22   the new management because under the old management, the

23   manager's name was Herbert.  He was general manager under the

24   old management.  When the new Remi came, when the new

25   management came, the owners, then his name was Mr. Pistorio.

350

C3tdcar1                          Caravantes - direct

1   BY MR. DELANEY:

2   Q.  Now, Mr. Caravantes, can I ask you again about the second

3   conversation you had with Mr. Pistorio about becoming a

4   manager?

5        What, if anything, do you recall about that

6   conversation?

7   A.  The second conversation, he made the comment -- he told me

8   that he was going to look for a coffee maker, for a good one,

9   for an honest one, like myself, and that he was going to do

10  that for me.  He told me he was going to have me as a food

11  runner.  And I told him it was OK.

12  Q.  Do you recall anything else about that conversation?

13       THE COURT:  Food runners make more money than coffee

14  makers?

15       THE WITNESS:  Yes.  Much more.

16  Q.  Do you recall anything else about that conversation, the

17  second conversation with Mr. Pistorio?

18       THE COURT:  That's what he referenced was the second

19  conversation?

20       MR. DELANEY:  Correct.

21  A.  Right now that's all I can recall.

22       During the first conversation he told me that he was

23  going to have a chat with Mr. Velandia.  He was going to sit

24  down with Oscar Velandia.  And the second time he told me that

25  he was going to sit and think about it.

C3tdcar1                              Caravantes - direct

1   Q.  Did you ever have a conversation with Mr. Velandia about

2   becoming a waiter?

3   A.  Yes.  Once.

4   Q.  OK.  What happened?  What do you recall about that

5   conversation?

6              THE COURT:  When was this?

7   Q.  When was this conversation, Mr. Caravantes, with

8   Mr. Velandia?

9              THE COURT:  After the first conversation?  After the

10  second conversation?  After the third conversation with

11  Mr. Pistorio?

12             THE WITNESS:  It was after the second.

13  Q.  What do you recall about this conversation with

14  Mr. Velandia?

15  A.  It was the Rialto.  I was entering the Rialto.  And he told

16  me, "What's going on with you, Caravantes?  What are your

17  plans?  What are you getting out of this?"

18             I told him, "No.  I spoke with Mr. Pistorio about

19  becoming a waiter."  And he asked me, "You want to be a

20  waiter?"  And I said, "Yes."

21             (Continued on next page)

22

23

24

25

1    BY MR. DELANEY:   (Continued)

2    Q.  What did he say next, Mr. Caravantes?

3    A.  Yes.

4    Q.  What did he say next?

5    A.  He said to me, "Yes, but in return -- in exchange for

6    something."  And I asked him, "But what?  You already do to me

7    whatever you want."  And I said OK, and that was the end of the

8    conversation.

9    Q.  At that time during that conversation, did you understand

10   what he meant by he wanted something in exchange?

11   A.  No.  I didn't know what he wanted.

12   Q.  What happened next, Mr. Caravantes?

13           THE COURT:  You didn't know that he wanted some sex?

14           THE WITNESS:  I didn't know what he wanted.

15           THE COURT:  Did you ask him?

16           THE WITNESS:  No.  Then he came back afterwards, I

17   don't recall if it was the same day or another day, but he came

18   back.  He used to come back every night, before that one he

19   used to come back and he used to always perform oral sex on me.

20   He used to perform oral sex on me at the coat check.  I used to

21   close my eyes.  On one occasion I opened my eyes because I

22   didn't want to see what he was doing to me, and he had his cell

23   phone in his hand.  And I asked him, "What are you doing?"  And

24   he said to me, "I'm taking a picture."  And I asked him, "What

25   for?"  And I told him, "Take that away," and I don't know

 1   whether he deleted it.

 2   Q.  Mr. Caravantes, I want to focus on right after

 3   Mr. Velandia's conversation with you becoming a waiter.  What

 4   happened after that, Mr. Caravantes?

 5            THE COURT:  Did you become a waiter?  Or a busboy?

 6            THE WITNESS:  Never.  I never became a waiter.

 7   Q.  Mr. Caravantes, when Mr. Velandia came back to the

 8   restaurant that night after you had a conversation with him

 9   about becoming a waiter, can you tell me what happened?

10   A.  He came back afterwards as he would come back at night.

11   Q.  What happened?

12   A.  He got me in the car and he used to pull my pants.  He got

13   me in the coat check.

14   Q.  What happened next?

15   A.  And he did the same thing to me; he pulled down my pants.

16   He sat me on a chair.  And he started performing oral sex on

17   me, and I would close the eyes.

18   Q.  On this occasion, what happened next?

19   A.  And he put down his pants.  I heard a noise.  He pulled

20   down his pants, and he told me "Just let me feel only the tip,"

21   and I said no to him.  He didn't understand me.  And he sat

22   down.  I had no strength.  I felt like every day; I felt like

23   every day dead.  I was dead on the inside.  I didn't want to do

24   anything else any more.  And he came in and he said, "Only the

25   tip, only the little tip."  And I was saying no to him.  And he

1    sat -- and he said -- only started with the little tip, and I

2    had no strength.

3    Q.   What did he sit on, Mr. Caravantes?

4    A.   On top of me.

5    Q.   Did he sit on your penis, Mr. Caravantes?

6    A.   Yes.  I didn't want to, but I had no strength.  I felt

7    dead.  And he sat completely.  He started moving ugly, and he

8    used to hurt me.  He said, "Don't go come inside of me."  But

9    he would move very ugly.  It was hurting.  And I used to close

10   my eyes like every other time he was doing things to me.  I

11   would force my mind more and more just to finish quicker.  That

12   would be the only way he would leave me alone, when I would

13   finish.

14   Q.   Did he try to do anything with your hands, Mr. Caravantes?

15   A.   My hands were down.  I would clench my hands.  I just

16   wanted to -- I wanted to hit him, but nobody would believe me

17   what I was saying, nobody would believe me why I hit him.

18   Q.   On this first occasion what happened next after he was

19   finished?

20           THE COURT:  Did you hit him?

21           THE WITNESS:  I didn't have strength.  I was dead.

22           THE COURT:  Did anything happen in the car?  You

23   mentioned earlier a car.  Did anything happen in a car?

24           MR. DELANEY:  I think it was a translation -- I think

25   it was coat check.

C3tQcar2                         Caravantes - Direct

1          THE INTERPRETER:  The interpreter discovered that he

2     was using the word actually in English coat check, and it's

3     very close to coche which means car.

4          THE COURT:  So it was an interpreter mistake?

5          THE INTERPRETER:  It could be, your Honor.

6          THE COURT:  All right.

7     Q.  Mr. Caravantes, where did this incident happen?  What part

8     of the restaurant?

9     A.  It was on several occasions at the coat check.

10    Q.  This first occasion, was it in the coat check?

11    A.  Yes, that coat check.

12    Q.  The coat check of the main dining room?

13    A.  Yes.

14    Q.  On this first occasion, Mr. Caravantes, after it was over,

15    what happened next?

16    A.  I told him, "I'm coming," so he got loose, and I got up,

17    and he started doing it with his hand and his mouth.  And I

18    came.  I came in his mouth.  And he took his T-shirt and he

19    spit in it.  I brought up my pants and I left.  I went inside

20    the bathroom, and I washed my part.  I came back out, and I sat

21    at the bar.  And he finished dressing himself up.  He went

22    inside the bathroom.  And when he came out, he went to the bar.

23    He took a bottle of wine, and he drank wine.  And while he was

24    drinking wine, he would tell me, "How nice, Carita."  And I

25    would just stay quiet.  And he would take about two glasses of

C3tQcar2                    Caravantes - Direct

 1  wine quickly, and he would leave.

 2              THE COURT:  "How nice, Carita," what does that mean?

 3              THE WITNESS:  Carita, it's my last name Cara, but he

 4  used to call me Carita.  And then the other co-workers would

 5  call me Carita, Cara.

 6  Q.  Did you want him to do this, what you just described?

 7  A.  Never.

 8  Q.  Did you ask him to do this?

 9  A.  Never.  I told him stop, not to do anything else to me, but

10  he didn't understand.

11  Q.  Did it ever happen again?

12  A.  He didn't understand.

13  Q.  Did it ever happen again, Mr. Caravantes?

14  A.  Yes, it occurred several times.

15  Q.  Did it occur again in the coat check of the main dining

16  room?

17  A.  Yes.  And a location it took place at the Rialto's coat

18  check.

19  Q.  On any of these occasions, did you want him to have anal

20  sex with you?

21  A.  No.  Whenever he would do that, I would feel dead.  My hand

22  would just stay out like this limp.  He would grab my hands,

23  and he would force my hands to go up, and he would put them up

24  here in front, and he would do this hard with his hands on my

25  hands, and then he wanted to bring them down, and I would

C3tQcar2                          Caravantes - Direct

1    strain to take them away.

2             MR. DELANEY:  Let the record indicate that the witness

3    was rubbing his chest with his hands.

4             THE COURT:  I didn't see that.  I can't see that.  No

5    one objected, so I will accept the statement of his counsel.

6    Q.  On any of these other occasions, did you ever tell him to

7    stop?

8    A.  I used to always tell him to stop; not to do me ugly; to

9    leave me alone.  Whenever I would try to pull away, he would

10   pull me by the penis, he would do it hard.

11   Q.  Did this happen when you were working the closing shift?

12   A.  He always did it to me when I was working.

13   Q.  When you were working the closing shift?

14   A.  Yes.

15   Q.  When you were working the closing shift, were there any

16   other workers in the restaurant?

17   A.  Yes.  There were two.  They were in the kitchen.

18   Q.  Was the kitchen upstairs or downstairs in the restaurant?

19   A.  It was downstairs.

20   Q.  Where were you?  Where were you when you were working the

21   closing shift in the restaurant?

22   A.  Whenever they were downstairs, I was sitting at the bar,

23   and Mr. Pistorio gave me that shift just so that I would take

24   care of the bar, and that I would take care of those two

25   employees.  At the beginning we used to leave together, all

C3tQcar2                          Caravantes - Direct

1    three.

2                    THE COURT:  All who three?

3                    THE WITNESS:  Then Mr. Pistorio told me not to go out,

4    let them go by themselves, the two of them, and then you go

5    afterwards.

6                    THE COURT:  Who were the three?

7                    THE WITNESS:  And I would be scared.

8                    THE COURT:  Who were the three?

9                    THE WITNESS:  Two dishwashers and myself.

10                   THE COURT:  Two what?

11                   THE INTERPRETER:  Two dishwashers.

12   Q.  After Mr. Velandia started coming back to the restaurant

13   when you were working the closing shift, what else would you

14   do?  What else would you do if you thought he was coming back?

15   A.  I used to always eat at the bar.  Whenever everybody else

16   would leave, I would stay behind eating at the bar.  Sometimes

17   I didn't eat there any more.  I didn't want to be there any

18   more.  Whenever they would leave, the managers and the last

19   workers upstairs, sometimes I would go downstairs quickly.  I

20   was afraid he would come back.

21   Q.  Who would come back?

22   A.  Oscar Velandia.

23   Q.  Why would you go downstairs?  Why would you go downstairs?

24   A.  I was afraid he would come back.  So that he won't grab me.

25   Sometimes when I would hear noises upstairs, I would tell the

C3tQcar2                         Caravantes - Direct

1    guys, "It seems as though somebody's upstairs."  And I would

2    make a comment to them, "It must be Oscar."  And I wouldn't go

3    upstairs.

4              THE COURT:  Who would be left in the restaurant after

5    the two dishwashers left?

6              THE WITNESS:  I by myself.

7              THE COURT:  So there were no customers?

8              THE WITNESS:  On one occasion Mr. Pistorio left me

9    inside there with two customers.

10             THE COURT:  All the workers had left; the dishwashers

11   had left?

12             THE WITNESS:  No, they were downstairs.

13             THE COURT:  There was no what?

14             THE INTERPRETER:  No, they were downstairs.

15             THE COURT:  They were downstairs?

16             THE WITNESS:  They were downstairs.

17             THE COURT:  And you were up at the bar near the coat

18   check room?

19             THE WITNESS:  It's nearby.

20             THE COURT:  That was your station?

21             THE WITNESS:  No.

22             THE COURT:  Why were you there?

23             THE WITNESS:  Because that was my job after the

24   managers would leave.  I had to be sitting down at the bar.

25   Q.  And that was only your job when you were working the

C3tQcar2                          Caravantes - Direct

1   closing shift, right?

2   A.   Yes.

3   Q.   After all the customers were gone?

4   A.   Yes.

5   Q.   And all the other workers had gone except for the two

6   dishwashers downstairs?

7   A.   Yes.

8   Q.   So there was only the three of you left in the restaurant,

9   correct?

10  A.   Yes.

11          THE COURT:   Now, a long time ago in your testimony you

12  mentioned that there were women busboys.  Do you remember that?

13          THE WITNESS:   I don't recall, but, yes, we have bus

14  girls.

15          THE COURT:   How many women bus girls were there at the

16  restaurant?

17          THE WITNESS:   I don't recall right now.

18          THE COURT:   One?  Two?  Six?  Eight?  Ten?  Were there

19  a lot of woman?

20          THE WITNESS:   More than four.

21          THE COURT:   More than a quarter?

22          THE WITNESS:   More than four.

23          THE COURT:   And they would work all shifts?

24          THE WITNESS:   They would rotate.

25          THE COURT:   Were there also women at the coat check?

C3tQcar2                          Caravantes – Direct

1          THE WITNESS:  At the coat check, yes.

2          THE COURT:  How long would they stay?

3          THE WITNESS:  In the wintertime, possibly until the

4     last client.

5          THE COURT:  In the summertime, no business?

6          THE WITNESS:  No, there was no coat check because

7     nobody wears coats.  If there was one or two jackets, the

8     hostess would take them.

9          THE COURT:  And the hostess was stationed up near the

10    front door?

11         THE WITNESS:  I'm sorry, can you please repeat?

12         THE COURT:  Did any of these instances happen when the

13    hostess was around?

14         THE WITNESS:  Every time whenever it took place, there

15    was nobody else.  They would all leave with the manager.

16         THE COURT:  You're just talking now about the anal

17    sex, is that right?

18         THE WITNESS:  Yes.

19         THE COURT:  Not the blow job.

20         THE WITNESS:  No.

21    BY MR. DELANEY:

22    Q.  Mr. Caravantes, do you remember the last time this

23    happened, anal sex at Remi Restaurant?

24    A.  I don't recall the last.

25    Q.  Do you recall whether it was in 2007?

C3tQcar2                          Caravantes - Direct

1    A.  Possibly even more.

2    Q.  Could it have been in 2008?

3    A.  I stopped Oscar.  It was towards the beginning of 2008.  I

4    don't recall whether right before I stopped him something

5    happened in 2008.

6    Q.  Mr. Caravantes, I'd like to change subjects.  Would you

7    like a break?

8              THE COURT:  Wait.  What happened?  What happened in

9    2008 before you stopped him?

10             THE WITNESS:  When I stopped him, I spoke with

11   Mr. Pistorio to become a waiter.  He turned very aggressive,

12   and he told me that I was never going to be a waiter there.

13   Q.  Mr. Pistorio told you that?

14   A.  Mr. Pistorio.  He told me I was never going to be a waiter

15   there or in any other restaurant.  As far as I can recall,

16   that's what he said to me.

17             THE COURT:  Did he tell you why you would never be a

18   waiter?

19             THE WITNESS:  I don't recall.

20             THE COURT:  Did anything happen before that?

21             THE WITNESS:  Yes.

22             THE COURT:  What happened before that?

23             THE WITNESS:  I complained with Mr. Pistorio a waiter

24   who had touched me.

25             THE COURT:  And was it -- when you complained, did he

C3tQcar2                          Caravantes - Direct

1    make that remark to you?

2            THE WITNESS:  No.  When I complained to Mr. Pistorio,

3    that a waiter had touched me and many things had happened.  And

4    that once I asked the chef, "Why doesn't Mr. Pistorio help me

5    become a waiter?  Why is Mr. Pistorio accusing me of everything

6    that's happening?  Why is Mr. Pistorio insulting me?"

7            And he said because -- the chef replied to me "Because

8    you messed with his people."

9    Q.  Mr. Caravantes, do you remember when you made this

10   complaint to Mr. Pistorio about another waiter touching you?

11   A.  That was in 2007.  If I'm not mistaken, it took place in

12   October.

13           THE COURT:  When you complained to Mr.  -- when

14   Mr. Pistorio accused you of everything that's happening, what

15   did you understand him to mean "everything that's happening"?

16           THE WITNESS:  There was -- what I understood was that

17   there was no one that could help me.  When I complained

18   regarding that incident, when I told him that the waiter had

19   touched me, Mr. Pistorio was with his back -- back here, he was

20   like this, he was like this, and I was behind him, and the chef

21   was over there; and when I told him that a waiter had touched

22   me, he told me, "Oh, that was just an incident."  And then when

23   I said to him, "Mr. Pistorio, that was an incident," I said,

24   "Whatever happened to the two workers?"

25   Q.  The translation was an incident or accident?

C3tQcar2                          Caravantes – Direct

```
 1              THE INTERPRETER:  Incident.  The witness said
 2      incident.
 3      A.  And then I said, "OK, Mr. Pistorio, with me it was an
 4      incident.  And whatever happened to the other two?"  And when I
 5      said the other two, then he turned around and he looked at me
 6      like this, and he said, "What?  What's going on with them?"
 7      And then I said, "One of them tried to touch the penis and I
 8      saw him.  His name is Raul."  And I said that the other --
 9      "there had been several occasions when he tried to touch him.
10      His name is Adrien."  There he didn't answer anything else.  He
11      said, "I'm going to look into that."
12      Q.  And what waiter were you complaining about to Mr. Pistorio
13      during this conversation?
14      A.  There were two waiters.  The one who touched me his name
15      was Ranieri.
16      Q.  Is that the one you made the complaint about to
17      Mr. Pistorio?
18      A.  Yes.
19      Q.  Did you tell Mr. Pistorio about what Mr. Velandia had been
20      doing to you?
21      A.  No.
22      Q.  Do you recall why?
23      A.  Because I was afraid, afraid to lose my job, afraid because
24      Mr. Pistorio told me that anyone would go complain about Oscar,
25      he was going to fire him.
```

C3tQcar2                          Caravantes - Direct

1    Q.  Now, you testified that in response to your complaint

2    during this conversation with Mr. Pistorio, he said "I'll look

3    into it," do you recall that?

4    A.  Yes.

5    Q.  Did Mr. Pistorio ever interview you about your complaint?

6            THE INTERPRETER:  I'm sorry?

7    Q.  Did Mr. Pistorio ever interview you about your complaint?

8    A.  No.

9    Q.  Are you aware of any investigation he did into the

10   complaint?

11   A.  I did it myself afterwards.

12   Q.  Are you aware of any complaint Mr. Pistorio did -- sorry --

13   any investigation that Mr. Pistorio did?

14   A.  No.  That's when he started blaming me for -- that

15   everything I did was wrong.

16           THE COURT:  Who is doing the blaming?

17           THE WITNESS:  Mr. Pistorio.  And he didn't help me.

18   He didn't solve my problem there.

19   Q.  Did you ever complain about Mr. Ranieri's conduct about

20   Remi -- sorry -- did you ever complain about Mr. Ranieri's

21   conduct at Remi to anyone other than Mr. Pistorio?

22   A.  Yes.  Can I use my eye drops?

23   Q.  Of course.

24           THE COURT:  Yes, take your time.

25           (Pause)

C3tQcar2                          Caravantes - Direct

```
 1              THE COURT:  Are you OK now?

 2              THE WITNESS:  Yes.

 3   Q.  I am going to ask you to turn to Exhibit 19 in your binder,

 4   Mr. Caravantes.  Do you recognize this document?

 5   A.  Yes.

 6   Q.  What is it?

 7   A.  It's a complaint from human rights.

 8   Q.  Is this the second complaint you made with Mr. Ranieri?

 9   A.  Yes.

10   Q.  If you look at the first page on page 1 of 9, in the

11   caption there, do you see your name there?

12   A.  Yes.

13   Q.  Underneath the V, do you see 53rd Street Partners and Ben

14   Ranieri?

15   A.  Yes.

16   Q.  Do you remember -- let me rephrase.  Can you turn to page 3

17   of 9 of Exhibit 19.  Do you recognize those signatures?

18   A.  Yes.  They're mine.

19              THE COURT:  Did you write this document or did someone

20   from the Human Rights Commission write this document?

21              THE WITNESS:  No, they wrote it.  I don't write

22   English.

23   Q.  Did you speak to anyone at the division of human rights

24   before you signed this document?

25   A.  Before signing this complaint, I spoke before.
```

C3tQcar2                              Caravantes - Direct

1    Q.  If you go to page 6, Mr. Caravantes.

2               THE COURT:  6?

3               MR. DELANEY:  6.

4    Q.  On the bottom of page 6 of Exhibit 19, is this your

5    handwriting?

6    A.  Yes.

7    Q.  If you go to page 7, is that also your handwriting?

8    A.  Yes.

9    Q.  On page 8 as well?

10   A.  Yes.

11   Q.  Now, Randall, if you don't mind going back to page 1 again.

12              Do you know the English words that the Judge asked you

13   about?  To the best of your knowledge, are these words based

14   upon --

15              THE COURT:  Objection sustained.

16   Q.  What do you believe these words were based on, these

17   English words?

18              THE COURT:  Objection sustained.

19   Q.  The handwritten part of the document that you saw, did you

20   provide that to the division of human rights?

21   A.  Yes.

22   Q.  Did you also have conversations with somebody at the

23   division of human rights?

24   A.  Yes.

25   Q.  Did you do both of those things before signing this, the

C3tQcar2                          Caravantes - Direct

1    document?

2    A.  Yes.

3    Q.  What were your allegations against Mr. Ranieri in this

4    complaint?

5            MR. PARKER:  I'm sorry, in the handwritten version or

6    in the typed version?

7            MR. DELANEY:  In the typed version, your Honor.

8    A.  That he had touched my part.

9    Q.  Did you make any other allegations against either --

10   against Mr. Ranieri in the typewritten portion of Exhibit 19?

11   A.  I don't recall.  I don't recall.  I don't recall there --

12   he had some conversations before, I don't know whether it was

13   before or after this complaint.

14           MR. DELANEY:  Your Honor, we are going to move

15   Plaintiff's Exhibit 19 into evidence.  I would just note that

16   the handwritten portion of the complaint we discussed was in

17   Spanish.  Again, there is a translation included at the end of

18   this exhibit with a certification as to its accuracy from

19   Merrill Corporation.

20           THE COURT:  We had a translation earlier by a

21   Dominican or Cuban, but that was oral, I think.  Dominican -- I

22   meant Mexican.

23           MR. DELANEY:  Your Honor, so we move Plaintiff's

24   Exhibit 19 into evidence including the translation with the

25   certification.  I don't believe Mr. Parker has any objections

C3tQcar2                          Caravantes - Direct

1    to our translation.

2                MR. PARKER:  That's correct, your Honor.

3                THE COURT:  All right, I'll allow it.

4                (Plaintiff's Exhibit 19 received in evidence)

5    Q.  Mr. Caravantes, when you made this complaint to the

6    division of human rights, the one in Exhibit 19 we were just

7    looking at, did you make any allegation against Mr. Velandia?

8    A.  Yes.

9    Q.  In this complaint, Mr. Caravantes, Exhibit 19.

10               (Pause)

11   Q.  If you want to look at page 3 where the signatures are, we

12   looked at this earlier -- can you highlight the date for me,

13   Randall?  It says the 10th of March, 2008.

14               So, in the complaint you made on or about the 10th of

15   March 2008, did you make any allegations about Mr. Velandia?

16   A.  No.  No, I don't recall.  No.

17   Q.  Do you recall why you didn't make any allegations against

18   Mr. Velandia?

19   A.  Because I was afraid.  Because I was still working there.

20   Q.  Were there any other reasons?

21   A.  Because nobody did anything.

22   Q.  Any other reasons?

23   A.  Because I was afraid I would get fired.

24   Q.  Do you recall whether you told anyone about what

25   Mr. Velandia had done to you before leaving Remi Restaurant?

370

1   A.   Still what he would do to me?

2   Q.   When did you leave Remi Restaurant, Mr. Caravantes?

3   A.   In August.

4   Q.   Did you tell anyone about what Mr. Velandia was doing to

5   you before August 2008?

6   A.   Yes.

7   Q.   Who?

8   A.   To a female psychologist from Safe Horizons, the first

9   psychologist I saw.

10  Q.   Do you remember when you told her?

11  A.   A few days before he fired me.  A few days before they told

12  me that I was not working there any more.

13  Q.   Do you recall what the name of the psychologist was?

14  A.   Yes.  Hilda Castillo.

15  Q.   Do you recall what you told Ms. Castillo?

16  A.   Towards the beginning I spoke with her regarding what had

17  happened over there.

18              THE COURT:  When was this?

19              THE WITNESS:  That was in August.  I don't recall the

20  date.

21              THE COURT:  Were you still working --

22              THE WITNESS:  Yes.

23              THE COURT:  -- at Remi?

24              THE WITNESS:  Yes, I was still working there.

25  Q.   Now, other than Ms. Castillo, did you tell anyone else

C3tQcar2                          Caravantes - Direct

1   about Mr. Velandia's conduct before you left Remi Restaurant in

2   August 2008?

3   A.  I don't recall.

4   Q.  Now, you did eventually make a complaint against

5   Mr. Velandia, right?

6   A.  Yes.

7   Q.  Did you do that with the division of human rights?

8   A.  Yes.

9   Q.  I am going to ask you to turn to Plaintiff's Exhibit 21.

10  Mr. Caravantes, I am going to ask you to turn to page 3 of

11  Exhibit 21.  My apologies, page 6 of Exhibit 21.  Do you see

12  that, Mr. Caravantes?  Are you on page 6?  Do you see the

13  caption?

14  A.  Yes.

15  Q.  That's your name?

16  A.  Yes.

17  Q.  Then you see the names of 53rd Street Partners, Ben Ranieri

18  and Oscar Velandia?

19  A.  Yes.

20  Q.  And this complaint is in English, correct?

21  A.  Yes.

22  Q.  Could you turn to page 10?  Is that your signature?

23  A.  Yes.

24  Q.  Is this the complaint you filed against Mr. Velandia with

25  the division of human rights?

C3tQcar2                          Caravantes - Direct

1    A.  Yes.

2              MR. DELANEY:  I move Plaintiff's Exhibit 21 into

3    evidence, your Honor.

4              THE COURT:  21 in evidence.

5              THE DEPUTY CLERK:  21 is admitted.

6              THE COURT:  Exhibit 21.

7              (Plaintiff's Exhibit 21 received in evidence)

8    Q.  Mr. Caravantes, did you ever make a complaint against

9    Mr. Velandia with EEOC?

10   A.  Yes.

11   Q.  I am going to ask you to turn to Exhibit 96 in your binder.

12   Do you recognize this as the complaint you filed with the EEOC?

13   A.  Yes.

14   Q.  Is that your signature on the bottom?  It's in two places?

15   A.  Yes.

16   Q.  Do you see the date there is 1/15/2009?

17   A.  Yes.

18   Q.  Do you understand that to be January 15, 2009?

19   A.  Yes.

20   Q.  Now, did you file this complaint personally or did your

21   attorneys file it for you?

22   A.  What I recall is that I was with my lawyers and I did it

23   personally.

24             MR. DELANEY:  Your Honor, we move Plaintiff's Exhibit

25   96 into evidence.

1           THE COURT:  96 is admitted in evidence.

2           (Plaintiff's Exhibit 96 received in evidence)

3   Q.  Mr. Caravantes, did you ever personally witness

4   Mr. Velandia touching another worker sexually after the new

5   owners took over and while you worked at Remi Restaurant?

6   A.  Yes.

7   Q.  Who?  Who did you see Mr. Velandia touching?

8   A.  Francisco Sotarriba.

9   Q.  How many times did you personally witness Mr. Velandia

10  touch Mr. Sotarriba sexually?

11  A.  I don't recall exactly how many, but there were several.

12  Q.  Can you describe one of those incidents?

13  A.  Francisco Sotarriba used to drink his coffee over there,

14  this is where the coffee makers worked.  He would take the

15  coffee maker here and have ice in it, and that's where he would

16  drink his coffee.  And it was towards the entrance of the

17  cafeteria, and Francisco was all the way in the back.

18  Q.  Looking at the photo on the screen, you mean the back of

19  the coffee station?

20  A.  Yes, right on there, approximately there, around there.

21          MR. DELANEY:  Let the record indicate that the witness

22  is pointing with the laser pointer towards the back of the

23  coffee station.

24          THE COURT:  The back on the left-hand side of the

25  walkway.

C3tQcar2                          Caravantes - Direct

1          THE WITNESS:  Oscar would enter there and would stand

2     on the one side.

3          THE COURT:  He would enter there?

4          THE WITNESS:  He would enter.

5          THE INTERPRETER:  Pointing at the picture.

6          THE WITNESS:  And then he would grab his -- he would

7     grab his penis, his private part, and Francisco would pull away

8     and push him.  And Oscar would laugh and would just leave.  On

9     several occasions he had a pen in his hand, he would just drop

10    it.

11    Q.  Who had a pen?

12         THE COURT:  Who is *he*?

13         THE WITNESS:  Oscar Velandia, would drop his pen, and

14    while picking it up, he would just back up, and his ass would

15    go right into Francisco's penis, and Francisco would push him,

16    and he would tell him, "Get out of here you damn fag."

17    Q.  Who would say that?

18    A.  Francisco would say it.

19    Q.  Who would he say it to?

20    A.  To Oscar Velandia.  And then he would do it on the outside.

21         THE COURT:  *He* is?  Who is *he*?

22         THE WITNESS:  Francisco would also take his coffee on

23    the outside.

24         THE COURT:  He would do *it*?  What is *it* on the

25    outside?  "He would do it on the outside."  What is *it*?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C3tQcar2                         Caravantes - Direct

1        THE WITNESS:  He would do the same thing:  He would

2   touch his penis and then also drop his pen, and back up his ass

3   against him.

4        THE COURT:  On the outside?  Where is the outside?

5        THE WITNESS:  The part, the outside, the hallway that

6   connects the Rialto with Grand Canal.  There was also coffee to

7   be served.  Whenever he had a little bit more time, he would

8   put ice in his coffee, he would drink it there.

9        THE COURT:  Who?

10        THE WITNESS:  Francisco would drink his coffee there,

11   and then Oscar would come and grab him.  And then Oscar would

12   drop his pen down, and then would just pick it up and back up

13   against his penis.

14        THE COURT:  Oscar would drop whose pants?

15        THE WITNESS:  His.

16        THE COURT:  Did you see this?

17        THE WITNESS:  Several times.  It wasn't only Oscar.

18   Jose Ortiz too.

19        THE COURT:  Who?

20        THE WITNESS:  Jose Ortiz, O-R-T-I-Z.

21        THE COURT:  What would Jose do?

22        THE WITNESS:  Same thing Oscar would do.

23        THE COURT:  To whom?

24        THE WITNESS:  To Francisco.

25   Q.  When you said the outside of the coffee station, can you

C3tQcar2                           Caravantes – Direct

1    indicate on the map with the laser pointer what you're

2    referring to?

3              THE COURT:  He would drop his pen or his pants?

4              THE WITNESS:  The pen.

5              THE COURT:  The pen?

6              THE WITNESS:  He would just drop his pen, and then he

7    would squat down like this.

8              THE COURT:  When he would drop his pen and he squatted

9    down like this, what would he do?

10             THE WITNESS:  He would bring his ass against

11   Francisco's, and Francisco would push him off and he would get

12   away quickly.

13             THE COURT:  How many times did you see that?

14             THE WITNESS:  Several.

15             THE COURT:  By that, do you mean three?  Six?  A

16   dozen?  20?

17             THE WITNESS:  Possibly over six.  There were several

18   times.

19         (Continued on next page)

20

21

22

23

24

25

C3tdcar3                          Caravantes - direct

1    BY MR. DELANEY:

2    Q.  Now, Mr. Caravantes, during the time period you described

3    when Mr. Velandia was doing these things to you, how would you

4    describe your relationship with your friends during that time

5    period?

6    A.  Bad.  I no longer have friends.  I want to be alone.

7    Q.  What did you do with your friends before Mr. Velandia

8    started touching you?

9          THE COURT:  Are you talking about fellow employees?

10   Are you talking about relatives?  Are you talking about --

11         MR. DELANEY:  I am talking about your friends outside

12   of work, not your family.

13   A.  Outside of work, I didn't want to share with anyone.  I

14   wouldn't go back to play football.  I didn't frequent parties

15   with my wife and my daughters.

16   Q.  Did you play soccer with your friends before Mr. Velandia

17   touched you?

18   A.  I used to only meet them for awhile to play football.  I

19   used to like it a lot.

20         THE COURT:  Is football soccer?

21         THE WITNESS:  Mm-hmm.  Yes.  A lot.  A lot.

22         As a matter of fact, we had a team at the restaurant

23   before.  Mr. Herbert used to play with us.

24   Q.  Who was Mr. Herbert?

25   A.  General manager from the old management.  Then my condition

C3tdcar3                         Caravantes - direct

1   changed with the new company and I didn't play football like

2   before.

3   Q.  Did anything else change about your relationship with your

4   friends?

5   A.  They would invite us to go to parties and I didn't want to

6   go.

7            THE COURT:  Did they play football when the new

8   company came in?

9            THE WITNESS:  Towards the beginning, I don't know.

10  They used to play with us, with me, but then afterwards we

11  didn't play anymore.

12           My life changed.

13  BY MR. DELANEY:

14  Q.  How did you sleep during this time period after

15  Mr. Velandia was touching you?

16  A.  I didn't sleep anymore.  I would come home at 3 o'clock in

17  the morning and I will fall asleep around 4.  I would wake up a

18  few hours later.  And I would dream; I used to dream.

19  Q.  What did you used to dream?

20  A.  That Oscar was coming to grab me, that Oscar was coming to

21  attack me. that Oscar is coming to hurt me.

22  Q.  Do you still have these dreams?

23  A.  Yes.  I don't want to dream anymore.  I want to go to sleep

24  and never wake up again.  I don't want to dream anymore.

25  Q.  Do you ever have these thoughts when you are awake?

C3tdcar3                          Caravantes - direct

1    A.  Yes.

2    Q.  These thoughts about Mr. Velandia?

3    A.  I'm scared.  I'm afraid.  Outside I'm afraid.  I don't know

4    what's going to happen to me.  I don't know what my reaction

5    would be.  Sometimes I would like to destroy him, to do what he

6    did to me, to kill him.  But at that moment I also think about

7    my daughters, and my life changed and it is not fair to my

8    daughters that all I've done to them for this.

9    Q.  Mr. Caravantes, during the time period when Mr. Velandia

10   was touching you, did you experience any depression?

11             MR. PARKER:  Objection.

12             THE COURT:  Objection sustained to the form of the

13   question.

14             MR. DELANEY:  Are you OK, Mr. Caravantes?

15             THE COURT:  Just give him a chance.  Do you want some

16   water?

17             THE CLERK:  He has water.

18             THE COURT:  It sometimes helps.

19             (Pause)

20   Q.  Are you OK?

21             After Mr. Velandia started touching you, did you ever

22   have thoughts of suicide?

23             MR. PARKER:  Objection.

24             THE COURT:  Can't you ask it in another way,

25   Mr. Delaney?  These are all leading questions.

1              MR. DELANEY:  Yes, your Honor.

2              THE COURT:  You can ask him what his thoughts are.

3              THE WITNESS:  Up to now, I'm thinking about hurting

4     myself.

5              MR. DELANEY:  Hang on, Mr. Caravantes.  There is an

6     objection and let me ask you another question.

7     Q.  During the time period that Mr. Velandia was touching you,

8     what kind of thoughts did you have?

9     A.  I wanted to die.  I wanted to go to sleep and never wake up

10    again.  When he was performing oral sex or anal, I wanted to

11    hit him -- I wanted to hit him but I couldn't.

12    Q.  Do you still have these thoughts today?

13    A.  I still have them.  I wanted to destroy him.  I wanted to

14    hit him.  I can't do nothing else to him.  I think about my

15    daughters, too.  I miss them; they miss me.  And it's not fair

16    that my daughters should pay.

17    Q.  Mr. Caravantes, have you sought any treatment for these

18    thoughts recently?

19    A.  I sought treatment -- ever since I spoke about that issue,

20    I sought treatment.  To date, I have my psychologist and my

21    psychiatrist.

22             THE COURT:  When did you get a psychologist?

23             THE WITNESS:  Ever since 2008.

24             THE COURT:  Who did you go to?

25             THE WITNESS:  With Hilda Castillo.

C3tdcar3                          Caravantes - direct

 1              THE COURT:  Is she still your psychologist?

 2              THE WITNESS:  No, because she told me there was only a

 3     limited time with her.  Then afterwards I got another

 4     psychologist.

 5              THE COURT:  Who did you get?

 6              THE WITNESS:  Psychiatrist.

 7              THE COURT:  Who was that?

 8              THE WITNESS:  I don't recall the names after Hilda

 9     Castillo.  The ones I have right now, they have been with me

10     for awhile.

11              My psychologist, her name is Hanna, and my

12     psychiatrist is Dr. Paul.

13              THE COURT:  Where is his office?

14              THE WITNESS:  I don't recall the address.  I don't

15     know the address.  All I know is how to get there.  I take the

16     train.  I walk two or three blocks this way and three blocks

17     that way and that's where my psychologist is.

18              THE COURT:  Where is your psychiatrist?

19              THE WITNESS:  It's in the same office.

20              THE COURT:  Are they connected with a hospital?

21              Are they going to be witnesses?

22              MR. DELANEY:  They are not, your Honor.  We will be

23     putting in medical records from them through our expert,

24     Dr. Pearson.

25              THE COURT:  They are connected with a hospital?

C3tdcar3                          Caravantes – direct

1            THE WITNESS:  They admitted me there.

2    BY MR. DELANEY:

3    Q.  When, Mr. Caravantes --

4            THE COURT:  Were you admitted to the hospital?  Did

5    you stay overnight?

6            THE WITNESS:  Yes.  I was there for many days.

7            THE COURT:  How many days?

8            THE WITNESS:  About a week.  I went to my psychiatrist

9    and I told him I didn't want the sleeping pills anymore, that I

10   didn't want to take them anymore.  I was scared.  When I heard

11   about Whitney Houston, how she died, it came to my mind I have

12   sleeping pills.  I told my psychiatrist not to give them to me

13   anymore.  I don't want to hurt myself ugly like that.  I don't

14   want those pills in my house because I'm scared, I'm afraid to

15   take them.  I told my psychiatrist don't give them to me

16   anymore.  And he asked me why.  I told him, "I don't want to do

17   the same thing Whitney Houston did."  And he asked, "What did

18   she do?"

19           "She took the pills, sleeping pills, and alcohol when

20   she died.  That's what I heard in the news."

21           And he asked me, "Do you wish to hurt yourself?  And

22   then I told him, "Yes."  And then they didn't let me go out.

23           And I told him I couldn't do it, I had to go home and

24   talk to my wife, to leave her money, because I didn't know how

25   long they were going to keep me there.  And Dr. Paul told me a

C3tdcar3                    Caravantes - direct

1   few days, only two or three, but I stayed there for a week.

2   Q.  Do you remember when you were admitted to the hospital,

3   approximately?

4   A.  I don't recall exactly.  It's been barely a month.  The

5   doctors from the inside, they wouldn't let me go.  They didn't

6   want to let me go out.

7           THE COURT:  Will the records show the dates?

8           MR. DELANEY:  Yes, they will, your Honor.

9           THE WITNESS:  I told them I wanted to leave.  And they

10  say to me, no, they wanted me to stay there longer.  I didn't

11  want to because of my family.  And they told me, do it for your

12  family.

13  BY MR. DELANEY:

14  Q.  Mr. Caravantes, I want to talk about your family for a

15  second.

16          How would you describe the relationship with your wife

17  since Mr. Velandia started touching you?

18  A.  I don't want to have relations with her anymore.  I got

19  away.  I didn't want to be near her.

20  Q.  How was your relationship with your wife before

21  Mr. Velandia started touching you?

22  A.  We were happy.  We had a lot of relations.

23  Q.  By "relations," do you mean sexual relations,

24  Mr. Caravantes?

25  A.  Yes.

C3tdcar3                          Caravantes - direct

1   Q.  How have your sexual relations been since --

2   A.  Everything was beautiful.

3   Q.  How would you describe your sexual relations with your wife

4   since Mr. Velandia started touching you?

5   A.  Dead.  Very little.

6   Q.  Why do you think that is?  Why do you believe that is?

7   A.  Because the thoughts that he did to me, Oscar Velandia,

8   they're here.  They're here.

9           (Indicating)

10          THE COURT:  The witness is pointing to his head.

11  A.  I can't be with my wife.

12  Q.  How are your relationships today with your wife?  How is

13  your marriage, I should say?

14  A.  Nowadays, now my wife went to visit me when I was at the

15  hospital before I left the hospital.

16  Q.  Mr. Caravantes, I remind you not to reveal any

17  communications with your wife because they are privileged.

18          Go ahead.

19  A.  When I left the hospital, my wife sat inside there

20  destroyed.  Now my wife is helping me to rebuild myself, to

21  recuperate what I've lost -- my morals, my heart, my mind, my

22  positive attitude.

23          MR. DELANEY:  Thank you, Mr. Caravantes.

24          No further questions.

25          THE COURT:  Do you want to take a break now?

1              THE WITNESS:  (Nodding).

2              THE COURT:  We will take a five-minute break.

3              (Recess)

4              THE COURT:  Please be seated.

5    CROSS-EXAMINATION (through the Interpreter)

6    BY MR. PARKER:

7    Q.  Mr. Caravantes, have you ever worked at Remi Restaurant as

8    a white jacket?

9    A.  As a coffee maker I had a white jacket.

10   Q.  What I meant was the position, the job, white jacket, did

11   you ever perform that job at Remi?

12   A.  The white jacket position?

13   Q.  Yes.

14   A.  No, I didn't work like that.

15             THE COURT:  When you began, what was the position you

16   held?

17             THE WITNESS:  With the new management or the old --

18             THE COURT:  No.  The old.  Way back when you began.

19             THE WITNESS:  With the new company, I started working

20   there in delivery --

21             THE COURT:  No, not the new company.  At the old, old

22   company.

23             THE WITNESS:  I used to deliver.  I used to work the

24   counter.  I used to work cleaning.  I would work as a cook.

25             THE COURT:  In any of those jobs, did you wear a white

C3tdcar3                          Caravantes - cross

1   jacket?

2           THE WITNESS:  Sometimes.  Sometimes I would wear a

3   blue shirt and it said Remi.  And sometimes I would wear a

4   white shirt.  I would clean.

5   BY MR. PARKER:

6   Q.  You never worked at Remi as a food runner, correct?

7   A.  Never.

8   Q.  OK.  Did you ever work at Remi as a food runner?

9   A.  Not that I recall.

10  Q.  You don't recall whether you ever worked as a food runner?

11  A.  No.  I didn't work as a food runner.

12  Q.  Did you ever work at Remi as a bartender?

13  A.  No, I don't have.  No.

14  Q.  Did you ever --

15          THE COURT:  Didn't you tell us on direct examination

16  that you worked as a bartender late in the afternoon sometimes,

17  late in the night?

18          THE WITNESS:  No.  I was a coffee maker.

19          THE COURT:  I know you were a coffee maker, but didn't

20  you also sit at the bar?

21          THE WITNESS:  Yes, but I would sit there to watch over

22  the liquor.  There was nobody there anymore.

23          THE COURT:  All right.  That was during the time --

24  the end, wasn't it?

25          THE WITNESS:  Yes.  It was for the new company with

C3tdcar3                              Caravantes - cross

1   the new Remi.

2               THE COURT:  So when he asked those questions, he may

3   be asking about those times.

4               THE WITNESS:  No.  I was only a coffee maker.

5               THE COURT:  Your position was coffee maker?

6               THE WITNESS:  Yes.

7               THE COURT:  But then when you went -- at those times

8   your position with the company was coffee maker, but you would

9   sit at the bar to watch the liquor when you were told to?

10               THE WITNESS:  After midnight.  Mr. Pistorio gave me

11   that job from midnight until 2 o'clock in the morning, watching

12   the workers so that they don't go grab the liquor.

13               THE COURT:  OK.

14   BY MR. PARKER:

15   Q.  Did you ever work at Remi as a waiter?

16   A.  No.

17   Q.  Now, let's talk about the --

18               THE COURT:  Let me make sure because I see a problem

19   here.

20               When he asked you a question about whether you worked

21   as a waiter or a food runner or something like that, he hasn't

22   made clear whether you are working in the position with the

23   company as a food runner, or whether you filled in not as in

24   your position but your actual work was running the food from

25   the kitchen to the station on an informal basis.

1              Do you understand?  He may be asking either one.

2              So I'll ask Mr. Parker to make it clear in the

3    questions.

4              THE WITNESS:  On several occasions when it was very

5    busy, at times I would go downstairs and the chef would tell me

6    take that tray and leave it on the door.  And I would bring it

7    upstairs and give it to the food runners, and they would take

8    care of them.

9    BY MR. PARKER:

10   Q.  Mr. Caravantes, just to clarify, did you ever work in the

11   position of waiter at Remi?

12   A.  No.

13   Q.  And did you ever work in the position of food runner at

14   Remi?

15   A.  I don't recall, no; but I don't think so.  No.

16   Q.  Did you ever work in the position of busboy at Remi?

17   A.  Yes.

18   Q.  When?

19   A.  I don't recall exactly when but only when the restaurant

20   was closed for private parties, for big parties, when they were

21   not going to use the coffee maker, then they had me help the

22   busboy.

23   Q.  Was that with the old company or with the new company?

24   A.  Or the new.

25   Q.  Now, when the new company took over Remi, you worked as a

C3tdcar3                           Caravantes - cross

1   coffee maker, right?

2   A.   Yes.   I worked as a coffee maker and I also worked at Remi

3   To Go.

4   Q.   This was after the new company took over?

5   A.   In 2005, when the new company took over, I was working

6   still at Remi To Go and also working as a coffee maker.

7   Q.   And did your work week change from six days per week to

8   five days per week at some point in time?

9   A.   Yes.

10  Q.   When was that?

11  A.   I don't recall exactly when it was, whether it was in 2005

12  or towards the beginning of 2006.

13  Q.   And after that happened, did you request to work from

14  Monday through Friday as your work week?

15  A.   Yes.   It was from Tuesday to Saturday, and then it changed

16  from Monday through Friday.

17  Q.   And you made that request to Mr. Pistorio, correct?

18  A.   Yes.

19  Q.   And what were your work hours when you changed initially

20  from Tuesday to Saturday to work Mondays through Fridays?

21  A.   My schedule was from 4 to 12.   And then Mr. Pistorio

22  changed it and gave me the job from 4 o'clock until 2 in the

23  morning.

24  Q.   When did that start, when Mr. Pistorio changed your

25  schedule to work from 4 in the afternoon until 2 in the

C3tdcar3                      Caravantes - cross

1   morning?

2   A.  I don't recall exactly when but I think it was in 2006.

3   Q.  When you worked -- I'm sorry.  When you did not work on the

4   weekends, on Saturdays and Sundays, do you know who made the

5   coffee?

6   A.  Busboys did.

7   Q.  And there was also a coffee maker who worked the lunch

8   shift, correct?

9   A.  Yes.

10  Q.  And while you worked at Remi under the new company, who

11  worked the lunch shift as a coffee maker?

12          THE COURT:  The whole time?

13          MR. PARKER:  Yes.

14  A.  Julius.

15  Q.  Was that during the entire time that you worked at Remi

16  under the new company?

17  A.  I don't recall exactly when he started, but Julius worked

18  in the morning.  I don't know when he started.

19  Q.  Now, the shift -- the hours that you mentioned a few

20  moments ago where Mr. Pistorio changed your hours to 4 p.m. to

21  2 a.m.?

22          THE INTERPRETER:  I'm sorry.  Please read that back to

23  me.

24          (Record read)

25          MR. PARKER:  Let me rephrase that.

C3tdcar3                          Caravantes - cross

1   Q.  You mentioned that your hours changed and they were changed

2   by Mr. Pistorio from 4 to midnight to 4 p.m. to 2 a.m.,

3   correct?

4   A.  Yes.

5   Q.  You said that, to your recollection, occurred in 2006?

6   A.  Yes.

7   Q.  When in 2006?

8   A.  I don't recall.

9   Q.  Did you continue working those hours until when you left

10  Remi?

11  A.  No.

12  Q.  When did your hours change?

13  A.  In 2008.

14  Q.  So are you saying they changed –- your hours changed in

15  2008 such that you were no longer working 4 p.m. to 2 a.m.?

16  A.  Yes.

17  Q.  When in 2008?

18  A.  I don't recall exactly when.

19  Q.  When did you last work at Remi?

20          THE COURT:  Approximately?

21  A.  In August in 2008.

22  Q.  Taking that date, are you able to approximate how long

23  before you stopped working at Remi your hours changed?

24  A.  I don't recall whether it was in January, February or March

25  of 2008.

C3tdcar3                          Caravantes - cross

1   Q.  After your hours changed at that time, what hours did you

2   work after that time?

3   A.  It was from 4 to 11:30.

4   Q.  And am I correct that the result of -- let me rephrase it.

5           After your hours changed from 4 p.m. until 11:30 p.m.,

6   did you stop staying in the restaurant until the last employees

7   left?

8   A.  Was my schedule changed?  No.  I would leave at 11:30, and

9   on some occasions they would let me go earlier.

10  Q.  All right.  During period of time when you worked the

11  4 p.m. to 2 a.m. hours, what specifically were your closing

12  duties?

13          THE COURT:  Duties, or what did he do during those

14  periods?

15          MR. PARKER:  Duties.

16          THE COURT:  Which is the question?

17          MR. PARKER:  Duties, your Honor.

18          THE COURT:  What his assignments were?

19          MR. PARKER:  Yes.

20  A.  From 4 to 12 was my normal job as a coffee maker.  From 12

21  to 2 it was watching over the bar.  On some occasions I would

22  stay until 8 o'clock in the morning when they would come to

23  polish the floor or paint the restaurant.  And sometimes the

24  exterminator would come, and I would have to leave at 3 or

25  4 o'clock in the morning after he would leave.

C3tdcar3                        Caravantes - cross

1   Q.  What door, or doors, did you use to exit the restaurant at

2   the end of the night at 2 a.m., or whenever it was that you

3   left the restaurant for the evening?

4   A.  One that had a lever and you would push downward, and I

5   would exit through the gate over there.

6   Q.  Is that a door on the side of the restaurant?

7   A.  Yes, on the atrium.

8   Q.  And while you were working the shift until 2 a.m., who

9   closed the front door of the restaurant?

10  A.  The manager would close the front door as he was leaving.

11  Q.  Was there a time during your employment under the new

12  company at Remi that you were assigned to security duties?

13  A.  I'd say from 12 to 2, that was the job.  I used to do there

14  whatever Mr. Pistorio wanted me to do.

15  Q.  Mr. Pistorio asked you to walk around and to make sure that

16  employees were doing their jobs?

17          THE COURT:  From 12 to 2?

18          MR. PARKER:  No.  At any time.

19  A.  I recall on one occasion he told me to watch Oscar, that if

20  he would -- try to go to the office, for me to stand there by

21  the office.  And he told me if Oscar is inside, don't move

22  until he leaves.

23          And I would stay there.  But I never saw him inside

24  because I was inside as well.

25  Q.  Now, earlier in your testimony, Mr. Caravantes, you

C3tdcar3                         Caravantes - cross

1   testified that you observed Oscar Velandia touching

2   Mr. Sotarriba on the penis several times in the coffee station,

3   correct?

4   A.  Yes.

5   Q.  You said that occurred six or more times, right?

6           THE COURT:  He said six.

7   A.  Yes.  I said six, or something like that.

8   Q.  And you said, also, that there were instances where Oscar

9   Velandia would drop a pen and as he's picking it up he would

10  move his rear end over towards Sotarriba, correct?

11  A.  Yes.

12  Q.  How many times did you observe that?

13  A.  It was several.

14  Q.  Was it six or more?

15  A.  It was several times.  I can't -- it was several times.

16  Q.  Are you able to put any number on that?

17          THE COURT:  More than three?

18          THE WITNESS:  It could be more than three, more than

19  four.

20          (Continued on next page)

21

22

23

24

25

C3tQcar4                          Caravantes - Cross

1    BY MR. PARKER:  (Continued)

2              MR. PARKER:  Could you read back that answer?

3              (Read back)

4    Q.  It could be or it was?

5              MR. DELANEY:  Objection.

6              MR. PARKER:  I asked it could be or it was?

7              THE COURT:  Objection sustained.

8    Q.  When you say it could be, are you saying it was three or

9    more or are you saying it's possible it's three or more?

10             MR. DELANEY:  Objection, your Honor.

11             THE COURT:  Objection sustained.

12   Q.  So, in total, you say you saw Mr. Velandia touch

13   Mr. Sotarriba's penis or move his rear end into Mr. Sotarriba

14   nine times?

15             MR. DELANEY:  Objection, your Honor.  He's summarizing

16   the witness's testimony.

17             THE COURT:  I think the question could be more clear.

18   I will allow the question but in a different form.

19   Q.  Mr. Caravantes, your testimony is, as I understand it, you

20   saw Mr. Velandia touch Mr.  Sotarriba's penis with his hand six

21   times, correct?

22             MR. DELANEY:  Objection.

23             THE COURT:  Approximately.  If you put in

24   approximately, I'll allow.

25             MR. DELANEY:  He also said "as I understand it."  I'm

 1   not sure counsel's understanding is relevant to the question.

 2            MR. PARKER:  I'll rephrase, Judge.

 3   Q.  Mr. Caravantes, you say that you saw Mr. Velandia touch

 4   Mr. Sotarriba on the penis approximately six times in the

 5   coffee station, correct?

 6   A.  Yes, I said that it was six or more.

 7   Q.  And you say that you saw Mr. Velandia after dropping a pen

 8   in the coffee station bend over and move his rear end to touch

 9   Mr. Sotarriba approximately three times, correct?

10            MR. DELANEY:  Objection.

11            THE COURT:  Reframe the question.  I don't think it's

12   clear the way you framed it.

13   Q.  How many times did you see Mr. Velandia move his rear end

14   into physically touch Mr. Sotarriba in a coffee station?

15            MR. DELANEY:  Objection.  Asked and answered.

16            THE COURT:  Objection overruled.  It's not a proper

17   objection.  It's cumulative at this point.  You can answer.

18            Do you want the question read back?

19            THE INTERPRETER:  He's answering.

20   A.  Yes, I had said that it was three or more.  I mean, I never

21   counted them.

22   Q.  When did these events occur?

23            THE COURT:  What year?

24   Q.  We'll start there.  What years did these events occur?

25            THE COURT:  Which events?

C3tQcar4                          Caravantes - Cross

1          MR. PARKER:  I will do it the long way.

2          THE COURT:  Which events are you including in the

3     question; touching him in the penis area or --

4          MR. PARKER:  I'll restate it, your Honor.

5          THE COURT:   -- backing into him?

6     Q.  In what years did the events where you say that

7     Mr. Velandia touched Mr. Sotarriba's penis occur?

8     A.  We could say in 2007.

9     Q.  And what years did you observe Mr. Velandia backing into

10    Mr. Sotarriba with his rear end?

11    A.  It could be in 2007.  In my mind there's a lot of those

12    dates.

13         THE COURT:  It's 1:20?  I'm sorry, I have not been

14    cognizant of the time.  Let's take a break.  Ask your question.

15         MR. PARKER:  Could I just do one thing, Judge?

16         THE COURT:  You can ask him the question if you are in

17    the middle of something.

18         MR. PARKER:  Yes.  It will just be a couple questions.

19    May I approach with the deposition transcript?

20         THE COURT:  Yes.

21    A.  Yes.  He says yes.

22    Q.  The deposition, could you open the deposition of

23    September 8, 2010?  September 8.  It should be in a transcript?

24         THE COURT:  Which page?

25    Q.  September 8.

C3tQcar4                           Caravantes - Cross

1          THE COURT:  Page 9?

2   Q.  Page 107/line 22 to 108 -- sorry, 109/line 2?

3          THE COURT:  The whole thing?

4   Q.  Mr. Caravantes, do you recall having your deposition taken

5   in this case, correct?

6   A.  Yes.

7   Q.  We are looking at your deposition of September 8, 2010 at

8   page 107/line 22.  There is a little background there, your

9   Honor, I need to read in order to get into --

10         THE COURT:  It's not relevant to the prior questions.

11         MR. PARKER:  I can start on page 108, but I think it

12  makes sense to read the background to it.

13         THE COURT:  This is background?

14  Q.  Mr. Caravantes, I'm going to read questions and answers now

15  from your deposition of September 8, 2010.

16  "Q. During that time before the new ownership came into Remi,

17  did Oscar touch you more than once?

18  "A. Before the new owners?

19  "Q. Yes.

20  "A. No.

21  "Q. Just one time?

22  "A. Yes.

23  "Q. And you told him that you didn't like it, is that correct?

24  "A. Yes.

25  "Q. What did Oscar say in response?

```
 1    "A. I don't remember exactly.

 2    "Q. Do you remember anything?

 3    "A. I saw the way he touched other people.

 4    "Q. How did he touch other people?

 5    "A. He would touch their penises.

 6    "Q. Who?

 7    "A. Above their pants, over their pants, I am sorry.

 8    "Q. What other people?

 9    "A. A guy named Yahsires.

10    "Q. Anyone else?

11    "A. No.

12    "Q. What was Yahsires's job?

13    "A. A waiter in the Rialto.

14    "Q. Was that before the new ownership?

15    "A. Yes."
```

16              Did you give that testimony on September 8 --

17              THE COURT:  Objection sustained.  It's not relevant to

18    the prior question.  It doesn't deal with the credibility at

19    all.

20              MR. PARKER:  May I be heard, Judge, on that?

21              THE COURT:  This part doesn't deal with the

22    credibility of the answer to the prior questions.  The prior

23    questions are confined to one person.  There is no person

24    that's been named here.

25              MR. PARKER:  Your Honor, the plaintiff testified that

1   he saw touching of Mr. Sotarriba.  In his deposition he admits

2   that he only saw touching of one other person.

3           THE COURT:  It's a different area.  It's a different

4   person.  Take the luncheon break.

5           MR. DELANEY:  Your Honor, does the witness need

6   instruction?

7           THE COURT:  You are on cross-examination.  You are not

8   to discuss your testimony with anyone, including counsel.

9           (Luncheon recess)

10                          AFTERNOON SESSION

11                             2:25 P.M.

12          (In open court)

13          THE COURT:  Call the witness.

14  ARTURO CARAVANTES, resumed.

15  CROSS-EXAMINATION CONTINUED

16  BY MR. PARKER:

17  Q.  You testified that Oscar Velandia performed oral sex on

18  you, correct?

19  A.  Yes.

20  Q.  When was the first time that Oscar Velandia performed oral

21  sex on you?

22  A.  I don't recall exactly, but it was in 2006.

23  Q.  How many times did Oscar Velandia perform oral sex on you?

24  A.  It was nearly daily.

25  Q.  When was the last time that Velandia performed oral sex on

C3tQcar4                              Caravantes - Cross

1    you?

2    A.  I don't recall whether it was towards the beginning of 2008

3    or towards the end of 2007.

4              THE COURT:  The first time -- when did he first do

5    oral sex with you?  You both worked there since 1999, is that

6    right?

7              THE WITNESS:  No.

8              THE COURT:  No?  When did you start working there?

9              THE WITNESS:  I started working there in 1991.

10             THE COURT:  1991.  And was he there then?

11             THE WITNESS:  I don't recall.  I met him when they

12   transferred me to the cafeteria.

13             THE COURT:  But when did he first perform oral sex on

14   you, approximately?

15             THE WITNESS:  It was in 2006, the first few months.

16   Q.  Say that again?  I'm sorry.

17   A.  The first few months.

18             THE COURT:  First few months of the year?  Or the

19   first few months -- the first few months some other time?

20             THE WITNESS:  The first few months of the year.

21   Q.  Of 2006, correct?

22   A.  Yes.

23   Q.  During what period of time did you have oral sex with Oscar

24   Velandia on almost or nearly a daily basis?

25   A.  Towards the end of 2006 or 2007.

C3tQcar4                          Caravantes - Cross

1   Q.  Before that, how frequently did you have oral sex with

2   Oscar Velandia?

3   A.  I don't recall.

4   Q.  Is it your testimony that beginning in 2006 or early 2007

5   and from that point until when you stopped having oral sex with

6   Mr. Velandia, that it occurred on almost a daily basis?

7   A.  Can you please repeat the question?

8   Q.  Yes.  You testified that beginning in late 2006 or early

9   2007 you began to have oral sex with Velandia on almost a daily

10  basis, is that correct?

11          THE COURT:  Well, the trouble is you are using both

12  *began to have oral sex on a daily basis* in a sentence, and the

13  witness has testified that he first had -- he began having oral

14  sex at an earlier date than that, but that on a daily basis it

15  happened in a slightly later period.

16          MR. PARKER:  That's what I'm trying to get at, Judge,

17  maybe inartfully so.

18          THE COURT:  I would reframe your question so you don't

19  use began, if you can.  Use increased or something of that

20  sort.

21  BY MR. PARKER:

22  Q.  In late 2006 or early 2007, you and Oscar Velandia,

23  according to your testimony, had oral sex on almost a daily

24  basis, is that correct?

25  A.  Yes.

C3tQcar4                          Caravantes - Cross

1   Q.  And did you continue to have oral sex with Oscar Velandia

2   on almost a daily basis up until you stopped having oral sex

3   with him?

4   A.  I didn't understand the question.

5   Q.  Did you continue to have oral sex on almost a daily basis

6   with Velandia from late 2006 or early 2007 until the end of

7   2007?

8   A.  Yes.

9   Q.  When you say almost a daily basis, what exactly do you mean

10  by that?

11  A.  If he worked every day at night, it was nearly every day.

12  Q.  So you're saying nearly every day that Velandia and you

13  worked together, you had oral sex together during that time

14  frame, is that what you're saying?

15              MR. DELANEY:  Objection.

16              THE COURT:  Objection sustained.  Because the time

17  period is not limited -- let me ask you, Mr. Caravantes, you

18  mentioned having anal sex.  When did that start with

19  Mr. Velandia?

20              THE WITNESS:  Around mid 2007.

21              THE COURT:  When did it end?

22              THE WITNESS:  I don't recall whether it was exactly in

23  2008 or December of 2007.

24              THE COURT:  When you were having anal sex with

25  Mr. Velandia, did you also have oral sex with him during that

C3tQcar4                              Caravantes – Cross

 1    same period?

 2              THE WITNESS:  Yes, during -- if he didn't close, he

 3    performed oral sex on me.

 4              THE COURT:  If he didn't what?

 5              THE WITNESS:  If he didn't close.

 6              THE COURT:  Close what?

 7              THE WITNESS:  The restaurant.  If he closed, then he

 8    would come back.

 9              THE COURT:  When he came back, what would he do?

10              THE WITNESS:  It was both things.  First he would

11    perform oral sex and then anal sex.

12              THE COURT:  The same night?

13              THE WITNESS:  Yes.

14              THE COURT:  All right.

15    Q.  Mr. Caravantes, were there weeks where you had oral sex

16    with Mr. Velandia five times?

17    A.  Yes.

18    Q.  Now, you testified earlier to a conversation between you

19    and Velandia which followed conversations you had with Pistorio

20    about a waiter job, correct?

21              THE COURT:  Can you give us a date?

22              MR. PARKER:  I don't think he gave us one, Judge.

23              THE COURT:  Approximately?

24              MR. PARKER:  I don't think we have one from him.

25              THE COURT:  All right.

C3tQcar4                          Caravantes - Cross

1   A.  Oscar when we had that chat in Rialto was around mid 2007.

2   Q.  That's when Oscar offered to help you get a waiter job at

3   Remi?

4   A.  Yes.

5   Q.  By mid 2007, you'd already had several oral sex experiences

6   with Mr. Velandia, correct?

7   A.  Yes.

8   Q.  Didn't you begin having sex with Oscar Velandia because he

9   offered to help you become a waiter?

10  A.  When he offered to do that, that's when he started doing

11  anal sex.

12  Q.  My question is, didn't you begin to have sex with Oscar

13  because he offered to help you become a waiter?

14          THE COURT:  Are you asking about --

15          MR. PARKER:  Any sex.

16          THE COURT:  You're asking about oral sex, aren't you?

17          MR. PARKER:  Well, any sex.  Yes.  Sex.

18          MR. DELANEY:  Objection.

19          THE COURT:  Are you defining the sex?  Touching the

20  person in the crotch?  Private parts?  You need a definition.

21          MR. PARKER:  I think what we're talking about is oral

22  or anal sex.

23          MR. DELANEY:  Objection, your Honor.

24          THE COURT:  With these witnesses you have to be clear

25  what you are referring to.

C3tQcar4                          Caravantes - Cross

1    BY MR. PARKER:

2    Q.  Didn't you begin to have oral sex with Mr. Velandia because

3    he offered to help you get a waiter job at Remi?

4    A.  No.

5    Q.  On each of the occasions where Oscar Velandia performed

6    oral sex on you, did you come in his mouth?

7            MR. DELANEY:  Objection, your Honor.  It's harassing.

8            MR. PARKER:  He asked the same question.

9            THE COURT:  I'll allow the question.

10   A.  Sometimes I wouldn't come.

11   Q.  How many times?

12           THE COURT:  How many times what?

13           MR. PARKER:  Let me strike that.

14   Q.  Could you please turn to page 120 of your deposition dated

15   September 8, 2010, line 17.

16           THE COURT:  Just a second.  I'm trying to find the

17   place.  All right.

18           MR. PARKER:  Line 17, your Honor.

19   Q.  Mr. Caravantes, did you give this testimony on September 8,

20   2010:

21   "Q. On each of these occasions where Oscar performed oral sex

22   on you, did you come in his mouth?

23   "A. Yes."

24           Did you give that testimony?

25           MR. DELANEY:  Your Honor, I object to the deposition.

C3tQcar4                              Caravantes – Cross

1    I object again on the basis it's harassing.

2              THE COURT:  On what?

3              MR. DELANEY:  I object to the deposition, the

4    transcript, and I want to renew my objection to the testimony

5    he's reading from the transcript.

6              THE COURT:  I will have to look back at the beginning.

7              MR. DELANEY:  Just for the record, your Honor.

8              THE COURT:  Objection is overruled.

9    Q.  Did you give that testimony on September 8, 2010,

10   Mr. Caravantes?

11             THE COURT:  He won't remember the testimony.

12   Q.  I'll do it again.  Page 120/line 17:

13   "Q. On each of these occasions where Oscar performed oral sex

14   on you, did you come in his mouth?

15   "A. Yes."

16             Did you give that testimony?

17             MR. DELANEY:  Objection, your Honor.

18   A.  Yes.

19             THE COURT:  Objection overruled.

20   Q.  And after each of those occasions where Oscar performed

21   oral sex on you and you came in his mouth, it happened again

22   and again and again, correct?

23             THE COURT:  On each of those occasions, is that what

24   you're asking?

25             MR. PARKER:  Yes.

 1                 THE COURT:  What happened again and again and again?

 2                 MR. PARKER:  I'll rephrase.

 3     Q.  Let's turn to a different subject.

 4                 How many times did you and Oscar Velandia have anal

 5     intercourse?

 6     A.  I don't recall.

 7     Q.  On each of those occasions, it was you who penetrated

 8     Oscar, is that correct?

 9                 THE COURT:  Objection sustained.

10     Q.  When you had anal intercourse with Oscar Velandia, how did

11     it occur?

12                 MR. DELANEY:  Objection, your Honor.

13                 THE COURT:  Objection overruled.

14                 In what manner did it occur?

15                 MR. PARKER:  Yes, in what manner did it occur?

16     A.  Regularly -- normally it would be when I was sitting down.

17     Q.  And then what?

18     A.  He would penetrate himself.  He would sit on top of me.

19     Q.  Was it that same way each time, the way you just described?

20                 THE COURT:  He said normally it would be.

21     A.  There were several times, two times -- several times when

22     he had me standing up.

23     Q.  What did you do when you were standing up?

24     A.  I would stand there.

25     Q.  What happened next?

C3tQcar4                         Caravantes - Cross

1   A.  He used to move.

2   Q.  Move what?

3   A.  He would move towards the inside and the outside.

4   Q.  The inside and outside of what?

5   A.  My penis.  I would stand like this at the coat check.  I

6   was leaning against the wall.

7   Q.  Holding -- motioning -- for the record, you're holding your

8   arm up?

9   A.  No.  This is the wall.  I would stand there leaning against

10  the wall, and he would move a lot.

11          THE COURT:  The witness has indicated with his hand

12  the wall was in front of him.

13  Q.  He would move a lot where?

14  A.  I would stand like this against the wall, and he would lean

15  against a chair, and he would move back and forth, and he used

16  to hurt me.  I used to close my eyes.

17  Q.  Other than the times when you say that he sat on you and

18  the times where you stood with your back against the wall and

19  described how the anal intercourse would occur, were there any

20  other ways in which you and Velandia engaged in anal

21  intercourse?

22  A.  I don't recall.  No.  Once he threw me on the floor.  And I

23  laid there.  And he sat.  That's what I remember.

24          THE COURT:  And he sat?  When he threw you on the

25  floor, were you face up or facedown?

C3tQcar4                        Caravantes - Cross

1          THE WITNESS:  Facing up.  And he sat on top, and he

2     would move.

3     Q.  Was there a time that you said to Oscar that we should go

4     buy condoms?

5     A.  I didn't say it that way.

6     Q.  How did you say it?

7     A.  He came back that night and he said, "I want you to stick

8     it to me" and I was scared.  And I asked him, "Do you have

9     condoms?"  And he said no.  Oscar said to me no, and I said,

10    "Go get them."  And he said, "No.  No" like this, and then he

11    pulled me by my pants.  I told him to go get condoms so that I

12    could go downstairs and so he wouldn't grab me.  I didn't want

13    him to grab me.  That's the reason why I told him to go get

14    condoms.

15    Q.  What is your height and weight?

16    A.  100 -- 215, 210, I don't know.  I'm losing weight right

17    now.  Five-four or five-five.

18    Q.  Did you ever perform oral sex on Oscar?

19    A.  No.  Never.

20    Q.  Did he ever ask you to do so?

21    A.  No.  On one occasion he was trying to pull my hands to the

22    front and he would pull them, and I would pull them off.  He

23    would pull them forward; I would pull them backwards.

24    Q.  Mr. Caravantes, you had conversations that you had

25    mentioned in your testimony with Francesco Pistorio about

C3tQcar4                                Caravantes - Cross

1     wanting to become a waiter, correct?

2     A.  Yes.

3     Q.  And there were, I think you said, four such conversations?

4     A.  Three or four.

5     Q.  In the course of one or more of those conversations,

6     Mr. Pistorio informed you that a change would be made to the

7     coffee station area to eliminate the coffee station operator

8     position at Remi, correct?

9     A.  I don't recall.

10            THE COURT:  You don't recall which occasion or you

11    don't recall any occasion where he said that they would

12    eliminate the coffee station position?

13            THE WITNESS:  I don't recall right now.

14            THE COURT:  You don't recall which conversation or you

15    don't recall any conversation about the coffee maker station

16    being eliminated?  Do you follow me?

17            THE WITNESS:  Yes.  He made that comment to me.  He

18    told me that.

19    Q.  When did he tell you that?

20    A.  That was after -- I don't recall whether it was after

21    March 2008.

22            THE COURT:  Or?

23            THE WITNESS:  Or towards the beginning of 2008.

24    Q.  When was the last conversation you had with Mr. Pistorio

25    about your wanting to become a waiter at Remi?

C3tQcar4                          Caravantes - Cross

```
 1            THE COURT:  I am going to sustain an objection.  You
 2    don't have to answer that question.  I don't think it's clear
 3    because any conversation mentioning the waiter would be about
 4    being a waiter, but whether it was about his wanting to be a
 5    waiter is another question.  That's the way it's phrased.  He's
 6    told you an answer about wanting to be a waiter.
 7            MR. PARKER:  I'll rephrase, your Honor.
 8    Q.  Just to take you back.  You said that there were three or
 9    four conversations that you had with Pistorio about your
10    becoming a waiter at Remi, correct?
11    A.  Yes.
12    Q.  When was the last of those conversations?
13    A.  I think it was in 2008.
14    Q.  When in 2008?
15    A.  I don't recall exactly when, but it was towards the
16    beginning -- January, February, March.
17    Q.  Did Pistorio tell you that you needed to have training in
18    order to become a waiter at Remi?
19            MR. DELANEY:  Objection.
20            THE COURT:  In that?  He hadn't finished, the
21    objection is overruled.  Finish your question.
22    Q.  Did Pistorio -- I'll just restate it.  Did Pistorio in one
23    of those conversations tell you that you needed to receive
24    training in order to become a waiter at Remi?
25    A.  I don't understand the question.
```

C3tQcar4                       Caravantes - Cross

1  Q.  Did you and Pistorio discuss any training that he had

2  mentioned -- let me rephrase.  Did you have a discussion with

3  Pistorio about training as a runner prior to becoming a waiter

4  at Remi?

5           MR. DELANEY:  Objection, your Honor.

6           THE COURT:  I'll allow the question.

7  A.  Mr. Pistorio said that in order to be a waiter, first you

8  had to be a busboy, then a runner and then a waiter.  But there

9  were some waiters who were never food runners.

10          MR. PARKER:  Your Honor, I'm going to move to strike

11  that as not responsive to the question.

12          THE COURT:  I'm going to allow the answer.  You can

13  move to question him about it.  Did you say that to him?  Did

14  you tell him that there were some waiters who were --

15          THE WITNESS:  Yes.  I told him about Julius.  I told

16  him that, and he said in his language not to imagine Julius in

17  the morning.  That's what he replied to me.

18          THE COURT:  What is his language?  Pistorio.

19          THE WITNESS:  Italian.

20          THE COURT:  Do you understand Italian?

21          THE WITNESS:  Some, yes.

22          THE COURT:  And he told you this in the morning?

23          THE WITNESS:  No, it was in the afternoon.  I used to

24  always see Mr. Pistorio in the afternoon.

25          THE COURT:  Why was he talking about in the morning?

1          THE WITNESS:  Regarding the coffee maker from the

2     morning time, his name is Julius; that I didn't see what he was

3     doing in the restaurant in the morning.

4          THE COURT:  Because you were in the afternoon, and he

5     was in the morning?

6          THE WITNESS:  Yes.

7          THE COURT:  Were there any other people besides Julius

8     that you knew had not been food runners before they became

9     waiters?

10          THE WITNESS:  Yes.

11          THE COURT:  Do you know their names?

12          THE WITNESS:  One has name is Adrien.  He was a white

13     jacket, and he went up to waiter.

14          THE COURT:  Anyone else?

15          THE WITNESS:  Right now I can only remember him.

16          THE COURT:  Did you mention him to Mr. Pistorio?

17          THE WITNESS:  Mr. Pistorio was not there any more.

18     Mr. Pistorio had already left for Washington.  This was between

19     June and July when Adrien went to become a waiter.

20     Mr. Pistorio was no longer there.  Only Oscar Velandia was

21     there.

22          THE COURT:  What happened to Mr. Pistorio?

23          THE WITNESS:  He told me that whenever he come back

24     from vacation, he was going to go away on vacation and stay for

25     a couple of months, and once he came back, we would talk about

C3tQcar4                          Caravantes - Cross

1    it, but he never came back.

2              THE COURT:  So he hadn't left the job.  He was on

3    vacation, is that right?  In Washington?

4              THE WITNESS:  He said he was on his way to Italy.

5              THE COURT:  What did Washington have to do with that?

6              THE WITNESS:  Then afterwards, one of the guys from

7    construction told me that he had not gone back to Italy, but

8    that he had been transferred to Washington.

9              THE COURT:  Transferred by whom?

10             THE WITNESS:  He didn't say who.  All he told me was

11   that he had been sent to Washington to work.

12             THE COURT:  By whom?  Does Remi have a restaurant in

13   Washington?

14             MR. PARKER:  No.

15   BY MR. PARKER:

16   Q.  Did you have a conversation with Mr. Pistorio about the

17   possibility of your going to work as a server at a restaurant

18   called Bistro Milano?

19   A.  He offered that to me.

20   Q.  And you declined it, correct?

21   A.  Yes.

22   Q.  During one of your conversations with Mr. Pistorio about

23   becoming a waiter, he told you that he could train you after

24   Julius was finished training, correct?

25             THE COURT:  He could train you as what?

1              MR. PARKER:  Train you as a food runner.

2      A.  I don't recall whether he told me about a food runner or a

3      busboy.  But it seems to me that it was a food runner.

4      Q.  I'm sorry, can you repeat that last answer?

5              (Read back)

6              THE COURT:  It seems to me that it was a food runner.

7      Q.  Mr. Caravantes, do you agree that the discussion that you

8      had with Pistorio was that he offered to train you as a food

9      runner after finishing Julius's training?

10             MR. DELANEY:  Objection.

11             THE COURT:  Objection overruled.

12     A.  Please read this question back?

13             (Read back)

14     A.  I don't recall -- I don't recall that it was in that way

15     because what he did was that he had two others, food runners,

16     but he put them in front of me.

17             THE COURT:  Was Julius being trained as a coffee maker

18     by Mr. Pistorio?

19             THE WITNESS:  No.  No.  As far as I recall, he was a

20     dishwasher and then they took him up to the cafeteria.

21             THE COURT:  Did he -- when he acted as a food

22     runner -- excuse me -- wrong -- he acted as a coffee maker

23     while you were there, did he not?

24             THE WITNESS:  Yes.

25             THE COURT:  Had he ever acted in that position before

C3tQcar4                          Caravantes - Cross

1    while you were there?

2           THE WITNESS:  In the morning he was a coffee maker, in

3    the afternoon he was a busboy, and then from there he went to

4    waiter.

5           THE COURT:  Do I have the right name?  I may have the

6    wrong name.  Who was acting as food maker -- who was acting as

7    coffee maker?  Was his name Julio or Julius?

8           THE WITNESS:  Julius.  He was the coffee maker in the

9    morning.  I was the coffee maker in the afternoon.

10          THE COURT:  Is there a difference in duties what kind

11   of coffee you make in the morning and in the afternoon?

12          THE WITNESS:  Yes.  Morning he used to come in at

13   8:00.  The whole room, the whole restaurant had to be cleaned.

14   The windows had to be cleaned.  That's what one would do from

15   8:00 when one would arrive, until 11:30, 11:00 or 11:30.  And

16   from there would go for break.  And then from 12:10 till 3:00

17   would be there at the station.

18          THE COURT:  Is there a difference in the kind of

19   coffee that you make in the morning and the kind of coffee you

20   make in the afternoon shift?

21          THE WITNESS:  The only difference is that in the

22   morning there was more iced tea sold and not as much in the

23   afternoon.

24          THE COURT:  Is there a difference in duties in the

25   afternoon and the duties in the morning?

1          THE WITNESS:  Yes.  In the afternoon I would come in

2     from 4:00, and then from 4:00 to 5:00 I would clean the

3     restaurant.  And if the offices had to be cleaned, I would go

4     clean them.  And then I would go up to my station from there.

5     And then I would be -- I would remain at my station from 6:00

6     until closing time at 12:00.

7          THE COURT:  But were there any new tasks that one

8     would have to learn to be an afternoon coffee maker?

9          THE WITNESS:  The only difference was that for the

10    afternoon you needed to learn how to make the foam for

11    cappuccino.

12         THE COURT:  How long had Julius been working as a

13    coffee maker when you had this conversation with Mr. Pistorio?

14         THE WITNESS:  I don't recall exactly.

15         THE COURT:  Well, approximately?

16         THE WITNESS:  I don't recall whether he started in

17    2005, but by 2007 he started doing it, then I don't recall

18    whether by 2008 he was already being -- working as a waiter.

19         THE COURT:  And when did you have the conversation

20    with Mr. Pistorio?

21         THE WITNESS:  I think it was in 2007.

22         THE COURT:  How long in 2007 had Julius been working

23    as a coffee maker in the afternoon when you had the

24    conversation with Mr. Pistorio?

25         THE WITNESS:  About a year and a half, I believe.

1          THE COURT:  And where had you been working?

2          THE WITNESS:  As a coffee maker in the afternoon.

3          THE COURT:  And he was doing the same work?

4          THE WITNESS:  Yes, he was a coffee maker for the

5  morning.

6          THE COURT:  I asked you in the afternoon.

7          THE WITNESS:  Yes.  Julius started in the afternoon as

8  a busboy, and then they would let him work sometimes as a

9  waiter.  They were training him as a waiter.

10          THE COURT:  I'm beginning to see what, all right.  I'm

11  beginning to understand the conversation.

12  BY MR. PARKER:

13  Q.  Mr. Caravantes, did you decline an offer from Mr. Pistorio

14  to become a food runner?

15  A.  Yes.

16  Q.  And was there a later conversation with Pistorio in which

17  he offered to keep you in the same position that you were in at

18  the time in 2008 and pay you $10 an hour?

19  A.  Yes.

20  Q.  What were you earning at the time per hour?

21  A.  I always earned the minimum.

22  Q.  What was that?

23  A.  $7.15, $7.25.  I don't recall how much the minimum was.

24  Q.  Also around that time in early 2008, did Mr. Pistorio offer

25  to you the opportunity to become a bartender at parties at

C3tQcar4                           Caravantes - Cross

1     Remi?

2     A.  Yes, but only for parties.

3     Q.  And that would have been -- that position as a bartender

4     would have been in addition to working the same job you were in

5     at the time, correct?

6              MR. DELANEY:  Objection.

7              THE COURT:  The objection -- I am going to overrule

8     the objection.  You can clarify.  You would hold the other

9     position when you weren't acting as bartender, is that right?

10             THE WITNESS:  Yes, I only worked as a coffee maker.

11             THE COURT:  But when you worked as a bartender, you

12    wouldn't get paid as coffee maker, you'd get paid as a

13    bartender, right?

14             THE WITNESS:  I never worked as a bartender.

15             THE COURT:  At parties?

16             THE WITNESS:  No.

17             THE COURT:  The offer was -- let me put it this way:

18    The offer was to let you work as a bartender and also when you

19    weren't working as a bartender, to let you continue to work as

20    a coffee maker, is that right?

21             THE WITNESS:  No.

22             THE COURT:  OK.

23             THE WITNESS:  No.  The offer was to work as a

24    bartender only for parties, and if there weren't any parties,

25    then I would just go home.

C3tQcar4                           Caravantes - Cross

1          THE COURT:  OK.

2     Q.  And you declined that offer as well, correct?

3     A.  Yes.

4     Q.  Now, later in 2008, Mr. Pistorio left Remi Restaurant,

5     correct?

6     A.  Yes.

7     Q.  Who became the general manager after -- let me rephrase.

8     Did Carlo Maggi in 2008 become the general manager of Remi

9     after Mr. Pistorio left?

10    A.  Yes, but it seems to me that there was a month went by

11    without a manager, without a general manager.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

C3tdcar5                         Caravantes - cross

1    Q.  You and Mr. Maggi worked at Remi for some period of time

2    together, correct?

3    A.  Yes.

4    Q.  By the time Mr. Maggi had started as general manager at

5    Remi, Julius, who had been in the coffee maker job, had left

6    that position in the mornings, correct?

7    A.  Yes, I think so.

8    Q.  And at that time, again, when -- by the time Mr. Maggi

9    started at Remi, you were the only remaining coffee maker at

10   Remi, correct?

11   A.  Yes.

12   Q.  You had meetings in July and August of 2008 with Mr. Maggi

13   about your job at Remi, correct?

14   A.  Yes.

15   Q.  And after Mr. Maggi started, the company brought in new

16   coffee machines at the coffee station, correct?

17   A.  I don't recall whether when he arrived recently the

18   machines were there.

19   Q.  So are you -- by the time you left Remi, in August of 2008,

20   there were new machines in the coffee station for making

21   coffee, is that correct?

22   A.  Yes, there was a new machine.

23   Q.  And how many times did you meet with Mr. Maggi in July and

24   August 2008 to discuss your job?

25   A.  I don't recall whether there were two, three or four.

C3tdcar5                        Caravantes - cross

1   Q.  And during one or more of those meetings, Mr. Maggi

2   discussed with you other positions at Remi that you might be

3   able to go into, correct?

4              MR. DELANEY:  Objection.

5              THE COURT:  Objection overruled.

6   A.  Yes.  He offered two positions to me.

7   Q.  One of them was a position as a busboy, to move up to a

8   runner position, correct?

9              THE COURT:  I think that's two questions.

10             MR. PARKER:  Sorry.  I will rephrase it.

11  Q.  Did Mr. Maggi tell you that you could become a food runner

12  but that you needed to start first as a busboy?

13  A.  No.  No, Carlo Maggi told me that there were two positions

14  open for me.

15  Q.  One position was a job as a cleaner at the restaurant, is

16  that correct?

17  A.  Yes.

18  Q.  That was a job that would begin at 7 a.m. daily, correct?

19  A.  I don't recall whether it was 7.  I believe it's for 8.  He

20  said to me from 8 to 1.

21             And then I asked him, "So what am I going to do after

22  1?"  And he did with his hands, "Home."

23  Q.  What was the other position that he offered you?

24  A.  Busboy.

25  Q.  And you declined both -- the offers for both positions,

C3tdcar5                          Caravantes - cross

1   correct?

2   A.  I don't recall that I rejected them.

3   Q.  You left Remi in August of 2008, correct?

4   A.  Yes.

5   Q.  And on the last day of your employment -- strike that.

6           What was the last day that you worked at Remi?

7           THE COURT:  Do you know the date?

8           THE WITNESS:  Yes.

9   A.  It was August 2008, on the 11th of August.

10  Q.  Did you actually work that day?

11  A.  Yes.

12  Q.  And after that date you had another conversation with

13  Mr. Maggi, correct?

14  A.  The last one -- one of the last ones.

15  Q.  "One of the last ones," what do you mean by that?

16  A.  The last one was when I went to pick up my money.

17  Q.  Mr. Caravantes, could you turn to in the exhibit book,

18  Exhibit P19, please.

19          THE COURT:  P what?

20          MR. PARKER:  P19, your Honor.

21          THE CLERK:  P19.

22          THE COURT:  Defendants' exhibit book?

23          THE CLERK:  Is it in the Defendants' exhibit book or

24  the Plaintiffs'.

25          MR. PARKER:  It is in the Plaintiffs' Exhibit Book.  I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C3tdcar5                          Caravantes – cross

1   believe there is a smaller one that was used for

2   Mr. Caravantes.

3           MR. DELANEY:  It was the one that I was using this

4   morning, I believe.

5           THE CLERK:  Exhibit 19, right?

6           MR. PARKER:  19.  P19.

7           THE COURT:  All right.  Exhibit 19.  OK.

8   BY MR. PARKER:

9   Q.  Mr. Caravantes, this is a copy of your Verified Complaint

10  to the New York State Division of Human Rights, correct?

11          THE INTERPRETER:  No, I don't think we have the right

12  one, then.

13          MR. PARKER:  It should be --

14          THE COURT:  He has something completely different.

15          MR. PARKER:  It is in the small binder.

16          (Pause)

17          (Question read)

18  A.  Yes.

19  Q.  Turn to --

20          THE COURT:  This is "a" complaint.

21  Q.  Turn to page 6 of 9.

22          Is that all your handwriting on that page?

23  A.  Yes.

24  Q.  It has -- in the middle of the page, it has X's next to

25  words.  "X Edad."  Did you put that there?

1   A.  Where?

2   Q.  On the left-hand side of the page, less than halfway down.

3   A.  Those X's?

4   Q.  Yes.  Did you put that there?

5   A.  Yes.

6   Q.  That's because you were claiming age discrimination?

7   A.  I can't recall right now.

8   Q.  What does "edad" mean?

9   A.  It was age.

10  Q.  Your allegation was that Mr. Pistorio discriminated against

11  you because of your age, is that correct?

12          MR. DELANEY:  Objection.

13          THE COURT:  One claim.

14  BY MR. PARKER:

15  Q.  Was that one of your claims?

16  A.  Yes.

17  Q.  And in the handwritten portion that is beneath where we

18  were just looking, it begins with the word "Todo," T-o-d-o,

19  that's all your handwriting on that page and the next?

20  A.  Where is it?

21  Q.  The bottom of page 6, all of page 7, and what is written on

22  page 8.

23          THE COURT:  What is the question?

24          MR. PARKER:  Is that all his handwriting?

25  A.  Yes.

C3tdcar5                          Caravantes - cross

1   Q.  You filled this -- you wrote this out to the Division of

2   Human Rights?

3   A.  Yes.

4   Q.  Is there any mention in your handwritten description on

5   pages 6, 7 and 8 of Ben Ranieri?

6           MR. DELANEY:  I'll object only to the extent that I

7   don't know if the witness has had time to read it or not yet.

8           (Pause)

9           THE COURT:  I don't want to get into this because then

10  we will have to have it -- why don't you just read what it says

11  in that description, starting with "Todo."  Can you read it to

12  us, Mr. Caravantes?  Can you read what it says with the word

13  starting "Todo" through page 8 to us, what it says?

14          THE WITNESS:  Yes.

15          THE COURT:  Read it aloud, please.

16          THE WITNESS:  (Reading) Everything started about eight

17  months ago when I told him regarding my tips, because I was

18  getting paid as a busboy on Saturdays, that it was .50 and they

19  took it away from me, they kept replacing it with .38, and I

20  asked Mr. Pistorio a question.

21          THE COURT:  A little slower.

22          THE WITNESS:  And he said no to me, for me to go ask

23  Oscar.  And I asked him and he told me why.

24          Then I don't know how Oscar told Mr. Pistorio, that he

25  came upstairs and yelled at me.  And he told me the next time I

C3tdcar5                    Caravantes - cross

1    used his last name, that I was going to be out of the company.

2            Then I found out, through Mr. Pena, that Mr. Pistorio

3    wanted to fire me.  Besides Mr. Pena, there was another person

4    who knew they wanted to fire me.  When I asked him that I

5    wanted to work six days, because I needed money, and he

6    replied, No, because for me it was illegal.  And I didn't say

7    anything to him because in order to avoid problems.  And I was

8    asking to myself why do they all work six days except for

9    myself, for having papers?

10           The first time I told them that if you see -- the

11   first time that I told them to see to give me the opportunity

12   to work as a waiter, Mr. Pistorio replied, no, because of the

13   language.

14           There are some letters missing over here.

15           That I had to be a busboy, then a runner, and then I

16   would go upstairs.

17           And the second time I asked him for another

18   opportunity, Mr. Pistorio replied to me -- he said to me, not

19   as a waiter, but that he was going to have me there as a runner

20   and then I would come upstairs, but first we have to find

21   someone to stay in your place, someone that is responsible and

22   serious, like you.  Which then he placed two runners in front

23   of me, and nothing.

24           And last time I felt that he discriminated against me

25   is that he always calls me by somebody -- by any one of my

C3tdcar5                              Caravantes - cross

1    coworkers' names.  He calls me Figueroa and he calls him

2    Caravantes.

3              THE COURT:  Was that statement true to the best of

4    your knowledge when you gave it?

5              THE WITNESS:  Yes.

6    BY MR. PARKER:

7    Q.   Now, what was your -- as a coffee operator at Remi, what

8    was your tip rate?

9    A.   Towards the beginning, it was only on Saturday.  They used

10   to give me 0.50, and then they lowered me to .38.

11   Q.   And what was the tip rate for a runner at Remi?

12   A.   Runners, there were different.  There were runners who used

13   to earn as waiters, and then they started bringing out other

14   runners for waiters.  And the new food runners used to earn

15   .75.

16             MR. PARKER:  No further questions.

17             MR. DELANEY:  He had no further questions, your Honor.

18             THE COURT:  All right.  Any redirect?

19             MR. DELANEY:  No.  We are not going to redirect.

20             THE COURT:  Mr. Caravantes, thank you very much.

21             (Witness excused)

22             THE WITNESS:  Thank you.

23             THE COURT:  It is five of 4.  Do I have another matter

24   waiting?

25             THE LAW CLERK:  Yes, Judge.

C3tdcar5

1            THE COURT:  Are the attorneys here?  Is everyone here?

2            (Pause)

3            Are both attorneys here in any matter?

4            THE LAW CLERK:  The defense attorney isn't here,

5       Judge.

6            THE COURT:  Have you got another witness?

7            MS. HALLETT:  The plaintiffs call Martina Caravantes

8       to the stand.

9            Just let me go and get her from the back.

10            (Pause)

11       MARTINA CARAVANTES,

12            called as a witness by the plaintiffs,

13            having been duly sworn (through the

14            Interpreter), testified as follows:

15            THE COURT:  Please be seated.  And tell us your last

16       name and your first name, and spell your last name.

17            THE WITNESS:  My name is Martina Caravantes.

18            THE COURT:  All right.  You can proceed.

19            I think we know --

20            THE WITNESS:  Should I say my last name?

21            THE COURT:  Are you married to the plaintiff?

22            THE WITNESS:  Yes, I am married to Arturo Caravantes.

23            THE COURT:  Do you spell your last name the same way?

24            THE WITNESS:  Yes.

25            THE COURT:  You can proceed.

C3tdcar5

1   DIRECT EXAMINATION

2   BY MS. HALLETT:

3   Q.  Good afternoon, Mrs. Caravantes.

4   A.  Good afternoon.

5   Q.  Where do you live currently?

6   A.  3706 65th Street, Apartment 1B, on Woodside Avenue.  The

7   zip code is 11377.

8   Q.  That's in Queens?

9   A.  Yes, in Queens.

10  Q.  Mrs. Caravantes, do you speak English?

11  A.  No.

12  Q.  Do you read English?

13  A.  No.

14  Q.  Do you write English?

15  A.  No.

16  Q.  Is Spanish your first language?

17  A.  Yes.

18  Q.  And are you most comfortable testifying in Spanish today?

19  A.  Yes, in Spanish.

20  Q.  Mrs. Caravantes, who do you currently live with?

21  A.  I live with Arturo Caravantes, my husband, and my three

22  daughters.

23  Q.  And when did you get married to Arturo Caravantes?

24  A.  I got married in '93, January 23rd.

25  Q.  And you said you have three daughters, is that correct?

C3tdcar5                              M. Caravantes – direct

1    A.  Yes.  I have three daughters.

2    Q.  What are their names?

3    A.  The elder is Lizette Caravantes.  The middle one is Jocelyn

4    Caravantes.  And the little one's name is Dana Caravantes.

5    Q.  And is your husband the father of all three of these

6    children?

7    A.  Yes.

8    Q.  How old are they?

9    A.  One is 17, the elder; the middle one is 13, and the little

10   one 7.

11   Q.  Are your daughters currently in school?

12   A.  Yes, the three of them are in school.

13   Q.  And how old are you currently?

14   A.  39 years old.

15   Q.  Did you graduate from high school?

16   A.  Yes, I graduated from high school.

17   Q.  And did you receive any further education after high

18   school?

19   A.  I took a short career for two years.

20   Q.  When you say "a short career for two years," what do you

21   mean?

22   A.  Stylist.

23          THE COURT:  In Mexico?

24          THE WITNESS:  Yes.

25   Q.  Did you receive any other education after this two-year

1    course?

2    A.   No.

3    Q.   Do you currently work?

4    A.   No.

5    Q.   What is the last time that you worked?

6    A.   It's been a long time ago.  I don't recall.

7    Q.   Has it been more than five years?

8    A.   No.

9    Q.   When was the last time that you worked full-time?

10   A.   I only worked in jobs as substitute.

11   Q.   Is that substitute for another worker?

12   A.   Aha.

13           THE COURT:  What kind of work do you do?

14           THE WITNESS:  If I'm not mistaken, five months.

15           THE COURT:  What kind of work do you do?

16           THE WITNESS:  Cleaning the house.

17   BY MS. HALLETT:

18   Q.   But you're not currently working, is that correct?

19   A.   No.

20   Q.   Mrs. Caravantes, when did you first meet your husband?

21   A.   I don't recall but it's been 19 years.

22   Q.   How did you first meet your husband?

23   A.   He used to go to Mexico.  First he was here and then he

24   would go to Mexico.  He met a friend, and then that friend --

25   we were very good friends, and the friend had his business and

C3tdcar5                          M. Caravantes - direct

1  I had my own business.  Then we exchanged glances and then we

2  would smile at each other.  And then he spoke to me right away.

3  He invited me to the movies, to the park, to go dancing.  And

4  that's how we got -- started to get to know each other.

5          THE COURT:  Let's get to the heart of what the witness

6  is going to testify about.

7  Q.  What attracted you to Mr. Caravantes when you first met

8  him?

9          MR. PARKER:  Objection.

10          THE COURT:  Objection sustained.

11          Let's get to the heart of the matter.

12          MS. HALLETT:  Your Honor, I'm trying to lay a

13  background of what their relationship was like.

14          MR. PARKER:  It was 20 years ago.

15          THE COURT:  Then ask another question.  Ask that

16  question.

17  Q.  Mrs. Caravantes, when you first got together with your

18  husband, can you please describe your relationship?

19          MR. PARKER:  Objection.

20          THE COURT:  Objection sustained.

21          Ask the question, what was the relationship like.

22  Let's move it on.

23          MS. HALLETT:  Yes, Judge.

24  BY MS. HALLETT:

25  Q.  Mrs. Caravantes, when you first got together with your

C3tdcar5                          M. Caravantes - direct

1    husband, what was your relationship like?

2    A.  Beautiful.  Very beautiful.

3    Q.  Did you fight?

4             MR. PARKER:  Objection.

5    A.  No.  Never.

6             MR. PARKER:  It's so remote in time.

7             THE COURT:  Are you trying to establish that there are

8    problems in the relationship?

9             MS. HALLETT:  That's what I'm trying to establish,

10   your Honor.

11            THE COURT:  That there were problems you're trying to

12   establish from the outset?

13            MS. HALLETT:  I'm trying to establish whether there

14   were problems.

15            THE COURT:  You're not supposed to do that on direct

16   examination unless that's your point.

17            MS. HALLETT:  Judge, I'm trying to make a comparison

18   here.  Just give me a little leeway.

19            THE COURT:  You're going to get a lot of objections

20   from the Court the way you are proceeding.

21            Just go ahead.  I've got other matters to hear.  If

22   you want, the witness is coming back again and I doubt she

23   wants to.

24   BY MS. HALLETT:

25   Q.  Mrs. Caravantes, what was your relationship like with your

C3tdcar5                        M. Caravantes - direct

1   husband before 2005?

2   A.  It was good.  Very beautiful.  We didn't used to fight.

3   Q.  And can you describe your husband's personality prior to

4   2005?

5   A.  He was -- he has always been a very sedative person.  He

6   doesn't like problems.  He never fought with me.  He has always

7   wanted to keep me well in the whole meaning of the word.

8   Q.  Mrs. Caravantes, did you ever notice a change in your

9   husband's personality?

10  A.  Yes.

11  Q.  What changes did you notice?

12  A.  He changed a lot, ever since they changed the owners of the

13  restaurant.  He became distant, sad, preoccupied.  He changed a

14  lot.

15  Q.  Are you OK, Mrs. Caravantes?

16  A.  Always afraid of -- yes, I'm OK.

17  Q.  Did these changes happen gradually or suddenly?

18  A.  They were gradually.  As time was passing by, gradually.

19  Q.  At that point, when you first started noticing the changes,

20  did you know why your husband was changing?

21  A.  I didn't know it.  I only noticed it.  But I never thought

22  the reason why, but I thought that perhaps he was having a

23  change in his job, a change in schedule and all those things.

24  Q.  But you didn't hear that from Mr. Caravantes, correct?

25  A.  I noticed it.

C3tdcar5                          M. Caravantes - direct

1    Q.  Mrs. Caravantes, can you describe your relationship with

2    your husband currently?

3    A.  Bad.  Very bad.

4    Q.  How is it bad?

5    A.  We fight.  We fight a lot.  Mostly I.  Sometimes I see him

6    in such a bad shape and in receiving the psychologist, I try to

7    understand, to stand out, but I see him very bad.

8    Q.  Mrs. Caravantes, how have the changes in your husband's

9    behavior affected you personally?

10   A.  A lot.  A lot.  Personally, as a mother, as a woman, as a

11   wife.  My self-esteem is bad.  I treat him very badly.  I try

12   to change for my daughters, for him.

13           Above, besides everything else, I do love him very

14   much.

15   Q.  Mrs. Caravantes, how have the changes in your husband's

16   behavior affected your children?

17           MR. PARKER:  Your Honor, I am going to object to that.

18           MS. HALLETT:  I can rephrase.

19           THE COURT:  You need a foundation for the question.

20           MS. HALLETT:  I can rephrase.

21   Q.  Mrs. Caravantes, have the changes in your husband's

22   behavior affected your children?

23   A.  Yes.

24           MR. PARKER:  I object.

25           THE COURT:  Objection sustained to the form of that

C3tdcar5                        M. Caravantes - direct

1   question also.

2   BY MS. HALLETT:

3   Q.  Mrs. Caravantes, do you sleep in the same bed as your

4   husband?

5   A.  We used to.

6   Q.  Where does Mr. Caravantes sleep now?

7   A.  We sleep in the same bedroom but separately.

8   Q.  Have you noticed anything about his -- how he sleeps --

9           THE COURT:  I asked you not to put any leading

10  questions.

11          MS. HALLETT:  All right.

12  Q.  Do you ever observe Mr. Caravantes in the middle of the

13  night?

14  A.  Yes.  He has a lot of nightmares.

15  Q.  How do you know that he has nightmares?

16  A.  Because I used to sleep with him.  I used to notice.  He

17  used to complain, and he used to sweat a lot, you know, covered

18  in his blanket.  I see him bad.

19          He used to go to the psychologist and the

20  psychiatrist.  He's nervous, very distant from everything.  He

21  wants to be alone.

22          He worries me.  He worries me a lot.

23  Q.  Mrs. Caravantes, what is your sex life with your husband

24  like?

25  A.  Right now it's bad.  He tries.  He tries to do -- be good

C3tdcar5                         M. Caravantes – direct

1    with me but sometimes he's bad.  Sometimes he doesn't function.

2    Q.  Has it always been like that?

3    A.  No.  No.

4    Q.  Mrs. Caravantes, do you believe that your husband is a

5    homosexual?

6    A.  No.

7    Q.  Do you believe your husband is bisexual?

8    A.  No.

9    Q.  Mrs. Caravantes, do you love your husband?

10   A.  Yes, I love him and I want him very much.

11           MS. HALLETT:  Thank you.  No further questions.

12           THE COURT:  Any cross?

13           MR. PARKER:  I have no questions, your Honor.

14           THE COURT:  You are excused, Mrs. Caravantes.

15           (Witness excused)

16           THE COURT:  We will adjourn until tomorrow at 9:30.

17           MR. DELANEY:  Thank you, your Honor.

18           (Adjourned to 9:30 a.m., Friday, March 30, 2012)

19

20

21

22

23

24

25

440

```
 1                    INDEX OF EXAMINATION

 2  Examination of:                        Page

 3  ARTURO CARAVANTES GARCES

 4  Direct By Mr. Delaney  . . . . . . . . . . . 314

 5  Cross By Mr. Parker  . . . . . . . . . . . . 385

 6  MARTINA CARAVANTES

 7  Direct By Ms. Hallett  . . . . . . . . . . . 431

 8                    PLAINTIFF EXHIBITS

 9  Exhibit No.                         Received

10   19    . . . . . . . . . . . . . . . . . . . 369

11   21    . . . . . . . . . . . . . . . . . . . 372

12  28 and 29  . . . . . . . . . . . . . . . . . 321

13  96    . . . . . . . . . . . . . . . . . . . . 373

14  110   . . . . . . . . . . . . . . . . . . . . 340

15

16

17

18

19

20

21

22

23

24

25
```