C3udcar1                     Trial

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   ARTURO CARAVANTES and
3  FRANCISCO SOTARRIBA,

4                 Plaintiffs

5        v.                              09 Civ. 7821 (RPP)

6  53RD STREET PARTNERS, LLC
   d/b/a REMI RESTAURANT
7  and OSCAR VELANDIA,

8                 Defendants
   ------------------------------x
9                                    New York, N.Y.
                                     March 30 2012
10                                   9:52 a.m.
   Before:
11            HON. ROBERT P. PATTERSON, JR.

12                                   District Judge

13                  APPEARANCES

14  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
        Attorneys for Plaintiffs
15  BY:  AARON S. DELANEY
        MAYUR P. SAXENA
16      MOIRA KIM PENZA
        JORDAN FEIT
17
18  URBAN JUSTICE CENTER
        Attorney for Plaintiffs
   BY:  NICOLE HALLETT
19
20  EPSTEIN BECKER & GREEN PC
        Attorneys for Defendants
   KERRY M. PARKER
21  ALKIDA KACANI

22       - also present -

23  JOHN MATT - Spanish Language Interpreter
   LILIANA HALAC - Spanish Language Interpreter
24  BRIAN DONOVAN - Plaintiff paralegal
   RANDALL CARTER - Plaintiff AV Tech

25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

C3udcar1                          Trial

```
 1              (Trial resumed)

 2              THE CLERK:  All rise.

 3              THE COURT:  Please be seated.  I'm sorry.

 4              All right.  Next witness.

 5              MR. SAXENA:  Your Honor, the plaintiffs call Moises

 6    Pastor by designation.

 7              THE COURT:  All right.

 8              MR. SAXENA:  We have people ready to read in the

 9    testimony.  If it is all right with the Court, we will have the

10    witness sit in the witness box and the questioning attorney

11    stand at the podium.

12              THE COURT:  All right.  You are all aware that you are

13    not to emphasize particular words in the testimony in your

14    answers?

15              MR. SAXENA:  Understood.

16              We also have binders containing the designations that

17    we are going to pass out now.

18              THE COURT:  Provide one to the Court, too.

19              I should warn you that on Monday we won't be able to

20    meet in the morning.  The afternoon I could resume at

21    2 o'clock.

22              MR. SAXENA:  Your Honor, before we start, I just

23    wanted to address the subject of objections to the testimony.

24              I understand that we're doing them as we go.  The

25    objections in this transcript are marked by a box around the
```

C3udcar1                    Trial

1    objected-to testimony.  Once we get to the box, the plaintiffs

2    warn the witness to stop reading, i.e., do not read the

3    question, the first question, and then we will address the

4    objection.

5              THE COURT:  Then you want me to rule on it?

6              MR. SAXENA:  Yes, please.

7              THE COURT:  Who is going to do the reading and who is

8    going to do the answering?

9              Is this a defense witness?

10             MR. SAXENA:  So this is a plaintiffs' witness.  The

11   person who is doing the reading is Brian Donovan.  He is a

12   paralegal from our offices.

13             MS. KACANI:  Alkida Kacani, with the office of Epstein

14   Becker & Green, for the defendant.

15             (Reading)

16   "Q  What is your date of birth?

17   "A  19th of November, 1990?

18   "Q  Are you employed?

19   "A  No.

20   "Q  When was your last employment?

21   "A  It's been close to some three months ago.

22   "Q  What job did you have until then?

23   "A  I was a busboy.

24   "Q  Where?

25   "A  It's a restaurant that's on 54, 55 and 9th Avenue.  It's

C3udcar1                        "M. Pastor

1   called Bocca de Bacco.

2   "Q   Spell it out loud, please.

3   "A   B-o-c-c-a d-e B-a-c-c-o.

4   "Q   From when to when did you work there?  What were the dates

5   when you worked at this restaurant?

6   "A   I'm not very sure but I believe I worked there about three

7   months.

8   "Q   Why did you leave there?

9   "A   Simply I just got tired of that employment.

10  "Q   So you quit?

11  "A   Yes?

12  "Q   Where did you work before Bocca de Bacco.

13  "A   In a restaurant called Arte.

14  "Q   Where is that?

15  "A   21 East 9th Avenue with University Avenue.

16  "Q   What did you do there?

17  "A   The same job.  As a busboy.

18  "Q   When did you work there?

19  "A   Truthfully, I don't remember.

20  "Q   How long did you work there?

21  "A   I don't remember, sir.

22  "Q   Where did you work before Arte?

23  "A   I'm sure that I worked at Bocca also.

24  "Q   Are you saying that you worked at Bocca during two

25  different periods of time?

C3udcar1                              "M. Pastor

1    "A   Yes.

2    "Q   When was the first time you first started working at Bocca?

3    "A   Truthfully, I don't remember the time or the days.

4    "Q   Why did you stop working at Arte?

5    "A   I didn't like the system there and I decided to quit, to

6    leave the job.

7    "Q   Why did you stop working at Bocca de Bacco during the first

8    time that you worked there?

9    "A   Because I wanted to look for something else.  Maybe be a

10   waiter for something.  I was tired of being a busboy.

11   "Q   So you quit there?

12   "A   Yes.

13   "Q   Before you first worked at Bocca de Bacco, where did you

14   work?

15   "A   Geisha.

16   "Q   Is that a restaurant?

17   "A   Yes.

18   "Q   Where is it?

19   "A   61 and Madison.

20   "Q   What was your job there?

21   "A   Busboy.

22   "Q   When did you work there?

23   "A   I don't have an exact date.

24   "Q   Approximately when did you work there?

25   "A   2008.  Earlier.

446

C3udcar1                              "M. Pastor

1    "Q   Earlier than 2008?

2    "A   No, not only early.   In 2008.

3    "Q   For how long did you work at Geisha?

4    "A   I don't remember.

5    "Q   Why did you stop working there?

6    "A   Simply because I wanted a better job.   And also I asked for

7    a rest period, a rest time, and I never returned.

8    "Q   Did you have another job to go to after you stopped working

9    at Geisha?

10   "A   Before Geisha?

11   "Q   No.   At the time that you left working at Geisha, did you

12   immediately begin working at another job?

13   "A   No.

14   "Q   Before Geisha where did you work?

15   "A   In the Remi Restaurant.

16   "Q   When did you work at the Remi Restaurant?

17   "A   I worked there in 2005.

18   "Q   Until when?

19   "A   November of 2007.

20   "Q   When did you start working at Remi?

21   "A   I don't have an idea.   It was maybe midyear.

22   "Q   Since you left working at Remi in November 2007, for how

23   many months or years have you been unemployed?

24   "A   May you repeat the question, please?

25            "(Record read)

C3udcar1                              "M. Pastor

1               "Truthfully, I don't have a good recollection.  Maybe

2       it was -- maybe four months, four months and a half, five

3       months.

4               "I could say -- you could say it was maybe four months

5       or so.  Yes.

6       "Q  So you say you've been unemployed for about four months in

7       almost the last three years; is that your testimony?

8       "A  I'm not in agreement with you.  Those were the four months

9       that I was unemployed at that time.

10      "Q  No.  My question is since November of 2007, for how long

11      have you been unemployed in total?

12      "A  Truthfully, I don't have an idea about that.  Because I've

13      worked at many restaurants and I'm not checking to see how long

14      I worked at which one.  I don't have an idea.  I don't have any

15      idea how much time I rested.  Also, it was 2007, 2008.  It was

16      many years ago.

17      "Q  When was the last time" --

18              MR. SAXENA:  Your Honor, plaintiffs have objected to

19      the portions of the testimony from page 15, line 14, through

20      page 18, line 6.

21              This testimony has been the subject of a motion in

22      limine that the Court has ruled on.  The testimony pertains to

23      drug use.  Drug use does not go to veracity.  Nor is there any

24      suggestion in the testimony that the drug use is being used to

25      impeach the witness' truth-telling ability.

C3udcar1                              "M. Pastor

1              (Pause)

2              THE COURT:  It starts on what page?

3              MR. SAXENA:  It starts, your Honor, on page 15, line

4    14, where the purple box begins.

5              THE COURT:  Thank you.

6              (Pause)

7              I don't see the relevance of the testimony as listed,

8    so I will strike the testimony from page 15 through 18 that is

9    subject to the line.

10             MS. KACANI:  (Reading)

11   "Q  Are you gay?

12   "A  No.

13   "Q  Are you bisexual?

14   "A  What's bisexual?

15   "Q  You have sex with men and women.

16   "A  No.

17   "Q  Do you have a girlfriend?

18   "A  No.

19   "Q  Have you ever had one?

20   "A  Yes.

21   "Q  When was the last time you did?

22   "A  2007.

23   "Q  Do you have a high school diploma?

24   "A  No."

25             MR. SAXENA:  Your Honor, plaintiffs have objected to

C3udcar1                              "M. Pastor

1    the next portion, beginning on page 20, line 2, solely on the

2    grounds of completeness.  We ask that the testimony be read

3    through line 11, which is the answer to the final question.

4              (Pause)

5              THE COURT:  Well, I note that this testimony was given

6    in Spanish, or there was a Spanish interpreter there.

7              MR. SAXENA:  That's correct, your Honor.  The

8    testimony was given in Spanish and through a Spanish

9    interpreter.

10             THE COURT:  I don't know whether his schooling was

11   alleged to have taken place in Mexico or Mexico schools or

12   English schools.

13             MR. SAXENA:  This particular schooling was after

14   Mr. Pastor was already in the United States.

15             We have no problem with the testimony.  We just wanted

16   it to be read through to line 11 so that the answer gets --

17             THE COURT:  Do both sides agree?

18             MR. PARKER:  Your Honor, I have no objection to that.

19             THE COURT:  All right.  I will allow the testimony.

20             MS. KACANI:  (Reading)

21   "Q  Have you gone to school?

22   "A  Yes.

23   "Q  How far did you go in school?

24   "A  I remained to 10th grade.

25   "Q  Did you complete the 10th grade?

C3udcar1                                "M. Pastor

1     "A   No.   I remained halfway in the grade.

2     "Q   What year was that that you were in 10th grade?

3     "A   2007."

4              MR. SAXENA:  Your Honor, the next testimony that is

5     designated begins on page 27.

6              THE COURT:  How old was he when he gave this

7     testimony?  Was it given in 2007?

8              MR. SAXENA:  Your Honor, in November -- he was born in

9     November 1990, November 19th, so he would have been 17 years

10    old.

11             The next portion of the designated testimony begins on

12    page 27, lines 14 through 16.

13             Plaintiffs have objected to this testimony, in

14    addition to the testimony on page 28, line 2 --

15             THE COURT:  Let me just first go over that.

16             27, the blue section?

17             MR. SAXENA:  Yes, correct, your Honor.  27, lines 14

18    through 16.  And the answer to that question is given on page

19    28, line 2.

20             The testimony continues on page 28, starting at line

21    19, and then ends on page 29, at line 3.

22             THE COURT:  What is the nature of the objection?

23             MR. SAXENA:  Plaintiffs' objection is that there is no

24    foundation laid that this alleged -- that this guilty plea that

25    is discussed is a plea to a felony or a crime of dishonesty,

C3udcar1                            "M. Pastor

1    and if it is not it would not be admissible.

2              THE COURT:  If that's all the testimony, then I will

3    grant the motion to strike.  It is not a motion to strike but a

4    motion --

5              MR. SAXENA:  It is a motion to strike, that is

6    correct, your Honor.

7              And then the testimony picks up again at page 31, line

8    2.

9              MS. KACANI:  (Reading)

10   "Q  In what year did you -- were you born in Mexico?

11   "A  Yes.

12   "Q  And what year did you begin to live in the United States?

13   "A  I don't remember.

14   "Q  Do you remember how old you were?

15   "A  No.

16   "Q  What is your height and weight?

17   "A  My height is 5 feet 4 inches and a half and my weight is

18   156.

19   "Q  Did you apply for a job at the Remi Restaurant in 2005?

20   "A  Yes."

21             MR. SAXENA:  Your Honor, plaintiffs have objected to

22   the testimony on page 34 --

23             THE COURT:  I've lost you.

24             MR. SAXENA:  Sure.  I think it might be helpful,

25   actually --

C3udcar1                              "M. Pastor

1              THE COURT:  You skipped over.  I think you have to

2       tell me when you are skipping over.

3              MS. KACANI:  OK.

4              MR. SAXENA:  So I think before, once we skip, we will

5       just say the page and line that we pick up on.

6              MS. KACANI:  I'll start over again, then.  Page 31,

7       line 2.

8              (Reading)

9       "Q  In what year did you -- were you born in Mexico?

10      "A  Yes.

11      "Q  And what year did you begin to live in the United States?

12      "A  I don't remember.

13      "Q  Do you remember how old you were?

14      "A  No."

15             MS. KACANI:  Starting again at page 34, line 7:

16      "Q  What is your height and weight?

17      "A  My height is 5 feet 4 inches and a half and my weight is

18      156.

19      "Q  Did you apply for a job at the Remi Restaurant in 2005?

20      "A  Yes."

21             MR. SAXENA:  Your Honor, plaintiffs have objected to

22      the testimony beginning on page 34, at line 22, and going

23      through page 35, line 3, as well as the testimony on page 35,

24      between lines 12 and 16.

25             There are two grounds.  The first is completeness.

C3udcar1                              "M. Pastor

1    The testimony refers to a document that was marked at the

2    deposition, which is mentioned at page 34 between lines 10 and

3    18.  That document is contained in all of our binders, as well

4    as yours, behind the transcript, behind the tab that's labeled

5    Pastor 1.

6           The second objection concerns the substance of the

7    testimony, which is that the document that is referred to when

8    on page 34, line 25, that says, "If you turn over to page 2,"

9    page 2 of the exhibit that was marked Pastor 1 is an

10   immigration document.  Immigration documents were the subject

11   of a motion in limine that was before the Court, and there is

12   no suggestion in any of the testimony that is objected to, or

13   anywhere else, that there is a false statement on the

14   immigration documents.  So we move to strike that testimony.

15          THE COURT:  I don't see why I should strike the

16   testimony.

17          MR. SAXENA:  Or, rather, the testimony in and of

18   itself is not objectionable, but we would move to redact any --

19   to the extent that the exhibit, Pastor 2, is moved into

20   evidence, we move to redact that page since it is an

21   immigration record.

22          MR. PARKER:  Your Honor, I have no interest in

23   immigration status with respect to this witness.  That is not

24   the purpose of the document.  I have no objection to redacting

25   the small portion of the document that relates to immigration

C3udcar1                              "M. Pastor

 1   status.  I've never made that an issue; I don't intend to.

 2   This is for a different purpose.

 3          This witness later on in the deposition admits that he

 4   lied about his age.  The age is set forth in the document.  And

 5   that's the purpose of the offer.  It has nothing to do with

 6   immigration status.

 7          THE COURT:  Well, these sections, as I understood it,

 8   just has the addresses.  Do you claim that the address is

 9   false?

10          MR. PARKER:  No.  It was -- no.  He hasn't admitted

11   the address is false.  It was really questioning him on whether

12   or not the information contained in his application was in fact

13   accurate to prove that it was his application for the job.

14          THE COURT:  I think if it is limited -- if the

15   testimony is to be interpreted that he did file the

16   application, or that an application was filed in his name in

17   which he lied on Exhibit 1, I think that is admissible.

18   Exhibit 1 can be redacted to show that it is not -- to not show

19   that it is an immigration document.

20          MS. KACANI:  (Reading)

21   "Q  Did you complete any paperwork in order to apply for the

22   job?"

23          MR. SAXENA:  Sorry.  Can you just do the --

24          MS. KACANI:  Do you want me to go back to 19?

25          MR. SAXENA:  Just say what line and page you are

C3udcar1                          "M. Pastor

 1   starting on.

 2            MS. KACANI:  Picking up on page 34, line 22:

 3   "Q  Did you complete any paperwork in order to apply for the

 4   job?

 5   "A  I don't remember.

 6   "Q  If you turn over to page 2.  Let me ask you, did you live

 7   at 1461 Amsterdam Avenue in New York?

 8            "Did you live at 1461 Amsterdam Avenue in New York?

 9   "A  Yes.

10   "Q  Did you live there in 2005?

11   "A  Yes.

12   "Q  When you applied for a job at Remi, did you speak with

13   anyone there?

14   "A  Yes.

15   "Q  Who did you speak with?

16   "A  The manager, his name is Luigi.

17   "Q  Where did you speak with Luigi?

18   "A  I only asked him for a job and he said yes.

19   "Q  Did your brother Sergio work there at the time that you

20   started working at Remi?

21   "A  Yes.

22   "Q  Now, when you applied for the job at Remi, was it in May of

23   2005?"

24            THE COURT:  Where are you reading from?

25            MS. KACANI:  Page 37, line 2, your Honor.

C3udcar1                          "M. Pastor

1              THE COURT:  You have to pick up.

2              MS. KACANI:  (Reading)

3     "A  I don't remember.

4     "Q  Did you tell anyone at Remi when you began working there

5     that your birthday was November 19, 1986?

6     "A  No.

7     "Q  Is your birth date November 19, 1986?

8     "A  No.

9     "Q  Have you ever informed anyone at Remi, either in writing or

10    orally, that your birth date is November 19, 1986?

11    "A  I don't remember.  I don't remember.  I only went there to

12    go to work.

13    "Q  When you started at Remi in the middle of 2005, you were

14    14-year old, correct?

15    "A  I don't know if I was 14 or 15.

16    "Q  Did you lie to Remi about your age in order to get the job?

17    "A  Yes.  I believe I might have needed to be a little bit

18    older in order to work there."

19             MS. KACANI:  Picking up on page 42, line 13:

20    "Q  What was your first job at Remi?

21    "A  On the first day that I went to work there it was as a

22    busboy, and then afterwards I worked as a white jacket.

23    "Q  Did you have any jobs before you worked at Remi?

24    "A  Worked at Milos restaurant.

25    "Q  How do you spell that?

C3udcar1                        "M. Pastor

1    "A   M-i-l-o-s.

2    "Q   Where is Milos?

3    "A   Between 7th and the Avenue of the Americas and 55th Street.

4    "Q   When did you work at Milos?

5    "A   I don't remember.  I believe it was before I worked at

6    Remi.

7    "Q   For how long did you work at Milos?

8    "A   It's been so long ago that I don't remember how much time I

9    worked there.

10   "Q   Was it less than a year?

11   "A   Yes.

12   "Q   What was your job there at Milos?

13   "A   To wash dishes.

14   "Q   Why did you stop working at Milos?

15   "A   I wanted to do something better than a dishwasher.

16   "Q   Did you quit your job at Milos?

17   A.   Yes.

18   "Q   When?

19   "A   I don't have an idea.  I don't remember.  What I do

20   remember is it was the same day that I began working at Remi.

21   "Q   So the same day you began working at Remi was the day that

22   you quit working at Milos?

23   "A   Yes.  What happened was that a better opportunity presented

24   itself, and I said that I was going to leave and go to the new

25   place."

C3udcar1                        "M. Pastor

1              Picking up on page 44, line 21:

2    "Q   What were your duties as a busboy at Remi?

3    "A   To help on the tables.  To help the waiters.  To serve

4    water, to clean the tables.  Reset the tables.  And then I

5    believe also that I was a helper of Mr. Pistorio.  I felt that

6    I was his helper also.

7    "Q   So were there any other jobs that the busboys had besides

8    serving water, cleaning tables and resetting tables?

9    "A   To do side work also.  To refill the vinegar, the olive oil

10   and vinegar.  And also to lay out the tablecloths, check that

11   the stations were filled.  Sometimes I worked, though, in the

12   Rialto Room and it wasn't the same system.

13   "Q   How was -- when you worked in the Rialto Room, how was that

14   different than working in the dining room?

15   "A   We would bring up the tables.  We would change the

16   dinnerware, the knives and the forks.  We would clean the

17   forkware.  To take down baskets with a lot of plates in them.

18   And also to work with the manager that worked there.  To obey

19   the manager.

20   "Q   When you say you felt that you were Mr. Pistorio's helper,

21   what did you do as Mr. Pistorio's helper?

22   "A   It was during the busy times, the times when he needed a

23   table and he would need them like that.  And he would make me

24   be attentive as to what the needs were of the tables.

25   "Q   You say that during the -- so the record reflects that the

C3udcar1                          "M. Pastor

witness snapped his fingers while describing his duties, right?

"You say that during the busy times he would --
Mr. Pistorio would make you do what?"

THE COURT:  When you have those interruptions, you
should put a question.
"A  As I would say, he would ask me to organize tables if there
were parties.  If there was a party of 15 people, he would tell
me to make a table for 15 people, but he would tell me to make
a nice table, a good table.  And that's the way I would like to
do the things.  I believe that that's the way the things should
have been done.  That's why when he had a large party he would
tell me to do this table, and then if there was another table
that he had another large party in it, to go and do that one
also.
"Q  When you were a busboy, were you assigned to stations when
working in the dining room?
"A  Yes.
"Q  And when Mr. Pistorio asked you to make up tables for
larger parties, did he ask you to do that in your own station
or in the other stations as well?
"A  Mr. Pistorio was the manager, and he would tell me to do
jobs all over the place.  Since he was the manager of the
place, if he would tell me and go -- tell me and go to do a job
one place, I would go there.  If he told me to do a job in
another place, I would go there, even if it was outside of my

C3udcar1                              "M. Pastor

1    station.

2    "Q  Do you know whether Mr. Pistorio asked other busboys to do

3    similar kinds of jobs outside of their stations?

4    "A  Yes.

5    "Q  When you say you felt that you were Mr. Pistorio's helper,

6    how was that different, if it was, than the jobs of any other

7    of the busboys at Remi?

8    "A  There was a young man called Javier Martinez, and myself

9    and Javier Martinez, we were -- we believed that we were the

10   two of his favorites and the one that he liked the best.  And I

11   felt that that was the difference.  That he would send us more

12   than the others.

13   "Q  Why do you think that you and Javier Martinez were two of

14   Mr. Pistorio's favorites?

15   "A  I believe that me -- and he told me one time, he would

16   always have us work with him.  And he would treat us well.  Not

17   very well, however.  We would always work with him and he

18   showed us how to work.  And I felt it in my heart.

19   "Q  For how long did you work as a busboy?

20   "A  I don't remember, sir.

21   "Q  You became a white jacket while working at Remi?

22   "A  I was a white jacket in the beginning when I worked at

23   Remi.  And then I went to busboy.  It was just the first day

24   that I was a busboy.

25   "Q  Let me try to understand.  The first day you worked at Remi

C3udcar1                         "M. Pastor

1    you were a busboy, right?  Is that right?

2    "A   Yes.

3    "Q   The second day you worked at Remi, was that as a busboy or

4    as a white jacket?

5    "A   It was a white jacket.

6    "Q   And did you continue then after the second day working as a

7    white jacket for some period of time?

8    "A   Yes.

9    "Q   And then at some point after that you became a busboy; is

10   that correct?

11   "A   Yes.

12   "Q   When did you become a busboy?

13   "A   Truthfully I don't remember.  It's been a long time.  It's

14   been five years or so.  I don't know.  Four years ago.  I don't

15   remember very well.  No.  I don't remember.

16   "Q   Did you earn more money working as a busboy than as a white

17   jacket?

18   "A   Definitely.  Everything is like everything, the money goes

19   up and goes down.  I don't know how to respond to you.

20   Sometimes I would earn 200, sometimes I would earn as much as

21   500.  And then that's also what I could make as a white jacket.

22   But busboy is a better position.

23   "Q   Was busboy a promotion from a white jacket?

24   "A   I believe they -- I think or I believe that they promoted

25   me."

C3udcar1                          "M. Pastor

1              MS. KACANI:  Picking up on page 51, line 3, your

2      Honor:

3      "Q  Did Mr. Pistorio promote you to busboy?

4      "A  Yes, Mr. Pistorio promoted me to busboy.

5      "Q  Do you remember what year you became a busboy?

6      "A  Maybe the same day.  In 2005.

7      "Q  The same day as what?

8      "A  The same year.

9      "Q  Oh, the same year.  OK.  What were your duties as a white

10     jacket?

11     "A  My duties as a white jacket at Remi's was to see that the

12     stations were filled with dinnerware, forks and knives.  We had

13     a certain system that we would place the baskets, we would put

14     the plates, cups, the dishes, the silverware.  We had to bring

15     them down.  We would fix them or arrange them in the place that

16     they go in and then bring them upstairs.

17     "Q  Did you ever have any other jobs at Remi besides white

18     jacket and busboy?

19     "A  No.

20     "Q  What were your days and work hours at Remi?

21     "A  It's very difficult to say what days I worked because it

22     was a long time ago.  I'm sure I worked during the hours of

23     dinner, dinner hours, from 4 to 11, but I don't remember what

24     days I worked.

25     "Q  Did the days change week to week?

C3udcar1                          "M. Pastor

1   "A  Sometimes yes because there were two people that worked at

2   that station, and we have to take turns working differently,

3   different shifts.

4   "Q  Did you work any lunch shifts or did you work only dinners?

5   "A  I couldn't work lunch.  So when I worked as a white jacket

6   I would work -- I could work there for some days.  I would work

7   lunch and dinners on the holidays.  And I worked -- also

8   worked.  I worked also the brunch shift, when Remi began to

9   work the brunch shift.

10  "Q  Was that on Sundays?

11  "A  And Saturdays.

12  "Q  You said in an earlier response there were two or more

13  people on a station and your nights changed.  What do you mean

14  by that?

15  "A  Osvaldo Sanchez was a man who worked there.

16          "He and I were the two white jackets.  It's the only

17  station that had two people.  And the coffee area.  But that's

18  very different from me.  I didn't get into there.

19          "Pardon me.  You can pardon me.  I did work as a

20  coffee boy sometimes because there were Saturdays and Sundays

21  they were very slow so I had to cover.

22  "Q  So you had to -- when you say you had to cover, you mean

23  your job was just to make coffee?

24  "A  I'm going to be sincere.  Sometimes they would make me just

25  make the coffee and sometimes they would put me outside and

C3udcar1                        "M. Pastor

1    everyone would make the coffee.  But I was the only one who

2    would make the most cappuccinos, however, because I knew how to

3    make -- work the machine.  But they also made the coffee.

4    Regular is just like so.

5    "Q  When you worked at Remi as a busboy for a dinner shift, how

6    many other busboys would be on duty at the same time?

7    "A  It's difficult to tell you.  There could be a time where

8    there was six busboys and there would be times it would be up

9    to 20.  Depending on the parties.  Remi's is a place where they

10   make parties.  So then I don't have the exact number of how

11   many busboys there were every day.

12   "Q  Was your job as a busboy to work sometimes in the dining

13   room and sometimes at parties?

14   "A  Truthfully when I had to work in the salon, I worked in a

15   salon.  When I had to work in the party, I was at the party.

16   We couldn't -- we couldn't mix because we were always separate

17   because they were under different systems.

18   "Q  But did you work more frequently in the dining room or in

19   the party room?

20   "A  I worked more frequently in the dinner room on the floor.

21   On the parties they were just a few times that I worked there.

22   "Q  How many days per week did you usually work?

23   "A  It's difficult to tell you and to give you a number.  There

24   were days that I worked four days, up to five days.  There was

25   some times that I worked only three days.  Yes.

C3udcar1                              "M. Pastor

1    "Q   Have you ever met or spoke with Roberto Delatona?

2    "A   To know him is that I knew him by sight, not in person.  He

3    is the boss of the Remi Restaurant.  There was some times that

4    he would pass by because he's the boss.  Everyone saw when he

5    passed by there.  And what was the complete question?

6    "Q   Have you ever spoken with him?

7    "A   No.

8    "Q   Ever said hello, or did he ever say hello to you?

9    "A   There was one time that I was his busboy and I believe

10   maybe it might have been one.

11   "Q   Do you know Stefano Fratella?

12   "A   No.

13   "Q   Never -- you've never spoken with him?

14   "A   I have never seen him.

15   "Q   Do you know Frank Tancredi?

16   "A   No.

17   "Q   Have you ever seen him?

18   "A   No."

19          MS. KACANI:  Picking up on page 57, line 3.

20          THE COURT:  Is that name Tancredi or Taneredi?

21          MS. KACANI:  Tancredi.

22          MR. PARKER:  It is spelled incorrectly in the

23   transcript, your Honor.  It's Tancredi.

24          THE COURT:  All right.

25          MS. KACANI:  Picking up on page 57, line 3:

C3udcar1                              "M. Pastor

"Q   On the days when you worked the dinner shift, what time
were you required to go to work at Remi?

"A   At 4 in the afternoon.

"Q   Did Mr. Pistorio conduct meetings of the employees at Remi
before dinner started?

"A   He would make some small reunions in order to -- for us to
be aware as to what was going on during the day, for example,
what were the 86 and in order to be clean, in order to have
black shoes on, to be on the time on the hour.  To correct us
to be sure that there were no mistake.  And there he would
explain some things, for example, what wines and in order for
us to behave ourselves, in order to treat the people well.

"Q   Was there anything else, any other subjects that you recall
being discussed at any of the meetings that Mr. Pistorio had
with the staff?

"A   Truthfully, it's been a long time and I don't know what
other subjects he spoke about.  I don't know if he spoke about
other topics.  Well, I think I remember he spoke about the food
one time and about the side work.  We had to do them well.

"Q   What is side work?

"A   Mr. Pistorio would explain that to us as the work that we
would have to do in order to prepare ourselves.  As I said
before, it was to refill the olive oil bottles, to bring up the
tablecloths, and to check all the stations -- to check all your
stations."

C3udcar1                         "M. Pastor

1              MS. KACANI:  Picking up on page 60, line 22:

2      "Q  When you worked as a busboy in the dining room at Remi at

3      dinners in the evening, what were your responsibilities at the

4      end of the night?

5      "A  My duties were to do the side work, close.  I work at the

6      restaurant.  There was different types of side work to closing.

7      If you were number one, you would have to take out the

8      baskets -- truthfully, I don't remember what these side works

9      were, these side jobs.  There were one and this one and this

10     one and this one, but, however, I remember we would take out

11     the garbage, the ice coolers, and to clean the stations and to

12     clean the stations in the back.  But there were times that --

13     and Pistorio when he would allow me to close, one of the things

14     that I would do is to put the plants in, to fix up the garden,

15     to arrange it and to check to see if all the doors were closed.

16     "Q  When you worked dinner shifts at -- in the dining room was

17     there -- was there one busboy who was required to stay longer

18     than the others to close or how did that work?

19     "A  Yes.  I would like to explain.

20     "Q  Sure.

21     "A  That was a process where we had No. 1, 2, 3, 4, 5, 6.  5

22     and 6, 5 would remain, he would remain until 11, 11:15.  I

23     don't know, maybe he would remain there more time to help out

24     with the closeouts.  And then two would remain and then 5 and 6

25     would remain to close.  There were exceptions.  For example,

C3udcar1                          "M. Pastor

1  sometimes I would stay 'til close if they would make me stay

2  and close.  Yes.

3  "Q  So I just wanted to get some clarification of what you just

4  said.  Are you saying that there were more than one busboy who

5  was on the schedule to stay to close or was it one?

6  "A  There were two.

7  "Q  And they would be whoever was assigned 5 and 6?

8  "A  Yes, sir.

9  "Q  So sometimes you would be 5 or 6 and sometimes not?

10  "A  Sometimes I was No. 2 and I would have to close.  Because

11  Pistorio would ask us to close.

12  "Q  So if you were No. 2 and Pistorio asked you to close, also

13  there would be Nos. 5 and 6?

14  "A  Sometimes.  Sometimes he would send us home.

15  "Q  So sometimes two busboys closed, sometimes more than two;

16  is that correct?

17  "A  Yes.

18  "Q  When you closed, whether you were No. 2 or 5 or 6, what

19  time did you leave the restaurant?

20  "A  Please tell him that that question I can't answer exactly.

21  Sometimes the patrons would say -- the clients would stay for

22  long periods of time, they would stay late and the restaurant

23  closed at 11:30.  Sometimes we would stay there until 1, 2,

24  2:30.  Then there were times where we would leave 12:30, and

25  sometimes would leave at 11:30.

C3udcar1                          "M. Pastor

1    "Q  Is it correct that if you were the closing busboy, you were

2    required to stay until the last dinner guest left the

3    restaurant?

4    "A  We would have to stay until we would leave the tables as we

5    found them and that there was no one in the restaurant.

6    "Q  In addition to the closing busboys, who would leave at the

7    end of the night?  What other people remained in the restaurant

8    until the restaurant was closed and locked for the night?

9    "A  Arturo Caravantes, Jose Ortiz, Marguerito Copas, he's the

10   porter who remained there.  Caravantes, he was the coffee man.

11   Joseph would stay until the end, like myself and Javier and

12   Pistorio.

13   "Q  And at the time of the closing of the restaurant, who

14   locked the restaurant doors?

15   "A  Mr. Pistorio, he was the general manager so he would do it.

16   But there were times that he would tell us to do it, to close

17   all the doors, to check and see if all the lights were turned

18   off.

19   "Q  Did you ever close the doors and lock them?

20   "A  Yes.

21   "Q  Did you use a key to lock the doors?

22   "A  Yes, we would use them to close.

23   "Q  What did you do with the key after you had locked the

24   doors?

25   "A  I would give them right there in his hand.

C3udcar1                              "M. Pastor

1    "Q   So when you did the locking of the doors, Pistorio was

2    there to take the key from you?

3    "A   Yes, sir.  I have an example.  It was the summer and we had

4    to bring the stuff from outside in; for example, the umbrellas,

5    the seats, the tables.  For Remi -- for -- those were for Remi

6    To Go, you have to close them and bring them inside.  We had to

7    take the chairs from Remi To Go.  We had to grab the seats, the

8    tables and the umbrellas -- oh, we would have to take the

9    seats, the tables and the umbrellas and we would bring them

10   inside Remi To Go.  And then we always had to use the keys.

11   "Q   Did you ever go home with the keys at night or did you

12   always give them to Mr. Pistorio?

13   "A   Always we would give them to him.  In another way how would

14   he open the restaurant?  Oh, then how would he close the

15   restaurant then if he didn't have the keys?

16   "Q   What clothing did you wear when you were working as a

17   busboy at Remi?

18   "A   We would use a T-shirt, a white shirt.  Like the one that I

19   have on now, and a black pair of pants, black socks and black

20   shoes and an apron.

21   "Q   Describe the apron.

22   "A   Here it has Remi Restaurant.

23   "Q   Here, pointing to your chest?

24   "A   Yes.  After that I only remember that and then it had two

25   pockets."

C3udcar1                              "M. Pastor

1            MS. KACANI:  Picking up on page 67, line 23:

2      "Q  So did you ever change clothing at Remi?

3      "A  I would change in Remi in the locker rooms."

4            MS. KACANI:  Picking up on page 68, line 14:

5      "Q  But my question is did you wear your work clothes from home

6      to go to Remi or did you change into your work clothes when you

7      got to the restaurant?

8      "A  When I would get to the restaurant, I would change from my

9      civil clothing into my uniform from the restaurant.

10     "Q  Where did you change?

11     "A  The locker rooms.

12     "Q  Did you have your own locker?

13     "A  Yes.

14     "Q  Did you ever change clothing anywhere else in the

15     restaurant other than the locker room?

16     "A  No.

17     "Q  Did your locker have a lock on it?

18     "A  Yes.

19     "Q  Is that where you stored any personal belongings while you

20     worked?

21     "A  It's my locker, yes.

22     "Q  Did you ever store any personal belongings anywhere else in

23     the restaurant while you were working other than in your

24     locker?

25     "A  No.  But please pardon me.  Let me tell you there was a

472

C3udcar1                          "M. Pastor

1   short period of time that I shared my locker with Ivan.  So

2   maybe one shirt or two shirts.

3              (Continued on next page)

C3uQcar2                          "M. Pastor

 1              MS. KACANI:  Picking up on page 72/line 19.

 2    "Q. Did you know Francisco Sotarriba?

 3    "A. He was a companion at work.

 4    "Q. And what was -- what was his job?

 5    "A. He was a food runner.

 6    "Q. Did you have any relationship with him outside of work?

 7    "A. No.

 8    "Q. Did you have any conversations with him about filing this

 9    lawsuit before it was filed?

10    "A. No, sir.

11    "Q. Do you know Arturo Caravantes?

12    "A. Yes.

13    "Q. How do you know him?

14    "A. He was also a companion at work.  He was a coffee man.

15    "Q. Have you ever spent any time with Caravantes outside of

16    work from Remi?

17    "A. No."

18              MS. KACANI:  Picking up on page 75/line 13.

19    "Q. Before this lawsuit was filed, did you have any

20    conversations with Caravantes where Caravantes was present

21    about filing the lawsuit, whether or not there was an attorney

22    doesn't matter.  Just yes or no.

23    "A. No.

24    "Q. Were you ever disciplined in any way at your job at Remi?

25    "A. Can you please explain the question to me.

C3uQcar2                         "M. Pastor

1   "Q. Were you ever reprimanded, warned or suspended in your job

2   at Remi?

3   "A. One time they suspend me.

4   "Q. Who suspended you?

5   "A. Francesco Pistorio.

6   "Q. Did he tell you why you were being suspended?

7   "A. Yes.

8   "Q. What did he say?

9   "A. For not arriving -- for not going to work and for arriving

10  to work late.

11  "Q. When was that?

12  "A. Truthfully, I don't remember the date.

13  "Q. Do you remember what year that was?

14  "A. No.

15  Q.  How long were you suspended for?

16  "A. For one week.

17  Q.  Did you return to work after that?

18  "A. Yes.

19  "Q. How long did you continue to work at Remi after your return

20  from the suspension?

21  "A. I said I don't remember when that was.

22  "Q. When did you stop working at Remi?

23  "A. 2007, in November."

24          MS. KACANI:  Picking up on page 81/line 2.

25  "Q. Did you ever hear other employees using the word "puta" or

C3uQcar2                          "M. Pastor

1   "bitch" to refer to -- to others while you were working at

2   Remi?

3   "A. I don't remember.  There are people who spoke incorrectly

4   or poorly.  And if those, they -- yes, I remember them who

5   spoke with bad words.

6   "Q. Who was that?

7   "A. Jose Figueroa, Luis Ramos and Julio Vega.  I feel they were

8   the people who maybe spoke, who had the poor language.  Oh, and

9   Corrie.  She was a young lady, and she would say -- sometimes

10  she would say yes, poppy you puta.  Truthfully, but there were

11  only a few occasions that I heard them say that.  And I didn't

12  know who would say that because I was working.

13  "Q. Why did you file this lawsuit?

14  "A. Because I want there to be justice.  Because I'm also very

15  upset.  Very angry.  Because at that time I was a young man and

16  Oscar abused me.  What hurts me the most in this world is that

17  Oscar, he violated me and also what gets me the most angry is

18  that he also abused -- he abused me, he also abused my brother

19  and that's what gets me the most upset.  And it also gets me

20  depressed and sad.  And my brother, he did it to my brother."

21          MR. PARKER:  Your Honor, the next portion from page 82

22  line 9, from the bottom of 82 picking up on 83 and 84, this

23  testimony is hearsay, and --

24          THE COURT:  I will have to read it.

25                          (Pause)

C3uQcar2                              "M. Pastor

1          THE COURT:  It's the red line, you want me to continue
2    reading on page 83?
3          MR. PARKER:  Yes.
4                          (Pause)
5          THE COURT:  The objection is sustained.
6          MR. SAXENA:  Your Honor, may we be heard?
7          THE COURT:  You can be heard, but it's clear it's
8    hearsay.  If you have other testimony that I should read, then
9    I'll read it.
10          MR. SAXENA:  The only thing I should point out is that
11    the witness does testify to his observations, meaning observing
12    his brother and the way he had reacted.
13          THE COURT:  Had what?
14          MR. SAXENA:  Moises Pastor testifies to observing his
15    brother, and, for example, on page 83, he doesn't -- nowhere in
16    this testimony does it actually refer to a statement that is
17    made out of --
18          THE COURT:  On May 3?
19          MR. SAXENA:  That is correct.  He says, "There is my
20    brother" -- I'm reading at 83/line 18.  He said, "There is my
21    brother" --
22          THE COURT:  I'm sustaining the objection to the
23    question and the answer on page 84.
24          MS. KACANI:  Picking up on 84/line 14.
25    "Q. When you were working at Remi, did you observe other

C3uQcar2                          "M. Pastor

1   employees touching one another with their hands?

2   "A. Many times.

3   "Q. What types of touching did you observe?

4   "A. There was other times in the locker rooms that they did

5   improper things.  I saw one time Oscar Velandia touch Francisco

6   Sotarriba in his private parts and there who was present was

7   Cinthia Peralta.

8   "Q. Where did that take place?

9   "A. On some steps.  On some stairs.

10   "Q. When?

11   "A. I don't remember the date.

12   "Q. Do you remember the year?

13   "A. What I believe it was in the afternoon.

14   "Q. What year?

15   "A. I don't remember.  He had recently returned back from his

16   operation.

17   "Q. Who?

18   "A. Francisco.  He didn't seem to be very happy.

19   "Q. Were there any other times where you saw one employee

20   touching another in their private parts?

21   "A. I don't remember, sir.  But what I do remember is that

22   Oscar touched me.  Very improperly, very inappropriately.

23   "Q. When did Oscar touch you very inappropriately?

24   "A. It was -- truthfully, I don't remember exactly when it was.

25   The first time was in the locker rooms.  One of the very first

C3uQcar2                          "M. Pastor

1  | times.

2  | "Q. What was the very first time that Oscar touched you

3  | improperly?

4  | "A. I don't remember, sir, but I'm sure it was in the locker

5  | room.  And he would make himself pass as the first lady.

6  | "Q. I want to know the first time.

7  | "A. I'm telling you it was in the locker room.  I'm saying that

8  | it was in the locker room.  That it was one of the first times

9  | that that happened.

10 | "Q. I want to know the first time.  First time.

11 | "A. Please tell him to not make this so difficult.  Because

12 | it's very difficult for me to remember when was the first time

13 | that that man he touched me inappropriately.

14 | "Q. I'll ask it again.  When and where were you the very first

15 | time that Oscar touched you inappropriately?

16 | "A. I don't remember, sir.

17 | "Q. Were you offended?

18 | "A. Very offended.  I feel dirty.

19 | "Q. Did you ever touch the butt of any other employee as a joke

20 | at work at Remi?

21 | "A. If I touched anyone in the butt?  No, I never joked around.

22 | "Q. Did you observe other employees joking around by touching

23 | one another?

24 | "A. Yes.

25 | "Q. What employees joked around by touching one another?

C3uQcar2                          "M. Pastor

1    "A. Luis Ramos.  Jose -- I forgot his last name.  Not Ortiz.

2    There was another Jose.  Jose Figueroa.  It was this guy Julio

3    Vegas and there was sometimes that he would touch Oscar.  And

4    to Hector.

5    "Q. When you say he would touch Oscar, who are you talking

6    about?

7    "A. I once caught Mr. Figueroa.  Once I caught Mr. Figueroa,

8    but they were playing around.  I didn't pay any attention to

9    them.

10   "Q. You testified earlier about one of the first times that you

11   say Oscar touched you in the locker room.  What did he do, what

12   did Oscar do?

13   "A. He would sit on my lap and then he would act like a -- like

14   a young woman and he would turn off the lights.  And then I

15   would feel very uncomfortable.  He would come and sit over

16   here.  I'm a man.  And then I was a young man.  I was a boy.

17   And he would come and he would sit higher (indicating).

18   "Q. And this occurred in the locker room?

19   "A. Yes, in the chair.

20   "Q. How many times did that take place where Oscar came into

21   the locker room and sat on your lap?

22   "A. There were many times.  There were many times.  And there

23   were many times that -- that he wouldn't leave me alone.  That

24   he wouldn't leave me.  Am I fine?  One second.  I would like

25   for you to repeat.  He would sit down in my legs.  He would sit

C3uQcar2                         "M. Pastor

1    down and touch me inappropriately.  And many times I didn't

2    allow myself to.

3    "Q. Allow yourself to what?

4    "A. For him to touch me.  No, no.  He would want to touch me

5    and then I would want to tell the others that I was too young

6    for this.

7    "Q. How many times did that happen in the locker room?

8    "A. Please tell him that I don't remember how many times.

9    However, please tell him that it was many times but there were

10   many times that the situation got very ugly in the locker room.

11   And I don't want to remember those things.

12   "Q. On any of those times when you claim that Oscar touched you

13   in the locker room, was anyone else present?

14   "A. Sometimes.

15   "Q. Who?

16   "A. To give names, they changed us so many times that for them

17   that was natural.  They would do it and they would play around

18   like that.  I don't know.  I wouldn't say that all of them

19   played around like that, but there were times that they would

20   do that and I don't know how many people were there.  I don't

21   remember.

22   "Q. Give me the names of anyone who ever saw Oscar touch you

23   improperly in the locker room.

24   "A. Ivan.  Many of the other people.  It's difficult for me to

25   remember because these people, they also did it -- they also

C3uQcar2                         "M. Pastor

1    did it like that.  I don't remember, Julio.

2    "Q. Julio?

3    "A. Julio Vegas.

4    "Q. That's two.  Ivan and Julio.  Are there any other names?

5    "A. There was this guy.  This Ecuadorian young man but I don't

6    remember his name.

7    "Q. Any others?

8    "A. Not that I remember, sir.

9    "Q. Did Oscar touch you improperly in any other location other

10   than in the locker room at Remi?

11   "A. Yes.

12   "Q. Where else?

13   "A. Yes, he did it.  Sometimes in the cafeteria.  One time he

14   followed me downstairs, he took me to the office.  One time it

15   was in the coat check.  There were various times.

16   "Q. Various times where?

17   "A. In the office.

18   "Q. So more than once in the office?

19   "A. Yes, sir.

20   "Q. What is the cafeteria?

21   "A. The cafeteria where they make the coffee.  The area of the

22   coffees.

23   "Q. There was one time there, in the cafeteria?

24   "A. I don't remember if it was.

25   "Q. Did anybody witness that time that you are talking about in

C3uQcar2                              "M. Pastor

1    the cafeteria?

2    "A. Truthfully, I don't know.

3    "Q. Did anybody witness any of the times that Oscar touched you

4    in the office?

5    "A. Pablo.

6    "Q. Pablo who?

7    "A. I don't recall his last name.

8    "Q. What was his job?

9    "A. He was a waiter and a dishwasher.

10   "Q. What do you think that Pablo saw Oscar doing to you?

11   "A. He went downstairs to the office one time and he touched --

12   he knocked on the door.  And that Oscar, I don't know what

13   happened, one time I told him to help me with something and he

14   closed the door.  And Pablo asked what were we doing and he

15   said -- and he told me, oh, you guys were doing something bad,

16   right?  And then I couldn't respond anything to him.  I

17   couldn't say anything back.

18   "Q. What is it that you believe Pablo saw?

19   "A. That I was with Oscar in the office and he closed the door

20   for no reason, for no important reason.

21   "Q. So what did Pablo say?

22   "A. He was laughing.

23   "Q. What did Pablo see?

24   "A. I don't know, sir.

25   "Q. What were you doing in the office at that time with Oscar

C3uQcar2                          "M. Pastor

1   that you say Pablo came and knocked on the door?

2   "A. Me in reality I didn't want to do anything.  I only asked

3   Oscar to give me an advance of my tips.  And I don't know what

4   happened.  He controlled me.  He didn't allow me to leave the

5   office.

6   "Q. Where is his office?

7   "A. That he did oral sex.

8   "Q. In the office?

9   "A. Yes.

10  "Q. Where is the office?

11  "A. It's in the back of the, by the chef table but downstairs.

12  "Q. What was in the office, what furniture?

13  "A. On this side there was furniture with some glasses on it.

14  On this side here was the calendar.  Here is the small table,

15  the desk.  Here's the door.  Here's the desk.  And right there

16  there's the computer.  In the back there is, there's like a

17  small room in the back.  There's a lot of wines there.  And

18  there's a camera upstairs.  That's all I remember.  It's a long

19  time ago.  I don't remember then.  But in that office there

20  were many bad experiences there.

21  "Q. So the occasion that we have been discussing where you say

22  Pablo knocked on the door, was that the first time that you had

23  oral sex with Oscar?

24  "A. Please tell him that I don't understand that question

25  because Oscar did it to me and it wasn't one of the very first

C3uQcar2                              "M. Pastor

1    times.

2              MR. PARKER:  Your Honor, the next portion is objected

3    to on page 95 beginning at line 17, two reasons, one --

4              THE COURT:  I'll read it.  What's the objection?

5              MR. PARKER:  It's unresponsive to the question and

6    it's no longer relevant to the case.

7              MR. SAXENA:  Your Honor, the fact that it -- whether

8    or not it's responsive to the question is not pertinent for our

9    purposes here, and it is relevant to the case because as was

10   subject of the motion in limine that you heard --

11             THE COURT:  Just a second.  Let me see what you said.

12                            (Pause)

13             THE COURT:  You say the question is not pertinent for

14   our purposes here.  What do you mean by that?

15             MR. SAXENA:  I said.

16             THE COURT:  Apparently --

17             MR. SAXENA:  No, I believe that the question is

18   pertinent here and so is the response.  I may have misspoke.

19             THE COURT:  Let me read it.

20             (Pause)

21             THE COURT:  The question that starts on page 95, is

22   that what the objection is to that.

23             MR. PARKER:  Yes, your Honor, 95/line 17 to the end of

24   page 95.

25             THE COURT:  What's the grounds?

485

C3uQcar2                          "M. Pastor

1          MR. PARKER:  It's irrelevant to the case.  Pastor is

2   not a party, and, in any event, it's not responsive.

3          THE COURT:  It's your question?

4          MR. PARKER:  Pardon?

5          THE COURT:  It's your question?  Whose question is it?

6          MR. PARKER:  I was taking the deposition.  At the time

7   he was a plaintiff.  He is no longer a plaintiff.  His feelings

8   are not relevant to the case, and in any event, the answer is

9   not responsive.

10         MR. SAXENA:  Your Honor, you have heard a motion in

11  limine on this and you have decided it.  The conduct that

12  happened with persons who worked at Remi Restaurant, even if

13  they were not parties, is relevant to the hostility of the

14  environment there, and whether Mr. Pastor found the conduct --

15  he's describing his reaction to the conduct here, if he reacted

16  unfavorably to the conduct he says was so terrible, that is

17  relevant.

18         THE COURT:  I have been thinking of it as a sex

19  harassment situation.  You're not offering it on the sex

20  harassment, is that what you're telling me?  You're offering it

21  on a hostile environment claim?

22         MR. SAXENA:  We are, your Honor, yes.  Mr. Pastor

23  himself is not a plaintiff, but the fact that he was subject to

24  conduct that he found unwelcome is nonetheless relevant to the

25  hostility of the environment there, especially since the

C3uQcar2                              "M. Pastor

1    conduct is coming from the same defendant.

2              THE COURT:  Let me look at it.

3                        (Pause)

4              THE COURT:  I'll allow the question.

5              MS. KACANI:  Picking up on page 95 line 17.

6    "Q. I'd like you to tell me about the very first time that

7    Oscar performed oral sex on you.

8    "A. Please tell him it's very difficult for me to remember that

9    time because I was a very young man and I don't remember.  I

10   was a boy.  It was a long time ago.  And please tell him that

11   it was something that was so terrible.

12   "Q. Can you tell me or not?

13   "A. No.

14   "Q. Where were you at that time?

15   "A. How so where was I?

16   "Q. Where were you when Oscar first performed oral sex on you?

17   "A. I'm trying to tell you that I don't remember.

18   "Q. When was the first time you remember Oscar performed oral

19   sex on you?

20   "A. Please tell Mr. that I don't remember."

21             MR. PARKER:  Your Honor, I believe we have an

22   agreement between counsel that the testimony from page 96/line

23   21 to page 97/line 14 should be stricken.

24             MR. SAXENA:  Plaintiffs agree.

25             THE COURT:  All right, if you stipulate to that.

1           MS. KACANI:  Picking up on page 97/line 15.

2      "Q. How many times in total did Oscar perform oral sex on you?

3      "A. Please tell the gentleman that it's very difficult for me

4      to respond to that question because truthfully I don't remember

5      how many times, I just know it was various times.  20, 25, 30.

6      I don't know.  Tell him it's very difficult for me to remember

7      every moment that I did that.  That he did that.

8      "Q. And on any of those times when Oscar performed oral sex on

9      you was anyone else present or a witness to that?

10     "A. One time in the coat check room I asked Oscar for an

11     advance.  Oscar made me wait in the coat check.  I was waiting

12     like a mad man because I needed to go.  And he entered the coat

13     check room in order to try to perform oral sex on me.  And he

14     did it.  But truthfully, I don't know how it was that it

15     happened.  At that time there was Enriquetta Pastor and CK

16     Yvonne Reyes.

17     "Q. Where is the coat check room?

18     "A. It's in the sanitary bathrooms next to -- for the clients.

19     It's at the entrance of the restaurant.  There is the desk and

20     then to the left of the desk.

21     "Q. And on this one time where you say that Enriquetta and Ivan

22     were there what time of the day was that?

23     "A. It was in the late night, early evening.

24     "Q. Early evening, did you say early evening?

25     "A. It was at night time.  It was in the late evening around

C3uQcar2                              "M. Pastor

1    11:00.  I don't remember.  11, 11:30 or so.  It was late.

2    "Q. And what do you believe Enriquetta and Ivan saw at that

3    time?

4    "A. That Oscar abused me.

5    "Q. Were they -- did you see them?

6    "A. Ivan Reyes, yes.  And Enriquetta heard a conversation.

7    "Q. Heard what conversation?"

8              MR. PARKER:  Your Honor, if I may, I overlooked this

9    testimony.  I had intended to object to it.  It is hearsay.  I

10   would like to interpose that objection at this point to the

11   testimony at page 99/line 20 to line 24 as hearsay.

12             MR. SAXENA:  I'm sorry, you said page 99/line 20 to

13   where?

14             THE COURT:  I'll have to read the whole testimony

15   because it seems a little unclear whether he's misspeaking or

16   not.

17             MR. SAXENA:  Just before you do, your Honor, it's

18   plaintiff's position that this is a party admission because

19   these are Remi's employees acting in their capacity as agents

20   of Remi.

21             THE COURT:  They're not Remi, are they?  Enriquetta.

22   By the way, is Enriquetta Pastor a relative of the witness?

23             MR. SAXENA:  Is Enriquetta a relative, is that your

24   question, Judge?

25             THE COURT:  Yes.

C3uQcar2                          "M. Pastor

1            MR. SAXENA:  I believe she is.  I don't know the exact

2     relation right now, but she is a direct familial relative.

3            (Pause)

4            THE COURT:  I have to go back to where the page was

5     because I want to read the context of this.  So the object is

6     to the testimony where?  On page 96, 97.

7            MR. PARKER:  On page 99, your Honor, line 20.

8            MR. SAXENA:  You also had a question, your Honor,

9     that.  I didn't want to leave unanswered.  Ms. Pastor is not a

10    manager of the restaurant.  However, as an employee of the

11    restaurant --

12           THE COURT:  I'm sorry.

13           MR. SAXENA:  Ms. Pastor, Enriquetta Pastor is not a

14    manager at the restaurant.  However, as an employee acting

15    within scope of her duty, the testimony is still subject to

16    Federal Rule of Evidence 801(d)(2)(D).

17           THE COURT:  Did you take her deposition?

18           MR. SAXENA:  We did.

19           THE COURT:  No?

20           MR. SAXENA:  We did.

21           THE COURT:  Oh, you did.

22           MR. SAXENA:  But any admission that is "made by the

23    party's agent or employee on a matter within the scope of that

24    relationship and while it existed is admissible as a party

25    admission."

C3uQcar2                              "M. Pastor

1          THE COURT:  I'm not sure that's always true.  What's

2      your basis?

3          MR. SAXENA:  I'm just actually reading from Federal

4      Rules of Evidence 801(d)(2)(D).

5          An analogous example, your Honor, might be two

6      employees of a trucking company are sitting in a truck driving

7      down the read.  The truck gets into an accident and they make

8      statements at the scene of the accident.  Those statements

9      would be admissible against the trucking company.

10         THE COURT:  Yes, but that's not what's happening here.

11     I can't tell where it comes from.  801(d)(2)(D).

12         MR. SAXENA:  801(d)(2)(D).

13         THE COURT:  I don't see why 14, line 14 to 16 is

14     admissible.  And I don't see why 17 and 18 are admissible.

15         MR. PARKER:  Really, it's that whole topic, your

16     Honor, 14 to 24, it actually goes over to the following page

17     because the last question on page 99 also refers over to page

18     100/line 4.

19         THE COURT:  I would strike to 100/line 4.

20         MR. SAXENA:  Did you say 100 through line 4?

21         THE COURT:  Yes, I would agree with the defendant.

22     Any other portions you are objecting to, Mr. Parker?

23         MR. PARKER:  That is all for now, Judge.

24         THE COURT:  Well, it's now or never.

25         MR. PARKER:  That's all as to this testimony.

C3uQcar2                              "M. Pastor

1            THE COURT:  All right.

2            MS. KACANI:  Picking up on page 100/line 5.

3    "Q. You said that Ivan Reyes came to the door of the coat check

4    room?

5    "A. Yes, sir.

6    "Q. And he said what are you doing?

7    "A. Yes.

8    "Q. Did you answer?

9    "A. I remained in shock.

10   "Q. Did you say anything?

11   "A. And Oscar took -- and then Oscar left all at once.

12   "Q. Did you say --

13   "A. He grabbed him all at once.  And he grabbed him and h said

14   let's -- come with me little boy.  And he didn't say anything.

15   He didn't give me a chance to.  I was in shock.  And he walked

16   away with him.

17   "Q. You are saying Oscar got up and walked away with Ivan, is

18   that what you are saying?

19   "A. And then he said, oh, pepito, let's go.  And then they

20   walked away.  I don't know if he was going to say anything.  I

21   didn't hear anything.  I felt very bad.  My friend saw him do

22   inappropriate things.

23   "Q. When Ivan came to the door of the coat check room where

24   were you and where was Oscar?

25   "A. They were behind the door.

C3uQcar2                           "M. Pastor

1    "Q. Who is they?

2    "A. I was behind the door and Oscar was to the side -- Oscar

3    was off to the side.  On the side with the door opened up.

4    "Q. Were you standing?

5    "A. Yes.

6    "Q. And what position Oscar in?

7    "A. He was there.  He was doing that.  I don't know what

8    position.

9    "Q. Were your pants undone?

10   "A. They were on.  He would only bring down the zipper and then

11   he would do the oral sex.  Please pardon me.  It's just that.

12   "Q. Now you told me that Oscar performed oral sex on you in the

13   coat check room.  Was that more than once or was that just

14   once?

15   "A. I remember it was one time.

16   "Q. And there were -- there was more than one time in the

17   office?

18   "A. Yes.

19   "Q. In same office or in the back office?

20   "A. In the same office.

21   "Q. And the times that Oscar performed oral sex on you in the

22   office, were you standing or seated or what position were you

23   in?

24   "A. I would like to explain this to you in detail.  Oscar would

25   be seated in the position that she is sitting in and the

1   computer would be right there.  Truthfully, I wouldn't walk any

2   more than being over here and he would make me walk over there.

3   It's close by.  Here's the table.  And then he would make me

4   stand here in order to cover the camera and then I don't know

5   what happened -- and he would control me because Oscar is a

6   very controlling person.  And he controlled me and he did oral

7   sex to me in the office.

8   "Q. So when he performed oral sex to you, he would be seated

9   and you would be standing?

10  "A. Yes, sir.

11  "Q. And did he take your pants down or just unzip the zipper?

12  "A. He intended to take off the pants but various times he

13  would only undo the zipper and then oral sex.

14  "Q. Were there times when your pants were taken down, your

15  pants were removed?

16  "A. One time in the Rialto Room, near the bathroom.  He wanted

17  me to penetrate him.

18  "Q. What did he say or do to lead you to believe that?

19  "A. He did something very inappropriate.  He made me believe

20  that that's what he wanted me to do.  He took his pants down.

21  And he wanted me to penetrate him.  And then he wanted me to

22  penetrate him and then I told him how so.  I don't want to do

23  that.  I didn't know anything about sex.  That's all I can say.

24  The man, he opened his pants.  He wanted me to penetrate him.

25  "Q. Did he say something to you about wanting to penetrate him?

C3uQcar2                              "M. Pastor

1    "A. He took down his pants.

2    "Q. Did he say anything?

3    "A. I don't remember, sir.

4    "Q. And you told him that you didn't want to do that?

5    "A. I told him.  I told him and we didn't do it.

6    "Q. So you refused?

7    "A. Yes.  How am I going to do that?  I was very tired of that.

8    He was always trying to control me.

9    "Q. Did you ever refuse to allow him to perform oral sex on

10   you?

11   "A. Yes.

12   "Q. When?

13   "A. I don't know the date.

14   "Q. How many times did you refuse?

15   "A. Many times.  And inclusively, he threatened me one time in

16   the area of the coffees, the coffee area.  He was telling me --

17   he would tell me that he was the boss.  He was the owner.

18   Inclusively there was one time where he followed me" --

19            THE COURT:  There was -- I think you put in the word

20   *one.*

21            MR. DONOVAN:  OK.

22   "A. Inclusively there was the time where he followed me from

23   the Rialto Room downstairs.  And I told him something.  And you

24   know what he told me?  You think they are going to believe you?

25   "Q. You say when Oscar threatened you, what did he say that you

C3uQcar2                          "M. Pastor

1    considered to be a threat?

2    "A. A big threat.  He was the assistant to the manager, the

3    right-hand man of the manager and he had the power to fire me

4    and he told me that one time.  He told me I'm the boss here

5    right now.  And he wanted me to do oral sex on me near where

6    the ice machine was and many times by God someone was coming

7    by, walking by.

8    "Q. In the times that Oscar performed oral sex on you did you

9    ejaculate in his mouth?

10   "A. I don't know.

11   "Q. When you say you don't know, what do you mean by that?

12   "A. I was a young man and I couldn't tell you if I knew how to

13   ejaculate or not.  I only felt pressure and emotion."

14          MS. KACANI:  Picking up on page 108/line 8.

15   "Q. You say that on one occasion you had asked Oscar for a cash

16   advance, correct?

17   "A. Yes, of my money.

18   "Q. Why were you looking for a cash advance?

19   "A. It was during a period.  One of the things was that I

20   wasn't earning well.  And another thing, me, a young man, a

21   boy, I paid rent.  I would go out with my companions from

22   school and I would spend money.  I would be without money.  I

23   would go out and have drinks.  I would remain without money.

24   "Q. The time that you asked for -- the time that you asked

25   Oscar for a cash advance and you say he performed oral sex on

C3uQcar2                          "M. Pastor

1   you, is that the first time that you asked him for a cash

2   advance?

3   "A. No.

4   "Q. So you had asked Oscar for cash advances prior to that

5   time?

6   "A. I would say that the first time he didn't ask me for

7   anything.  He loaned me.  He called me pepito and he touched me

8   over here.  And he would caress my cheeks.  And then he told

9   me, OK, let's go downstairs.

10  "Q. Before that time, did you ever ask Oscar for any cash

11  advances?

12  "A. I don't remember, sir.

13  "Q. To your knowledge, did other employees ask for cash

14  advances?

15  "A. Not that I know of, sir.

16  "Q. And then after the first time -- after the time when you

17  asked him for a cash advance and he said let's go downstairs,

18  you went to the office and that's when he performed oral sex,

19  correct?

20  "A. Yes, he gave it to me.  I signed.  But that day -- but I

21  don't know if that day there was any oral sex.

22  "Q. What did you sign?

23  "A. The negative that in order to prove that I had asked for

24  money.

25  "Q. Did you ask anyone else at Remi for cash advances other

C3uQcar2                          "M. Pastor

1    than Oscar?

2    "A. No.  Only my brother.

3    "Q. Why did you ask Oscar for cash advances?

4    "A. It was very difficult to tell my brother I didn't have any

5    money.  And Oscar was the one who controlled the money for the

6    tips.

7    "Q. Who else controlled the money for the tips?"

8              MS. KACANI:  Your Honor, if I may, can we have a five

9    minute break?

10             THE COURT:  Finish what you were going to read for

11   now.

12             MS. KACANI:  Picking up on page 110 line 17.

13   "Q. Who else controlled the money for the tips?

14   "A. I remember the -- I now remember the name, the last name of

15   the person that you asked me for before.  It was Pablo so lease

16   and Jose Ortiz.  But Jose Ortiz it didn't interest him very

17   much.

18   "Q. What didn't interest him very much?

19   "A. The money when they were paying.  He was from the group of

20   Oscar, Pablo and Joseph.  But I never saw him there paying us.

21   "Q. Pablo and Oscar paid you, right?

22   "A. Yes, sir.  Pablo was one of the people who was more in the

23   system because Oscar was one of the managers."

24             THE COURT:  I see it's going to go on for quite

25   awhile.  You can have your break now.

498

C3uQcar2                          "M. Pastor

1           MS. KACANI:  Thank you, Judge.

2           THE COURT:  Five minute break.

3           (Recess)

4           MR. SAXENA:  Your Honor, I believe we left off --

5           THE COURT:  Yes.

6           MR. SAXENA:  -- at page 111/line 12.  Plaintiff's

7    withdraw the objection to this testimony from lines 12 through

8    14.

9           MS. KACANI:  Picking up on page 111/line 12.

10   "Q. And did you ever ask Pablo for a cash advance?

11   "A. No.

12   "Q. Did you ever tell Mr. Pistorio about any of the things that

13   you say Oscar was doing to you?

14   "A. Let me tell you.  One time I told Mr. Pistorio about what

15   happened with one person and he didn't do anything.  And how

16   was I going to tell him this time.  Maybe he was going to fire

17   me.  I was a boy.  And he wasn't going to believe.  And yes, I

18   told him.

19   "Q. Told him what?

20   "A. That there was somebody who was touching me.

21   "Q. When did you tell him that?

22   "A. I don't have any idea.  It's been a long time that has

23   passed.

24   "Q. Was anyone else present when you told him that?

25   "A. No.

C3uQcar2                              "M. Pastor

1    "Q. What else did you tell him besides that there was someone

2    who was touching you?

3    "A. I told him that I didn't feel comfortable working with

4    somebody who was doing those things.  And I also told him that

5    I didn't want to work with the man any more.  I said that I was

6    afraid to tell him about Oscar.  Oscar was his right hand man.

7    If you would know, one time Oscar fired me and Pistorio became

8    very crazy.

9    "Q. What else did you tell Pistorio besides telling him that

10   someone was touching you and you didn't want to work with them

11   any more?

12   "A. I don't remember, sir.

13   "Q. And when you told him that, you didn't mention Oscar's

14   name, correct?

15   "A. No.

16   "Q. It's not correct, you did mention Oscar's name?

17   "A. I did not mention his name.

18   "Q. And what did Mr. Pistorio say in response?

19   "A. Yes, young man, I'm going to try to do the best.  And he

20   spoke with the chef and they spoke with the man who was doing

21   those terrible things.

22   "Q. You say that Pistorio spoke with the chef.  Who is the

23   chef?

24   "A. Giovanni.

25   "Q. Were you there when he spoke with Giovanni?

C3uQcar2                          "M. Pastor

1    "A. No."

2             MR. PARKER:  Your Honor, the next portion, page

3    113/line 20 all the way over to page 117/line 19.

4             (Continued on next page)

5

6             THE COURT:  117, line 18, I will have to read it.

7             The grounds for your objection?

8             MR. PARKER:  There is hearsay in there.

9             THE COURT:  OK.

10            MR. PARKER:  And, as well, this goes to, Judge, one of

11    the aspects of our in limine motion having to do with the case

12    becoming far affair.

13            THE COURT:  I'm sorry?

14            MR. PARKER:  Having to do with our in limine motion

15    that we brought to exclude this entire testimony, but one of

16    the aspects of that motion was with respect to the case

17    becoming far afield from what the claims are in the case and

18    trying a case within a case with respect to this witness.

19            MR. SAXENA:  Judge, briefly, I know you have to read

20    the testimony, but our position on that is that this testimony

21    pertains to a relevant time period when Moises Pastor was

22    working at the same time as Mr. Caravantes and Mr. Sotarriba.

23            This testimony also pertains -- as you'll read it,

24    you'll seem to notice because the general manager was directly

25    involved in this particular incident.  And it also pertains to

C3udcar3                              "M. Pastor

1    the hostility of the environment at the time.

2            THE COURT:  I started reading, so I've got to begin

3    now where?  Line 20, page 113?

4            MR. PARKER:  Yes.

5            (Pause)

6            THE COURT:  I'm going to allow page 113, line 20,

7    through 117, line 19, and I think in view of the testimony that

8    Cajita apologized to the witness after speaking with

9    Mr. Giovanni, it constitutes an admission of the conduct

10   happening.

11           MS. KACANI:  Picking up on page 113, line 20:

12   "Q  How do you know that he spoke with Giovanni about what you

13   told him?

14   "A  Giovanni called him downstairs.  He singled him out and

15   said, Come here, I want to speak with you and in private.  And

16   I'm sure it was about that.  And he came over and he told me to

17   to forgive him.

18   "Q  Who came over and told you to forgive him?

19   "A  That man who was touching me.

20   "Q  Who was that?

21   "A  One name Cajita.

22   "Q  So there was a man by the name of Cajita?

23   "A  That's what they called him.  I didn't have a lot of

24   friendships there so I didn't ask them.

25   "Q  And you say that this Cajita improperly touched you too?

C3udcar3                                "M. Pastor

1   "A   Yes.

2   "Q   When was that?

3   "A   When I was a white jacket.

4   "Q   And how did he touch you, where?

5   "A   In my buttocks.  The man, he didn't have -- he didn't wear

6   any undergarments.  He would change in front of us and he

7   didn't have any underclothes on.  And you could see everything.

8   You could see his penis.

9   "Q   He would change where?

10  "A   With us in the locker room.

11  "Q   And how many times did Cajita touch you on the butt?

12  "A   It was a few times.  And he did it after that they had

13  spoken to him.  But he calmed down because my brother told him

14  to stop or there was going to be problems.

15  "Q   Did you identify Cajita to Giovanni?

16  "A   Yes.

17  "Q   Before the break we were discussing this occasion where you

18  spoke with Pistorio about someone touching you, then you spoke

19  with Giovanni, the chef, and identified Cajita as a person who

20  was touching you, right?

21  "A   I said that I spoke to Mr. Pistorio.  Pistorio spoke to the

22  chef Giovanni and then he said it's him, it's him.  Why don't

23  you come over here.  This is the staircase.  Here is the

24  kitchen.  Here is where he works at.

25          "Giovanni came down and I was in the area over here,

C3udcar3                          "M. Pastor

1    and that's the area for the white jackets.  And he asked me who

2    was the one who was touching you.  And then I said, It's him,

3    Cajita.  And then he said, Hey, you, I need to talk to you in

4    private.  And then he took him over to the area that's called

5    the chef's table.

6    "Q  And and after that took place, after Giovanni spoke with

7    Cajita, did you have any further problems with Cajita?

8    "A  He touched me again.  But what was I going to do if they

9    never did anything?  I felt bad.  I began to cry and my brother

10   saw me.  He asked me what had happened.  And I told him that

11   the man, he touched me.

12            "And then he went over and he talked to the man.  He

13   said to stop because if he didn't, that they were going to be

14   serious problems.  And from there I never spoke to him anymore.

15   I never spoke with him anymore.

16   "Q  Now, after you complained about Cajita the first time to

17   Pistorio, did you go back to Pistorio after Cajita had touched

18   you again and tell him?

19   "A  No.

20   "Q  Did you go back to Giovanni and tell Giovanni that Cajita

21   had touched you again after Giovanni had spoken with him?

22   "A  Let me tell you that Giovanni, he didn't like me.

23   "Q  Just answer my question, please.

24   "A  I couldn't tell him.

25   "Q  Did you or did you not?

C3udcar3                          "M. Pastor

1    "A  I couldn't tell him.

2    "Q  Did you or did you not?

3    "A  I did not.

4    "Q  Did you tell your brother that Oscar was performing oral

5    sex on you while you worked at Remi?

6    "A  No."

7             (Pause)

8             MR. PARKER:  Your Honor, the next portion, beginning

9    at page 118, line 14, carrying over to 120, line 9, objection

10   on hearsay grounds.

11            MR. SAXENA:  Your Honor, plaintiffs' position is that

12   this is, as well, a party admission.  These are all Remi

13   employees speaking while employed at Remi in the course of

14   their duties concerning one of their busboys.

15            (Pause)

16            THE COURT:  I have to read it.

17            (Pause)

18            What are the grounds for the plaintiff seeking this

19   admission?

20            MR. SAXENA:  On hearsay grounds, Judge, or relevance?

21            THE COURT:  Either one.

22            MR. SAXENA:  Well, it is relevant, one, because it

23   shows the waiters' knowledge concerning the conduct and the

24   pervasiveness of the conduct and the fact that they felt they

25   need to protect Mr. Pastor.

C3udcar3                              "M. Pastor

1              And on hearsay grounds, again, they are Remi

2       employees.  This is again 801(d)(2)(D).  This testimony is

3       being offered against Remi.  It is testimony by Remi employees

4       during the scope of -- during the time that they were employed

5       and within the scope of their employment.

6              (Pause)

7              THE COURT:  You've got another point to make?

8              MR. SAXENA:  Just one more point -- two more points.

9              One, the testimony concerns the fact that Mr. Velandia

10      is gay, which is relevant for the discrimination on the basis

11      of sex point.

12             And, number two, it's relevant -- just like the

13      previous --

14             THE COURT:  It is not disputed, is it?  It is not

15      disputed that he's gay?

16             MR. SAXENA:  That is correct, your Honor.  But it's

17      also relevant for the point that -- it goes to the lack of a

18      reasonable complaint mechanism.

19             THE COURT:  What?

20             MR. SAXENA:  It goes to the lack of a reasonable

21      complaint mechanism, because Moises Pastor is going to the

22      waiters here and asking for their protection.  He can't go to

23      management because management has already ignored his

24      complaints.

25             THE COURT:  He can't go to management why?

C3udcar3                          "M. Pastor

1            MR. SAXENA:  Because management has already ignored

2       his complaints, as we just heard with regard to the Cajita

3       complaints.

4            (Pause)

5            THE COURT:  I am going to strike the testimony.  I

6       don't think it is -- he acknowledged that he was gay, and it

7       appears to be hearsay, conclusory testimony, as opposed to

8       anything that directly involved the parties or the conduct.

9            Let's go on.

10           MS. KACANI:  Starting off on page 120, line 10.

11      "Q  While you worked at Remi, did you tell anybody who worked

12      at Remi about any of the things that you are accusing Oscar of

13      doing to you?

14           MR. PARKER:  Your Honor, there an objection box there,

15      line 14 and 15.  That is our objection.  We withdraw it.

16           THE COURT:  Your objection is withdrawn?

17           MR. PARKER:  Yes.

18           THE COURT:  All right.

19           (Reading)

20      "A  No.  Let me tell you that he's the manager."

21           MR. PARKER:  Your Honor, beginning the next section,

22      page 120, line 16, through 128, line 18, we have an agreement

23      with counsel that that will be stricken.

24           MR. SAXENA:  The plaintiffs agree.

25           THE COURT:  16 through?

C3udcar3                                "M. Pastor

1              MR. PARKER:  120, line 16, through 128, line 18.

2              THE COURT:  All right.  That is stipulated.

3              MS. KACANI:  Beginning with page 128, line 19:

4      "Q  How many times did you ask Oscar for a cash advance while

5      you worked at Remi?

6      "A  I don't remember.  18 or 20 times.

7      "Q  And each time you asked did you receive a cash advance?

8      "A  Oscar, yes.  One time, no.  Well, he told me a few times,

9      once or twice he told me, oh, Pepito, I can't do this right

10     now.  How am I going to go down to the office to give you

11     money?  The people are going to see.  The people are going to

12     see that I'm doing this and that I'm giving you advances.  Oh,

13     and they were also going to start asking for advances.

14     "Q  Was there -- was there a policy against giving cash

15     advances at Remi?

16     "A  I don't know.

17     "Q  What amounts of money did you ask for when you asked for

18     cash advances from Oscar?

19     "A  100, 150, 180, 80.  I don't know, I don't remember.  It was

20     money.

21     "Q  Each time you asked for -- Oscar for an advance and

22     received it, did you sign a document?

23     "A  He would write on the envelope on a small card, and then he

24     would write down how much I would earn in a week minus this and

25     then he would sign it.

C3udcar3                              "M. Pastor

1    "Q   On what envelope did he write this?

2    "A   The ones that they would pay us from.  Regular envelopes.

3    "Q   What color were the envelopes?

4    "A   White.

5    "Q   And where did Oscar gets the envelope from?

6    "A   From the top.

7    "Q   Top of what?

8    "A   It was a small piece of wood.  A small -- yes, a small

9    piece of wood.  I would see that he would stick his hand up

10   there and he would pull it out.

11   "Q   In what room in the restaurant?

12   "A   In the office.

13   "Q   In the same office where he performed oral sex on you or in

14   the other office?

15   "A   In the same office.

16   "Q   Other than the time that Oscar came into the locker room

17   and sat on your lap or on your legs and the times when Oscar

18   performed oral sex on you, were there any other times when

19   Oscar improperly touched you?

20   "A   Not that I remember right now.  I don't know.  It's very

21   difficult for me to remember this.

22   "Q   Were there any things or comments that Oscar said to you at

23   any time which you claim were improper?

24   "A   May you repeat it for me, please?

25            "Well, Oscar has made some commentaries and they were

C3udcar3                                "M. Pastor

1    very inappropriate.

2    "Q   That's what I'm asking about.

3    "A   Yes, he did say that.

4    "Q   What did he say?

5    "A   Well, let me begin by telling you that in the third station

6    there was a party, and Oscar opened the wine and there was a

7    napkin and he cleaned the wine.  And it got a little bit red.

8    And then he's saying, oh, poppy, look, my period.  And then he

9    went, look, oh, poppy, my period.  He said, look, my period,

10   and I've ejaculated.

11           "And then I stood there" --

12           MR. PARKER:  Hold on.

13           THE COURT:  Objection to this part?

14           MR. PARKER:  Yes, your Honor.

15           The objection is -- the question was what did he say,

16   and after Mr. Pastor completed --

17           THE COURT:  There is no objection in the record.  Let

18   me just read it.

19           (Pause)

20           MR. PARKER:  This is on page 132, line 14, to line 25.

21           The objection is it is unresponsive to the question.

22   It goes beyond the scope of the question.

23           MR. SAXENA:  But it's relevant.

24           (Pause)

25           THE COURT:  I don't see what it adds, so I am going to

C3udcar3                              "M. Pastor

1    strike it.

2           MR. SAXENA:  Well, just quickly, your Honor.  We

3    actually also think it goes to modus operandi in terms of the

4    specifics of the way that the conduct is described, in that it

5    is the moving of the body and the positioning and the isolating

6    is similar to other testimony that we have heard in this case.

7           THE COURT:  You can't tell from this testimony -- I

8    understand your point but it takes guesswork.  I have to

9    speculate as to what he means by that.  I can't tell from his

10   testimony what it means.

11          It could mean that, I agree with that.

12          MS. KACANI:  Beginning on page 133, line 2:

13   "Q  I just want to know what he said, that's all.  Said or did.

14   How you felt is a different question.  I just want to know what

15   he said.

16          "Other than that, were there any other comments that

17   he made to you while you worked at Remi that you feel were

18   improper?

19   "A  Yes.

20   "Q  What else -- when did this take place where he had the

21   napkin and he rubbed up against you?  When did it occur?

22   "A  It occurred at the third station.

23   "Q  When?

24   "A  I don't have any idea.  As I said before, it was

25   afterwards.  It was after seven.  It was after 2007.  I don't

C3udcar3                          "M. Pastor

1   remember what year.  It was only very terrible for me, that's

2   why I remember it.  It was in the afternoon, it was about 6 or

3   7.

4   "Q  What month and what year did it happen in?

5   "A  Please tell Mr. Kerry what -- that I don't remember what

6   day or year that it occurred.

7   "Q  What other comments did Oscar make to you during your

8   employment at Remi that you say were inappropriate?

9   "A  There was another time where we were in the atrium and

10  there was a big party and that he sent all of them -- he sent

11  everyone else to go eat and then he left me alone.  And then I

12  told him, What's going on, Oscar, let me go eat.  And then I

13  told him in English.  And he responded to me in English, and he

14  told me that if I was taking care of you, I would let you leave

15  early.  He said that he was worrying about me.  He told me he

16  was going to let me leave early because they were in the Rialto

17  and they were going to leave early.  He told me that, You don't

18  speak English, you Mexican.  And then he told me, Since I'm

19  going to take care of you, I'm going to let you leave early.

20  That was one of the commentaries that he made.  For what did I

21  need that?  I didn't need anything from him.

22  "Q  When did that take place?

23  "A  I only know that it was a Saturday in the evening, sir.

24  "Q  What month and year?

25  "A  I believe it was in 2006.  I don't remember the month.

C3udcar3                          "M. Pastor

1    "Q  Were there any other comments that Oscar made to you that
2    you claim were inappropriate?
3    "A  Yes.
4    "Q  What else did he say to you that you claim is
5    inappropriate?
6    "A  I believe it was in the morning.  It was after lunch.  We
7    were going to go take a break.  I was there with the manager.
8    I was making the napkins.  I was working hard because -- I was
9    sweating because I was working hard.  He came and he touched my
10   sweat and he said, Oh, I like your sweat because it's very
11   sexy, Pepito.  And he said, Oh, I love you.  Oh, how much I
12   love you.  Oh, how do I love you.  How do I love you.
13   "Q  Were there any witnesses to that, to your knowledge?
14   "A  Not that I know of, sir.
15   "Q  When did he -- when did Oscar say that to you, what month
16   and year?
17   "A  I don't remember, sir, but I do remember that it was in the
18   summer because I was sweating.
19   "Q  Were there any other comments that Oscar made to you that
20   you felt were inappropriate that you haven't already testified
21   to?
22   "A  Not that I remember at this moment.
23   "Q  Your complaint alleges that Velandia subjected you to
24   nearly daily sexual touching.
25   "A  Yes.

C3udcar3                          "M. Pastor

1  "Q  When did that occur?

2  "A  Every day that I would go in to work, he would come over to

3  me.  He would grab my hand and would say, oh, Pepito how are

4  you.  He would hug me and say how have you been.

5  "Q  When did Oscar start to do that?

6  "A  I don't remember, sir, but I believe that it was a little

7  bit after I became a busboy.

8  "Q  Other than what you just testified to about touching your

9  hand or putting his arm around you and asking how you are

10 doing, was there any other way in which Oscar touched you on a

11 daily basis during your employment at Remi?

12 "A  Right now I don't remember, sir.  It was a long time ago.

13 "Q  Did you ever tell Oscar to stop touching you?

14 "A  Yes.

15 "Q  When?

16 "A  I tell you, it was a long time.  It's very difficult for me

17 to remember the date.

18 "Q  In what month and in what year did you first tell Oscar to

19 stop touching you?

20 "A  It was a little bit after, he was speaking with Ivan Reyes

21 a lit bit more.  A little bit after Ivan saw him Oscar didn't

22 want to talk to me very much -- I mean more after that.  And

23 then I told him after that to stop.  How could he continue to

24 do this to me.

25 "Q  Are you able to tell me when that was, what month and year

C3udcar3                              "M. Pastor

1   you told him to stop?

2   "A  I can only tell you that it was a little bit after that

3   that incident occurred with Ivan but I don't remember.

4   "Q  Did you ever physically push Oscar away from you?

5   "A  When he had my penis on the outside I would grab onto his

6   head and I would push him away and say no, no, because I felt

7   that this was bad.

8   "Q  How many times did you do that?

9   "A  Some seven times or eight.

10  "Q  And what happened on those times when you pushed him away?

11  "A  He told me that he was my husband -- oh, no -- he told me

12  that he was the boss.  And he had that -- and he wore the

13  jacket.  That he could do everything that he wanted to do.

14  "Q  And did you believe that that was true?

15  "A  I believe that he had the jacket on and that he was there

16  as the manager.

17  "Q  Was the jacket for people who were headwaiters?

18  "A  I know that he was the manager.

19  "Q  How do you know that he was the manager?

20  "A  He was the man who made the reports.  And he also fired me

21  before then.

22  "Q  Made what reports?

23  "A  What was sold during the day.  For example, if a waiter

24  would bring a bad order to one of the tables, he would

25  reprimand them.  He ran the Rialto Room.  And as I told you

C3udcar3                          "M. Pastor

before, he fired me one time because he was the manager.  And

Mr. Pistorio told me.

"Q  Mr. Pistorio told you what?

"A  And he yelled at me.  He told me not to disrespect

Mr. Velandia anymore like that because he had the same power as

I do.  And he told me that if he wasn't there it was like if --

if he was there when Oscar was there.  That if he wasn't there

it was like -- when Oscar was there it was like if he was there

himself.

"Q  When did Oscar fire you?

"A  2006.  I believe it was the summer.

"Q  Well, what happened that led to Oscar firing you?

"A  Please tell him that I want to explain to him in detail.

There was those young men who were tough guys, they were good

looking guys, they were big and they were strong.  He let them

go because they had made 50 napkins.  And I hadn't finished my

50 napkins -- oh, I had finished my 50 napkins.  I went and I

told him, Oscar, I'm going to take a break because I'm tired.

And that I work also in the afternoon and they left and they

don't work.

      "He told me that, no, you can't leave because you have

to make 250 more napkins.  And then I asked him why.  And then

he told me, You are going to ask or you believe that I'm going

to tell you why?  He told me that if I only have three

reservations and then all of a sudden 150 people would come in,

C3udcar3                          "M. Pastor

1    or he said maybe 500 people came in, who is going to make the

2    napkins?  Oh, who is going to be responsible if there are no

3    napkins?  I told him, Oscar, don't mess around with me like

4    that, or don't play around like that with me because you've

5    already let them go and you are asking me to do this and it's

6    already -- and I work in the afternoon.  I had 30 minutes to go

7    and eat something.  He didn't want to let me go on my break.

8    And then he told me, OK, you're fired.

9          "I went to go change.  Pablo Solece came behind me and

10   he asked me what had happened.  And I told him that Oscar fired

11   me.  I couldn't talk because I was crying.  And I was also

12   gagging and also because of the emotion.  And then my brother

13   came about two minutes afterwards and he told me let's go

14   upstairs.  And then I told him to give me another

15   opportunity -- oh, and he told Oscar to give me another

16   opportunity.  And then Oscar told me, OK, make 250 napkins.

17         "And that's when Mr. Pistorio came and -- after I -- I

18   did the 250 napkins, and that's when the next day Mr. Pistorio

19   came and told me that you can't talk to Oscar like that.  He is

20   the manager of the restaurant.  And that he has the same power

21   as I do.  And to respect him like myself.  And that if he

22   wasn't there, that Oscar was an example of him.  It's just like

23   if he was there.

24   "Q  Was anyone else present when Mr. Pistorio said that to you?

25   "A  Truthfully, no.  We bumped into each other by coincidence

C3udcar3                          "M. Pastor

because I was going to go and cash my check.  Oh, I went to go

and bring my check to the restaurant -- oh, I went to go get my

check from the restaurant and he saw me.  And that's when he

began to argue with me.  And I told him to forgive me, that I

wouldn't do it again."

          MS. KACANI:  Picking up on page 144, line 13:

"Q  Did you ever perform oral sex on Oscar?"

          THE COURT:  Just one second.

          (Pause)

          All right.  What line?

          MS. KACANI:  Page 144, line 13:

"Q  Did you ever perform oral sex on Oscar?

"A  No.

"Q  Earlier you testified that you had received oral sex from

Oscar in the office and in the coat room?

"A  Coat check room.

"Q  And in the Rialto Room -- near the Rialto Room, correct?

"A  Please tell him that you've forgotten about the cafeteria."

          MR. PARKER:  Your Honor, the next portion is objected

to, page 144, line 24 through page 145, line 11.  The answer is

completely unresponsive to the question.  The question was

repeated at 145, line 12 to 15, and it was answered at that

time.

          MR. SAXENA:  Your Honor, the response is responsive

and relevant.  It actually relates details of the incident in

C3udcar3                          "M. Pastor

question, and Mr. Pastor then does clarify that it was one time

only.

          (Pause)

          THE COURT:  I am going to allow the testimony.

          MS. KACANI:  Beginning at page 144, line 24:

"Q  How many times did Oscar perform oral sex on you in the

cafeteria?

"A  The time that I told -- that I told you that he yelled at

me and he told me that I'm the boss and I was in the cafeteria

but thank God Oscar was coming.  He was already pulling down my

zipper, and he went there for a glass of milk also.  He went

there for a glass of milk.  I'm remembering now he was there

also getting a glass of milk, and he said that, oh, this tastes

like a man's milk.

"Q  How many times did that happen -- did he perform oral sex

on you in the cafeteria?

"A  One time only.

"Q  Were you present at any meeting where Mr. Pistorio

discussed with other employees physical touching at work?

"A  Not that I remember, sir."

          MR. SAXENA:  Your Honor, that's the end of that day of

the deposition, and then a blue sheet appears in the binder

after which the transcript of another day of Mr. Moises

Pastor's deposition starts.

          (Pause)

C3udcar3                              "M. Pastor

1          THE COURT:  What page?

2          MR. SAXENA:  So the continued deposition begins on

3     page 155, and the first designated testimony begins on page

4     161.

5          THE COURT:  All right.

6          MR. PARKER:  Your Honor, the --

7          THE COURT:  Who is doing the questioning?

8          MR. PARKER:  Your Honor, I'm doing the question.

9          THE COURT:  Still Mr. Parker?

10         MR. PARKER:  Yes.

11         MR. SAXENA:  And it is still through an interpreter,

12    your Honor.

13         THE COURT:  All right.

14         MR. PARKER:  Judge, on page 161, lines 14 through 19,

15    that testimony is directly related to testimony on the

16    following page, 162, lines 9 through 11, and the objection is

17    that it is clearly hearsay.

18         THE COURT:  You want it or you don't want it?

19         MR. PARKER:  I don't want it.  I am objecting to it.

20         MR. SAXENA:  Plaintiffs' position, your Honor, is that

21    it is not hearsay pursuant to, again -- or not "again,"

22    pursuant to Rule 801, because it is a declarant witness' prior

23    consistent statement.  In this case, Sergio Pastor has

24    testified, was subject to cross-examination in this case.  And

25    the veracity of his testimony --

C3udcar3                              "M. Pastor

1          THE COURT:  On which issue are you talking?

2          MR. SAXENA:  His testimony concerning the conduct at

3     the restaurant, specifically whether oral sex happened.  He

4     provided testimony that Mr. Velandia did perform oral sex, and

5     then was questioned as to his omission of that conduct from his

6     Human Rights complaint.  With the attack being that, you know,

7     why didn't you put it on the complaint if it happened.

8          This testimony is a prior consistent statement because

9     he is telling Moises Pastor that Mr. Velandia performed oral

10    sex on him.

11         THE COURT:  I want to take a short break and I'll be

12    back in a few moments.  I have to take a call.

13         (Recess)

14         THE COURT:  I'm not going to allow that testimony,

15    because there is no showing that it was prior in the timeframe,

16    prior --

17         MR. SAXENA:  I'm sorry, Judge, prior to?

18         THE COURT:  It is not showing that it was a prior

19    consistent statement.

20         MR. SAXENA:  I guess our position would be that the

21    relevant statement would be Mr. -- the testimony that

22    Mr. Sergio Pastor provided at the trial would be the comparison

23    statement, and this statement was prior to that statement.

24    Although I understand there is no date put on the testimony

25    here, this deposition was certainly prior to --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C3udcar3                          "M. Pastor

1          THE COURT:  The deposition isn't the test.  It seems

2    to me that during the events in question is what made the

3    timing.

4          Go ahead.

5          MS. KACANI:  Your Honor, the next designation starts

6    at 175, line 12, and I believe there is an objection.

7          THE COURT:  175?

8          MS. KACANI:  Line 12.

9          THE COURT:  All right.

10          MR. SAXENA:  Yes, your Honor.  This is plaintiffs'

11    objection.  There are two reasons.

12          First, it is cumulative.  The date on which Mr. Pastor

13    left Remi Restaurant had already been established in the

14    previous testimony; and, two, the only thing that is added by

15    this testimony is the comment about the group home.  Since that

16    relates to issues with drug treatment and drug use, we don't

17    think it is relevant here and it is prejudicial.

18          MR. PARKER:  Your Honor, the purpose is to show the

19    reason why Pastor left his employment with Remi.  There is no

20    other testimony anywhere in the record that shows it.

21          MR. SAXENA:  I'm not sure why that's relevant, either.

22          THE COURT:  This is the only testimony that the

23    plaintiff is offering?  Is there any other testimony about

24    this?

25          MR. SAXENA:  The defendants are offering the

C3udcar3                          "M. Pastor

1   testimony, your Honor.

2              THE COURT:  That the defendants are offering, I'm

3   sorry.  I'm really asking Mr. Parker.

4              MR. PARKER:  This is the only testimony that I was

5   able to find that provides the background as to why Mr. Pastor

6   terminated his employment at Remi.  It is for factual

7   information as to why he left.

8              THE COURT:  Well, does this relate in some way to the

9   testimony about his credibility?

10             MR. PARKER:  No, it does not.  And the plaintiff --

11             THE COURT:  During the time that he was at Remi, or

12  his ability to observe?

13             MR. PARKER:  No.  It simply provides the reason that

14  his employment terminated at Remi.

15             If the plaintiffs are willing to stipulate that he

16  quit, then we don't need the testimony.

17             THE COURT:  Is there an issue on that?

18             MR. SAXENA:  I just don't think it is relevant, Judge.

19  I mean --

20             THE COURT:  Is there an issue about when he quit?

21             MR. SAXENA:  There is not an issue about when he quit.

22             THE COURT:  Or whether he quit?

23             MR. SAXENA:  I mean, there is no issue that he was not

24  fired from the restaurant.  I don't know what "quit" means

25  necessarily in this context.

1          THE COURT:  You mean, there is no question he left the

2     employment?

3          MR. SAXENA:  Correct.

4          THE COURT:  And that they did not fire him?

5          MR. SAXENA:  Also correct.

6          THE COURT:  Is that sufficient?

7          MR. PARKER:  That is fine, Judge.

8          THE COURT:  All right.  Then I will strike the

9     testimony on page 175, 12 through 17.

10          MR. SAXENA:  Judge, the testimony next picks up on

11     page 177.

12          THE COURT:  Yes.

13          MR. SAXENA:  And plaintiffs have asserted an objection

14     to this testimony through 178, line 3.

15          THE COURT:  In view of the last stipulation, is this

16     necessary?

17          MR. PARKER:  It's not necessary except, your Honor,

18     with respect to some evidence that we have, documents from a

19     treatment facility that are being offered for impeachment

20     purposes.  I don't particularly need this testimony, but I

21     don't want this to be perceived as a waiver of our right to

22     introduce the documents.

23          THE COURT:  For what purpose are you offering the

24     treatment testimony, the medical records from the Phoenix House

25     or Bellevue Hospital?

C3udcar3                              "M. Pastor

1            MR. PARKER:  It is not Bellevue Hospital.  Phoenix

2       House.

3            THE COURT:  But Bellevue is mentioned.

4            MR. PARKER:  Bellevue was mentioned, but we would not

5       be introducing any evidence with respect to Bellevue.

6            Phoenix House, there are records --

7            THE COURT:  I understand what Phoenix House is.

8            MR. PARKER:  OK.

9            THE COURT:  So for what purpose are you offering the

10      records from Phoenix House?  To affect his credibility?

11           MR. PARKER:  To affect his credibility.

12           THE COURT:  How is it -- during what period of time?

13           MR. PARKER:  To statements he made to the Phoenix

14      House during two separate stays there regarding the critical

15      issues in the case.

16           THE COURT:  Well, I'll defer ruling on this.  You can

17      read it in, and it will be subject to striking based on what

18      those records are.  I haven't examined those records.

19           MR. PARKER:  Thank you.

20           MS. KACANI:  Beginning on page 177, line 18:

21      "Q  After you left Bellevue Hospital from your visit there, did

22      you receive substance abuse treatment?

23      "A  Yes, but I went -- it was a little bit late.

24      "Q  Where and when did you receive substance abuse treatment?

25      "A  I went to this place called Phoenix House.  It was close to

C3udcar3                          "M. Pastor

1    2008, November, around there."

2                 MR. SAXENA:  Your Honor, the testimony picks up on

3    179, at line 15, and plaintiffs have an objection to this

4    testimony, as well.  This testimony concerns the substance

5    abuse treatment at the Phoenix House.

6                 There is nothing intrinsic to this testimony that

7    shows any sort of impeachment or lack of veracity.  It is

8    simple, matter-of-fact testimony.  And the defendants aren't

9    permitted to introduce extrinsic evidence outside of the

10   cross-examination, which is what the Phoenix House records

11   would be if the purpose is to attack veracity here.

12                THE COURT:  How can I rule on that at this time?

13   Couldn't I do the same thing with the verbal one, when I have

14   the other evidence before me and I know what it is?

15                MR. SAXENA:  Yes, sure, your Honor.  That makes sense.

16                THE COURT:  I will defer it on that.

17                MS. KACANI:  Beginning on page 179, line 15:

18   "Q  Well, did you tell anyone at the Phoenix House when you

19   were there that in 2008 that you smoked marijuana daily since

20   you were 12 years old?

21   "A  I don't remember that.

22   "Q  Well, have you smoked marijuana since you were 12 years

23   old?

24   "A  I don't think so.

25   "Q  Have you used cocaine since you were 13 years old?

C3udcar3                              "M. Pastor

1    "A   I don't think so."

2                MR. SAXENA:  Your Honor, the testimony picks up on

3    181, at line 12 through 17.  The plaintiffs have asserted an

4    objection to this testimony as well as the testimony that

5    follows, from 182 to 183.  The testimony is not probative of

6    any issue in this case, nor I believe does it even touch on

7    veracity.  And, in any event, the testimony is that Moises

8    Pastor was not a member of any gang.  So just a suggestion of

9    gang activity is just purely prejudicial without any probative

10   value.

11               MR. PARKER:  Judge, this falls within the same

12   category of what we just discussed.  It's impeachment --

13               THE COURT:  What evidence on this subject are you

14   going to offer besides this testimony?

15               MR. PARKER:  His statements to Phoenix House.

16               THE COURT:  What?

17               MR. PARKER:  His statements to the Phoenix House.  His

18   admissions to the Phoenix House.

19               THE COURT:  I don't know what statements to Phoenix

20   House you are referring to, and I don't see how it relates to

21   any issue -- I mean, I have nothing before me to show me that

22   it has anything to do with his credibility.

23               MR. PARKER:  All I'm suggesting is that this should be

24   treated in the same way that --

25               THE COURT:  All right.  Subject to connection.

C3udcar3                              "M. Pastor

1              You can read it.

2              MS. KACANI:  Starting on page 181, line 12:

3      "Q  Are you familiar with a gang called Raza Loca?

4      "A  Yes.

5      "Q  Have you ever been a member of that gang?

6      "A  No."

7              MS. KACANI:  Picking up on page 182, line 11:

8      "Q  Did you tell anyone at the Phoenix House that you had to

9      fight three people as part of the initiation into Raza Loca?

10     "A  I don't remember but that is one of the rules of that gang.

11     "Q  And did you fight three people in order to be inducted into

12     Raza Loca?

13     "A  No, because I was never a member.

14     "Q  Did you fight anyone in order to be inducted into Raza

15     Loca?

16     "A  No.

17     "Q  When you went to the Phoenix House, did you meet counselors

18     there?

19     "A  Yes.

20     "Q  Did they ask you a lot of questions?

21     "A  Many."

22             MR. SAXENA:  Judge, the testimony picks up at 187, on

23     line 6 through 20, and we have asserted an objection.  And I

24     have a feeling that Mr. Parker is going to tell me that this is

25     in the same boat as what we have been talking about and that we

528

C3udcar3                            "M. Pastor

1    are going to have to defer until we get the Phoenix House

2    records before the Court.

3              MR. PARKER:  That is correct, your Honor.

4              THE COURT:  Then the same ruling, I guess.  The same

5    ruling.  I will defer ruling subject to connection.

6              MS. KACANI:  Beginning on page 187, line 6:

7    "Q  Did you tell any of the counselors at the Phoenix House in

8    2008 that you started sniffing glue at age 10?

9    "A  Not that I remember that.

10   "Q  Did you do that?

11   "A  I saw that but I didn't have the time to do it, no.

12   "Q  Are you saying that you did not sniff glue beginning at age

13   10?

14   "A  I am saying that I did not use glue at age 10.

15   "Q  Have you ever sniffed glue in order to get high?

16   "A  No."

17             MR. SAXENA:  I think that's it, Judge.

18             MS. KACANI:  No, it is not.

19             MR. SAXENA:  Is there more?

20             THE COURT:  Next witness.

21             MS. KACANI:  No, your Honor.  There is more.

22             It starts on page 213, line 3, but I believe there is

23   an objection.

24             THE COURT:  OK.

25             MR. PARKER:  Your Honor, page 213, beginning at line

C3udcar3                          "M. Pastor

1    3, continuing over to 214, line 21, the deposition was taken

2    when Mr. Pastor was a plaintiff.  This was a typical question

3    relating to claimed damages.  Mr. Pastor is no longer a

4    plaintiff.  His response to this question is not relevant to

5    this proceeding at this time.

6             MR. SAXENA:  The plaintiffs' position is that we

7    understand that damages are not at issue for Mr. Pastor, but

8    the testimony still goes to show the hostility of the conduct

9    and the environment.

10            THE COURT:  Let me read it.

11            (Pause)

12            I will strike the testimony because he is not a party,

13   and it appears to me that he is talking about events after he

14   left the employ at Remi.

15            MR. SAXENA:  Now that is it, Judge.

16            So I guess we will call our next witness.

17            It's Dr. Jessica Pearson.

18            THE COURT:  You are excused, Mr. Donovan.

19            (Continued on next page)

20

21

22

23

24

25

C3uQcar4

1    JESSICA PEARSON,

2         called as a witness by the Plaintiff,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. SAXENA:

6         MR. SAXENA:  Actually, Judge, I do have one

7    preliminary matter that pertains to Dr. Pearson's testimony.

8         We intend to offer Dr. Pearson as a psychological

9    expert, and part of her testimony concerns certain

10   psychological testing that was done.  The company that authors

11   this psychological testing have sent us a letter -- which I do

12   have copies of, and I can pass around if you'd like -- asking

13   that any discussion of the testing, the details of the testing

14   and specific questions on things like that be subject to a

15   protective order.  And the reason is because if the details of

16   that testing are disseminated publicly, it diminishes the

17   effectiveness of the test.

18        THE COURT:  What's the defense's position?

19        MR. PARKER:  I have read the letter that was provided

20   to me by counsel.  Judge, I don't know how to respond.  I don't

21   necessarily object to the suggestion, but I don't know how you

22   draw the line between what is sealed and what is not sealed.

23   It seems to me to be a very vague request.

24        MR. SAXENA:  If it is useful, Judge, I can pass up the

25   letter.

C3uQcar4                            Pearson - Direct

1          THE COURT:  I'll look at it.  I won't know in advance

2   whether it is of any importance or not.  There is no one here

3   from PAR, Psychological Assessment Resources, Inc.?  There is

4   no one here from them?

5          MR. SAXENA:  There is not, Judge.  We submit though

6   that the scope of what we are talking about here would be

7   extremely narrow.  We are talking about the details of the test

8   or specific questions on the test; not the general findings of

9   the test or what the test tells experts.

10         THE COURT:  Well, they have copyright theories in

11  here.  That would suggest that their psychological tests are

12  possibly not accepted by other psychologists.  I doubt that

13  that's the case, but it would suggest it.

14         MR. SAXENA:  As do I, Judge.

15         THE COURT:  What?

16         MR. SAXENA:  I agree with you that they are widely

17  accepted which we will get to.

18         THE COURT:  What is the customer?

19         MR. SAXENA:  What is the question, Judge?

20         THE COURT:  I guess she is the customer?

21         MR. SAXENA:  She is the customer, yes.

22         THE COURT:  Yes?

23         MR. SAXENA:  She is the customer, Judge.

24         THE COURT:  Is the company aware that Ms. Pearson is

25  going to be a witness in this case?

1          MR. SAXENA:  Pardon me, Judge, is the company aware?

2          THE COURT:  Yes.  Is the company made aware that she

3     will be testifying in this case?

4          THE WITNESS:  No.

5          MR. SAXENA:  I don't believe they are.

6          THE COURT:  Shouldn't they be made aware?

7          THE WITNESS:  Is it OK to say anything?

8          No.  I mean, psychological tests -- as a licensed

9     psychologist, we are allowed to purchase and use psychological

10    tests, but it's also our obligation to attempt to protect the

11    materials from public dissemination, otherwise, they lose their

12    validity.  So that's why they provide that letter when you're

13    testifying in Court that that is the case.

14         THE COURT:  Have you made them aware that you're going

15    to testify?

16         THE WITNESS:  No.  This specific case?  No.  I've

17    consulted them in general as to what to do, and that's why they

18    sent me the letter, but I didn't say that I was specifically

19    testifying in this case.

20         THE COURT:  Do you want to notify them?  I'll take a

21    break and I'll take another witness if you want to notify them

22    about testifying so they have time to hire an attorney if they

23    want to object.

24         MR. SAXENA:  Judge, maybe we can take five minutes to

25    do that?

1      THE COURT:  It's going to take more than five minutes

2   because if they want to object, they will have an attorney.

3      MR. SAXENA:  We don't actually have another witness

4   other than Dr. Pearson.

5      THE COURT:  She's your last witness?

6      MR. SAXENA:  Correct.

7      THE COURT:  Does defense have any objection to taking

8   her out of order?

9      MR. PARKER:  I think the plaintiffs may have an issue

10   with that, but --

11      THE COURT:  What?

12      MR. SAXENA:  So, Judge, maybe we can avoid this, we

13   are not actually going to get to the testing until well into

14   the testimony, so if we can wait to inform them until that

15   point, we can do it over lunch.

16      MR. DELANEY:  Your Honor, I'm happy to go call them

17   right now.  We can proceed with the testimony, and I will get

18   this process started while Mr. Saxena is pursuing his direct.

19      THE COURT:  So they have the opportunity to hire a

20   lawyer if they want to.

21      In any event, the defense would agree to an

22   interruption and let the witness testify later in the trial?

23      MR. PARKER:  I guess I don't have an objection, but I

24   also don't have an objection to just proceeding at this point.

25      THE COURT:  All right.  We'll take a portion testimony

1    at this point, just not the results of the tests.

2              MR. PARKER:  Sure.

3              THE COURT:  Let's go ahead on that basis.

4              MR. SAXENA:  Judge, we have binders that we can pass

5    out with exhibits that are relevant to this witness.

6              We are ready to proceed?

7              THE COURT:  Yes.

8    BY MR. SAXENA:

9    Q.  Good afternoon, Dr. Pearson.

10   A.  Good afternoon.

11   Q.  Would you please introduce yourself to the Court?

12   A.  My name is Jessica Pearson.  I'm a licensed psychologist in

13   New York.

14   Q.  How did you become involved in this litigation?

15   A.  I was asked by attorneys at Paul Weiss to do an evaluation

16   of Mr. Arturo Caravantes.

17   Q.  What sort of evaluation?

18   A.  A psychological assessment in the context of a legal case.

19   Q.  Did you, in fact, do the evaluation?

20   A.  Yes, I did.

21   Q.  Did you submit a report of your findings?

22   A.  I did.

23   Q.  I would like you to ask you to turn, please, to the tab in

24   your binder that says Exhibit 23.  Do you see that there is a

25   document there that has been marked Plaintiff's Trial Exhibit

C3uQcar4                        Pearson - Direct

1    23?

2    A.  Yes.

3    Q.  Do you recognize that document?

4    A.  I do.

5    Q.  What is it?

6    A.  It is the forensic psychological assessment of

7    Mr. Caravantes that I submitted.

8    Q.  Is that your signature on the cover?

9    A.  It is.

10   Q.  Did you submit it on May 27, 2011?

11   A.  Yes.

12   Q.  You use the word forensic when you read the title.  What

13   does that word mean in this context?

14   A.  Well, as it applies to psychology, it is the application of

15   psychological principles or methods to a task faced by the

16   legal system.

17   Q.  Is forensic assessment the type of work you do as a

18   psychologist?

19   A.  Yes.

20   Q.  I would like to ask you to please turn to page 19 of 25 in

21   Plaintiff's Trial Exhibit 23.  Let me know when you are there.

22   A.  Yes, there.

23   Q.  Do you see the notation Appendix B at the top of the page?

24   A.  Yes.

25   Q.  Do you recognize what appears below that notation?

1    A.  Yes.

2    Q.  What is it?

3    A.  This is my CV.

4    Q.  I would like to ask you a few questions about your

5    educational and professional background referring to your CV.

6    A.  OK.

7    Q.  What is your educational background?

8    A.  I obtained my bachelor's degree from Vassar College and

9    then a master's and Doctor in Psychology from Yeshiva

10   University which I completed in 2003.

11   Q.  Was part of your education learning about psychological

12   assessment?

13   A.  Yes.  Basically, from day one of the doctoral program we

14   start training in academics and clinical work learning about

15   psychological assessment.

16   Q.  You mentioned academics and clinical work.  Can you expound

17   on that distinction?

18   A.  Sure.  We have -- we're required to take four years of

19   academic courses which include courses on psychometrics and

20   aspects of the administration of psychological testing, and

21   then we're required to do a number of clinical training

22   positions while we're taking course work where we apply what we

23   learn to clinical settings, so we're doing therapy, assessment,

24   evaluation, diagnosis.

25   Q.  I would like you to look at page 21 of this same exhibit.

1    Do you see where it says clinical training?

2    A.  Yes.

3    Q.  Does that section of your CV describe the training that you

4    just referred to when you said clinical training?

5    A.  Yes.

6    Q.  So, could you please just describe for the Court, starting

7    from the earliest and then going forward, the nature of your

8    clinical training?

9    A.  Sure.  Actually, it starts on 22.  There are externships

10   that we're required to do.  All externship means it's a

11   part-time position.  There is a full time training position.

12   So in the beginning of my training, we're doing therapeutic

13   services, evaluation, learning about group therapy, and

14   starting to focus on psychological assessment and then the

15   actual practice of assessment.

16        So the first time I really was specifically involved

17   in training in psychological assessment was at Bellevue at the

18   neuropsychological consultation service where we did

19   neuropsychological assessment of individuals with traumatic

20   brain injury or other types of organic problems or medical

21   problems.

22        The following year I stayed on at Bellevue for my last

23   externship which was the forensic inpatient unit where I

24   focused specifically on forensic assessment and working with

25   forensic patients.

C3uQcar4                          Pearson - Direct

1    Q.   The externship at Bellevue that you specifically referred

2    to --

3    A.   Mmm-hmm.

4    Q.   -- is that described in your or can you just tell me

5    basically using the CV where that is described?

6    A.   Sorry.  On the bottom of page 21, the forensic inpatient

7    unit where it says psychology extern September 2001 to

8    May 2002, yes.

9    Q.   Then does it continue over on to page 22?

10   A.   Yes, it does.

11   Q.   Can you tell me what the forensic male inpatient unit is?

12   Just describe the type of patients.

13   A.   Sure.  So, in New York City there is one hospital that

14   provides services for inpatient psychiatric men or male

15   patients who are also under arrest.  So, on that unit we have

16   both pretrial detainees and prearraignment detainees.  These

17   are all individuals who are needing psychiatric inpatient

18   treatment.

19   Q.   Would any sort of a particular disorders be common among

20   that pool of patients?

21   A.   Yes.  We see a lot of severe mental illness, schizophrenia,

22   schizoaffective disorder, bipolar disorder.  Then we see a lot

23   of adjustment difficulties, depressive disorders, anxiety, and

24   trauma-related disorders.  Oftentimes these people are perhaps

25   being arrested for the first time or experiencing events

C3uQcar4                          Pearson - Direct

1   related to their incarceration that leads to symptoms, so we

2   see both.  And then we also see a lot of substance use and a

3   lot of personality disorders.

4   Q.  What specific training in assessment did you receive there?

5   A.  Well, I started doing -- I mean, every externship has a lot

6   of supervision as a component of it.  So you're trained and

7   supervised by licensed clinical psychologists.  And I started

8   doing assessments on the forensic unit, so administration

9   psychological testing and writing up psychological assessment

10  both with those patients on that unit and actually in regular

11  civilian patients as well, patients on other non-detained

12  units.

13  Q.  And your externship at Bellevue ended in May 2002?

14  A.  Yes.

15  Q.  Did you receive any additional training in forensic

16  psychological assessment following your externship at Bellevue?

17  A.  I did.  So the last step of getting your doctoral degree is

18  doing a full year clinical internship, and I did that at

19  NYU/Bellevue.  And I was part of the forensic track, which

20  meant that there was a focus on forensic psychology.  So, two

21  days a week I was at Kirby Forensic Psychiatric Center, which

22  is a maximum secure forensic hospital on Wards Island, and the

23  other three days I was doing rotations at Bellevue which I had

24  general clinical responsibilities and assessment

25  responsibilities there.

1    Q.  Is this portion of your training described on page 21 of

2    your CV in the middle of the page under clinical training?

3    A.  Yes.

4              THE COURT:  Is Kirby a part of the NYU/Bellevue?

5              THE WITNESS:  It is not.  It is just affiliated with

6    NYU for the purposes of training, so they sent a lot of their

7    residents, fellows, psychiatry fellows, psychology interns

8    there for forensic training.

9    Q.  During your internship, did you receive training

10   specifically in psychological assessment?

11   A.  I did.  So at Kirby, which I said is primarily forensic, we

12   focused on doing assessment like risk assessment, learning risk

13   assessment measures, competency or restoration for fitness

14   evaluations and then doing general assessment and treatment of

15   forensic patients.  And the patients are either there because

16   they're insanity acquittees or they're there for competency

17   restoration.

18             THE COURT:  For what?

19             THE WITNESS:  Restoration of competency to stand

20   trial.

21   Q.  Do you see on the same page, page 21, the line that says

22   comprehensive psychiatric emergency program?

23   A.  Yes.

24   Q.  Under your internship?

25   A.  Yes.

1    Q.  Can you tell the Court what that is?

2    A.  That's Bellevue psychiatric emergency room.  I rotated

3    through there as well where you learned to do very quick

4    diagnostic evaluation of individuals coming into a psychiatric

5    emergency room, and determine whether or not they needed

6    admission or whether or not they can be released with a

7    disposition for a different kind of treatment.

8    Q.  What sorts of disorders would the patients coming through

9    there present with?

10   A.  Many different types.  You see a lot of severe mental

11   illness where people have decompensated or become severely

12   mentally ill from not taking their medicine or for other

13   reasons.  We see a lot of suicidalities, and then intoxication,

14   trauma related, anxiety, and generally people coming in because

15   they're, you know, that's where they go when they seek

16   assistance for feeling suicidal or feeling homicidal.

17   Q.  On the same page a few lines down, do you see where it says

18   the program for survivors of torture?

19   A.  Yes.

20   Q.  Can you tell the Court what that is?

21   A.  So NYU/Bellevue has a program for the survivors of torture.

22   They provide legal -- I am sorry, not legal -- social, medical

23   and psychological services to individuals who are coming from

24   other countries looking for asylum and who have claimed that

25   they are survivors of torture from their home countries; and so

1    as part of that elective, we took lectures, didactics, training

2    in the assessment of individuals who have experienced torture.

3    So a lot of trauma-related disorders, adjustment difficulties,

4    depression.  And then I did psychotherapy long term with one of

5    the patients and did intake evaluations with those patients as

6    well.

7    Q.  When did your internship end?

8    A.  It ended in June 2003.

9    Q.  Following your internship -- was that the conclusion of

10   your training in psychological assessment?

11   A.  No.

12   Q.  What additional training did you receive?

13   A.  I applied for a post doctoral fellowship in forensic and

14   clinical psychology also at NYU/Bellevue.  I went back to the

15   forensic unit where I had done my externship in 2001, and I was

16   there as a fellow.  So what that meant was I could now begin

17   not only advancing my own training in assessment and treatment

18   but also begin supervising trainees in assessment and

19   treatment.  I continued my work in the psychiatric emergency

20   room, and worked, you know, as kind of an almost-staff

21   clinician on the unit.

22   Q.  Is that post doctoral fellowship described on page 20 of

23   your CV?

24   A.  Yes, it is.

25   Q.  Is that near the top of the page?

C3uQcar4                          Pearson – Direct

1   A.  Yes, post doctoral fellow.

2   Q.  Do you see there that it says it's a full-time fellowship

3   on the prison ward?

4   A.  Yes.

5   Q.  During your post doctoral fellowship, did you come across

6   similar types of disorders as to those that you've mentioned

7   already?

8   A.  Yes, severe mental illness, adjustment difficulties,

9   trauma-related disorders, anxiety, all sorts of problems.

10  Q.  Did you continue to administer psychological assessments?

11  A.  During that fellowship?  Yes, I did.  And I also supervised

12  others in their administration and interpretation of

13  psychological testing.

14  Q.  How does that supervision process work?

15  A.  So until you're a licensed professional, you have to be

16  supervised on all assessments, and so depending on the level of

17  the trainee, that could be from teaching them how they actually

18  administer the test, teaching them about the test, going

19  through the test after they've administered it, interpreting it

20  with them, going over their report and their findings, and then

21  ultimately the licensed individual is the one who is completely

22  responsible for the report.

23  Q.  And you were the one who was doing the supervising during

24  this time?

25  A.  So, during the fellowship I wasn't licensed until the end

1    of my fellowship, so I was learning the process of being the

2    supervisor so I actually had my own supervision by a licensed

3    professional while I was learning -- while I was beginning to

4    supervise other trainees.

5    Q.  Did you subsequently obtain a professional license?

6    A.  I did.  Right at the end of my fellowship in

7    September 2004.

8    Q.  And what is that license?

9    A.  It's a license in clinical psychology.

10   Q.  Do you currently continue to hold that license?

11   A.  I do.

12   Q.  Have you ever had any interruption in your holding of that

13   license?

14   A.  No.

15          THE COURT:  I didn't hear what you said.  You dropped

16   your voice.

17   Q.  Have you ever had any interruption in your holding of that

18   license?

19   A.  No.

20          THE COURT:  Let's take a break now.  Thank you.

21          Come back at 2:05 p.m.

22                         (Luncheon recess)

23

24

25

C3uQcar4

<pre>
 1                          AFTERNOON SESSION

 2                              2:45 p.m.

 3                          (In open court)

 4           THE COURT:  Call Ms. Pearson.

 5           MR. DELANEY:  Your Honor, Aaron Delaney.

 6           I contacted the Psychological Assessment Research

 7      folks.  I spoke to somebody on the phone.  They had me send

 8      them an email and just tell them what was going on; that

 9      Dr. Pearson was testifying.  We've subsequently exchanged

10      emails.  They don't intend to testify, and I discussed it with

11      Mr. Parker.

12           THE COURT:  Or appear.

13           MR. DELANEY:  Or appear, exactly.  And none of us are

14      going to submit the actual testing materials of records; and

15      when we said that, they said that was fine.

16           THE COURT:  All right.

17      JESSICA PEARSON, resumed.

18      DIRECT EXAMINATION CONTINUED

19      BY MR. SAXENA:

20      Q.  After obtaining your professional license, did you continue

21      to work at Bellevue?

22      A.  I did.  I was hired on the staff in -- basically at the end

23      of my post doctoral fellowship in August 2004.

24      Q.  When you say you were hired on the staff, did you have a

25      title?
</pre>

Pearson - Direct

1    A.   I was hired as a senior psychologist on the men's -- the

2    psychiatric inpatient unit, forensic inpatient unit.

3    Q.   Is that position set forth on page 19 of 25?

4    A.   Yes.

5    Q.   Of Plaintiff's Trial Exhibit 23?

6    A.   Yes.

7    Q.   Can you describe your work experience at Bellevue once you

8    joined the staff?

9    A.   Sure.  So I was hired as a full-time psychologist on the

10   inpatient unit.  I was involved in working as a primary

11   clinician for individual patients.  Part of a treatment team.

12   We did evaluations.  I completed my own psychological

13   assessments but primarily was teaching and supervising trainees

14   externs and interns in psychology, psychological assessment.

15   Q.   Just to clarify, we're talking about the paragraph at the

16   bottom of the page?

17   A.   Yes.

18   Q.   Page 19?

19   A.   That's correct, yes.

20   Q.   When you say you were involved --

21            THE COURT:  Let me see what you are referring to.

22            THE WITNESS:  It's the bottom one.

23   Q.   And it goes over on to the next page, right, the

24   description?

25   A.   Yes.

Pearson - Direct

1   Q.  On 19, do you see that it says assistant director of

2   forensic assessment under senior psychologist?

3   A.  Yes.

4   Q.  Can you explain what that means?

5   A.  It means that I was involved a lot in doing the

6   supervision, and not only the coordination but the supervision

7   and training of externs and interns on the forensic service in

8   psychological testing.

9   Q.  What was involved in training externs in psychological

10  assessment?

11  A.  It was the supervision, so teaching of measures, the

12  supervision of interpretation of test measures, discussion of

13  findings, assistance in report writing, editing report writing,

14  developing formulations or answers to questions that we were

15  being asked in the testing, and then ultimately being

16  responsible for that assessment.

17  Q.  What sorts of disorders would you come across working in

18  this position?

19  A.  Basically, the same as when I was on fellowship, again

20  severe mental illness, schizophrenia, schizoaffective disorder,

21  bipolar disorder, and then a lot of adjustment disorders --

22  depressive disorders, anxiety, trauma-related disorders common

23  in incarcerated individuals.

24  Q.  Until when did you work on staff at Bellevue?

25  A.  So I left in 2008 in June, and I started immediately at

1   Elmhurst Hospital Center basically the week after.

2   Q.  Is that experience described further up on the same page,

3   page 19 of 25?

4   A.  Yes, it is.

5   Q.  Can you briefly describe for the Court what that position

6   entailed?

7   A.  So, that is the unit for -- at Elmhurst Hospital it is the

8   unit where female forensic detainees who need psychiatric

9   inpatient treatment go within the five boroughs.  So we treat

10  women who are in the custody of the department of corrections

11  or pre-arraignment NYPD detainees.  And there my clinical

12  responsibilities are very similar to what they were at

13  Bellevue -- treatment, evaluation, diagnosis, member of a

14  treatment team.  But I also took on a number of administrative

15  and supervisory roles when I got there, one of which was

16  coordinating the testing service in the hospital.  So I'm the

17  primary supervisor for all testing that occurs in the hospital.

18  I don't do all of the supervision, but I am the coordinator,

19  and then I do a majority of it with externs and interns.

20          Also, as of fall 2011, I coordinate the psychological

21  externship training program which is specifically in

22  psychological assessment, and that's for two predoctoral

23  externs to come for nine months and train in psychological

24  assessment in the hospital.

25  Q.  And that last position that you mentioned as of fall 2011,

1    is that mentioned on your CV?

2    A.  No, it's not.

3    Q.  At Elmhurst, what sort of disorders would you come across

4    in patients?

5    A.  We see similar disorders at Elmhurst that you would at

6    Bellevue:  A lot of severe mental illness, schizophrenia,

7    schizoaffective disorder, bipolar disorder, major depressive

8    disorder.  We see a lot of trauma-related disorders as we're

9    dealing with the female incarcerated population, so a good

10   percentage of them have histories of abuse, domestic violence,

11   could potentially be re-traumatized by their incarceration,

12   substance use, of course, and personality disorders.

13   Q.  Do you remain at Elmhurst today?

14   A.  Yes, I do.

15   Q.  Do you know what the Diagnostic and Statistical Manual is?

16   A.  Yes.

17   Q.  Can you explain to the Court what it is?

18   A.  The DSM-IV, it's currently in its fourth revision, the text

19   revision at this point.  It was published in 2000.  It is a

20   manual or a diagnostic manual that provides descriptions of

21   different diagnoses, and its purpose is to help clinicians in

22   terms of categorizing and treatment and intervention.

23   Q.  Is the DSM, as you referred to it, widely used among

24   psychologists?

25   A.  Yes.

Pearson – Direct

1   Q.  And what about other mental health professionals?

2   A.  Yes.

3   Q.  Do you know what major depressive disorder is?

4   A.  Yes.

5   Q.  Can you explain to the Court, without giving us all the

6   details, just generally what it is?

7          THE COURT:  Is that a definition under the manual?

8          THE WITNESS:  It is, yes.  It is one of the diagnoses

9   listed in the manual.

10  A.  So major depressive disorder is a disorder made up of a

11  major depressive episode in which you have experienced a

12  significant change in functioning, it has to be at least for a

13  two-week period of time, and you have to have at minimum

14  depressed mood every day -- excuse me -- nearly every day or a

15  loss of pleasure in previously enjoyed activities along with a

16  number of other criteria.  There's nine other ones.

17  Q.  Do you know what posttraumatic stress disorder is?

18  A.  Yes.

19  Q.  Is that also a disorder defined in the manual?

20  A.  Yes.

21  Q.  The DSM?

22  A.  Yes.

23  Q.  Can you briefly explain what posttraumatic stress disorder

24  is?

25  A.  Sure.  When the individual experiences a traumatic stressor

Pearson – Direct

1    and their response is one of horror, fear or helplessness, then

2    there are three categories and subsections of symptoms that

3    they experience in response to that trauma.  That would be

4    re-experiencing the event, defensive avoidance or a

5    hyperarousal of the nervous system, physiological responses.

6    Q.  How long now have you been doing forensic psychological

7    assessment?

8    A.  I mean, I started training in it in 2001 specifically.  But

9    I guess I've been licensed to do it on my own since 2004.  So

10   eight years -- seven and a half years.

11   Q.  Over that time period, over those seven and a half years,

12   can you estimate how many patients you would have performed

13   forensic psychological assessments of?

14   A.  Well, so, psychological assessment would be with any

15   patient.  So not in a forensic context, and I certainly have

16   been involved in and supervised, I would say, hundreds of

17   those; and I would say also forensic psychological assessment

18   since I was a licensed individual, a licensed clinician, I

19   would say that I supervised or completed myself probably

20   close -- over 200.

21   Q.  Among those patients, have you performed an assessment and

22   came to the conclusion that a patient had major depressive

23   disorder on any occasion?

24   A.  Yes.

25   Q.  Also among those patients, have you ever assessed a patient

Pearson – Direct

1    and concluded that that patient had posttraumatic stress

2    disorder?

3    A.   Yes.

4    Q.   Would you say that those two disorders, MDD and PTSD,

5    are -- with what frequency would you say they occur on your

6    patients that you took an assessment of?

7    A.   In the hospitals, I would say that they are not as frequent

8    as the severe mental illness because it's an inpatient

9    population, but they often co-occur, especially PTSD

10   co-occurring with other severe mental illness.  So less than

11   the most severe major psychotic disorders, but it's common

12   enough.  I don't know if I could give you a percentage, but...

13   Q.   In addition to your hospital practice, have you done any

14   teaching?

15   A.   Yes.

16   Q.   Is that teaching described on your CV?

17   A.   It is.

18   Q.   Could you tell us where?

19   A.   It is page 20.

20   Q.   Could you briefly describe your relevant teaching

21   experience?

22          THE COURT:  What page?

23          THE WITNESS:  20.

24   A.   So since the fall of 2004, I have been teaching at NYU

25   Graduate School of Arts and Sciences in their master psychology

Pearson - Direct

program.  I teach two different courses there.  One is the
introduction to forensic psychology and one is an advanced
seminar in forensic psychology.  And I also at Elmhurst since
I've been there since the summer of 2008 I have co-ran or
co-facilitated a ten-week forensic psychiatry series with the
psychiatrist that I work with on the unit, and that's for
psychiatry residents.

Q.  Do you specifically teach psychological assessment?

A.  There are lectures within the courses on psychological
assessment and the evaluation of particular disorders, yes.

Q.  Among those disorders, have you ever lectured on
posttraumatic stress disorder?

A.  Yes, I have a lecture in both classes on posttraumatic
stress disorder, its use in the legal system, and its
evaluation clinically.

Q.  In addition to your hospital practice and your teaching
work, do you do any other psychological work?

A.  I have a private practice that I've had since I got my
license in 2004.

Q.  What does that private practice entail?

A.  It at times entails doing psychotherapy with regular people
in the community, and primarily it's psychological assessment
and the majority of which is in forensic psychological
assessment, so I do work for attorneys and testify as needed.

Q.  Is your private practice also described on page 20 of your

Pearson – Direct

1   CV?

2   A.   Yes.

3   Q.   Is that toward the top?

4   A.   Yes.

5          THE COURT:   Where?   Where is the top?

6          THE WITNESS:   Clinical psychologist, private practice

7   at the top of page 20.

8   Q.   Under that clinical psychologist section, do you see that

9   the last sentence says: "expertise in civil cases including

10  trauma and PTSD assessment"?

11  A.   Yes.

12  Q.   Can you just describe generally that experience?

13  A.   Sure.   Almost all of the civil work that I've done has

14  involved the evaluation of trauma-related events and symptoms

15  that stem from those events.

16  Q.   Have you ever been qualified as an expert witness?

17  A.   Yes.

18  Q.   How many times?

19  A.   Eight.

20  Q.   In what areas have you been previously qualified as an

21  expert witness?

22  A.   Clinical psychology, psychological testing, psychological

23  assessment, forensic assessment, competency to stand trial

24  evaluations.

25          MR. SAXENA:   Thank you.   Your Honor, at this time I'd

1   like to move to qualify Dr. Jessica Pearson to testify as an

2   expert in forensic psychological assessment.

3            THE COURT:  Any objection?

4            MR. PARKER:  No, your Honor.

5            THE COURT:  She is deemed qualified as an expert in

6   forensic psychological assessment.

7   BY MR. SAXENA:

8   Q.  Having completed a forensic psychological assessment of

9   Arturo Caravantes, have you made a diagnosis?

10  A.  I did.

11  Q.  What is your diagnosis?

12  A.  My diagnosis was that Mr. Caravantes was suffering from

13  major depressive disorder and posttraumatic stress disorder.

14  Q.  I'd like you to take a look at your binder and --

15           THE COURT:  Are those primary diagnoses?  Are both of

16  them the same, or one is secondary?

17           THE WITNESS:  Both primary.

18  Q.  I would like you to turn in the same exhibit, Plaintiff's

19  Trial Exhibit 23 to page 13?

20  A.  OK.

21  Q.  Do you see the text below the heading summary?

22  A.  Yes.

23           THE COURT:  Just a second until I find the page.

24           (Pause)

25         (Continued on next page)

C3udcar5                          Pearson - direct

1    Q.   What is that X, what does it describe?

2    A.   Under C, it's a description of the DSM-IV diagnoses, along

3    with the five-axis system.

4              MR. PARKER:  Your Honor, I object to the use of the

5    report in the witness' testimony.

6              MR. SAXENA:  I'm sorry.  I'm not clear.  What are the

7    grounds?

8              THE COURT:  I think she is supposed to testify on her

9    own without the report.

10             MR. SAXENA:  You can do that.

11             THE COURT:  How it was conducted.

12   BY MR. SAXENA:

13   Q.   So with regard to -- so you mentioned major depressive

14   disorder and posttraumatic stress disorder as the diagnoses

15   that you reached, is that right?

16   A.   Yes.

17   Q.   With regard to major depressive disorder, is that the full

18   statement of the diagnosis, or was there any other information

19   to complete the diagnosis?

20   A.   There are specifiers that the DSM allows you to include

21   when you give a diagnosis.  So the first is whether it is a

22   single or recurrent episode.  I gave a major depressive

23   episode -- excuse me, major depressive disorder, single

24   episode, severe without psychotic features.

25   Q.   And what about posttraumatic stress disorder, is that the

1    complete description of that diagnosis?

2    A.  It is.  You can say acute or chronic, but I did not specify

3    that.  It is chronic, as it lasted for a sufficient period of

4    time.

5            THE COURT:  What does "chronic" mean?

6            THE WITNESS:  More than three months.

7            THE COURT:  What does "trauma" mean as a psychiatrist

8    making an assessment?

9            THE WITNESS:  What does trauma mean, meaning in

10   general?

11           THE COURT:  Not in general; taking the psychiatric

12   assessment.

13           THE WITNESS:  OK.  It means that the individual has

14   experienced something significantly outside of the norm that

15   has created a response in them, one of extreme reaction,

16   emotional reaction, and that, in response, they have developed

17   symptoms because they're not -- they're unable to cope with

18   whatever that event was.

19           THE COURT:  So it is not limited just to the exposure;

20   it also requires development of symptoms in response?

21           THE WITNESS:  I guess if you experience an event and

22   it is not particularly upsetting to you, then it wouldn't

23   necessarily -- and if it is not causing any type of difficulty

24   coping, then I guess I wouldn't classify that as a trauma.  I

25   would classify it as an event that was upsetting or out of the

C3udcar5                        Pearson - direct

1  norm.  But by calling it a trauma it means that you've had some

2  particularly negative reaction to it.

3         THE COURT:  Is it limited to a psychological reaction,

4  or when you have the word trauma, it involves some body blow or

5  something of that sort?

6         THE WITNESS:  Right.  That can be a physical trauma,

7  but psychological traumas can also cause symptoms and those

8  symptoms can be physiological in nature.  So you can have

9  bodily reactivity, like increased heart rate, sweatiness, and

10  those kinds of responses, and also have psychological responses

11  to that as well both for psychological trauma and for physical

12  trauma.

13  BY MR. SAXENA:

14  Q.  Dr. Pearson, you were just talking about symptoms.  Did you

15  make an assessment as to whether any impairment was caused to

16  Mr. Caravantes by his symptoms?

17         MR. PARKER:  Your Honor, there is no foundation laid

18  for any of this testimony.

19         THE COURT:  I think you have to tell what she did, as

20  to what she conducted.  What did she do?  Did she see him?  Did

21  she interview him?

22  Q.  So let's start there, Dr. Pearson.

23         THE COURT:  What are her findings?

24  Q.  What exactly did you do in evaluating Mr. Caravantes?

25  A.  I met with -- I did a clinical interview over five

C3udcar5                         Pearson - direct

1    sessions.  So I saw Mr. Caravantes for over ten hours total,

2    four sessions kind of chunked together within two months and

3    then one session almost a year after the first session.

4            So during that clinical interview, I obtained my

5    symptom report from him.  I had behavior observations in how he

6    was behaving in that moment or during those evaluations.  I got

7    a narrative of what he was describing had happened to him.  And

8    I also took a history, a clinical history.  So in addition to

9    that, I also did psychological testing, and I reviewed

10   collateral information that was provided to me.

11           THE COURT:  When you say a symptom report, you

12   obtained a symptom report from him, was that in writing or

13   oral?

14           THE WITNESS:  Oral.

15   BY MR. SAXENA:

16   Q.  You mentioned interviews and psychological testing.

17           Were there any other components to your assessment of

18   Mr. Caravantes?

19   A.  Collateral information.

20   Q.  And what is that?

21   A.  Any outside information.  So interviews with relevant

22   individuals, review of mental health records, medical

23   documents, and any materials that are provided that are

24   relevant to the individual's assessment.

25   Q.  OK.  And have you asked us to prepare a slide to help

C3udcar5                          Pearson - direct

1   illustrate this process?

2   A.   Yes.

3          MR. SAXENA:   Randall, could you please put up the

4   slide.

5   Q.   So, Dr. Pearson, I would like you to go into a little more

6   detail about the things you just mentioned that were components

7   about the assessment.

8          What is a symptom report?

9   A.   So during clinical interview you ask about the individual's

10  symptoms, what they have been experiencing, how they have been

11  feeling, changes that they've had, and, you know, there is a

12  mental status exam that asks very specific questions about

13  certain symptoms.

14  Q.   And what are behavioral observations?

15  A.   So it's my assessment of how the individual is presenting

16  during the interview.  So I want to get a measure of whether

17  they're being consistent in how they're describing themselves

18  as to what I see.  So if someone says that they're depressed

19  but they appear super happy in front of you, that would be

20  inconsistent; or if they're telling you they're anxious, the

21  consistency measure is are you seeing some evidence of anxiety

22  in front of you as well, especially when they are talking about

23  anxiety-provoking information.

24  Q.   What is a narrative?

25  A.   So a narrative, it depends on the type of evaluation you

C3udcar5                          Pearson - direct

1   are doing, but in this case a narrative would be what is the

2   individual's description of what happened to them of the

3   traumatic event or events.

4   Q.  Why is the narratives -- why do you do the narrative?

5   A.  Again, this is not only for information but you also --

6   this is another way of getting at a measure of consistency.  So

7   if someone is describing something traumatic and you're

8   observing them and watching them when they're telling you what

9   happened, and you would expect that there would be some

10  consistency in their emotional reaction while they're talking

11  about it.  And you want to know about whether there is

12  consistency between what they're saying happened and the

13  symptoms that they're reporting.

14          So if they're talking about, let's say, a car accident

15  but then they're telling you that they react when they are in a

16  movie theater, that would be a little inconsistent unless

17  perhaps it was to a movie of a car accident.  So, again, more

18  consistency.

19  Q.  And why do you take the patient's history?

20  A.  So it's important to know how the person was functioning

21  before you started assessing them.  So you want to know about

22  their early history.  You want to know about previous traumas.

23  You want to know about their educational and their employment

24  history, and you're trying to get a sense of what was their

25  premorbid or pre-event functioning to see if something could be

1   contributing to their current symptoms other than what they are

2   describing.

3   Q.  Is this clinical interview process you have described

4   widely used among psychologists?

5   A.  I would say yes.

6   Q.  So let's move on to number 2 on the slide there.

7          THE COURT:  How do you know?

8          THE WITNESS:  That's how I was trained by many

9   psychologists, yes, and how I trained other psychologists.

10  Q.  Let's move on to number 2, Dr. Pearson, the psychological

11  testing.  What is psychological testing?

12  A.  Psychological testing is a component of psychological

13  assessment where you administer, score, interpret psychological

14  test measures that have been designed to assess specific pieces

15  of information.

16  Q.  And can you explain the two bullets that appear under that

17  slide, personality functioning and psychopathology, and then

18  the second bullet, response style?

19  A.  So personality functioning and psychopathology:

20  Psychopathology are the symptoms, basically what pathology is

21  the person experiencing, what psychological or psychiatric

22  symptom.

23          Personality functioning is more how the person --

24  maybe how those symptoms affect their functioning in the world

25  or what kind of interactions they have with other people.

1            And response style is are they trying to portray

2    themselves in an inaccurate way, let's say, a more positive or

3    more negative manner, or are they even paying attention to the

4    test itself when taking it.

5    Q.  Is the type of psychological testing that you described

6    widely used by psychologists in the field?

7    A.  Yes.

8    Q.  How do you know that?

9    A.  My own training, text materials, in the field.

10   Q.  And you started explaining collateral sources earlier.

11   What are those?

12   A.  So collateral sources can be interviewing other individuals

13   who have the opportunity to observe the person that you're

14   evaluating and any relevant materials, especially in this kind

15   of context, mental health records by other clinicians or

16   individuals who have seen that person in different contexts of

17   their treatment or evaluation.

18   Q.  What do those collateral records tell you?

19   A.  Well --

20            THE COURT:  Have you examined any collateral records

21   here?

22            THE WITNESS:  I did.

23            THE COURT:  What collateral records?

24            THE WITNESS:  Well, I interviewed Mr. Caravantes'

25   wife, was who was the first collateral source.  And I would say

C3udcar5                          Pearson - direct

1    five or six separate clinicians' documents, mental health

2    clinicians' evaluations of Mr. Caravantes over a four-year

3    period from 2008 to 2012.

4            THE COURT:  Previous psychologists that have consulted

5    with him; is that what you are saying?

6            THE WITNESS:  Not only psychologists but mental health

7    clinicians; so social workers, psychiatrists, psychologists,

8    yes.

9    BY MR. SAXENA:

10   Q.  Were you able to successfully employ this method that you

11   described with Mr. Caravantes?

12   A.  Yes.

13   Q.  And have you prepared a slide to illustrate how you did so?

14   A.  Yes.

15           MR. SAXENA:  Can we put that up, please, Randall.

16   Q.  Can you describe the interviews that you had with

17   Mr. Caravantes?

18   A.  Yes.  So Mr. Caravantes' primary language is Spanish, so

19   there was an interpreter present during my evaluations of him.

20           I met with him, as I mentioned before, on four

21   occasions in 2010, kind of the beginning of 2010.  During those

22   evaluations, Mr. Caravantes, I did a clinical interview with

23   him.  He described symptoms that he was experiencing.  Those

24   symptoms were depressive symptoms and anxious symptoms,

25   primarily in those two categories.

C3udcar5                              Pearson - direct

1          Symptoms such as depressed mood, isolation from

2    friends and family, social withdrawal, lack of enjoyment in

3    previously-enjoyable activities, difficulty sleeping,

4    disruptive sleep once he fell asleep, awaking, hopelessness,

5    guilt, helplessness, disruption in his marriage, and suicidal

6    ideations that have occurred subsequent to his no longer

7    working at Remi.

8          He also endorsed -- described symptoms, trauma-related

9    symptoms.  So those are anxious, anxiety symptoms, things like

10   nightmares; flashbacks, which is the experience of reliving an

11   event.  So when he would have sexual relations with his wife,

12   he would feel as if Mr. Velandia was present, which was very

13   distressing to him and cause him to not want to engage in

14   sexual relations with his wife.  He had intrusive memories of

15   the sexual experiences that he had had.

16         He was avoiding aspects -- he was avoiding

17   restaurants.  He was avoiding his friends that he used to have

18   at the restaurant.  And he was irritable and had difficulty

19   concentrating.

20         So that was the general symptoms -- that was actually

21   more specific.  That was the specific symptom report.

22   Q.  How many total hours did you meet with Mr. Caravantes,

23   approximately?

24   A.  Over ten.

25   Q.  Is that a typical amount of hours to assess someone?

C3udcar5                         Pearson - direct

1    A.  It's a bit more.  It is more than the typical amount of

2    time, and, actually, it's unusual in my experience to get to

3    see somebody over a full year period of time.  Usually the

4    evaluation is within, you know, a couple of months or even

5    within two weeks or three weeks.  But in this case I had the

6    opportunity to observe and hear about Mr. Caravantes' symptoms

7    over a full-year period of time.  So I got my own internal

8    measure of consistency in addition to all the other information

9    that we talked about already.

10   Q.  And the January 13, 2011 interview, was that the last

11   interview you had of Mr. Caravantes?

12   A.  Yes, it was.

13   Q.  Did Mr. Caravantes have the same symptom report at that

14   meeting?

15   A.  So that meeting happened, I guess, shortly or sometime

16   after he had been a party -- experienced or sat through

17   Mr. Velandia's deposition.

18        So when I saw him he had said he had been doing

19   better, that his symptoms had improved, until the deposition --

20        MR. PARKER:  Your Honor, I am going to object to that.

21        THE COURT:  I will have to read the testimony.

22        (Pause)

23        MR. SAXENA:  Go ahead.

24        I'm sorry.  Just wait one second.

25        (Pause)

C3udcar5                        Pearson - direct

1                THE COURT:  I think you can go into that on

2      cross-examination, Mr. Parker.

3      BY MR. SAXENA:

4      Q.  So could you tell us about the symptom report at that

5      January 13, 2011 meeting?

6      A.  Yes.  So he had said that his symptoms had worsened -- some

7      of them that had improved had worsened after the deposition.

8      And what he described as having to sit through what he had to

9      listen to during that testimony during the deposition was very,

10     very upsetting to him, and he began to have some of the same

11     suicidal and aggressive thoughts that he had had prior to my

12     first evaluation with him.

13                I was concerned about him.  I actually did a full risk

14     assessment to make sure that he was safe to leave, that he

15     wasn't going to go hurt himself in any way.  And I did not

16     think he was and that it was more passive thoughts, but it was

17     still worsening of those symptoms.

18     Q.  I would like to move on now to the behavioral observations

19     that you made during your interviews --

20                THE COURT:  Let me ask you.

21                THE WITNESS:  Sure.

22                THE COURT:  Did you go into the content of the

23     deposition, as to what was said during the deposition?

24                THE WITNESS:  He did give me a couple of examples that

25     he found particularly upsetting.  You know, what was making him

C3udcar5                          Pearson - direct

1   so upset was that he would --

2              THE COURT:  Did he tell you what the questions were

3   that upset him?

4              THE WITNESS:  Not the questions; I guess the answers

5   from --

6              THE COURT:  The answers?

7              THE WITNESS:  What Mr. Velandia said in his deposition

8   about Mr. Caravantes Mr. Caravantes felt very upset about.

9              THE COURT:  Did he tell you what they were?

10             THE WITNESS:  He did.

11             THE COURT:  What did he tell you?

12             THE WITNESS:  This is not a quote, but things that

13  Mr. Velandia had described in his letters, which he disagreed

14  with and found very shameful and upsetting, and that the

15  process -- that what had happened between them had been

16  described as consensual when he doesn't believe that it was.

17             THE COURT:  All right.  What do you mean by described

18  in his letters?

19             THE WITNESS:  I don't think I said "letters."  I'm not

20  sure what letters --

21             THE COURT:  That's how I read your answer.

22             THE WITNESS:  I'm sorry.  What does it say that I

23  said.

24             THE COURT:  You said Mr. Velandia had described in his

25  letters --

1          THE WITNESS:  Lovers, that they were lovers, like

2     consensual lovers.

3          THE COURT:  I see.

4          THE WITNESS:  When Mr. Caravantes believes they were

5     not.

6     BY MR. SAXENA:

7     Q.  Were there any other observations that you left out, or was

8     that it?

9     A.  I hadn't said any observations yet.

10    Q.  I'm sorry.  Were there any other things that Mr. Caravantes

11    related to you about the deposition, or are you done answering?

12    A.  I am done answering.  None that I recall.

13    Q.  Moving on to your behavioral observations during these

14    interviews with Mr. Caravantes, can you explain what those

15    were?

16    A.  Sure.  So I observed Mr. Caravantes as to be quite

17    dysphoric, which means with depressed affect or emotional

18    expression.  He became tearful many times when talking about

19    the loss of his job or what had happened with Mr. Velandia.

20          He was very anxious, made poor eye contact, was

21    playing with his backpack a lot, unable to look at myself or

22    the interpreter while speaking.  He definitely had poor

23    concentration.  He needed to be refocused a number of times to

24    kind of reorient him back to what we were talking about.

25    Q.  OK.  And did these behavioral observations remain constant

1    over the course of all of your interviews, or did they vary at

2    all?

3    A.  I would say the majority remained consistent over time.

4         THE COURT:  Are you still talking about the interview

5    after the deposition?

6         THE WITNESS:  No.  I'm sorry.  All of them.  Over the

7    five times I met with him, he presented as depressed and

8    anxious consistently.

9    BY MR. SAXENA:

10   Q.  Did you also collect a narrative from Mr. Caravantes?

11   A.  I did.

12   Q.  Did you do that at each interview?

13   A.  No, I did not.

14   Q.  When did you do it?

15   A.  You know, I would have to -- I don't know.  I don't recall

16   at which -- definitely parts of the first and part of the

17   second, but there were also follow-up questions that I asked at

18   different times and so I don't have an exact date.

19        THE COURT:  Is your testimony you didn't take a

20   complete statement from him on the first interview?

21        THE WITNESS:  No, but there are always more questions

22   to ask once you kind of let the information, which is why --

23        THE COURT:  But it covered the entire time period, the

24   first one?

25        THE WITNESS:  Yes.  It covered his narrative, and then

C3udcar5                          Pearson - direct

1    I went into depth about certain things I needed to go back and

2    ask different questions about.

3            But I would have to check whether that was either the

4    first or second time.  I don't always do it the first time

5    because it is very emotionally arousing, so sometimes I like to

6    let the person have a relationship, you know, do part of the

7    interview, establish some type of rapport with the person

8    before I then ask them to tell me incredibly upsetting or

9    personal information.  So I would have to go back and look

10   whether I did it the first or second time.  But that's why I

11   always like to have more than one interview.

12   BY MR. SAXENA:

13   Q.  What was Mr. Caravantes' narrative?

14   A.  Mr. Caravantes explained to me that he had been working at

15   Remi for many years; that sometime around 2005 -- I guess prior

16   to what he described as his job being threatened, or being

17   threatened to be fired, that Mr. Velandia had made attempts

18   at -- you know, touching him or engaging in some type of sexual

19   interaction; that he had rebuffed; and then after he was --

20   that his job was threatened.  He felt that he needed to submit

21   to these sexual advances because Mr. Velandia was the

22   right-hand man or the manager of -- Mr. Pistorio.

23           So it began as over-the-clothing touching and moved to

24   under-the-clothing fondling, and then there were many episodes

25   of oral sex where oral sex was performed on Mr. Caravantes.

C3udcar5                          Pearson - direct

 1    And then at some point there were no more -- I guess, between

 2    10 and 20 episodes of anal intercourse.

 3              THE COURT:  Remind me, when did these interviews

 4    begin?  On February 4, 2010?

 5              THE WITNESS:  That was the first one.

 6              THE COURT:  And the others were February 17 and

 7    February 24?

 8              THE WITNESS:  Yes.

 9              THE COURT:  April 2, and January 13, 2011?

10              THE WITNESS:  That's correct.

11    BY MR. SAXENA:

12    Q.  And why was taking Mr. Caravantes' narrative necessary in

13    this case?

14    A.  Well, number one, I wanted to hear what he had to say,

15    obviously hear what happened; the information is important.

16    I'm also looking to see whether the symptoms that he's

17    reporting are consistent with what you might expect from that

18    particular type of trauma or that reported story, narrative.

19              And it was.

20    Q.  And, I'm sorry, could you expound on the end of that

21    answer?  You said, "it was."  What do you mean by that?

22    A.  The symptoms that Mr. Caravantes was reporting to me, along

23    with -- and I will talk about this next -- the collateral

24    information and the testing, that these symptoms were

25    consistent -- flashbacks, nightmares, intrusive memories of

```
 1  unwanted sexual activity -- this is all consistent with the
 2  narrative that he's describing to me, where he's reporting that
 3  he's engaging or submitting to unwanted sexual activity at
 4  work.
 5  Q.  Did you supplement your expert report in this matter?
 6  A.  I did.
 7  Q.  Can you describe to the Court what you did to supplement
 8  your report, or what that supplement contained?
 9  A.  Yes.  So I was asked a question at the deposition, at my
10  deposition, about who penetrated, or I guess -- I don't
11  remember the exact question right now, but whether or not
12  Mr. Caravantes penetrated Mr. Velandia or whether Mr. Velandia
13  penetrated Mr. Caravantes and what Mr. Caravantes had told me.
14  And in my deposition I reported that Mr. Caravantes -- that it
15  was my understanding that Mr. Caravantes had reported that
16  Mr. Velandia had penetrated him.
17          However, after the deposition I refreshed my
18  recollection and that Mr. Caravantes did not say that to me.
19  That was an assumption I made based on my interview with him,
20  where he said that he had had anal intercourse with him.  And
21  so I wrote the supplement to correct my statement -- my error
22  at the deposition.  And also to say that --
23          THE COURT:  How did you correct it?
24          THE WITNESS:  By stating that Mr. Caravantes did not
25  say that to me.  So my error was that --
```

C3udcar5                          Pearson - direct

1            THE COURT:  Did you say what he did say?

2            THE WITNESS:  Yes.  In my correction?

3            THE COURT:  Yes.

4            THE WITNESS:  Yes.  Which was that he said

5    Mr. Velandia had anal sex with him, not that he was ever

6    penetrated.

7            THE COURT:  Had what?

8            THE WITNESS:  Had anal sex -- anal intercourse with

9    him.  But my assumption was who was penetrating --

10           THE COURT:  What do you mean by that?

11           THE WITNESS:  Well, that was the misunderstanding.  I

12   made an assumption as to what that meant.

13           THE COURT:  What does that mean to you?

14           THE WITNESS:  Now?

15           THE COURT:  No.

16           THE WITNESS:  Now it means it is ambiguous.

17           THE COURT:  You corrected it?

18           THE WITNESS:  Yes.

19           THE COURT:  Why did you correct it?

20           THE WITNESS:  Because originally what I misunderstood

21   that to mean was that Mr. Velandia had penetrated

22   Mr. Caravantes.  But that's not what it meant.  It was an

23   ambiguous statement that I did not clarify in the moment

24   because I made an assumption about what it meant.

25           THE COURT:  What did you ascertain -- or how did you

C3udcar5                         Pearson - direct

1   ascertain what it meant?

2            THE WITNESS:  I'm sorry.  I don't know that I'm -- as

3   I was doing the interview, my assumption, based on what he

4   said --

5            THE COURT:  Another interview?

6            THE WITNESS:  No, this was back then.  This is while I

7   was doing my interview.

8            THE COURT:  Was this after you gave your deposition.

9            THE WITNESS:  No.  One of the interviews from the five

10  interviews that I did, we talked about the anal sex, right, the

11  narrative, and within that narrative he told me that

12  Mr. Velandia -- that he and Mr. -- that Mr. Velandia had had

13  anal intercourse with him.  My assumption while we were doing

14  that interview was that -- was what that meant as to who was

15  penetrating who.  However, that was my assumption.  I didn't

16  clarify it.

17           THE COURT:  In order to have intercourse, there has to

18  be penetration, right?

19           THE WITNESS:  Yes.  Well, yes.  Yes.

20           THE COURT:  I mean, anal penetration.

21           THE WITNESS:  Yes.  But the who was doing it to who

22  was the part that I --

23           THE COURT:  I understand.  Why did you change it?

24           THE WITNESS:  Because I was not correct in assuming

25  what that sentence meant.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C3udcar5                           Pearson - direct

1          THE COURT:  How do you know you were not correct?

2          THE WITNESS:  How do I know I was not correct?  I

3    don't believe I was correct because no other information

4    suggests that Mr. Velandia ever penetrated --

5          THE COURT:  What other information?

6          THE WITNESS:  So the deposition that Mr. Caravantes

7    gave, there is -- I guess all of the other relevant information

8    that I subsequently know.

9          THE COURT:  You reviewed that before, hadn't you?

10          THE WITNESS:  Before I met with him?  No.

11          THE COURT:  No.  Before your deposition.

12          THE WITNESS:  Before my deposition, yes.  But it was

13    not a detail that -- within this narrative of this three-year

14    period of unwanted sexual behavior, it wasn't a detail as --

15    you know, it was an event that occurred fewer times than any of

16    the other sexual contact.  It wasn't a detail that I

17    specifically focused on as much as the overall description of

18    unwanted sexual behavior over time.  So....

19          THE COURT:  So there was nothing -- you didn't talk

20    with anyone or review it with anyone?

21          THE WITNESS:  Review what?

22          THE COURT:  Your change.

23          THE WITNESS:  Oh, the change?  I mean, I submitted

24    that supplement with the correction.  I mean, I made an

25    addendum to my report; is that what you mean?

C3udcar5                          Pearson - direct

1          THE COURT:  You didn't talk with anyone before you

2     made that supplement?

3          THE WITNESS:  I mean, at the deposition, yes.  At my

4     deposition, yes.

5          THE COURT:  Was the change made based on what you

6     learned in that conversation?

7          THE WITNESS:  Well, and a number of other things, yes,

8     reviewing of other information, yes.

9          THE COURT:  What other information?

10         THE WITNESS:  Going back and seeing what the

11    deposition of Mr. Caravantes said, where he gave that testimony

12    as well.  But I didn't go back and talk to Mr. Caravantes.

13         THE COURT:  Was it brought to your attention by

14    someone?

15         THE WITNESS:  Yes.  I was asked about it at the

16    deposition, and, yes, it was brought to my attention.

17         THE COURT:  By who?

18         THE WITNESS:  By the attorneys I was working with.

19         THE COURT:  The attorneys for whom?

20         THE WITNESS:  For Mr. Caravantes.

21    BY MR. SAXENA:

22    Q.  And having supplemented your report in this manner,

23    Dr. Pearson, did your supplement cause you to change your

24    diagnosis from what it had previously been?

25    A.  No.

C3udcar5                          Pearson - direct

1   Q.   Why not?

2   A.   As I was just describing, the episodes of anal intercourse,

3   whoever penetrated whoever, still is a boundary violation, a

4   physical violation, which is what contributed to my diagnosis

5   in the first place, and that these episodes of anal intercourse

6   were some of what were described as many unwanted sexual

7   behaviors that occurred over a three-year period of time.  So

8   it did not change my opinion.

9   BY MR. SAXENA:

10  Q.   And does that mean that you found the symptoms to still be

11  consistent with the narrative?

12  A.   Yes.

13  Q.   Even after supplementing it?

14  A.   Yes.

15          THE COURT:  Did you have an interpreter present?

16          THE WITNESS:  I did have an interpreter present.

17  Q.   Can you tell us about your interpreter, Dr. Pearson?

18          THE COURT:  Do you know from what country the

19  interpreter learned Spanish?

20          THE WITNESS:  The interpreter is a psychologist also,

21  and her -- she is from Spain.  So her --

22          THE COURT:  And the other one?

23          THE WITNESS:  That's it.  I had the same one every

24  single time.

25          THE COURT:  She is a native of pain?

579

1              THE WITNESS:  She is a native of Spain.

2              THE COURT:  Any other South American country?

3              THE WITNESS:  I don't know the answer to that, whether

4    she has or not.  I know she does evaluations in Spanish on

5    clients from many countries, and she has evaluated individuals

6    from Mexico before.

7    BY MR. SAXENA:

8    Q.  Did you also take a history from Mr. Caravantes?

9    A.  Yes, I did.

10   Q.  Can you briefly describe this history that he provided?

11   A.  Sure.  Well, most relevant in this particular case about

12   the history is that there wasn't anything particularly

13   significant that might lead to a diagnosis.  So he provided me

14   with his early history, his educational history.  There is no

15   psychiatric history.  He was having some medical concerns

16   during the time that I saw him; we talked about that.  But

17   there were no major medical problems in his history.

18         His work history was very consistent over a 20-year

19   period of time, and no known psychiatric problems prior to me

20   meeting with him -- or prior to, excuse me, these events.

21   Q.  And do your clinical interviews of Mr. Caravantes support

22   your diagnoses of posttraumatic stress disorder and major

23   depressive disorder?

24   A.  Yes.

25   Q.  Can you explain how?

C3udcar5                          Pearson - direct

1    A.  The symptoms -- the behavioral observations -- I mean, they

2    support it also in the context of the other information, the

3    psychological testing and the collateral resources.  But all of

4    that information together provides a consistent picture of

5    depressive symptoms and anxious symptoms that meet criteria for

6    major depressive disorder and PTSD.

7    Q.  OK.  So I would like to move on to psychological testing.

8         Can you explain to the Court what psychological

9    testing you performed on Mr. Caravantes?

10   A.  I completed two measures, the Personality Assessment

11   Inventory And the Structured Interview of Reported Symptoms,

12   which is in the second position.

13   Q.  OK.  Let's start with the Personality Assessment Inventory.

14   A.  Yes.

15   Q.  Can I call that the PAI?

16   A.  Yes.

17   Q.  What does the PAI test for?

18   A.  It looks at clinical symptoms that the person is reporting,

19   personality functioning, meaning how they may interact with

20   others in the world.  And there are validity scales, as well,

21   or scales of response style built into the Personality

22   Assessment Inventory.  And this is a measure that has been

23   translated into Spanish -- both of them, actually.

24   Q.  And is it -- when you say it is translated into Spanish, is

25   it approved for use in Spanish speakers?

C3udcar5                         Pearson - direct

1   A.   It is approved for use in Spanish speakers.  It is most

2   useful in looking at the clinical symptoms.  There is less

3   validity or -- the research has been less consistent or clear

4   in its use in looking at the validity scales.

5            So the translated version hasn't been normed in the

6   same way as the regular version.  So when they do a comparison

7   study, they found that the clinical scales are useful, they're

8   applicable to Mexican -- specifically to Mexican-speaking --

9   the Mexican Spanish-speaking population, but the validity

10  scales they were less certain of.  And there hasn't been a lot

11  of follow-up research since, and a new test actually just came

12  out so there won't probably be any more research in that area

13  because of this new test that just came out.

14  Q.   Can you explain to the Court the distinction between the

15  clinical scales and validity scales that you discussed?

16  A.   So the clinical scales are directly related -- most of them

17  are directly related to DSM criteria, looking at symptoms and

18  experiences that people are saying they are experiencing.

19           The validity scales are how was the response style:

20  How was this person responding to this test?  Are they paying

21  attention?  Are they trying to look worse or look better?  Are

22  they denying certain things?  Or are they randomly responding?

23  Q.   So just to clarify, are you more confident -- so what does

24  the norming issue mean for those two scales?

25  A.   That the clinical information that comes out of the PAI is

C3udcar5                              Pearson - direct

1    more reliable than what's coming out of the validity scales,

2    which is why you would give the SIRS-2, to hopefully get a

3    sense of response style.

4    Q.   Why is the SIRS-2 reliable?

5    A.   The SIRS-2 has been found to be reliable in its Spanish

6    translation.

7    Q.   So focusing on the clinical scales of the PAI, what were

8    the results of Mr. Caravantes' tests?

9    A.   The results were primarily consistent with my evaluation,

10   my interview, his symptom report, my behavioral observations of

11   him.  Anxiety both at -- I'm sorry.  Affective, cognitive and

12   physiological symptoms of anxiety, so that's like thoughts,

13   emotions and physical responses to anxiety; that was reported.

14   Depressive symptoms were reported.  Feelings of persecution

15   were reported.  Social isolation and withdrawal.  Confusing

16   thoughts.  All of those things were consistent with what I was

17   told by him and things that I observed as well.

18   Q.   You mentioned that the PAI criteria related to the DSM, is

19   that --

20   A.   Yes.

21   Q.   And how is it related to the DSM?

22   A.   So the test, when you put in the individual's responses, it

23   looks at how the responses line up with DSM-IV criteria, and

24   then it gives you options, like closest matches to DSM-IV

25   criteria.

1        THE COURT:  And when used the word "related," you mean

2   related in results, is that correct?

3        THE WITNESS:  The results --

4        THE COURT:  Conclusions?

5        THE WITNESS:  Not conclusions.

6        I'm sorry.  Can you say the question again?

7        THE COURT:  When you say they were related, you mean

8   those sections of the report related, the results?

9        THE WITNESS:  So the --

10       THE COURT:  You are not saying that they were somehow

11  related --

12       THE WITNESS:  I don't know that I'm -- sorry, I don't

13  think I am following your question.

14       THE COURT:  -- in the manner in which they were taken?

15       THE WITNESS:  No.  So the individual provides

16  responses to many, many, many questions, and how they respond

17  to certain questions, those questions match criteria for the

18  DSM, and then the program of the test tells you best matches.

19       Right.  So, yeah.  Right, yeah.

20       THE COURT:  It has more than one meaning.

21  BY MR. SAXENA:

22  Q.  Do you recall what DSM criteria the PAI matched up to in

23  Mr. Caravantes' case?

24  A.  Yes.

25  Q.  What?

C3udcar5                         Pearson - direct

1    A.  Major depressive disorder and posttraumatic stress disorder

2    with a top, Axis 1, considerations.

3    Q.  If the PAI gives you a DSM diagnosis, why do you need to do

4    anything else?

5    A.  Well, testing -- first of all, one test, or even testing in

6    general is just an aspect of your evaluation.  So you're

7    looking for numerous sources of information to provide a

8    consistent picture.

9         The test is giving you more data points that are

10   providing, again, consistency, but you wouldn't rely just on

11   one tool, one measure, to come to your conclusion.

12   Q.  So is it your conclusion that the PAI results are

13   supportive of your overall diagnosis?

14        MR. PARKER:  Objection.

15        THE COURT:  Objection sustained to the form of the

16   question.

17   Q.  What conclusions have you drawn from the PAI results?

18   A.  That the PAI results are consistent with the rest of the

19   materials, my evaluation, all the other information that I have

20   in making a diagnosis.

21   Q.  You also mentioned the SIRS-2, S-I-R-S - 2.

22   A.  Yes.

23   Q.  Can you describe that?

24   A.  Mm-hmm.  So this is a structured interview that is designed

25   to assess response style or feigning or exaggeration of

C3udcar5                         Pearson - direct

1    psychopathology.

2    Q.   What does feigning or exaggeration of psychopathology mean?

3    A.   So that would mean someone making up symptoms or

4    exaggerating symptoms; you know, they have symptoms but they

5    are making them sound worse.

6    Q.   And how does the SIRS-2 make this evaluation?

7    A.   Well, it looks at a number of areas that known feigners or

8    exaggerators -- known things that they do, and it incorporated

9    that into an interview.  It asks about symptoms that are, you

10   know, don't really occur, perhaps.  And it compares the

11   individual taking the test to known what are called

12   dissimulators, or known feigners or exaggerators.

13   Q.   And what did Mr. Caravantes' results on the SIRS-2

14   indicate?

15   A.   So overall his score fell in a range that's called the

16   indeterminate general range.  It means that there is no

17   increased likelihood of him feigning or exaggerating his

18   symptoms than seen in the base rate population that takes the

19   test, like the test is normed done.

20   Q.   OK.  I would like to move on to collateral resources.

21        What were the collateral resources that you consulted?

22   A.   So I interviewed Mr. Caravantes' wife, Martina Caravantes,

23   also with the same interpreter.  And I reviewed medical records

24   and mental health records that spanned 2008 to 2012.

25   Q.   You also had previously mentioned Mr. Caravantes'

1   deposition.

2   A.  Yes.  I reviewed other documents that were provided to me,

3   including depositions and other -- the civil complaint and

4   other items like that.

5   Q.  Are certain of these item more or less important in your

6   analysis?

7   A.  Everything is important, but in terms of -- again, I was

8   asked to do an evaluation of the individual's, you know, do a

9   psychological assessment within this context, and so collateral

10  resources that provide information related to consistency of

11  symptom report and evaluation of him psychologically are most

12  relevant to my evaluation.

13  Q.  Why did you interview Mrs. Caravantes?

14  A.  Because she sees him -- she, as his wife, would potentially

15  see him the most and would be able to provide an outsider's

16  perspective on his behavior.  So she's doing her own behavioral

17  observations of him, and I want to get a sense of if they are

18  consistent with what he's telling me and with what I'm seeing.

19  Q.  What perspective did she provide to you?

20  A.  When I met with her, she was not aware of all of the

21  circumstances related to the -- she wasn't aware that there was

22  any sexual or unwanted sexual behavior between -- that

23  Mr. Caravantes was reporting.  So she thought that he was

24  having problems at work or something related to work.

25          And what she said was quite consistent with what

1    Mr. Caravantes had told me about himself.  She observed that he

2    was having very significant change in his sleep; that he was

3    waking up in the middle of the night having nightmares;

4    sounding like he was unable to breathe; he wasn't sleeping

5    well; he was despondent from his three daughters with whom he

6    had previously had a very close relationship with; that he was

7    tense with her, irritable.  She said he had never been somebody

8    who cursed or yelled but that all -- you know, now he was doing

9    those things towards her.  She was very distraught when we were

10   meeting.

11             And she said that their sexual relationship had

12   dramatically changed.  I guess -- I think the timeframe was

13   about within the last -- the two years; I saw her in 2010.  And

14   that he had gained some weight.  And that his memory and

15   that -- that his memory was worse and that he was distractable

16   and that he spent a lot of time out of house.

17             THE COURT:  When did she say that he had a change that

18   occurred?  I thought you said one thing and I just want to be

19   sure what years.

20             THE WITNESS:  So I saw her in 2010 at the second

21   meeting that I met with him, and she said that it had been, I

22   think -- I would have to look back at my report, but I think it

23   was about two years that their sexual -- maybe three, I have to

24   look.  But two years, I think, that their sexual relationship

25   had been impaired, that he didn't seem to want to be with her

C3udcar5                              Pearson - direct

1   sexually anymore.

2   BY MR. SAXENA:

3   Q.  OK.  In addition to interviewing Mrs. Caravantes, what

4   other collateral sources were you provided?

5   A.  There were a number of mental health records that I was

6   provided.  I looked at medical records, too, but the mental

7   health records were most relevant.  And I reviewed records from

8   a number of sources.

9   Q.  I would like you to turn, please, in your binder to Exhibit

10  22.  Let me know when you have it.

11  A.  Yes.

12  Q.  Do you recognize this record?

13  A.  Yes.

14  Q.  What is it?

15          THE COURT:  I'm sorry, I don't have it.

16          THE CLERK:  22.

17          THE WITNESS:  It is before my report.

18          THE COURT:  The first page of 22 is on the board.

19  BY MR. SAXENA:

20  Q.  Do you recognize that first page?

21  A.  Yes.

22  Q.  What is it?

23  A.  This is kind of an overview of services that were provided

24  by Safe Horizon to Mr. Caravantes.

25  Q.  What is Safe Horizon?

C3udcar5                         Pearson - direct

1  A.  It is my understanding, it is a service -- an agency that

2  provides services, including counseling and advocacy, to

3  individuals who are reporting domestic violence or sexual

4  assault.

5  Q.  Do you see on the bottom of the page there are a series of

6  dates under "Client Case Notes"?

7  A.  Yes.

8  Q.  Do you have an understanding of what those dates are?

9  A.  These are the dates that Mr. Caravantes saw a counselor

10  named Ms. Castillo.

11  Q.  Is that Hilda Castillo whose name appears at the top of the

12  page?

13  A.  Yes.

14  Q.  In the same exhibit, Plaintiffs' Trial Exhibit 22, I would

15  like you to flip to page 28, the last page.

16  A.  Yes.

17  Q.  Did you review this document?

18  A.  I did.

19  Q.  And what is that?

20  A.  This is the first session he had with Ms. Castillo on

21  July 18, 2008.

22  Q.  And did you find it significant in making your assessment?

23  A.  I did.  I found the information useful.  This is -- a

24  couple of things are of note.  One is, again, there is -- this

25  is the first time I had the opportunity to observe or there

C3udcar5                          Pearson - direct

1    seems to be any documentation of his symptoms and how he's

2    reporting -- and what he's reporting has happened.  So I used

3    this to get a timeline of symptoms.  This is still while he's

4    working at the restaurant so it's giving a sense of how he is

5    feeling and what's happening to him prior to his leaving the

6    restaurant or no longer working at Remi.

7              And, again, there is a piece of the narrative that is

8    consistent, where it says that the manager forced him to

9    perform sexual favors if he wanted to keep his job.  And his

10   symptomatic response to that, where he gets visibly upset,

11   describing distressing images, feeling shame and guilt,

12   experiencing nightmares and distressing dreams.  Again, this is

13   one additional piece of consistency in the symptom report and

14   the narrative that I used in my evaluation.

15   Q.  I actually should have asked this earlier.

16             Did you prepare a slide concerning these records?

17   A.  Yes.

18   Q.  Or did you have us prepare a slide?

19   A.  Yes.

20             MR. SAXENA:  Can we see that slide now?

21   Q.  Did you prepare a slide specifically about Ms. Castillo's

22   report?

23   A.  Yes.

24             MR. SAXENA:  Can we see that one?

25             THE COURT:  When were these prepared, the slides?

C3udcar5                          Pearson - direct

1            THE WITNESS:  I had asked them to prepare the slides.

2       I don't know the date that the slide was prepared.

3            THE COURT:  And when was that?

4            THE WITNESS:  Within the last two weeks.

5       BY MR. SAXENA:

6       Q.  So this information that appears on the slide, is that the

7       symptom report that you referred to previously?

8            THE COURT:  Did you give them anything to prepare the

9       slide from?

10           THE WITNESS:  Did I give them anything?  No.  All the

11      materials were here already.

12           THE COURT:  All of what?

13           THE WITNESS:  All of the information on the slides are

14      in the materials.

15           THE COURT:  Yes.  But did you point out the

16      information you wanted included on the slide?

17           THE WITNESS:  Yes, we discussed it.  Yes.

18           THE COURT:  And when did you do that?

19           THE WITNESS:  Within the last two weeks, two weeks

20      ago.

21           THE COURT:  Go ahead.

22           MR. SAXENA:  OK, Randall, you can go to the next

23      slide.

24      Q.  OK.  Still staying within Plaintiffs' Trial Exhibit 22,

25      Dr. Pearson -- and, Randall, you don't have to put this up --

C3udcar5                              Pearson - direct

1        THE COURT:  What is on the board now?

2        MR. SAXENA:  This is just the next slide, your Honor.

3        THE COURT:  How do I identify the slides in my notes?

4   I have to write an opinion here.

5        MR. SAXENA:  We can distribute hard copies of the

6   slides and identify them now.  We can do that.

7        THE COURT:  Get the slides marked so that I can

8   identify them.  They have got to be in my record.

9        MR. DELANEY:  I am going to mark them for

10  identification, your Honor.

11       MR. SAXENA:  Your Honor, we are going to mark the

12  slides as Plaintiffs' Exhibit 200, for identification.

13       THE COURT:  200-A, B, C, D, or something?

14       MR. SAXENA:  For each slide, OK.

15       THE COURT:  To remind me of the testimony.

16       MR. DELANEY:  For identification?

17       THE COURT:  As long as it is in the report and not

18  confusing.

19  BY MR. SAXENA:

20  Q.  Dr. Pearson, without discussing the slides for now, let's

21  just focus on Plaintiffs' Trial Exhibit 22 in your binder.

22  A.  Mm-hmm, yes.

23  Q.  Could you flip, please, to page 27.

24  A.  Yes.

25  Q.  Did you review this document --

1    A.   Yes.

2    Q.   -- in preparing your assessment?

3    A.   Yes, I did.

4    Q.   And what is this document?

5    A.   This is the second session that Mr. Caravantes had with

6    Ms. Castillo.  Again, there is more description of his

7    symptoms.  The fact that he's avoiding family, keeping to

8    himself, becoming, you know, socially isolated, feelings of

9    anger and rage, feeling very emotional, becoming tearful,

10   presenting with some anxiety.

11   Q.   OK.  And what is the date of this session?

12   A.   This is July 29, 2008.

13   Q.   And why was this significant, or was this significant in

14   your evaluation?

15   A.   Yes.  I mean, again, this is providing more -- not only his

16   symptom report but Ms. Castillo's behavioral observations of

17   him while he is giving this report.  He's also still working at

18   the restaurant.  And this is giving me again a timeline of his

19   symptoms and a measure of consistency.

20   Q.   Please flip to page 26 of 28 in the same trial exhibit.

21   A.   Yes.

22   Q.   Did you review this document in preparing your assessment?

23   A.   Yes, I did.

24   Q.   And what is it?

25   A.   This is the third session, which takes place on August 14,

C3udcar5                       Pearson - direct

1    2008.

2    Q.  And did you find that significant as well?

3    A.  Yes.  I mean, again, it's providing -- so Mr. Caravantes is

4    still working at the restaurant but he's talking about having

5    problems, and, again, presenting with worry and tension,

6    symptoms of anxiety.  He's feeling overwhelmed.  So, again,

7    just more consistency of his symptoms.

8    Q.  And can you please -- I'm sorry, what is the date on that

9    slide?

10   A.  August 14, 2008.

11   Q.  Can you please flip to page 25 of 28 of the same trial

12   exhibit?

13   A.  Yes.

14   Q.  Did you review this document in making your assessment?

15   A.  Yes.

16   Q.  And what information did you gain from this document?

17   A.  So this is the fourth session.  And this is where

18   Mr. Caravantes reports to Ms. Castillo that he was laid off, or

19   lay off; that the manager told him to pack his belongings, that

20   he doesn't work there anymore.  And he's emotionally

21   distraught, again reporting distress, taking long walks,

22   describing anger, confusion, disbelief, etc.  And this is

23   August 27, 2008.

24   Q.  Did you also review what is page 24 of 28?

25   A.  Yes.

C3udcar5                        Pearson - direct

1    Q.  And what is that?

2    A.  This is session five, again, with Ms. Castillo.

3              She describes him as appearing flat, meaning no

4    affect, or like a blunted constricted affect.  He's having --

5    he's reporting symptoms again, difficulty sleeping, nightmares.

6    He's isolating himself from friends and family -- or, excuse

7    me, family, his children and his wife.  Now he's talking about

8    feeling distressed about not having a job, financial hardship.

9              Again, a measure of consistency.

10   Q.  Finally, did you review page 23 of 28 in Plaintiffs' Trial

11   Exhibit 22?

12   A.  So this is the last session that takes place March 23,

13   2009.

14             Again, appearing worried and anxious.  Sees some

15   behavioral observations of that by the snapping of the buttons

16   and clenching.  He's reporting nightmares, difficulty

17   concentrating in a course he's taking.  He's withdrawing from

18   family, depression.  And, again, this is another measure of

19   consistency.

20   Q.  And looking at all of those entries that we've described

21   together as a whole, meaning Plaintiffs' Trial Exhibit 22,

22   pages 23 through 28, what information did you gain from them as

23   a whole?

24   A.  So this is the first interaction he has with some type of

25   counselor.  It is the first documentation of his symptoms and

C3udcar5                          Pearson - direct

1   his experiences, of his feelings, and someone else's behavioral

2   observations of him.  So this provides useful information to

3   me, again talking about consistency of symptom report, and when

4   these symptoms are really starting to develop and get worse.

5           MR. SAXENA:  Thank you.

6           Your Honor, I believe we have the slides ready.

7           THE COURT:  Show them to Mr. Parker.

8           MR. PARKER:  I have a copy, Judge.  Thank you, Judge.

9           MR. SAXENA:  Does your Honor have a copy as well?

10          THE COURT:  I will mark them for the record so that I

11  can review them, the transcript with the slides, when they are

12  referred to.

13          MR. SAXENA:  OK.

14          THE COURT:  You should mark them for identification

15  now.

16          MR. SAXENA:  So for the record, then --

17          THE COURT:  You just have to give the number and

18  letters and say they are the slides with the witness,

19  Ms. Pearson.

20          MR. SAXENA:  OK.  So let's view them on the screen,

21  and I will mark them for identification as we see them.

22          Randall, can you go to --

23          THE COURT:  You can mark them for identification now

24  and just hand them in.

25          MR. SAXENA:  Then I would like to mark, Judge, as

C3udcar5                        Pearson - direct

1   Plaintiffs' Exhibit 200, a two-page slide, it has pages 1 and

2   2, with "Psychological Assessment" at the top of the first

3   page.

4              THE COURT:  That is A?  200A?  Or 200-1?

5              MR. SAXENA:  There are different series of slides,

6   your Honor.  So this is 200, this one series, and it has got

7   two pages.

8              THE COURT:  All right.  So it is Exhibit 200 for

9   identification is admitted for that purpose.

10             (Plaintiff's Exhibit 200 received in evidence)

11             MR. SAXENA:  Also marked for identification,

12  Plaintiffs' Exhibit 201, which is a nine-page slide, which at

13  the top of the first page says, "Arturo Caravantes:  PTSD & MDD

14  Diagnoses."

15             THE COURT:  201, for identification -- it is marked

16  201 for identification.

17             Go ahead.

18             MR. SAXENA:  Also marked for identification

19  Plaintiffs' Exhibit 202, which is a five-page slide, which on

20  the front page says "DSM-IV-TR" and then "Additional Effects"

21  follows.

22             THE COURT:  Exhibit 202, for identification.

23             MR. SAXENA:  And, finally, Judge, Plaintiffs' Exhibit

24  203, which is a one-page slide that says at the top, "Arturo

25  Caravantes:  Impairment."

C3udcar5                          Pearson - direct

1           THE COURT:  That is marked Plaintiffs' Exhibit 203,

2   for identification.

3           All of these will be used by the witness Pearson?

4           MR. SAXENA:  Yes, your Honor.

5           THE COURT:  All right.  You can go ahead.  I've got

6   about three or four more minutes before I have to conduct an

7   arraignment and then I have another matter.

8           MR. SAXENA:  Understood, your Honor.

9   BY MR. SAXENA:

10  Q.  OK.  Dr. Pearson, if you could -- I think we can do this in

11  enough time.

12          If you could flip to Plaintiffs' Exhibit 24, in your

13  binder.

14  A.  OK.

15  Q.  Do you recognize that document?

16  A.  Yes.

17  Q.  What is it?

18  A.  This is a psychiatric evaluation completed by a

19  Dr. Cervantes on July 18, 2009.

20  Q.  And what is the date of this document?

21  A.  July 18, 2009.

22  Q.  Did you review it in the course of making your assessment?

23  A.  I did.

24  Q.  Were you able to make out the handwriting?

25  A.  Some of it.

C3udcar5                        Pearson - direct

1    Q.  OK.

2    A.  To the best of my ability, I did, yes.

3    Q.  What were you able to make out?

4    A.  So there is a history of present illness, which is the

5    initial complaint that the individual comes in with.

6              And Dr. Cervantes describes that Mr. Caravantes is

7    feeling frustrated, sad, depressed, and anxious since August

8    '08, after he lost his job, and that he reported being abused

9    sexually by a homosexual manager with the promise of getting a

10   better position in the restaurant; that the patient ends up

11   losing his job, and since then he's had intermittent thoughts

12   about the molestation and abuse.  That he feels depressed at

13   times.  He's got poor sleep.

14             And it goes on to talk about the rest of his symptoms:

15   Feeling irritable, appetite OK, energy OK, decreased

16   concentration.  That he denies manic or psychotic symptoms.

17   That he feels irritable, angry at times.  And I think the

18   stressor is that he is unemployed.

19             And then he provides a little bit of history -- very

20   little, minor stuff -- and then he provides a diagnosis at the

21   completion of the evaluation, and recommends medication.

22   Q.  And what diagnosis does he provide?

23   A.  The diagnosis here is major depressive disorder recurrent,

24   rule out posttraumatic stress disorder on Axis 1.

25   Q.  Could you explain what "rule out" means?

1    A.   Yeah.  "Rule out" is a term that is used to indicate that

2    you are considering the diagnosis as a clinician but you

3    don't -- you may not have enough information or it may not have

4    been enough time -- there may not have been enough time passed

5    for you to make the diagnosis.  So it is something that you are

6    still considering.

7              THE COURT:  Did you say "ruled" out or "rule" out?

8              THE WITNESS:  Rule.  It's rule -- yeah, rule out,

9    right.  So you're still considering it; you just don't know

10   yet.

11   BY MR. SAXENA:

12   Q.   And you mentioned Dr. Cervantes.  Does his name appear on

13   this page anywhere?

14   A.   Yes.

15   Q.   Where?

16   A.   I'm sorry.  On page 2 of 3?

17   Q.   Yes.

18   A.   At the bottom.

19   Q.   Is that Lober Cervantes, M.D.?

20   A.   Yes.

21             THE COURT:  Where is that.

22             THE WITNESS:  At the bottom of page of 2 of 3.

23             THE COURT:  Oh, the first name?

24             THE WITNESS:  Yes.  Lober.

25             THE COURT:  The first name of Dr. Cervantes?

C3udcar5                        Pearson - direct

1              THE WITNESS:  Yes.

2   BY MR. SAXENA:

3   Q.  Lastly, Dr. Pearson, do you see in the middle of the page

4   on page 2, under "Diagnosis," there is an Axis 5?

5   A.  Yes.

6   Q.  It says "GAF."

7   A.  Yes.

8   Q.  What does that mean to you?

9   A.  The GAF is the Global Assessment of Functioning.  It is a

10  scale from zero to 100, described in the DSM-IV.  And it kind

11  of classifies people based on a number, where -- how severe

12  their impairment is.  So a 55 is -- I think between 51 and 60

13  is moderate impairment.  And I can't -- I would have to see the

14  DSM to tell you exactly what it is, but it is moderate

15  impairment in functioning and moderate level of symptoms, or

16  moderate symptom severity.

17             THE COURT:  Where is the 55?

18             THE WITNESS:  If you see "Diagnosis" in the middle of

19  the page?

20             THE COURT:  Yes.

21             THE WITNESS:  It is Axis I, Axis II, Axis III, Axis IV

22  and Axis V.  Axis V says "GAF" and then "55."

23             MR. SAXENA:  Can you put up the slide on this?  That

24  might help.

25             This is Plaintiffs' 201, page 3.

C3udcar5                          Pearson - direct

1           (Indicating)

2           MR. SAXENA:  Your Honor, the parties have a

3    stipulation --

4           THE COURT:  All right.

5           MR. SAXENA:  -- that they have signed.

6           THE COURT:  Do you want to read it into the record?

7           MR. SAXENA:  Yes, sure.  Or we could enter it or I

8    could read it, either way.

9           THE COURT:  Do you want to hand it up?

10          MR. SAXENA:  I think --

11          THE COURT:  Then go ahead.

12          MR. SAXENA:  I think it might be more efficient that

13   way; it is a little long.

14          And as part of that stipulation, Plaintiffs' Exhibits

15   22 and 24, which we just reviewed with Dr. Pearson, are agreed

16   by all parties to be authentic and to be business records.

17          THE COURT:  Well, let's --

18          MR. SAXENA:  And --

19          THE COURT:  I've got the stipulation, signed by

20   Mr. Parker and Mr. Delaney.  I want to give it a number.

21          MR. SAXENA:  We can mark the stipulation for

22   identification, your Honor.

23          THE COURT:  Well, you both stipulated to it so it

24   should be in evidence.  I just want to give it a number.

25          MR. PARKER:  How about J1?

C3udcar5                          Pearson - direct

1              THE COURT:  Can you do S-1, if you've got more than

2      one stipulation?

3              MR. SAXENA:  Let's do S-1.

4              THE COURT:  All right.  Exhibit S-1 is admitted in

5      evidence.

6              (Joint Exhibit S-1 received in evidence)

7              MR. SAXENA:  Based on that stipulation, Judge, I would

8      also request that Exhibits 22 and 24 be moved into evidence.

9              THE COURT:  Any objection?

10             MR. PARKER:  No objection.

11             THE COURT:  22 and 24 are admitted in evidence.

12             (Plaintiff's Exhibits 22 and 24 received in evidence)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

C3udcar5                          Pearson – direct

1            MR. SAXENA:  Do we have time, Judge?

2            THE COURT:  I guess we've got to break.

3            The best I can figure is 2 o'clock on Monday to

4     recommence.

5            And don't you have that baby beforehand.

6            THE WITNESS:  I can't promise.  I have to say, I can't

7     promise.  I'll try.

8            THE COURT:  All right.

9            MR. PARKER:  Monday night.

10            THE WITNESS:  Let's hope not.

11            THE COURT:  We all wish you the best.

12            THE WITNESS:  Thank you.  Thanks.

13            (Witness excused)

14            (Adjourned to 2 p.m., Monday, April 2, 2012)

15

16

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    JESSICA PEARSON

4    Direct By Mr. Saxena . . . . . . . . . . . . . 530

5                        PLAINTIFF EXHIBITS

6    Exhibit No.                                 Received

7     22 and 24   . . . . . . . . . . . . . . . . 603

8     200   . . . . . . . . . . . . . . . . . . . 597

9                         JOINT EXHIBITS

10   Exhibit No.                                 Received

11    S-1                                         603
```