C42dcar1                          Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    ARTURO CARAVANTES and
3   FRANCISCO SOTARRIBA,

4                      Plaintiffs

5           v.                              09 Civ. 7821 (RPP)

6   53RD STREET PARTNERS, LLC
    d/b/a REMI RESTAURANT and
7   OSCAR VELANDIA,

8                      Defendants
    ------------------------------x         New York, N.Y.
9                                           April 2 2012
                                            2:35 p.m.
10
    Before:
11                  HON. ROBERT P. PATTERSON, JR.,

12                                          District Judge

13                          APPEARANCES

14  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
            Attorneys for Plaintiffs
15  1285 Avenue of the Americas
    New York, NY 10019
16  AARON S. DELANEY
    MAYUR P. SAXENA
17  MOIRA KIM PENZA

18  URBAN JUSTICE CENTER
            Attorney for Plaintiffs
19  123 William Street 16th Floor
    New York, NY 10038
20  NICOLE HALLETT

21  EPSTEIN BECKER & GREEN PC
            Attorneys for Defendants
22  KERRY M. PARKER
    ALKIDA KACANI

23
            – also present –
24
    JOHN MATT, LILIANA HALAC – Spanish Language Interpreters
25  RANDALL CARTER – Plaintiff AV Tech

C42dcar1                          Trial

1              (Trial resumed)

2              THE COURT:  Please be seated.

3              The collar is just preventative.

4              Should we call the witness.

5         MR. SAXENA:  The plaintiffs call Jessica Pearson back

6    to the stand.

7     JESSICA PEARSON,

8         Resumed, and testified further as follows:

9              THE COURT:  Dr. Pearson, you are reminded you are

10   still under oath.

11             THE WITNESS:  Yes.  Thank you.

12             THE COURT:  All right.

13   DIRECT EXAMINATION (Resumed)

14   BY MR. SAXENA:

15   Q.  Dr. Pearson, do you still have your binder of exhibits up

16   there?

17   A.  Yes.

18   Q.  I'd like you to please turn back to Plaintiffs' Exhibit 24,

19   page 2 of 3.

20   A.  OK.

21   Q.  And on the screen you will see a slide which has been

22   previously marked as Plaintiffs' Exhibit 201, and it is page 3

23   of that slide.

24             Can you tell us what Axis V represents --

25   A.  Yes.

C42dcar1                          Pearson - direct

1   Q.   -- on this slide?

2   A.   Sorry.

3             Axis V is the GAF, which is the Global Assessment of

4   Functioning, and it is a score from zero to 100 that a

5   clinician gives to assess the individual's functioning at that

6   time based on symptoms and impairment, the level of symptoms

7   and the level of impairment.  And so zero being the most

8   dysfunctional and a hundred being the most functional.

9             THE COURT:  This is Exhibit 24?

10            MR. SAXENA:  This, your Honor, is the slide that we

11   marked yesterday as Plaintiffs' Exhibit 201.

12            THE COURT:  Oh.

13            MR. SAXENA:  It is page 3 of that slide.

14            (Pause)

15            THE COURT:  OK.

16   Q.   What do you understand that the number 55 means there?

17   A.   So 55 is in the -- there is a range of -- each ten-point

18   increment is a range.  And so 51 to 60 is a range of moderate

19   impairment and moderate symptoms.  So the individual is

20   experiencing a moderate level of the symptoms that they are

21   endorsing, and they're also experiencing a moderate level of

22   impairment in one or more areas.

23   Q.   And did you review this figure in the course of conducting

24   your assessment of Mr. Caravantes?

25   A.   Yes, I did.

C42dcar1                          Pearson - direct

1   Q.  And what did you conclude from your review?

2   A.  Dr. Cervantes assessed him in 2009 -- excuse me.  Yeah,

3   2009 as -- in July of 2009 as having this particular level of

4   impairment, and this is consistent with the range that I gave

5   him in my evaluation as well.

6   Q.  OK.  Dr. Pearson, I would like you to flip, please, if you

7   could to Plaintiffs' Exhibit 25 in your binder.

8           And do you recognize Plaintiffs' Exhibit 25 in your

9   binder?

10  A.  Yes, I do.

11  Q.  What is it?

12  A.  This is a psychiatric evaluation completed at the Karen

13  Horney Clinic of Mr. Caravantes.

14  Q.  Did you review this document in conducting your assessment

15  of Mr. Caravantes?

16  A.  Yes, I did.

17  Q.  And can you explain what you glean from this document?

18  A.  Sure.  This is an evaluation that was completed, I guess,

19  within usually they're about 30 days of the individual being

20  seen.  And so it is an assessment of his chief presenting

21  problem and along with a diagnostic evaluation.  So they

22  include past history, mental status exam, and a summary and

23  formulation of the individual's diagnosis, and then ultimately

24  concluding with a five-Axis diagnosis here.

25  Q.  And on the first page of Plaintiffs' Exhibit 25, do you see

C42dcar1                          Pearson - direct

1    the date 4/23/10 listed on the top?

2    A.   Yes.

3    Q.   What is your understanding of what that date is?

4    A.   This was the first session he had with his psychotherapist,

5    a licensed social worker, Hannah Emmerich.

6    Q.   And the text appearing below that date, what do you

7    understand that text to be?

8    A.   That's the information that she obtained within the

9    first -- I guess, the first month that she saw him.  So she

10   summarizes his chief complaint, which is that he has symptoms

11   of PTSD and depression resulting from abuse that he alleges

12   happened, and that he has a case pending with the Department of

13   Labor.

14          And then she goes into talking about the history of

15   the chief complaint, which is kind of a summary of his

16   narrative again.  And also talking about his symptoms --

17   nightmares, flashbacks, headaches, insomnia, anxiety,

18   irritability, sadness, shame, anger, feelings of hopelessness

19   and helplessness, fantasies of suicide and homicide, marital

20   problems, problems in sexual relations because of flashbacks.

21   Again, these symptoms are quite consistent with the symptoms

22   that were reported to me during my evaluations as well.

23   Q.   I would like you to please turn to page 2 of 22 in the same

24   exhibit.

25          Do you see near the bottom of the page it says,

1   "Mental Status Examination"?

2   A.  Yes.

3   Q.  What is your understanding of the mental status

4   examination?

5   A.  This is standard practice in doing a clinical evaluation,

6   where you -- there are a number of components that go into a

7   mental status examination.  But it includes -- and they

8   categorized it nicely here for you but sometimes you just see

9   it in kind of prose form, where they provide information about

10  the symptom report and the behavioral observations of the

11  clinician.

12  Q.  Did you review this mental status examination in conducting

13  your assessment?

14  A.  I did.

15  Q.  And what did you conclude?

16  A.  Again, this is consistent with my observations of him, with

17  my mental status exam of him as well, mental status of him as

18  well.

19  Q.  What exactly is consistent?

20  A.  The mood and affect, which is that he was sad and angry,

21  somewhat restricted or constricted, actually, meaning a little

22  bit flattened in mood, in the affect; that eye contact was

23  poor; that he was visibly uncomfortable; that he's describing

24  persistent and intrusive thoughts of abuse; that the content is

25  focused on the abuse, that was consistent.  The thoughts about

C42dcar1                         Pearson - direct

1    suicide ideation, also consistent.  Admits to fantasies of

2    suicide and homicide of his family, that was consistent with

3    what he had told me as well.  Nightmares of the abuse, as well;

4    that was also consistent.

5    Q.  OK.  Dr. Pearson, I would like you to turn again to page 4

6    of the same exhibit.  Do you see at the top where it says

7    "Multiaxial Evaluation Report Form"?

8    A.  Yes.

9    Q.  Did you review this form in conducting your assessment?

10   A.  I did.

11   Q.  And what did you conclude from reviewing this form?

12   A.  So the clinician here, Ms. Emmerich, diagnosis

13   Mr. Caravantes with posttraumatic stress disorder and major

14   depressive disorder, single episode, severe without psychotic

15   features.  These are the same diagnoses as I gave

16   Mr. Caravantes after my evaluation.

17           And she also at the bottom gives him a GAF, a Global

18   Assessment of Functioning, of 49.

19   Q.  And what does a GAF of 49 mean?

20   A.  She believes that he's right below the level of some

21   moderate, starting at 51 to 60, that he is right below that.

22   So this is the more severe range, which would be 40 to 49 or 41

23   to 50, and she's noting that he is just on the cusp of the more

24   severe range.

25   Q.  And by "she," do you mean Ms. Emmerich?

C42dcar1                    Pearson - direct

 1    A.  Ms. Emmerich, yes.

 2    Q.  Do you know if Ms. Emmerich is a psychologist?

 3    A.  She is not a psychologist, no.

 4    Q.  Do you know what, based on the documents, she does?

 5    A.  She is a social worker.  She is a licensed social worker.

 6    She has a master's degree in social work.

 7    Q.  And does her -- do you see at the bottom of the page where

 8    it says primary therapist?

 9    A.  Yes.

10    Q.  Do you see the words "LMSW" above "Primary Therapist"?

11    A.  Yes.

12    Q.  Do you know what that stands for?

13    A.  That is licensed master's of social work.

14    Q.  Do you see on the following page, page 5, it says

15    "Physician" at the top of the page?

16    A.  Yes.

17    Q.  And do you see that it also says "Supervisor" at the top of

18    the page?

19    A.  Yes.

20    Q.  What is your understanding of these notations?

21    A.  That both the physician, who was involved in

22    Mr. Caravantes' case, I assume a psychiatrist, as well as

23    Ms. Emmerich's clinical supervisor, who is a licensed clinical

24    social worker, both signed off indicating their agreement with

25    the evaluation and the assessment.

C42dcar1                    Pearson - direct

1   Q.  Dr. Pearson, I would like you to flip in the same exhibit

2   to page 11 of 22.  Let me know when you are there.

3   A.  Yes.  I am here.

4   Q.  Did you review this page in conducting your assessment?

5   A.  Yes.

6   Q.  And what is your understanding of this page?

7   A.  This is the treatment review that they have to do

8   quarterly, which is also common.  And they are talking about

9   the goals of treatment here and the objectives and the

10  interventions for Mr. Caravantes.

11  Q.  Do you see a noted at the top of the page the date July 1,

12  2010?

13  A.  Yes.

14  Q.  What is your understanding of that date?

15  A.  My understanding is that is the date that they are doing

16  the treatment review for the last quarter.

17  Q.  And when you say "they," who are you referring to?

18  A.  The treatment team, which I take to include the licensed

19  MSW, Ms. Emmerich; her supervisor; and the

20  physician/psychiatrist who is involved in the case as well.

21  Q.  And can you turn the page to page 12 of the same exhibit,

22  Plaintiffs' Exhibit 25.

23  A.  Yes.

24  Q.  Do you see the section at the top of the page titled,

25  "Treatment, Current Assessment, and Progress"?

1    A.  Yes.

2    Q.  Did you review this section in conducting your assessment?

3    A.  I did, yes.

4    Q.  What did you conclude from your review?

5    A.  So this is a discussion of the actual treatment, the

6    psychotherapy that's been going on between -- that was going on

7    between him and Ms. Emmerich.  So she is summarizing what's

8    happening, what he's sharing, and some of the difficulties he's

9    having in the treatment, because it's difficult for him to talk

10   about sharing feelings and that this is based on his cultural

11   background or in part based on his cultural background.

12        She determines or indicates that she believes he's

13   dedicated to getting better; talks about the marriage being

14   strained.  I guess she had told him -- she notes that

15   Mr. Caravantes had informed his wife of the details about what

16   happened, the sexual nature of the details, shortly after

17   beginning the treatment.  And also that the patient at some

18   point was referred to see a psychiatrist, or "the"

19   psychiatrist, and was given or prescribed an antidepressant,

20   Zoloft; an anxiety medication, which is Ativan; and Ambien,

21   which is to assist with sleep.

22   Q.  Further down on the same page, page 12 of 22, do you see

23   again the notation, "Multiaxial Evaluation Report Form?"

24   A.  Yes.

25   Q.  Did you review this form as well in conducting your

C42dcar1                        Pearson - direct

 1   assessment?

 2   A.  I did.

 3   Q.  And what did you conclude from your review?

 4   A.  So they're reviewing the diagnosis at this time.  Again,

 5   this is the quarterly review, and they continue to give him a

 6   diagnosis of posttraumatic stress disorder.

 7   Q.  And if you'll look to page 13 of 22, does the form continue

 8   on page 13?

 9   A.  Yes.

10   Q.  And at the top of it, do you see at the top of the page the

11   notation "Major Depressive Disorder"?

12   A.  Yes.

13   Q.  What is your understanding of this?

14   A.  That they also gave him a diagnosis of major depressive

15   disorder, single episode, severe without psychotic features.

16   So this indicate to me that he continued to meet the criteria

17   for both of those disorders after the three-month review, or

18   quarterly review, I should say.

19   Q.  Near bottom of the page, the same page, 13 of 22, there is

20   a series of signatures.  Do you see those?

21   A.  Yes.

22   Q.  And what is your understanding of those signatures?

23   A.  Again, these are the three members -- or it seems to be the

24   three members of the treatment team.  We have the clinician,

25   Ms. Emmerich, her supervisor; the licensed clinical social

C42dcar1                          Pearson - direct

1   workers; and the physician.

2   Q.  And if you would flip to page 14 of 22, there is a

3   signature on the top of the page.

4   A.  Yes.  So above that is the psychiatrist's signature, and

5   then that -- I don't know, it is another licensed clinical

6   social worker.  I am not sure if that is the same one or a

7   different one involved.

8           MR. SAXENA:  Your Honor, at this time plaintiffs move

9   that Plaintiffs' Exhibit 25 be entered into evidence.  In the

10  same binder, behind the Tab Exhibit 25, the last page, behind a

11  blue sheet appears Plaintiffs' Exhibit 25A, which is a

12  declaration pursuant to Federal Rules of Evidence 902.11,

13  attesting that Plaintiffs' Exhibit 25 is authentic and a

14  business record.

15          Pursuant to that declaration, we would ask that it be

16  moved into evidence.

17          THE COURT:  Any objection?

18          MR. PARKER:  No objection.

19          THE COURT:  25 and 25A are admitted into evidence.

20          (Plaintiff's Exhibits 25 and 25A received in evidence)

21  BY MR. SAXENA:

22  Q.  OK.  Dr. Pearson, I would like you to please flip to

23  Plaintiffs' Exhibit 26 in your binder.

24          Did you review this document in conducting your

25  assessment of Mr. Caravantes?

1    A.  I did.

2    Q.  And can you please tell the Court what it is?

3    A.  This is the psychiatric evaluation completed by Dr. Henry

4    Paul.  He evaluates Mr. Caravantes during the period of time

5    while he's at the Karen Horney Clinic.  And he does a summary

6    assessment of what he sees, and then provides a diagnosis and

7    plan to start medication.

8    Q.  And what did you conclude from your review of this document

9    with regard to Mr. Caravantes' assessment?

10   A.  Again, this is another clinician evaluating Mr. Caravantes,

11   discussing symptoms, discussing the narrative that he has

12   reported to me and others.  And he diagnoses him with PTSD, and

13   as I mentioned before related to the Karen Horney records,

14   starts him on antidepressant and antianxiety medication and

15   sleep medication to assist with those symptoms.

16   Q.  And what specific symptoms did you find significant?

17   A.  So specifically he's talking about flashbacks interfering

18   with his ability to have a sexual relationship with his wife,

19   marital problems, nightmares, depressed mood, thoughts of

20   dying, fantasies about suicide and homicide, insomnia, shame;

21   physiological symptoms like headaches and backaches, and this

22   social withdrawal from the family by staying away from the

23   home.  Temper issues and irritability.  And he also notes that

24   there is no history of psychiatric problems, which is

25   noteworthy.  Again this goes to that there wasn't a premorbid

C42dcar1                          Pearson - direct

1    or pre-event psychiatric problem that might be causing these

2    symptoms.

3              MR. SAXENA:  Your Honor, at this time the plaintiffs

4    would like to move Plaintiffs' Exhibit 26 into evidence.  The

5    parties have stipulated, pursuant to a stipulation previously

6    marked S-1, that the document is a business record and

7    authentic.

8              MR. PARKER:  No objection.

9              THE COURT:  26 is admitted.

10             I would like to ask you a question.  What does the

11   word "dyadic" mean?

12             THE WITNESS:  One-on-one therapy session.  He is

13   referring to one-on-one therapy sessions between the therapist

14   and Mr. Caravantes.

15             THE COURT:  All right.  26 is admitted in evidence.

16             (Plaintiffs' Exhibit 26 received in evidence)

17             MR. SAXENA:  Randall, could you put up page 6 of the

18   slide previously marked as Plaintiffs' Exhibit 201.

19   BY MR. SAXENA:

20   Q.  Dr. Pearson, do you recognize the information appearing on

21   this slide?

22   A.  Yes.

23   Q.  Can you tell us --

24             THE COURT:  Sorry.  The exhibit number I have here is

25   33, or something.  Where would I find it in the book?

C42dcar1                          Pearson - direct

1            Oh, it is attached to Arturo Caravantes; it is part of

2     201?

3            MR. SAXENA:  That is right, your Honor.

4     Q.  Can you describe what appears on this slide for the Court?

5     A.  This is the diagnosis that I gave Mr. Caravantes:  Major

6     depressive disorder, single episode, severe without psychotic

7     features, and posttraumatic stress disorder, and I gave him a

8     global -- a GAF score of 50 to 55.

9     Q.  And can you explain for us the words that follow "Major

10    Depressive Disorder" and what they mean?

11    A.  Sure.  So "single episode" -- there are some qualifiers in

12    the DSM that you include after certain diagnoses.  One of those

13    with major depressive disorder is is this something for the

14    individual that has been recurrent or is this, you know, the

15    first time that they've experienced this particular disorder.

16    And so a single episode I gave because he doesn't have a

17    history of experiencing major depressive disorder prior to

18    this.

19           The second is the qualifier about severity.  And so

20    you can give somebody mild, moderate, or severe.  And if you

21    give them severe you have to say that it is with psychotic

22    features or without psychotic features, and I believe -- it was

23    my opinion that it was severe without psychotic features.

24    Q.  And can you tell us what the 50 -- do you see there on the

25    slide there appears Axis V and then 50 to 55 next to Axis V?

C42dcar1                        Pearson - direct

1    A.  Yes.

2    Q.  Can you explain that to the Court?

3    A.  Sure.  This is the Global Assessment of Functioning score,

4    and I gave Mr. Caravantes a range of 50 to 55, meaning that

5    he's demonstrating a level of symptoms and/or impairment that's

6    falling in this descriptive range, within that.  That's

7    moderate, what this GAF describes as moderate.

8    Q.  Finally, do you see the text, "Posttraumatic Stress

9    Disorder"?

10   A.  Yes.

11   Q.  Can you explain what that means?

12   A.  There are no qualifiers really necessary for posttraumatic

13   stress disorder, and that is the diagnosis that I gave him as

14   well.

15   Q.  Dr. Pearson, we're going to show you another slide now that

16   is going to be the next page in the same packet of slides.

17          Do you recognize the information that appears on this

18   slide?

19   A.  Yes.

20   Q.  Can you describe to the Court what it is?

21   A.  This is Dr. Goldstein's diagnosis of Mr. Caravantes.  And

22   he gives him a diagnosis of major depressive disorder, single

23   episode, mild to moderate.

24   Q.  Who is Dr. Goldstein?

25   A.  Dr. Goldstein is the expert on the opposing side.

C42dcar1                          Pearson - direct

1   Q.  And can you explain what the text "major depressive

2   disorder, single episode, mild to moderate" means?

3   A.  That means that he believes -- or, well, he gives him a

4   diagnosis of major depressive disorder, as do I.  He also

5   agrees that it is a single episode.  The difference is that he

6   believes that the diagnosis severity qualifier is mild to

7   moderate, as opposed to -- you can give mild, moderate or

8   severe, and he gives mild to moderate, I guess, implying that

9   it's somewhere in between those two.

10  Q.  And do you know what date he gave that diagnosis?

11  A.  Is it July 14, 2011?

12  Q.  Let's make it -- let's do this.  In your binder,

13  Dr. Pearson, at the very back, the last tab, you will see

14  Exhibit D-49.  I would like you to flip to that exhibit.

15  A.  Yes.

16  Q.  Do you recognize what appears at D-49?

17  A.  Yes.

18  Q.  What is it?

19  A.  This is Dr. Goldstein's report.

20  Q.  And what date is that report dated?

21  A.  So on page -- not including the cover page, page 1 is

22  July 14, 2011.

23  Q.  Dr. Pearson, in your binder I would like you to flip,

24  please, to Exhibit 113.

25          Do you recognize what appears as Plaintiffs' Trial

1   Exhibit 113?

2   A.  Yes.

3   Q.  And what is it?

4   A.  Well, the cover letter from Karen Horney Clinic, but the

5   documents following are discharge summary and paperwork from

6   New York Presbyterian Hospital, which is a discharge summary

7   for Mr. Caravantes.

8   Q.  Have you reviewed these records prior to today?

9   A.  Yes.

10  Q.  And what have you concluded from your review?

11          MR. PARKER:  Objection.  Beyond the scope of

12  Dr. Pearson's --

13          THE COURT:  I'm sorry.

14          MR. PARKER:  Your Honor, I'm not sure if this is

15  working.  But this is beyond the scope of Dr. Pearson's

16  involvement in this case.

17          MR. SAXENA:  Plaintiffs respectfully disagree.

18  Dr. Pearson is testifying concerning her assessment of

19  Mr. Caravantes' mental state, and her testimony is being

20  offered today.  Counsel's objection appears to be because this

21  document was created after Dr. Pearson's expert report was

22  submitted, but it is nonetheless pertinent to Mr. Caravantes'

23  mental state.

24          THE COURT:  Are the parties contemplating recalling

25  these witnesses?  I mean, is that what you have been

C42dcar1                      Pearson - direct

1    contemplating, recalling the plaintiffs' witnesses on your

2    case?  I think it is best to go ahead and allow the testimony

3    as her comment on subsequent reports from the defendant so she

4    won't have to be recalled.

5              MR. PARKER:  I wasn't planning on recalling her, your

6    Honor.

7              THE COURT:  You weren't?

8              MR. PARKER:  No.

9              THE COURT:  Then I will allow the plaintiff to ask it.

10   BY MR. SAXENA:

11   Q.  Can you please explain to the Court, Dr. Pearson, what

12   these records indicate?

13             THE COURT:  How you interpret the records.

14             THE WITNESS:  I'm sorry?

15             THE COURT:  How you interpret the records.

16   A.  So my understanding this is, as I said, a discharge

17   summary.  Mr. Caravantes was hospitalized on a psychiatric unit

18   at New York Presbyterian Hospital on March 2nd of 2012.

19             They provide a history of the present illness.  And

20   they indicate that, again, his report is that he was coerced

21   into a sexual relationship and that he had become more

22   depressed recently and that he had had passing suicidal

23   thoughts that his psychiatrist was particularly concerned

24   about.  And he details his history of his depressive symptoms

25   after he left the restaurant in 2008 -- insomnia, nightmares,

1    no longer enjoying playing with his children, didn't want to do

2    anything, kind of unmotivated, having difficulty finding

3    work --

4              THE COURT:  We don't need to have you read it all.

5              THE WITNESS:  OK.

6              THE COURT:  We want your --

7              THE WITNESS:  OK.

8    A.  So my thoughts are that here, still in 2012, he's been

9    hospitalized for six days.  The clinicians evaluate him over a

10   period of time.  And they determine, again, that his diagnosis

11   is major depressive disorder, recurrent, severe without

12   psychotic features, and posttraumatic stress disorder.  And

13   they add a new medication to his regimen to hopefully

14   supplement the antidepressant that he was taking before, which

15   is Abilify.  And they discharge him back to his primary

16   treater, Ms. Emmerich, at the Karen Horney Clinic.

17   Q.  Why did you mention that Mr. Caravantes was there for six

18   days?

19   A.  Because, you know, unlike evaluations by myself or other

20   clinicians, where you only see the individual for 45 minutes or

21   two hours at a shot, they saw him 24 hours a day for six days

22   and really had an opportunity to observe his symptoms, observe

23   the consistency of his symptoms, and that's really one of the

24   best ways to get a sense of how somebody is feeling, how

25   somebody is doing is to see them over an intense period of

C42dcar1                          Pearson - direct

```
 1    time, a constant period of time, in an inpatient
 2    hospitalization.
 3    Q.  Can you please flip to page 5 of 6 of Plaintiffs' Trial
 4    Exhibit 113.
 5              THE COURT:  What date was that that that occurred,
 6    that hospitalization?
 7              THE WITNESS:  Or March 2, 2012.
 8    Q.  Just let me know when you are at page 5.
 9    A.  Yes, I am here.
10    Q.  Do you see near the bottom it says "Discharge Diagnosis"?
11    A.  Yes.
12    Q.  Is the text below that the diagnoses that you are referring
13    to?
14    A.  Yes.
15    Q.  Can you please flip to page 6 of 6.
16    A.  Yes.
17    Q.  Do you see at the top --
18              THE COURT:  The same exhibit, 113?
19              MR. SAXENA:  Yes.  Correct, your Honor.  Plaintiffs'
20    Trial Exhibit 113.
21    Q.  Do you see at the top it says, "Axis V"?
22    A.  Yes.
23    Q.  Did you review this page as well?
24    A.  Yes, I did.
25    Q.  What does this information indicate to you?
```

C42dcar1                         Pearson - direct

1   A.  So they gave him a GAF of 41 to 50, suggesting that his

2   impairment at this time is even more severe, that he

3   actually -- he's functioning -- he's having a harder time.  His

4   symptoms and his impairment are more severe than his clinicians

5   had given him previously.

6   Q.  Lastly, I would just like you to flip back to page 5,

7   please.  Next to "Major Depressive Disorder," do you see that

8   it says "Recurrent"?

9   A.  Yes.

10  Q.  Do you know what that means?

11  A.  It means that they believe that this is a recurrent

12  disorder rather than a single episode disorder.

13  Q.  OK.  Dr. Pearson, I would like you to please flip to

14  Plaintiffs' Exhibit 114 in your binder.

15          Did you review this document prior to your testimony

16  today?

17  A.  I did.

18  Q.  And what is it?

19  A.  This is an evaluation completed by Dr. Elizabeth Owen, who

20  is a clinical psychologist, and she was asked to provide an

21  opinion on his ability to withstand or tolerate the stress of a

22  trial.  And she met with him and she gives an evaluation, a

23  diagnostic impression, and then an opinion.

24  Q.  And what is your understanding of her opinion?

25  A.  Her opinion -- diagnostic impressions were posttraumatic

stress disorder and major depressive disorder.  And her opinion

was that he was not stable enough to withstand the stress of a

trial without possibly severe or permanent damage,

psychological damage, and that her primary concerns were about

his level of suicidality and PTSD.

Q.  And how does Dr. Owen's assessment relate to your diagnosis

of Mr. Caravantes?

A.  I mean, again, I think this and the previous records that

we were just talking about provide additional support for

consistency of diagnosis and symptom picture.  It also is

consistent with what you would expect as a stressor related to

the trauma is coming up, that symptoms may get worse.  And we

had talked about this previously in my testimony, about the

deposition of Mr. Velandia and how Mr. Caravantes reported that

his symptoms worsened when confronted with having to hear the

deposition testimony.  And I think this is, again, similar,

that as the trial is coming up and having to tolerate the

retraumatization of hearing about the facts and the incidents

again, that he starts to -- his symptoms start to get

significantly worse.

     MR. SAXENA:  Your Honor, at this time plaintiffs would

like to move Exhibit 114 into evidence.  The last page of the

tab in the binder, that is Exhibit 114, behind a blue sheet has

a declaration pursuant to Federal Rule of Evidence 902.11,

attesting that the document is authentic and a business record.

1              THE COURT:  Exhibit 114 and 114A are admitted in

2     evidence he.

3              (Plaintiffs' Exhibits 114 and 114A received in

4     evidence)

5              MR. SAXENA:  And, your Honor, plaintiffs would also

6     like to move Plaintiffs' Exhibit 113 into evidence.  There is

7     no declaration in your binder.  However, we would like to mark

8     as Plaintiffs' Exhibit 113A a declaration that we have obtained

9     attesting that Plaintiffs' Exhibit 113 is authentic and a

10    business record.

11             And we can distribute copies of that.

12             THE COURT:  Show it to Mr. Parker.

13             MR. SAXENA:  Yes, your Honor.

14             (Pause)

15             THE COURT:  Any objection?

16             MR. PARKER:  No, your Honor.

17             THE COURT:  113 and 113A are admitted in evidence.

18             (Plaintiffs' Exhibits 113 and 113A received in

19    evidence)

20    BY MR. SAXENA:

21    Q.  Dr. Pearson, did you ask us to prepare a slide summarizing

22    all of these medical records?

23    A.  Yes.

24             MR. SAXENA:  Your Honor, I would like to mark as

25    Plaintiffs' Exhibit 204 a slide which I'll distribute to

C42dcar1                          Pearson - direct

 1    opposing counsel and your Honor now.

 2                MR. PARKER:  Your Honor, I am just going to object to

 3    this as cumulative.

 4                THE COURT:  Well, I am not going to admit it in

 5    evidence, but I will allow you to use it on summation for

 6    purposes of demonstration, provided that the defense has found

 7    that the reports were made on the dates in question.

 8    BY MR. SAXENA:

 9    Q.  Dr. Pearson, what do you understand this slide to

10    illustrate?

11    A.  So these are all the known clinicians that have seen and

12    evaluated Mr. Caravantes since July of 2008, and these are the

13    diagnoses that he has been given by each of these clinicians.

14                (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

C42kcar2                          Pearson - direct

1    BY MR. DELANEY:

2    Q.  In looking at all of these records together, how does this

3    inform your assessment of Mr. Caravantes?

4    A.  Again, I think it provides a measure of consistency, that

5    in addition to my evaluation of him, I believe that he had PTSD

6    and major depressive disorder, that a number -- in fact, almost

7    all of the other clinicians who have evaluated him since July

8    of 2008 also feel -- and it's also their opinion -- that he has

9    symptoms of PTSD or meets full criteria for PTSD and major

10   depressive disorder as well, so it's a measure of consistency

11   with my assessment.

12   Q.  Are you aware of any records indicating symptoms occurring

13   before July of 2008?

14   A.  I'm not aware of any.

15   Q.  Did you consider this fact in making your assessment?

16   A.  I did.

17   Q.  And what did you conclude with respect to this fact?

18   A.  To me, it relates to etiology of the symptoms, so what

19   perhaps is causing the symptoms.  If there were symptoms before

20   the events that Mr. Caravantes described as causing the

21   symptoms, then I would wonder if there was a pre-incident

22   trauma or stressors.  However, there was no indication, and I

23   haven't been made aware of any documentation or report of

24   symptoms previous to July 18th, 2008.

25   Q.  Is there an ordinary time when PTSD would onset?

C42kcar2                        Pearson - direct

1              MR. PARKER:  Objection.

2              THE COURT:  With what?

3              Objection sustained to the form of the question.

4    BY MR. SAXENA:

5    Q.  Do you attribute any significance to the dates of these

6    symptom reports concerning Mr. Caravantes?

7    A.  I think there are a couple of things that are significant.

8    First, the symptoms began before he left the restaurant, so the

9    symptoms aren't just caused by the stress of losing a job and

10   the financial hardship that that might cause, but that these

11   symptoms began and were reported before, about a month before,

12   that happened.

13              Another significant factor is that these symptoms

14   began -- Mr. Caravantes has reported that the sexual behavior,

15   the unwanted sexual behavior, began years before these severe

16   symptoms began and --

17              THE COURT:  How many years?

18              THE WITNESS:  How many years?  I guess it's about --

19   he said things started in 2005, so about --

20              THE COURT:  He reported them in 2008?

21              THE WITNESS:  So the symptoms don't start in 2005.

22   The unwanted sexual behavior starts in 2005, and the symptoms

23   start in 2008.

24   BY MR. SAXENA:

25   Q.  Do you attribute any significance to that gap in time

C42kcar2                          Pearson - direct

1    you've just mentioned?

2    A.   Right, so people can experience trauma and start to

3    experience the symptoms of trauma at different times, related

4    to that trauma.  So some people might start experiencing

5    symptoms right away, like right after a single-event trauma,

6    and sometimes people don't start experiencing symptoms until

7    later.  And the DSM has allowance for a delayed onset of

8    symptoms with PTSD.

9         However, it's my opinion that -- and this is one of

10   the questions that I looked at:  Why do these symptoms not come

11   out until July of 2008 or why didn't he start seeking

12   treatment.

13        MR. PARKER:  Your Honor, I apologize for objecting in

14   the middle of the answer, but I think her answer is going

15   beyond the question, and I'm concerned about what the content

16   is, in terms of the content of her report and what she was

17   asked to do in the case.  I believe that the answer would go

18   beyond that, and I would object.

19        THE COURT:  This is going beyond.  You need another

20   question, plaintiff's attorney.  I don't think you asked her

21   that.  I may be wrong.

22        MR. SAXENA:  I'm sorry, your Honor, I didn't hear the

23   last thing you said.

24        THE COURT:  I don't think you asked her to explain

25   why.

C42kcar2                          Pearson - direct

1    BY MR. SAXENA:

2    Q.  And why, Dr. Pearson, would you say that it's ordinary for

3    the symptoms to occur at a later date?

4    A.  I would not say it's ordinary, but I would say that it does

5    happen that people can experience symptoms later.  Sometimes

6    that can happen with an event that is a chronic trauma, so not

7    a single-episode trauma but a trauma that occurs over time that

8    sometimes people persevere, tolerate what they're experiencing

9    in the moment because they have to get through it and then once

10   something shifts or something changes, is when they start to

11   feel the full extent of what happened; so they can kind of

12   separate themselves and distance themselves and evaluate what

13   has happened and then really experience the full extent of the

14   symptoms at that time.

15   Q.  And would you describe the conduct as reported by

16   Mr. Caravantes to be chronic?

17   A.  Yes.

18   Q.  And with specific regard to Mr. Caravantes, why do you

19   believe his symptoms had a delay in onset?

20          MR. PARKER:  Your Honor, I object to that; nothing in

21   Dr. Pearson's report addresses that issue; and going beyond the

22   scope of the report.

23          MR. SAXENA:  It's within the scope, your Honor.  We

24   can have a sidebar if you'd like.

25          THE COURT:  OK, have a sidebar.

C42kcar2                    Pearson – direct

1            MR. SAXENA:  Your Honor, I'm sorry, the witness is

2   asking if she can use the restroom.

3            THE COURT:  Sure.

4            THE WITNESS:  Thank you.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C42kcar2                          Pearson - direct

1              (At the sidebar)

2              MR. SAXENA:  I've got the report here, Judge.  It's

3      right here.  And on page 10 you'll see that there's a

4      discussion of how Mr. Caravantes' termination at Remi and the

5      realization that he wouldn't become a waiter, and that he was

6      tolerating the conduct for no ostensible purpose, made things

7      worse for him and caused things to cumulate for him.  That's

8      what I'm trying to elicit from Dr. Pearson.

9              THE COURT:  Where is her conclusion?

10             MR. SAXENA:  Her conclusion is right here.  I can hand

11     this to you if you'd like.  It's when Mr. Pistorio informed

12     Mr. Caravantes that he would never promoted to waiter and he

13     felt that everything that he suffered for was for nothing, and

14     that this exacerbated his symptoms.  And she opines that it was

15     these circumstances that led to the development of his current

16     mental illness.

17             It's page 10, Kerry.

18             MR. PARKER:  I don't think that expresses an opinion

19     on the delayed onset.

20             THE COURT:  What's the opinion?

21             MR. SAXENA:  Diagnostic opinion.

22             THE COURT:  I'll allow it.

23             (In open court)

24             (Continued on next page)

25

C42kcar2                        Pearson - direct

1              THE COURT:  When she gets back.

2              (In open court)

3              THE COURT:  How much longer do you expect to be?

4              MR. SAXENA:  We're almost to the end, Judge.  Maybe 20

5      minutes, max.

6              THE COURT:  You can answer the question.

7              MR. SAXENA:  Would you like to have the question read

8      back?

9              THE WITNESS:  Oh, yes, please.

10             (Record read)

11             THE WITNESS:  I'm sorry, can you say it one more time.

12             (Record read)

13             THE WITNESS:  Thank you.

14     A.  So, while he was still working in the restaurant -- he was

15     fully employed, he was making money, supporting his family --

16     the restaurant for him was a big source of his identity.  And

17     so it was my opinion, or it is my opinion, that he was able to

18     tolerate what he had to, to get through during that period; but

19     when things changed, around July of 2008, and then August 2008,

20     when he was no longer working at the restaurant, that it all

21     kind of came rushing at him, all of the things -- he had no

22     more support, he lost his friends, he wasn't working anymore,

23     and all of what he had endured over the past three years just

24     became completely intolerable.  And that's why the symptoms

25     onset at that time.

C42kcar2                         Pearson - direct

1    Q.  So, Dr. Pearson, after you complete all the steps of your

2    assessment, what is the next step in rendering diagnosis?

3    A.  Well, in this case, I was asked to give a diagnostic

4    opinion.  So I would formulate what that diagnosis is, and then

5    I would look at the DSM to ensure that the individual met all

6    of the necessary criteria.

7    Q.  And what is the DSM?  What does it stand for?

8    A.  The Diagnostic and Statistical Manual.

9    Q.  Could you please turn to Exhibit 116 in your binder.

10             Do you recognize this page?

11   A.  Yes.

12   Q.  And what is it?

13   A.  This is part of the introduction to the manual itself,

14   where it provides clinicians who are using the manual with

15   instruction and guidelines and pieces of information.  And this

16   specific section talks about the use of clinical judgment in

17   making a diagnosis.

18   Q.  Can you describe what clinical judgment is, in making the

19   diagnosis?

20   A.  Sure.  Clinical judgment is using a clinician's experience,

21   experience in treating, in evaluating, in diagnosing, and using

22   that in applying that at times when appropriate to making

23   diagnostic opinions.

24   Q.  Did you use clinical judgment in this case with respect to

25   Mr. Caravantes?

C42kcar2                    Pearson - direct

1   A.  Yes.  I would use clinical judgment in all cases but, yes,

2   I used it in this case as well.

3   Q.  I'd like you to turn, please, to Exhibit 108 in your

4   binder.  Let me know when you're there.

5   A.  Yes.

6   Q.  Do you recognize what appears as Plaintiff's Trial

7   Exhibit 108?

8   A.  Yes.

9   Q.  What is it?

10  A.  These are the DSM four criteria for major depressive

11  episode.

12  Q.  Does major depressive episode relate to major depressive

13  disorder in any way?

14  A.  Yes.  In order to have a major depressive disorder, you

15  have to -- the primary component is having the episode, a major

16  depressive episode.

17  Q.  And did you review these criteria in making your diagnosis

18  of Mr. Caravantes?

19  A.  Yes, I did.

20  Q.  Can you explain to the Court, starting with criterion A,

21  how the criteria have been satisfied in this case?

22  A.  Yes.  So criterion A requires that five or more of the

23  following nine symptoms have been present during a specific

24  amount of time -- which is, two weeks or more, they have to be

25  a change in functioning, so if you were depressed before, this

C42kcar2                          Pearson - direct

1    wouldn't be the onset of a major depressive episode -- and that

2    one of those symptoms has to be item 1 or 2.  One of those five

3    or more symptoms has to be item 1 or item 2.

4    Q.  Did you find the criterion satisfied in this case?

5    A.  Yes.  And Mr. Caravantes met seven or more of the following

6    symptoms, and items 1 and 2, and it was a significant change in

7    his level of previous functioning.

8    Q.  Do you recall which seven of the nine Mr. Caravantes met?

9    A.  Yes.

10   Q.  Can you describe them for the Court?

11   A.  Yes.  So, number 1 is depressed mood most of the day,

12   nearly every day.  And that was reported by Mr. Caravantes,

13   that was observed by his wife, that was seen in the

14   psychological assessment -- excuse me, testing, and also other

15   clinicians observed that in their reports of him as well.

16        Also, item number 2, so the diminished interest or

17   pleasure in all or almost all activities.  This was reported by

18   Mr. Caravantes, this was observed by his wife, this was noted

19   by other clinicians who evaluated him, and this was also noted

20   in the psychological testing.

21        Item number 3 is significant weight loss or weight

22   gain.  Mr. Caravantes reported, as did his wife, that he had

23   gained weight since I guess September -- excuse me,

24   August 2008.  And this was also noted in the prior records, by

25   other clinicians.

1          Number 4, which is insomnia or hypersomnia nearly

2    every day:  This was a primary complaint, symptom, complaint of

3    Mr. Caravantes as well as his wife, both of them noted that his

4    sleep had drastically changed, that he used to be quite a

5    sound, calm sleeper and now he was sleeping about half as much,

6    he had disrupted sleep, he was waking from nightmares, and he

7    was having a hard time falling asleep.  This was also noted by

8    other clinicians in their evaluations as well.

9          Number 7, feelings of worthlessness or excessive or

10   inappropriate guilt:  Mr. Caravantes reported feelings of

11   worthlessness, guilt, shame.  And this was observed also in the

12   psychological testing and by other clinicians' reports in their

13   evaluations.

14         Number 8 is diminished ability to think or

15   concentrate.  This was observed behaviorally by me during my

16   evaluation.  He was distracted, had poor concentration.  His

17   wife observed this in her report to me as well, he

18   self-reported this, other clinicians observed this, and also it

19   was seen on the psychological testing.

20         And the last criteria, number 9, is recurrent thoughts

21   of death, recurrent suicidal ideation or suicide attempt or

22   plan.  Mr. Caravantes reported this to me, that he had had

23   suicidal ideation and homicidal ideation after leaving Remi in

24   2008 homicide.  Those thoughts came back at my last evaluation,

25   which was the beginning of 2011.  Other clinicians noted this

C42kcar2                    Pearson - direct

1    exact same report, and even recently we see that he was

2    hospitalized for recurrent suicidal ideation in 2012,

3    March 2012.

4           So he satisfies seven of the nine criteria.

5    Q.  And did you find that Mr. Caravantes satisfied the

6    remaining criteria, B through E, for a major depressive

7    episode?

8    A.  Yes, I did.

9    Q.  Can you briefly explain how he satisfied those?

10   A.  Yes.  So B is just a rule-out, meaning that he didn't ever

11   have a manic episode, there's no evidence that he ever had a

12   manic episode.

13          C, this is where the disorder itself or the symptoms

14   have to cause clinically significant distress or impairment in

15   an area of functioning, one or more areas of functioning.  And

16   so Mr. Caravantes has consistently demonstrated an impairment

17   in social functioning, probably the most severe in social

18   functioning, and then also an impairment in occupational

19   functioning as well.

20          No indication -- D, which is about these symptoms

21   coming from substance use or some type of medical illness,

22   there's no indication of that at all.

23          And E, that their symptoms aren't coming from

24   bereavement, from the death of a loved one, and there's no

25   indication of that either.

C42kcar2                      Pearson - direct

```
 1    Q.  And, Dr. Pearson, can you please flip to Exhibit 117 in
 2    your binder.
 3          Do you recognize what appears as Plaintiff's Trial
 4    Exhibit 117?
 5    A.  Yes.
 6    Q.  Can you explain what that is?
 7    A.  So these are the specifiers that I was referring to before,
 8    the severity specifiers, for major depressive episode.
 9    Q.  Did you consider these specifiers in reaching your
10    diagnosis?
11    A.  I did, and I gave him the "severe without psychotic
12    features thus far."
13    Q.  And why did you do that?
14    A.  Well, the definition of that is that there be more -- or
15    symptoms in excess of the five or more that are required, and
16    that they markedly interfere with occupational functioning or
17    usual social activities or relationships with others.  And it
18    was my opinion, so I just described the seven criteria, which
19    is beyond the five required criteria, but also the level of
20    impairment specifically in the social domain was quite
21    significant.  So he had really changed from having a stable
22    relationship with his family, a stable relationship with his
23    children, friends, people he socialized with, to being
24    completely socially isolated, having marital discord, and not
25    spending time with his three children, which was a valued
```

1    aspect of his life.  He also had occupational impairment as

2    well.

3    Q.  And have you asked us to prepare a slide to demonstrate

4    this impairment?

5    A.  Yes.

6              MR. SAXENA:  Randall, can you put up what's been

7    previously marked as Plaintiff's 203.

8    Q.  Does this slide summarize the impairment that you referred

9    to concerning Mr. Caravantes?

10   A.  Yes.

11   Q.  OK, Dr. Pearson, lastly I'd like you to flip, please, to

12   Plaintiff's Exhibit 109 in your binder.

13             Do you recognize what appears as Plaintiff's Trial

14   Exhibit 109?

15   A.  Yes.

16   Q.  And what is it?

17   A.  This is the beginning of the discussion of the

18   posttraumatic stress disorder in the diagnostics and

19   statistical manual.

20   Q.  Can you please flip to page 5 of 6.

21   A.  Yes.

22   Q.  Do you recognize what appears at the bottom of the page?

23   A.  These are the bottom of the page of the diagnostic criteria

24   for posttraumatic stress disorder.

25   Q.  Did you consider these criteria in making your diagnosis of

1    Mr. Caravantes?

2    A.  I did.

3    Q.  And, what, did you find?

4    A.  That Mr. Caravantes met the required criteria for a

5    diagnosis of posttraumatic stress disorder.

6    Q.  Can you explain why Mr. Caravantes meets criterion A?

7    A.  So the individual for criterion A, the individual has to be

8    exposed to a traumatic event.  And aspect number 1 of that is

9    that they experience, witness or be confronted with an event

10   that involves actual or threatened death or serious injury or a

11   threat to the physical integrity of self or others, and that

12   their response to that event is intense fear, helplessness or

13   horror.

14         So it was my opinion that the unwanted sexual behavior

15   that Mr. Caravantes submitted to over a period of three years

16   was a threat to the physical integrity -- was the threat to his

17   physical integrity, and it was a boundary violation, a physical

18   boundary violation, and that his response to that trauma was

19   helplessness, that he was unable to effect change in preventing

20   that from continuing to happen.

21   Q.  On the same page, further up, do you see where it says

22   "Differential Diagnosis"?

23   A.  Yes.

24   Q.  What is a differential diagnosis?

25   A.  A differential diagnosis is what other disorders that a

C42kcar2                        Pearson - direct

clinician is supposed to consider when making a diagnosis.

Q.  Do you see the first sentence reads, "In posttraumatic

stress disorder, the stressor must be of an extreme (i.e.,

life-threatening) nature"?  Do you see that?

A.  Yes.

Q.  Did you consider that sentence in evaluating

Mr. Caravantes?

A.  I did.

Q.  And can you explain how it factored into your

consideration?

A.  Yes.  This sentence is specifically in contrast to an

adjustment disorder, which is, the next sentence here is:  "In

contrast, an adjustment disorder the stressor can be of any

severity."  This sentence also does not take into consideration

the aspect of criterion A, item 1, which allows for a threat to

the physical integrity of self, which does not have to be

life-threatening.  So in an adjustment disorder, an individual

can experience a stressor and have symptomatic response and the

clinician, in making his differential, is supposed to think

about the nature of the stressor itself, to see which aspect --

which diagnosis it might be more appropriate for.

          But the examples for adjustment disorder are

significantly, significantly less severe; so things like moving

or going to college can be things that can cause an adjustment

disorder, your relationship ending.  So these things I did not

C42kcar2                          Pearson - direct

1   consider to be even close to as extreme as three years of

2   unwanted sexual behavior.

3   Q.  And did you consider whether Mr. Caravantes might have an

4   adjustment disorder?

5   A.  I did consider it.

6   Q.  And what did you conclude?

7   A.  I concluded that he did not have an adjustment disorder.

8   Q.  Is the differential diagnosis a part of the criteria for

9   posttraumatic stress disorder?

10  A.  No.  This is just something that clinicians are supposed to

11  be thinking about when looking at the criteria and making the

12  diagnosis.

13          THE COURT:  How about the physical integrity itself?

14          THE WITNESS:  The physical boundary violation that

15  occurred with unwanted sexual contact.

16          THE COURT:  It says physical nature.

17          THE WITNESS:  It says threat to physical integrity of

18  self.

19          THE COURT:  Physical integrity, what does that mean?

20          THE WITNESS:  This is poorly defined by the DSM, and

21  it's actually --

22          THE COURT:  What's it defined as?

23          THE WITNESS:  It's not.  It's actually not defined

24  specifically.  In my opinion, and in others' opinions, it is --

25          THE COURT:  You can't cite others.

1          THE WITNESS:  OK.

2          In my opinion, it is specifically a violation of the

3    physical body.  And in my opinion, unwanted sexual behavior,

4    the submission to unwanted sexual behavior, is a threat to

5    someone's physical integrity because it's a constant boundary

6    violation of the body.

7          THE COURT:  Is that what it means, physical integrity.

8    Do you have grounds for that?

9          THE WITNESS:  Are you asking just for my opinion?

10          THE COURT:  Have you had any other cases on that?

11          THE WITNESS:  Where specific --

12          THE COURT:  Where you found that it was a threat to a

13    person's personal physical integrity?

14          THE WITNESS:  That something --

15          THE COURT:  Have you had other cases in which you made

16    that finding?

17          THE WITNESS:  That some specific trauma was a threat

18    to the physical integrity?

19          THE COURT:  No.  This type of physical.

20          THE WITNESS:  This type?  Unwanted sexual behavior?

21    No, not that I recall.  I have had other cases where

22    individuals did not have a life-threatening injury, that met

23    criteria for PTSD.  But specifically this circumstance?  No.

24    BY MR. SAXENA:

25    Q.  Do you know of any other clinicians who have diagnosed

C42kcar2                          Pearson - direct

1    Mr. Caravantes with posttraumatic stress disorder?

2    A.  Yes.

3    Q.  And who are they?

4    A.  The majority of the other clinicians who saw him knew the

5    same reported circumstances that I did --

6              THE COURT:  I've heard this.

7    BY MR. SAXENA:

8    Q.  And finally, did Mr. Caravantes meet the remaining criteria

9    of posttraumatic stress disorder?

10   A.  Yes.

11   Q.  Can you briefly explain how he did?

12   A.  So criterion B is, the traumatic event be reexperienced or

13   consistently be reexperienced in one or more of the following

14   ways.  And so Mr. Caravantes met several of these.  One was the

15   recurrent and intrusive distressing recollection.  So this is

16   the idea of intrusive memories of the events.  And so he

17   reported these to me, and these were noted by the clinicians

18   who had seen him in prior evaluations.

19             He reported flashbacks, which is number 3, acting or

20   feeling as if the traumatic event were recurring.  So this is

21   the idea that when he was engaged in sexual activity with his

22   wife, that he would feel as if he were reliving previous sexual

23   activity with Mr. Velandia, and this was very distressing.

24             THE COURT:  I should disclose that I read the New York

25   Times book review this weekend.

C42kcar2                          Pearson - direct

1              THE WITNESS:  I did not.  What was it?

2              THE COURT:  And it comments on the fact that

3      eroticism, which used to be a common psychological finding, is

4      no longer in the DSM because of difficulty in definitions.

5              THE WITNESS:  Can I --

6              THE COURT:  And they have opted for trying to be more

7      specific.  You'll have to read the book.

8              THE WITNESS:  Well, they actually -- in addressing

9      exactly your comment about that, the new DSM-5 is coming out

10     very shortly, in May 2013, and they do seem to address this

11     very vague issue of physical -- threat to physical integrity,

12     and what they add is sexual violation.  So that is one of the

13     new criteria under PTSD, and they remove this threat to

14     physical integrity as one of the described --

15             THE COURT:  I don't think I can take that into

16     account.

17     BY MR. SAXENA:

18     Q.  So, did you complete describing, Dr. Pearson, how

19     Mr. Caravantes meets the criteria for PTSD?

20     A.  No.  Under criterion B, number 4 is intense psychological

21     distress and exposure to events, internal or external cues.

22     And Mr. Caravantes reported this to me, he reported this to

23     other clinicians, the idea that he avoided restaurants, he

24     avoided friends, he avoided people that were associated with

25     the restaurant as well because it was a trigger, although we

1    did -- as part of my evaluation, I obviously had to require him

2    to expose himself to these cues, because I asked him to talk

3    about it, and there was very clear psychological distress when

4    that was happening.

5          So, criterion C is the avoidance of stimuli associated

6    with the trauma and numbing of general responsiveness, so the

7    person has to have three of these criteria.

8          So, number 2 -- efforts to avoid activities, places or

9    people -- that's similar to what I was just talking about, this

10   idea of avoiding working in restaurants at all, avoiding his

11   friends, avoiding -- and also, not engaging with his family --

12         THE COURT:  Who are these friends that he avoids?

13         THE WITNESS:  The individuals that he -- he worked at

14   Remi for 17 years, and I guess had told me that he had a number

15   of people that he considered friends at that restaurant.

16         THE COURT:  Who worked at the restaurant?

17         THE WITNESS:  Yes.

18         Number 4, markedly diminished interest or

19   participation in significant activities:  This was noted by

20   myself, Mr. Caravantes, by his wife, by, again, the previous

21   clinicians who saw him, this idea that he was no longer

22   engaging in activities, especially with his children, that he

23   used to enjoy, he wasn't going to church anymore, and he was

24   basically wandering the streets, sitting in his car alone when

25   what he used to be doing other things.

1              Number 5 is feeling detachment or estrangement from

2      others.  And this was with his wife and his three children and

3      his extended family, feeling very detached from them and unable

4      to connect.

5              The restrictive range of affect was noted by a number

6      of clinicians, where they said that he had constricted affect

7      or restricted affect, that he was kind of unable to show a full

8      range of emotion.  So that is 4 of criterion C.

9              And then the last criterion is D, and this is about

10     the increased arousal and physiological responses that the

11     person has related to the trauma, difficulty falling or staying

12     asleep.  Certainly insomnia and wakening in the middle of the

13     night was a problem that he reported numerous times to

14     different clinicians and in the psychological testing, and his

15     wife observed this as well.

16             Irritability was something also that his wife noted

17     was a significant change in his functioning, that he had not

18     been an irritable guy, he had not had a temper and that since

19     all of this happened, that he didn't have really the same

20     personality.  And he described this irritability as well.

21             And difficulty concentrating, that was also observed

22     in my evaluation, and that was observed by other clinicians.

23     And it was self-reported by Mr. Caravantes and reported by his

24     wife.  So that is 3 of criterion D.

25     Q.  So then do you conclude in the end that Mr. Caravantes did

C42kcar2                        Pearson - direct

1    suffer from posttraumatic stress disorder?

2    A.   Yes.   In addition, the disturbance has to last a certain

3    period of time, more than a month, and that it has to cause

4    significant distress and impairment in functioning, the same

5    way that any disorder does in the DSM.   And I believe he has

6    significant distress and impairment in a number of areas of

7    functioning, and it clearly lasted longer than a month because

8    we saw medical records persisting for about four years.

9    Q.   Thank you.

10            MR. SAXENA:   No further questions.

11            THE COURT:   Before the cross, did your review of the

12   medical records reflect any other testing that any of these

13   organizations gave Mr. Caravantes?

14            THE WITNESS:   I think the only clinician who did any

15   testing was Dr. Owen, who saw him quite recently, on 3/19, this

16   month -- last month.   And she did very minor testing.

17            THE COURT:   What?

18            THE WITNESS:   She did the -- I think she only did the

19   Beck Depression Inventory, which is a self-reporting --

20            THE COURT:   I'm not confining myself to psychological.

21            THE WITNESS:   I'm sorry.

22            THE COURT:   Any medical, any educational, any test of

23   his IQ?

24            THE WITNESS:   I know he saw numerous medical people,

25   doctors, specialists.   Out of the medical records that we

1    talked about here, no, nobody tested his IQ.

2              THE COURT:  None of these groups tested his IQ?

3              THE WITNESS:  Not as far as I can tell from the

4    documentation that I have.

5              THE COURT:  You note the concentration problem?

6              THE WITNESS:  Uh-huh, right.  So, no, it doesn't look

7    like any of these individuals did testing to assess that.

8              One difficulty is -- and I can't answer for why they

9    didn't, but when someone speaks Spanish, there are fewer,

10   significantly fewer, options for testing, and it has to be done

11   by a psychologist.  And these individuals are primarily M.D.'s

12   and social workers that are doing his treatment, so I don't

13   know if that had anything to do with it.

14             Cross-examination?  I can go to 4:30.

15   CROSS-EXAMINATION

16   BY MR. PARKER:

17   Q.  Dr. Pearson, am I correct that this is the first sexual

18   harassment case in which you've served as an expert witness?

19   A.  Yes.

20   Q.  And is this also the first case of employment

21   discrimination of any kind in which you have served as an

22   expert witness?

23   A.  Yes.

24   Q.  In performing your role in this case, did you interview

25   anyone other than Mr. and Mrs. Caravantes?

C42kcar2                         Pearson – cross

 1   A.  I'm sorry, can you say the beginning part again?

 2   Q.  You interviewed Mr. Caravantes, correct?

 3   A.  Yes.

 4   Q.  And you interviewed his wife, right?

 5   A.  I did.

 6   Q.  Did you interview anyone else?

 7   A.  Specifically related to Mr. Caravantes?

 8   Q.  Anyone else.

 9   A.  Yes.

10   Q.  Who?

11   A.  I was asked to evaluate other individuals as well related

12   to -- but I guess I'm not sure if you're asking in relation to

13   my evaluation of Mr. Caravantes or --

14   Q.  Yes, yes.

15   A.  No.

16   Q.  Did he identify by name any of these friends that you said

17   he became isolated from?

18   A.  Off the top of my head, I don't know.

19   Q.  Did you interview any of the clinicians who had seen him

20   prior to when you wrote your report?

21   A.  Did I interview any of them?

22   Q.  Yes.

23   A.  I did speak to some of them over the phone, yes, I spoke to

24   Ms. Emmerich over the phone.

25   Q.  Anyone else?

C42kcar2                    Pearson - cross

1   A.  Not that I recall, no.

2   Q.  For purposes of preparing your report and your opinion in

3   this case, you have accepted as true what Mr. Caravantes told

4   you about his experiences; am I right?

5   A.  I did an assessment as to his consistency, and I made an

6   assessment based on what he reported to him, yes.

7   Q.  And you didn't use any process of seeking to corroborate

8   any of the factual claims he made to you, did you?

9   A.  Other than reviewing the documentation that I was given?

10  Q.  Correct.

11  A.  Other than that, no.

12  Q.  There were at least two physicians whose records appear

13  here, Dr. Cervantes and Dr. Paul.  Am I correct you have never

14  spoken with either of those gentlemen?

15  A.  No, I've never spoken to either of them.

16  Q.  Do you have any idea how many times Dr. Paul saw

17  Mr. Caravantes?

18  A.  I don't.

19  Q.  Do you have any idea how much time he spent with him?

20  A.  He didn't write that in his evaluation.

21  Q.  Dr. Cervantes had two pages of handwritten notes that you

22  referred to earlier, correct?

23  A.  Yes.

24  Q.  Do you have any idea how many times Dr. Cervantes saw

25  Mr. Caravantes?

C42kcar2                         Pearson – cross

1   A.  I don't.  I assumed that the date on the evaluation was the

2   date that he saw him.

3   Q.  Meaning one, one day?

4   A.  That's what it appears, yes.

5   Q.  Do you have idea how long he spent with him?

6   A.  I don't.

7   Q.  You also said that in the reports of the Karen Horney

8   Clinic, there appeared to be a signature by a psychiatrist on a

9   few of the pages in those documents, correct?

10  A.  Yes.

11  Q.  Do you know that person's name?

12  A.  It's difficult to read; no, I don't.

13  Q.  So I gather you've never spoken with that psychiatrist?

14  A.  I have never spoken with that psychiatrist, no.

15  Q.  Do you have any idea whether that psychiatrist ever met

16  Mr. Caravantes?

17  A.  I can't answer that.  I have no idea.  He had to be

18  familiar enough with his case to sign off on it, but I have no

19  idea.

20  Q.  That's your presumption, right?

21  A.  That would be an appropriate clinical intervention, but

22  you're right, I can't answer it, no.

23  Q.  You don't even know that that's in fact the signature of a

24  psychiatrist in those records, do you?

25  A.  It says psychiatrist, but...

C42kcar2                    Pearson - cross

1   Q.  But you don't know?  You don't even know the name, right?

2   A.  I do not know the name.

3   Q.  Did you ever speak with Hilda Castillo from Safe Horizons?

4   A.  No, I did not.

5   Q.  Did you ever speak with anyone from Safe Horizons?

6   A.  I did not.

7       MR. PARKER:  Pardon me, your Honor.  I'm just trying

8   to find something here.

9       (Pause)

10  BY MR. PARKER:

11  Q.  If you go to Exhibit P-23 in the binder I have there --

12  A.  I'm sorry, is that this binder, the bigger one?

13  Q.  It should be that -- does it say Plaintiff's Exhibits on

14  it?

15  A.  Yes.

16  Q.  Does it have your name on it?

17  A.  Yes.

18  Q.  In your report, P-23 is your report, correct?

19  A.  Yes.

20  Q.  On page 5 -- first go to page 4, down near the bottom where

21  it says "Current Evaluation, A, Subject's Narrative of the

22  Incidents," and you proceed in italics to say what that is, and

23  that, in fact, is Mr. Caravantes' accounts of what he claimed

24  happened at Remi Restaurant, right?

25  A.  Yes.

1    Q.   And you prepared this section of the report based upon what

2    Mr. Caravantes told you, right?

3    A.   Yes.

4    Q.   You didn't rely on any of the other documents that were

5    provided to you in connection with your reviewing this matter

6    did you?

7    A.   For this section?  No.

8    Q.   So, if you turn over to page 5, the first full paragraph --

9    I don't know if that first section is the full paragraph, but

10   it looks like the second paragraph on the page that begins

11   with, "After 2006," correct?

12   A.   Yes.

13   Q.   So if I'm reading that sentence correctly, Mr. Caravantes

14   told you that it was after 2006 that Mr. Velandia began

15   undressing him and touching him under his clothing, correct?

16   A.   Yes.

17   Q.   Now, did you see anything to the contrary in any of the

18   records that you reviewed?

19   A.   That I recall at this moment?  No.

20   Q.   Did you look for anything to corroborate that statement?

21   A.   Again, this was his narrative.  I didn't look to

22   corroborate the details of his narrative, in this section.

23   Q.   Now, you say that in that same paragraph that "Caravantes

24   stated that Velandia told him that he would help him become a

25   waiter but Caravantes had to be willing to do more than the

C42kcar2                         Pearson – cross

 1  sexual contact that had previously occurred."

 2          THE COURT:  Where are you reading from?

 3          MR. PARKER:  Your Honor, it's the third sentence of

 4  that same paragraph, beginning with "After 2006."

 5  BY MR. PARKER:

 6  Q.  So, Mr. Caravantes, he didn't tell you that he had

 7  approached Velandia about asking to become a waiter, correct?

 8  A.  I don't know the answer to that, I'm sorry.  Based on what

 9  this says, based on my recollection, I recall this part of it,

10  but I don't know specifically what you're asking.

11  Q.  Well, someone, according to Caravantes, someone initiated a

12  conversation about helping Caravantes become a waiter, right?

13  A.  I guess, yes.

14  Q.  And you don't say in your report that it was Caravantes who

15  initiated that discussion, do you?

16  A.  No, I don't.

17          THE COURT:  Did you record this?

18          THE WITNESS:  No.

19  BY MR. PARKER:

20  Q.  And according to what Caravantes told you, he had already

21  been engaging in oral sex activities with Velandia by the time

22  that this discussion about becoming a waiter had occurred,

23  right?

24  A.  Yes.

25  Q.  And you also said in your report that according to

C42kcar2                    Pearson - cross

1   Caravantes, Velandia did not threaten his job at any time,

2   correct?

3   A.  I said that he didn't overtly threaten him.

4   Q.  And that he, Caravantes, allowed the sexual activity to

5   continue so that he could keep his job, right?

6   A.  My understanding was that he submitted in order to maintain

7   what he believed needed to happen in order to maintain his job.

8   Q.  For any of those statements, did you attempt to corroborate

9   them with anything, any of the records that you had in the

10  case?

11  A.  I reviewed the materials that I was given, and I did not

12  fact-check all of the details of the narrative.  I think my

13  primary role was to do an assessment of his symptoms and his

14  diagnosis, which I did, and established consistency and

15  consistency with that narrative.

16  Q.  However -- and we'll talk about this more later, but,

17  however, your diagnosis of posttraumatic stress disorder

18  depends upon your assumption that the sexual activity between

19  Caravantes and Velandia was unwanted, correct?

20  A.  Yes.

21  Q.  And for that, you accepted simply what Caravantes told you,

22  correct?

23  A.  I didn't -- no, that's not correct.  I didn't simply accept

24  what he told me.  I did my own assessment of his symptom report

25  over time, a measure of consistency, psychological testing, and

C42kcar2                         Pearson - cross

1   review of documents where other individuals also provided that

2   same information.

3   Q.  Well, you had Velandia's deposition transcript, correct?

4   A.  I did.

5            THE COURT:  What do you mean by that, "that same

6   information"?  What do you mean by that, "same information"?

7            THE WITNESS:  That the symptom report was consistent

8   over time, so I was doing an assessment of whether his symptom

9   report was consistent over time, as well as other clinicians

10  were assessing him to have those symptoms, as well as he was

11  reporting the same events over time to other clinicians.  So

12  that's what I meant by same information, that they're

13  reporting, he's telling them --

14           THE COURT:  You're saying the clinicians' reports --

15           THE WITNESS:  Yes.

16           THE COURT:  -- reflected the same information?

17           THE WITNESS:  Yes, yes.

18  BY MR. PARKER:

19  Q.  So one example of that would be if he tells every single

20  clinician that he has flashbacks, that you would regard that as

21  a consistent symptom report, correct?

22  A.  That would be one piece of information, yes.

23  Q.  But you have no way to gauge -- you have no way to

24  objectively determine whether a patient has had flashbacks; is

25  that accurate?

C42kcar2                         Pearson - cross

1   A.  Objectively?  No, I mean I didn't see him have a flashback

2   in my office, no, so that's correct.

3   Q.  Getting back to the other question I had asked:  You had

4   Velandia's deposition transcript, correct?

5   A.  Yes.

6   Q.  You read it, right?

7   A.  I watched the video.

8   Q.  So you know that there is a dispute as to whether or not

9   the relationship between the two of them, Caravantes and

10  Velandia, was voluntary and consensual, right?

11  A.  Yes.

12  Q.  For purposes of your diagnosis of posttraumatic stress

13  disorder, you assumed that it was not, correct?

14  A.  I believed his symptom report, and I believed his report,

15  yes.

16  Q.  And so if in fact that relationship was consensual and

17  voluntary, you would have to reevaluate your diagnosis of

18  posttraumatic stress disorder; is that a fair statement?

19  A.  Yes, it is.  Obviously I would want more information,

20  considerably more information, but that would be something that

21  I would have to take into consideration, yes.

22              (Continued on next page)

23

24

25

C42dcar3                         Pearson - cross

1   Q.  And you used, as I think you said in your direct, the

2   DSM-IV as your tool for making your diagnosis in the case,

3   correct?

4   A.  I used it, yes, to look at the criteria, yes.

5   Q.  And DSM is the most reliable and recognized tool for use by

6   U.S. psychologists for diagnosing mental disorders, is that

7   correct?

8   A.  Yes.

9   Q.  So you would agree that in order to diagnose posttraumatic

10  stress disorder, a patient must have been exposed to an extreme

11  traumatic stressor, correct?

12  A.  That is not the description of Criterion A.  It just says a

13  traumatic event.

14  Q.  Let's turn to Plaintiffs' 109.  That is the very beginning

15  of the section of the DSM on PTSD, right?

16  A.  Yes.

17  Q.  And does not the first sentence say that the essential

18  feature of posttraumatic stress disorder is the development of

19  characteristic symptoms following exposure to an extreme

20  traumatic stressor?

21  A.  Yes.

22  Q.  And the next paragraph of the section gives examples of

23  what the DSM considers to be traumatic events, right?

24  A.  It says that they are not limited to, but, yes, it gives

25  examples, and then says the clinician is not limited to these

1   examples.  But, yes, there are examples.

2   Q.  And those examples include military combat, violent

3   personal assault, being kidnapped, torture, terrorist attack,

4   and being diagnosed with a life-threatening illness, right?

5   A.  It includes other examples as well, but those are some of

6   the ones that are included here.

7   Q.  And that is -- that feature of a posttraumatic stress

8   disorder diagnosis is an objective feature, is it not; that an

9   event has to have occurred --

10  A.  An event has to have occurred.

11  Q.  And that an event must be traumatic in nature, correct?

12  A.  That's correct.

13  Q.  Mr. Caravantes never reported to you that he was sexually

14  assaulted in a violent or forcible manner, did he?

15  A.  No, he did not.

16  Q.  In fact, Dr. Paul, Henry Paul, in Plaintiffs' 26,

17  concluded, in a report you relied on, that Caravantes was never

18  abused, right?

19  A.  I would have to look back at exactly the language.

20  Q.  Let's look back at it.

21  A.  Which?

22  Q.  It is P26.  Dr. Paul says -- this is Dr. Paul's report,

23  right?

24  A.  Yes.

25  Q.  In the third sentence, he says, "He," Caravantes, "was not

C42dcar3                        Pearson - cross

1  forced physically but he was told that if he cooperated he

2  would get him a better position.  Instead, he was fired in

3  2008, when he called it off.  He was never abused."

4          Do you see that?

5  A.  Yes.

6  Q.  In fact, as he told you, Caravantes engaged in the oral and

7  the anal sex with Velandia because, according to him, it would

8  help him get promoted, right?

9  A.  That was one of the -- that was part of it.  Also, the

10 threat to being fired.

11 Q.  When was the threat to being fired made?

12 A.  My recollection is that Mr. Caravantes was told -- his job

13 was threatened by Mr. Pistorio in 2005, and that his

14 understanding was that he needed to submit to this behavior in

15 order to prevent being fired, because Mr. Velandia was

16 basically the right-hand man of Mr. Pistorio and had power and

17 authority in those situations.

18 Q.  When was the latter statement made?  You said Velandia made

19 a statement to him?

20 A.  I don't think I said that.

21 Q.  You are referring to one statement which was made

22 supposedly by Mr. Pistorio in 2005?

23 A.  Oh, no.  I'm sorry.  I'm not even sure exactly what I said.

24          But I was saying -- so first his job was threatened in

25 2005.  And then he believed -- Mr. Caravantes -- believed that

C42dcar3                         Pearson - cross

in order to maintain his job and not lose his job, he had to

submit to this behavior because, A, he had seen it happen with

other people, and, B, he feared that if he didn't make -- do

what Mr. Velandia wanted him to do, that he would be fired.

Q.  Are you saying that Mr. Caravantes told you that he had

seen other people engaging in sexual activity so as not to be

fired?

A.  I didn't -- no, I did not say that.  Seeing, observing with

his eyes?  No, I didn't say that.

Q.  Did he identify any of these situations to you?

A.  No.  That he knew of it.

Q.  Caravantes' decision to enter into and to continue sexual

relations with Velandia was made in his own self-interest, was

it not?

A.  I believe that he felt coerced and that he felt that he had

to submit in order to maintain his employment.

Q.  And that is in his self-interest, is it not?

A.  Maintaining employment?

Q.  Yes.

A.  I guess -- I mean, I don't know that I would -- I mean,

that is partially a degree of what you have to do to survive;

you have to be employed if you are supporting a family of five.

Q.  So are you saying it is not in his self-interest,

Dr. Pearson?

A.  I am not saying that it is not in his self-interest --

C42dcar3                          Pearson - cross

1    well, I think it is a matter of what is not necessary.

2    Self-interest sounds a little bit more self-promotional.

3    Q.  But you do -- even though Caravantes claims that he was

4    coerced into this activity, he did allow it to occur, correct?

5    A.  He allowed it to occur.  He submitted to it, yes.

6    Q.  And you would agree, would you not, that the DSM nowhere

7    states that unwanted sexual activity qualifies as an extreme

8    traumatic stressor for purposes of diagnosing PTSD?

9    A.  It does not specifically say that, no.  It does say that

10   you can have a threat to the physical integrity of the self.

11   It does say that clinicians are allowed to use clinical

12   judgment in making a diagnosis when the symptoms are persistent

13   and severe even if the exact specifics are not met.

14   Q.  In fact, the traumatic event that is used as an example in

15   the definition of PTSD that comes --

16             THE COURT:  Which definition of PTSD?

17             MR. PARKER:  It is in Plaintiffs' 109, your Honor, the

18   first page of the exhibit.

19             THE COURT:  Go ahead.

20   Q.  It uses, in the bottom of the page there, it uses as an

21   example violent personal assault that includes sexual assault,

22   physical attack, robbery, mugging.  None of those occurred

23   here, correct?

24   A.  None of those occurred.  There are more examples that I

25   think are less severe --

C42dcar3                          Pearson - cross

1   Q.  But none of those occurred, factually?

2   A.  None of those occurred.

3   Q.  And when you prepared your report and opined that

4   Caravantes was suffering from PTSD, it was based, in part, on

5   an assumption that with regard to the anal sexual activities

6   between them, that Velandia had penetrated Caravantes, correct?

7   A.  Yes.

8   Q.  And when you testified yesterday about that issue, you

9   stated that you made an assumption that Velandia had penetrated

10  Caravantes and not the other way around; right?

11          MR. SAXENA:  Objection.  "Yesterday."

12          THE COURT:  I will allow it.

13          MR. PARKER:  I am sorry.  We were not here yesterday,

14  but on Friday.

15  A.  Sorry.  Can you please repeat the question?

16          MR. PARKER:  Sure.  Let me rephrase it.

17          THE COURT:  I will allow the question.

18          Do you want it read back, or do you want to rephrase?

19          MR. PARKER:  You can read it back.

20          (Question read)

21  A.  So -- sorry.  I made -- the language that I heard, I heard

22  in one particular way, yes.  I didn't make an assumption --

23          THE COURT:  You heard it in the way that he said it,

24  right, in the way Mr. Parker stated it?

25          THE WITNESS:  Yes.  That's correct.  Mm-hmm.

C42dcar3                         Pearson - cross

1    Q.  But when you testified at your deposition, you didn't

2    characterize your knowledge as an assumption, you testified

3    that that's what Caravantes had told you, right?

4    A.  I didn't realize that I had been --

5    Q.  Please answer yes or no.

6    A.  Yes.

7    Q.  Now, isn't it significant to your opinion that it was

8    Caravantes who was the penetrator each and every time that he

9    and Velandia engaged in anal sex?

10   A.  It does not change my opinion about the symptoms.  It is a

11   fact, piece of information that I was not aware of or

12   misunderstood, but it doesn't change the symptom picture and it

13   doesn't change my opinion.

14   Q.  It doesn't cause you to think about whether or not that

15   activity was desired by Caravantes?

16   A.  I'm sorry.  I don't know how to answer that question.  Can

17   you say it again?  Does it cause me to question whether a

18   desire was present?

19   Q.  Doesn't the fact that Caravantes was the penetrator in the

20   anal sex activities of the two each and every time cause you to

21   question whether or not Caravantes desired to engage in that

22   activity in the first place?

23   A.  Because he's the penetrator, it does not necessarily mean

24   that he desired to have the activity.

25   Q.  Wouldn't you agree that it's unlikely that a man could be

1   capable of arousal and completion of that kind of sexual

2   activity over an extended period of time absent --

3          MR. SAXENA:  Objection.

4   Q.  -- a desire to do so?

5          MR. SAXENA:  Objection.

6          THE COURT:  Do you have an opinion on that?

7          THE WITNESS:  I'm sorry.  On whether he could

8   sustain -- I'm sorry.  You have to repeat the question.

9          MR. PARKER:  May I have it read back, please?

10          (Question read)

11   A.  I don't think that desire -- arousal is a physiological

12   response; it does not require desire.  And so I don't believe

13   that desire over a prolonged period of time is necessary for a

14   man to experience arousal.

15   Q.  At the time you prepared your report, were you aware of the

16   testimony of Mr. Caravantes that he achieved a climax each and

17   every time that he received oral sex from Velandia?

18   A.  I think you had asked me this question, so, yes, I was

19   aware of that.

20   Q.  And is it your testimony that that fact has no role in

21   determining whether or not -- let me rephrase.

22          Is it your testimony that that fact has no part in

23   your conclusion, in your assumption, that this was unwanted

24   sexual activity between the two of them?

25   A.  I think actually that individuals who have unwanted sexual

C42dcar3                     Pearson - cross

1    activity done, performed on them and then they do ejaculate,

2    which is a normal physiological response that often individuals

3    can't control, that it can increase helplessness and cause that

4    experience to be even more upsetting than perhaps it would be.

5             THE COURT:  What would you find constituted a threat

6    to him?

7             THE WITNESS:  The threat to physical integrity.  That

8    we as human beings have control over our body and our physical

9    beings, and when someone violates those boundaries and you feel

10   that you don't --

11            THE COURT:  It doesn't have to be orally spoken?

12            THE WITNESS:  I'm sorry?

13            THE COURT:  A threat.

14            THE WITNESS:  No.

15            THE COURT:  It doesn't have to be somehow demonstrated

16   by physical actions?

17            THE WITNESS:  I don't believe so.

18            THE COURT:  Where did you find your definition of

19   threat?

20            THE WITNESS:  I'm not sure.  I mean, in general or

21   specifically to this?

22            THE COURT:  In the DSM.

23            THE WITNESS:  The DSM doesn't specifically define it.

24            THE COURT:  It talks about it in 109.

25            THE WITNESS:  Mm-hmm.  It also gives an example of

C42dcar3                          Pearson - cross

1     somebody who sees them unarmed.

2               THE COURT:  Where do you find that this constitutes a

3     threat?  I don't quite understand.

4               THE WITNESS:  I don't think there is any discussion of

5     the threat in here at all.  I think that they give examples of

6     different aspects of the criteria and that they don't give

7     examples of the threat to the physical integrity of self.

8               THE COURT:  Does it say "or other threat to one's

9     physical integrity"?

10              THE WITNESS:  I'm sorry.  Where are you reading?

11              THE COURT:  On 4 of 5 of --

12              THE WITNESS:  On page 4?

13              THE COURT:  On page 1.

14              THE WITNESS:  On page 1, OK.

15              On the bottom paragraph, is that where you are talking

16    about?

17              THE COURT:  The fourth line and fifth line.

18              THE WITNESS:  The fourth line and fifth line.

19              THE COURT:  Exercise other threat, or a threat --

20              THE WITNESS:  Yes.  Or a threat to the physical

21    integrity of another person or a threat to one's physical

22    integrity.

23              THE COURT:  Where do you find the threat?  What

24    conduct constitutes a threat?

25              THE WITNESS:  It's my opinion that the threat to

C42dcar3                           Pearson - cross

1    physical integrity is the violation -- the inability of someone

2    to control their own physical body and the response that that

3    creates in that individual, a boundary violation --

4                THE COURT:  What is the act that you say constitutes

5    the threat?

6                THE WITNESS:  The threat that if he doesn't do it,

7    that something very negative will happen.

8                THE COURT:  And where in the body of your report do

9    you cover that?

10               THE WITNESS:  What the threat -- in the opinion --

11               THE COURT:  Where is it recited in your report?

12               THE WITNESS:  Under PTSD in the opinion section.

13               THE COURT:  What page is that?

14               THE WITNESS:  Page 11.

15               THE COURT:  Page 11?

16               THE WITNESS:  At the bottom.

17               THE COURT:  Of Exhibit 23?

18               THE WITNESS:  I'm sorry.  Exhibit 23.

19               THE COURT:  Where in your report does the report cover

20   this?

21               THE WITNESS:  If you go to page 12 at the top, in the

22   middle of the paragraph.  So, "The inappropriate sexual

23   behavior and sexual coercion violated Mr. Caravantes' physical

24   boundaries.  Mr. Caravantes, who identifies as heterosexual,

25   had his physical body violated on a frequent basis, and he

C42dcar3                          Pearson - cross

1   believed that if he refused to allow this physical violation he

2   would be fired and that if he did allow it he would be

3   promoted."

4           THE COURT:  Where do you find the threat?

5           THE WITNESS:  I thought -- I believe that is the

6   threat.  The threat is to --

7           THE COURT:  The threat by some third party, not what

8   he interpreted it as.

9           THE WITNESS:  I don't believe it has to be a threat by

10  a third party.  I believe that the threat is to the integrity

11  of the self.  It's not necessarily that someone is going to

12  threaten you; it's that the behavior is threatening your

13  physical integrity, your bodily integrity.

14          THE COURT:  But that is saying the same thing, is it

15  not, as it's saying that he violated his physical boundaries?

16          THE WITNESS:  Yes.

17          THE COURT:  But that doesn't constitute a threat.

18          THE WITNESS:  It's not my interpretation that they

19  require it to be a physical threat to the body, because that's

20  already subsumed in the criteria that's already mentioned.

21          THE COURT:  In what?  In 109?

22          THE WITNESS:  In the DSM.  So they already say at the

23  beginning, "Actual or threatened death or physical injury."

24  That's already separate.  That's the threat of injury.

25          THE COURT:  Actual or threatened death or serious

C42dcar3                              Pearson - cross

1   injury.

2               THE WITNESS:  Right.

3               THE COURT:  And then it says, "or other threat."

4               THE WITNESS:  Right.

5               THE COURT:  "Or a threat to the physical integrity of

6   another person."

7               THE WITNESS:  Right.  I don't believe that has to be a

8   physical threat.

9               THE COURT:  But where is the threat in the evidence

10  that you heard in your report?

11              THE WITNESS:  I don't believe there was a physical

12  threat.

13              THE COURT:  So it wasn't made by Mr. Velandia?

14              THE WITNESS:  That he physically threatened?

15              THE COURT:  Physically threatened.

16              THE WITNESS:  That I am aware of, no physical threat,

17  but the threat --

18              THE COURT:  No physical threat by Mr. Pistorio?

19              THE WITNESS:  The threat was the loss of employment.

20              THE COURT:  And who was that by?

21              THE WITNESS:  My understanding was Mr. Pistorio

22  threatened to fire him earlier in 2005.

23              THE COURT:  If?  Any qualifiers?

24              THE WITNESS:  Not that I am aware of -- not that I

25  know of.

C42dcar3                          Pearson – cross

1         THE COURT:  In 2005?

2         THE WITNESS:  Yes.

3         THE COURT:  What about Velandia?  Did Velandia

4    threaten him?

5         THE WITNESS:  Overtly?  Not that I am aware of.

6         THE COURT:  So you don't need that?

7         THE WITNESS:  I don't believe -- I mean, the behavior

8    is driven from the fear or the perception that he'll be fired,

9    right, the submission to the behavior.  But I don't believe you

10   need to have someone say to you, "I threaten to do this to

11   you."

12        THE COURT:  Do it or I'll fire you, that would be a

13   threat, right?

14        THE WITNESS:  That would be a threat, yes.  And his

15   perception was that that threat existed.

16        THE COURT:  His perception was that he could fire him?

17        THE WITNESS:  Yes.  If he did not go along, yes.

18   BY MR. PARKER:

19   Q.  But, Dr. Pearson, as you agreed earlier, the traumatic

20   event that's necessary in order to come to this diagnosis of

21   PTSD is an objective event, not a perception by the victim,

22   correct?

23   A.  Oh, I'm sorry.  No.  I don't necessarily think that's true.

24   Q.  OK.

25   A.  I didn't know that's what you were asking when you asked

C42dcar3                          Pearson - cross

1    that.

2    Q.  So, Dr. Pearson, all these statements about what type of

3    event has to actually occur, you disagree with all of that, and

4    say that if in the mind of the person the event occurred -- so

5    if in the mind of a person a threat occurred, whether it is a

6    death or a violation of physical integrity, that's enough under

7    the DSM to find a traumatic event sufficient to find PTSD?

8    A.  I don't think I can answer that with a "yes" or "no."  I

9    think that there are certain circumstances where a perception

10   and actual events -- a perception of an event could potentially

11   cause the symptoms, yes, even though there may be an objective

12   person looking on the outside doesn't necessarily -- or that

13   that's not actually what happened.

14   Q.  Could you show me where in the body of this section of the

15   DSM that there is any reference to perception of an event as

16   being a qualifying factor?

17   A.  I don't know that I can point you to perception but I could

18   give you an example.

19   Q.  No.  Is there anything in the DSM that supports what you

20   just said?

21   A.  I just said, yes, I could give you an example.

22            THE COURT:  An example from the DSM?

23            THE WITNESS:  Yes.  OK.  So for an example, if you

24   experience, let's say, an earthquake, right, and you're

25   actually not at harm objectively, you're not actually at risk,

C42dcar3                    Pearson - cross

1   but you don't know that.  Your perception is that an earthquake

2   is happening and you don't know, that's your perception.  And

3   so, yes, I believe that you can have symptoms stemming from

4   that perception.

5   Q.  Are you saying that -- in your example, does the earthquake

6   actually happen?

7   A.  Yes, the earthquake happens.

8             THE COURT:  Other natural disasters also, right?

9             THE WITNESS:  Sure, yes.  You don't have to actually

10  be at risk to not know that you are not at risk in that

11  scenario.  You could believe.  You could have never been in an

12  earthquake before and be terrified and not know that you

13  weren't at risk.

14            THE COURT:  What about people who were, say, in the

15  World Trade Center?

16            THE WITNESS:  Well, that seems like quite an objective

17  risk.  You mean --

18            THE COURT:  Well --

19            THE WITNESS:  But you're saying if they could have

20  gotten out?  Their perception of what could have happened?  I

21  think many people experienced posttraumatic stress symptoms

22  after that, yes.

23  BY MR. PARKER:

24  Q.  But, actually, the DSM, the very first sentence,

25  Dr. Pearson, says you have to be exposed to an extreme

C42dcar3                        Pearson - cross

1   traumatic event, does it not?

2   A.  It does.

3               THE COURT:  Where are you reading from?

4               MR. PARKER:  The first sentence of Plaintiffs' Exhibit

5   109, Judge, the first sentence under "Posttraumatic Stress

6   Disorder, Diagnostic Features."

7               (Pause)

8               THE COURT:  OK.  She answered, I think.

9               THE WITNESS:  Yes.

10              MR. PARKER:  I am about to start a different section.

11  I don't know if you want me to continue, Judge, or shall we --

12              THE COURT:  I guess --

13              MR. PARKER:  -- pick up tomorrow?

14              THE COURT:  I lost track of the time.

15              You are too engrossing.

16              All right.  I guess we had better break for the day

17  and come back tomorrow at 9:30.

18              MR. SAXENA:  Your Honor, should we instruct the

19  witness?

20              THE COURT:  You are instructed not to talk to counsel

21  until the case breaks.

22              THE WITNESS:  OK.  Thank you.

23              (Adjourned to 9:30 a.m., Tuesday, April 3, 2012)

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

JESSICA PEARSON

Direct By Mr. Saxena . . . . . . . . . . . . . 607

Cross By Mr. Parker  . . . . . . . . . . . . . 654

PLAINTIFF EXHIBITS

Exhibit No.                                   Received

 25 and 25A   . . . . . . . . . . . . . . . 617

 26   . . . . . . . . . . . . . . . . . . . 619

 113 and 113A   . . . . . . . . . . . . . . 629

 114 and 114A   . . . . . . . . . . . . . . 629