C43kcar1

<pre>
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
      ARTURO CARAVANTES and
 3    FRANCISCO SOTARRIBA
                      Plaintiffs
 4
                   v.                        09 CV 7821 (RPP)
 5    53RD STREET PARTNERS, LLC
      d/b/a REMI RESTAURANT and
 6    OSCAR VELANDIA
                      Defendants
 7    ------------------------------x
                                        New York, N.Y.
 8                                      April 3 2012
                                        9:48 a.m.
 9
      Before:
10                      HON. ROBERT P. PATTERSON, JR.

11                                          District Judge

12                            APPEARANCES
      PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
13          Attorneys for Plaintiffs
      1285 Avenue of the Americas
14    New York, NY 10019
      AARON S. DELANEY
15    MAYUR P. SAXENA
      MICHAEL PALMIERI
16    MOIRA KIM PENZA

17    URBAN JUSTICE CENTER
            Attorney for Plaintiffs
18    123 William Street 16th Floor
      New York, NY 10038
19    NICOLE HALLETT

20    EPSTEIN BECKER & GREEN PC
            Attorneys for Defendants
21    KERRY M. PARKER
      ALKIDA KACANI
22        – also present –

23    JOHN MATT – Spanish Interpreter
      LILIANA HALAC – Spanish Interpreter
24    RANDALL CARTER – Plaintiff AV Tech

25
</pre>

C43kcar1

1            (Trial resumed)

2            THE COURT:  You may recall the witness.

3            MR. SAXENA:  Your Honor, Dr. Pearson had a medical

4     appointment this morning but is on her way into the courthouse

5     now.

6            THE COURT:  Next witness then?

7            MR. SAXENA:  We actually had a few housekeeping

8     matters that we were hoping to clear out.

9            THE COURT:  All right.

10           MR. SAXENA:  We're just working on the microphone,

11    Judge.

12           (Pause)

13           MR. DELANEY:  Your Honor, we are just going to move a

14    few documents into evidence.  We have got another stipulation

15    to enter --

16           THE COURT:  All right.

17           MR. DELANEY:  -- and a few other things.

18           Plaintiffs are going to move Plaintiffs' Exhibit 98

19    and 99 into evidence.

20           THE COURT:  Hand them up.

21           MR. DELANEY:  Your Honor, these are the notices of

22    right to sue from the EEOC, from both Mr. Caravantes and

23    Mr. Sotarriba.  Plaintiffs move both of these exhibits into

24    evidence.

25           THE COURT:  Any objection?

C43kcar1

1          MR. PARKER:  No objection.

2          THE COURT:  98 and 99 are admitted into evidence.

3          (Plaintiff's Exhibits 98 and 99 received in evidence)

4          MR. DELANEY:  Plaintiffs are going to move Plaintiffs'

5   Exhibit 4 into evidence.  Plaintiffs' Exhibit 4 is a letter of

6   recommendation from Mr. Francesco Pistorio for Oscar Velandia.

7   Plaintiffs move Plaintiffs' Exhibit 4 into evidence.

8          THE COURT:  Any objection?

9          MR. PARKER:  No, your Honor.

10          THE COURT:  Subject to connection?  I don't see the

11   connection.

12          MR. DELANEY:  The relevance is going to, in general,

13   the trust and authority that was invested in Mr. Velandia by

14   the general manager, which is part of that picture for us.

15          THE COURT:  It's dated October 2007?

16          MR. DELANEY:  Correct, your Honor.  It's during the

17   relevant period.

18          THE COURT:  I'm sorry?

19          MR. DELANEY:  That's correct.  That's during the

20   relevant time period.

21          THE COURT:  With no objection, Plaintiffs' Exhibit 4

22   is admitted in evidence.

23          (Plaintiff's Exhibit 4 received in evidence)

24          MR. DELANEY:  Plaintiffs are moving Plaintiffs'

25   Exhibit 12D into evidence.

C43kcar1

1          Plaintiffs' Exhibit 12D, your Honor, is a letter from

2     the general manager, Francesco Pistorio, confirming that

3     Mr. Velandia and Mr. Pablo Solis have been given the

4     responsibility of managing the tip pool at the restaurant.

5     Again, your Honor, we believe it goes to Mr. Velandia's

6     authority, both actual and apparent.  So plaintiffs move

7     Exhibit 12D into evidence.

8               THE COURT:  Any objection?

9               MR. PARKER:  No.

10              THE COURT:  12D is admitted in evidence.

11              (Plaintiff's Exhibit 12D received in evidence)

12              MR. DELANEY:  Your Honor, this next one is more of a

13     housekeeping, so Plaintiffs' Exhibit 31 has been admitted into

14     evidence, and that's the video excerpt that we saw during

15     Mr. Caravantes' direct examination.  What I have here is a

16     transcript.  There is some audio in that file, so what I have

17     here is a translation, so there are two voices speaking in

18     Spanish at the very beginning of that excerpt, and I have here

19     a transcript which I believe is in your binder as 31T-REV.  I'm

20     going to hand it around now.

21              Your Honor, 31T-REV, attached to it is a certificate

22     of accuracy from Merrill Corporation, attesting that the

23     translation is true and accurate.  So plaintiffs move 31T-REV

24     into evidence.

25              THE COURT:  Any objection to 31T-REV?

C43kcar1

1           MR. PARKER:  Your Honor, I do have an objection.  I

2    believe we have worked it out between counsel, but just let me

3    state, if I may, that when the plaintiffs introduced P31, it

4    was an excerpt of a longer video.  I had objected to its

5    admission.  Your Honor admitted it, but I maintained the

6    objection but have suggested that the entire video be moved

7    into evidence for completeness' sake.  I believe we have an

8    agreement on that.

9           MR. DELANEY:  We do, your Honor.  I don't have any

10   objection to -- we'll put together the full -- it's like a

11   20-minute file -- we'll put together the full file -- I don't

12   have it with me today -- and we'll move that into evidence as

13   well.

14          THE COURT:  Well, this transcript is only of the part

15   that you showed, as opposed to -- is it the transcript of all

16   the statements made during the part you showed?

17          MR. DELANEY:  It is of all the audible statements made

18   during the part that we showed.

19          THE COURT:  During the whole?

20          MR. DELANEY:  So Plaintiffs' Exhibit 31 is an excerpt

21   of, as Mr. Parker says, of a longer video file.

22          THE COURT:  Yes, I understand that, but 31T-REV, is

23   that just the part that was shown?

24          MR. DELANEY:  Correct.  It's a translation of the

25   audible audio from that excerpt.

C43kcar1

```
1            THE COURT:  Well, wasn't that some evidence that was
2    stopped or cut at some point in that video?
3            MR. DELANEY:  Correct, your Honor.  What we did is, we
4    showed the first 15 seconds, which showed Mr. Caravantes
5    setting it up so that would be clear, and then there's dead
6    space where nothing is happening, so we cut that, and that's
7    where we see the jump in the video and then we start it again
8    at what we believe is the relevant portion.
9            THE COURT:  As far as the spoken words came, they only
10   came on the latter part of the video; is that agreed upon by
11   the parties?
12           MR. PARKER:  I'm not sure whether -- I don't know,
13   your Honor, whether this translation or transcription --
14           THE COURT:  Well, why don't you all look at it again
15   during the break --
16           MR. DELANEY:  OK.
17           THE COURT:  -- or overnight.
18           MR. PARKER:  All right.
19           THE COURT:  And let me know, because I think, just for
20   accuracy's sake, I would like to know if it's confined to a
21   certain portion or whether it covers before the break and after
22   the break.
23           MR. DELANEY:  What I may be able to do -- I'll work
24   with Randall -- I may be able to time-code the excerpt so it's
25   obvious.
```

C43kcar1

1          THE COURT:  Just so I can see it.

2          MR. DELANEY:  On that point, counsel and I worked out

3    another agreement.  Plaintiffs --

4          THE COURT:  Subject to that, I'll admit 31T-REV,

5    subject to that agreement, which I think you're going to get

6    but presuming you're going to get.  But I sustain any objection

7    of the defense that they are entitled to have the full tape

8    shown to the Court, and they will have that opportunity to on

9    their case.

10          (Plaintiff's Exhibit 31T-REV received in evidence)

11          MR. DELANEY:  Your Honor, related to the transcripts,

12    Plaintiffs' Exhibits 28 and 29 were both admitted into evidence

13    subject to -- there was a transcription.  And, your Honor, we

14    had a discussion about how you wanted some kind of attestation

15    or testimony from the woman who had done the transcription.

16    That woman is named Cynthia Romero.  She's a contractor for

17    Merrill Corporation; she's based in Florida, so it's very

18    difficult to get her here and to track her down.  So what I did

19    with Mr. Parker is, he agreed he would have no objections to us

20    admitting 28T and 29T, and he's going to do the same; he's got

21    some excerpts of audio files that he's going to put in some

22    transcriptions, and we're not going to object to those either.

23    So we've got a stipulation between the two of us.

24          THE COURT:  Stipulations, 28T, 29T, agreed to by both

25    parties?

C43kcar1

1          MR. PARKER:  Yes, your Honor.

2          THE COURT:  28T and 29T are admitted in evidence.

3          (Plaintiff's Exhibits 28T and 29T  received in

4    evidence)

5          THE COURT:  Have you got a copy?

6          MR. DELANEY:  We'll get some and hand them up, your

7    Honor.

8          Plaintiffs are now going to move two stipulations into

9    evidence, marked S2 and S3.

10         THE COURT:  I'm sorry, I was reading the stip,

11   proposed reading of 28T.

12         S2 and S3 are in.  I don't have 29T and 28T.  Oh, here

13   it is.

14         We have S2 and S3?

15         MR. DELANEY:  Correct, your Honor.  So these are

16   stipulations.  S2 are admissions by Mr. Velandia from the

17   requests for admission we made during discovery, so we have got

18   a stipulation on his admissions.  So we move S2 into evidence.

19         THE COURT:  Any objection?

20         MR. PARKER:  No, your Honor.

21         THE COURT:  All right.  S2 is admitted in evidence.

22         (Plaintiff's Exhibit S2 received in evidence)

23         MR. DELANEY:  And S3 are admissions from the

24   defendant, 53rd Partners LLC, again, based on our requests for

25   admissions from fact discovery.  So we move S3 into evidence.

C43kcar1

1          THE COURT:  No objection?

2          MR. PARKER:  No, your Honor.

3          THE COURT:  S3 is admitted in evidence.

4          (Plaintiff's Exhibit S3 received in evidence)

5          THE COURT:  S3 is admitted in evidence.  I don't think

6    I mentioned 28 and 29; they're admitted in evidence.

7          (Plaintiff's Exhibits 28 and 29 received in evidence)

8          MR. DELANEY:  So Dr. Pearson is here now, so we have

9    one last exhibit that we are marking solely for identification,

10   your Honor.

11         THE COURT:  All right.

12         MR. DELANEY:  Now, this is the map, the floor plan of

13   Remi Restaurant that we were showing during our case --

14         THE COURT:  Yes.

15         MR. DELANEY:  -- along with the pictures that were

16   shown during our direct examinations.  So this is Plaintiffs'

17   Exhibit 205, and we're submitting it just for identification.

18         THE COURT:  205 is for identification only.

19         We can call the next witness.  I see Dr. Pearson is

20   here.

21         MR. PARKER:  Dr. Pearson.

22         THE COURT:  Good morning, Dr. Pearson.  You are

23   reminded you are still under oath.

24         THE WITNESS:  Yes, good morning.  Thank you.

25

C43kcar1

1    JESSICA PEARSON, resumed.

2    CROSS-EXAMINATION CONTINUED

3    BY MR. PARKER:

4    Q.  Dr. Pearson, in your direct examination, do you recall

5    testifying about what's called a differential diagnosis?

6    A.  Yes.

7    Q.  What is a differential diagnosis?

8    A.  It is other diagnoses that clinicians are supposed to think

9    about and consider when making a diagnosis.

10   Q.  And that would apply as well to an opinion with respect to

11   posttraumatic stress disorder, correct?

12   A.  That you would use a differential, yes.

13   Q.  And in Plaintiffs' Exhibit 109, there is a section on

14   page -- Plaintiffs' Trial Exhibit page 5 of 6, which refers

15   specifically to the differential diagnosis for PTSD, correct?

16   A.  Yes.

17   Q.  In the first sentence of that section, it again restates

18   the requirement that the stressor must be of an extreme, and I

19   quote, i.e., life-threatening nature, close quote, correct?

20   A.  Yes.

21   Q.  And without that, absent that level of a stressor, you

22   would agree that PTSD would be ruled out as a diagnosis, would

23   you not?

24   A.  No, I would not agree.  Without the life-threatening piece

25   of it?  Is that what you're asking?

C43kcar1                        Pearson - cross

1    Q.  Well, I'm reading from the excerpt from the diagnostic tool

2    that you relied on and you say is the most --

3            THE COURT:  Where are you reading from?

4            MR. PARKER:  P109, Judge.  It's actually the last page

5    of the exhibit, differential diagnosis, the first sentence.

6            THE COURT:  Page 5 of 6?

7            MR. PARKER:  Yes.

8            THE COURT:  Do you see that?

9            THE WITNESS:  Yes.

10   BY MR. PARKER:

11   Q.  You would agree, would you not, that the stressor has to be

12   of an extreme nature in order for there to be a proper

13   diagnosis of PTSD?

14   A.  I agree with the extreme nature, yes.

15   Q.  Absent an extreme stressor, this section discusses the

16   diagnosis of adjustment disorder, right?

17   A.  Yes, as one other possibility, yes.

18           THE COURT:  What does differential diagnosis mean?

19           THE WITNESS:  It means that when you are thinking

20   about how a person fits criteria for a diagnosis, you should be

21   thinking about some other diagnostic possibilities as well.

22   So, for each disorder in the DSM, it provides you some

23   guidelines to think about, what other possibilities might

24   exist.

25   Q.  In your report, you do not include a section on

1   differential diagnosis, did you?

2   A.  No, I did not.

3   Q.  You didn't discuss at all in your report adjustment

4   disorder, did you?

5   A.  I did not.

6   Q.  Also, under the DSM section on posttraumatic stress

7   disorder, phycologists are guided to rule out malingering in

8   situations in which financial remuneration plays a role,

9   correct?

10  A.  Yes.

11  Q.  What is malingering?

12  A.  Malingering is the voluntary production or exaggeration of

13  psychological symptoms for some type of external incentive.

14  Q.  In connection with your work with Mr. Caravantes, you

15  conducted some psychological tests, correct?

16  A.  Yes.

17  Q.  You mentioned, I believe, in your direct testimony that one

18  of them was the SIRS-2 test, right?

19  A.  Yes.

20  Q.  The SIRS-2 test measures or contains various scales of

21  measurement, correct?

22  A.  Yes.

23  Q.  And one of those scales is called an SU scale, right?

24  A.  Yes.

25  Q.  And that's for what they called subtle symptoms?

1    A.   It assesses general symptoms of psychopathology general

2    symptoms of distress.

3    Q.   Am I correct that depending on the scale, the score on the

4    scale, for subtle symptoms, a measurement can be taken which

5    measures the probability of feigning?

6    A.   I don't know that I would put it exactly that way.  It is a

7    scale that you can get one of four levels of -- I don't want to

8    call it probability of feigning, but elevation indicating a

9    higher proportion of reported symptoms than normal clinical

10   populations.

11   Q.   Am I correct that the higher the score on the subtle

12   symptom scale, the higher the probability of feigning exists?

13   A.   I think -- I'm sorry, I thought I just answered that.  I

14   don't know that I would word it that way, especially with that

15   particular scale, with the population that we're talking about

16   in this particular case, but that it means a higher elevation

17   in the probable range, which is where Mr. Caravantes fell, was

18   an elevation indicating that he was reporting a higher

19   proportion than clinical populations reported of that

20   particular type of symptom.  And that's often seen in

21   individuals reporting trauma histories.

22   Q.   If you could turn to Defendants' Exhibit 57.

23             THE COURT:  57?  Defendants'?

24             THE LAW CLERK:  This only goes to 55.

25             MS. KACANI:  It's in the judge's binder.

C43kcar1                          Pearson - cross

1           THE LAW CLERK:  OK.  Do you have more copies?

2           MS. KACANI:  Yes.

3   BY MR. PARKER:

4   Q.  Is that a copy of the SIRS-2 booklet with respect to

5   Mr. Caravantes?

6   A.  Yes.

7   Q.  And I think what you said was there was an elevation --

8   we're talking about subtle symptoms.  What exactly does that

9   mean?

10  A.  That scale assesses general symptoms of psychopathology.

11  So --

12  Q.  And the reported scale score is, am I correct, on the first

13  page of the exhibit on the right-hand side, under scale scores,

14  where it says SU?

15  A.  I'm sorry, did you ask me what the score is?

16  Q.  No, no.  I asked you, is that where the score is reported?

17  A.  That's a raw score; yes.

18  Q.  So the score shown there is 24, correct?

19  A.  Yes.

20  Q.  Am I correct that the highest number that one could attain

21  on that particular measurement is a 25?

22  A.  It's very difficult.  I can't read in my copy what the

23  highest score is, so I would have to see -- but if you have a

24  clearer copy and 25 is at the very top --

25          THE COURT:  Copy of what?

C43kcar1                          Pearson – cross

1              THE WITNESS:  The first page, mine is completely

2      blacked out at the top, so I can't see what the highest score

3      is.

4              THE COURT:  Let me see what you've got.

5              THE WITNESS:  See.  Usually the highest score is going

6      to be up here, but I have no idea --

7              THE COURT:  Oh, you can't see what --

8              THE WITNESS:  If your copy --

9              THE COURT:  S2 profile?

10             THE WITNESS:  Yes.

11             MR. PARKER:  I apologize, it's the copy that I was

12     provided.

13             THE WITNESS:  OK.

14     BY MR. PARKER:

15     Q.  So you do you not know whether or not whether 25 is the top

16     score?

17     A.  I don't off the top of my head, I'm sorry, I don't.

18     Q.  If 25 is the highest score, is 1 the lowest score?

19             THE COURT:  Well, is 25 the highest score that he

20     achieved, or is this the highest score that's achievable?

21             MR. PARKER:  I'll ask that, Judge.

22     BY MR. PARKER:

23     Q.  Mr. Caravantes scored a 24, correct?

24     A.  Yes.

25     Q.  That's an elevated number, right?

C43kcar1                          Pearson - cross

1  A.  It is elevated in the --

2          THE COURT:  What do you mean by elevated, Mr. Parker?

3  Q.  It's an elevated number relative to the scores that one

4  could achieve, it's closer to the top of the range than to the

5  bottom of the range, right?

6  A.  That's correct.

7  Q.  And elevated means that he reported a higher number of

8  common psychological problems as major issues, as compared

9  others in the population, correct?

10  A.  That is correct.

11  Q.  If 25 is the highest score that one could attain, or that

12  one could achieve on the scales for subtle symptoms, would 1 be

13  the lowest?

14  A.  Zero would be the lowest.

15  Q.  If 25 were the highest score, what would that tell you?  If

16  25 were the highest score possible on this scale and someone

17  were to attain a 25, what would that tell you?

18  A.  It would tell me that they are endorsing a higher

19  proportion of symptoms in that category than other clinical

20  groups do.

21          THE COURT:  Is this scale, S2 profile, of subtle

22  symptoms?  Is that what it is?

23          THE WITNESS:  Yes.

24          THE COURT:  Just confined to subtle symptoms?

25          THE WITNESS:  Yes, just that scale looks at general

C43kcar1                        Pearson - cross

1    symptoms, such as -- not severe symptoms, but general symptoms

2    such as sleep problems, poor concentration, so things that are

3    more general than specifically related to a particular

4    disorder.

5              THE COURT:  We don't have what the scores were?

6              THE WITNESS:  We have the scores.  The score was a 24.

7    We just can't see --

8              THE COURT:  That's the total, but we don't know what

9    the scores are in the categories?

10             THE WITNESS:  No, we do.

11             THE COURT:  Oh, OK.

12             THE WITNESS:  The scores on the right side are the

13   scale scores.

14             THE COURT:  I see.

15             THE WITNESS:  We just can't see them on the profile.

16             THE COURT:  Those numbers that appear on the scale

17   scores are each -- RS is some kind of subtle score?

18             THE WITNESS:  No, those are all different scales,

19   looking at different reported symptoms.

20             THE COURT:  Where do I find what compromised the 24?

21             THE WITNESS:  Oh, the actual questions?  Would be the

22   following page --

23             THE COURT:  Where you came up with 24 total.

24             THE WITNESS:  You would look at the following pages,

25   at the different items.

1                THE COURT:  I see, all right.

2                And are these translated for use of the Court?  Are

3      these --

4                THE WITNESS:  I did not provide an English version.

5                THE COURT:  They're all in Spanish, right?

6                THE WITNESS:  Yes; the test was administered in

7      Spanish.

8                THE COURT:  Do you have an English version?

9                MR. PARKER:  We do not, Judge.

10                THE COURT:  I take it there is an English version?

11                THE WITNESS:  Yes, there is.

12                THE COURT:  So as far as I'm concerned, unless we

13      translate it, I won't be able to tell what made up the 24,

14      right?

15      BY MR. PARKER:

16      Q.  You found that Mr. Caravantes' score of 24 was an elevated

17      score, right?

18      A.  Yeah, it's in the probable range; yes, that is an

19      elevation.

20      Q.  Is there a manual that goes with the SIRS-2 test?

21      A.  Yes.

22      Q.  Does that manual provide that reporting of the most common

23      psychological problems as a major issue is uncharacteristic of

24      patients with genuine disorders?

25      A.  Are you quoting out of the manual?  I don't have a manual

C43kcar1                          Pearson - cross

1    in front of me.

2    Q.  Is that your understanding, though?

3    A.  My understanding is that the test looks at all of these

4    different scales, and you don't look at one scale in isolation.

5    That's not how the interpretive process occurs.  So each scale

6    has higher scores and lower scores; and in isolation, one

7    elevation would not indicate that, but each elevation would add

8    the accumulative factor to not matching genuine disorders.

9    Q.  Generally speaking, do you agree that the more common

10   psychological problems that are reported by a patient as a

11   major issue is uncharacteristic of patients with genuine

12   disorders?

13   A.  Except with trauma-related disorders.  The manual clearly

14   states that individuals reporting trauma histories often have

15   elevations on this subtle scale.

16   Q.  And those who don't have trauma histories fall outside of

17   that category, correct?

18   A.  They're only -- in the manual they're only commenting on

19   those with trauma histories having elevations on that scale.

20   Q.  On the same page of the booklet --

21   A.  I'm sorry, I didn't hear that.

22   Q.  On the same page of the SIRS booklet, D57, the first page,

23   two lines down where it says "SEV" --

24            THE COURT:  I'm sorry, where are you?

25            MR. PARKER:  D57, your Honor, first page.

C43kcar1                         Pearson - cross

1           THE COURT:  Page what?

2           MR. PARKER:  Page 1.

3           THE COURT:  Yes.

4           MR. PARKER:  Just two lines beneath where it says SU,

5   it says SEV in capital letters.

6   BY MR. PARKER:

7   Q.   What is that scale?

8   A.   That's severity scale.

9   Q.   What is severity scale?

10  A.   Meaning that the individual is endorsing the same symptoms

11  that we were just talking about and having them be of a severe

12  nature.  So it's putting a qualitative description on the

13  individual's report of the symptom.

14  Q.   The test shows that Mr. Caravantes' score was a 16 on that

15  category, right?

16  A.   Yes.

17  Q.   Am I correct that 16 is the highest number that one could

18  attain on that category?

19  A.   No.

20  Q.   What is?

21  A.   I can't read it in this picture, in this image here, but it

22  is not the highest.

23  Q.   So that score was elevated as well, was it not?

24  A.   It was also elevated in the probable range, yes.

25  Q.   Does the SIRS-2 also measure what are called rare symptoms?

1   A.  Yes.

2   Q.  Where is that in the booklet?

3   A.  The top one, RS.

4   Q.  What are rare symptoms?

5   A.  Symptoms that are rare in psychiatric populations, clinical

6   populations.

7   Q.  And was Mr. Caravantes' score on that category elevated as

8   well?

9   A.  No.

10  Q.  What is the highest number that is graded for rare

11  symptoms?

12  A.  I'm sorry, again, I can't read -- I don't know what the

13  score is.

14  Q.  Is it a 5?

15  A.  I don't know.  I can't read it.

16  Q.  How many times have you given the SIRS-2 test to a patient?

17  A.  The SIRS-2 and the SIRS, which are basically the same test?

18  Many times, a hundred.  But, again, memorizing the top score is

19  not necessarily part of the interpretation process.

20  Q.  You also gave, as you discussed in your direct examination,

21  you also gave a Personality Assessment Inventory?

22  A.  Yes.

23  Q.  And there was a written report on that as well, was there

24  not?

25  A.  A written report, meaning in my report, or there's an

C43kcar1                      Pearson - cross

1    interpretation?

2    Q.  An interpretation of that test.

3    A.  The computer provides an interpretation, yes, a printout.

4    Q.  And if you turn to Exhibit D56, what is D56?

5    A.  The computer printout of the Personality Assessment

6    Inventory.

7    Q.  And the purpose of the Personality Assessment Inventory is

8    what?

9    A.  It provides clinical information on symptoms of

10   psychopathology.  Generally speaking, not specifically to this

11   case but generally speaking, it provides a measure of validity

12   as well as a clinical symptom picture, and it is closely -- the

13   questions and the symptoms asked about closely matched to the

14   DSM-IV.

15   Q.  If you turn over to page 4 of the document, do you see

16   where it says at the top, near the top of the page,

17   "Supplemental PAI Indexes"?

18   A.  Yes.

19   Q.  What is that?

20   A.  These are indices that have been developed through

21   research, looking at certain data points on the test, and

22   comparing them, within research, to look at what configurations

23   might match certain clinical issues that you should be thinking

24   about.

25   Q.  One of the measurements is a malingering index, correct?

C43kcar1                         Pearson - cross

1    A.  That's correct.

2    Q.  And you see that under where it says index and then it

3    gives a value and a T score.  What does value mean?

4    A.  The value is the raw score.

5    Q.  And what is the T score?

6    A.  A T score describes how -- where someone is compared to a

7    mean.

8    Q.  Let's look at defensiveness index; for example, two lines

9    up.  There's a value of 5 and a T score of 63.  What does that

10   mean to you?

11   A.  It means that the raw score on the defensiveness index was

12   5, and that the T score -- so the mean is 50 in T scores, and

13   then a 63 would be about one standard deviation above the mean,

14   which is not particularly significant.

15   Q.  Is the mean 50 for all of these indices?

16   A.  On T scores, yes, the mean is 50.

17   Q.  And out of all the T scores, the score for malingering for

18   Caravantes was the highest, correct?

19   A.  That's correct.  They're not relative to each other, but

20   yes.

21   Q.  But in absolute terms, it's significantly higher than the

22   next higher score, correct?

23   A.  It is higher than the next score, yes.

24   Q.  How many standard deviations is that off the mean of 50?

25   A.  I think it's about four.

C43kcar1                          Pearson - cross

1    Q.  That would be statistically significant, would it not?

2    A.  It is statistically significant, yes.

3    Q.  Isn't the average raw score for malingerers lower than the

4    5 that was valued here for Caravantes?

5    A.  The average raw score for malingerers or for the general

6    population taking the test, the norm population?

7    Q.  For malingerers.

8    A.  The average score for malingerers is -- I'm sorry, and what

9    did you say it was?

10   Q.  Isn't the average score for malingerers --

11            THE COURT:  The average mean?

12            MR. PARKER:  The average raw score.

13            THE WITNESS:  OK.  I didn't hear what the number was,

14   I'm sorry.

15   BY MR. PARKER:

16   Q.  Isn't the average raw score for malingerers in the area of

17   4.4?

18   A.  I actually don't know that number off the top of my head.

19   Q.  Did you know it when you looked at this test?

20   A.  I certainly evaluated this elevation, yes.

21   Q.  Didn't you find that on the raw score of 5, that Caravantes

22   had a high raw score on the malingering value?

23   A.  Yes; this is an elevated score on this index.

24   Q.  With regard to the T score, if it were two standard

25   deviations off to of the mean, that would be statistically

C43kcar1                              Pearson - cross

1    significant, would it not?

2    A.  Yes.  Two standard deviations above the mean?  Yes.

3    Q.  What T score would be two standard deviations off the mean

4    of 50?

5    A.  Somewhere around 70.  It's not going to work out like that

6    on this index because there aren't that many data points, but

7    around that.

8    Q.  And the result of these scores is that Caravantes scored

9    the highest on the malingering index out of all the indices,

10   right?

11              MR. SAXENA:  Objection, your Honor; cumulative.

12              THE COURT:  I'll allow the question.  It's

13   cross-examination.

14              THE WITNESS:  They're not at all in comparison to each

15   other, so saying one is higher than another -- there's no

16   relevance to that.  They're individual indices made up of

17   individual data points.  It happens to be the highest one in

18   this list, but it's not in comparison to anything else.  For

19   example, the Rogers Discriminant Function is actually also a

20   measure of feigning, which you can see is 49, it's actually

21   below the mean -- so, again, they're not in relation to each

22   other.  I can't really answer that question.

23   BY MR. PARKER:

24   Q.  Down beneath the PAI indexes, there's a category called

25   "Coefficients of Fit with Profiles of Known Clinical Groups."

C43kcar1                        Pearson - cross

1    What is a coefficient of fit?

2              THE COURT:  Where are you?

3              MR. PARKER:  That same page --

4              THE COURT:  I see where you are, the second column at

5    the bottom?

6              MR. PARKER:  Yes, your Honor.

7              THE WITNESS:  So these are clinical groups, and it's

8    matching Mr. Caravantes' profile to those known groups, to see

9    which is the best -- not to see which is the best fit but to

10   show you all of the fits.  And the closer you get to one on the

11   coefficient of fit, the better match.

12             So this suggests that the fit for Mr. Caravantes with

13   these cluster 2 -- these are the better matches based on his

14   symptom profile.

15             THE COURT:  What does cluster 2 mean?

16             THE WITNESS:  It's a designation by the test itself,

17   so they come up with --

18             THE COURT:  What's included in cluster 2?

19             THE WITNESS:  Off the top of my head, I am going to --

20   I'm just going to think for one secondly.

21             It's usually a two -- it's a combination of two

22   particular elevations to clinical scales, and I'm sorry, I'm

23   not a hundred percent sure, without looking back at my notes,

24   which two cluster 2 is versus cluster 7 and versus cluster 10.

25   I don't know off the top of my head.

C43kcar1                          Pearson – cross

1              THE COURT:  What's included in cluster 7?

2              THE WITNESS:  That's what I'm saying, I'm not sure

3     which clinical scales.  What it does is it looks at a

4     combination of two clinical scales and it comes up with a

5     profile picture of an individual.  And it's matching him best

6     to cluster 2 and next to someone reporting taking antipsychotic

7     medication and next to cluster 7, and I don't recall which

8     combination of clinical scales goes with which cluster.

9              THE COURT:  What does FIT mean?

10             THE WITNESS:  Coefficient of fit?

11             THE COURT:  I'm sorry, what?

12             THE WITNESS:  Coefficient of fit is how well it

13    matches that group's profile.

14             THE COURT:  FIT means fit?

15             THE WITNESS:  Yes, fit.

16             THE COURT:  For what?

17             THE WITNESS:  Yes, match; it's basically a coefficient

18    of how they're matching together, with 1.0 being the best match

19    and negative numbers being the least consistent match.

20             THE COURT:  1.0 being the best match?

21             THE WITNESS:  That's right.

22    BY MR. PARKER:

23    Q.  So, in other words, looking at this list, all of the items

24    listed above major depressive disorder were graded as better

25    fits for a diagnosis for Mr. Caravantes than either major

1    depressive disorder or posttraumatic stress disorder, correct?

2    A.  So those would be singly, right, so major depressive

3    disorder, and posttraumatic stress disorder would be singly

4    whereas cluster designations are usually two or more

5    combinations of clinical elevations.  So one of these, cluster

6    2 or cluster 7, is related to posttraumatic stress disorder and

7    depression and social withdrawal and thought disturbance, and I

8    don't know which one off the top of my head.  So it's more of a

9    combination of issues rather than a single diagnosis.

10   Q.  Now, you said this test is computer-graded -- I think you

11   said graded, did you not?

12   A.  I did not say graded, but you put the results in a computer

13   and the computer provides you with a printout and then you do

14   an interpretation based on that printout.

15            THE COURT:  The computer software is operated by

16   personality assessment company; is that right?

17            THE WITNESS:  Yes.  By PAR.

18            THE COURT:  PAR, right.

19            THE WITNESS:  That's Person Assessment Resources or

20   something similar to that.

21   BY MR. PARKER:

22   Q.  If you turn over to page 6 of the same exhibit, 56, this

23   narrative section, how is that prepared?

24   A.  The same way.  The computer provides you with a printout

25   and you interpret the printout.

C43kcar1                          Pearson - cross

Q.  Am I correct that one of the findings here was that, in the

third paragraph, that based upon the fact that certain

indicators fell outside the normal range, it suggested that

Caravantes may not have answered in a completely forthright

manner?

            MR. SAXENA:  Objection, your Honor; this area was the

subject of a motion in limine at the beginning of the case.  It

concerns malingering as specifically applied to determine

credibility, which is the provenance of the finder of fact.

And the Court ruled on the motion in limine and determined that

malingering should not be used in this case to make

determinations about Mr. Caravantes' credibility.

            MR. PARKER:  I don't think that was the ruling at all,

and this is their document their expert, and her tests.

            THE COURT:  I'll have to review the ruling.  I didn't

think I said that, but I may have.

            MR. PARKER:  I believe the motion that the plaintiffs

filed was to preclude Dr. Goldstein from testifying --

            THE COURT:  That's my recollection.

            MR. PARKER:  -- about Mr. Caravantes' credibility.

And, frankly, Dr. Pearson's direct testimony, as well as her

cross, involves, and has involved, the issue of malingering,

which she admits the DSM instructs her to consider and rule

out.

            THE COURT:  You can go ahead.

C43kcar1                        Pearson -- cross

1           THE WITNESS:  Can you repeat the question, please.

2           MR. PARKER:  Could I have that read back, please.

3           (Record read)

4    A.  I would say -- so --

5    Q.  My question is:  That was one of the conclusions that was

6    drawn, correct?

7    A.  I wouldn't call that a conclusion, no.  This is a piece of

8    the interpretation that's provided by a computer, and that is a

9    quote out of that interpretation.  I don't think you call that

10   a conclusion.

11          THE COURT:  Are those test results?

12          THE WITNESS:  Yes.  These are items that we are

13   supposed to consider.

14          THE COURT:  Where is the language?

15          MR. PARKER:  On page 6, the third full paragraph, the

16   third paragraph, Judge, the second sentence of that paragraph.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          (Pause)

2     Q.  And in terms of that same thought, regarding the suggestion

3     that Caravantes may not have answered in a completely

4     forthright manner, there was a concern expressed that his

5     responses might lead the evaluator to form a somewhat

6     inaccurate impression of him based upon his responses, right?

7     A.  That's the next sentence, yes.

8     Q.  And further in the same paragraph, the following sentence

9     states that the response pattern of Mr. Caravantes is unusual

10    in that they indicate a defensiveness about particular personal

11    shortcomings as well as an exaggeration of certain problems.

12    Correct?

13    A.  The printout says that, yes.

14    Q.  But you didn't find any of that to be in any part of your

15    conclusions, did you?

16    A.  I certainly read this section of the interpretation --

17    Q.  Did you or did you not find any of that to be accurate in

18    your conclusions?

19    A.  I can't answer that in a "yes" or "no" question.

20    Q.  Well, you accepted what Caravantes told you in terms of his

21    narrative history and the underlying facts themselves as true,

22    correct?

23    A.  Solely accepted them?  Just by his word?  No.

24    Q.  In the end, whatever you used, you accepted his statements

25    to you as true, right?

1    A.  After doing my entire evaluation, yes.

2    Q.  In addition to suggesting that Caravantes may not have

3    answered in a forthright manner on the test, the validity of

4    your test results section also suggests concern about a

5    distortion of the clinical picture regarding Caravantes,

6    correct?  That would be in the last paragraph of page 6.

7    A.  I'd like to respond to that more than a "yes" or "no," if

8    possible.  I mean, yes, you are just reading out of here and

9    that's correct, it's in here.

10   Q.  OK.  You considered this report in reaching your

11   conclusions and your diagnosis in the case, right?

12   A.  I did.

13   Q.  Now, the clinical features section on page 7, what is the

14   purpose of that section of the report?

15   A.  It's a description of the scale elevations and symptoms

16   that the person endorsed, again, based on a computer printout,

17   and so the role of the psychologist is to interpret that.

18   Q.  Now, in the third paragraph, the second sentence, in the

19   clinical features section, it states that "Caravantes is likely

20   to be a socially isolated individual who has few interpersonal

21   relationships that could be described as close and warm."

22             Did you find that to be your own conclusion?

23   A.  I mean, at the time that he took this test there was

24   significant social isolation and detachment that he was

25   reporting from friends and family.  This doesn't -- the test

1   doesn't indicate the timeframe of which the person is talking

2   about.  It is not necessarily a lifelong issue.

3   Q.  In your testimony, you talked about, or you identified

4   major depressive disorder as a conclusion -- as a diagnosis of

5   Mr. Caravantes, correct?

6   A.  Yes.

7   Q.  And you would agree that there were several stressors that

8   Mr. Caravantes experienced prior to and during the time that

9   you were seeing him; would you agree?

10  A.  Yeah, there were stressors, yes.

11  Q.  One of those was he reported financial hardship, correct?

12  A.  Yes, from the loss of his job, yes.

13  Q.  And did he tell you that he had been fired from Remi?

14  A.  That was his understanding is, yes, that he was.

15  Q.  Did he tell you that he had the opportunity to remain there

16  in Remi's employ?

17  A.  He did not tell me that.

18  Q.  He used the word "fired," did he not, when he talked to

19  you?

20  A.  Rather than terminate?

21  Q.  You used the word fired in your report to describe his

22  leaving Remi, right?

23  A.  If that's what it says in my report, then that's what it

24  says in my report.  I mean, I don't have my notes to

25  double-check the exact word.  But that was the implication that

C43dcar2                         Pearson - cross

I understood, was fired.

Q.  So you would use the word fired even if the patient didn't

characterize his termination as a firing?

A.  That's not what I said.

Q.  Well, would you?

A.  If the person characterized their being fired as being

fired, then that's the word I would use.

Q.  And if they didn't say they were fired, would you

characterize a termination as a firing?

A.  I don't -- I'm not sure I understand that question.  Would

I characterize --

Q.  In your report you characterized his termination as a

firing, did you not?

A.  I did.

Q.  OK.  And you based your report on what he told you, right?

A.  That's correct.

Q.  There were other stressors that he had.  He identified his

relationship with his wife as a stressor, correct?

A.  Yes.

Q.  And he identified attempts to find employment as a

stressor, did he not?

A.  Yes.

Q.  And, as well, he identified medical issues he was having as

a stressor?

A.  I don't know that he characterized them as a stressor but

C43dcar2                     Pearson - cross

1  that he was having medical problems that were concerning him.

2  Q.  Did you determine that the medical issues he reported to

3  you constituted a stressor to him?

4  A.  I don't know if I used that language; I'd have to look back

5  at my report.  But I do think that they were stressful.

6  Q.  Well, "stressor" -- the word "stressor" has a significance

7  in psychological diagnoses, does it not?

8  A.  Yes.  In certain circumstances, yes.

9  Q.  As a psychologist attempting to determine what is causing a

10 particular condition, you would, as a routine matter, attempt

11 to identify a person's stressors, would you not?

12 A.  Yes.

13 Q.  And so did you conclude that the medical issues he reported

14 to you was a stressor for Mr. Caravantes?

15 A.  Relating to a diagnosis specifically?

16 Q.  I'm just asking, did you consider them to be a stressor to

17 him?

18 A.  The implication of that question, though, is that it

19 applies to a diagnosis, which is what you just asked.  You said

20 that it's related to making a diagnostic opinion.  I'm

21 suggesting that I do consider them to be stressful; the medical

22 problems he was describing were stressful to him.  I don't know

23 that I considered them as related to his diagnosis.

24 Q.  I didn't ask that question.  I asked if you considered the

25 medical issues to be a stressor for him.  Yes or no?

C43dcar2                         Pearson - cross

1    A.  Again, I don't -- the way you're asking the question

2    suggests that it's related to the diagnosis, and so I didn't

3    think it was related to his diagnosis.

4            MR. PARKER:  Your Honor, may I hand the witness her

5    deposition?

6            THE COURT:  Yes.  I need the deposition, too.

7            (Pause)

8            Page and line?

9            MR. PARKER:  Page 52, line 15, to 53, line 9.

10   A.  I'm sorry.  53, line 9?

11   Q.  On page 52 it starts.

12           First off, do you recall, Dr. Pearson, having your

13   deposition taken in this case?

14   A.  I do.

15   Q.  And you have in front of you a copy of it.  If you can

16   turn, please, to page 52 --

17   A.  Yep.

18   Q.  -- line 15.  Were you asked these questions and did you

19   give these answers at your deposition?

20   "Q  Now, did you develop any understanding of what the -- at

21   the times that you interviewed Caravantes, what were the

22   stressors that he was undergoing during that timeframe?

23   "A  During the year period that I saw him?

24   "Q  Yes.

25   "A  Yes.

C43dcar2                        Pearson - cross

1   "Q   And what were they?

2   "A   Financial hardship.  His relationship with his wife and his

3   three children was deteriorating or deteriorated.  He was

4   having a hard time finding employment.  He was stressed about

5   some medical stuff he had going on -- medical concerns with his

6   eye.  I would say those are the primary ones that we talked

7   about."

8          Correct?  That was your testimony?

9   A.   That is my testimony.

10  Q.   Do you agree that any one of those stressors that you

11  testified about in your deposition could be a triggering cause

12  of a major depressive episode?

13  A.   I do not agree, no.

14         (Pause)

15         Some of them could be, yes.

16         MR. PARKER:  I have nothing further.

17         THE COURT:  Any redirect?

18  REDIRECT EXAMINATION

19  BY MR. SAXENA:

20  Q.   Dr. Pearson, do you recall discussing on cross-examination

21  the concept of physical integrity as stated in the DSM?

22  A.   Yes.

23  Q.   And do you recall testifying that that concept is not

24  defined in the DSM?

25  A.   Yes.

C43dcar2                          Pearson - redirect

1   Q.  Did you find that the criterion of a threat to physical

2   integrity was satisfied with respect to Mr. Caravantes?

3   A.  In my opinion, yes.

4   Q.  What is the basis for that finding?

5   A.  Because the DSM doesn't clearly define it, I also looked

6   outside of the DSM, which is something that as a psychologist

7   you can do research and look to the clinical community.  And so

8   I did.  And there was discussion about threats -- actually,

9   there is not a lot of discussion about threats to physical

10  integrity, unfortunately, but there was discussion.  And what I

11  found was that physical sexual violations were consistent with

12  threats of physical integrity itself.

13  Q.  When you say the "psychological community," what do you

14  mean by that?

15  A.  Individuals -- psychologists, academic psychologists or

16  clinical psychologists writing on, doing research on this area.

17  Q.  Did you review any peer-reviewed publications?

18  A.  I did.

19  Q.  And what did you find in your review?

20          MR. PARKER:  Objection.  Hearsay.

21          THE COURT:  Objection sustained.

22          MR. SAXENA:  Your Honor, is Dr. Pearson permitted to

23  testify as to the bases of her opinion notwithstanding their

24  admissibility?

25          THE COURT:  I don't remember anything about this on

C43dcar2                     Pearson - redirect

 1   direct.

 2           MR. SAXENA:  I believe the concept of threats to

 3   physical integrity was discussed on direct as well as on cross.

 4           THE COURT:  The concept was but nothing about outside

 5   reading.  Is it in the report?

 6           MR. SAXENA:  OK.  I will move on.

 7   BY MR. SAXENA:

 8   Q.  Do you recall testifying on cross-examination just now

 9   about adjustment disorder?

10   A.  Yes.

11   Q.  Do you have experience diagnosing adjustment disorder?

12   A.  Yes.

13   Q.  Can you describe it?

14   A.  Yes.  So adjustment disorder -- I've seen adjustment

15   disorder in my regular practice where individuals are coming in

16   for psychotherapy.  And adjustment disorder can stem from,

17   again, everyday issues that people go through such as moves --

18   things that are stressful events -- moves, going to college,

19   losing a job, losing a relationship, and that they have a

20   harder time adjusting to that particular event and it's causing

21   some type of onset -- increase of onset of symptoms.  They

22   could be depressed symptoms.  They could be anxious symptoms.

23   Or you could actually have a disturbance in your behavior and

24   be acting out like an adolescent or college-aged person acting

25   out and having difficulty adjusting.

C43dcar2                        Pearson - redirect

1   Q.  Why did you determine that Mr. Caravantes did not have an

2   adjustment disorder?

3   A.  The stressors seen in adjustment disorder tend to be,

4   again, as I said, of a much more normal range of experiences,

5   and I did not -- the stressors and the traumas that

6   Mr. Caravantes reported to me were more on the extreme range

7   than these other kind of normal experiences that people have.

8           THE COURT:  I just want to look at your report for

9   what you did find.

10          THE WITNESS:  23.

11          THE COURT:  Your report is --

12          THE WITNESS:  Is 23.

13          THE COURT:  23, right?

14          THE WITNESS:  Yes.

15          THE COURT:  Let me find it.

16          THE WITNESS:  About the diagnosis?

17          THE COURT:  About the diagnosis.

18          THE WITNESS:  Page 11.

19          THE COURT:  Page 7?

20          THE WITNESS:  11.

21          THE COURT:  11.

22          THE WITNESS:  Specifically if you are looking at PTSD,

23   but in general the diagnosis starts on page 10.

24          THE COURT:  You found a major depressive disorder?

25          THE WITNESS:  That's right.

C43dcar2                          Pearson - redirect

 1              THE COURT:  You were just talking about adjustment

 2      disorder.  Your testimony just now is about an adjustment

 3      disorder, which is a lower category?

 4              THE WITNESS:  That's right.

 5              THE COURT:  I see.

 6      BY MR. SAXENA:

 7      Q.  Dr. Pearson, I would like you to turn back, please, to the

 8      defendants' exhibit binder, to Exhibit 57.

 9              Do you recall testifying on cross-examination about

10      these subscales of the SIRS-2 test?

11      A.  Yes.

12      Q.  Can you describe how you read the SIRS-2 test?

13      A.  Yes.  So the SIRS-2 has an interpretation process.  So you

14      look at how many scales are elevated.  And then there's a

15      decision tree, which is not provided here in this exhibit.  And

16      the decision tree, in this particular case you look at how many

17      elevations are in the probable range, and there were two.

18      Mr. Caravantes had two, which we talked about, the subtle and

19      the severe.  And that, plus some other scores, ultimately led

20      to the designation of indeterminate general.  And what that

21      means is is that his profile overall is not -- is no more

22      likely to be a malingering profile than the base rate of

23      malingering in the norming of the test, which is 33 percent --

24      34 percent.

25      Q.  You just mentioned indeterminate general.  Is that a

C43dcar2                         Pearson - redirect

1   category among other categories?

2   A.  Yes.  So there's the feigning category.  There's

3   indeterminate evaluate, meaning there are a number of red red

4   flags; you need to go look at lots of other information.

5   There's indeterminate general, and then there's general

6   responding.  And so, as I said, indeterminate general means

7   that this person is falling statistically around the same range

8   as the base rate of malingering, which is 34 -- for this test,

9   which is 34 percent.

10          THE COURT:  Does malingering require intent?

11          THE WITNESS:  Yes.  So, really, we're using the word

12  malingering, but you are exactly right, we should be talking

13  about feigning or exaggerating, because malingering doesn't

14  apply while you are doing it.  The test doesn't measure that at

15  all.  The test measures the actual symptom report.  So, really,

16  feigning, which is making up symptoms or exaggeration, which is

17  having symptoms and then increasing their severity, that's

18  really what the test is looking at.

19  BY MR. SAXENA:

20  Q.  So what would you describe as the result of the SIRS-2 with

21  regard to Mr. Caravantes?

22  A.  That his score fell in a range that was not elevated

23  compared to the base rate of malingering, at 34 percent.  So

24  that's -- you know, again, 34 percent is not a statistically

25  elevated level of concern, especially for a test that is quite

1    specific and sensitive; it can get you to about over

2    90 percent.

3    Q.  Did you consider the individual subscales of the SIRS-2 as

4    well?

5    A.  I did.  We talked about how subtle -- the subtle scale is

6    elevated.  And, again, I mentioned earlier that this scale is

7    often elevated in people who have experienced traumas because

8    their symptoms tend to be a little bit more diffuse, so a

9    little bit broader in their range, which we also saw on PAI,

10   where it's not just specifically I'm hearing voices or I'm

11   paranoid but there's a whole range of symptoms, and that's what

12   that scale is looking at, and that's why the manual directly

13   addresses that.

14          Severity of symptoms is what is the person's objective

15   experience of how bad everything is right now.  Literally the

16   question is is that unbearable for you.  And Mr. Caravantes

17   report in that moment was that all of these experiences were

18   unbearable.  That was his subjective report.  It was higher in

19   proportion than other people's generally are.  But I also found

20   that to be consistent with the level of the distress that I saw

21   and the level of distress that other clinicians are reporting

22   from him, that he is really reporting severe distress.

23   Q.  Could you please turn to Defendants' Exhibit 56.

24          And could you please turn to page 5 of that exhibit.

25   I'm sorry.  Page 4 of that exhibit.

C43dcar2                          Pearson - redirect

1    A.  Yes.

2    Q.  Do you recall testifying earlier today about the

3    malingering index?

4    A.  Yes.

5    Q.  Did you consider the malingering index to be a useful tool

6    in evaluating Mr. Caravantes?

7    A.  I mean, it was an index, like all of the other indices that

8    I evaluated, all of the other information in this test that I

9    considered.  I didn't find it particularly useful because one

10   of the roles -- one of the things we're supposed to do in

11   psychological assessment is not just to accept what a printout

12   from a computer tells us but to really look in depth at what

13   that index is looking at and to see why are we getting this

14   elevation, what is the meaning of it.

15          So when I looked at the malingering index, there are

16   eight data points and these data points, in looking at them

17   specifically, were consistent so with Mr. Caravantes symptom

18   report.  Although they may be unusual, which is what's causing

19   this elevation for people who might be malingering, it wasn't

20   unusual compared to all of the rest of his symptom report.

21          So, again, I considered it.  It was important to

22   consider.  But it didn't change my thoughts about the test and

23   the value of the test.

24   Q.  And can you look further down the same page, page 4, at the

25   "Coefficients of Fit."  Do you see that?

C43dcar2                      Pearson - redirect

1   A.  Yes.

2   Q.  Do you recall testifying about that earlier today?

3   A.  Yes.

4   Q.  Do you see that major depressive disorder and posttraumatic

5   stress disorder are both listed under the column labeled

6   "Database Profile" under "Coefficients of Fit"?

7   A.  Yes.

8   Q.  And do you see that next to them the notation 0.812 is

9   listed?

10  A.  Yes.

11  Q.  What's your understanding of that number?

12  A.  As I discussed before, the closer you get to 1, you have a

13  better match, a better fit.  So his profile is at that level as

14  compared to profiles of posttraumatic stress disorder and

15  profiles of major depressive disorder, and so that's a

16  relatively high coefficient of fit.

17  Q.  Could you please flip the page to page 5.  Is the list on

18  this page a continuation of the coefficient of fit listing?

19  A.  Yes.

20  Q.  And is there a way to characterize the number 0.812 with

21  reference to the entire list of coefficient of fit?

22  A.  It is high.  Some profiles don't even match at a .812 at

23  all, they don't match anything as consistently as his profile

24  is matching those two profiles and others.  And there are some

25  other profiles that he's not matching as well.  Something like

1   a fake bad profile is somebody who is exaggerating or, you

2   know, faking bad.  So these scores or these matches are

3   significantly higher than that.

4   Q.  Can you turn, please, to, in the same exhibit, page 6.

5   A.  Yes.

6           THE COURT:  Plaintiffs' exhibits.  I've got to change

7   books.

8           THE WITNESS:  We are on the same one.

9           MR. SAXENA:  No, the same, Defendants' 56.  Sorry

10   about that.

11   Q.  Do you recall testifying about the section labeled

12   "Validity of Test Results"?

13   A.  Yes.

14   Q.  Did you find this section useful with regard -- with

15   specific regard to Mr. Caravantes?

16   A.  Well, one of the things that I was asked earlier was about

17   the PAI and its use with Spanish -- so Mexican Spanish-speaking

18   individuals.  And the validity sections of the PAI at this

19   point have not been as empirically validated as the clinical

20   scales.  So you must, in doing the interpretation, put less

21   weight on what those scores are, because we as clinicians don't

22   actually know the meaning of those scores in relation to this

23   specific population of Spanish-speaking Mexican individuals.

24           That being said, I still reviewed it.  I still took it

25   into consideration the way I did every item in this

1    interpretation.  But, again, I had to give it a little bit less

2    weight, and I primarily relied on the SIRS-2 because it has

3    been validated with a Spanish-speaking population.

4    Q.  Can you please turn the page to page 7.

5         Do you recall testifying about the section labeled

6    "Clinical Features" on cross-examination?

7    A.  Yes.

8    Q.  How well is this section -- how reliable is this section in

9    your opinion with regard to a person such as Mr. Caravantes?

10   A.  I mean, it's certainly -- so this is basically a

11   description from the T-scores.  And so the first thing that I

12   would do is look at the T-scores, because my job is to

13   interpret T-scores, not to quote out of a manual or

14   interpretation.  So I look at the T-scores and the T-scores of

15   the subscales.  I read this clinical feature discussion.  And I

16   find it useful because it's matching a lot of what I have seen

17   and a lot of what has been reported.  And it's just, again, one

18   more piece of information that I'm using to corroborate the

19   symptom report.

20   Q.  Let me ask you further about that, Dr. Pearson.  On that

21   page, the bottom paragraph, the second sentence begins, "The

22   respondent has likely experienced," do you see that?

23   A.  Mm-hmm, yes.

24   Q.  Could you please read that sentence.

25   A.  "The respondent has likely experienced a disturbing

C43dcar2                        Pearson - redirect

traumatic event in the past, an event that continues to

distress him and produce recurrent episodes of anxiety."

Q.  In light of your prior testimony concerning how you

interpret this section of the test, how did you interpret this

particular sentence?

A.  I mean, this means that he was endorsing consistent items

with experiencing a traumatic event, which is consistent with

what he had reported to me and consistent with what he had

reported to other people as well.

Q.  And on the same page, could you please look at the second

paragraph under "Clinical Features," and read the first

sentence out loud.

A.  "The respondent reports a number of difficulties consistent

with a significant depressive" episode.

Q.  I'm sorry.  Does it say "episode"?

A.  "Experience."  Excuse me.

Q.  And how did you interpret this sentence?

A.  Again, it's just a measure of consistency.  So he's

reporting these symptoms here.  He's reporting them to me.  I'm

observing them.  I'm hearing about them from his wife.  And all

other sources of information are consistent with this.

            MR. SAXENA:  No further questions, your Honor.

            THE COURT:  Anything on recross?

            MR. PARKER:  Just a few, Judge.

            THE WITNESS:  Your Honor, excuse me.  I just want to

1   use the restroom.  Can I take two minutes for the restroom?

2               THE COURT:  Sure.  We will take a break.

3               We will take a break of ten minutes.

4               (Recess)

5               THE COURT:  All right.

6   RECROSS-EXAMINATION

7   BY MR. PARKER:

8   Q.  Dr. Pearson, on redirect you were asked some questions

9   about adjustment disorder.  And you said things like moving a

10  residence, someone going away to college, someone losing a

11  relationship, those are the types of things that you would

12  normally be associated with an adjustment disorder?

13  A.  They can be, yeah.  Those can be the stressors.

14  Q.  How about questions relating to a person's sexual identity,

15  can that be a stressor that is associated with adjustment

16  disorder?

17  A.  Questions about them figuring out what their sexual

18  identity is?

19  Q.  Yes.

20  A.  It could be.

21  Q.  Did you consider that as a stressor for Mr. Caravantes?

22  A.  No.  He reported to me that that wasn't an issue.

23  Q.  Did it occur to you, based upon the factual report that he

24  gave you, that there might be an issue of sexual identity

25  questioning?

C43dcar2                         Pearson - recross

1   A.  I'm sorry.  Can you say the first part of your question?

2              MR. PARKER:  Would you read it back, please.

3              (Question read)

4   A.  I asked him about it, based on my interviews with him.  I

5   asked him about his sexual identity.  And he told me that he

6   was not homosexual and he had not had previous homosexual

7   relationships or homosexual fantasies, and, therefore, I looked

8   at it and determined that that wasn't the issue.

9   Q.  But my question was based upon the facts that he told you

10  about the relationship between him and Velandia, did you

11  consider whether or not sexual identity questioning was a

12  stressor for him?

13  A.  I don't see that being different from what I said, but I

14  obviously considered it because I asked additional --

15             THE COURT:  He is asking you, one, whether you

16  considered it, and the next question was whether you ruled it

17  in or out.

18             THE WITNESS:  So I considered it.  I asked questions.

19  And I ruled it out.

20  Q.  With regard to the SIRS-2 test, you mentioned on redirect

21  that it was graded as an indeterminate general category, right?

22  A.  Yes.

23  Q.  Was that your conclusion?

24  A.  That's the conclusion using the interpretive method

25  provided by the manual.

C43dcar2                       Pearson - recross

1   Q.  All right.  Is that strictly a numbers-counting exercise or

2   is it a --

3   A.  It is a decision tree.

4   Q.  And that is an interpretive conclusion, correct?

5   A.  It's not my interpretation; it is a very clear decision

6   tree model provided in the test.

7   Q.  But it is not based on counting numbers, right?

8   A.  It is based on counting numbers.

9              MR. PARKER:  Your Honor, I have nothing else.  Thank

10  you.

11             THE COURT:  All right.  You are excused.

12             THE WITNESS:  Thank you.

13             THE COURT:  Thank you.  Good luck with that baby now.

14             THE WITNESS:  Thank you.

15             (Witness excused)

16             THE COURT:  All right.  Next witness.

17             MR. DELANEY:  Your Honor, the plaintiffs are going to

18  rest at this time subject to two reservations.

19             The first is with regard to Mr. Francesco Pistorio,

20  who is not within the jurisdiction, he is in D.C.  But

21  Mr. Parker informs me that he believes he will appear live

22  within his case, within Mr. Parker's case.  And so we would --

23  in order to avoid having to put designations in in our case in

24  chief, we would like to reopen our case in chief for when

25  Mr. Pistorio does appear live, or if he ends up not wanting to

C43dcar2

1    appear, and he is outside our subpoena range, that we are able

2    to put in our designations as determined.  And I don't believe

3    Mr. Parker has any objections to that.

4              MR. PARKER:  I do not have any objections to that,

5    Judge.

6              THE COURT:  No objection.  All right, subject to that

7    first reservation.

8              MR. DELANEY:  And the second reservation is with

9    respect to Dr. Paludi.  She is our second expert.  She is not

10   available this week -- or she wasn't available last week.

11   Sorry.  She had preexisting commitments and could not break

12   them.  She was chairing or an integral part of an academic

13   conference so we could not call her last week.  And this week

14   she has got religious obligations.  She is a devout Catholic,

15   and she has obligations all week, which makes us unable to call

16   her this week.  But she is available next week, assuming this

17   case goes over into next week.  And so we again would like to

18   reopen our case in chief and call her Monday, I think, subject

19   to further agreement with defense counsel.

20             THE COURT:  Is that consented to?

21             MR. PARKER:  Judge, I don't object and I don't think

22   Mr. Delaney objects to the following, which I would want to

23   disclose to the Court as well, because we are talking a little

24   bit here about witness scheduling.  As I mentioned at the

25   outset of the case, I have two witness scheduling issues of my

C43dcar2

1    own.  One is Francesco Pistorio, who is away right now on a

2    family vacation that had been planned, he tells me, for a year,

3    returning on Monday.  I can't get him here until Tuesday.

4         I have Dr. Goldstein, our expert, who is available on

5    Friday and on Monday.  I'm concerned, and I want to bring it to

6    the Court's attention, that I may have one or two small gaps

7    where I do not have a witness available to testify and that we

8    could -- and that's why I say if Mr. Delaney needs to call

9    Dr. Paludi out of turn, I don't have any objection to that.

10        THE COURT:  You have to tell me in advance what day is

11   convenient, because if there is going to be a gap, I want to

12   know when it is going to be.

13        MR. PARKER:  I will do that, Judge.

14        THE COURT:  Because there are some things I would like

15   to do besides hearing this case, and I have to schedule one

16   with the marshals.  So it takes some time on my side, too, to

17   accomplish these things.

18        MR. PARKER:  I will refine this but my best guess

19   right now would be part of Thursday afternoon and --

20        THE COURT:  Well, you are going to have to have a -- I

21   am going to have to have a period of a half a day or something

22   like that.

23        MR. PARKER:  If we do have one this week, it would

24   likely be Thursday afternoon, and --

25        THE COURT:  From noon or until 1?

C43dcar2

```
 1            MR. PARKER:  Yes.  And we should have Dr. Goldstein
 2   available on Friday morning.  I doubt that his testimony would
 3   take until 1 o'clock, but if we are talking about cutting off
 4   at 1 on Friday, that might not be an issue.  Then perhaps part
 5   of Monday.
 6            But I'll certainly let the Court know as soon as I can
 7   determine that.
 8            THE COURT:  Well, I may have to change that because
 9   the matter I want to take care of involves a number of people
10   being present and I have to see what their schedules are.
11            So I gather that you could do Goldstein -- you could
12   start Goldstein in the afternoon instead of the morning, if you
13   wanted to?
14            MR. PARKER:  On which day?
15            THE COURT:  Thursday.
16            MR. PARKER:  I will have to check.  I mean, last night
17   he --
18            THE COURT:  He is going to have to be here.  I mean,
19   one of the things you learn as a judge is you have got to wait
20   for a doctor in his office but you don't wait for him in the
21   courtroom.  They've got to wait and be present when they are
22   called.
23            MR. DELANEY:  Your Honor --
24            THE COURT:  If necessary, we will issue him a
25   subpoena.
```

C43dcar2

1          MR. DELANEY:  I don't know if this is rational or not.

2     Counsel and I discussed this beforehand.  But since it looks

3     very likely that we are going to have to sit Monday and Tuesday

4     anyway, because that is when Dr. Paludi is available and I

5     think Mr. Pistorio is only available Tuesday, might it make

6     sense just to like have Friday off so you can do your other

7     stuff and then we will just then pick up Monday and Tuesday?

8          THE COURT:  I don't know if we are here because there

9     are some devout Catholics involved in that case, too.

10          MR. PARKER:  I will try to get ahold of Dr. Goldstein

11     and report back to the Court.

12          THE COURT:  The world can't revolve around

13     Dr. Goldstein's practice.  He can reschedule his clients just

14     as easily as we can reschedule our court, if not more so.  He

15     has more flexibility than I do.

16          All right.  Let's go ahead and get the case tried.

17     But maybe I should make a call or two.  I have other things to

18     do during lunch.

19          MR. DELANEY:  Your Honor, we'll also speak with

20     Dr. Paludi and she may be able to appear Thursday afternoon or

21     Thursday.  Between the two of us, we can get the time filled, I

22     think.

23          THE COURT:  OK.

24          MR. DELANEY:  Anyway, subject to those two

25     reservations between Mr. Pistorio and Dr.  Paludi, we rest.

C43dcar2

1           THE COURT:  Subject to those two reservations, the

2    plaintiff rests.

3           (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C43kcar3

1          THE COURT:  OK, call the defense witness.

2          MR. PARKER:  Your Honor, the defendants call Oscar

3    Velandia.

4          THE COURT:  I'm going to change my mind.  I think I

5    better make some calls now before lunch -- I'll make at least

6    one call before lunch -- because people I'm trying to get in

7    touch with may be out to lunch.  So I think before we swear in

8    the witness, I'll take a break.

9          (Recess)

10         THE COURT:  I can't do it Thursday, so we'll sit on

11   Thursday.

12   OSCAR VELANDIA,

13        called as a witness by the Plaintiff,

14        having been duly sworn through the

15        Interpreter, testified as follows:

16         THE DEPUTY CLERK:  Please state your name and spell

17   your first and your last name slowly for the record, please.

18         THE WITNESS:  My name is Oscar Velandia, O-s-c-a-r

19   Oscar Velandia, V-e-l-a-n-d-i-a.

20   DIRECT EXAMINATION (Through Interpreter)

21   BY MR. PARKER:

22   Q.  Mr. Velandia, is your primary language Spanish?

23   A.  No.

24   Q.  Was your primary language?

25   A.  Spanish.

C43kcar3                              Velandia - direct

1   Q.  Do you feel more comfortable today testifying with an

2   interpreter?

3   A.  Yes, I feel more comfortable this way.

4   Q.  Do you speak English?

5   A.  Yes.

6   Q.  How would you rate your proficiency in English?

7   A.  I would calculate that it is, for spoken, written -- would

8   be 80 to 90 and for writing, 90.

9   Q.  Where do you live?

10  A.  I live in Queens County.

11  Q.  How long have you lived there?

12  A.  Ever since I came to live here in the United States.

13  Q.  Whom do you live with?

14  A.  I live with my sister, my nephew, and my partner.

15  Q.  Where are you employed?

16  A.  I work for Remi Restaurant.

17  Q.  What is your job there?

18  A.  Currently, I have shifts as waiter, and then I'm also

19  captain for parties.

20  Q.  What does "captain for parties" mean?

21  A.  That means that I'm in charge of organizing private events

22  at the restaurant.

23  Q.  Are you a high school graduate?

24  A.  Yes, I graduated.

25  Q.  Where did you go to high school?

C43kcar3                          Velandia – direct

1   A.  It was in my country of origin, Colombia.

2   Q.  Did you go to college?

3   A.  Yes, I attended college.

4   Q.  Where did you go to college?

5   A.  Also in Colombia.

6   Q.  Did you complete college?

7   A.  No, I didn't get to.

8   Q.  How much college did you finish?

9   A.  I did two years in college.

10  Q.  And what did you study?

11  A.  Public accounting.

12  Q.  When did you begin living in the United States?

13  A.  In 1996.

14  Q.  How old are you now?

15  A.  I'm 42 years.

16  Q.  So, doing math, how old were you when you came to the U.S.

17  to live?

18  A.  26 years.

19  Q.  Before emigrating to the U.S., what did you do

20  professionally, if anything?

21  A.  Right before coming to this country, I was working for a

22  company, as Texas Instruments, and I was assistant accountant.

23  Q.  Have you lived anywhere in the United States other than in

24  New York City?

25  A.  No, only New York.

C43kcar3                          Velandia - direct

1   Q.  When you came to New York, what was your first job?

2   A.  I was working as a dishwasher at a restaurant.

3   Q.  Do you remember who your employer was at that time?

4   A.  Yes.  The name of the restaurant was Erizo Latino.

5   Q.  At some point, that changed, your employer?

6   A.  Yes.  After that, I started working at Remi.

7   Q.  In what year did you start at Remi?

8   A.  In '97.

9   Q.  What was your first job?

10  A.  I was hired as a busboy.

11  Q.  How long did you serve as a busboy at Remi?

12  A.  Perhaps approximately four years.

13  Q.  After that, did your job change?

14  A.  Yes.  Then I was promoted to waiter.

15  Q.  At some point in time, did the ownership of the restaurant

16  change?

17  A.  Yes; it changed in 2005.

18  Q.  At that time, the time that the ownership changed, what was

19  your job at Remi?

20  A.  When the management changed, I was a waiter.

21          THE COURT:  So, not only the ownership changed but the

22  management changed?

23          THE WITNESS:  Yes, your Honor, also management.

24  BY MR. PARKER:

25  Q.  At that time, in 2005, when the ownership and management

1 | changed, who became in charge of the management of the

2 | restaurant?

3 | A.   Mr. Francesco Pistorio.

4 | Q.   What was his job title?

5 | A.   He was general manager.

6 | Q.   Did you know Mr. Pistorio before he became the general

7 | manager of Remi?

8 | A.   No, I didn't know him.

9 | Q.   Let's take the period of time beginning in 2005, when the

10 | ownership of the restaurant and management changed.  What kind

11 | of products and services did Remi serve?

12 |         THE COURT:  Before the management changed?

13 |         MR. PARKER:  Right after the management changed.

14 |         THE COURT:  Oh, after.

15 |         THE WITNESS:  Well, the normal restaurant service of a

16 | restaurant is, food is served to customers.  And then after the

17 | new management came, then we also started doing private

18 | parties.

19 |         And in addition to that we also have an area in the

20 | restaurant called Remi To Go, where we also serve food to go or

21 | to take away.

22 | Q.   Prior to the management and ownership change in 2005, did

23 | Remi Restaurant provide private parties?

24 | A.   Yes, also.

25 | Q.   Would you describe the areas of the Remi Restaurant where

1  food and beverages are served to customers.

2  A.  Yes.  Mainly the Grand Canal, which is our main room and

3  then we also have the private party room, called Rialto.

4  Q.  Let's say before the management and ownership change

5  occurred, you were a waiter, correct?

6  A.  Yes, that's correct.

7  Q.  Where in the restaurant did you work as a waiter?

8  A.  Mainly at the Grand Canal, but then also my schedule would

9  change as a waiter.  But then I also had to work at both dining

10 rooms.

11 Q.  Are the responsibilities of a waiter at Remi the same or

12 are they different, when working in the Grand Canal dining room

13 as compared to the Rialto Room for a party?

14 A.  Yes, I would say they differ a bit.

15 Q.  How do they differ?

16         Let me do this:  Would you describe, taking the time

17 frame after the management and ownership changed in 2005, the

18 duties of a waiter providing service in the dining room, the

19 Grand Canal.

20 A.  The main responsibility of the waiter is to come prepare

21 the dining room for service.  And once customers arrive, first

22 we start taking the orders and serving drinks or beverages.

23 And then at the end of the meal, we just make sure that the

24 table is set again and is ready for the next group of

25 customers.

C43kcar3                         Velandia - direct

```
 1            And at the end, then each waiter has to make their
 2    report and give it to the bartender.
 3    Q.   What type of report?
 4    A.   Well, it's the sum of all the sales, and then he generates
 5    something from the computer, and then they separate what's cash
 6    and what's credit cards.
 7    Q.   Is that report done every day that you work as a waiter?
 8    A.   Yes; each waiter has to do it.
 9            THE COURT:  Cut the check for the customers?
10            THE WITNESS:  Yes, your Honor, each waiter has to
11    print a check for his customers.
12            THE COURT:  You take the order for the check?
13            THE WITNESS:  Yes, sir, we do take the order for the
14    check.
15            THE COURT:  Do you bring the food to the table?
16            THE WITNESS:  No, your Honor.  There is a position for
17    that, and it's the runners, the ones in charge of doing that.
18            THE COURT:  Do the runners go from the kitchen to a
19    serving table?
20            THE WITNESS:  No.  Runners come from the kitchen with
21    the food, and they come upstairs and we have tripod, or stands,
22    and they place it there, as close as possible to the table, and
23    then the waiter serves.
24            THE INTERPRETER:  No:  Runners will serve the meal.
25            THE COURT:  The runners serve?
```

C43kcar3                        Velandia - direct

1              THE WITNESS:  The runners serve.

2              THE COURT:  How do they know which order to place in

3    front of which customer?

4              THE WITNESS:  Because when each waiter takes the order

5    for the meal, he writes out the number of the table and also

6    each chair has a certain -- the meal.  He assigns it like that.

7              THE COURT:  What does he do with the order so that the

8    runner will know?

9              THE WITNESS:  As I said before, the waiter takes the

10   order, and then in an orderly fashion, places it on the

11   computer.  And in the kitchen they receive a receipt, like a

12   printout of that order.  And that's how runners know who

13   gets -- each person sitting at the table, who gets what.

14             THE COURT:  Are the orders taken in Spanish or in

15   English?

16             THE WITNESS:  No, they're taken in English.  However,

17   if there are customers who speak Spanish, I will speak to them

18   in Spanish.

19             THE COURT:  So the busboy or, excuse me, the food

20   runner sees an English order?

21             THE WITNESS:  Yes; everything is done in English.

22             THE COURT:  So is it a requirement to know English, to

23   be a runner?

24             THE WITNESS:  No, not really, because the runners, all

25   they see is the plate or the dish number, and they -- the dish

C43kcar3                         Velandia - direct

 1   name and the name of the dishes, and they hardly have any

 2   interaction with the customers.

 3           THE COURT:  So they tell from the order; is that

 4   right?  They can tell whether the order is right, from the

 5   English, even if they don't speak English?

 6           THE WITNESS:  I think so, because they already know

 7   the name of each dish.

 8           THE COURT:  Who tells them?

 9           THE WITNESS:  That they learn when they are being

10   trained as runners.

11           THE COURT:  It changes each day, doesn't it?

12           THE WITNESS:  No, the only thing that changes is the

13   specials, but the restaurant has a fixed menu all the time.

14           THE COURT:  And the specials have numbers?

15           THE WITNESS:  No, they don't have numbers.  We just

16   know them as the special part --

17           THE INTERPRETER:  Other special pasta?

18           THE WITNESS:  -- special appetizer, special meat, and

19   the special dessert.  So that's how they know that the special

20   is a special, and that's how they will serve it to the

21   customers.

22           THE COURT:  Please go ahead.

23           MR. PARKER:  Thank you.

24   BY MR. PARKER:

25   Q.  We have talked about the waiters and we have talked about

C43kcar3                        Velandia - direct

1    the food runners.  What do the busboys do in the dining room?

2    What are their jobs?

3    A.  Busboys are in charge of assisting waiters with the

4    service.

5    Q.  And assisting in terms of what?  Could you describe some of

6    their duties?

7    A.  Yes.  The waiter welcomes the guests at the table, and then

8    he has to tell what type of water, for example, to bring, or if

9    they initially order a coffee, we have to let the busboy know

10   so that he can make it.

11          And then once the dessert comes, we have to know

12   what's going on at the table so that they can help assist in

13   the process as well.

14          THE COURT:  Who sets the table?

15          THE WITNESS:  Busboys are in charge of that.

16   BY MR. PARKER:

17   Q.  Who cleans the tables after guests have completed their

18   meals?

19   A.  That's the busboys' main duty, to clean the tables.

20          THE COURT:  Do they clean it after they take the

21   dishes off, or does the waiter clean it?

22          THE WITNESS:  No, usually they are the ones who clean

23   them.

24          THE COURT:  The waiter sets up the new table or the

25   busboy?

C43kcar3                          Velandia - direct

1            THE WITNESS:  No, the new table is the busboy, is the

2       one who will reset it.

3            THE COURT:  So far you've been talking about the Grand

4       Canal?

5            MR. PARKER:  Yes, your Honor.

6            THE WITNESS:  Yes, exactly the regular service.

7            THE COURT:  Go ahead.

8       BY MR. PARKER:

9       Q.  Again, focusing on the Grand Canal, how are the busboys

10      assigned to work in the Grand Canal?

11           MR. DELANEY:  Objection.

12           THE COURT:  Foundation for the question?

13      Q.  When the busboys work in the Grand Canal, do you know where

14      they physically work?

15      A.  Yes.  Daily, depending on the number of reservations, we

16      have maps of the different stations, in which we can split the

17      dining room.  And to each station, there is a -- we designate

18      one waiter and one busboy.

19           THE COURT:  Who makes out the maps for the different

20      breakdowns of tables and waiters and busboys?

21           THE WITNESS:  The manager in the shift.

22      Q.  During the time that Mr. Pistorio was the general manager,

23      who made up the individual daily maps where waiters and busboys

24      were assigned to work?

25      A.  Usually he was the one doing them.

C43kcar3                         Velandia - direct

1    Q.  So you have talked about the Grand Canal.  How do the

2    responsibilities of a waiter differ when working in the Rialto

3    Room and a private party?

4              THE COURT:  Let me clear up one thing.  If

5    Mr. Pistorio takes a day off, who did it?

6              THE WITNESS:  In case Mr. Pistorio has a day off or

7    comes in a little late in the morning, somebody would help him

8    in that case; I would do that sometimes.

9              THE COURT:  Go ahead.

10   BY MR. PARKER:

11   Q.  Could you describe now how the responsibilities of a waiter

12   differ when working in a private party in the Rialto Room?

13             MR. DELANEY:  I am going to object to the extent it's

14   vague as to time.

15             THE COURT:  I'll sustain the objection.  Why don't you

16   do the date and time.

17   BY MR. PARKER:

18   Q.  After the ownership and management change occurred in 2005,

19   and from that point, during the time Mr. Pistorio was working

20   in the restaurant as a general manager, how did the duties of

21   the waiter working in the Rialto Room in a private party differ

22   from those when the waiter worked in the dining room?

23   A.  Well, because it is a private event, we all work based upon

24   a contract.  Then the difference is that all our

25   responsibilities is already detailed in writing.  And then as a

C43kcar3                         Velandia – direct

```
 1   team, we set up and serve the tables.  And what I mean by that
 2   is that waiters, busboys and runners were all helping in the
 3   preparation.
 4            And then the next thing the waiter does now is take
 5   the order and put it on the computer.
 6            THE COURT:  Who decides what waiters, busboys and
 7   runners take part in the party in the Rialto Room?
 8            THE WITNESS:  The general manager is the one who does
 9   that, when he creates the schedule.
10   BY MR. PARKER:
11   Q.  Do you know Rachel Lovaglio?
12            THE COURT:  Some busboys, some food runners and some
13   waiters don't participate in the private party?
14            THE WITNESS:  No, your Honor.  The schedule varies,
15   and if you work -- it just rotates.  So sometimes you work in
16   private events, other times you don't.
17   BY MR. PARKER:
18   Q.  Do you know Rachel Lovaglio?
19   A.  Yes, I know her.
20   Q.  Who is she?
21   A.  Currently her position is, she's in charge of private
22   events.
23   Q.  How long has she been with Remi Restaurant?
24   A.  I don't recall the exact date she started working there,
25   but I think that it is around '98 or '99.
```

C43kcar3                          Velandia - direct

1          THE COURT:  Did she work just on private events then?

2          THE WITNESS:  No, your Honor.  Originally she was the

3   general manager.

4          THE COURT:  When did she start working on private

5   events?

6          THE WITNESS:  In the same way, I don't know the exact

7   date, but I know she worked for approximately one year as

8   general manager.  And then after that, then they spoke with

9   Mr. Antonucci, and it was agreed that she was going to be the

10  manager of the private events.

11         THE COURT:  Approximately what year?

12         THE WITNESS:  I think it was perhaps in 2000.

13         THE COURT:  Did she work under the new management

14  too --

15         THE WITNESS:  Yes, your Honor.

16         THE COURT:  -- as in charge of private events?

17         THE WITNESS:  Yes, but I'd like to clarify that she is

18  in charge of selling the event, and then she's in charge of all

19  the details.  And then based on all those details is how we

20  work the party.

21         THE COURT:  Are you going to cover Remi To Go also,

22  Mr. Parker?

23         MR. PARKER:  Yes.  I can do that actually right now.

24  BY MR. PARKER:

25  Q.  What is Remi To Go, Mr. Velandia?

C43kcar3                          Velandia - direct

1    A.  Remi To Go is a section of the restaurant which is in

2    charge of fast food, just so to speak.

3    Q.  Where is Remi To Go located?

4    A.  It's adjacent to the restaurant.  It's located in front of

5    the Rialto, across from the atrium.

6    Q.  What types of employees work in Remi To Go?

7    A.  In Remi To Go, they have some in-house employees, and they

8    work the shift from 7:00 to 4:00 or 8:00 to 4:00 I'm not sure.

9    Q.  Are those the operating hours?

10   A.  Yes.

11   Q.  Is it open for dinner?

12   A.  No.

13   Q.  Did you ever work in Remi To Go?

14   A.  No.

15   Q.  Back at the time that the new ownership and management came

16   into Remi, who was in charge of Remi To Go?

17   A.  Ursula.

18   Q.  And what was her job?

19   A.  She is the manager of Remi To Go.

20   Q.  Do you remember her last name?

21   A.  No, I don't recall her last name.

22   Q.  Is she still there?

23   A.  Yes, she is still working there.

24   Q.  And is she still the manager of Remi To Go?

25   A.  Yes, she's still the manager.

C43kcar3                         Velandia - direct

1              THE COURT:  What type of employees work for her?

2              THE WITNESS:  Your Honor, what do you mean by what

3      type of employee?

4              THE COURT:  The waiters, food runners, busboys or

5      cooks.

6              THE WITNESS:  No, the Remi To Go employees don't have

7      such type of employees, like runners and busboys.  It works

8      pretty much like a cafeteria; they give the clients the product

9      over the counter.

10              THE COURT:  Who gives them the product?

11              THE WITNESS:  Behind the counter, they have three or

12      four people who help the clients from behind the counter.

13              THE COURT:  Where do they get the food?

14              THE WITNESS:  The food is on the inside of the

15      counter, then customers can see the food, and they queue on a

16      line, and they place their order, they say they want this pasta

17      or this sandwich, and then the employee from the inside passes

18      it to them, and then they go up to the head of the line and

19      pay.

20              THE COURT:  Where does the employee behind the counter

21      get the food to put in the cafeteria?

22              THE WITNESS:  That food was prepared in the kitchen,

23      which is the same kitchen as the restaurant.  In the morning

24      the food is ready and they bring it up and they just place it

25      behind the counter.

C43kcar3                          Velandia - direct

1               THE COURT:  Who brings it up?

2               THE WITNESS:  The Remi To Go employees.

3               THE COURT:  What happens in the atrium?  What do they

4     do in the atrium?  Is food served in the atrium?

5               THE WITNESS:  Well, your Honor, the atrium is a public

6     space.  The people who use Remi To Go, then they can sit

7     outside at the tables, which are available for the public.  And

8     then sometimes we serve food in there, when there is a private

9     event; and then, by permit from the city, we close the atrium

10    and we operate as in the regular restaurant.

11              THE COURT:  As in the Grand Canal or in the Rialto?

12              THE WITNESS:  No, as the Rialto.

13              THE COURT:  I guess that clears it up.

14    BY MR. PARKER:

15    Q.  Has Remi ever employed anyone in the title of headwaiter?

16              MR. DELANEY:  Objection.

17              THE COURT:  Sustained.

18              THE WITNESS:  No.

19              THE COURT:  Calls for a conclusion.

20    BY MR. PARKER:

21    Q.  Have you ever held the title of headwaiter at Remi?

22    A.  Yes.

23    Q.  When did you become a headwaiter at Remi?

24    A.  After the new management and owners came to the restaurant,

25    Mr. Pistorio spoke with me and told me that he wanted me to be

C43kcar3                      Velandia - direct

1   the headwaiter.

2   Q.  Do you remember when that occurred?

3   A.  Well, I don't have the exact date in my mind, but it could

4   be towards the end of 2005.

5   Q.  Prior to when you had that discussion with Mr. Pistorio

6   about becoming headwaiter, are you aware of whether anyone else

7   at Remi, while you were employed there, was a headwaiter?

8   A.  No.  Before, there were only two managers for Grand Canal,

9   and that was it.

10              THE COURT:  Wasn't there a man named Lockard or

11  something like that?

12              MR. PARKER:  Lockard.

13              THE COURT:  Do you know of a man named Lockard?

14              THE WITNESS:  Yes, your Honor.

15              THE COURT:  What was his position?

16              THE WITNESS:  Mr. Lockard's position was he was

17  general -- a manager of the restaurant.

18              (Continued on next page)

19

20

21

22

23

24

25

C43dcar4                        Velandia - direct

1   Q.  When did he --

2              THE COURT:  Before Mr. Pistorio?

3              THE WITNESS:  Yes, your Honor, before Mr. Pistorio.

4              THE COURT:  OK.

5   BY MR. PARKER:

6   Q.  Did Mr. Lockard work at Remi after Mr. Pistorio started?

7   A.  Yes, he worked with Mr. Pistorio for awhile.

8              THE COURT:  When you say awhile, a week?  Two weeks?

9   A month?  Three months?  A year?

10             THE WITNESS:  Your Honor, I wouldn't be able to tell

11  you exactly how long, but when the new management and owners

12  arrived, they kept him also as a manager for awhile.

13             THE COURT:  We had better take a break now and come

14  back at 2 o'clock.

15             (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

1              **A F T E R N O O N   S E S S I O N**

2                            2:16 p.m.

3  OSCAR VELANDIA,

4      Resumed, and testified further (through the interpreter) as

5      follows:

6              THE COURT:  Please be seated.

7              Call the witness.

8              MR. PARKER:  Mr. Velandia.

9  DIRECT EXAMINATION (Resumed through the Interpreter)

10 BY MR. PARKER:

11 Q.  Before lunch, you testified with regard to Brett Lockard,

12 that Mr. Lockard was a manager at Remi, is that correct?

13 A.  Yes, correct.

14 Q.  And you had testified that he was employed at Remi for some

15 period of time after the change in ownership and management of

16 the restaurant, right?

17 A.  Yes, correct.

18 Q.  Are you aware of what his responsibilities were as a

19 manager?

20 A.  Yes, correct.

21 Q.  Based on your knowledge and observation, what were

22 Lockard's responsibilities?

23 A.  Mr. Lockard, his responsibilities as the manager, he will

24 come to the restaurant.  He was in charge of the meals.  He

25 would only work meals -- dinner.  He only worked dinners.  And

```
 1   he would come and have a meeting with the general manager, who
 2   worked all day long.  And then both of them would go together,
 3   attend the employees' meeting.  And then during service,
 4   Mr. Lockard was in charge of patrolling the whole dining room
 5   and taking questions or anything from customers.
 6   Q.  Did Mr. Lockard ever wait on tables?
 7           MR. DELANEY:  Objection.
 8   A.  No.  He was the manager.
 9           MR. DELANEY:  Withdrawn.
10           THE COURT:  Where was the meeting of employees?
11           THE WITNESS:  They are small meetings before dinner or
12   lunch which take place so that we can discuss the meals and the
13   specials.
14           THE COURT:  Who would attend the meetings?
15           THE WITNESS:  The white jackets, busboys, food
16   runners, the waiters.
17           THE COURT:  What are white jackets?
18           THE WITNESS:  White jackets is a position at the
19   restaurant, is the person who is in charge of shining
20   silverware and glasses and bringing everything upstairs.
21           THE COURT:  From where?
22           THE WITNESS:  From the basement, which is where the
23   washing machine is located.
24           THE COURT:  And where would they put them when they
25   got upstairs?
```

1          THE WITNESS:  They bring them upstairs.  They would
2    distribute them to each station.
3          THE COURT:  Where would -- the stations are on the
4    map?
5          THE WITNESS:  Yes, your Honor.  That was on the map.
6          THE COURT:  You said silverware.  What about China?
7          THE WITNESS:  No.  China I would always get
8    downstairs, which is where they serve meals.
9          THE COURT:  I see.  Any other white jackets besides
10   the people who bring up the silverware and glasses?
11         THE WITNESS:  No, no other white jackets.
12         THE COURT:  Are there any other employees of the
13   restaurant who worked in the restaurant besides the waiters,
14   busboys, food runners, and white jackets?
15         THE WITNESS:  Yes.  With the new change in
16   administration or management, the waiters also used to wear
17   white jackets for awhile -- for a certain period of time,
18   rather, and, also, the person who was in charge of running
19   things at the coffee station wears a white jacket as well.
20         THE COURT:  Is that a separate position?
21         THE WITNESS:  Yes.  The coffee maker.
22         THE COURT:  All right.  Did all of those people attend
23   the meetings?
24         THE WITNESS:  Yes, your Honor, all of them.
25         THE COURT:  Anyone else?

C43dcar4                          Velandia - direct

1              THE WITNESS:  No.

2              THE COURT:  The manager?

3              THE WITNESS:  Yes.  The manager was always there

4     because he was the one who would normally preside or lead the

5     meeting.

6              THE COURT:  OK.

7     BY MR. PARKER:

8     Q.  Just to take that one step further.

9              Besides the busboys, the white jackets, the runners

10    and the waiters and the managers, what other kinds of employees

11    worked at the restaurant during the service of meals?

12    A.  So we also had -- we had; we no longer have -- a sommelier

13    who helps in the service of meals.

14             THE COURT:  A what?

15             THE INTERPRETER:  Meal service.

16             THE COURT:  What is the name?

17             THE INTERPRETER:  Sommelier, s-o-m-m-e-l-i-e-r.

18             MR. PARKER:  Sommelier?

19             THE INTERPRETER:  Sommelier.

20             THE COURT:  What is his or her function?

21             THE WITNESS:  The job of the sommelier is to help

22    people choose wines.

23             THE COURT:  Now, would any employees of Remi To Go

24    attend the meetings?

25             THE WITNESS:  Also those who work the parties, because

C43dcar4                    Velandia - direct

 1  they don't always take place at the same time as service, they

 2  all go and get together and discuss what will be done and how

 3  the party will be served.

 4           THE COURT:  Do they go to the employee meetings we

 5  were just discussing?

 6           THE WITNESS:  No, neither ones work in the parties.

 7           THE COURT:  Do the cooks attend the employees'

 8  meeting?

 9           THE WITNESS:  No.  Your Honor, they never attended

10  that type of meeting.

11  BY MR. PARKER:

12  Q.  Does Remi have a bar?

13  A.  Yes.  It has two bars.

14  Q.  And does it have bartenders?

15  A.  Yes.  That, too.

16  Q.  Did the bartenders attend the daily meetings you mentioned?

17  A.  Yes, bartenders as well.

18  Q.  Are there bartenders stationed at bars for each service?

19  A.  Yes.  They are always at the bar.

20  Q.  And in the kitchen of the restaurant, what kinds of

21  employees work there during meal service?

22  A.  Well, there the white jackets, food runners, cooks and

23  dishwashers.

24  Q.  Now, with regard to Mr. Lockard, during the time that he

25  was manager at Remi, did he share in the tip pool?

1   A.  No, because he was the manager, therefore he would not take

2   part in the pool of tips.

3   Q.  Have you ever worked in the Grand Canal, the dining room at

4   Remi, on any occasion where you were not assigned to wait

5   tables?

6   A.  No.

7   Q.  Has there ever been a time that you worked at Remi where

8   you were not part of the -- well, let me ask it differently.

9           Did you receive tips as part of your job at Remi?

10  A.  Yes.  Each time I work I would receive tips.

11  Q.  Has there ever been any time while you worked at Remi that

12  you did not share in the tip pool?

13  A.  No.  No.

14  Q.  Since you became a headwaiter at Remi, have there been any

15  other headwaiters there?

16  A.  Yes, there have been other headwaiters.

17  Q.  What are their names?

18  A.  I don't recall all of them, but I know that Alessandro

19  Mancino was one of the headwaiters.  Stacy Crow.  There was

20  another headwaiter who was Italian but I can't recall his name

21  right now.  Also, Michelle Tabossi and Luigi Martini.

22  Q.  Where in the restaurant did each one of those persons work?

23          MR. DELANEY:  Objection.

24          THE COURT:  I will allow the question.

25  A.  Headwaiters work at Grand Canal and also sometimes at the

C43dcar4                          Velandia - direct

1    party room.

2            THE COURT:  Were all of those people headwaiters

3    before you became a headwaiter?

4            THE WITNESS:  No.  They were simultaneously.

5            THE COURT:  They all worked while you were a

6    headwaiter?

7            THE WITNESS:  No.  From when I was a headwaiter, first

8    was the other Italian guy, and after him was for a while

9    Alessandro Mancino.  And after that Michelle Tabossi and after

10   him Stacy Crow.

11           THE COURT:  Did they work different shifts than you?

12           THE WITNESS:  Not always.  Sometimes we used to

13   coincide at the same shift.

14   BY MR. PARKER:

15   Q.  When the ownership and management of Remi changed in 2005,

16   immediately before that, what type of clothing did you wear to

17   work as a waiter?

18   A.  As I said before, initially we used to wear a white jacket.

19   And then the new management changed to a white shirt and a

20   black jacket -- a vest and black pants and an apron.

21   Q.  And at any point in time, did you change your dress at work

22   from what you just described?

23   A.  Yes.

24   Q.  When was that?

25   A.  Once they established the positions such as headwaiter, and

C43dcar4                          Velandia - direct

1  that's when Mr. Pistorio gave us the opportunity or the option

2  whether if we wanted to wear a suit, because as a matter of

3  fact, the gentleman who helps with the wines, he has always

4  worn a suit.

5  Q.  When did you -- did you begin at some point wearing a suit

6  to work?

7  A.  Yes.

8  Q.  When was that?

9  A.  As I said before, once they had the transition and

10  Mr. Pistorio asked me whether I wanted to wear a suit, then I

11  said yes to him.

12  Q.  That was in late 2005, approximately?

13  A.  Yes.  I think that it was towards the end of 2005 and

14  towards the beginning of 2006.

15  Q.  You mentioned that the sommelier wore a suit to work.  Did

16  any other Remi employees wear a suit or jacket or tie during

17  that same time?

18  A.  Only Nick, Michelle Tabossi, and myself would wear a suit,

19  and Alessandro didn't like wearing a suit so he didn't wear it

20  to work, and, also, the other Italian gentlemen didn't like

21  them so they didn't wear them.

22  Q.  When did Arturo Caravantes leave his job at Remi?

23              MR. DELANEY:  Objection.

24              THE COURT:  Objection sustained to the form of the

25  question.

1   Q.  Do you know the plaintiff Arturo Caravantes?

2   A.  Yes.

3   Q.  Did there come a time when he stopped working at Remi?

4   A.  Yes.

5   Q.  When was that?

6   A.  Towards the end of 2008.

7   Q.  What month in 2008?

8   A.  August.

9   Q.  I want to talk about the period of time in the next series

10  of questions beginning when the new company took over in 2005

11  through when Mr. Caravantes left Remi in August of 2008.

12  A.  OK.

13  Q.  During that time, did you ever hire an employee to work at

14  Remi?

15  A.  No, I never did.

16  Q.  Do you know a Lurdes Carrera?

17  A.  Yes.  She still works at Remi.

18  Q.  What does she do there?

19  A.  She is a busgirl.

20  Q.  Did you have any involvement in her hiring at Remi?

21  A.  No, I didn't have any.

22  Q.  Are you aware of who hired her, Lurdes Carrera?

23  A.  Mr. Francisco Pistorio.

24  Q.  During that timeframe we're discussing, from when the new

25  company came in until August of 2008, were you ever given the

C43dcar4                        Velandia - direct

1    authority to hire employees at Remi?

2           MR. DELANEY:  Objection.

3    A.  No, I never had that authority.

4    Q.  During that same timeframe, from when the new company came

5    in 2005 through August 2008, did you ever fire an employee from

6    a job at Remi?

7    A.  No, sir, I never did.

8           THE COURT:  Did you ever interview people for

9    employment at Remi?

10          THE WITNESS:  No, I never conducted an interview for

11   anything.

12   Q.  Did anyone in management grant you the authority to fire an

13   employee at Remi?

14   A.  No, nobody.

15   Q.  From 2005, when the new company came, until August 2008,

16   did you ever promote any Remi employee to another position in

17   the restaurant?

18   A.  No, sir.  I didn't do that either.

19   Q.  Were you ever given the authority by management to promote

20   employees to other positions in the restaurant?

21   A.  No.

22   Q.  During the timeframe from 2005, when the new company came,

23   until August of 2008, did you ever demote an employee from one

24   position to a lower one in the restaurant?

25   A.  No.

1    Q.  Did anyone in management ever give you the authority to

2    demote an employee to a lower position?

3    A.  No, sir.  None of that.

4    Q.  Between 2005, when the new company came, and August 2008,

5    did you ever grant any employee of Remi a pay raise?

6    A.  No.  Never.

7    Q.  Did anyone in management give you the authority to grant

8    pay raises for employees?

9    A.  No, sir.

10   Q.  Between those times that we have been discussing, 2005

11   through August 2008, did you ever set the initial salary or pay

12   rate for a new employee coming into Remi?

13   A.  No.

14   Q.  Did anyone in management ever give you that authority?

15   A.  No, never.  I never had that authority.

16   Q.  Between when the new company came in 2005 and August 2008,

17   did you ever suspend any employee from work at Remi?

18   A.  No, I never did that.

19          THE COURT:  Did you cause any employee to be suspended

20   from work?

21          THE WITNESS:  No, sir.

22          THE COURT:  Did you do anything to cause a complaint

23   about employees to management?

24          THE WITNESS:  No, your Honor.  I didn't do that

25   either.

C43dcar4                         Velandia - direct

1   BY MR. PARKER:

2   Q.  Were you ever given the authority by Remi management to

3   suspend employees from work?

4   A.  No.

5           THE COURT:  Did you tell employees, based on your

6   observations, why they were suspended?

7           THE WITNESS:  If I ever spoke with anyone regarding a

8   suspension, it was because I was assisting Mr. Pistorio with

9   translation.

10  BY MR. PARKER:

11  Q.  Between that --

12          THE COURT:  What was Mr. Pistorio's native language?

13          THE WITNESS:  Italian.

14  BY MR. PARKER:

15  Q.  Between 2005, when the new company came, and August 2008,

16  did you consider yourself to be a manager at Remi?

17  A.  No.  No, sir.

18  Q.  Since the new company -- from the time the new company took

19  over in 2005, until Mr. Caravantes left Remi's employment in

20  August 2008, who was your boss at Remi?

21  A.  Mr. Francesco Pistorio.

22  Q.  When did Mr. Pistorio -- well, did there come a time when

23  he left Remi's employ?

24  A.  Yes, he left.  He left Remi.

25  Q.  When did he leave Remi?

C43dcar4                          Velandia - direct

```
 1   A.  He left towards the beginning of June of 2008.

 2   Q.  After Mr. Pistorio left, did you have a different boss?

 3   A.  Yes.  Carlo Maggi.

 4   Q.  What's Mr. Maggi's job title?

 5   A.  Mr. Maggi came to replace Mr. Pistorio.  He's the general

 6   manager.

 7            THE COURT:  Before or after Mr. Pistorio left?

 8            THE WITNESS:  After Mr. Pistorio left.

 9            THE COURT:  How long after?

10            THE WITNESS:  It was about two weeks after

11   Mr. Pistorio left.

12            THE COURT:  Who was manager -- who acted as manager in

13   the meantime?

14            THE WITNESS:  Mr. Roberto Delledonne.

15   Q.  Who is Roberto Delledonne?

16   A.  He's one of the shareholders of the restaurant.

17   Q.  How were --

18            THE COURT:  Did he hold employee meetings?

19            THE WITNESS:  He would attend the meetings when

20   Mr. Pistorio wasn't there, but he would not conduct the

21   meetings himself.

22            THE COURT:  Who would do the assignments?

23            THE WITNESS:  If I had the day off, Alessandro would

24   do them, or if I was there then I would do them myself.

25   Otherwise, Michelle Tabossi would do it, or whoever was there
```

 1  at the time.

 2          THE COURT:  Who would hire and fire employees and

 3  suspend them during that period?

 4          THE WITNESS:  Well, during that time, there was no

 5  hiring or firing of any employee until Carlos came in.

 6          THE COURT:  Were there discussions about -- who would

 7  conduct discussions with the employees about their performance

 8  at work?

 9          MR. PARKER:  Your Honor, do you mean during this --

10          THE COURT:  During that period.

11          THE WITNESS:  Well, at that time, because it was such

12  a short period of time, nothing really that deserved that

13  attention ever took place, but if any such situation had

14  occurred, they would have to speak with Mr. Delledonne.

15          THE COURT:  Did any such discussions occur with either

16  Mr. Caravantes or Mr. Sotarriba, to your knowledge?

17          THE WITNESS:  During that period of time, those two

18  weeks?

19          THE COURT:  Yes.

20          THE WITNESS:  No.  No, there was no problem.

21          THE COURT:  All right.

22  BY MR. PARKER:

23  Q.  Again, focusing on the period between when the new company

24  came and August of 2008, how did the busboys and the white

25  jackets and the food runners and the waiters, how was their

C43dcar4                        Velandia - direct

 1  work scheduled?

 2          MR. DELANEY:  Objection.

 3          THE COURT:  As transcribed, it doesn't make sense so I

 4  will sustain the objection.

 5  Q.  Are you familiar with how the Remi employees' work

 6  schedules were determined?

 7          THE COURT:  You are talking about -- do you mean by

 8  "schedule" what days they would work or what shifts they would

 9  work?

10          MR. PARKER:  Yes, your Honor.

11  A.  Yes.

12  Q.  And during the time that Mr. Pistorio was the general

13  manager of Remi, who prepared employees' work schedules?

14  A.  Well, Mr. Pistorio was the one that used to prepare those

15  schedules.  However, he would give people the opportunity to

16  put in requests for days.

17  Q.  And did you from time to time put in requests for days off?

18  A.  Yes, I, too.

19  Q.  To whom did you communicate your request for days off?

20  A.  I would have to let Mr. Pistorio know.  That way when he

21  would make the schedule, he would know how many days I was

22  available for work.

23  Q.  Did you ever -- while Mr. Pistorio was the general manager

24  at Remi, did you ever have the responsibility to receive

25  requests from employees for days off from their work schedules?

C43dcar4                    Velandia - direct

1   A.  No, never.

2   Q.  While Mr. Pistorio was the general manager, did you ever

3   prepare any work schedules for employees?

4   A.  No.  What would happen is that Mr. Pistorio would pick up

5   or gather up all the requests, and he was the one who would

6   prepare the schedules.

7            MR. DELANEY:  I move to strike that answer, your

8   Honor.  It calls for speculation.  It is speculative.  He

9   didn't lay any foundation how he knows that, or if he ever saw

10  Mr. Pistorio prepare any schedules.

11           THE COURT:  Well, it is conclusory.

12           Did you ever receive from employees requests for days

13  off?

14           THE WITNESS:  No, your Honor.  The way it works is

15  there is an envelope at the front desk where the hostess is so

16  people go and they drop the requests in there.

17           THE COURT:  And you don't pick up the requests?

18           THE WITNESS:  No.  No, sir.

19           THE COURT:  Who picks up the requests that are dropped

20  in that box, if you know?

21           THE WITNESS:  Mr. Pistorio would pick them up, and

22  then he would announce that I'm not taking any more requests

23  because I'm about to start making the schedule.

24           THE COURT:  All right.

25  BY MR. PARKER:

1   Q.   And how often were work schedules prepared during this

2   time?

3   A.   Weekly.

4   Q.   Did you ever prepare any of the weekly schedules while

5   Mr. Pistorio was there as the general manager?

6           THE COURT:   That is an ambiguous question.   "While"

7   covers days off as well as the schedule.

8   Q.   During the time that Mr. Pistorio was employed at Remi as

9   the general manager, did you ever prepare any of the weekly

10  work schedules?

11  A.   No.   While Mr. Pistorio was there I never prepared the

12  schedules.   He did them all the time.

13  Q.   Have you ever prepared any of the weekly work schedules at

14  Remi?

15  A.   Yes.   During the time that Mr. Delledonne -- while we were

16  waiting for Carlos to arrive, I helped Mr. Delledonne print out

17  the schedules for the parties that were going to take place.

18  Q.   When you were working at Remi during this time, 2005

19  through 2008 August and you were waiting tables, did you

20  have -- how were your work areas within the restaurant

21  assigned?

22  A.   I don't understand the question.

23  Q.   If you were assigned to work on a particular day in the

24  dining room as a waiter, how would you know where in the dining

25  room you were required to work?

1   A.  OK.  Now I understand.  Well, Mr. Pistorio would come and

2   take a look of the people who were working, and then he would

3   get a map and he would indicate where everybody -- each one had

4   to work.

5   Q.  As a headwaiter, were you assigned to work in any

6   particular locations within the dining room?

7   A.  Well, once I was a headwaiter, then headwaiters usually

8   work the stations, the one or two which are the ones more up in

9   the front of the restaurant.

10  Q.  While you were working at Remi, before the new owners came

11  in 2005, what did -- what name did -- how did people address

12  you?

13  A.  Oscar.

14  Q.  And since the new owners came in 2005, how do employees

15  address you at work?

16  A.  The same thing, by my first name, Oscar.

17  Q.  How did you address Mr. Pistorio when he worked there?

18  A.  As Mr. Pistorio.

19  Q.  Did you have occasion to hear the way other employees

20  addressed Mr. Pistorio at work?

21          MR. DELANEY:  Objection.

22          THE COURT:  Objection overruled.

23  A.  Yes.  I had the opportunity because we were all working

24  together in the same place.  Everybody used to call him

25  Mr. Pistorio.

C43dcar4                          Velandia - direct

```
 1              THE COURT:  How many tables does a waiter handle at

 2    Remi Restaurant?  How many are assigned to a waiter?

 3              THE WITNESS:  I would say approximately eight to ten

 4    tables.

 5              THE COURT:  To one waiter?

 6              THE WITNESS:  Yes.

 7              THE COURT:  And one busboy?

 8              THE WITNESS:  Yes, your Honor.

 9              THE COURT:  And one food runner?

10              THE WITNESS:  No, your Honor.  Food runners don't have

11    a station.  They're not assigned to any part of -- a specific

12    part of the restaurant.

13              THE COURT:  How many white jackets?

14              THE WITNESS:  It could be one or two, depending on how

15    many people we're expecting.

16    BY MR. PARKER:

17    Q.  You mentioned earlier that you have been a party captain at

18    Remi?

19    A.  Yes.

20    Q.  What exactly is a party captain?

21    A.  The captain -- the party captain takes the information that

22    Rachel -- verbatim -- I mean, provided him, and based on that

23    it's called VEO.  We set up the room according to how the

24    party's going to be.  Then the captain has to make sure the

25    room is ready for when the client arrives.  Then the room is
```

C43dcar4                      Velandia - direct

1   all ready.

2   Q.   When did you first serve as a party captain at Remi?

3   A.   Well, when I first started, like I said before, Michelle

4   Tabossi was the captain.  Then there were some parties I would

5   help him out and we would share the job but if there were

6   several parties.  If there was only one party, he would take

7   care of the mission.  But then when I started as full-time was

8   when Michelle Tabossi left.

9                 (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1    BY MR. PARKER:

 2    Q.  When was that?

 3    A.  I don't recall the dates, but it was around May of 2008.

 4    Q.  Have you, as a headwaiter at Remi, ever had the -- let me

 5    rephrase.

 6            During the period of time between 2005, when the new

 7    company came in, and August 2008, as a headwaiter, did you

 8    ever, for any reason, tell an employee to go home from work?

 9    A.  No, I don't recall, but as a matter of fact, can you

10    make -- rephrase the question?  Because I'm not really

11    understanding it.

12    Q.  Was there ever a time between 2005, when the new company

13    took over, and August of 2008 when you had occasion to send an

14    employee home from work?

15    A.  Well, not exactly sending them home, because the employees

16    are already there; nobody wants to go home.

17            THE COURT:  If someone gets sick?

18            THE WITNESS:  Well, in that case, if somebody is

19    feeling ill, then, yes, he would have to report to the manager

20    and let them know that he's not feeling well so the manager

21    could send him home.

22            THE COURT:  What happens if two employees get in a

23    fight?

24            THE WITNESS:  In that case also, the manager has to

25    intervene and determine what's the course of action to take.

1          THE COURT:  Did you ever do that for the manager?

2          THE WITNESS:  No, not if there was any conflict,

3    but -- because it was something serious, then I would have to

4    speak with the manager in that case, Mr. Pistorio.  And in case

5    he wasn't in the restaurant, then I would have to get a hold of

6    him and ask him what it is that he wanted me to do in that

7    case.

8          THE COURT:  Did he ever ask you to tell the employee

9    that he had to go home?

10         THE WITNESS:  No, that situation never occurred.

11   BY MR. PARKER:

12   Q.  As a waiter in --

13         THE COURT:  Mr. Pistorio spoke Italian, so how would

14   he explain to this to Spanish employees?

15         THE WITNESS:  Because Mr. Pistorio didn't used to

16   speak with me in Italian, he spoke with me in English.

17         THE COURT:  But how would he explain to the employee

18   that he had to go home, if he spoke Italian and they spoke

19   Spanish?

20         THE WITNESS:  He would use the assistance of someone

21   who spoke Spanish and English, like myself or Augustine Pena or

22   Giovanni Pinot, who speaks Spanish very well.

23         THE COURT:  Did you act in that capacity for

24   Mr. Pistorio with either Mr. Caravantes or Mr. Sotarriba?

25         THE WITNESS:  Perhaps I was in a meeting present when

1    a meeting with Mr. Pistorio and Caravantes, Giovanni and Pena

2    were present at the time.

3              THE COURT:  And was Mr. Pistorio present also?

4              THE WITNESS:  Yes.  As a matter of fact,

5    Mr. Pistorio's point was to have witness to what was going on

6    and also for interpreting purposes.

7    BY MR. PARKER:

8    Q.  Are there usual work hours for a waiter at Remi?

9              THE INTERPRETER:  Please read that back to me.

10             (Record read)

11   A.  Yes.  A waiter who is on the schedule for work, would work

12   approximately for lunch, from 11:00 to 2:00.  And if he worked

13   dinner, then he would have to work from 4:00 till around

14   10:00 unless he had to close.

15   Q.  What does "close" mean?

16   A.  That means that that waiter will arrive a little bit later,

17   around 4:45, and would leave after the last customer leaves.

18   Q.  In that case, did the waiter who was doing the closing have

19   any responsibilities other than just to stay there?

20   A.  Yes.  He would have to pick up the report from all the

21   other waiters, plus do the numbers, and add up the tips.

22             THE COURT:  Did he have to clean the tables?

23             THE WITNESS:  No, your Honor.  Usually busboys will do

24   the tables.

25             THE COURT:  A busboy had to stay?

C43kcar5                          Velandia - direct

1          THE WITNESS:  Yes.  Usually one busboy, one white

2     jacket, and one foot runner, yes.

3          THE COURT:  They would have to serve food if it was

4     after 10:00, if the customer had ordered it?

5          THE WITNESS:  Yes, because the restaurant closes at

6     11:30 at night.  So that waiter has to -- if there is a

7     customer who arrives at 11:20, he would have to order and wait

8     for the meal to be served.

9     Q.  Now, if you know, how does the restaurant get opened in the

10    morning and closed at night?

11    A.  Well, I like to know what it is you mean, whether it is

12    administratively or physically.

13    Q.  Physically.

14    A.  Yes, I know how it's opened.

15    Q.  Would you explain that.

16    A.  Yes.  Usually the manager opens up the front door and the

17    lateral doors, and when it's summertime then they open all the

18    doors.

19    Q.  That's opening the restaurant.  And how does the restaurant

20    get closed physically at night?

21    A.  In the same manner:  The person who's in charge of closing

22    the restaurant has to make sure that -- verify that all doors

23    are closed, locked.  And then that person has to make sure and

24    wait, that the last customer left, and make sure that door is

25    locked as well.

1   Q.   During the time when Mr. Pistorio was at Remi as the

2   general manager, who opened and closed the restaurant

3   physically?

4   A.   He would do it usually.  But if he wasn't going to be

5   there, he would designate some other person.

6                THE COURT:  And what employees?

7                THE WITNESS:  Only headwaiters.

8   BY MR. PARKER:

9   Q.   Were there occasions where you did the opening and closing

10  of the restaurant?

11  A.   Yes.

12  Q.   When would that occur?  When did that occur?

13  A.   Like I said before, if Mr. Pistorio was to come in late, he

14  would actually put it sometimes on the schedule that I would

15  have to come in earlier and open the door to let in all the

16  other employees.

17               And the same thing for dinner:  If he would actually

18  put it on the schedule, then I would stay and make sure I

19  close.

20  Q.   What did he put on the schedule to signify that you were

21  either going to open or close or both?

22  A.   Usually my schedule would have "L" for lunch or "D" for

23  dinner, but if he opted for writing "MGR," then that would mean

24  that I would also have to close the restaurant.

25               THE COURT:  What were those letters that he would

C43kcar5                          Velandia - direct

1    write, to close the restaurant?

2              THE WITNESS:  MGR.

3              THE COURT:  M as in Mary?

4              THE WITNESS:  Yes, your Honor.

5    BY MR. PARKER:

6    Q.  Now, on those occasions where Mr. Pistorio assigned you to

7    open and/or close the restaurant, what were your

8    responsibilities?

9    A.  My responsibilities were the same -- I would come and do

10   the setup with the waiters, and then we would ready all the

11   stations, I would work all night long on my stations, and then

12   at the end of the night, when I had my report done, I would

13   give it to the closing waiter.  And then all I would do is just

14   wait for that waiter to finish and close so that I could close

15   the doors.

16   Q.  When you say you would give your report to the closing

17   waiter, what report are you referring to?

18   A.  The report from the daily sales.

19   Q.  Was that the same or different from the report that you did

20   daily if you weren't closing the restaurant?

21             THE COURT:  I don't understand the question.

22             I don't understand the question.

23             MR. PARKER:  I'll withdraw it.

24   Q.  You mentioned that when you were assigned on the schedule

25   as MGR to open and close the restaurant, that in the evenings

1    you had to give a report to the closing waiter?

2    A.   Yes, I had to give in a report, but that was my report in

3    which I had to report my sales as a waiter.  But once the last

4    waiter finishes, then we had to do the closing in the computer.

5    And then to do that closing, the report, we had to print out

6    all the reports, which is cumulative.  And that's the report

7    for the whole day, for the closing.

8              THE COURT:  So you put into the computer all of the

9    waiters' reports for the day, at the end of the day?

10             THE WITNESS:  No, your Honor.  The computer does it

11   all by itself.  All I had to do was put in all the individual

12   reports -- I didn't have to put them in.  The computer already

13   has each waiter's report.  And then once the last waiter

14   finishes, then the computer will give me an option to print out

15   the general report.

16             THE COURT:  And you printed it out?

17             THE WITNESS:  Yes, your Honor.

18   BY MR. PARKER:

19   Q.   And once you printed out the general report, what did you

20   do with it?

21   A.   Well, those are the jobs I had to do.  I had to print out

22   the final report, pick up all the envelopes from all the

23   waiters in which they included the cash.  And all that

24   together, I would have to bring it down and put it in the safe

25   at the office.

C43kcar5                         Velandia - direct

1   Q.  That process you have just described -- the printing out of

2   the general report, assembling all the data from the waiters

3   and putting it in the safe -- did you do that job when you were

4   acting just as a waiter or when you were asked by Pistorio to

5   close?

6            MR. DELANEY:  Objection.

7            THE COURT:  I will allow the question.

8            THE WITNESS:  No.  Up to this date, I don't have to do

9   that because it's actually the manager the one who printed it

10  out.  And at the time, when Mr. Pistorio was there, I had to do

11  that once or twice a week, just so that Mr. Pistorio can go

12  home earlier and he could rest.

13           THE COURT:  So you're saying you did it when

14  Mr. Pistorio was there, but you don't do it now?

15           THE WITNESS:  I used to do it when Mr. Pistorio was

16  there, but only when he wanted me to cover for him.  And to

17  this date, I do it only if Carlos asks me to do the report for

18  him.  But that's only if he's not at the restaurant or has the

19  day off.

20  BY MR. PARKER:

21  Q.  Just if you could take a look in the Plaintiffs' Exhibit

22  binder and take a look at Exhibit P70.  Do you have P70?

23  A.  Yes.

24  Q.  And do you see where it says on the first page of P70,

25  there's a column "Servers," to the right of that there's a

1   column that says "Position," and then to the right of that

2   there are --

3              THE COURT:  I'm sorry, which book is that in?

4              MR. PARKER:  It should be in the Plaintiffs' Exhibit

5   binder, your Honor, Volume II.

6              THE COURT:  OK.  P70?

7              MR. PARKER:  P70, on the first page, Judge.

8              THE COURT:  And I am referring to the column on the

9   left that says "Servers," it has Oscar Velandia listed, there's

10  a column next to it that says "Position," it says "Server," and

11  then to the right of that, under Monday, February 13th, in that

12  column, under L, it says MGR, and under D, it says MGR.

13  A.  Yes, I see it.

14  Q.  Is this a copy of a weekly schedule?

15  A.  Yes, it is a copy of that.

16  Q.  And what does that reference to MGR mean?

17             MR. DELANEY:  Objection; he's already testified he

18  didn't make these schedules.

19             THE COURT:  Well, I'm going to allow the question.

20  Sometimes upon further questioning, it becomes clear what he is

21  saying.

22  A.  In this case of the MGR letters, they're referring to the

23  assignment I had for that day.

24  Q.  And what was the assignment?

25  A.  According to the schedule for that week, on Monday I had to

C43kcar5                        Velandia - direct

```
1    come open the restaurant's doors.  I was going to work as a
2    waiter as well.  And for dinner, I would work as a waiter too,
3    but that I will stay after Mr. Pistorio leaves, I would have to
4    print out the general report and bring the documentation
5    downstairs to the office and close the doors.
6    Q.  From time to time you had the responsibility to open and
7    close the restaurant physically, as you stated?
8    A.  Yes.
9    Q.  How was that done?
10   A.  Like I said, I would -- once I run all the documentation
11   downstairs, I would sit at the bar, wait for the waiter to
12   finish, then go downstairs, change his clothes, and the busboy
13   as well.  Then I would get to turn all the lights out and close
14   the doors.
15   Q.  During the time that Mr. Pistorio was general manager at
16   Remi, you were a waiter sharing in the tip pool there, correct?
17   A.  Yes, that's correct.
18   Q.  Are you familiar with the manner in which tips were
19   distributed to employees?
20   A.  Yes, of course.
21   Q.  Describe that process, please.
22   A.  The process works in this way:  We work based on points.
23   Bartenders and waiters earn one point; foot runners, .75;
24   busboys, .50; and white jackets, .38.  And then at the end of
25   the day, all points are added.  And tips are divided in that
```

C43kcar5                      Velandia - direct

1  number of points -- by the number of points.  And the result of

2  all that, it's what one point is worth.

3           THE COURT:  One point per day, one point per hour, one

4  point for what?

5           THE WITNESS:  No, one point per shift.

6           THE COURT:  Any points for closing?

7           THE WITNESS:  No, there are no extra points for

8  closing because the people that close are not the same each

9  day.

10  BY MR. PARKER:

11  Q.  Could you turn in the Defendants' Exhibit binder to

12  Exhibit D32.

13  A.  Is it D or B?

14  Q.  D.

15           THE INTERPRETER:  B or D?

16           MR. PARKER:  D32, D as in David, Defendants' binder.

17  A.  OK, I got it.

18  Q.  Does the document have a Remi logo at the top?

19  A.  Yes, it has a logo on top.

20  Q.  Are you familiar with this document?

21  A.  Yes.

22  Q.  What is it?

23  A.  That's the form I was talking about before, how we allocate

24  tips at the restaurant.

25  Q.  And what are pages 2 and 3?

1    A.   It's the signature of all the employees consenting to page

2    1.

3    Q.   Now, on page 1, it says in the next to last paragraph that,

4    "The wait staff has voted and agreed that Pablo Solis, waiter,

5    and Oscar Velandia, waiter/party captain, should carry out the

6    recordkeeping allocation and distribution of tip monies."

7          What does that mean?

8    A.   That means that Mr. Pistorio called for a general meeting

9    to talk about tips because when the new administration came in,

10   I was already in charge of tips with Mr. Pablo Solis.  And then

11   Mr. Pistorio suggested that a new meeting be conducted because

12   there were new employees, because he wanted to know that these

13   new employees also agreed that I was in charge of the tips,

14   like I was already in the past.

15          THE COURT:  Is this relevant?  Isn't this out of the

16   case?  It's out of the case.

17          MR. PARKER:  Out of the case?  I'm not sure what

18   you're referring to, your Honor.

19          THE COURT:  I thought any claims about wages and tips

20   were out of the case.

21          MR. PARKER:  No, no, they're not in the case, but the

22   purpose of this is to have Mr. Velandia describe the process by

23   which the employees voted to --

24          THE COURT:  All right, OK.

25          MR. PARKER:  I'm not sure where we were.

C43kcar5                    Velandia - direct

1           THE COURT:  You were on Exhibit 32, Defendants'

2    Exhibit 32.

3           MR. PARKER:  May I have the part of the answer

4    Mr. Velandia's last read back, your Honor?

5           THE COURT:  Yes, you may.

6           (Record read)

7    BY MR. PARKER:

8    Q.  So the document indicates that the staff voted and agreed.

9    And do you recall when that occurred?

10          THE COURT:  This is just the new employees, is it not?

11          THE WITNESS:  No, your Honor.  This meeting, all the

12   employees, the new employees were all required to go.

13          THE COURT:  This document, 32, these are new

14   employees; am I not right?

15          THE WITNESS:  No --

16          THE COURT:  I don't see Mr. Caravantes or

17   Mr. Sotarriba amongst the signatures.

18          THE WITNESS:  If their names are not there, it's

19   because perhaps they did not attend the meeting.

20          THE COURT:  Are all these employees new employees, on

21   the list?

22          THE WITNESS:  All were called to attend the meeting.

23          THE COURT:  Are there old employees on the signatures?

24          THE WITNESS:  No, they're not all there really; only

25   those who were present there that day.

1              THE COURT:  Are there any persons employed before the

2      meeting, employed in 2004, on that list?

3              THE WITNESS:  Yes.

4              THE COURT:  Who?

5              THE WITNESS:  Oscar Velandia, Luis Ramos, Adrian Gill,

6      Jose Ortiz, Jose Figueroa.

7              THE COURT:  OK, I'm satisfied.

8      BY MR. PARKER:

9      Q.  Following this event where the vote was taken and you and

10     Pablo Solis were selected to handle the tips, for how long

11     after this did you and Pablo Solis maintain responsibility for

12     the tip pool at Remi?

13     A.  Until approximately about six months ago.

14             MR. PARKER:  Your Honor, I offer Exhibit D32 in

15     evidence.

16             THE COURT:  Any objection?  32 is admitted in

17     evidence, Defendants' 32, without objection.

18             (Defendant's Exhibit 32 received in evidence)

19     BY MR. PARKER:

20     Q.  Would you take a look at Exhibit D1, please.  Tab 1.  At

21     the very beginning of the book.

22     A.  Yes.

23     Q.  What is D1?

24     A.  That's a sheet everybody signs when they receive their

25     tips.

C43kcar5                        Velandia - direct

1   Q.  Who prepares, during this time -- this was August 4th, 2008

2   to August 10th, 2008 -- during this time period, from when the

3   new company came until this document was prepared, who prepared

4   these forms?

5   A.  I was preparing them.

6              MR. PARKER:  Your Honor, I offer D1 in evidence.

7              THE COURT:  Any objection?

8              MR. DELANEY:  No objection.

9              THE COURT:  What day was Mr. Caravantes' last day?  Is

10  there a stipulation on what day was Mr. Caravantes' last day?

11             MR. PARKER:  I don't know if we have a stipulation.  I

12  believe the last day of actual work was August 8th and the last

13  day --

14             THE COURT:  So he didn't work this prior period?

15             MR. PARKER:  I believe he worked this particular

16  period.

17             THE COURT:  He worked during that period but not the

18  entire period.  It says to August 10th.

19             MR. DELANEY:  I believe that was until on or about

20  August 11th that he worked, August 11th.

21             THE COURT:  August 11th?

22  BY MR. PARKER:

23  Q.  The very next document --

24             THE COURT:  Defendants' Exhibit 1 is admitted in

25  evidence, with no objection.

1              (Defendant's Exhibit 1 received in evidence)

2              THE COURT:  Go ahead.

3              MR. PARKER:  We are now looking at D2, your Honor.

4              THE COURT:  Yes.

5    BY MR. PARKER:

6    Q.  Are you familiar with this form?

7    A.  Yes, sir.

8    Q.  And what is it?

9    A.  That page with tips distribution form.

10   Q.  Was this a form that was prepared each week at Remi?

11   A.  No.  This is prepared twice a day, once for lunch, one for

12   dinner.

13   Q.  Who prepares that?

14   A.  The closing waiter.

15             MR. PARKER:  Your Honor, I offer D2 in evidence.

16             THE COURT:  D2 is admitted.  Any objection?

17             MR. DELANEY:  No objection, your Honor.

18             THE COURT:  D2 is admitted in evidence.

19             (Defendant's Exhibit D2 received in evidence)

20   BY MR. PARKER:

21   Q.  Are you familiar with the term "voiding an order"?

22   A.  Yes, I do.

23   Q.  What does voiding an order mean, in the context of working

24   at Remi?

25   A.  It means that a certain item on a check from a table is

1   going to be deleted or taken out of the check.

2   Q.  During the time that Mr. Pistorio was the general manager

3   at Remi, are you familiar with how an order actually was

4   voided?

5   A.  Yes, I know how one would void it.

6   Q.  How would it be done, physically?

7   A.  There is a card -- there is a card that has administrative

8   functions for a manager.  Then you swipe that in the computer,

9   and then it opens up a screen.  There is an option where you

10  can open up the table and go directly to that item and delete

11  it.

12  Q.  During this time, from 2005, when the new company came,

13  until August of 2011, were you ever asked to void an order?

14  A.  Yes.  Actually, Mr. Pistorio went ahead and got me my own

15  card, just so -- because it was very busy, in case something

16  needed to be voided, because waiters don't have the capacity to

17  actually do that.

18  Q.  When were you given a card in order to be able to void

19  orders?

20  A.  I don't recall the exact date.

21  Q.  Would you, in the Plaintiffs' Exhibit binder, turn to

22  Exhibit P11, please.  Tab 11.

23          Do you recognize this type of document?

24  A.  Yes, I do recognize it.

25  Q.  What is it?

C43kcar5                         Velandia - direct

1    A.  This is -- hold on a second.

2              Yes, this came from Table 301, and it is scallopini,

3    it's a cancellation, or voiding, scallopini caprese and

4    bolognese.

5    Q.  Does this represent the voiding of a particular order?

6    A.  Yes, that's exactly what it is.

7    Q.  In this particular case, who voided the order?

8    A.  I did it.

9    Q.  It has your name at the top of the page.  And after your

10   name it has MGR next to it.

11             Do you have any understanding of why MGR appears there

12   on the document?

13   A.  Yes, because in my function as a waiter, I wanted to

14   explain that in order to access the computer, you need a code

15   which identifies each waiter.  And then after that, all the

16   orders from the bar or the kitchen come out with that waiter's

17   information.  But since I'm a waiter, as a waiter, I don't have

18   the capacity to void; my code doesn't give me the ability to

19   void.

20             So Mr. Pistorio created a special code so that

21   whenever he was absent, I could void and give a promo.  And

22   then it had to bear my name so that he knew what was the nature

23   of the transaction.

24             THE COURT:  It says on it "To Go."  Is that a Remi To

25   Go order?

C43kcar5                          Velandia - direct

 1              THE WITNESS:  Yes, your Honor.  That means that it was
 2    an order they were to take home.
 3              THE COURT:  But you don't know whether it was a Remi
 4    To Go order or a restaurant order?
 5              THE WITNESS:  No, your Honor, because what happened is
 6    that this -- a hundred percent sure that Remi To Go has its
 7    daily operations completely separated from the restaurant.
 8              THE COURT:  That code was Mr. Pistorio gave, did he
 9    give that out daily or was that a code that he allowed to
10    operate for a period of time?
11              THE WITNESS:  No, your Honor.  He created a card with
12    that code, and he gave it to me.
13    BY MR. PARKER:
14    Q.  Now, we talked briefly earlier about the meetings that were
15    held by Mr. Pistorio before lunch and before dinner.  Do you
16    recall that?
17    A.  Yes, I recall.
18    Q.  Were there any standard topics that were discussed in those
19    meetings daily?
20    A.  Well, we're talking about a meeting, we're talking about
21    the meeting which are held daily for the regular operation of
22    the restaurant; usually those meetings don't take any longer
23    than five or ten minutes.  So if there was something
24    Mr. Pistorio wanted to communicate, he would do it there.
25    However, if it was something very important, then he would call

1    for another separate meeting, with everybody else in it.

2    Q.  Let's talk about the shorter meetings, the five- to

3    ten-minute meetings.

4          What types of issues were discussed at those meetings?

5    A.  As I said before, it was about the regular operation,

6    regarding specials as well.  And there were things that had to

7    do with the service or anything that wasn't going well that we

8    had to discuss, Mr. Pistorio would want to talk about it during

9    that meeting.

10   Q.  Did any other Remi employees conduct any of those meetings

11   while Mr. Pistorio was the general manager?

12   A.  If Mr. Pistorio was present, he would always conduct the

13   meetings.  But if he was absent, then we would still hold the

14   meeting, but it was only to discuss specials.

15   Q.  And in his absence --

16          THE COURT:  Wouldn't the assignments have to be made?

17          THE WITNESS:  Yes, your Honor.

18          THE COURT:  Who would make the assignments?

19          THE WITNESS:  If Mr. Pistorio was not there, then I

20   would do the map.

21   BY MR. PARKER:

22   Q.  In Mr. Pistorio's absence, for those shorter meetings, who

23   spoke?

24   A.  If I was there and I was doing the closing, then I would be

25   the one speaking at the meeting.  But if Alessandro was there

C43kcar5                          Velandia - direct

1    and he was doing the closing, then he would do the meeting,

2    but, generally, I was the one who would do them when he was not

3    present.

4    Q.  You mentioned that occasionally there were meetings that

5    Mr. Pistorio called, other than these shorter five- to

6    ten-minute daily meetings.  What type of meetings are you

7    referring to?

8    A.  Well, a good example would be the topic with the tips, so

9    he would post a sign and it says it was mandatory attendance.

10   Q.  Can you recall how many of those kinds of meetings that

11   Mr. Pistorio held while he was general manager, the mandatory

12   meetings?

13   A.  Well, I do recall there were several, but I don't recall

14   the exact number.

15   Q.  While working at Remi, have you ever observed employees of

16   the restaurant touching one another on the buttocks or in the

17   genital area?

18              THE INTERPRETER:  Please read that back to me.

19              (Record read)

20   A.  Yes, many times.

21              (Continued on next page)

22

23

24

25

1    Q.   When did you first observe touching of that kind at Remi?

2    A.   When I started working at Remi.

3    Q.   Have you, yourself, been touched by other employees in the

4    buttocks or in the genital area?

5    A.   Yes, I have been touched.

6    Q.   And have you engaged in touching other employees in either

7    or both of those areas, the genital area or the buttocks area?

8    A.   Yes, I have done that as well.

9    Q.   Would you describe the circumstances under which this type

10   of touching occurred at Remi, when -- we'll start with when you

11   started working at the restaurant?

12   A.   That's the type of behavior that presents itself suddenly.

13   It is not a game but we Latinos, we consider that as playing.

14   And that occurs when someone is trying to annoy someone

15   basically and just to make others laugh.

16   Q.   You testified that you first saw and experienced this when

17   you started working at Remi, correct?

18   A.   Yes, that's correct.

19   Q.   Did this type of conduct continue after you had first

20   started there?

21   A.   Yes, sir.  It has always been that way.

22   Q.   Let's talk about the time period from when the new company

23   came in to Remi in 2005.

24         Immediately before that, were employees touching one

25   another in the same manner that you have described?

C43dcar6                           Velandia - direct

1                    MR. DELANEY:  Objection.

2                    THE COURT:  Are you talking about before the new

3          company?  All right.  I will allow the question.

4                    THE WITNESS:  Please read that back to me.

5                    (Question read)

6          A.  Yes.

7          Q.  Who was involved in that type of touching at that time?

8                    MR. DELANEY:  Objection.

9                    Your Honor, my objection is to speaking very generally

10         about --

11                   THE COURT:  I have another matter on, so let's break

12         for the day and start with a new question.

13                   9:30 tomorrow.

14                   (Adjourned to 9:30 a.m., Wednesday, April 4, 2012)

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION
 2   Examination of:                           Page
 3   JESSICA PEARSON
 4   Cross By Mr. Parker . . . . . . . . . . . . . 691
 5   Redirect By Mr. Saxena . . . . . . . . . . . 718
 6   Recross By Mr. Parker . . . . . . . . . . . 730
 7   OSCAR VELANDIA
 8   Direct By Mr. Parker . . . . . . . . . . . . 738
 9                    PLAINTIFF EXHIBITS
10   Exhibit No.                            Received
11    98 and 99  . . . . . . . . . . . . . . . . 684
12    28T and 29T  . . . . . . . . . . . . . . . 689
13    28 and 29  . . . . . . . . . . . . . . . . 690
14    S2   . . . . . . . . . . . . . . . . . . . 689
15    S3   . . . . . . . . . . . . . . . . . . . 690
16    4  . . . . . . . . . . . . . . . . . . . . 684
17    12D  . . . . . . . . . . . . . . . . . . . 685
18    31T-REV  . . . . . . . . . . . . . . . . . 688
19                    DEFENDANT EXHIBITS
20   Exhibit No.                            Received
21    1  . . . . . . . . . . . . . . . . . . . . 792
22    32   . . . . . . . . . . . . . . . . . . . 790
23    D2   . . . . . . . . . . . . . . . . . . . 792
24
25
```