C44dcar1                              Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    ARTURO CARAVANTES and
3   FRANCISCO SOTARRIBA,

4                    Plaintiffs

5           v.                              09 Civ. 7821 (RPP)

6   53RD STREET PARTNERS, LLC
    d/b/a REMI RESTAURANT and
7   OSCAR VELANDIA,

8                    Defendants
    ------------------------------x        New York, N.Y.
9                                          April 4 2012
                                           9:40 a.m.
10
    Before:
11                  HON. ROBERT P. PATTERSON, JR.,

12                                         District Judge

13                        APPEARANCES

14  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
            Attorneys for Plaintiffs
15  1285 Avenue of the Americas
    New York, NY 10019
16  BY:  AARON S. DELANEY
         MAYUR P. SAXENA
17       MOIRA KIM PENZA

18  URBAN JUSTICE CENTER
            Attorney for Plaintiffs
19  123 William Street 16th Floor
    New York, NY 10038
20  BY:  NICOLE HALLETT

21  EPSTEIN BECKER & GREEN PC
            Attorneys for Defendants
22  BY:  KERRY M. PARKER
         ALKIDA KACANI
23
          - also present -
24
    JOHN MATT, LILIANA HALAC - Spanish Interpreters
25  RANDALL CARTER - Plaintiff AV Tech

C44dcar1                          Trial

1                    (Trial resumed)

2                    THE COURT:  Please be seated.

3                    Mr. Velandia, you are reminded you are still under

4        oath.

5                    That is a requirement that the Court give you that

6        admonition whenever you take the stand on another day.

7         OSCAR VELANDIA,

8             Resumed, and testified further (through the Interpreter),

9             as follows:

10       DIRECT EXAMINATION (Resumed through the Interpreter)

11       BY MR. PARKER:

12       Q.  Mr. Velandia, yesterday you testified about various types

13       of touching by Remi employees, and I want to continue with that

14       line of questioning.

15                    THE INTERPRETER:  There were just a couple of words I

16       could not hear.

17                    MR. PARKER:  I said that yesterday Mr. Velandia began

18       to testify about various types of touching engaged in by Remi

19       employees, and I want to continue with that line of

20       questioning.

21       A.  OK.

22       Q.  You referred yesterday to this touching of buttocks and

23       genitals as a game or playing around.  Who participated in

24       those activities?

25       A.  Well, when I started working at Remi's, I noticed that most

1   of the employees participated in that type of activity.

2   Q.  When you started working at Remi, was Mr. Caravantes

3   employed there?

4   A.  Yes.  I have understood that he had already been working

5   there.

6   Q.  And when you started working at Remi, was Mr. Sotarriba

7   working there?

8   A.  No.  He started afterwards.

9   Q.  Did Mr. Caravantes participate in this touching of other

10  employees?

11          MR. DELANEY:  Objection.  Foundation.

12          THE COURT:  Objection sustained.

13  Q.  After you began working at Remi, you said you had occasion

14  to observe other employees engage in touching of one another's

15  buttocks and genitals, correct?

16  A.  Yes, correct.

17  Q.  And you began when at Remi?

18  A.  In '97.

19  Q.  After you began working at Remi and began observing other

20  employees engaged in this touching game, as you called it, did

21  you ever see Caravantes engaged in touching other employees?

22  A.  Yes, I saw him.

23  Q.  What types of touching did you see Mr. Caravantes engage in

24  at Remi?

25  A.  Well, I noticed that -- well, he was engaged in doing the

1  same activity with other -- playing with other coworkers, like

2  slapping or tapping in the back, and they would touch each

3  other's behind.

4  Q.  Touch each other's what?

5          THE INTERPRETER:  Behind.

6          MR. PARKER:  Buttocks?

7          THE INTERPRETER:  Buttocks.

8  A.  Yes, and also genitals.

9  Q.  When did that take place?

10  A.  Well, ever since I started working there, I started

11  noticing, as you would call it here, horseplaying among

12  themselves.

13  Q.  But during that timeframe, after you began working at Remi

14  in 1997, was there ever a time when Mr. Caravantes touched you

15  anywhere?

16          MR. DELANEY:  Objection.  Leading.

17          THE COURT:  I will allow the question.

18  A.  Yes.  Mr. Parker, there was a moment in which he started

19  touching me.

20  Q.  Do you recall when that began?

21  A.  No, not exactly.  I don't recall.

22  Q.  Can you place it in terms of time as to whether it was

23  before or after the management changed and ownership changed in

24  2005?

25  A.  Well, that type of joking started before the administration

C44dcar1                         Velandia - direct

1    changed.

2    Q.  When you say that type of joking, you are referring now to

3    the genital/buttocks touching?

4                MR. DELANEY:  Objection.  Leading.

5                THE COURT:  Objection sustained to the form of the

6    question.

7    Q.  When you use the word "joking," what are you referring to?

8    A.  I was referring to the type of behavior -- well, you know,

9    not the regular type of behavior that you see people doing.

10               THE COURT:  What kind of behavior were you talking

11   about?

12               THE WITNESS:  Your Honor, I'm referring to the

13   behavior of engaging in touching and joking around touching

14   each other's genitals and behinds, which is something that I

15   was not used to observe in my culture before.

16               THE COURT:  Touching the clothes, or is that touching

17   the bare buttocks?

18               THE WITNESS:  No, your Honor.  I'm referring to --

19   this is a type of joking which somebody tells a joke or plays

20   around and they touch each other on clothes quickly.

21               THE COURT:  On the clothes?

22               THE WITNESS:  Yes, on the clothes.

23               MR. PARKER:  Your Honor, may I proceed?

24               THE COURT:  Yes, you may.

25   BY MR. PARKER:

1    Q.  You mentioned in your response that --

2                THE COURT:  Well, let me ask one more question.

3                Are you talking about goosing?  Do you know what

4    "goosing" is?

5                THE WITNESS:  I don't know what it is, your Honor.

6                THE COURT:  What?

7                THE WITNESS:  What's this?  Your Honor, I don't know

8    the word "goosing."

9                THE COURT:  OK.

10   BY MR. PARKER:

11   Q.  Describe further, if you would, what you meant when you

12   said touching buttocks and genitals over the clothing quickly.

13   What did you mean by "quickly"?

14   A.  One of the examples of that situation is as follows:  For

15   example, someone who is already at work, somebody else comes in

16   afterwards.  Then one of them says, "Hola, mami," or hello,

17   babe, and then touches that person's buttocks.  But it's

18   something rather quick, a tap or touch, like this.

19               And the objective there is, how they talk to each

20   other like that, is just speaking to them as if you're talking

21   to a female just so that the other one would feel less macho.

22   Q.  What types of words were used when this occurred?

23               MR. DELANEY:  Objection.  Foundation.

24               THE COURT:  Objection sustained.

25   Q.  In your response you mentioned that there would be jokes

C44dcar1                    Velandia - direct

1    made.  What types of jokes were made at the time that these

2    touchings occurred?

3             MR. DELANEY:  I am still going to object to the

4    foundation.

5             THE COURT:  I will allow the question.

6    A.  Well, Mr. Parker, there are many things that are said to

7    many, because, in fact, the language they used is very obscene.

8    Any type of obscenity that will come out to mind, that's the

9    first thing that will come out.

10            THE COURT:  When people touch the buttocks, is it a

11   caress or is it meant -- was it intended to shock?

12            THE WITNESS:  No, your Honor.  I don't think it is a

13   caress.  It's like a quick tap but light.

14   BY MR. PARKER:

15   Q.  Did you participate in what you have just described as the

16   type of touching that occurred at Remi?

17   A.  Yes.  At one point -- I started doing that once, I started

18   getting familiar with them, I started doing it, too.

19   Q.  About when did you start?

20   A.  I really don't have a specific time to tell you because it

21   is something that starts becoming more and more as you get more

22   familiar with people.

23   Q.  And after you began engaging in this touching game, as

24   you've described, how long did this continue?

25   A.  Mr. Parker, always.  It hasn't stopped.

C44dcar1                        Velandia - direct

```
 1   Q.  And would you describe, please, the nature of the touching
 2   that Mr. Caravantes did to you.
 3   A.  Well, I feel that it was -- at the beginning it was
 4   something like everybody else, it was something inoffensive.
 5            THE COURT:  When these incidents occurred, who was the
 6   first person to touch the other person, you or Mr. Caravantes?
 7            THE WITNESS:  Well, your Honor, I think that he was
 8   the one who started touching me first because before that I was
 9   not accustomed to doing -- touching people.  So I would say
10   that he started touching me first.
11            THE COURT:  All right.
12   BY MR. PARKER:
13   Q.  At any time after -- well, let me clarify it.
14            Did you also -- were there occasions where you touched
15   Caravantes in the same way?
16   A.  Yes.  The same manner because once we became familiar with
17   each other, then we started joking around like that.
18   Q.  Did Caravantes ever ask you to stop?
19   A.  No, because this was just playing, and everybody noticed,
20   everybody knew, and so he never said for me to stop.
21   Q.  Did the nature of the touching between you and Caravantes
22   ever change from what you've described?
23   A.  Yes.  At one point I thought that it was something
24   different; it changed.
25   Q.  When was that?
```

1   A.  That was approximately around 2005.

2   Q.  Please describe what happened.

3   A.  On one occasion I felt one advancement in which I thought

4   to myself, well, this is no longer part of the joking around.

5   Q.  Mr. Velandia, what is your sexual orientation?

6   A.  I consider myself a gay man.

7   Q.  You just said that there was one occasion where you felt it

8   was different.  Describe what happened and why it was

9   different.

10  A.  OK.  As I said before, as we used to play around not only

11  with Mr. Caravantes but with other employees as well, and on

12  one occasion there was a party going on in the Rialto Room and

13  the party host was speaking.  Then all employees stopped

14  working.

15          The employees who were working with me stayed inside

16  the room.  And at the moment the host started speaking, I was

17  outside the Rialto's door.

18  Q.  OK.  Let me stop you there.  The Rialto's door, what do you

19  mean by that?

20  A.  Well, the Rialto has two doors.  One is on 54th Street,

21  which is the main entrance.  And there are two doors which open

22  and close, which are the doors that separate the Rialto Room

23  from where it leads to the coffee station.

24  Q.  OK.  Now, could you take the binder for defendants' trial

25  exhibits.  Could you open up to Tab No. 61.

                          C44dcar1                    Velandia - direct

1              Do you see that photograph?

2   A.  Yes, sir.

3   Q.  Do you recognize what is shown in that photograph?

4   A.  Yes, I recognize everything that's in the picture.

5              THE COURT:  I don't have the exhibit.

6              (Pause)

7   Q.  What does this photograph show, Mr. Velandia?

8   A.  Well, this picture was taken from the door that connects

9   from the Grand Canal towards a hallway to the coffee station.

10  So from where the photographer is, if you make a left, it will

11  lead you to the kitchen.  And if you keep walking and you see

12  that first man dressed in black, if you make a right right

13  there, there is an emergency exit.  Two steps forward is the

14  coffee machine, to the left.

15             THE COURT:  Two steps forward from where?

16             THE WITNESS:  Two steps past where the gentleman in

17  black is, to the left is the coffee machine.

18  BY MR. PARKER:

19  Q.  Are you saying the coffee machine is located between the

20  two men who are standing in the photograph?

21  A.  Exactly, yes.

22  Q.  Now, do you see the man who is standing with his back to

23  the camera holding a briefcase?  There is a circular -- it

24  looks like a window in the back.  What is that?

25  A.  Yes.  That's the door I was talking about which separates

C44dcar1                        Velandia - direct

1   the Rialto Room from the coffee station.

2   Q.  And if you turn to Tab 60, do you recognize -- that is Tab

3   D-60, your Honor.

4          THE COURT:  I've got it.

5   Q.  Do you recognize what is shown in that photograph?

6   A.  Yes, sir.  That's the coffee station.

7          MR. PARKER:  Your Honor, I move the admission of

8   Defendants' 60 and 61 into evidence.

9          MR. DELANEY:  No objection.

10          THE COURT:  Defendants' Exhibits 60 and 61 are

11   admitted in evidence.

12          (Defendants' Exhibits 60 and 61 received in evidence)

13   BY MR. PARKER:

14   Q.  Mr. Velandia, please turn back to Tab 61.

15          OK.  Now, you testified earlier, when you were shown

16   the photographs, that you were standing outside the doors to

17   the Rialto Room.  Does this photograph show where you were

18   standing --

19          THE COURT:  I'm not sure that that is accurate.

20          MR. PARKER:  OK.  I'll cover that again, Judge.

21   Q.  You started to describe this other situation with

22   Mr. Caravantes.  Where were you at the time that this event

23   occurred?

24   A.  As I was explaining before, I was outside the Rialto Room.

25   I was standing exactly out the door that you see in the back.

1    And I was looking out the circular window which you see on the

2    door.

3    Q.  What were you looking at?

4    A.  I was looking towards the inside -- looking for a clue to

5    see when the host would stop talking and we can start with the

6    service.

7    Q.  What happened next?

8    A.  While I was standing there, that's when I noticed for the

9    first time that Caravantes wanted to advance, to go beyond the

10   kind of joke that we were used to.  That day I was looking

11   through the window and Mr. Caravantes came from behind me as I

12   was looking through the window, and I felt his contact from

13   behind me.  But I thought he was joking, as usual.  And I

14   noticed that it was not joking as usual because he was

15   experiencing an erection, and I was able to feel it.  I noticed

16   it because while I was standing and he was touching me from

17   behind, I could feel that he was -- he had an erection.

18   Q.  He was touching you how?  Describe that.

19   A.  No.  All he did was he touched me with his genitals from

20   behind.

21   Q.  Touched you where?

22   A.  In my buttocks.

23   Q.  What happened next?

24   A.  Well, what happened?  I myself was surprised because I

25   never saw Mr. Caravantes as a gay man or as a bisexual man,

1   and the fact that he had an erection allowed me to think

2   something else.  However, they joke very heavily.  Then what I

3   did was I took my hand and I felt it backwards and I felt,

4   because I was trying to find out whether it was really an

5   erection he had or that he was touching me with something else,

6   and then that's when I was able to realize that he had nothing

7   else in there but it was his member, which was erect.

8   Q.  When you did that, when you felt that, did you feel it on

9   the outside of the clothing or inside the clothing?

10  A.  No.  It was inside the clothes.

11  Q.  Your hand went inside the clothing or stayed on the

12  outside?

13          THE INTERPRETER:  The witness is answering directly

14  from English and bypassing the interpreter and making it --

15  your Honor, would you be so kind as to direct the witness to

16  wait for the interpretation, because he is confusing the

17  interpreter and correcting the interpreter at the same time

18  without allowing the interpreter to interpret.

19          Please, read this again.

20          MR. PARKER:  Your Honor, may I have that question read

21  back?

22          THE COURT:  Yes, you may.

23          "Question:  Your hand went inside the clothing or

24  stayed on the outside?"

25          THE WITNESS:  No, I touched him outside the clothes.

C44dcar1                         Velandia - direct

1          THE COURT:  What was outside the clothes, your hand or

2   his member?

3          THE WITNESS:  No.  My hand.

4          THE COURT:  And you touched his clothes, not his

5   member?

6          THE WITNESS:  Yes, your Honor.

7   BY MR. PARKER:

8   Q.  What happened after that?

9   A.  No.  That day absolutely nothing else happened.

10  Q.  Did there -- what did you conclude as a result of that

11  event?

12  A.  The day was too soon for me to have any conclusion.  It was

13  something that happened, and I was wondering myself why did

14  that happen because he -- I didn't know that he liked doing

15  that.

16  Q.  After that occasion, was there ever another time where you

17  and Caravantes touched one another?

18  A.  Yes.  There were other occasions.

19          THE COURT:  About what date was this occurrence that

20  you recounted at the door of the Rialto Room?

21          THE WITNESS:  Your Honor, I don't have in my mind the

22  exact date because it was something that happened while I --

23          THE COURT:  OK.  How long before the new ownership

24  took over did this happen, approximately?

25          THE WITNESS:  No, your Honor.  This occurred after the

1    new owners arrived.

2              THE COURT:  How long, approximately, after the new

3    owners arrived?

4              THE WITNESS:  No.  It was recently.  It was shortly

5    after he started this, because I remember the Maitre d' Luigi

6    Martini was the one managing the parties.

7    Q.  Do you recall how long Luigi Martini worked for under the

8    new ownership at Remi?

9    A.  I think Mr. Luigi Martini worked with the new management

10   for seven or eight months.  I'm not sure.

11   Q.  Did there come a time when there were any other instances

12   after that occurred where you and Caravantes had any type of

13   exchange other than the type of touching that you had been

14   describing?

15   A.  Yes.  One week after I was at my workstation –– I'm sorry,

16   it was a few weeks later.  As I was working at my station, and

17   Caravantes came over and asked me, come to the coffee station.

18   And when I came to the coffee station, he was standing in front

19   of the coffee machine and he was holding in his hand a big

20   gallon of milk.  But the gallon was empty.  He had the gallon

21   in front of his genitals.

22              And when I got to face him face-to-face, he put away

23   the gallon, and I was able to see that he had an erection and

24   he had his penis outside his pants.

25   Q.  What happened after that?

C44dcar1                          Velandia - direct

1   A.  Well, at that moment I understood that Mr. Caravantes

2   wanted to have a sexual relation with me or wanted to incite me

3   to have a sexual relation with him.  And then that day I felt

4   my heart beating wildly because it was a situation I did not

5   expect.  And that day all I did is I touched him in his skin,

6   and I went back to my room in the Grand Canal.

7            THE COURT:  Where is your room at the Grand Canal?

8            THE WITNESS:  It's the main room, Grand Canal.  That's

9   where I was working as a waiter that day, in the Grand Canal

10  Room.

11  Q.  Were there any words spoken by either of you following

12  Mr. Caravantes' exposure of his penis to you?

13  A.  No.  Mr. Parker, there were no words.  We just looked at

14  each other face-to-face and there were no words exchanged.

15  Q.  After that incident occurred, was there ever any

16  conversation between the two of you about that event?

17  A.  No.  Mr. Parker, it's because there was -- on my part, I

18  wasn't looking for any of that.  And on the other side, I was

19  shocked myself because I did not expect that behavior from

20  Mr. Caravantes.  And then I simply allowed him to proceed with

21  his advances and I didn't see the need to ask anything.

22  Q.  At any time --

23            THE COURT:  What do you mean, "after that"?  Are you

24  talking about during that day?

25            THE WITNESS:  No, your Honor.  That day we didn't talk

1   about it nor any other day did we talk about what had happened.

2   BY MR. PARKER:

3   Q.  At any time after that day when that event occurred in the

4   coffee station, were there any other events that led you to

5   conclude that Caravantes was interested in a relationship?

6              MR. DELANEY:  Objection.  Leading.

7              THE COURT:  Objection sustained to the leading.

8   Q.  What happened after that event occurred between you and

9   Caravantes on that day?

10  A.  After that, about a few weeks later, as I was closing at

11  night and I was already wrapping up to bring the reports

12  downstairs, Caravantes approached and touched me from behind

13  and whispered in my ear, "I'll wait for you at the coat check."

14             Then I finished.  I did the reports, and I took the

15  things downstairs.

16             And then once I went upstairs, the bartender, the

17  waiter who closes and the busboys and the food runners had left

18  already, and I closed the door but from the inside.  And I went

19  to the coat check.  And Mr. Caravantes was there.

20             And he had brought a chair inside the coat check, and

21  he was sitting on the chair and he had his pants open with his

22  genitals outside.

23  Q.  What happened next?

24  A.  And then that day we did have a sexual encounter of another

25  nature.  That day I performed fellation to Mr. Caravantes.

C44dcar1                        Velandia - direct

1  Q.  Mr. Velandia, have you ever attempted to establish a sexual

2  relationship with a man whom you believed was heterosexual?

3  A.  No.  Mr. Parker, I think that would be something that made

4  no sense.

5  Q.  Why?

6  A.  Because I don't see why I would approach a man with a

7  sexual inclination -- a man who is a heterosexual when I know

8  that he will not have any desire for me.

9        THE COURT:  Did you get pleasure from performing

10  fellatio on Mr. Caravantes?

11        THE WITNESS:  Yes, your Honor.

12  BY MR. PARKER:

13  Q.  At that time of that event did Mr. Caravantes ejaculate?

14  A.  Yes.

15  Q.  Did he ask you to stop?

16  A.  No.  At no time, no.  That would have been even more

17  strange to me because if he hadn't provoked the situation, it

18  wouldn't have taken place.

19  Q.  Were there any times thereafter, after this occasion where

20  you performed oral sex on him, that this repeated itself?

21  A.  Yes, Mr. Parker.  After that time, then I waited for him to

22  let me know that he wanted it to take place again, because I

23  thought that perhaps all he wanted to do is satisfy a

24  curiosity.  I wanted to wait for him to be the one to make the

25  advances, because I figured that if he was the one starting,

C44dcar1                           Velandia - direct

1   then he would stop as well.

2   Q.  And what happened after that?

3   A.  Then after that I noticed that he didn't stop.  Then I

4   realized that he was not satisfying his curiosity --

5           MR. DELANEY:  Objection to the -- sorry.  Motion to

6   strike, your Honor.  He is speculating on Mr. Caravantes'

7   mental state.

8           MR. PARKER:  I think he is just describing his

9   behavior, Judge.

10          MR. DELANEY:  That is not what he said.  He said his

11  curiosity not being satisfied, your Honor.

12          THE COURT:  It goes to the witness' state of mind, not

13  Mr. Caravantes' state of mind.  I will allow the question.

14          You can answer it.

15  A.  And then because he didn't stop, then I allowed for these

16  occurrences to continue.

17          THE COURT:  When was this incident in the coat room?

18          THE WITNESS:  Your Honor, each one of them that occurs

19  started happening in a slow manner, so perhaps between each

20  occurrence or episode a couple of weeks would go by.

21          As I said before, I have always known that I'm gay.

22  And I recall I felt that way ever since I was six years old.

23  And then I knew that these things that happened with

24  Mr. Caravantes is things that he provoked because I know my

25  sexual taste.  And so each thing happened in weeks from one

C44dcar1                         Velandia - direct

1    another.

2    BY MR. PARKER:

3    Q.  Mr. Velandia, have you told third parties that you were gay

4    before testifying here today?

5    A.  Mr. Parker, I have never hidden my sexual identity.  All my

6    friends have always known that I'm gay.

7              THE COURT:  Did you tell anyone at work that you were

8    gay at Remi?  Did you tell anyone at Remi that you were gay?

9              THE WITNESS:  Yes, your Honor.  Everybody knew.

10             THE COURT:  Who?  Did you tell the management that you

11   were gay?

12             THE WITNESS:  Well, when I first started working, it's

13   not a situation which you go and say, "Hey, hello.  I'm gay."

14   But as time goes along and you're sharing with people, they ask

15   you whether you have a girlfriend or not.  That's when they ask

16   do you have a girlfriend.  I say, No, I don't have a

17   girlfriend.  I'm in a couple and he's a man, as well.

18             And that's the way in which I have let all my friends

19   know, and that's also the management, they know that I'm gay as

20   well.

21             THE COURT:  Who did you tell in management?

22             THE WITNESS:  Well, from the management, I didn't tell

23   anybody particularly because with management we don't socialize

24   much.  But the managers know because the employees know, and so

25   they get to know who's who at the restaurant.

C44dcar1                          Velandia - direct

1            THE COURT:  Who did you tell among the employees that

2       you were gay?

3            THE WITNESS:  Well, I recall the first one I told that

4       I was gay was a waiter who worked there, but he left around

5       '98.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Who else?

2           THE WITNESS:  And then after I told the waiter, he

3    would tell my other friends, and the other busboys and the foot

4    runners.

5           THE COURT:  Who did you tell?

6           THE WITNESS:  Well, your Honor, I know I told some of

7    the busboys and some of the runners, but after -- but then I

8    don't recall the names of the persons because I told them I

9    want -- I've been working at the restaurant for 14 years, so

10   those are things that took place 14 years ago.

11          THE COURT:  But new employees come on.  Did you tell

12   any of the new employees?  Who did you tell?

13          THE WITNESS:  Yes, your Honor, when there are new

14   employees and we're talking, then if we're talking about

15   whatever, then I do tell them that I do live with Luis.

16          THE COURT:  Who did you tell that to?

17          THE WITNESS:  Recently?

18          THE COURT:  It doesn't matter.

19          THE WITNESS:  For example, I told Stacy Crow, I told

20   Eric Ishanov, Michelle Russo, Felipo Mioli, one of the busboys

21   named Miguel Cruz.

22          THE COURT:  OK.

23   BY MR. PARKER:

24   Q.  Before any of these events that you described with

25   Caravantes occurred, do you believe he was aware you were gay?

1    A.  Yes, because we had been working in the restaurant for a

2    while already, and I had been dating people -- going out with

3    people of my orientation as well.  So they commented, oh,

4    they're gay and they go to gay bars.

5            THE COURT:  Did Mr. Caravantes go to the gay bars with

6    you?

7            THE WITNESS:  No, Mr. Caravantes never went.  Other

8    friends who used to work at the restaurant with us, they're

9    heterosexual, they used to go sometimes but not Mr. Caravantes.

10           THE COURT:  So he wouldn't know you actually went to

11   the gay bar, right?

12           THE WITNESS:  No, he would only know because the

13   following day, then we would tell about where we had been to

14   and who we went with.  That's how he would find out.

15           THE COURT:  But you don't know what he heard the

16   following day, do you?

17           THE WITNESS:  Well, but I would -- I would know that

18   he knew because then everybody else would just make comments

19   the following day and then they would just joking around, even

20   with the heterosexual guys, the guys would just go and said,

21   oh, I heard you went to the gay bar with -- Caravantes used to

22   say that to the gay -- to the straight guys.

23           THE COURT:  And you heard it?

24           THE WITNESS:  Yes, your Honor.

25   Q.  After the first time that you and Caravantes had oral sex,

C44kcar2                       Velandia - direct

1  were there times, any other times, thereafter when you had oral

2  sex together?

3  A.  Yes, sir.

4  Q.  How many times?  About how many times, exactly if you know,

5  and, if not, approximately how many times?

6  A.  Yes, Mr. Parker, but I don't know exact -- the amount of

7  times because I don't think anybody counts the times that they

8  have sexual intercourse.  I would dare say it was ten times or

9  perhaps even more than ten times, if we take -- I took

10 consideration fellation and anal sex.

11 Q.  Let's just talk about the oral sex.  Where did these acts

12 occur?

13 A.  Those acts occurred usually at the coat check of the

14 restaurant because this would always happen when everybody else

15 had left the restaurant.

16 Q.  Other than the coat check, was there any other occasion

17 when you performed oral sex on Caravantes anywhere else in the

18 restaurant?

19 A.  Yes.  It once occurred at the Rialto Room because there was

20 no party, and I think it also once occurred at the coffee

21 station once everybody else had left.

22 Q.  Did you ever have a sexual encounter, either oral or anal

23 sex, with Mr. Caravantes in anywhere other than on the premises

24 of Remi Restaurant?

25 A.  No, not anywhere else besides the restaurant, just at the

1    restaurant.

2    Q.  Do you recall specifically any of the other occasions on

3    which you and Caravantes engaged in oral sex?

4    A.  Specifically any other location?  No, but I recall the

5    first occasions because it was something that caused an impact

6    in my mind.  But then afterwards, it was just something

7    repetitive; even though it may sound strange, it was something

8    natural.

9    Q.  On these other occasions where you'd had oral sex, did

10   Mr. Caravantes ever perform oral sex on you?

11   A.  No, none.

12   Q.  Who initiated the oral sex encounters?

13   A.  Mr. Caravantes.

14   Q.  Did you ever initiate any of them?

15   A.  Yes, perhaps after it became usual, then I may have

16   insinuated to him so that we would do it.

17   Q.  Describe these other occasions where you had oral sex

18   together with Caravantes.  What led up to them?

19   A.  Like I said before, usually he and I never exchanged a

20   complete conversation regarding this.  I feel this was

21   something completely sexual which was taking place.  If

22   Mr. Caravantes wanted to initiate it, he would come and touch

23   me and tell me that he would wait for me at the coat check.  Or

24   if I was going to initiate it, I would ask him, do you want me

25   to stay?  But those were the only verbal exchanges between him

1   and I.

2   Q.  When you say you would ask him if he wanted you to stay,

3   what do you mean by that?

4   A.  Because when I would ask him, he knew that I was referring

5   to, whether he wanted to do something with me that day.

6             MR. DELANEY:  Objection, your Honor; again he's

7   talking about Mr. Caravantes' state of mind.

8             THE COURT:  The objection is sustained as far as it's

9   asking for Mr. Caravantes' state of mind.

10            MR. PARKER:  It was probably a bad question, Judge.

11  Let me try a different one.

12  BY MR. PARKER:

13  Q.  You said that you on occasion asked Caravantes if he wanted

14  you to stay.  Stay where?

15  A.  It was for me to stay at the restaurant.  I know that it's

16  not something that's clear, but it was clear to us; we already

17  knew what was going on.

18            If I would ask Mr. Caravantes, you want me to stay,

19  there was no other reason why I would stay.  So, between him

20  and I, we knew what it was, and so it's like if he came over

21  and he touched me, then I knew what he wanted.

22            THE COURT:  He touched you where?

23            THE WITNESS:  Your Honor, on my behind.

24  BY MR. PARKER:

25  Q.  On the occasions where you performed oral sex on

1  Mr. Caravantes, did he ejaculate?

2  A.  Yes.

3  Q.  Was there ever a time when he did not ejaculate?

4  A.  No.

5  Q.  What was his demeanor?  Describe his demeanor during these

6  events, please.

7  A.  His demeanor is a demeanor of any person who's having

8  sexual intercourse.  He was relaxed and he was enjoying the

9  situation.  That's how his demeanor was.

10  Q.  On any of the times that you, as you testified, asked

11  Caravantes if he wanted you to stay, did he ever say no?

12          MR. DELANEY:  Objection, your Honor; it's leading.

13          THE COURT:  I'll allow the question.

14          THE WITNESS:  Yes, Mr. Parker.  On some occasion,

15  obviously he said like he had something else to do, so he would

16  decline.  And by the same token, when sometimes he wanted to

17  have an encounter with me, I would also decline.

18  Q.  Did there ever come a time when Caravantes told you that he

19  no longer wanted to have oral sex with you?

20  A.  No, that never happened.

21  Q.  You mentioned in your earlier testimony anal sex.  Did you

22  and Caravantes ever have anal intercourse?

23  A.  Yes.

24  Q.  About how many times?

25  A.  The same; I think it could have been a little bit more than

C44kcar2                        Velandia - direct

1  ten times.

2  Q.  Was the first time that you had anal intercourse with

3  Caravantes before or after the first time that you performed

4  oral sex on him?

5  A.  That was after.  It was something also which took place,

6  and I couldn't tell you exactly when, I couldn't recall, but

7  something that happened with the passage of time.

8  Q.  Do you have a recollection of any conversation --

9          MR. PARKER:  Let me rephrase.

10 Q.  Do you have a recollection of the first time that you and

11 Caravantes had anal intercourse?

12         MR. DELANEY:  Asked and answered.

13         THE COURT:  Objection overruled.

14 Q.  I'm just asking if you have a recollection of that event.

15 A.  It's like I said before, we never really exchanged many

16 words, but in the same manner, this time he asked me -- I knew

17 that he wanted to have anal sex when he asked me if I had a

18 condom.

19 Q.  Why --

20         THE COURT:  Can you remember when and where you first

21 had anal sex with Mr. Caravantes?

22 A.  When and where --

23         THE COURT:  I'll change the question.  Do you remember

24 when -- can you remember where you first had oral sex with

25 Mr. Caravantes?

C44kcar2                          Velandia - direct

1            THE INTERPRETER:  Can you please read that back to me?

2            MR. PARKER:  Did you mean anal sex, your Honor?

3            THE COURT:  I'm sorry, anal sex.

4            THE INTERPRETER:  Please read that back to me.

5            (Record read)

6            THE COURT:  I'm sorry, withdraw the question.  Can you

7    remember when you first had anal sex with Mr. Caravantes?

8            THE WITNESS:  No, I don't recall where the first time

9    occurred.

10           THE COURT:  I said where.

11           THE WITNESS:  Where?  At the coat check.

12           THE COURT:  And how long was that after you first had

13   oral sex with Mr. Caravantes?

14           THE WITNESS:  Could have been like weeks later.

15   Q.  You testified --

16           THE COURT:  Can you tell us how it came about that you

17   had anal sex with Mr. Caravantes the first time in the

18   coatroom?

19           THE WITNESS:  Yes, your Honor.  As I said before, I

20   allowed this to happen the way he wanted them to happen.  One

21   day, I stayed at the restaurant, we had already closed the

22   door, then we went to the coat check room, and that's where it

23   occurred, anal sex as well as fellation.

24           THE COURT:  What actions did you take to cause anal

25   sex to occur?

C44kcar2                          Velandia - direct

1           THE WITNESS:  Mr. Caravantes asked me whether I had a

2     condom and whether I wanted to have anal sex, and I said yes.

3           THE COURT:  And what actions -- what happened next?

4           THE WITNESS:  Then, your Honor, the following thing is

5     that he put on the condom, then I stood against the wall, and

6     he penetrated me.

7           THE COURT:  Were you facing the wall or facing the

8     room when you stood against the wall?

9           THE WITNESS:  No, I was facing the wall.

10          THE COURT:  Were you standing up or sitting down?

11          THE WITNESS:  No, I was standing up.

12          THE COURT:  And then what happened?

13          THE WITNESS:  Well, then he proceeded to perform anal

14    sex until he reached climax, and that was the end.

15          THE COURT:  Do you find that pleasurable?

16          THE WITNESS:  Yes, sir.

17    BY MR. PARKER:

18    Q.  What was Mr. Caravantes' demeanor during this act, and

19    afterwards?

20    A.  Well, the encounters that we had, while we were having

21    them, he was relaxed and he was enjoying what we were doing.

22          THE COURT:  How can you be relaxed and ejaculate?

23          THE WITNESS:  No, your Honor, when I said relaxed, I

24    really mean that he was enjoying it.  Perhaps it is the way we

25    say it in Spanish.

 1                 THE COURT:  How do you say it in Spanish?

 2                 THE WITNESS:  Relajado.

 3                 THE INTERPRETER:  It's pretty much like relaxed.

 4                 THE COURT:  How do you spell that word?

 5                 THE WITNESS:  R-e-l-a-j-a-d-o.

 6    BY MR. PARKER:

 7    Q.  Mr. Velandia, you said you had ten or more anal sex

 8    experiences with Mr. Caravantes.  Where did they take place

 9    after the first time?

10    A.  Most of the times, it took place at the coat check room in

11    the restaurant, and once at the Rialto Room.

12    Q.  On any of those occasions, did you penetrate

13    Mr. Caravantes?

14    A.  No, never.

15                 THE COURT:  Was it always standing up?

16                 THE WITNESS:  No, your Honor, it was not always

17    standing up.

18                 THE COURT:  What other positions?

19                 THE WITNESS:  Sometimes I was on the floor -- how do

20    you say it -- kneeling down, and leaning forward, and other

21    times Caravantes was laying on the floor.  And that's it.

22    BY MR. PARKER:

23    Q.  Were condoms used each time?

24    A.  Always.

25    Q.  Who supplied them?

C44kcar2                    Velandia - direct

1   A.  I had them; I used to buy them.

2   Q.  Who put them on each time?

3   A.  He used to put them on.

4   Q.  Put them on himself?

5   A.  Yes.

6   Q.  Did Mr. Caravantes ever physically resist having anal

7   intercourse with you?

8   A.  No, never.

9   Q.  Did he ever physically resist having oral sex performed on

10  him by you?

11  A.  No, never.

12  Q.  Did he ever push you away on any of those occasions?

13  A.  No.

14  Q.  Did he ever say orally at any time to you that he did not

15  want to engage in these activities with you?

16  A.  No, never.

17         THE COURT:  Did you make any promises to him in

18  connection with the oral sex or anal sex?

19         THE WITNESS:  No, your Honor.

20  Q.  Did you ever offer to help him become a waiter in return

21  for sexual favors?

22  A.  No.  We never spoke with Mr. Caravantes regarding that

23  possibility.

24         THE COURT:  Who is "we"?

25         THE WITNESS:  Mr. Caravantes and myself.

C44kcar2                        Velandia - direct

1   Q.  Did Mr. Caravantes ever say anything to you that suggested

2   to you that the sexual encounters between the two of you were

3   unwelcome.

4   A.  No, he never did.

5   Q.  Did you ever threaten Caravantes in any way?

6   A.  No, I never threatened Caravantes, nor any other person.

7   Q.  Did you ever take a photograph of Caravantes' genitals?

8   A.  No.

9   Q.  When was the last time that you and Caravantes engaged in

10  any type of sexual encounter?

11  A.  Mr. Parker, in the same manner these encounters started,

12  that's how they ended.  All of a sudden, they didn't happen

13  again, and neither one of us spoke about it.

14          THE COURT:  When was that, that they stopped?

15          THE WITNESS:  Your Honor, I think it was approximately

16  sometime in 2007.

17          THE COURT:  2007?  How long before Mr. Caravantes

18  stopped working at Remi?

19          THE WITNESS:  Well, I think -- your Honor, I think it

20  was a few months before that, but I'm not sure how many months.

21          THE COURT:  He left in 2008.  Does that change your

22  answer as to when it stopped?

23          THE WITNESS:  Yes.  Like I said, your Honor, it was

24  months before he stopped working there, but I think it was

25  sometime during 2007, perhaps towards the end.

C44kcar2                         Velandia - direct

 1   BY MR. PARKER:

 2   Q.  On any of the times when you had sex with Caravantes, did

 3   you ever push him to the floor?

 4   A.  No.  That would have been something difficult because

 5   Caravantes is big and heavy person.

 6   Q.  What is your height and weight?

 7   A.  My height is five-five, and my weight is 150 pounds.

 8            THE COURT:  Is there anything that caused these

 9   relations to stop?  Can you think of anything that caused the

10   relations to stop?

11            THE WITNESS:  No, your Honor.  I don't know, we never

12   spoke about why they stopped, so I don't think it stopped...

13            THE COURT:  Why did you stop asking him if he wanted

14   to stay late?

15            THE WITNESS:  Because Caravantes started -- his

16   demeanor started changing and he seemed -- he appeared to be

17   angry towards people.

18            THE COURT:  Did you ask him about that?

19            THE WITNESS:  No, your Honor.

20            THE COURT:  Did you ask him why he appeared to be

21   angry?

22            THE WITNESS:  No, your Honor.  It seems to me that in

23   2007 Mr. Pastor had filed a complaint.  And for that same

24   reason, I assumed that was the reason why Mr. Caravantes wanted

25   to stop.

1          THE COURT:  What was the complaint that Mr. Pastorio

2    filed?

3          THE WITNESS:  That Mr. Pastor had complained that they

4    had fired him, also complained regarding, saying that it was

5    because of my advances or my harassment.

6          THE COURT:  Oh, this is Pastor?

7          THE WITNESS:  Pastor.

8          THE COURT:  Now, which Pastor are you talking about?

9          THE WITNESS:  Sergio Pastor.

10          THE COURT:  How did you learn that he had filed a

11    complaint?

12          THE WITNESS:  Because I received a copy of the

13    complaint.

14          THE COURT:  Who gave you the copy of the complaint?

15          THE WITNESS:  It was sent to me, my name, by The

16    Department of Human Rights.

17          THE COURT:  Was the complaint against you?

18          THE WITNESS:  Yes, your Honor.  The restaurant -- we

19    received a copy one for the restaurant, one for myself.

20          THE COURT:  Is there any reason you can think of why

21    Mr. Caravantes would know about that complaint?

22          THE WITNESS:  Yes, because Sergio Pastor and

23    Mr. Caravantes were very good friends.

24          THE COURT:  What was Mr. Pastor's position, Sergio

25    Pastor's position at the time?

C44kcar2                      Velandia - direct

1          THE WITNESS:  Sergio Pastor used to work as a food

2     runner.

3          THE COURT:  Why do you believe that they were good

4     friends?

5          THE WITNESS:  Because he and Mr. Caravantes were

6     always talking together and always -- each time I would see

7     Mr. Caravantes, he would be together with Sergio Pastor, and

8     sometimes Sergio would go upstairs to the coffee station to

9     speak with Mr. Caravantes.

10    BY MR. PARKER:

11    Q.  Mr. Velandia, do you know Francisco Sotarriba?

12    A.  Yes, I know him.

13    Q.  How do you know him?

14    A.  Also when he came to work at the restaurant.

15    Q.  What was your job at the restaurant when Sotarriba started

16    working there?

17    A.  I was already a waiter.

18    Q.  What was his job when he started there?

19    A.  He was a busboy.

20    Q.  Do you recall when Mr. Sotarriba started working at Remi?

21    A.  I don't recall the year.

22    Q.  About how long after you began working at Remi did

23    Mr. Sotarriba start there?

24    A.  It could be a couple years or perhaps he started working

25    there in '99.

C44kcar2                        Velandia - direct

1   Q.  After Mr. Sotarriba began working at Remi, what was your

2   relationship with him?

3   A.  Work relation, and then with the passage of time, then we

4   became good friends.

5   Q.  Did you ever see one another socially outside of work?

6   A.  Yes, many times.  We would go out sometimes with him and

7   Pablo Solis and a waitress called Maybrigth, and then we would

8   go to bars or a dance club.  And then on some occasions I went

9   to Mr. Sotarriba's house.

10  Q.  When did that occur, when you went to bars and went to his

11  house?

12          MR. DELANEY:  Objection, your Honor; form of the

13  question.

14          MR. PARKER:  I can rephrase, Judge.

15          THE COURT:  It is a double question.

16  BY MR. PARKER:

17  Q.  During what period of time are you talking about where you

18  saw Mr. Sotarriba socially outside of work?

19  A.  While he was working at the restaurant.

20  Q.  What was Mr. Sotarriba's job at Remi after the new owners

21  came in?

22  A.  He was a food runner.

23  Q.  Did you ever engage in any of the type of touching with

24  Sotarriba that you described earlier, the buttocks, the

25  genitals over the clothing?

C44kcar2                    Velandia - direct

1          MR. DELANEY:  I am going to object again, your Honor;

2     it's a compound question.

3          THE COURT:  I'll sustain the objection to the form of

4     the question.  It calls for more than one conclusion.

5          MR. PARKER:  I'm sorry, your Honor, I didn't hear.

6          THE COURT:  It calls for more than one conclusion.  It

7     involves two different actions.

8     BY MR. PARKER:

9     Q.  Did you ever engage in any touching of Mr. Sotarriba's

10    buttocks at any time, while the two of you worked at Remi

11    together?

12    A.  Yes.

13    Q.  Did you ever engage in any touching of Mr. Sotarriba's

14    genitals over the clothing, at any time while you worked at

15    Remi?

16    A.  Yes.  That was part of our horseplaying in the restaurant.

17    Q.  Were there any times where Mr. Sotarriba touched your

18    buttocks, while working at Remi?

19    A.  Yes.

20    Q.  And were there any times when Mr. Sotarriba touched your

21    genital area over the clothing, while working at Remi?

22    A.  No, he never touched my genital area.

23    Q.  When and where did the -- let's talk about when.

24          When did it first start to occur where you were

25    touching Sotarriba and Sotarriba was touching you?

1   A.  I think when we established a certain level of friendship.

2   Q.  Can you estimate -- can you put a year on that?  What year

3   was it?

4   A.  I think it was shortly after he started working there,

5   because people arrive and soon enough they get familiar with

6   these things and start doing them.

7   Q.  And you said he started, Sotarriba started, at Remi about

8   1999?

9            THE COURT:  Started work, is what he said.

10           MR. PARKER:  Started work, yes.

11           THE WITNESS:  Yes, approximately.

12  Q.  Would you describe, please, the types of touching that you

13  and Sotarriba engaged in with one another.

14           MR. DELANEY:  It's been asked and answered, your

15  Honor.

16           THE COURT:  Objection overruled.  It's not a proper

17  objection.

18           THE WITNESS:  Then in the same manner, it came with

19  friendship and the same, he would pass by and say something to

20  me and then touch, and I would do the same thing to him.

21  BY MR. PARKER:

22  Q.  On these occasions where he would touch you or you would

23  touch him in the manner you described, was anything said?

24  A.  No, short words, like I said before, for example, like

25  "mami"; I would say something vulgar in Spanish, I would say,

C44kcar2                    Velandia - direct

1   for example, in Spanish "mi puta" and then especially

2   Mr. Sotarriba had the habit of calling "my flower," "oh,

3   flower," and he used to call all the guys, "hello, flower."

4   Q.  What is your understanding of the phrase "mi puta"?

5   A.  The word "puta" in Spanish is an abbreviation of the word

6   "prostitute."  So when they call somebody puta, it's in the

7   most extensive or strongest sense of the vulgarity of the word.

8   Q.  What did you understand the term "flower" to mean, in the

9   context in which Mr. Sotarriba used it?

10  A.  In the context Mr. Sotarriba would use the word, it's as

11  though he was speaking to a woman, and he was calling her,

12  because of her being delicate or state of being delicate, he

13  would call her a flower.

14  Q.  Did you ever observe Sotarriba engage in the type of

15  touching he did with you, with anyone else at Remi?

16  A.  Yes, also to his group of friends.

17  Q.  Who?  Who was his group of friends?

18  A.  Sometimes he would touch me, the other runners,

19  Mr. Caravantes --

20          THE COURT:  Are you asking --

21  A.  -- Sergio Pastor --

22          THE COURT:  He's asking for names.

23  A.  -- Caravantes, Sergio Pastor, he used to get along with

24  Luis Martinez like that, one of the cooks, and with some of the

25  busboys like Leonardo Sanchez -- no, it was Leonardo but it's

1    not Sanchez, it was Valdo, and then I don't recall.  At the

2    time that this was taking place, there were many other people

3    that were working at the restaurant who are no longer working

4    there.

5    Q.  The touching that you and Sotarriba engaged in with one

6    another, where in the restaurant did these take place?

7    A.  It would occur, but the fact that Mr. Sotarriba is a food

8    runner, that would occur on the floor or at his workstation

9    downstairs by the kitchen.

10   Q.  When you say "on the floor," what do you mean by that?

11   A.  Whenever we were ready in the room and we were doing

12   things, that's when these things would take place.

13   Q.  Well, what does "floor" mean?  Where is the floor?

14   A.  The floor is the dining room.

15   Q.  What times of the day did these touchings take place?

16   A.  Usually that would take place before service or once the

17   service was already done.  Because once the service starts,

18   there are people in the restaurant, and it could happen, but it

19   would be if they're way up in the front.  But once the

20   restaurant is full, then one can no longer play like that

21   because people will notice.

22   Q.  What time is the lunch service?

23   A.  Employees arrive at 11:00, the restaurant opens at 12:00.

24   The restaurant opens at 12:00 and then it stays open all day

25   long, until 11:30, when it closes.

C44dcar3                    Velandia - direct

1  Q.  You said that the comments and the touching that you and

2  Sotarriba did with one another began shortly after he began

3  working at Remi.

4         When did the comments and the touching between you and

5  Sotarriba end?

6  A.  With Mr. Sotarriba, I thought that he always played like

7  that and I never really noticed when it stopped.  As a matter

8  of fact, I don't think they ever stopped between us.

9  Q.  When did Mr. Sotarriba leave work at Remi?

10 A.  I recall that Sotarriba left in June of 2008.

11 Q.  What types of -- well, did you during these occasions where

12 you and Sotarriba touched one another make comments of any kind

13 to him?

14 A.  Yes.  I used to make comments to him, too.

15 Q.  What kind of comments?

16 A.  The same words he used to use at me, I would use them on

17 him.

18 Q.  Did you ever use any different words other than the ones

19 that Sotarriba said to you?

20 A.  No.  Practically, they all used the same words.

21        THE COURT:  What words were they using?

22        THE WITNESS:  Yes, your Honor.  Words like "mami,"

23 "puta."  Also, we used to use "prosti," p-r-o-s-t-i, and

24 particularly Mr. Sotarriba, "flower."

25 Q.  What did you understand the word "prosti" to mean?

1    A.  It's an abbreviation of prostitute.

2              THE COURT:  Puta means whore, doesn't it?

3              THE WITNESS:  In English, yes, but not in Spanish.  In

4    Spanish it's the second word of "prostituta."  It's closely

5    related to prostitute.

6    Q.  Did you ever say to Sotarriba, "Let me suck you"?

7    A.  No.  Because in the same manner I never saw Sotarriba as

8    bisexual or gay so why would I tell him that?

9    Q.  How frequently did you and Sotarriba engage in touching and

10   comments to one another?

11   A.  All these games were sporadic.  They were not daily.  It is

12   in the same manner that one jokes with friends, we don't joke

13   around every day with friends.

14   Q.  Was there ever a time when you were -- or was there any

15   period of time when you were touching Sotarriba in the manner

16   you described, 10 to 15 times every day?

17   A.  No.  That would have been impossible.

18   Q.  Why?

19   A.  Because he and I, we saw each other from 11 to 12 in the

20   dining room.  That's an example.  That would only allow one

21   hour and then the service with the customers starts, and we

22   can't be playing like that on the floor.  Then I don't see how

23   I could possibly touch him 15 times in one hour; that's not

24   possible.

25              And then in the same manner it would be during dinner.

C44dcar3                          Velandia - direct

```
 1    And if we only have one hour, from 4 to 5, before service

 2    starts, and if I was to touch him like 10 to 15 times, then I

 3    would have to be on top of him so that I could touch him that

 4    many times.

 5              THE COURT:  When you say you have to be on top of him,

 6    what do you mean?

 7              THE WITNESS:  That, too, is one of our expressions.

 8    By that I mean being next to you all the time.

 9    BY MR. PARKER:

10    Q.  Have you been in the locker room at Remi Restaurant?

11    A.  Yes.  At one point I had a locker.

12    Q.  Did you ever see Sotarriba in the locker room?

13    A.  Yes.

14    Q.  Was there ever a time when you physically touched

15    Sotarriba's pants and attempted to pull them down while in the

16    locker room?

17              MR. DELANEY:  Objection, your Honor.  It is a leading

18    question.

19              THE COURT:  Objection sustained.

20              Let's take the morning break and come back in about

21    five minutes.

22              (Recess)

23              THE COURT:  Please proceed.

24    BY MR. PARKER:

25    Q.  Mr. Velandia, other than the mutual touching between you
```

C44dcar3                    Velandia - direct

1   and Sotarriba of buttocks and the genital area with your hands,

2   was there any other type of touching between the two of you

3   that occurred?

4   A.   Well, yes.   There were times when we were playing.

5   Somebody would squat down to pick something up.   Another guy

6   would just come from behind and approach, touch him with his

7   genitals, that other guy's buttocks, as if to simulate a sexual

8   act.

9   Q.   Did that, what you just described, ever occur between you

10  and Sotarriba?

11  A.   Yes, I think that occurred also.   Yes.   Also, I think if I

12  ever bent over to pick something up, like a napkin, a dish or

13  something, then he will come around to the front and take my

14  head and simulate and push it towards his genitals as though --

15  as a sexual act as well.

16  Q.   When did he do that?

17  A.   That was also part of the playing around.

18  Q.   During what period of time?

19  A.   Well, in the period of time that when these things started

20  happening, when we started becoming familiar in the friendship,

21  until they stopped.

22          THE COURT:   He would come around to the front of your

23  body?

24          THE WITNESS:   Yes, to the front side.

25          THE COURT:   And to the rear?

C44dcar3                       Velandia - direct

1             THE WITNESS:  Both things, the front or the back; it

2     could be both.

3             THE COURT:  And what about you doing the same thing to

4     him when he bent over to pick up a napkin?

5             THE WITNESS:  Yes.  I did either touch the back or the

6     front, but I never liked the situation or the action which I

7     would touch him with my genitals.  I never did.

8             THE COURT:  Did you ever touch him with your genitals,

9     bare genitals?

10            THE WITNESS:  No.

11            THE COURT:  Did you ever touch him on his bare

12    genitals?

13            THE WITNESS:  No.

14            THE COURT:  Always outside the clothing?

15            THE WITNESS:  Yes, always outside the clothing.

16            THE COURT:  You never put your hand down his pants?

17            THE WITNESS:  In Sotarriba's pants?  No, never.

18            THE COURT:  All right.

19    BY MR. PARKER:

20    Q.  Did you ever attempt to pull Sotarriba's pants down?

21    A.  No.

22            THE COURT:  Did you observe his pants being pulled

23    down?

24            THE WITNESS:  No.  I didn't observe that either, your

25    Honor.

C44dcar3                              Velandia - direct

1          THE COURT:  Did you observe other people pulling his

2     pants down?

3          THE WITNESS:  I never saw him play in that manner with

4     any other person.

5     BY MR. PARKER:

6     Q.  Did you, on these occasions where you and Sotarriba engaged

7     in touching of one another, did you observe his reactions to

8     those events?

9          THE COURT:  Reaction to what?

10          MR. PARKER:  A reaction to the touching.

11    A.  It was just to laugh, because remember that the objective

12    of this form of touching was just to cause laugh in the others.

13    Q.  Well, how did Sotarriba react?

14    A.  Oh, normal.  He would either turn around and touch me or

15    touch the other person or just use words.

16    Q.  What words?

17    A.  If, for example, someone would tell him "You're my puta,"

18    or my whore, he would say, "No, you're my puta," or my whore.

19    Q.  Did Sotarriba ever ask you to stop touching him in the

20    manner you described?

21    A.  No.  He never did.

22          THE COURT:  Did anyone else touch him in that manner?

23          THE WITNESS:  Yes, your Honor.  All the friends of his

24    would touch him that way.

25          THE COURT:  Who?

1           THE WITNESS:  Like I said before, he used to get along

2      with people in the kitchen.  For example, Luis Martinez.  The

3      other cooks, they used to get along in that manner but I don't

4      recall their names.  And he used to get along in that manner

5      with Sergio Pastor.  Also with Caravantes.  Also with a busboy

6      called Leonardo.  So, well, those are the names I can recall

7      right now.

8      Q.  Did Sotarriba ever physically push you away at any time you

9      touched him or attempted to touch him in the way you have

10     described?

11     A.  No.  Never.

12          THE COURT:  He told you he was not gay, is that right?

13          THE WITNESS:  No, your Honor.  He never said that to

14     me.

15          THE COURT:  He never said that he was heterosexual?

16          THE WITNESS:  No.  He didn't mention that he was

17     heterosexual either.

18          THE COURT:  You thought he was heterosexual?

19          THE WITNESS:  Yes, because of his demeanor.

20          THE COURT:  What in his demeanor caused you to believe

21     that he was heterosexual?

22          THE WITNESS:  Because I never observed him making any

23     advances to any other men or making any other comment which

24     would lead me to think he was gay.

25          THE COURT:  You are saying that the playing around

C44dcar3                       Velandia - direct

1    that you have been referring to was engaged in by

2    heterosexuals, by people you believed to be heterosexual, as

3    well as homosexuals?

4             THE WITNESS:  Yes, your Honor.  In fact, that kind of

5    playing around has been established by heterosexuals.

6             THE COURT:  How?  How would they establish that

7    playing around?

8             THE WITNESS:  I don't know, your Honor.  But from all

9    the Mexicans, it must be in their culture because all the

10   Mexicans working in the restaurant, they are all heterosexuals

11   and they all joke in that manner.

12            THE COURT:  That's why you believe heterosexuals

13   established the playing around?

14            THE WITNESS:  (Through Interpreter) No, your Honor.  I

15   don't think that they are heterosexual because they --

16            THE WITNESS:  (To Interpreter) No.  No.  No.

17            (Through Interpreter) They play in such a manner even

18   though they're heterosexual, but that doesn't cause me to think

19   that they were gay or that they may be bisexual either.

20            THE COURT:  All right.

21   BY MR. PARKER:

22   Q.  Did Sotarriba ever say anything to you which indicated to

23   you that any of the touching that you've described was

24   unwelcome to him?

25   A.  No.  He never said anything to me.

C44dcar3                    Velandia - direct

1    Q.  Did you ever threaten to Sotarriba that you were going to

2    fire him?

3    A.  No.  I never did that.

4    Q.  Did you ever have any conversation with Sotarriba about the

5    potential of him becoming a waiter at Remi?

6    A.  No.

7              THE COURT:  Did he ever ask you about becoming a

8    waiter?

9              THE WITNESS:  No, your Honor, and I will explain to

10   you the reason why not.

11             Francisco Sotarriba became a food runner before the

12   new administration, or management, rather.  When he came to be

13   a runner, the policy was to pay the runner the same as the

14   waiter, one point.  When the new management came in, they

15   changed that policy and then they established that a food

16   runner is now earning only .75.  Bearing in consideration that

17   he was the only old runner, because the rest of them were new,

18   so the new ones started earning .75, and he always continued to

19   earn the same as a waiter until the day he left.  Therefore, he

20   didn't have any good reasons for becoming a waiter because his

21   tips were not increased.

22             THE COURT:  In addition to tips, did waiters and other

23   employees get a salary?

24             THE WITNESS:  Yes.  We get paid for the hours.

25             THE COURT:  What rate do the waiters get?

C44dcar3                        Velandia - direct

1              THE WITNESS:  Waiters and food runners earn the same,

2     which I think currently is 6.25 or 7.75, something like that.

3              THE COURT:  And that was true under the old

4     management?

5              THE WITNESS:  Yes, it was the same.

6              THE COURT:  And it was also true under the new

7     management?

8              THE WITNESS:  Yes, your Honor.

9              THE COURT:  OK.

10    BY MR. PARKER:

11    Q.  Mr. Velandia, referring back to your earlier testimony

12    about the touching that you and Caravantes engaged in together,

13    at any of those times did either of you make oral comments to

14    the other?

15    A.  I think there could have been comments, but I don't recall

16    specific words.

17    Q.  Do you know Sergio Pastor?

18    A.  Yes, I know him.

19    Q.  How do you know him?

20    A.  He came to work at Remi's also.

21    Q.  What was his job at Remi?

22    A.  Initially, I think it was either a white jacket or a

23    dishwasher, but I'm not sure.

24    Q.  Do you remember when, the period of time during which he

25    worked at Remi?

C44dcar3                          Velandia - direct

1    A.  I think perhaps he started working in 2003 or 2004.

2    Q.  And when did he leave?

3    A.  I think it was in 2007 but I'm not sure.  I think it was

4    2007.

5    Q.  Were there any occasions where -- you testified earlier

6    that you observed Sotarriba and Sergio Pastor engaged in

7    touching.  What did you see them do together?

8    A.  They had more opportunities of playing around like that

9    because they together were food runners simultaneously.  And

10   the same thing, I would see the same thing, them touching each

11   other's behind or simulating sexual acts and things of that

12   nature.

13   Q.  Did you and Sergio Pastor ever engage in any of the type of

14   touching you've described here today?

15   A.  Yes.  We did, too.

16   Q.  What specifically did you do and did he do?

17   A.  He would usually touch me on the rear or, also, come from

18   behind and simulate a sexual act, or usually I would also touch

19   him in his behind or the front side.

20   Q.  Did you ever proposition Sergio Pastor to engage in any

21   sexual act with you?

22   A.  No.  Never.

23   Q.  Did you ever perform oral sex on Sergio Pastor?

24   A.  No.

25   Q.  Did you ever attempt in any way to convince him to engage

C44dcar3                        Velandia - direct

1    in oral sex with you?

2    A.  No.

3    Q.  Did you ever put your hand inside Sergio Pastor's pants for

4    any reason?

5    A.  No.  Never.

6    Q.  Did your hand ever come in contact with the skin of Sergio

7    Pastor's genitals?

8    A.  No.  Never.

9    Q.  Are you familiar with the circumstances of Sergio Pastor's

10   departure from employment at Remi?

11   A.  Yes.  I heard what happened.

12   Q.  Did you have any personal involvement in any of the

13   circumstances leading up to his departure from Remi?

14             MR. DELANEY:  Objection.  Leading.

15             THE COURT:  Objection overruled.

16   A.  Mr. Parker, when you say a personal involvement, what are

17   you referring to?

18   Q.  Were you present at any meeting or discussion about Sergio

19   Pastor's departure from Remi?

20             MR. DELANEY:  Objection.  Leading.

21             THE COURT:  I will allow the question.

22   A.  Yes, I was present.

23             THE COURT:  Who else was present?

24             THE WITNESS:  Mr. Francesco Pistorio, Mr. Augustine

25   Pena, and Giovanni Pinato, the chef of the restaurant.

1              THE COURT:  Mr. Pastor was not present?

2              THE WITNESS:  Yes.  I'm sorry, your Honor.  Sergio

3    Pastor was there as well with us.

4              THE COURT:  Anyone else aside from Sergio Pastor?

5              THE WITNESS:  No.  Only the ones I just mentioned --

6    Mr. Pistorio, Mr. Augustine Pena, Giovanni Pinato, Oscar

7    Velandia and Sergio Pastor.

8    BY MR. PARKER:

9    Q.  Where did that meeting take place?

10   A.  The restaurant's office, which is located in the basement.

11   Q.  How did it come to be that you were in attendance at that

12   meeting?

13   A.  Because I understood from Mr. Pistorio that Sergio Pastor

14   engaged into a fight with Julio Cuellar.

15             THE COURT:  Was this before or after you received the

16   complaint?

17             THE WITNESS:  After.

18             (Pause)

19             I'm sorry.  I'll take that back.  Before.

20             THE COURT:  Why do you say that?

21             THE WITNESS:  Because I now recall that Sergio Pastor

22   wanted to file a complaint after he left the restaurant.

23             THE COURT:  A complaint against you?

24             THE WITNESS:  Yes.

25   BY MR. PARKER:

C44dcar3                         Velandia - direct

1   Q.  You were saying that you understood that there had been a

2   fight between Sergio Pastor and Cuellar?

3   A.  Correct.  And then the day these events occurred, I wasn't

4   there --

5            THE COURT:  What was your understanding of why you

6   were present if you weren't a part of the management?

7            THE WITNESS:  Because Mr. Pistorio asked me to

8   translate for Sergio Pastor.

9            THE COURT:  You come from Colombia, not Mexico?

10           THE WITNESS:  Yes, your Honor.

11           THE COURT:  And he speaks a Mexican dialect, right?

12           THE WITNESS:  No.  He also speaks Spanish, just like I

13   do.

14           THE COURT:  They are different dialects, aren't they?

15           THE WITNESS:  Well, your Honor, what I have understood

16   is that a dialect is like language or words that are different,

17   but there is not such a difference between us.

18           THE COURT:  Well, people translate from Mexican

19   different than they do from Colombian, don't they?  They

20   translate the Spanish differently, don't they?

21           THE WITNESS:  I'm not sure of that.

22           THE COURT:  Words have certain meanings depending on

23   which culture you come from, no?

24           THE WITNESS:  Yes.  Some words but....

25           THE COURT:  Like "puta"?

1              THE WITNESS:  No.  I think that's global, it's

2      international.  In all countries where Spanish is spoken, they

3      know what puta means.

4              THE COURT:  In some places it means "bitch," doesn't

5      it?

6              THE WITNESS:  Probably.

7              THE COURT:  In other places it means "prostitute,"

8      doesn't it?

9              THE WITNESS:  Yes.  Even in Colombia, like every

10     person could give it a slightly different meaning as they see

11     it fit, but the essence of the word is always the same.

12             THE COURT:  Puta in certain countries are fighting

13     words, no?

14             THE WITNESS:  Probably.

15             THE COURT:  Not "probably," yes or no?

16             THE WITNESS:  Your Honor, but what do you mean by a

17     fighting word?

18             THE COURT:  Make people angry.

19             THE WITNESS:  Yes.  I agree with you somehow.  But

20     then in our country, if there is a fight between two men, they

21     are not calling each other puta.  The word puta is only used to

22     refer to a woman.  So if there is a fight between two women,

23     they would call each other puta, or if there is one between a

24     man and a woman, but it's used by the men to use that against a

25     woman.

1            THE COURT:  Go ahead.

2     BY MR. PARKER:

3     Q.  Prior to this meeting, you said you had learned that there

4     had been a fight, correct?

5     A.  That's correct.

6            MR. DELANEY:  Objection.  Leading.

7            MR. PARKER:  I am just bringing him back to the

8     subject that he already testified to.

9            MR. DELANEY:  I don't think that was his testimony.

10           THE COURT:  Objection sustained as to whether or not

11    there was a fight between them, but I will allow it as to his

12    belief, his state of mind.

13           MR. PARKER:  May I have that question read back, your

14    Honor?

15           THE COURT:  Yes, you may.

16           (Question read)

17    A.  Correct.

18    Q.  Were you -- did you witness any altercation between Sergio

19    Pastor and Mr. Cuellar?

20    A.  No.  As I said before, it was my day off; I was not at the

21    restaurant.

22    Q.  Did you prior to the meeting that you identified with the

23    five individuals, including yourself, have any conversation

24    with Sergio Pastor about the meeting?

25    A.  No.  I didn't have any conversation.  Only that when I came

C44dcar3                        Velandia – direct

1    into the restaurant, everybody was talking about a fight.

2    Q.  Prior to the meeting that you've identified with Pena,

3    Pistorio, Giovanni, you and Sergio Pastor, did you ever tell

4    Sergio Pastor that you were going to fire him?

5    A.  No.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C44kcar4                         Velandia - direct

1   BY MR. PARKER:

2   Q.  Had you worked --

3          THE COURT:  Did you have a conversation with him prior

4   to the meeting, about the meeting?

5          THE WITNESS:  No, I didn't have any conversation

6   regarding the fight or what had happened.

7          THE COURT:  Did you have a conversation with him about

8   what was going to occur at the meeting?

9          THE WITNESS:  No, because Mr. Pistorio was the one who

10  was going to preside over the meeting, and I didn't know what

11  was going on his mind.

12         THE COURT:  Did you have any conversation with

13  Mr. Sergio Pastor about the nature of the meeting, before the

14  meeting?

15         THE WITNESS:  No, not before the meeting, no.

16         THE COURT:  He didn't ask you about the meeting,

17  before the meeting?

18         THE WITNESS:  No, it was a surprise that Sergio had

19  gotten fired, because even the day of the fight, Mr. Pistorio

20  was there and they closed the restaurant and nothing was said

21  to him.

22         THE COURT:  I asked you a question.  The question was:

23  Did Mr. Sergio Pastor ask you anything about the meeting before

24  the meeting?

25         THE WITNESS:  No, he didn't ask anything to me.

1           THE INTERPRETER:  "He didn't ask me anything."

2           THE COURT:  I didn't ask that.  I asked him whether

3   Mr. Pastor asked anything about the meeting, of Mr. Velandia.

4   Did he tell you about the meeting?

5           THE WITNESS:  Excuse me, your Honor, you are asking me

6   whether Sergio Pastor asked me anything or Mr. Pistorio asked?

7           THE COURT:  Sorry, Sergio Pastor, did he tell you that

8   the meeting was going to occur?

9           THE WITNESS:  No, your Honor, because he didn't know

10  the meeting was going to take place.

11          THE COURT:  Someone has to know that the meeting would

12  take place in order to attend the meeting.

13          THE WITNESS:  OK, now I understand, your Honor.  What

14  happened is that Mr. Pistorio called for the meeting, called

15  Giovanni and Pena first --

16          THE COURT:  Were you present when he did that?

17          THE WITNESS:  -- and I was upstairs.

18          THE COURT:  Were you present when he called Pistorio

19  and Giovanni?

20          THE WITNESS:  No, I was upstairs.

21          THE COURT:  You don't know then.  I want to know what

22  you know.

23          THE WITNESS:  What I know is that Mr. Pistorio called

24  me while I was upstairs and told me to go look for Sergio and

25  bring him over, we're going to have a meeting.

C44kcar4                        Velandia - direct

1           THE COURT:  So did you go to look for Sergio?

2           THE WITNESS:  Yes.  I went downstairs and he was at

3    the runner station.  And all I said to him was, Mr. Pistorio

4    wants to speak with you.  And once we got to the office, Pena

5    and Mr. Giovanni was there already.

6           THE COURT:  Did Sergio Pastor ask you any questions

7    when you told him Mr. Pistorio wants to speak with you?

8           THE WITNESS:  No, he didn't ask me anything.  He just

9    followed me.

10          THE COURT:  Did you tell him, while you were walking

11   to the room, what the meeting was about?

12          THE WITNESS:  No, your Honor.  I didn't know what the

13   meeting was about.

14   BY MR. PARKER:

15   Q.  Did you bring Sergio Pastor into the meeting?

16   A.  Yes.  I entered the office with him.

17   Q.  What happened at that meeting?

18   A.  Then he told Mr. Pistorio that he assumed the reason why he

19   was being called into the office, because he had had a fight.

20   And Mr. Pistorio told him that he wanted me to be there to

21   interpret for them, and he also wanted Giovanni and Pena from

22   the kitchen to be there as well.

23          THE COURT:  Mr. Pistorio speaks Italian?

24          THE WITNESS:  Yes.

25          THE COURT:  As far as you know, Sergio Pastor doesn't

C44kcar4                          Velandia – direct

1    speak Italian; is that correct?

2              THE WITNESS:  Yes, that's correct, your Honor, but

3    Mr. Pistorio conducted the meeting in English.

4              THE COURT:  So you had to interpret for Mr. Sergio

5    Pastor into Spanish?

6              THE WITNESS:  Yes, that's correct.

7              THE COURT:  When you came into the room, you

8    translated for Mr. Pistorio and told Mr. Sergio Pastor that he

9    was being called into the office because he had had a fight?

10             THE WITNESS:  No, that's what Mr. Pistorio told him,

11   you know you had a fight and that's the reason why we're having

12   a meeting.

13             THE COURT:  And you translated that language?

14             THE WITNESS:  Yes, I translated, even though I know

15   that most of them understand English.  I did it because that's

16   what Mr. Pistorio wanted me to do.

17             THE COURT:  All right.

18   BY MR. PARKER:

19   Q.  After that was said, what happened?

20   A.  Then Mr. Pistorio asked -- he told Sergio that that was not

21   the first fight he had since he's been working there, and that

22   he told him that Julio Cuellar had gone the night before to the

23   police precinct to file a report.  And he told him, due to

24   those circumstances he had to fire him because he didn't -- he

25   couldn't allow that situation to go on there.

C44kcar4                        Velandia - direct

 1              THE COURT:  Because I didn't -- because you didn't

 2     allow that situation to go on there?

 3              THE WITNESS:  Mr. Pistorio said that he could not

 4     allow that to continue happening.

 5              THE COURT:  Earlier in your answer you said "because I

 6     couldn't allow the situation to go on there."

 7              THE WITNESS:  No, perhaps it was due to the

 8     translation.  But that's not what I told him.

 9              THE COURT:  Is that what you told the interpreter?

10              THE WITNESS:  I was interpreting, and those were the

11     words of Mr. Pistorio.

12              THE COURT:  Is that what you told the interpreter here

13     today?

14              THE WITNESS:  No, I told the interpreter that

15     Mr. Pistorio started speaking.  And those are not my words but

16     his.

17     BY MR. PARKER:

18     Q.  How did the meeting end?

19     A.  Sergio told him that he understood, and he left.

20     Q.  Did you play any role in the decision to terminate Sergio

21     Pastor's employment?

22     A.  No, I didn't have anything to do with that.

23              THE COURT:  Other than translating?

24              THE WITNESS:  Yes, sir, only translating.

25              THE COURT:  Did you give any report on how good a

C44kcar4                        Velandia - direct

1   worker Mr. Sergio Pastor was?

2                THE INTERPRETER:  Please read that back to me.

3                (Record read)

4                THE WITNESS:  I don't understand the question.

5                THE COURT:  During the meeting, did you give a report

6   on how good a worker Mr. Sergio Pastor was?

7                THE WITNESS:  No, your Honor.  Mr. Pistorio was the

8   one that mentioned.  He said to Sergio, you're a good worker

9   but because of your fight, I have to fire you.

10               THE COURT:  Did you give any report on his being --

11  Mr. Sergio Pastor being -- late, or other things that would

12  reflect on him?

13               THE WITNESS:  No, your Honor, because, as a matter of

14  fact, Sergio was always early to work, he was always a good

15  worker.  In the opinions regarding employees, only Mr. Pistorio

16  gives them.

17  BY MR. PARKER:

18  Q.  Did you know Moises Pastor?

19  A.  Yes, I met him too.

20  Q.  How did you know Moises Pastor?

21  A.  He came to work at the restaurant too.

22  Q.  What job did he have at the restaurant?

23  A.  I think he started as a white jacket or as a busboy.

24  Q.  Did he have any other jobs at Remi?

25  A.  No, I think all he did was a busboy.

1    Q.   When did Moises Pastor work at Remi?

2    A.   I think he came to work in 2005, because he came with the

3    new management.

4    Q.   Did you and Moises Pastor ever engage in the type of

5    touching of the buttocks and the genital area over the clothing

6    that you've described here today?

7    A.   Yes, sir, that too.

8    Q.   Describe those circumstances, please.

9    A.   Yes.  It was as I described before; it was touching and

10   exchanging words.

11   Q.   How frequently did that occur?

12   A.   Every now and then.

13   Q.   You said that there were comments.  What types of comments

14   were made by either one of you at the times that the touching

15   occurred?

16   A.   It was also the same words used, as just calling each other

17   mami and those other words.

18   Q.   Where did these events take place?

19   A.   The same manner, upstairs in the dining room or downstairs

20   in the kitchen.

21   Q.   Were there any times where you observed Moises Pastor

22   engage in that same kind of touching you described, and

23   comments you've described, with other employees at Remi other

24   than yourself?

25   A.   Yes, as well.

C44kcar4                        Velandia – direct

1    Q.  What other employees did you observe engage in that type of

2    conduct with Moises Pastor?

3    A.  Moises Pastor used to get along like that with Jose Ortiz

4    and myself and Mr. Sotarriba, and with other busboys but I

5    don't recall their names.  Perhaps he used to get along in the

6    same manner with Osvaldo.

7    Q.  Did you ever put your hand in Moises Pastor's pants?

8    A.  Please repeat the question.

9    Q.  Yes.  Did you ever put your hand in Moises Pastor's pants?

10   A.  No, never.

11   Q.  Did you ever touch the skin of his genital area with your

12   hand?

13   A.  No.

14   Q.  Did you ever perform oral sex on Moises Pastor?

15   A.  No.

16   Q.  Did you ever attempt in any way to do so?

17   A.  No.

18   Q.  Did you ever proposition Moises Pastor to engage in oral

19   sex with you?

20   A.  No, I never did that.

21   Q.  Did you ever engage in anal sex with Moises Pastor?

22   A.  No.

23   Q.  Did you ever proposition him to engage in anal sex with

24   you?

25   A.  No.

C44kcar4                     Velandia - direct

1   Q.  Were you aware of Moises Pastor's age at any time while he

2   worked at Remi?

3   A.  No.

4   Q.  Were you aware of Sergio Pastor's age at any time while he

5   worked at Remi?

6   A.  No, I never knew.  I never knew how old they were.

7   Q.  Other than the touching that occurred between the two of

8   you --

9           MR. PARKER:  Let me strike that.

10  Q.  Were there times when Moises Pastor touched you?

11  A.  Yes, he used to also touch me.

12  Q.  Where did he touch you?

13  A.  He used to touch my ass.

14  Q.  What did he touch your ass with?

15  A.  No, he used to touch my behind with his hand, and sometimes

16  he would do it with his genitals.

17  Q.  In what way did he do it with his genitals?

18  A.  Also suggested as though he was penetrating me, but he had

19  his pants on and so did I.

20          THE COURT:  Did he have an erection?

21          THE WITNESS:  No, no.

22  Q.  Were there ever any times where you sat on Moises Pastor's

23  lap?

24  A.  No.

25  Q.  While Moises Pastor was employed at Remi, was that during

C44kcar4                          Velandia – direct

1   the period of time when, as you had testified, you and Pablo

2   Solis were in charge of distributing tips?

3   A.  Yes, that's correct.

4   Q.  Did Remi have any policy during that time, or practice

5   during that time, about whether or not tip advances could be

6   given to employees?

7           MR. DELANEY:  Your Honor, I'll object; compound

8   question.  Policy and practice are two different things.

9           THE COURT:  Could you ask it differently?

10          MR. PARKER:  Yes, your Honor.

11  Q.  During the time that you were in charge of distributing

12  tips, along with Pablo Solis, was there any rule at Remi about

13  whether tip advances could be provided to employees?

14  A.  Well, there was not such a rule, but in case anybody -- for

15  example, Italian waiters, before they left, they would ask for

16  their tip even though it was not the day for them to get paid.

17  And when I say leaving, it's when they were going to leave the

18  country, that they needed to have the money quickly.

19          And so that's one of the instances in which an advance

20  would be given, but not everybody would be asking for advances.

21  I would say that's not our normal practice at Remi, that people

22  don't come to ask for advances.

23  Q.  Did Moises Pastor ever ask for tip advances?

24  A.  Yes, he did.

25          THE COURT:  Who?

C44kcar4                    Velandia — direct

1              MR. PARKER:  Moises Pastor.

2              THE COURT:  Of you?

3              THE WITNESS:  Yes, he asked me on some occasions,

4    because me and Pablo were in charge of distributing the money.

5    So sometimes if he asked Pablo for the money, Pablo would give

6    him some, but if Pablo wasn't in, then he would come to me.

7    BY MR. PARKER:

8    Q.  And were there times where you gave Moises Pastor tip

9    advances?

10   A.  Yes, sir.

11   Q.  Did you ever, as a condition of giving Moises Pastor a tip

12   advance, request oral sex from him?

13   A.  No, never.

14   Q.  Was there ever a time where --

15             THE COURT:  Did you ever have oral sex with him?

16             THE WITNESS:  No, your Honor, never.

17   Q.  Did you ever tell Moises Pastor that you were firing him

18   from Remi?

19   A.  No, never.

20   Q.  Would you turn in the --

21             THE COURT:  Let's take the luncheon break.  It's

22   1:00 o'clock.  We'll come back at 2:00.

23             (Luncheon recess)

24

25

C44kcar4

1                        AFTERNOON SESSION

2                           2:19 P.M.

3           (In open court)

4           THE COURT:  OK, continue.

5    OSCAR VELANDIA, resumed.

6    DIRECT EXAMINATION CONTINUED

7    BY MR. PARKER:

8    Q.  Mr. Velandia, you testified earlier that there were

9    occasions where you stayed at Remi Restaurant to close the

10   restaurant at night?

11   A.  Yes, that's correct.

12   Q.  What activities are involved in closing the restaurant at

13   night?

14   A.  At the end of the night, the report -- in order to close, I

15   have to wait for all waiters to finish.  And when each waiter

16   finishes, he gives me his report.  Then I print out a general

17   report, which includes everything.  Then, after that, I have to

18   take everything, put it together, bring it into the office,

19   including the cash.  Then I put it in the safe box, then I go

20   upstairs and I start closing all the doors.  Then I finally

21   turn off all the lights.  Then I -- I also turn out the light

22   from the bar, and I physically exit the restaurant, and then I

23   close the door behind me.

24           THE COURT:  What do you do with the keys?

25           THE WITNESS:  The front door's key, I keep it with me.

C44kcar4

1    Q.  On any of those occasions where you closed the restaurant,

2    was Mr. Caravantes present?

3    A.  Yes.  The period that he was assigned to work, from

4    12:00 to 2:00 in the morning, he was there.  But after that

5    time period was over, he was no longer there.

6    Q.  During the time that --

7            THE COURT:  Was anyone else present during that

8    period?

9            THE WITNESS:  Yes, your Honor.  Sometimes the closing

10   waiter was waiting as well as the bartender would wait for me,

11   Jose Ortiz.

12   BY MR. PARKER:

13   Q.  During the time when Caravantes was staying at the

14   restaurant until 2:00 a.m., who left first, you or Caravantes,

15   when you closed the doors?

16   A.  No, I always used to come out first and close the door and

17   he would stay inside.

18           THE COURT:  What about the other men or the other

19   closing waiter and the bartender?

20           THE WITNESS:  If anybody else was there, they would

21   have to leave with me, because only Caravantes would be allowed

22   to stay in the restaurant and the two dishwashers who were

23   cleaning downstairs, the porters.

24           THE COURT:  What period of time are we talking about,

25   Mr. Parker?  I don't understand the testimony.

C44kcar4

```
 1              MR. PARKER:  I'll ask that question, Judge, to make it
 2      clear.
 3      BY MR. PARKER:
 4      Q.  You said there was a time period when Caravantes was
 5      working from midnight till 2:00 a.m. in the restaurant.
 6              Approximately when was that?
 7      A.  Well, I really don't know the exact date when he started
 8      working, but he worked from 12:00 to 2:00, but he would have to
 9      wait for the porters to leave before he would leave.  And that
10      happened during the new administration.
11      Q.  Would you turn, please, in the exhibit book, the
12      Defendants' Exhibit book, to tab 62.
13      A.  From Plaintiff or Defendants'?
14      Q.  Defendants'.
15      A.  OK, I got it.
16      Q.  Do you have D62?
17      A.  Yes, sir, I have it.
18      Q.  Do you know what that photograph represents?
19      A.  Yes.  This is the front of the restaurant.
20      Q.  The photograph shows two doors on the right-hand side, with
21      writing above it, "145 W 53," are they the front doors to the
22      restaurant?
23      A.  Yes.  That's the main door for access to the restaurant.
24      Q.  When you closed the restaurant, did you lock these doors?
25      A.  Yes.  These are the last doors that have to be locked in
```

C44kcar4

```
 1   order to secure the restaurant.
 2   Q.  How do you lock these two doors?
 3   A.  Both doors have on the lower part, they have a lock.  And
 4   there is a master key; with only one key you close or you lock
 5   both locks.
 6   Q.  Where are the locks on the doors?
 7   A.  All the way down the bottom, the lower portion of the door.
 8   Q.  There appear to be two circles on the photograph down near
 9   the very bottom of the doors.  Are they the locks?
10   A.  Yes, those are the locks.
11   Q.  Were there ever times when you locked these doors from the
12   outside, when Caravantes was still inside the restaurant?
13   A.  Yes.  Each time I was doing the closing, I will lock the
14   doors -- I would exit and then lock the doors, and he would
15   remain inside.
16   Q.  Was there ever a time when Caravantes was standing
17   immediately on the other side of the door while you were
18   locking the door?
19   A.  Yes.  Sometimes he would physically walk with me to the
20   door, bid me farewell, and I would go to the other side of the
21   glass doors.  And he would be inside, right on the other side
22   of the doors.
23   Q.  Were there ever any occasions where he said or did anything
24   from the other side of the door while you were locking the
25   door?
```

C44kcar4

1   A.  Yes.  Sometimes -- normally jokingly, as I would bend over

2   or squat down to close the bottom locks, which are by the

3   floor, he would approach the door and place or press his

4   genitals against the glass of the door as I was closing, and he

5   would motion from side to side, and then his genitals would be

6   on the other side of the door but in front of my face.

7   Q.  What did you understand him to be doing?

8   A.  Well, he was suggesting that, as he was pressing his

9   genitals against the door -- it was making believe like he was

10  doing it in front of my face.

11  Q.  Did he ever do that in the presence of anyone else?

12  A.  Yes.  Sometimes he had done it in front of the bartender,

13  whose name is Jose Ortiz.  And while he was rubbing his

14  genitals against the door, he would just laugh and watching for

15  a reaction.

16  Q.  How many times did he do that, Mr. Velandia?

17  A.  He did that many times.

18          THE COURT:  He was fully clothed, though, right?  He

19  was fully clothed?

20          THE WITNESS:  Yes, he was fully clothed.

21          MR. PARKER:  I have no further questions.

22          THE COURT:  Cross-examination?

23          If he was still inside the restaurant and you had

24  locked the doors, how did he get out?

25          THE WITNESS:  There are two lateral emergency doors,

C44kcar4

exits, which are facing the atrium.  And as per orders of the

fire department, those don't bear locks; they're opened simply

by pressing a lever.  And that's the door that Caravantes would

use when he was leaving with the porters.  And once the door

closes, there is no way you can reopen it.

          And then they would walk either out the door through

54th Street or 53rd, through some gates which are placed there

at 7:00 at night.

          THE COURT:  OK.  When you left the restaurant, after

having had sex with Mr. Caravantes, what door would you use to

exit?  Would it be before or after you locked the front doors?

          THE WITNESS:  Your Honor, when this was going to

occur, I would usually close the door from inside.  And after

the encounter is over, then I would unlock the front door again

and leave through that door.  I would close it, lock it back.

          (Continued on next page)

1           THE COURT:  All right.  Please proceed, Mr. Delaney.

2           MR. DELANEY:  Your Honor, I am going to hand up the

3    deposition transcripts.

4           THE COURT:  Yes.  We need a copy.

5    CROSS-EXAMINATION (Through the Interpreter)

6    BY MR. DELANEY:

7    Q.  Mr. Velandia, you became headwaiter in 2005, correct?

8    A.  Approximately between 2005 and 2006.

9    Q.  You were the only headwaiter at that time?

10   A.  No.  But there were others.  There were others.

11   Q.  Prior to that time there was no headwaiter position,

12   correct?

13   A.  No, not during the old management.

14   Q.  When the new management took over in April 2005, there was

15   no headwaiter position?

16   A.  No.  No, sir.

17   Q.  There was no headwaiter position until you were made

18   headwaiter by Mr. Pistorio?

19   A.  I would say yes.

20   Q.  Now, yesterday you said there were other headwaiters.  One

21   of them was Alessandro Mancino?

22   A.  Yes.  Correct.

23   Q.  And Michelle Tabossi?

24   A.  Yes.

25   Q.  I am going to ask you to look in the plaintiffs' exhibit

C44dcar5                          Velandia - cross

1    binders on P-110.  So it is Tab 110 of the exhibit binders.

2              That is the deposition binder.  I think you are

3    looking for the big ones up front there.

4              THE COURT:  You are going to exhibit binders now?

5              MR. DELANEY:  Yes, sir.

6              THE COURT:  110?

7              MR. DELANEY:  110.

8              THE COURT:  All right.

9              THE INTERPRETER:  You said 110?

10             MR. DELANEY:  110.

11             THE INTERPRETER:  P, Plaintiffs'.

12             MR. DELANEY:  P-110.

13             THE COURT:  All right.  I have it.

14             MR. DELANEY:  I am just waiting for the witness, your

15   Honor.

16             (Pause)

17             THE COURT:  Do you have a question?

18             MR. DELANEY:  Yes, your Honor.  I am just waiting for

19   the witness to find the exhibit.

20             The tabs are sequentially numbered so it is 109, 110.

21             THE COURT:  What are you looking for?  110?

22             (Pause)

23             It would speed things up, Mr. Delaney, if you could

24   step up and pick out the exhibits so that he can look at it.

25             MR. DELANEY:  I would be happy to, your Honor.

C44dcar5                    Velandia - cross

1           THE COURT:  Instead of standing there.

2    BY MR. DELANEY:

3    Q.  Do you have 110 in front of you, Mr. Velandia?

4    A.  Yes.

5    Q.  You recognize this as these are the work schedules we

6    discussed yesterday, correct, or you discussed with Mr. Parker?

7    A.  Yes, correct.

8    Q.  Can you turn -- do you see on the bottom, Mr. Velandia, do

9    you see it says, "Page 1 of 60," do you see that?

10   A.  Yes.

11   Q.  Can you turn to page 8 -- 8 -- of 60 for me.

12   A.  I got it.

13   Q.  I'm going to direct your attention to the top left of the

14   document.  Do you see your name?

15   A.  Yes.

16   Q.  And do you see next to it the words "Head Server"?

17   A.  Yes, I see it.

18   Q.  If you go down four rows, do you see the name Michelle

19   Tabossi?

20   A.  Yes, I see it.

21   Q.  And we can agree that next to Mr. Tabossi's name it just

22   says "server," correct?

23   A.  Yes, correct.

24   Q.  It does not say head server?

25   A.  Yes, correct.

C44dcar5                          Velandia - cross

1  Q.  If you go down five more rows, do you see Alessandro

2  Mancino?

3  A.  I see it.

4  Q.  And do you see next to his name, it says "new server,"

5  correct?

6  A.  Yes.

7  Q.  It also does not say head server?

8  A.  No.

9  Q.  Can you turn to page 22 of Plaintiffs' 110.

10          THE COURT:  What page?

11          MR. DELANEY:  22 of Plaintiffs' 110.

12          THE COURT:  22 of 60?

13          MR. DELANEY:  Yes, your Honor.

14  Q.  Again, I will direct your attention to the top left.

15          Do you see your name there?

16  A.  OK.

17  Q.  And do you see to the right it says "Head Server" again?

18  A.  Yes.

19  Q.  And if you go about two-thirds of the way down, under the

20  servers, do you see Alessandro Mancino again?

21  A.  Yes.

22  Q.  And to the right of his name it just says "server,"

23  correct?

24  A.  Yes.  It says just server.

25  Q.  It does not say head server, does it?

C44dcar5                    Velandia – cross

1   A.  Yes.  So I actually have to call your attention to the fact

2   that when Alessandro Mancino came from Florida, Mr. Pistorio

3   already knew him and so he would also give him attributes,

4   those of a headwaiter.  And the same situation with Michelle

5   Tabossi.

6   Q.  Mr. Velandia, your testimony was that they were head

7   servers, correct; and they do not appear as head servers on

8   these schedules, do they?

9   A.  Not on the schedule.

10  Q.  In fact, only you appear as head server on these schedules?

11  A.  Correct.  On that schedule, yes.

12  Q.  And another head server you named -- or another person you

13  named as a head server yesterday was Stacy Crowe, correct?

14  A.  Yes, correct.

15  Q.  Now, Ms. Crowe did not start at the restaurant until 2008,

16  correct?

17  A.  Yes, that's correct.

18  Q.  And if you turn to page 34 -- I apologize, page 35 of

19  Plaintiffs' 110.

20  A.  OK.

21  Q.  Now, this document doesn't have a date on it, but I'll

22  represent to you it is in November 2008.

23          Do you see Ms. Crowe's name about two-thirds of the

24  way down under the servers.

25          MR. DELANEY:  Under the servers, Randall.  Right

C44dcar5                          Velandia - cross

1    there.

2    A.  Yes.

3    Q.  Again, to the right, she is just listed as a server,

4    correct?

5    A.  Yes.  Initially she started out as a waitress.  Then she

6    was promoted to head waitress.

7    Q.  Now, November of 2008 --

8              THE COURT:  This is what exhibit?

9              MR. DELANEY:  This is Plaintiffs' Exhibit 110.

10             THE COURT:  Page?

11             MR. DELANEY:  Page 35 of 60, your Honor.

12             THE COURT:  All right.

13   Q.  So your testimony is Ms. Crowe was made a head server after

14   this point?

15   A.  Yes.

16   Q.  And we can agree that November 2008 is after Mr. Caravantes

17   left the restaurant?

18   A.  Correct.

19   Q.  We can also agree that Mr. Pistorio left the restaurant

20   before November 2008, correct?

21   A.  Yes, that too.

22   Q.  In fact, Mr. Pistorio left the restaurant in May 2008,

23   correct?

24   A.  Yes, that's correct.

25   Q.  So Ms. Crowe was not made a head server during the time

C44dcar5                        Velandia - cross

1    Mr. Pistorio was there?

2    A.  No.  That's correct.

3            THE COURT:  Mr. Velandia, do you see the name of

4    Alvise Marangoni on that page, page 110, page 35 of 60?

5            THE WITNESS:  Yes, your Honor.  I see it.

6            THE COURT:  And what position is he said to hold?

7            THE WITNESS:  There he's -- his position is head

8    server.

9            THE COURT:  Is your name on that list?

10           THE WITNESS:  Yes, sir.

11           THE COURT:  What position would you have been, does

12   that have you listed as?

13           THE WITNESS:  It says "party manager" there.

14           THE COURT:  Does that mean you were in the Rialto

15   Room?

16           THE WITNESS:  Correct, your Honor.

17           THE COURT:  And you were the manager?

18           THE WITNESS:  That's when that first started.

19           THE COURT:  Well, no.  This I think is dated after

20   Mr. Caravantes had left.

21           THE WITNESS:  Correct, your Honor.

22   BY MR. DELANEY:

23   Q.  Mr. Velandia, staying with Plaintiffs' Exhibit 110, can you

24   go one page before, on page 34 of 60.

25   A.  Yes.

C44dcar5                      Velandia - cross

1   Q.  Again, do you see your name at the top?  It says, "Oscar

2   Velandia, head server."

3   A.  Yes, correct.

4   Q.  And do you see four lines down, it says Alvise Marangoni?

5   A.  Yes.

6   Q.  And he's just listed as a server, correct?

7   A.  Yes.  He also started only as waiter.

8   Q.  Now, if you look at the top, the top right, do you see it

9   says, "Francisco Pistorio, GM," very small?

10  A.  Yes, correct.  I see it.

11  Q.  And it says May 23, 2008?

12  A.  Yes, correct.

13  Q.  So, again, Alvise Marangoni was not a head server when

14  Mr. Pistorio was there, correct?

15          THE COURT:  What is your question?

16          MR. DELANEY:  Let me ask a different question, your

17  Honor.

18  Q.  May 23, 2008 was approximately the time that Mr. Pistorio

19  left the restaurant, correct?

20  A.  Approximately, yes.

21  Q.  So we can agree, at least on this schedule Mr. Marangoni

22  was not a head server?

23  A.  No.  Not yet.

24  Q.  And so Mr. Pistorio did not make him a head server?

25  A.  No.

1   Q.  So he was made a head server later by Mr. Maggi, perhaps?

2   A.  Perhaps.

3   Q.  Now, yesterday --

4           THE COURT:  How about the other people?  Were they

5   made head servers after Mr. Pistorio at the restaurant?

6           THE WITNESS:  Carlo promoted Stacy Crowe as head

7   server.

8           THE COURT:  After Mr. Pistorio left the restaurant?

9           THE WITNESS:  Yes, that's correct, your Honor.

10          THE COURT:  Now, would more than one person be head

11  server on a shift?

12          THE WITNESS:  No, your Honor.  In one shift there was

13  only one head server.  In the occasions where Michelle --

14  Alessandro Mancino, Michelle Tabossi, the only reason they

15  would act as head server, even if I was on the schedule, is if

16  I wasn't able to come to work.  Then Mr. Pistorio obviously

17  would have to designate someone to close and act as such

18  because he would leave earlier.

19  BY MR. DELANEY:

20  Q.  Now, you testified yesterday that you were able to void

21  customer orders, correct?

22  A.  Yes, that's correct.

23  Q.  And Mr. Pistorio could also void customer orders?

24  A.  Yes, that too.

25  Q.  Did you -- you started to be able to void orders when you

C44dcar5                        Velandia - cross

1   became a head server, correct?

2   A.  That's correct.

3   Q.  That was in late 2005?

4   A.  Yes, possibly.

5   Q.  So you could void orders in 2006, as well?

6   A.  Yes.

7   Q.  2007?

8   A.  Yes.

9   Q.  2008?

10  A.  Yes.

11  Q.  And each time you voided an order, it would print a

12  receipt, correct?

13  A.  Yes, that's correct.

14  Q.  And we saw one of those receipts yesterday?

15  A.  Yes, that's correct.

16  Q.  And it had the words "MGR" on it?

17  A.  Yes, that's correct.

18  Q.  And every time you voided one of these receipts, would it

19  have the words "MGR" on it?

20  A.  Yes, that's correct.

21  Q.  And that is signified because the computer -- you had

22  manager level access to the computer, correct?

23  A.  Yes, that's correct.

24  Q.  And these receipts, other employees saw these receipts,

25  correct?

C44dcar5                    Velandia - cross

1    A.   Yes.

2    Q.   The busboys would see these receipts?

3    A.   Not the busboys but possibly the food runners as well as

4    the person who was working at the coffee station or also the

5    bartender.

6              THE COURT:  Would they have "MGR" on them when they

7    saw them?

8              THE WITNESS:  Yes, your Honor.  They would bear "MGR."

9              THE COURT:  Would they have any identification of you

10   on them?

11             THE WITNESS:  Yes.  It would bear my name and next to

12   it "MGR."

13             THE COURT:  And your number?

14             THE WITNESS:  No name and number, your Honor, but the

15   name and the word MGR.

16             THE COURT:  On the receipt?

17             THE WITNESS:  Yes, your Honor.

18   BY MR. DELANEY:

19   Q.   I will ask you to turn to Plaintiffs' Exhibit 11.

20             MR. DELANEY:  Your Honor, I am just going to help the

21   witness.

22             THE COURT:  I see this is very important.

23             THE INTERPRETER:  This is what?  The plaintiffs'?

24             MR. DELANEY:  Yes.

25             THE INTERPRETER:  Oh, there are two binders.

C44dcar5                         Velandia – cross

1          (Pause)

2                MR. DELANEY:  I have other copies here, your Honor.

3    BY MR. DELANEY:

4    Q.  So, Mr. Velandia, Mr. Parker discussed this with you

5    yesterday, but this is the kind of voided receipt you are

6    talking about, correct?

7    A.  Yes, that's correct.

8    Q.  Where on the receipt it says "Oscar V." and next to it it

9    says "MGR"?

10   A.  Yes, that's correct.

11   Q.  So, again, all the receipts when you void them, they looked

12   like this, correct, more or less?

13   A.  Yes, correct.

14               MR. DELANEY:  Your Honor, we move Plaintiffs' Exhibit

15   11 into evidence.

16               THE COURT:  Plaintiffs' Exhibit 11 is admitted in

17   evidence.

18               (Plaintiff's Exhibit 11 received in evidence)

19   BY MR. DELANEY:

20   Q.  Now, Mr. Velandia, you also led the shift meetings on

21   occasion, correct?

22   A.  Yes, correct.

23   Q.  These were the meetings that occurred at the beginning of

24   the lunch shift, for example?

25   A.  Yes, correct.

C44dcar5                    Velandia - cross

1   Q.  Or also the meetings that occurred at the beginning of the

2   dinner shift?

3   A.  Yes, correct.

4   Q.  And when you led these meetings, you would speak to the

5   employees?

6   A.  Yes.

7   Q.  In your testimony yesterday, you said you only spoke of

8   menus, is that correct?

9   A.  No -- yes, I would talk not only about menus but also about

10  the number of people or size of parties that we were having.

11  We were -- and how the night was expected to be so that we can

12  prepare for it.

13  Q.  And so when you spoke of meetings, you would speak of how

14  the night was going to be and how to prepare for it, correct?

15  A.  Yes, that is correct.

16  Q.  And when you led these meetings, you stood at the front, in

17  front of all the employees?

18  A.  Yes.  I guess I would be around because the restaurant is

19  narrow and we would meet in a circle.  Some would stand up and

20  others would sit down.

21  Q.  But you would be standing.

22         THE INTERPRETER:  I'm sorry?

23  Q.  Mr. Velandia, you would be standing, correct, when you led

24  the meetings?

25  A.  Yes.

C44dcar5                        Velandia - cross

1    Q.  And there were also meetings before private parties?

2    A.  Yes, correct.

3    Q.  And when you were headwaiter, you would also lead these

4    meetings before private parties?

5    A.  Correct.

6    Q.  And did you lead these meetings in 2006, the private-party

7    meetings?

8    A.  No.  In 2006, I didn't do the parties, or partially in

9    2006, Luigi Martini was the one in charge and after that

10   Michelle Tabossi was in charge of this.

11   Q.  Just to be clear, in 2006 you never led one of the

12   private-party meetings?

13   A.  It is possible that I may have done one of the parties when

14   there were multiple parties.  I would help Mr. Michelle with

15   one of the parties.

16   Q.  And in 2007 -- I'm sorry.  Let me rephrase it.

17          In 2007, you led these private-party meetings?

18   A.  Yes, if Michelle needed help with a party, yes.

19   Q.  And in 2008 you became a party manager, correct?

20   A.  Yes, that's correct.

21   Q.  Prior to you becoming party manager, did you lead any of

22   the private-party meetings in 2008?

23   A.  Yes.  How I said before, that may have occurred but I'm not

24   sure.

25   Q.  And on occasion Mr. Pistorio would also have larger staff

C44dcar5                    Velandia - cross

1  meetings?

2  A.  Yes.  That's correct.

3  Q.  When he would ask all the employees to be there?

4  A.  Yes.  If he wanted everyone to be there, he would make a

5  memo and he would post it on the board, and he would write in

6  it that it was mandatory.

7  Q.  And you attended one of these meetings, correct?

8  A.  Yes.

9  Q.  Did you attend more than one?

10 A.  Yes.  I think so.

11 Q.  And at the meetings you attended, Mr. Pistorio stood at the

12 front of the employees, correct?

13 A.  Normally when these meetings took place, we would do it in

14 the Rialto and everybody would sit around in a circle and

15 Mr. Pistorio would be in the front.

16 Q.  He would be standing?

17 A.  Yes.  He was standing.

18 Q.  And at these meetings you translated for Mr. Pistorio,

19 correct?

20 A.  Yes.

21 Q.  And you would be standing beside him?

22 A.  Not usually.

23 Q.  Sorry.  You would be standing beside him?

24 A.  Sometimes I was next to him.  Other times I would be facing

25 him but on the other side of the circle.

C44dcar5                    Velandia - cross

1   Q.  When you were translating for him, would you be standing

2   beside him?

3   A.  Sometimes.

4   Q.  Now, in front of all the employees?

5   A.  Among the employees because, like I said before, it was a

6   circle so there was no front or back of the circle.

7   Q.  Mr. Pistorio was standing at the front of the circle?

8   A.  Yes, if you like to call it that way, but I don't

9   understand.  If there is a circle and he's standing in the

10  middle of the circle, I don't know what you're calling the

11  front of the circle.

12  Q.  I apologize.  I didn't understand that he was standing in

13  the middle of the circle.  I'll move on.

14          So you said yesterday you translated for Mr. Pistorio

15  on occasion with other workers, correct?

16  A.  Yes, sir, that's correct.

17  Q.  And you would translate, for example, when an employee

18  wanted to go home sick?

19  A.  Well, I don't have the recollection that he had exactly

20  called me to do that, help him do that, but perhaps.

21  Q.  We could agree that on occasion you translated for

22  Mr. Pistorio --

23          THE COURT:  Objection sustained to the form of the

24  question.

25  Q.  You did translate for Mr. Pistorio?

C44dcar5                    Velandia - cross

1    A.  If Mr. Pistorio would ask me for some type of help, yes.

2    Q.  And Mr. Augustine Pena would also translate for

3    Mr. Pistorio?

4    A.  Yes, I think so.

5    Q.  And Mr. Pena spoke Spanish?

6    A.  Yes, he spoke Spanish.

7    Q.  And the chef, Giovanni Pinato, also spoke Spanish, correct?

8    A.  Yes.

9    Q.  And he would also translate for Mr. Pistorio?

10   A.  Yes, he used to also translate.

11   Q.  And Mr. Pena was an assistant manager at the restaurant,

12   correct?

13   A.  Pena was in charge of the kitchen.

14   Q.  He was the manager of the kitchen?

15          THE COURT:  Do you know?

16   A.  I don't know.  He was -- like I said before, he was in

17   charge of the kitchen before, but nobody would refer to him as

18   the manager.

19   Q.  Mr. Pinato, he was the executive chef?

20   A.  That is correct.

21          THE COURT:  Aren't we getting a little far afield?

22   BY MR. DELANEY:

23   Q.  Now, you testified yesterday that Mr. Pistorio did all the

24   hiring, correct?

25   A.  Yes, that's correct.

C44dcar5                    Velandia - cross

1    Q.  And that you never did any hiring of the new employees?

2    A.  No, I never hired anyone.

3    Q.  You did participate in some of these -- I'm sorry.  Let me

4    rephrase.

5         When Mr. Pistorio hired new employees, he would hold

6    interviews, correct?

7    A.  Yes, that's correct.

8    Q.  So he would interview the new employees?

9    A.  Yes, that's correct.

10   Q.  And you participated in some of these interviews?

11   A.  Only if he was going to interview or hire someone like a

12   busboy, or something like that, who didn't speak English, he

13   would ask me to keep his company.

14   Q.  So it is your testimony that you were only there to

15   translate?

16   A.  Most of the times, yes.

17   Q.  So there were times you did more than translate?

18   A.  No.  Not more than translating because he would make the

19   question and they would answer.

20   Q.  So your testimony is you were there only to translate?

21   A.  Yes, only to translate or unless Mr. Pistorio would ask me

22   just to stay there with him.  But if Mr. Pistorio asked me to

23   be there, stay there with him, that was very rarely an

24   occasion.

25   Q.  Is it your understanding that he wanted you to be there

1    because you were the most senior waiter?

2    A.  Not necessarily, no.  It's that Mr. Pistorio always wanted

3    to have -- it was something personal -- he wanted to have

4    somebody present at all times just to act as a witness.

5    Q.  So he had you there to act as a witness?

6            THE COURT:  These all go to Mr. Pistorio's state of

7    mind and I don't --

8            MR. DELANEY:  OK.

9    Q.  Now, did you ever participate in a meeting --

10           THE COURT:  They are not admitted for that purpose, if

11   that's what you are trying to get them in for.

12   Q.  Did you ever participate in a meeting where an employee was

13   fired?

14   A.  Yes, on one opportunity.

15   Q.  And that was the time when Mr. Pastor was fired?

16   A.  Yes, Mr. Sergio Pastor.

17   Q.  And that was the only meeting you were ever at when an

18   employee was fired?

19           THE COURT:  Is that correct?

20   A.  Yes, that's correct.

21   Q.  Now, you were part of the tip pool, correct?

22   A.  Yes, sir.

23   Q.  And beginning in 2005, you were in charge of distributing

24   the cash tips to the workers?

25   A.  I was in charge of that job ever since before -- well, I'm

C44dcar5                    Velandia - cross

1    sorry, the old administration.

2    Q.  Under the new administration, you were also in charge of

3    distributing tips?

4    A.  Yes, as well.

5    Q.  In 2005?

6    A.  Yes.

7    Q.  And until approximately 2009?

8    A.  Yes -- no, actually approximately until 2010 or 2011.

9    Q.  And you distributed them every week?

10   A.  Yes, they are distributed every week but I was not the one

11   distributing them.  I was the one doing the numbers in the

12   computer.

13   Q.  The cash tips were kept in the safe?

14   A.  Yes.  Correct.

15   Q.  And the safe was in the office?

16   A.  Yes, that is correct.

17   Q.  And you had the combination to the safe, correct?

18   A.  Yes, that's correct.

19   Q.  And Mr. Solis did not have the combination to the safe?

20   A.  No, if I wasn't there, Mr. Pistorio would give him the

21   money, but that is only in the case of the employees who were

22   not there present on payday.  Because on Mondays, when it is

23   payday, Mr. Delledonne always would hand directly the money to

24   Pablo Solis, so there was no need to take it out from the safe

25   box.

1   Q.  Cash tips were distributed every Thursday, correct?

2   A.  Well, it has changed.  It used to be every Thursday and

3   then Fridays, and now it's every Monday.

4   Q.  OK.  But in 2005, when the new owners took over, they were

5   distributed on Thursdays?

6   A.  I think so.

7   Q.  And also in 2006, on Thursdays?

8   A.  Probably.

9   Q.  And they were given out to the employees -- the cash was

10  given in white envelopes, correct?

11  A.  Yes, that's correct.

12  Q.  And you were one of the people in charge of handing the

13  envelopes to the employees?

14  A.  No, it was Pablo Solis.

15  Q.  So you never distributed the cash in the white envelopes to

16  employees?

17  A.  Like I said before, if I had to hand over an envelope to

18  someone, it's because a person was off on the day of

19  distribution.  And then perhaps the following day, when the

20  person would come in, if Pablo was not in, then I would give it

21  to them and they would sign a receipt.

22  Q.  So on Thursdays, when the cash tips are distributed, you

23  would get the money from the safe?

24  A.  No.  The way -- like I said before, Mr. Delledonne would

25  bring the money from the bank and would give it directly to

C44dcar5                    Velandia - cross

1    Pablo.  And then Pablo would sit at a table and count, then

2    distribute it, and mark the envelopes, and immediately hand out

3    the money to all those who were there waiting.

4    Q.  Now, yesterday you testified that -- let me rephrase.

5         So you ran the tip pool starting in 2005 under the new

6    owners -- under the new owners, you ran tip pool in

7    August 2005, correct?

8         THE INTERPRETER:  Can you please read that back to me?

9         (Question read)

10   A.  Yes, that's correct.

11   Q.  And the workers voted you and Pablo to run the tip pool in

12   August 2005?

13   A.  That is correct.

14   Q.  And yesterday Mr. Parker showed you a document, D-32 --

15   D-32.  I can show it to you again.

16        THE INTERPRETER:  Do you want him to look for it?

17        THE COURT:  Yes, he wants him to look for it.

18        I have to get someone to look for it for me.

19        MR. DELANEY:  It is in a different binder.  It is in

20   the binder on your left.

21        (Pause)

22        THE COURT:  Defendants' D-32?

23        MR. DELANEY:  Defendants', your Honor.

24        (Pause)

25        THE COURT:  Yes.

C44dcar5                    Velandia - cross

1   BY MR. DELANEY:

2   Q.  Do you remember this document?

3   A.  Yes, I do recall.

4   Q.  And yesterday you said this document memorialized the

5   meeting in August 2005, when the workers voted you and Pablo

6   Solis to manage the tip pool?

7   A.  No, Mr. Delaney.  What happened is that that meeting took

8   place twice, first with Mr. Pistorio and then after with

9   Mr. Maggi, and this document is from where Mr. Maggi was

10  around.

11  Q.  OK.  I think yesterday you testified it was under

12  Mr. Pistorio.  So just to be clear --

13          THE COURT:  I'm sorry.

14  Q.  Yesterday you testified that this was the meeting with

15  Mr. Pistorio.  But I understand now that you made a mistake and

16  this is Mr. Maggi, under Mr. Maggi.

17          THE COURT:  That isn't a question.  You have to state

18  one, Mr. Delaney.

19          MR. DELANEY:  Let me rephrase.

20  Q.  Just to make the record clear, so this memo, D-32, is under

21  Mr. Maggi?

22  A.  Yes, sir, that's correct.  Yes, because there are people

23  here who came in after Mr. Maggi was in.

24  Q.  Now, under the old owners there were assistant managers,

25  correct?

C44dcar5                    Velandia - cross

1   A.  Yes, that's correct.

2   Q.  And under the new owners there were no assistant managers

3   in the dining room?

4   A.  No, sir.

5   Q.  Now, do you recall whether any Remi employee ever referred

6   to you as a manager?

7   A.  No.  They will always refer me as Oscar.  They have always

8   called me Oscar.

9   Q.  So they never referred to you with the title of manager?

10  A.  No.

11  Q.  So you don't recall any Remi employee ever referring to you

12  by the title of assistant manager?

13  A.  No, not assistant manager.

14  Q.  And you also don't recall any Remi employee referring to

15  you as the manager on duty?

16  A.  Yes.  Maybe on some occasions Mr. Pistorio did so but not

17  the employees.

18  Q.  So Mr. Pistorio referred to you as the manager on duty?

19  A.  He did that sometimes.

20  Q.  Did he do it more than once?

21  A.  I don't recall.

22  Q.  Was it at least once?

23  A.  Yes.

24  Q.  Do you remember it being more than one time?

25          MR. PARKER:  Asked and answered, Judge.

C44dcar5                         Velandia - cross

1          THE COURT:  I think if you look at the record, he

2    answered.  So I would sustain the objection.  He said

3    "sometimes," which is plural.

4    Q.  Did Mr. Pistorio ever refer to you as an assistant manager?

5    A.  No, never.

6    Q.  In writing?

7    A.  No, not that I recall.

8    Q.  Did he ever -- did Mr. Pistorio ever refer to you as a

9    manager?

10   A.  As manager?  No, he never referred to me as manager.

11         THE COURT:  You asked this very question before this.

12         MR. DELANEY:  No, sir.  I asked assistant manager.

13   That is a different title.

14         THE COURT:  You asked manager, and he said sometimes.

15         MR. DELANEY:  I asked the first question --

16         THE COURT:  That is a different person than you are

17   asking now.

18         MR. DELANEY:  I am asking three different titles, your

19   Honor.

20         THE COURT:  Manager and assistant manager so far.

21         MR. DELANEY:  Well, my first question was has

22   Mr. Pistorio ever referred to you as a manager on duty.  I

23   believe that was the one when he answered "sometimes."  Maybe

24   the transcription is off.

25         THE COURT:  All right.  If you think it is important,

1    you can answer.

2              MR. DELANEY:  I will ask my question again.

3    BY MR. DELANEY:

4    Q.  Did Mr. Pistorio ever refer to you as a manager?

5    A.  No, not that I recall, he did not refer to me as manager,

6    that I recall --

7    Q.  Did he ever refer to you as manager in writing?

8    A.  -- because I was not the manager.

9              THE COURT:  The record is being made a mess.  Start

10   over again and get your questions right.

11             I've got to get out of this case sometime this month.

12             MR. DELANEY:  I'll start over.

13   Q.  Did Mr. Pistorio ever refer to you as a manager either

14   orally or in writing?

15             MR. PARKER:  Objection.

16             THE COURT:  Objection sustained.

17   Q.  Did Mr. Pistorio ever refer to you as a manager?

18             MR. PARKER:  Objection.

19             MR. DELANEY:  You said I could ask the question.

20             THE COURT:  I am going to allow the question.

21             MR. PARKER:  I'm sorry, your Honor.

22   A.  No.  No, he never referred to me as manager.  I was not his

23   manager at the restaurant.

24   Q.  And he never referred to you as a manager in writing?

25   A.  Not that I recall.

C44dcar5                          Velandia - cross

1    Q.   Did he ever refer to you -- did Mr. Pistorio ever refer to

2    you as the manager on duty?

3    A.   Yes, sometimes.

4    Q.   And Mr. Pistorio made the work schedules, correct?

5    A.   Yes, that's correct.

6    Q.   And you never made a work schedule?

7    A.   The work schedules, as long as Mr. Pistorio was there, he

8    always did them.  Or when he would be -- would absent himself

9    to go visit his children, he would already leave the schedules

10   already made.

11   Q.   So when Mr. Pistorio was general manager, you never made a

12   work schedule?

13   A.   No.

14   Q.   Can you turn to Plaintiffs' 110 again.

15              These are the work schedules?

16   A.   Yes, sir.

17   Q.   Can you turn to page 12 of 60.

18   A.   Yes.

19   Q.   Can you look at the top of the screen, where it says, "Made

20   by Oscar Velandia - Manager on Duty," do you see that?

21   A.   Yes, that is correct.

22   Q.   All I want to know is is it your testimony you did not make

23   this schedule?

24   A.   Yes, that is my testimony.

25   Q.   Now, yesterday you testified --

C44dcar5                        Velandia - cross

1              THE COURT:  I'm sorry.  What was the answer?

2              THE WITNESS:  Yes, it is my testimony.

3              THE COURT:  What is your testimony?

4              THE WITNESS:  Your Honor, that I did not make that

5       schedule.

6              THE COURT:  Even though it says "Made by Oscar

7       Velandia"?

8              THE WITNESS:  Yes, your Honor.

9              THE COURT:  All right.  That's all I want.

10      BY MR. DELANEY:

11      Q.  Now, in addition to running the tip pool, you were also a

12      member of the tip pool, correct?

13      A.  Correct.

14      Q.  So you received tips from the tip pool?

15      A.  Yes, as well.

16      Q.  And you received tips when you were a server?

17      A.  Always.

18      Q.  And so also when you were a head server, just to be clear?

19      A.  Yes, also.

20      Q.  And if you hadn't been a manager, you could not have

21      received tips from the tip pool, correct?

22             THE COURT:  I'm sorry.  What's the question?

23      BY MR. DELANEY:

24      Q.  If you hadn't been a manager -- I'm sorry.  Let me rephrase

25      the question.

C44dcar5                          Velandia – cross

1              Managers could not receive tips from the tip pool?

2     A.   Restaurant managers?  No.

3     Q.   Mr. Pistorio was not part of the tip pool?

4     A.   No, he was not part of it.

5     Q.   And Mr. Brett Lockard was an assistant manager for a few

6     months under the new ownership, correct?

7     A.   Correct.

8     Q.   And when he was working under the new managers, he was not

9     a member of the tip pool either, was he?

10    A.   No, he never took part in the tip pool.

11    Q.   Now, you received a significant amount of tips every week

12    as a member of the tip pool?

13    A.   Well, if I worked that week, the more one works during one

14    week is the more tips one gets.  But that's generally true of

15    everyone.

16    Q.   You could receive up to $1,000 a week in tips?

17              MR. PARKER:  Objection.  Relevance.

18              THE COURT:  Objection sustained.

19              MR. DELANEY:  Your Honor, it goes to motive for why he

20    didn't want to be called a manager.  There is a significant

21    financial incentive, because if he was a manager he couldn't

22    participate in the tip pool.

23              THE COURT:  I understand.

24              Objection sustained.

25    BY MR. DELANEY:

1    Q.   Now, Mr. Velandia, I want to talk about the game that you

2    described earlier today, the game at Remi Restaurant.

3              Now, that game involved jokes, correct?

4    A.   Verbally, yes.

5    Q.   Was it jokes between workers?

6    A.   Yes, that's correct.

7    Q.   And to your knowledge, it also involved sexual comments by

8    one worker to another?

9    A.   Yes.  In fact, any kind of obscene language anyone --

10   people wanted to use.

11   Q.   Those were explicitly sexual comments, correct?

12             THE COURT:  I don't think you let him finish -- I

13   guess you did let him finish.  All right.

14   A.   Please repeat the question.

15             MR. DELANEY:  Can you read it back, please.

16             (Question read)

17   A.   Not all of them.  Some of them.

18   Q.   And it involved touching on the buttocks?

19   A.   By the same token, not all comments were accompanied with

20   touching or vice versa.  It depended on the situation.  It

21   could be combined.

22   Q.   But there was touching on the buttocks?

23   A.   Yes.

24   Q.   And there was touching on the penis over the clothes?

25   A.   Correct.

1    Q.  And this morning you described simulated sex?

2    A.  Yes, that's correct.

3    Q.  And also on some occasions simulated oral sex?

4    A.  Correct.

5    Q.  Now, you viewed this touching, this kind of conduct as

6    normal at Remi, correct?

7    A.  But at the beginning I didn't see it as normal under my

8    point of view because from the culture I come from, people

9    don't touch each other like that.  But at the present time, I

10   could say that it was normal because everyone was doing it.

11   Q.  So just to be clear, at Remi Restaurant, under the new

12   management, you viewed this as normal?

13   A.  Yes, correct.

14   Q.  And did you also view it as part of the daily routine at

15   Remi?

16   A.  I wouldn't say part of the routine but part of the behavior

17   of the employees of Remi.

18   Q.  My question was very specific.  Did you view it as part of

19   the daily routine at Remi?

20   A.  Mr. Delaney, to me a routine, it's everything in reference

21   to work.  But if you want to include that in there as well,

22   then you may.

23   Q.  Did it occur daily?

24   A.  Yes.

25   Q.  And did it occur in front of customers?

```
 1   A.  I think that if it ever occurred in front of customers, it
 2   would be very rare because I don't think anyone wants to be
 3   seen by customers touching.
 4   Q.  Did you ever see it occur in front of customers?
 5   A.  Perhaps.  But the truth is that I don't recall it, and I
 6   don't want to say to you yes or no.
 7   Q.  But the game only happened in front of other employees,
 8   correct?
 9   A.  Yes.  Usually it was only with employees when we were
10   getting the room ready.
11   Q.  If the touching had happened with only two employees
12   present, it would not have been part of the game, correct?
13   A.  Yes.  It depends.  If the two employees got along well and
14   they were alone and they would do that, only they would know
15   whether they were joking or not.
16   Q.  So if it was just two employees in private, it would not
17   have been part of the game that you described?
18           THE COURT:  He doesn't say that.  It is an improper
19   question.  Look at the testimony.  So you started with "so."
20   You can't do that.
21   Q.  If the touching had only occurred in private between two
22   employees, that would not have been part of the game, correct?
23   A.  Yes.  It was also part of the game.
24           (Continued on next page)
25
```

C44kcar6                      Velandia - cross

```
 1   BY MR. DELANEY:
 2   Q.  Now, you recall being deposed in this matter?
 3   A.  Yes.
 4   Q.  And you recall that you were deposed under oath?
 5   A.  Yes.
 6   Q.  I'm going to ask you to open your deposition.
 7            THE COURT:  What exhibit?  It's here someplace.
 8            Page and line?
 9            MR. DELANEY:  Yes, sir.  It's page 48, line 25.
10   Through 49 line 8.
11            MR. PARKER:  Could I have that again, please?
12            MR. DELANEY:  Page 48 line 25 through 49 line 8.
13   BY MR. DELANEY:
14   Q.  Mr. Velandia, do you recognize this as the deposition that
15   was taken of you?
16            THE COURT:  What?  You're standing.
17            MR. PARKER:  I'll let your Honor find the page.  I am
18   going to object.
19            THE COURT:  On what grounds?
20            MR. PARKER:  On the ground that if this is for
21   purposes of impeaching his last testimony, this is not
22   impeachment.
23            THE COURT:  All right, let me look through.  49 what?
24            MR. DELANEY:  Line 8.
25            THE COURT:  I will allow him to read the question.
```

C44kcar6                    Velandia – cross

1   BY MR. DELANEY:

2   Q.  Mr. Velandia, do you recognize this as your deposition?

3   A.  Yes.

4            MR. DELANEY:  I'm going to read.

5   "Q.  So, then it is fair to say that any contact you had with

6   Mr. Sotarriba would not have been in public, as we have said?

7   "A.  No.  It was always in public.  There was always people

8   around.  Like I said before, it was like to make fun of

9   somebody.  If we were alone, then that was not making fun.

10  That was something else."

11  Q.  Was that your testimony at your deposition?

12  A.  Yes, but I was only answering to Mr. Sotarriba's behavior.

13  Q.  My only question is:  Was that your testimony at your

14  deposition?

15  A.  Yes.

16  Q.  Now, I want to talk about the employees that were part of

17  the game that you witnessed.

18           So you were part of the game, correct?

19  A.  Yes.

20  Q.  And you touched other employees on the penis?

21  A.  Yes.

22  Q.  Over the clothes?

23  A.  Yes, correct.

24  Q.  And you touched the plaintiff's over the clothes on the

25  penis in this action?

1    A.  Yes.

2    Q.  You touched Mr. Moises Pastor on the penis over the

3    clothes?

4    A.  That's correct.

5    Q.  And Mr. Sergio Pastor?

6    A.  Yes.

7    Q.  Which other employees did you touch on the penis over the

8    clothes, under the new ownership?

9    A.  Well, all of those who get along with us.

10   Q.  I'm asking you for specific names, Mr. Velandia.  Which

11   other people do you remember touching on the penis over the

12   clothes under the new ownership?

13   A.  Besides Mr. Sotarriba, Caravantes?  Mr. Moises Pastor,

14   Mr. Sergio Pastor, and perhaps I played like that once with

15   Pablo, Jose Ortiz, Jose Figueroa, and sometime with Luis.  I

16   don't recall his last name, but he used to work downstairs in

17   the kitchen, in the line.  I also recall I used to get along

18   that way with Ivan Reyes.  Well, perhaps there were other

19   guys -- perhaps there were other guys that we used to get along

20   like that, that were working there, but I don't recall their

21   names.

22   Q.  So that's all the names you recall right now?

23            THE COURT:  Is Ivan Pena a man or a woman?

24            THE WITNESS:  Ivan what, your Honor?

25            THE COURT:  Reyes.  Is she a man or a woman?

C44kcar6                    Velandia - cross

1        THE WITNESS:  No, your Honor, Ivan Reyes is a man.

2   BY MR. DELANEY:

3   Q.  What's the last time you've touched a Remi employee over

4   the clothes on their penis?

5        MR. PARKER:  Objection.

6        THE COURT:  It's outside the scope of this case.

7   Q.  When is the last time you touched Mr. Caravantes over the

8   clothes on his penis?

9   A.  I don't recall.

10  Q.  What's the last time you touched Mr. Sotarriba on his penis

11  over his clothes?

12  A.  That either I don't recall.

13  Q.  Was it in 2007?

14  A.  I couldn't be precise, but when we stopped, we stopped.

15  Q.  You don't remember the year at all?

16  A.  No, Mr. Delaney, I don't recall exactly.

17  Q.  I'm not asking for an exact date.  I'm asking for a general

18  recollection.  Do you generally recall when the last year is

19  that you touched Mr. Sotarriba?

20  A.  Perhaps that could have been in 2006, if you want me to

21  give you a year.

22  Q.  Now, all those names you just listed, who you touched, were

23  those all part of your group, what you would call your group?

24  A.  Correct, yes.

25  Q.  But you never discussed the game with the members of your

1   group, did you?

2   A.  No, Mr. Delaney, because this is not a game of strategies;

3   it's just simply demeanor or behavior.

4   Q.  You never specifically asked for permission to touch

5   Mr. Caravantes, did you, on the penis over his clothes?

6   A.  No, because by the same token, he never asked me whether he

7   could touch me; everything occurred for just playing.

8   Q.  And you never specifically asked Mr. Sotarriba for

9   permission to touch him on his penis over his clothes?

10  A.  No, I didn't ask either, because he didn't ask me for

11  permission either, to be daring in such a way with me.

12  Q.  Now, Mr. Velandia, is it your belief that consent -- a

13  consensual sexual relationship is something that doesn't have

14  to be spoken?

15          MR. PARKER:  Objection.

16          THE COURT:  Objection sustained to the form of the

17  question.

18  Q.  Do you believe you can get consent to touch someone

19  sexually without getting a verbal agreement from them?

20          MR. PARKER:  Objection.

21          THE COURT:  Objection sustained to the form of the

22  question.

23  Q.  Do you believe that consent --

24          MR. DELANEY:  I'll move on.

25  Q.  Now, do you recall when you touched Mr. Sotarriba -- sorry,

1    strike that.

2           Do you recall any instance when you touched

3    Mr. Sotarriba where you were wearing the jacket that you

4    described?

5           THE INTERPRETER:  Please read that back to me.

6    Q.  When you became headwaiter, you wore a suit jacket,

7    correct?

8    A.  Correct.

9    Q.  And do you recall any incident when you touched

10   Mr. Sotarriba when you were wearing that jacket?

11   A.  Well, a specific instance?  I don't recall any because with

12   Mr. Sotarriba it was just playing quickly like that.  But I

13   think that it could have well happened because we used to get

14   along that well.

15   Q.  So you believe it's possible that you touched him when you

16   were wearing the jacket?

17   A.  Yes, of course.

18   Q.  You recall touching Mr. Sotarriba in the middle server

19   station -- sorry.

20          Do you recall touching Mr. Sotarriba in one of the

21   server stations?

22   A.  I, again, in the same manner, I don't recall any specific

23   instance, but it could have well happened while we were

24   preparing for the meal, for dinner.

25   Q.  You used the computers in the server stations, correct?

1   A.  Yes, that's correct.

2   Q.  Do you remember ever touching Mr. Sotarriba in the coffee

3   station?

4   A.  I don't recall any specific instance, but the situation

5   could have arisen while we were getting prepared for a meal,

6   for dinner.

7   Q.  Do you remember any incident when you touched Mr. Sotarriba

8   in the coffee station?

9   A.  At the coffee station?  Specifically, no, but like I said,

10  we would play, and it's a situation that could happen at any

11  moment, at anywhere in the restaurant, because nobody knew when

12  it was going to take place.

13  Q.  I'm just trying to understand your testimony.  So it was

14  possible that you could have touched Mr. Sotarriba in the

15  coffee station?

16          MR. PARKER:  Objection.

17          THE COURT:  Objection sustained to the question.

18  Anything is possible.

19  Q.  Do you think it's likely that you touched him in the coffee

20  station?

21  A.  It is possible that it could be possible.

22  Q.  Is it likely?

23  A.  Maybe yes, maybe no, maybe it happened there, maybe not.

24  Q.  Now, you testified you saw Mr. Sotarriba touch other

25  people, correct?

1    A.  Yes, correct.

2    Q.  Who specifically did you see him touch?

3    A.  I recall he used to play a lot like that with Osvaldo and

4    also with Jorge Cortez.  He also used to play like that with

5    Jose Ortiz, with Mr. Caravantes, also with Sergio Pastor.

6    Q.  Do you recall whether he ever touched Osvaldo in the coffee

7    station?

8    A.  No, I didn't say that he had touched him at the coffee

9    station.

10   Q.  So you did not see him touch him in the coffee station?

11           THE COURT:  Touch who?

12           MR. DELANEY:  Osvaldo Serrato.

13           THE WITNESS:  Mr. Osvaldo Serrato touching

14   Mr. Francisco?

15   Q.  I'll go back to my original question.  I'd asked you for

16   examples of who Mr. Sotarriba had touched, and one of the names

17   you gave me was Osvaldo Serrato.

18   A.  Correct.

19   Q.  So I'm asking, did you ever see Mr. Sotarriba touch

20   Mr. Serrato in the coffee station?

21   A.  I used to see them play like that, but I don't recall

22   specifically if I saw him touching him at the coffee station.

23   It could have also happened at the dining room or also at the

24   locker room.

25   Q.  Do you remember any specific location you saw Mr. Sotarriba

C44kcar6                          Velandia - cross

1   touch Mr. Serrato?

2   A.   No.   These are occurrences that took place so many years

3   ago, so I don't recall the specific place.

4   Q.   Do you remember where Mr. Sotarriba touched Mr. Serrato,

5   where on the body?

6   A.   They would usually touch each other in the buttocks, or

7   would pretend to make believe that they were having a sexual

8   act.

9   Q.   Are you speculating, Mr. Velandia, or are you recalling a

10   specific instance when you saw Mr. Sotarriba touch Mr. Serrato?

11         MR. PARKER:   Your Honor, I'm not sure he even

12   completed his answer, first of all; and secondly, I object to

13   the form of the question.

14         THE COURT:   I'll sustain the objection to the form of

15   the question.   Ask another question.

16   BY MR. DELANEY:

17   Q.   Do you remember a specific instance when Mr. Sotarriba

18   touched Mr. Serrato on the butt, on the buttocks?

19         THE INTERPRETER:   What was the name of the other

20   gentleman Sotarriba touched?

21         MR. DELANEY:   Mr. Serrato.

22         THE WITNESS:   To be specific, I don't recall any

23   specific instances.   I know, yeah, the way they played, but I

24   don't recall a date or place exactly.

25   Q.   Do you recall a specific instance where Mr. Sotarriba

1    simulated sex with Mr. Serrato?

2    A.   No, I don't recall.

3    Q.   You don't recall a date?

4    A.   No.

5    Q.   You don't recall the location?

6    A.   At the restaurant, but I wouldn't dare say the specific

7    place because I don't recall.

8    Q.   You also said Mr. Sotarriba touched Mr. Jorge Cortez?

9    A.   Yes, that's correct.

10   Q.   Do you remember any specific incidents when Mr. Sotarriba

11   touched Mr. Cortez?

12   A.   No, I don't recall anything specifically.

13   Q.   Do you recall any specific incident when Mr. Sotarriba

14   touched another employee at Remi?

15   A.   No.

16   Q.   Now, you said Mr. Sotarriba called you Flower correct?

17   A.   Yes, not only to me but he used to call others Flower as

18   well.

19   Q.   Do you remember any specific incident when he called you

20   Flower?

21   A.   No, Mr. Delaney, he was just saying jokingly at any time,

22   hello, Flower.

23   Q.   Do you remember any -- did Mr. Sotarriba call you a puta?

24   A.   Yes, I recall him calling me that way.

25   Q.   Do you remember any specific incident when he called you

1   puta?

2   A.  No, Mr. Delaney, I don't recall.

3          MR. DELANEY:  Your Honor, are we breaking at 4:00?

4   That will affect where I start.

5          (Discussion off the record)

6          THE COURT:  I'm waiting for a defendant, so go right

7   ahead.

8          MR. DELANEY:  OK.

9   BY MR. DELANEY:

10  Q.  Now, you said Mr. Caravantes was also part of the game that

11  you described, correct?

12  A.  Yes, that's correct.

13  Q.  And he touched you as part of the game?

14  A.  Yes, as well.

15  Q.  And you touched him as part of the game?

16  A.  Yes.

17  Q.  Now, he didn't touch you as part of the game under the new

18  ownership, correct?

19  A.  Yes, he used to touch me.

20  Q.  Let me rephrase.  Did he touch you as part of the game

21  under the old ownership?

22  A.  Yes, correct.

23  Q.  Did he touch you on the penis, under the old ownership?

24  A.  No, he never touched my penis.

25  Q.  Did he touch you on the buttocks, under the old ownership?

C44kcar6                           Velandia - cross

1    A.  Yes.

2            THE COURT:  Did he touch you on the clothes over the

3    penis, in the old ownership?

4            THE WITNESS:  Yes, your Honor.

5            THE COURT:  Over the clothes?

6            THE WITNESS:  Correct, over the clothes.

7            THE COURT:  Under the old ownership?

8            THE WITNESS:  Yes, your Honor, that's correct.

9    BY MR. DELANEY:

10   Q.  At some point -- and I'll come to this in a second -- at

11   some point you and Mr. Caravantes, your testimony is, that you

12   and Mr. Caravantes had a different kind of relationship,

13   correct?

14   A.  Yes, that's correct.

15   Q.  And your testimony is that that relationship was not part

16   of the game?

17   A.  Well, no, once he made a different type of advancement,

18   then it was no longer a joke.

19   Q.  Well, I'm trying to draw a distinction between that

20   relationship and the game.

21           So, under the new ownership, did Mr. Caravantes touch

22   you on the buttocks as part of the game?

23   A.  Well, I would say that changeover, from playing around to

24   something more serious, occurred during the transition from the

25   old management to the new company.  So, perhaps during the new

C44kcar6                          Velandia - cross

1    company he touched me as well as a game but also as something

2    different.

3    Q.  Do you have a specific recollection of Mr. Caravantes

4    touching you as part of the game, under the new ownership but

5    before you claim he initiated a different kind of relationship?

6    A.  No, because it was just part of a game, and I don't have

7    any recollection of any specific moment.  That could have

8    happened at any day, any moment.

9    Q.  Mr. Caravantes was not part of your group, though, was he?

10   A.  He used to get along with me, and he used to get along with

11   others, but not necessarily -- and that doesn't mean that if I

12   saw some other person touching a third person, that I would go

13   touch the first person, because perhaps I didn't get along as

14   well with that other person.

15   Q.  You had a specific group that you played the game with,

16   though, correct?

17   A.  Well, that I recall, yes.

18   Q.  And at the time, when the new ownership took over,

19   Mr. Caravantes was not part of that group, was he?

20   A.  Well, Caravantes used to get along with me like that, well,

21   but I can't think of it as part of a team or group.

22   Q.  So he was not part of your group?

23            THE COURT:  Were there other groups?

24            THE WITNESS:  Your Honor, this is a situation that

25   happens --

C44kcar6                          Velandia - cross

1          THE COURT:  I'm asking you whether there are other

2     groups that got along together.

3          THE WITNESS:  I would say that, yes, there were other

4     people that didn't get along with me as well, so, yes --

5          THE COURT:  I'm not talking about you.  I'm asking

6     about in the restaurant.  Were there several groups of people

7     who got along well together?

8          THE WITNESS:  Yes, your Honor.

9          THE COURT:  Did they all --

10         THE WITNESS:  You could say that.

11         THE COURT:  -- engage in the game, more than one group

12    engage in the game?

13         THE WITNESS:  Yes, your Honor.

14         THE COURT:  How big would these groups be, four, five

15    people, what, five or six people?

16         THE WITNESS:  Yes, your Honor.  If you allow me, I'll

17    explain something to you?

18         THE COURT:  Yes.

19         THE WITNESS:  It was not per se a group of five

20    people.  It was like a way that people will relate to each

21    other, but it was not limited only to a group of people.  And

22    like I say, some people have their friends and some of those

23    friends have friends in common.  In that case, there are

24    friends in common, but other times there are not.

25         THE COURT:  Are there more than one of those groups

C44kcar6                          Velandia - cross

1    who engaged in the game?

2              THE WITNESS:  Yes, your Honor.

3              THE COURT:  You observed that?

4              THE WITNESS:  Yes, your Honor.  Maybe I can also

5    clarify that they would -- a lot of them would play but not all

6    of them would play, would touch one another.

7    BY MR. DELANEY:

8    Q.  So Mr. Caravantes was not part of your group, though,

9    correct?

10             THE COURT:  I think he's answered that question.  It's

11   been asked, I think, and answered as well as you can under the

12   circumstances.

13   BY MR. DELANEY:

14   Q.  I want you to turn to your deposition transcript,

15   Mr. Velandia.

16   A.  OK.

17   Q.  Page 59 line 17.

18             THE COURT:  59?

19             MR. DELANEY:  Line 17.

20   Q.  Through 59 line 22.

21             THE COURT:  All right.

22             MR. DELANEY:  I'm going to read this passage to you,

23   Mr. Velandia.

24   "Q.  And would you consider Mr. Caravantes a member of the

25   group that you described?

1    "A.  Not the same group, because he would -- he would get along

2    with his group, his crowd, his people, not with the same

3    group."

4    Q.  Was that your testimony at your deposition?

5    A.  Yes, that's correct.

6            THE COURT:  Is that testimony true?

7            THE WITNESS:  Yes, your Honor.

8    Q.  Now, you claim Mr. Caravantes initiated a sexual

9    relationship with you in 2005, correct?

10   A.  That's correct.

11   Q.  Prior to that, you two had only engaged in what you call

12   the game, correct?

13   A.  Yes, correct.

14   Q.  And as you stated at your deposition, he was not part of

15   your group, was he?

16   A.  Well, he would get along with me like that.

17   Q.  He was not part of your group, was he, Mr. Velandia?

18   A.  Mr. Delaney, we can't talk about a group as if it was -- as

19   if they had like several different groups.  When I spoke about

20   a group, I just meant to talk about the people with whom I get

21   in that manner.

22   Q.  He was not part of that group that you got along with in

23   that manner, was he?

24   A.  In that case, yes, because he used to touch me, so he was

25   part of it.

1   Q.  So it's your testimony that Mr. Caravantes, up until this

2   point, had only participated in the game with you, correct?

3   A.  With me and other people that he used to get along like

4   that.

5   Q.  And you knew at this time that Mr. Caravantes was married,

6   correct?

7   A.  Yes, correct.

8   Q.  Did you know that he had children?

9   A.  Yes.

10  Q.  And he had never told you that he was gay, had he?

11  A.  No.

12  Q.  Or that he was bisexual?

13  A.  No.

14  Q.  So just to be clear, your testimony is that he approached

15  you from behind, correct?

16  A.  Correct.

17  Q.  While you were standing at the door of the Rialto Room?

18  A.  Correct.

19  Q.  When the Rialto Room was full of a private party?

20  A.  Yes, correct.

21  Q.  And he pressed an erection into you?

22  A.  Yes.

23  Q.  This was the first time he had ever done anything like that

24  to you?

25  A.  That was the first time he ever did that.

C44kcar6                    Velandia - cross

1   Q.  And he had never said to you that he was interested in this

2   type of relationship that you described?

3   A.  No, we never spoke about that.

4   Q.  And you had never said to him that you were interested in

5   that kind of relationship?

6   A.  No, I didn't do that either, because I never saw

7   Mr. Caravantes as a bisexual or homosexual person, so I never

8   expressed that to him.

9   Q.  You said you knew that he was pushing an erection into your

10  buttocks, correct?

11  A.  Yes, that's correct.  I was able to feel it.

12  Q.  And you said you reached behind and you felt his

13  erection -- reached behind yourself, sorry, and felt the

14  erection?

15  A.  Yes, correct.

16  Q.  Now, did you touch the skin of his penis?

17  A.  No.

18  Q.  I'm going to ask you to go to your deposition again, page

19  61.  Page 61 line 23 through 62 line 4.  I'm going to read this

20  to you, Mr. Velandia.

21  "Q.  But -- well, first, do you recall seeing his erection?  He

22  was behind you, right?

23  "A.  No.  I -- I did touch it, I put my hand behind me and I

24  touched it, I could feel that he was erect and I could feel the

25  skin."

C44kcar6                     Velandia - cross

1   Q.  Was that your testimony at the deposition?

2   A.  Yes, Mr. Delaney, that was my testimony.

3   Q.  Does that refresh your recollection that you touched the

4   skin of his penis when you reached behind you?

5   A.  Yes, I would say yes, but it's -- I can't recall all the

6   details.  It's been seven years since then, and I can't recall

7   all the details one by one.

8   Q.  So you're changing your testimony?  You're now saying that

9   you did feel his erect penis outside of his clothes?

10  A.  Well, it's not that I'm changing it.  If I did put my hand

11  and I felt it, but if I said that the day of the deposition,

12  that's the details that I remember at the time.

13          THE COURT:  Listening to that testimony that you gave

14  at your deposition, does that refresh your recollection that

15  you did feel the skin of his penis?

16          THE WITNESS:  Yes, exactly, your Honor.

17          THE COURT:  That refreshes your recollection that you

18  did?  Not because you read it, because you now remember?

19          THE WITNESS:  Oh, no, all because I'm reading it here

20  now.

21          THE COURT:  Does it refresh your recollection

22  without -- not paying any attention to what it says in writing,

23  but your thinking back about the event, does it refresh your

24  recollection that you did feel the skin on his penis?

25          THE WITNESS:  No, honestly, your Honor, no, it does

C44kcar6                          Velandia - cross

1    not.

2              THE COURT:  All right, we'll have to break for the

3    day.  9:30 tomorrow morning.

4              MR. DELANEY:  Your Honor, can we instruct the witness?

5              THE COURT:  Oh, yes.

6              You're under cross-examination.  You're not to discuss

7    the case with your counsel or with anyone else until tomorrow

8    at 9:30, when Mr. Delaney resumes.

9              THE WITNESS:  (In English) thank you.

10             (Adjourned to April 5, 2012 at 9:30 a.m.)

11                              * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    OSCAR VELANDIA

4    Direct By Mr. Parker . . . . . . . . . . . . 802

5    Cross By Mr. Delaney . . . . . . . . . . . . 876

6                        PLAINTIFF EXHIBITS

7    Exhibit No.                               Received

8     11    . . . . . . . . . . . . . . . . . . 887

9                        DEFENDANT EXHIBITS

10   Exhibit No.                               Received

11    60 and 61   . . . . . . . . . . . . . . . 811

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```