C45kcar1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    ARTURO CARAVANTES and
3   FRANCISCO SOTARRIBA
                    Plaintiffs
4
            v.                          09 CV 7821 (RPP)
5   53RD STREET PARTNERS, LLC
    d/b/a REMI RESTAURANT and
6   OSCAR VELANDIA
                    Defendants
7   ------------------------------x
                                        New York, N.Y.
8                                       April 5 2012
                                        9:45 a.m.
9
    Before:
10                  HON. ROBERT P. PATTERSON, JR.

11                                      District Judge

12                          APPEARANCES
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
13        Attorneys for Plaintiffs
    1285 Avenue of the Americas
14  New York, NY 10019
    AARON S. DELANEY
15  MAYUR P. SAXENA
    MICHAEL PALMIERI
16  MICHAEL NADLER
    MOIRA KIM PENZA
17
    URBAN JUSTICE CENTER
18        Attorney for Plaintiffs
    123 William Street 16th Floor
19  New York, NY 10038
    NICOLE HALLETT
20
    EPSTEIN BECKER & GREEN PC
21        Attorneys for Defendants
    KERRY M. PARKER
22  ALKIDA KACANI

23        – also present –

24  CARLOS CRUZ – Spanish Interpreter
    LILIANA HALAC – Spanish Interpreter
25  RANDALL CARTER – Plaintiff AV Tech

C45kcar1

1            THE COURT:  Recall the witness.

2            You're reminded you're still under oath, Mr. Velandia.

3            THE WITNESS:  Yes, sir.

4            THE COURT:  All right.

5            MR. DELANEY:  Your Honor, a small housekeeping matter?

6            THE COURT:  OK.

7            MR. DELANEY:  Yesterday I read three sections of the

8    deposition transcript into the record, and I'd like those to be

9    admitted as evidence, but my question was:  Are they in

10   evidence just by reading them into the record, or is it your

11   preference we actually mark the pages of the deposition and

12   submit those?

13           THE COURT:  No, if you read them in, it's not

14   necessary.  They're in the record, as read.

15           MR. DELANEY:  All right.

16           THE COURT:  You can mark the depositions for

17   identification if you want.

18           MR. DELANEY:  OK, I'll do that at the end.

19           THE COURT:  All right.  Or the pages of the

20   deposition, the excerpt.

21           MR. DELANEY:  OK, we'll do that.

22    OSCAR VELANDIA, resumed.

23   CROSS-EXAMINATION CONTINUED

24   BY MR. DELANEY:

25   Q.  Mr. Velandia, we finished up yesterday talking about the

C45kcar1                         Velandia - cross

```
 1   first time that Mr. Caravantes approached you indicating he

 2   wanted a sexual relationship.  Do you recall that?

 3   A.  Yes, I remember.

 4   Q.  Now, you've described a second incident, correct?

 5   A.  Yes, correct.

 6   Q.  That occurred at the coffee station?

 7   A.  Yes.

 8   Q.  And in this incident, Mr. Caravantes was standing there

 9   with a milk jug, correct?

10   A.  Yes, that's correct.

11   Q.  And it was a gallon milk jug?

12   A.  Yes, that's correct.

13   Q.  And you specifically recall that it was a gallon?

14   A.  Yes, it was a large gallon.

15   Q.  And then he moved it, and you saw his erect penis outside

16   of his pants, correct?

17   A.  Correct.

18   Q.  And then you went over and touched his penis?

19   A.  Yes, that I remember, yes.

20   Q.  But no words were exchanged?

21   A.  No.

22   Q.  Mr. Velandia, I'm going to ask you to turn to your

23   deposition.  Can you turn to page 69 line 19.

24           THE COURT:  What's the exhibit number?  Oh, it's

25   separate.
```

C45kcar1                          Velandia – cross

1           THE DEPUTY CLERK:  Page?

2           MR. DELANEY:  Page 69.

3    Q.  I'm going to read this to you, Mr. Velandia.

4           THE DEPUTY CLERK:  Hold on, hold on.

5           Line?

6           MR. DELANEY:  Page 69 line 19.  Through 70 line 9.

7    "Q.  Do you remember how you discovered such a strategic spot?

8    "A.  When I saw the confidence that Mr. Caravantes had, to take

9    his member out of his pants and cover it with a gallon, he --

10   he measured the space and he knew that he could do that there.

11   He would never do that in -- in the dining room or the party

12   room.

13   "Q.  So what happened next, once you saw Mr. Caravantes?

14   "A.  What happened that day, he simply just let me see it, let

15   me look.  That day, there was no touching.  That was something

16   very quick.  I got there, I saw what was happening.  Again,

17   there were no words."

18   Q.  Mr. Velandia, was that your testimony at the deposition?

19   A.  Yes, that's what I recalled that day, when I gave

20   testimony.

21          THE COURT:  Let me ask you something about this

22   proceeding.  Why is it that the interpreters don't use a

23   microphone to read their questions to the witness and then

24   interpret in English, so that the interpreter in back doesn't

25   have -- any Spanish-speaking people can hear, that are here,

C45kcar1                           Velandia - cross

1    and instead you have an interpreter in back?

2                MR. DELANEY:  The interpreter in back, there's a

3    headset.

4                THE COURT:  Yes.

5                MR. DELANEY:  And we did that so as not to disturb the

6    courtroom, so that the headset is going right into the

7    plaintiffs' headsets as well.

8                THE COURT:  But if the interpreter here interprets,

9    then they hear the Spanish and we hear the English.  I don't

10   see the purpose of this duality.  And the way you do it, I

11   don't hear the Spanish, nor does anyone else in the courtroom.

12               MR. DELANEY:  Your Honor, we just thought this would

13   be the most convenient, so it wouldn't be like Spanish all over

14   the whole courtroom, which people wouldn't understand.  But we

15   could --

16               THE COURT:  As a procedure it's unusual, very unusual.

17               MR. DELANEY:  Mr. Cruz -- there's a mike there -- he

18   could just speak into the mike.  He could have the hand mike

19   that the person in the back has, or whatever she uses.  And

20   then you don't need a second interpreter.  But I don't think

21   that mike is wired through the sound system.  It's just a

22   battery-operated wireless into the headsets.  But Mr. Cruz

23   could speak into this microphone here at the witness stand, and

24   that will --

25               THE COURT:  It raises questions, because I have

C45kcar1                          Velandia - cross

1      questions about the interpreters.

2                   MR. DELANEY:  Mr. Cruz, would you mind maybe using

3      that mike so everybody in the courtroom can hear the Spanish?

4                   THE INTERPRETER:  Not at all, not at all.  I would

5      just have to do a consecutive interpretation, which means I

6      would wait for you to finish your question and then translate

7      into Spanish.

8                   THE COURT:  Yes.

9                   MR. DELANEY:  Is that your preference, your Honor?

10                  THE COURT:  That would be my preference, because

11     that's the ordinary practice.  And several questions have

12     arisen in my mind about the manner in which the interpretation

13     is done, not with this interpreter, because I can't hear this

14     interpreter, but I have heard the prior interpreter and

15     sometimes his answers seemed much shorter than the Spanish

16     version.

17                  THE WITNESS:  Yes.

18                  THE COURT:  It's important that when you're talking,

19     that the words be accurately transcribed, because we're making

20     distinctions about words in connection with the acts in

21     question here.  Interpreters don't necessarily understand the

22     significance of what you're getting at from a legal standpoint.

23     That's just my observation.  But I did confirm that that was

24     going on yesterday, that the answers were actually longer than

25     the answers that the interpreter stated, or different.  They

C45kcar1                           Velandia - cross

 1    were not word for word.  So it does make my finding more

 2    difficult.

 3              Were these same interpreters used on the depositions?

 4              MR. DELANEY:  Mr. Cruz interpreted on a couple of the

 5    depositions, but we had multiple different translators,

 6    depending on -- I think for our depositions, we used Mr. Cruz

 7    quite a bit and Mr. Parker used Mr. Cruz for a couple, and then

 8    there were a few different translators for the plaintiffs'

 9    depositions.

10              THE COURT:  You see what difficulties it causes for

11    the Court.

12              All right.

13              MR. DELANEY:  Thank you, your Honor.

14    BY MR. DELANEY:

15    Q.  Now, Mr. Velandia, Mr. Caravantes -- it's your belief that

16    Mr. Caravantes -- it was your belief that Mr. Caravantes

17    initiated the first instance -- incident by the Rialto Room

18    door, correct?

19              THE INTERPRETER:  Realty room?

20              MR. DELANEY:  Rialto Room.

21    A.  That is correct.

22    Q.  And it was also your belief that Mr. Caravantes initiated

23    the incident with the gallon milk jug, correct?

24    A.  That is correct.  He had it in his hand.

25    Q.  And the next incident he also initiated, correct?

C45kcar1                         Velandia - cross

1          MR. PARKER:  Objection; foundation.  I don't know what

2     he means; there's been no testimony about a next incident,

3     Judge.

4          MR. DELANEY:  I'll reask the question, your Honor.

5          THE COURT:  All right.  Objection sustained.

6     BY MR. DELANEY:

7     Q.  You testified yesterday that the next incident was when

8     Mr. Caravantes whispered into your ear?

9          MR. PARKER:  I am going to object to the question,

10    Judge.  I think the question is misleading.  The next incident

11    to what?  There was no testimony about a next incident.

12         MR. DELANEY:  Your Honor --

13         THE COURT:  You can clear that up.  So let's reask the

14    question.

15    BY MR. DELANEY:

16    Q.  So you testified about another incident where

17    Mr. Caravantes whispered into your ear, correct?

18    A.  That's correct.

19    Q.  And he asked you to join him in the coatroom, coat check?

20    A.  Yes, I recall that incident.

21    Q.  When you entered the coat check, you performed oral sex on

22    Mr. Caravantes?

23    A.  Yes.

24    Q.  And was that the first time that you performed oral sex on

25    Mr. Caravantes?

C45kcar1                          Velandia - cross

1   A.  No.  Perhaps it had already occurred once before.

2   Q.  Now, you said yesterday that these first occasions that

3   Mr. Caravantes initiated, you said that was something that

4   caused an impact in your mind.  Do you recall that?

5   A.  Yes, that is correct.

6   Q.  I'm going to ask you to turn to your deposition again.

7             Page 71 line 5.

8             MR. PARKER:  To where?

9             MR. DELANEY:  Line 5.

10            This is a long excerpt, your Honor.  To 73 line 4.

11            THE INTERPRETER:  Go line by line?

12            MR. DELANEY:  I'll try to read slow for you, Carlos.

13            I'm going to read the first few lines just for

14  context.  Starting at 71 line 5:

15  "Q.  So then how -- how did this encounter end?

16  "A.  That's how it ended.  He showed me, I saw, he moved the

17  gallon, he let me see, and that was it.

18  "Q.  OK.  And then did you ever talk about this encounter

19  subsequent to the encounter?

20  "A.  No.

21  "Q.  OK.  What is the next time that you can remember that you

22  had sexual contact with Mr. Caravantes?

23  "A.  One day when the restaurant was not very busy, it was

24  towards the end of the night, at that point I already had in my

25  head, he had let me know that he wanted to have some kind of

C45kcar1                           Velandia - cross

1    sexual encounter.

2              "Obviously I also reacted to my nature, to my sexual

3    preference, that awoke my curiosity to go beyond.

4              "So one day I went over to the coffee station and I

5    touched him.  He had an erection.  I lowered his zipper and --

6    and I put my hand in there, I actually touched him.

7    "Q.  So you went to the coffee station and touched him over his

8    pants on the penis; is that correct?

9    "A.  At first, yes.

10   "Q.  OK.  And as you said, you didn't feel the need to ask

11   before doing this; is that right?

12   "A.  Why would I feel that I need to ask something that he

13   opened the door to?

14   "Q.  Just to clarify, you did say that you were the one who

15   undid his pants; is that right?

16   "A.  Yes.

17   "Q.  And then you were the one who touched his penis under his

18   clothes, right?

19   "A.  Yes.

20   "Q.  And then what happened next?

21   "A.  Then he told me, you know something, now that you have

22   reached this point -- now that you have put my penis in this

23   condition, you can't leave it like that.  You have to leave it

24   without an erection.

25   "Q.  OK.  And then what happened next?

C45kcar1                          Velandia - cross

1    "A.   That day we had oral sex."

2    Q.   Was that your testimony at the deposition?

3          THE COURT:   Does that refresh your recollection?   Is

4    the question?

5    BY MR. DELANEY:

6    Q.   Does that refresh your recollection about another incident?

7    A.   Yes, yes, I recall.

8    Q.   And you initiated that incident; is that correct?

9    A.   Yes, that is correct.

10   Q.   Now, Mr. Velandia, you testified that Mr. Caravantes

11   touched other employees in the restaurant?

12   A.   Yes, that is correct.

13   Q.   Who specifically do you remember him touching?

14   A.   I remember that he got along with other co-workers in the

15   kitchen.   And I remember that he played that way with some of

16   the workers that worked beyond the line in the kitchen.   I

17   recall that he also played that way with Mr. Sotarriba.   At

18   this moment, I don't remember any other names.

19         THE COURT:   When you say "that way," "played that

20   way," what are you referring to?

21         THE WITNESS:   Your Honor, I'm just referring to the

22   act of touching themselves, but over their clothes, that's it.

23   BY MR. DELANEY:

24   Q.   And you specifically saw Mr. Caravantes touch

25   Mr. Sotarriba?

1   A.   Yes.

2   Q.   Where in the restaurant did you see that?

3   A.   At this moment, I don't recall the specific locations.

4   Q.   Who in the kitchen did you see Mr. Caravantes touch?

5   A.   The workers on the line, but I don't have their names at

6   this moment.

7   Q.   You can't remember a single name?

8   A.   Maybe just Luis Martinez.  That's in it.

9   Q.   Where in the restaurant did he touch Mr. Martinez?

10  A.   In the kitchen, because Luis Martinez works in the kitchen.

11  Q.   But you only remember that because that's where he works,

12  correct?

13  A.   Correct.

14  Q.   Now, I want to talk about the workers that you said you

15  touched.  You knew that some of those men were heterosexuals,

16  correct?

17  A.   Correct.

18  Q.   Were most of them heterosexual?

19  A.   Yes, correct.

20  Q.   And you touched them on their buttocks?

21  A.   Yes, after they touched and that level of confidence was

22  reached, I would do it too.

23  Q.   And you didn't ask their permission, correct?

24  A.   And in the same manner, they didn't ask me for permission

25  in all the other situations, neither party was heard asking for

C45kcar1                          Velandia - cross

1    permission.

2    Q.  You didn't ask for permission --

3              THE INTERPRETER:  I'm sorry, did you ask if he asked?

4    BY MR. DELANEY:

5    Q.  Mr. Velandia, you didn't ask them for permission before you

6    touched them?

7    A.  No.

8    Q.  And after you became headwaiter, did you ask any of them

9    for permission to touch them?

10   A.  No.

11   Q.  After you started wearing the suit jacket, did you ask them

12   for permission?

13   A.  I don't believe that at any moment I had ever asked anyone

14   for permission.  I don't remember ever asking for permission,

15   no.

16   Q.  You didn't ask them for permission because at that time you

17   believed that they could consent to you touching them without

18   using words, correct?

19             MR. PARKER:  Objection.

20             THE COURT:  Objection; sustained to the form of the

21   question.

22             MR. DELANEY:  Your Honor, I'm asking about his state

23   of mind at the time when he touched it.

24             THE COURT:  It's the form of the question, I'm sorry,

25   the way you phrased it.

C45kcar1                    Velandia - cross

1   BY MR. DELANEY:

2   Q.  When you touched --

3           THE COURT:  You used "could," as I heard it, and that

4   throws the question off.

5   Q.  You didn't ask them for permission at that time because you

6   believed that they consented without using words, correct?

7           MR. PARKER:  Objection.

8           THE COURT:  Objection overruled.

9   A.  No, Mr. Delaney, I did it because they also touched me, so

10  it was reciprocal act.

11  Q.  At that time you believed that their consent was unspoken,

12  correct?

13  A.  Possibly.

14  Q.  You didn't ask for their consent because at the time you

15  believed that you weren't doing anything wrong?

16  A.  I don't believe that this act was, or ever has been, a bad

17  act because it was never bad-intentioned.

18  Q.  Even though you were touching workers on their genitals in

19  a restaurant?

20  A.  Yes, Mr. Delaney.  As I explained when I first started to

21  work at Remi, it was a surprise to me, and I did see it as

22  something abnormal, but when I saw that everyone was touching

23  each other and they began to touch me, in my mind, it became --

24  you could call it something that was normal.

25  Q.  Mr. Velandia, isn't it true that you believed you weren't

C45kcar1                    Velandia - cross

1    doing anything wrong because you didn't get caught?

2    A.  No, I didn't think that.

3    Q.  Let me read you something from your deposition.

4          Page 55 line 22 -- 155 I apologize, page 155 line 22.

5    A.  What line?

6    Q.  Line 22.

7          THE INTERPRETER:  I'm sorry, Mr. Delaney, you said

8    page 155, right?

9          MR. DELANEY:  155 line 22.

10         THE COURT:  155?  Oh, I thought you said 55.

11         Line?

12         MR. DELANEY:  22.

13   BY MR. DELANEY:

14   "Q.  Did you not have anal sex with another Remi employee

15   inside the restaurant?

16   "A.  Yes.

17   "Q.  So does that change your mind about whether you violated

18   this policy that you just described?

19   "A.  No, because it was something I did privately, and Mr. --

20   Mr. Pistorio never found out about this, so there was no reason

21   to discipline me."

22   Q.  Was that your testimony at your deposition?

23         MR. PARKER:  Your Honor, I object to the use of the

24   testimony.  It's not --

25         THE COURT:  Objection sustained.

C45kcar1                    Velandia – cross

1   BY MR. DELANEY:

2   Q.  Mr. Velandia, you're familiar with the complaint that

3   Mr. Sergio Pastor filed with the Division of Human Rights,

4   correct?

5           THE INTERPRETER:  Human Rights, you said?

6           MR. DELANEY:  Division of Human Rights, yes.

7   A.  Yes, I am.

8   Q.  And you read his complaint at the time?

9   A.  Yes, I did.

10  Q.  You read the Spanish portion of his complaint, correct?

11  A.  I read it all.

12  Q.  And at the time, you were aware that Mr. Pastor had alleged

13  that you sexually harassed him, correct?

14  A.  That is correct.

15  Q.  In response to this complaint, you wrote a letter to

16  Mr. Delledonne, correct?

17  A.  Yes, that is correct.

18  Q.  And Mr. Delledonne is Mr. Roberto Delledonne, the owner of

19  Remi Restaurant?

20  A.  Yes, that is correct.

21  Q.  I'm going to ask you to turn to Plaintiffs' Exhibit 105 in

22  your binder.

23          MR. DELANEY:  It's the second volume, Carlos.  There

24  are two volumes.

25          THE INTERPRETER:  What page again?

C45kcar1                      Velandia - cross

1            MR. DELANEY:  It's Plaintiffs' Exhibit 105.

2            THE COURT:  One second.

3            (Pause)

4            THE COURT:  OK.

5      BY MR. DELANEY:

6      Q.   Mr. Velandia, do you recognize this as the letter that you

7      wrote to Mr. Delledonne?

8      A.   Yes, that's correct.

9      Q.   That's your signature at the bottom?

10     A.   Yes, that is my signature.

11     Q.   And at the top it's dated August 21st, 2007?

12     A.   Yes, sir, that's correct.

13     Q.   Now, you testified that you were present at the meeting

14     when Mr. Pastor was fired, correct?

15     A.   Yes, that's correct.

16     Q.   And that you were there only to translate?

17     A.   Correct.

18     Q.   Look at the fourth paragraph of this letter.  It says, "We

19     met with Mr. Pastor (Mr. Cuellar did not appear for this

20     scheduled meeting and had been terminated the previous day for

21     his absences) and Mr. Giovanni Pinato, executive chef, after

22     the lunch shift on August 7th, around 4:15 p.m.  We spoke with

23     Mr. Pastor, and he showed no regret and that insisted that, in

24     resorting to physical violence, he had acted appropriately.

25     After considering the matter, Mr. Pistorio decided to terminate

C45kcar1                        Velandia - cross

1    Mr. Pastor's employment at Remi Restaurant."

2            In your description of this meeting in this paragraph,

3    nowhere do you say you were just translating?

4            THE COURT:  I'm sorry?

5    Q.  In your description of the meeting in this paragraph I just

6    read, nowhere does it say that your role was just to translate?

7    A.  No, in this paragraph I did use the word "speak," "spoke."

8    Q.  It says "we spoke with Mr. Pastor," correct?

9    A.  Yes, that is correct.

10   Q.  And you also said that Mr. Pistorio fired Mr. Pastor

11   because Mr. Cuellar had filed a police complaint.

12           Let me clarify:  That was your testimony yesterday,

13   correct?

14           MR. PARKER:  I am going to object, Judge.  I think

15   that misrepresents his testimony yesterday.

16           THE COURT:  Sustained.

17           MR. DELANEY:  I can read it.

18           THE COURT:  It's not that.  There's nothing

19   inconsistent that you've shown.

20           MR. DELANEY:  Your Honor, the fact that he did not

21   disclose in this --

22           THE COURT:  I'm not going to hear argument.  You can

23   argue it later.  There's nothing inconsistent in the statement.

24           MR. DELANEY:  Sorry, your Honor --

25           THE COURT:  It doesn't have things, but there's

C45kcar1                    Velandia – cross

1   nothing inconsistent.  It doesn't have things that you want.

2   BY MR. DELANEY:

3   Q.  Prior to you writing this letter, you had touched

4   Mr. Pastor, correct?

5   A.  The same day?

6   Q.  At any point prior to this letter, you had touched

7   Mr. Pastor, Mr. Sergio Pastor?

8           THE INTERPRETER:  Pastor?

9           MR. DELANEY:  Correct, Sergio Pastor.

10  A.  Yes.

11  Q.  And you touched him on the penis?

12  A.  Yes, over his pants.

13  Q.  And on his buttocks?

14  A.  Yes, the same way that he touched me.

15  Q.  And you see in the first sentence of this letter, you say,

16  "I want to inform you that all of Sergio Pastor's allegations

17  pertaining to me are false."

18  A.  Yes, Mr. Delaney.  What I'm referring to is the fact that

19  Mr. Pastor had alleged that I wanted to have sex with him.

20  Q.  In this letter you didn't disclose to Mr. Delledonne that

21  you had touched Mr. Pastor on the penis, did you?

22  A.  No, sir, no.

23          MR. DELANEY:  I move Plaintiffs' Exhibit 105 into

24  evidence.

25          THE COURT:  105 is admitted in evidence.

C45kcar1                          Velandia – cross

1            (Plaintiff's Exhibit 105 received in evidence)

2       BY MR. DELANEY:

3       Q.  I'd like you to turn to Plaintiffs' Exhibit 86.

4            Do you recognize this, Mr. Velandia, as the affidavit

5       you filed with the Division of Human Rights in response to

6       Mr. Pastor's complaint?

7       A.  Yes.

8       Q.  And if you turn to page 2 of Plaintiffs' Exhibit 86, is

9       that your signature?

10      A.  Yes, sir, this is my signature.

11      Q.  And it's dated September 7th, 2007?

12      A.  Yes, sir.

13      Q.  And are paragraphs 4 and 5 your description of the meeting

14      when Mr. Pastor was fired?

15      A.  Yes, that's correct.

16            MR. DELANEY:  Your Honor, I move Plaintiffs' 86 into

17      evidence.

18            THE COURT:  86 is admitted in evidence.

19            (Plaintiff's Exhibit 86 received in evidence)

20      Q.  Now, Mr. Velandia, you've spoken to Mr. Delledonne about

21      your conduct at Remi Restaurant, correct?

22      A.  Yes, that's correct.

23      Q.  And you told him that you performed oral sex on

24      Mr. Caravantes while working at the restaurant?

25      A.  Well now, yes, he knows.

C45kcar1                          Velandia - cross

1    Q.  Well, did you have a conversation with Mr. Delledonne?

2              THE COURT:  When?

3              MR. DELANEY:  In 2010.

4    Q.  When you informed him about this conduct.

5    A.  Yes, I remember that I had a conversation with

6    Mr. Delledonne, but I don't remember all the words that were

7    said, but, yes, everything was discussed.

8              THE COURT:  In 2010?

9              THE WITNESS:  Possibly it was in 2010, but I don't

10   really remember the exact date now.

11   BY MR. DELANEY:

12   Q.  Maybe this helps refresh your recollection.  Your

13   deposition was two days in January 2011.  Do you recall that?

14   A.  Yes, correct.

15   Q.  And at that deposition, you testified that you had had a

16   prior conversation with Mr. Delledonne about this conduct?

17   A.  Yes, sir, that is correct.

18   Q.  So we can agree the conversation at least happened before

19   January 2011?

20   A.  Yes, yes, sir, that's correct.

21   Q.  And at that conversation, did you tell him about the oral

22   sex with Mr. Caravantes in Remi Restaurant?

23   A.  Yes, I think I did.

24   Q.  Did you tell him that you had anal sex with Mr. Caravantes

25   in Remi Restaurant?

C45kcar1                        Velandia - cross

1   A.  Yes, also I did.

2   Q.  After this conversation you had with Mr. Delledonne, he

3   didn't punish you, did he?

4   A.  Not really.

5   Q.  He didn't punish you, did he?

6   A.  No, no, sir.

7   Q.  And, in fact, after this conversation, you continued to

8   work at Remi Restaurant, didn't you?

9   A.  Yes, that is correct.

10  Q.  You continued to work as a party manager?

11  A.  Yes, that is correct, sir.

12  Q.  You continued to manage other employees?

13  A.  Not really to manage the employees, but to be the party

14  manager, which includes working as a team with the other

15  employees.

16  Q.  You still work at Remi today?

17  A.  Yes, sir.

18          MR. DELANEY:  No other questions at this time.

19          THE COURT:  Any redirect?

20          MR. PARKER:  Your Honor, just one housekeeping item:

21  I move the admission of Defendants' Exhibit 62 in evidence.

22          THE COURT:  Plaintiffs' 62?

23          MR. PARKER:  Defendants' 62, Judge.

24          THE COURT:  Any objection?

25          MR. DELANEY:  No objection, your Honor.

C45kcar1                         Velandia - cross

1              THE COURT:  62 is admitted in evidence.

2              (Defendant's Exhibit 62 received in evidence)

3      REDIRECT EXAMINATION

4      BY MR. PARKER:

5      Q.  Mr. Velandia, you testified on cross-examination that you

6      witnessed Mr. Sotarriba engage in acts of simulated sex.  Do

7      you recall that?

8              THE INTERPRETER:  Let me get the question again.  I'm

9      sorry.

10             MR. PARKER:  May I have that read back?

11             THE COURT:  Yes.

12             (Record read)

13     A.  Yes, I recall.

14     Q.  Would you describe those acts that you saw?  What did he

15     do?

16     A.  For example, I remember that he played that way with Jorge

17     Cortez, he would approach Jorge Cortez and grab him by the

18     waist, and he would pull him towards his genitals.  That was

19     one of the ways in which I saw that he did that.

20     Q.  Can you recall any other ways?

21     A.  Also, for example, if Jorge would bend to pick something

22     up, Sotarriba would approach him, he would approach him from

23     the front, and he would grab Jorge's head and pull it towards

24     his genitals.

25             MR. PARKER:  I have no further questions.

C45kcar1                           Velandia - redirect

```
 1              THE COURT:  Recross?

 2              MR. DELANEY:  Very short.

 3              Mike, can I have the deposition for identification,

 4     the three that I gave to you?

 5     RECROSS EXAMINATION

 6              MR. DELANEY:  Your Honor, plaintiffs want to submit

 7     three --

 8              THE COURT:  We have lost the binder for the

 9     deposition.

10              OK.

11              MR. DELANEY:  Your Honor, plaintiffs have marked three

12     portions, three excerpts, from Mr. Velandia's deposition for

13     identification.  These are the ones I spoke about yesterday.

14     We'll mark the ones I did today --

15              THE COURT:  Is this recross or?

16              MR. DELANEY:  Yes.  I'm just doing a little

17     housekeeping first.  So we're going to mark three as

18     Plaintiffs' Exhibit 323 --

19              THE COURT:  I'm sorry, what?

20              MR. DELANEY:  I thought you had asked us to mark the

21     excerpts of the deposition for identification.

22              THE COURT:  Yes, yes.

23              MR. DELANEY:  So I'm just doing that right now

24     quickly.

25              THE COURT:  What did you say, 323?  Is that a page of
```

C45kcar1                          Velandia - recross

 1   the deposition?

 2              MR. DELANEY:  Plaintiffs' Exhibit 323.

 3              THE DEPUTY CLERK:  It's an exhibit.  They're going to

 4   mark --

 5              THE COURT:  I don't have that exhibit.

 6              THE DEPUTY CLERK:  Right, they're going to mark them.

 7              THE COURT:  Oh, these are excerpts from the

 8   deposition?

 9              MR. DELANEY:  Correct.

10              THE COURT:  Well, then you better tell me what page

11   they're excerpts from.

12              MR. DELANEY:  Absolutely.

13              I'll say the exhibit number first, and then I'll say

14   what page of the deposition it's from.

15              So Plaintiffs' Exhibit 323 are pages 48 and 49 of

16   Mr. Velandia's deposition, 48 line 25 through 49 line 8.

17              THE COURT:  Yes.  Next?

18              MR. DELANEY:  Plaintiffs' Exhibit 324 is page 59 of

19   Mr. Velandia's deposition lines 17 through 22.

20              THE COURT:  OK.

21              MR. DELANEY:  Plaintiffs' Exhibit 325 is page 61 line

22   23 through 62 line 4.

23              THE COURT:  Plaintiffs' Exhibits 323, any objection to

24   323, 324 and 325?

25              Hearing none --

1          MR. PARKER:  No objections, your Honor.

2          THE COURT:  Plaintiffs' Exhibits 323, 324, and 325 are

3   admitted in evidence.

4          (Plaintiff's Exhibits 323, 324, and 325 received in

5   evidence)

6   BY MR. DELANEY:

7   Q.  Mr. Velandia, the simulated sex that you just testified

8   about in response to Mr. Parker's question, you didn't mention

9   that conduct by Mr. Sotarriba at your deposition, did you?

10  A.  No, Mr. Delaney.  It's difficult to remember all the

11  details of everything that's happened at the same time.

12  Q.  You remember it very clearly now?

13  A.  Well, some things come back to your memory.

14          MR. DELANEY:  No further questions.  Thank you.

15          THE COURT:  You're excused, Mr. Velandia.  Thank you.

16          THE WITNESS:  Thank you, your Honor.

17          (Witness excused)

18          THE COURT:  Next witness.

19          MR. PARKER:  Pablo Solis, your Honor.

20   PABLO SOLIS,

21       called as a witness by the Defendant,

22       having been duly sworn through the

23       Interpreter, testified as follows:

24          THE DEPUTY CLERK:  Please state your name, spell your

25  first and your last names slowly for the record, please.

C45kcar1

1          THE WITNESS:  Pablo Solis, P-a-b-l-o S-o-l-i-s.

2     DIRECT EXAMINATION

3     BY MR. PARKER:

4     Q.  Good morning, Mr. Solis.

5     A.  Good morning.

6          MR. SAXENA:  I'm sorry, your Honor.  The witness did

7     not use an interpreter at his deposition.  I object to the use

8     of an interpreter now, if he didn't need one before.

9          THE COURT:  Well, we'll hear how the examination goes.

10    I take it that Mr. Parker will probably cover that.

11         MR. PARKER:  I was just about to.

12    Q.  Mr. Solis, what is your native language?

13         THE INTERPRETER:  Should I translate this?

14         THE COURT:  Yes.

15    A.  Spanish.

16    Q.  Do you speak English?

17    A.  85 percent.

18    Q.  Do you feel more comfortable with an interpreter

19    translating English to Spanish, or would you prefer to testify

20    today here in English?

21    A.  I believe it's better in Spanish.

22    Q.  Are you employed at Remi Restaurant, sir?

23    A.  Yes.

24    Q.  How old are you?

25    A.  42.

C45kcar1                    Solis - direct

 1   Q.  Where do you live, Mr. Solis?

 2   A.  In Queens.

 3   Q.  And with whom do you live?

 4   A.  With my wife and two daughters.

 5   Q.  Where are you from originally?

 6   A.  I am from Mexico, the state is Puebla, and the city is

 7   Atlixco.

 8   Q.  And when did you come to the United States to live?

 9   A.  When I was 17 years old.

10   Q.  When did you start working at Remi?

11   A.  12 years ago, in the year 2000.

12   Q.  What was your first job there?

13   A.  Busboy.

14   Q.  How long did you serve as a busboy?

15   A.  About a year and a half.

16   Q.  And did you take another job at Remi at that time?

17   A.  Yes.

18   Q.  What job did you then take?

19   A.  Afterwards, I worked as a food runner.

20           THE COURT:  How old were you when you went to work for

21   Remi?

22           THE WITNESS:  (In English)  OK, let me see.

23           (Through Interpreter)  Well, now I'm 42.

24           THE COURT:  You were about 30?

25           THE WITNESS:  Yes, about 30, 30-something, yes.

C45kcar1                    Solis - direct

```
 1              MR. PARKER:  By the way, how old are your children?
 2    A.   The youngest is seven, the eldest is 13.
 3    Q.   So you went from busboy to food runner at Remi.  Do you
 4    recall how long you remained as a food runner at Remi?
 5    A.   Yes, like four to six years -- to five years, sorry.
 6    Q.   Did you at sometime take another job at Remi?
 7    A.   Yes.  When Mr. Roberto took ownership of the restaurant,
 8    there was a transition.
 9    Q.   And what was the transition?
10    A.   I was offered the opportunity to work the floor as a
11    waiter.
12    Q.   Who offered you that opportunity?
13              THE INTERPRETER:  I'm sorry?
14              MR. PARKER:  Who offered you that opportunity?
15    A.   Mr. Pistorio.
16    Q.   What was Mr. Pistorio's job at Remi at that time?
17    A.   General manager.
18    Q.   What training, if any, did you receive in order to become a
19    waiter at Remi?
20    A.   I did receive training for about a week or a week and a
21    half.  It related to how to explain the plates, the wines, how
22    to serve the people, the computer, how to register the orders
23    in the computer.
24    Q.   Have you, since becoming a waiter at Remi, held any other
25    jobs there?
```

C45kcar1                       Solis - direct

1    A.  Yes.  About two, three years ago, I started to work at the

2    bar.

3    Q.  As a bartender?

4    A.  Yes.

5    Q.  And who appointed you to that position?

6    A.  It was Mr. Carlos Maggi, though now he's the general

7    manager.

8    Q.  When Mr. Pistorio was the general manager at Remi, how did

9    you address him by name?

10             MR. SAXENA:  Objection.

11             THE COURT:  I will allow the question.

12             THE WITNESS:  We called him Mr. Pistorio.

13   Q.  While Mr. Pistorio was the general manager at Remi, how was

14   your work schedule -- how were the work schedules prepared for

15   the employees there?

16   A.  Mr. Pistorio was the one who would prepare the schedules.

17   Q.  And if you, as a waiter, wanted to take a day off or a

18   vacation, how would you communicate that to the restaurant?

19   A.  If it was a day off, you would make a request.  If it was

20   vacation time, you would speak to him and he would give you a

21   form; and you'd fill it out, indicating from what date to what

22   date.

23             (Continued on next page)

24

25

1   Q.  Who did you speak to for that?

2   A.  Mr. Pistorio.

3   Q.  As a waiter, Mr. Solis, were you part of the tip pool at

4   Remi?

5   A.  Yes.

6   Q.  Was there ever a time that you were involved in handling

7   the distribution of tips to employees?

8   A.  Yes.  I did that for about three to four years.

9   Q.  When did you first start that function?

10  A.  I don't have the exact date, but it might have been three

11  to four months after the new ownership came in.

12          THE COURT:  Is that when it started?

13          THE WITNESS:  Yes.

14  Q.  How did it come to be that you had responsibilities for

15  distributing tips?

16  A.  There was a general lesson that included the busboys,

17  coffee makers, white jackets and waiters and bartenders.

18  Q.  Was there any -- during the time that you were involved in

19  distributing tips, was anyone else working with you doing that?

20          THE COURT:  The question calls for more than one

21  conclusion, so I am going to sustain an objection to the

22  question.  It calls for a conclusion with respect to whether it

23  was -- I think it calls for more than one conclusion.

24  Q.  You said you distributed --

25          THE COURT:  Did you do it -- I don't know whether he

C45dcar2                          Solis - direct

1  did it alone or whether he -- based on one day, one day it was

2  his, one day it was theirs, whether they both worked together

3  every day.

4          MR. PARKER:  I will break it down, your Honor.  Thank

5  you.

6  BY MR. PARKER:

7  Q.  Mr. Solis, you said that you were involved in distributing

8  tips over the course of, you said, three or four years at Remi?

9  A.  Yes.

10  Q.  And what specifically was your responsibility?

11  A.  My responsibility was to collect all of the money and to

12  distribute it into envelopes.

13  Q.  How often were the envelopes -- and what were the envelopes

14  used for?

15  A.  To put the money in, and each envelope had a person's name.

16  Q.  Was the envelope the tip money to be distributed to the

17  employees?

18  A.  Yes.  Yes, in the envelopes.

19  Q.  How often were tips distributed during that time that you

20  were involved in it?

21  A.  It was distributed every Thursday each week.

22  Q.  Was it your responsibility to distribute the tips in the

23  envelopes each week during that three- or four-year period that

24  you were involved in doing that?

25  A.  Yes.

C45dcar2                    Solis - direct

1    Q.  Was there anyone else during that time who had

2    responsibilities for distributing tips along with you?

3    A.  Well, the lesson was done for three people.  So if I wasn't

4    in, if I was on vacation, Oscar would do it.  If Oscar wasn't

5    in and I wasn't in either, there was another person that could

6    do it; that was Jose Ortiz.

7    Q.  Just a question on the translation.  I heard the

8    interpreter say "lesson."  Did you mean lesson or did you mean

9    election?

10   A.  I'm sorry.  Election.

11   Q.  Thank you.

12          THE COURT:  When you made the calculation for the

13   distribution, did you make it alone?

14          THE WITNESS:  No.

15          THE COURT:  Who, if anyone, made it with you?

16          THE WITNESS:  Oscar and I would do it.

17          THE COURT:  So you checked each other?

18          THE WITNESS:  Yes.

19          THE COURT:  Then one of you made the distribution?

20          THE WITNESS:  Yes.  I was in charge of the

21   distribution.

22   BY MR. PARKER:

23   Q.  And you said the name "Oscar."  Do you mean Oscar Velandia?

24   A.  Yes.

25   Q.  How long have you known Mr. Velandia?

C45dcar2                    Solis - direct

1   A.   Since I began to work at the restaurant; twelve years now.

2   Q.   Would you describe your relationship with Mr. Velandia?

3   A.   We are coworkers and at one time we shared an apartment.

4   After I moved out we continued to be coworkers.  We would go

5   out in the evenings for drinks, dancing, and I also remember

6   there was another gentleman that would accompany us many times;

7   that was Mr. Sotarriba.

8   Q.   OK.  When did you and Mr. Velandia share an apartment?

9   A.   I think it was about a year after I started working at the

10  restaurant, and we shared it for about a year or a year and a

11  half.

12  Q.   And you said that you used to go out socially with Velandia

13  and Sotarriba.  When did that take place?

14  A.   That was after work.  Many times it was in the middle of

15  the week or on the weekends.

16          THE COURT:  Did anyone else live at the apartment when

17  you lived there?

18          THE WITNESS:  Yes.  I lived there with my wife, my

19  daughter, Oscar Velandia's sister and his nephew.

20  BY MR. PARKER:

21  Q.   Do you enjoy working at Remi, Mr. Solis?

22  A.   Yes.  From the first day that I sought work there, I've

23  enjoyed working there, and I still continue to be very pleased

24  working there.

25  Q.   Why?

C45dcar2                    Solis - direct

1    A.   Because it has provided many satisfactions for me, among

2    them emotional and financial, and it's also allowed me to take

3    care of my family.

4    Q.   Now, let's talk about the timeframe after the new owners

5    came to Remi.

6              How would you describe the working environment in the

7    restaurant when you worked there?

8    A.   There were many changes.  Many changes.  Many good changes.

9    Because under the prior administration there were many things

10   that were injustices, and under the new administration many

11   things changed.

12   Q.   Can you give me some examples of the changes you viewed as

13   positive?

14   A.   Yes.  For example, I would say that there were unjustified

15   firings, but under the new administration everything was done

16   the way it should be.

17             MR. SAXENA:  Objection, your Honor.  Move to strike.

18             What is the relevance of any of this?

19             THE COURT:  Well, it is just conclusory.  We will have

20   to -- I will just treat it as conclusory.  It is not evidence

21   of facts.  It is just his opinion.  It is not evidence of

22   facts.

23             He will have to explain the factual background for

24   that.  You can go into it on cross if you want.

25   BY MR. PARKER:

C45dcar2                    Solis - direct

1   Q.  Would you, Mr. Solis -- again, focusing on the time period

2   after the new owners came to Remi, while Mr. Pistorio was the

3   general manager, how did employees interact with one another?

4   A.  Well, the interaction between the coworkers was the same

5   under the old and the new administration.  Those that got along

6   very well continued to do so, joking around, playing around.

7   Q.  What do you mean by "joking around, playing around"?

8   A.  Well, like before, when they would say to each other, you

9   know, you're my prosti or you're my flower, you are my puta, or

10  my bitch, they would touch each other -- or we would touch each

11  other, because I was one.

12  Q.  Had you ever seen that type of conduct occur before you

13  began working at Remi?

14  A.  I don't understand the question.

15  Q.  Before you --

16          THE COURT:  Where did you work before you worked at

17  Remi?

18          THE WITNESS:  OK.  If there are Mexicans in the

19  workplace, this is conduct that we bring with us; this is part

20  of our culture.

21          THE COURT:  Where did you work before you worked at

22  Remi?

23          THE WITNESS:  Before working at Remi, I worked at a

24  pizzeria on Delancey Street.

25          THE COURT:  OK.  How long did you -- what years did

C45dcar2                           Solis - direct

1    you work there?

2              THE WITNESS:  I worked there for about a year.

3              THE COURT:  Before that where did you work?

4              THE WITNESS:  Well, before that I was in Mexico for

5    five years.

6              THE COURT:  What year did you come to the United

7    States?

8              THE WITNESS:  In 1989, I think.

9              THE COURT:  And you went back to Mexico?

10             THE WITNESS:  I arrived here when I was 17 and stayed

11   for five years.  After that five-year period ended, I went back

12   to Mexico for another five-year period.  And then I returned.

13   I started working at the pizzeria.  Then I started to work at

14   Remi.

15             THE COURT:  In the first period you were in the United

16   States, where did you work?

17             THE WITNESS:  I worked at an Italian restaurant in New

18   Jersey for four years.

19             THE COURT:  All right.

20   BY MR. PARKER:

21   Q.  In one of your earlier answers, you said that -- you used

22   the word culture -- Mexican culture.  What do you mean by that?

23             MR. SAXENA:  Objection.  I think he is misstating.

24             THE COURT:  It is the Court's recollection he used

25   words -- if it wasn't "culture," it was a word of a similar

C45dcar2                    Solis - direct

 1  sort.  I will allow the question.

 2  A.  Well, this is a game that we play even as children.  This

 3  is a game that as children you play with your very close

 4  friends.

 5          THE COURT:  What part of Mexico do you come from?

 6          THE WITNESS:  I'm from the State of Puebla, the City

 7  of Atlixco.

 8          THE COURT:  Is that the south or the north of Mexico?

 9          THE WITNESS:  The south.  The south.

10  BY MR. PARKER:

11  Q.  And when you say that you played this game as children in

12  Mexico, what specifically are you talking about?  What game?

13          MR. SAXENA:  Objection to relevance.  There is no

14  foundation or showing that this witness is from the same town

15  or grew up with any of the plaintiffs.

16          THE COURT:  I am going to allow the question.  You can

17  go into that on cross.

18          THE WITNESS:  Could you repeat the question again,

19  please?

20          MR. PARKER:  May I have it read back, your Honor?

21          THE COURT:  Yes, you can have it read back.

22          (Question read)

23  A.  Touching each other's rear ends and sometimes simulating

24  sex.

25  Q.  Do you know either of the plaintiffs, Arturo Caravantes or

C45dcar2                       Solis - direct

1   Francisco Sotarriba?

2   A.  I'm sorry.  I don't understand.

3   Q.  OK.  Do you know Caravantes and Sotarriba?

4   A.  I know Mr. Caravantes because we're from the same city and

5   just about the same block.

6   Q.  In Mexico?

7   A.  In Mexico.

8           And Mr. Sotarriba, I met him when I started working

9   here at the restaurant.

10  Q.  OK.  The game you've described that you knew from childhood

11  in Mexico, did any of that occur at Remi?

12  A.  Yes.

13  Q.  I want to focus on the period of time --

14          THE COURT:  First, I think we need a timeframe.

15          MR. PARKER:  Thank you, Judge.

16          THE COURT:  When?

17          MR. PARKER:  I was just going to --

18          THE COURT:  When did he first observe it?

19          MR. PARKER:  That was my next question.

20  Q.  When did you observe this type of conduct at Remi?

21  A.  There was no time.  It could happen at any moment.

22          THE COURT:  When was the first time?

23          THE WITNESS:  Oh, OK.  I wouldn't say that the first

24  day I started working there I saw it but I'd say maybe the

25  second, third or fourth day.

C45dcar2                        Solis - direct

1    Q.  And did the same kind of conduct continue while

2    Mr. Pistorio was the general manager at Remi?

3    A.  It continued to occur and still occurs.

4              THE COURT:  When during the workday would it occur?

5              THE WITNESS:  There's no specific time for it.

6    Whenever there's an opportunity for it, at any time.

7              THE COURT:  Well, it would occur while customers were

8    present?

9              THE WITNESS:  No.  No.  No.  It happens in the back.

10   Nothing out on the floor.

11   BY MR. PARKER:

12   Q.  Would you describe the touching that you are referring to

13   that you saw occur at Remi.

14   A.  Yes.  If a coworker is passing by me and he's distracted,

15   I'll turn and grab his buttocks.  In the same way if a coworker

16   sees me distracted, he'll do the same thing.

17   Q.  And when you say "grab your buttocks," can you be more

18   specific about the type of touch that occurs?

19   A.  It's like a smack (indicating).

20   Q.  Have you --

21             THE COURT:  A slap?

22             THE WITNESS:  Like a slap.  Like a slap.

23             (Indicating)

24   Q.  Have you witnessed any other types of --

25             THE COURT:  The record should show that the witness

C45dcar2                          Solis - direct

1    raised himself up and slapped himself on the buttocks, or one

2    buttocks.

3    BY MR. PARKER:

4    Q.  Mr. Solis, have you witnessed any other kinds of touching

5    at Remi other than what you've just described?

6    A.  Yes.  Also simulating sex.

7    Q.  And would you describe what you mean by that, please.

8    A.  OK.  In the same way if you see a coworker and they're not

9    paying attention, the other person would sneak up behind them

10   and grab them.  Many times you can grab the person by the waist

11   or even completely hug them so that they can't get away and

12   pull them closer to you.

13   Q.  When that happens, as you've witnessed it, do the bodies of

14   the two individuals touch?

15   A.  Yes.

16   Q.  What parts of the bodies touch during these simulated sex

17   acts that you're discussing?

18   A.  The buttocks and the front part.

19          THE COURT:  The front part is what?

20          THE WITNESS:  The private part and the back.

21          THE COURT:  "Private part and the back," what do you

22   mean?

23          THE WITNESS:  The back, the buttocks.

24          THE COURT:  And what do you mean by "the back"?

25          THE WITNESS:  Can I give an example?

C45dcar2                         Solis - direct

1              THE COURT:  Sure.

2              THE WITNESS:  (Indicating) This is the distracted

3      person.  They could be doing anything.  The other person would

4      come up from behind and just grab them and go like this

5      (indicating).

6              Many times they would grab them or hug them completely

7      and do that.

8              THE COURT:  The record will show that the person

9      initiating the action would come from behind and place his

10     hands on the waist of the other person and pull the other

11     person back towards his body, I guess, the front of his body.

12     BY MR. PARKER:

13     Q.  These, what you've just described, these simulated sex

14     acts, are there any others besides the one you just described?

15     A.  Yes.  Another one.

16     Q.  Would you describe it, please.

17     A.  Can I give another example?

18             THE COURT:  Yes.

19             THE WITNESS:  (Indicating)  OK.  If the coworker is

20     bent or kneeling cleaning something, the other one could

21     approach.  The other coworker could approach and do this

22     (indicating).

23             THE COURT:  Do what?

24             THE WITNESS:  Grab the person's head and pull it

25     towards his private parts.

C45dcar2                          Solis - direct

 1          THE COURT:  The witness was standing and indicated the

 2     other person was bending over or down in a low position,

 3     crouching, or something like that, and the initiator would

 4     reach out and hold his head down and pull it towards the front

 5     of his body, near the genital area.

 6     BY MR. PARKER:

 7     Q.  Mr. Solis, have you witnessed both of those types of acts

 8     occur at Remi?

 9     A.  I have witnessed them and I have also done that.

10     Q.  And have you witnessed other Remi employees engaged in that

11     type of conduct?

12     A.  Yes.  Yes.

13     Q.  What other employees have you witnessed engaged in this

14     conduct?

15     A.  I can give the name of Mr. Sotarriba.  He would do that to

16     me; I would do that to him, as well.  But it was like a game.

17     Q.  Anyone else?

18     A.  Yes.  There are other coworkers that have done that.  Also,

19     Mr. Caravantes, I remember that he would do that to other guys.

20     Q.  Now, when you were a food runner at Remi, was Mr. Sotarriba

21     also a food runner?

22     A.  Yes.

23     Q.  And did any of these occasions where you had simulated sex

24     acts with Sotarriba occur while you were a food runner and he

25     was a food runner?

C45dcar2                          Solis - direct

1    A.  Yes.

2    Q.  Did any of these simulated sex acts between you and

3    Sotarriba occur after you became a waiter?

4    A.  There was a little but not as much as before.  It was done

5    a little less.

6    Q.  Did each of you -- you and Sotarriba -- did you sometimes

7    initiate it and did he sometimes initiate it, or was it one

8    person who always initiated these simulated sex acts?

9             MR. SAXENA:  Objection.

10            THE COURT:  Objection sustained to the form of the

11   question.

12   Q.  With regard to the simulated sex acts that you described

13   between you and Sotarriba, who initiated these acts?

14   A.  It wasn't any one of us.  It would be if he had the

15   opportunity, he did it.  If I had the opportunity, I would do

16   it.

17   Q.  Are you saying, Mr. Solis, there would be times when

18   Mr. Sotarriba would be the person standing behind you --

19            MR. SAXENA:  Objection.

20   Q.  -- as you demonstrated it?

21            THE COURT:  Objection?

22            MR. SAXENA:  Objection, yes.

23            THE COURT:  Objection sustained.

24   Q.  On the times when Mr. Sotarriba initiated these simulated

25   sex acts with you, how did he do that?  What did he do?

1          MR. SAXENA:  Objection again.

2          THE COURT:  Since there are different simulated sex

3    acts, I guess I have to sustain the objection.

4          MR. PARKER:  All right.  We'll break it down.

5    Q.  Mr. Solis, as between you and Sotarriba, what were the

6    simulated sex acts that the two of you engaged in?

7    A.  Touching each other and grabbing each other.

8    Q.  You demonstrated the two different ones that you talked

9    about, the one standing up and the other person was squatted

10   down, and the other where both were standing.  Which ones

11   occurred between you and Sotarriba?

12   A.  In both.

13   Q.  Did Sotarriba initiate either one of those types of acts

14   with you at any time?

15         MR. SAXENA:  Objection.

16         MR. PARKER:  He already testified, your Honor, that he

17   did.  I'm just trying to find out what he did.

18         THE COURT:  I am going to overrule the objection.

19         THE INTERPRETER:  Can I hear the question back?  I'm

20   sorry.

21         MR. PARKER:  May I please have that read back?

22         THE COURT:  Read it back.

23         (Question read)

24   A.  I'd say yes; if he had the opportunity, he did it.

25   Q.  Which type of the ones you described?

C45dcar2                    Solis - direct

1  A.  Either one, depending on the occasion as it presented

2  itself.

3  Q.  And you also mentioned a few moments ago that you and

4  Sotarriba engaged in the slapping or the grabbing of the

5  buttocks that you described; is that correct?

6  A.  Yes.

7  Q.  Were there any times when Sotarriba touched your buttocks

8  with his hand?

9  A.  Yes.

10          THE COURT:  Were there other people present on these

11  occasions?

12          THE WITNESS:  Yes.

13          THE COURT:  What was their position?

14          THE WITNESS:  It could have been a busboy.  It could

15  have been a chef.  Not chef; the cooks.  Cooks are different

16  from the chefs.

17          (Pause)

18  BY MR. PARKER:

19  Q.  As between you and Sotarriba, did Mr. Sotarriba ever ask

20  you not to touch him any longer?

21  A.  How could I say it?  No -- he never said anything serious.

22          THE COURT:  What do you mean by that?

23          THE WITNESS:  Can I give an example?

24          THE COURT:  Yes.

25          THE WITNESS:  This is Sotarriba (indicating).  I'm

C45dcar2                      Solis - direct

behind him.  I'd grab him and I'd go like this.

He'd turn --

THE COURT:  You would grab him like what?

THE WITNESS:  With his buttocks.

And then he will turn and push me and say, "No, wey."
"Wey" is like a word that Mexicans use.  It's not like wait,
wait.  So he'll say, "No, wey."  That's it.

And when I'm referring to something serious will be
the moment where he might say something like, "That's enough.
I don't want you to touch me.  That's enough.  The next time, I
don't know."

But nothing like that ever happened.

THE COURT:  But it happened in one case where he would
say, "No, wait"?

THE WITNESS:  "Wey" is a word that Mexicans use.  It's
similar to way, but it's like saying, "How are you, wey?"

I think that you're understanding him to say like, no,
no way, but that's not it; it's not like that.

THE COURT:  After he would say, "No, wey," were there
occasions after that in which either of you approached the
other?

THE WITNESS:  Yes.  After that, if he had an
opportunity he would approach me, and I would do the same and
say, you know, "Wait, wey."

BY MR. PARKER:

C45dcar2                    Solis - direct

1   Q.  Have you ever seen Sotarriba engage in any of the -- in

2   either of those simulated sex acts that you demonstrated for

3   us?

4              THE COURT:  Let me ask one.

5              when he would say, "No, wey," what was his facial

6   expression?

7              THE WITNESS:  Normal.  He wasn't upset.  He was

8   normal.  He wasn't upset.

9              THE COURT:  He didn't appear to you to be upset?

10             THE WITNESS:  No.  Because I would do the same thing

11   to him and I wasn't upset.

12             Can I say something?

13             THE COURT:  It is up to the lawyer.  You can say

14   something, I guess.

15             I will let you say something.

16             THE WITNESS:  OK.  As Mexicans, when we don't like

17   something, we go to blows.  If from the beginning I wouldn't

18   have liked what he was doing, I would go to blows with him.

19             THE COURT:  You would get fired if you would go to

20   blows?

21             THE WITNESS:  It wouldn't matter to me.  It wouldn't

22   matter to us.  It wouldn't matter whether we get fired or not,

23   if we don't like something.  Especially at that age, at the age

24   of 35, we're men.  If there's something that we don't like,

25   we'll say it at the moment.

C45dcar2                          Solis - direct

1    BY MR. PARKER:

2    Q.  Did Sotarriba ever tell you that he didn't like playing the

3    game?

4    A.  No.

5    Q.  Did you observe Sotarriba touching other employees?

6    A.  Yes.

7    Q.  Who else did you see -- did you observe Sotarriba touching

8    in the game that you had described?

9    A.  I could say Mr. Velandia.  I could say Mr. Jose Ortiz --

10            THE COURT:  Don't say "could."  I want to know whether

11   you did, not whether you could.

12            THE WITNESS:  Mr. Velandia, Mr. Ortiz, other people --

13   more people whose names I don't recall.

14   BY MR. PARKER:

15   Q.  With regard to Mr. Velandia, what did you observe between

16   the two of them, between Sotarriba and Velandia, in terms of

17   touching?

18   A.  That they participated in the game.

19   Q.  And in particular what did you see them do?

20   A.  Many times Sotarriba would hug Velandia; many times

21   Velandia would allow him to as part of the game.  And many

22   times Velandia would hold Sotarriba the same way, in the same

23   fashion.  And he would allow himself to.  He would say he's my

24   prosti, my flower.

25            THE COURT:  When these acts occurred, you never

C45dcar2                              Solis - direct

1    mentioned anyone talking before.  Earlier in your testimony you

2    showed us the acts but you didn't say anything about anyone

3    talking.

4              THE WITNESS:  I mean, at this time it's difficult to

5    remember many details.

6              THE COURT:  How often would the people speak words?

7              THE WITNESS:  They would speak words always.

8              THE COURT:  What were those words that were part of

9    the game?

10             THE WITNESS:  Prosti, flower, my puta.

11             THE COURT:  And would they say those words at the time

12   these acts occurred?

13             THE WITNESS:  Sometimes yes; sometimes no.

14             THE COURT:  Sometimes they'd say them alone, they

15   would say the words without any acts, is that right?

16             THE WITNESS:  Yes.

17             THE COURT:  I guess we had better take a break.

18             MR. SAXENA:  Just a five-minute break, your Honor?

19             THE COURT:  I hope so.  I've got to go up and see what

20   calls I've got.

21             (Recess)

22             (Continued on next page)

23

24

25

C45kcar3                         Solis - direct

1              (In open court)

2    BY MR. PARKER:

3    Q.  Mr. Solis, are you aware of whether or not Mr. Velandia is

4    gay?

5    A.  Yes.

6    Q.  And for how long have you known that?

7    A.  I have known him for 12 years now, so...

8              THE COURT:  What caused you to be aware of it?

9              THE WITNESS:  He's said it himself.

10             THE COURT:  When?

11             THE WITNESS:  I don't know, but he has said it

12   himself.

13             THE COURT:  How do you know that you have been aware

14   for 12 years?

15             THE WITNESS:  How do I know he's gay?  Because I know

16   his partner.

17             THE COURT:  When did you meet his partner?

18             THE WITNESS:  I think he's been with him for five or

19   six years; and before that, the other partner that he was with

20   I also knew.

21   BY MR. PARKER:

22   Q.  You testified that you used to on occasion go out socially

23   with Mr. Velandia and Mr. Sotarriba, right?

24   A.  Yes, that's correct.

25   Q.  Was that during the time that you were a food runner at

C45kcar3                          Solis - direct

1    Remi?

2    A.   Also when I was a busboy.

3    Q.   Before the new ownership came?

4    A.   Yes.

5    Q.   Are you aware of whether or not Mr. Sotarriba knew that

6    Mr. Velandia is gay?

7              MR. SAXENA:   Objection.

8              THE COURT:   I'm not going to allow it in terms of

9    what -- I'm going to sustain the objection.  It goes to what

10   someone else's state of mind is.

11   BY MR. PARKER:

12   Q.   Did Mr. --

13             MR. PARKER:   I'm sorry, your Honor?

14             THE COURT:   The question, as you framed it, it seems

15   to me, asks what Mr. Sotarriba's state of mind is; and this

16   witness can't testify as to what Mr. Sotarriba's state of mind

17   is.

18   BY MR. PARKER:

19   Q.   Did Mr. Sotarriba ever tell you that he knew Mr. Velandia

20   is gay?

21   A.   No, no.

22             THE COURT:   Were you of the opinion that Mr. Sotarriba

23   did know that Mr. Velandia was gay?

24             THE WITNESS:   Yes.

25             THE COURT:   What caused you to reach that opinion?

C45kcar3                          Solis - direct

1          THE WITNESS:  Since we went out together, many times

2    we went to gay locations.

3          THE COURT:  But you weren't gay, Sotarriba wasn't gay;

4    so why would that indicate to anyone that Mr. Velandia was gay?

5          THE WITNESS:  I'm trying to remember if -- I don't

6    have a specific example, but I'm sure that he knew that he was

7    gay.

8    BY MR. PARKER:

9    Q.  You mentioned earlier in your testimony that Mr. Caravantes

10   participated in the touching game?

11   A.  Yes.

12   Q.  How did he participate in the touching game?

13   A.  That I can remember, I remember seeing Caravantes touch

14   Mr. Ortiz once, and I know that Mr. Ortiz is also gay.  And it

15   was in the same manner, grabbing his buttocks, hugging him, or

16   saying "mami" to him or "prosti."

17         THE COURT:  But Mr. Ortiz did that to nongay people;

18   isn't that so?

19         THE WITNESS:  Mr. Ortiz?

20         THE COURT:  I'm sorry.  Mr. Caravantes did that with

21   nongay people; isn't that true?

22         THE WITNESS:  Yes.  The people that he was most

23   comfortable with.

24   BY MR. PARKER:

25   Q.  Other than Jose Ortiz, who are you referring to you when

1  you say "the people he was most comfortable with"?

2  A.   Whoever he got along with the most; for example, he never

3  did it to me.  We were friends, but we didn't really get along

4  like that.

5  Q.   And other than Ortiz, did you observe Caravantes engaging

6  in the touching game with any other employees?  Can you name

7  them, in other words?

8  A.   The truth is that I know that he did those things, but the

9  truth is also that I can't say names because I don't remember

10  their names right now.

11          THE COURT:  When you say "those things," what are you

12  referring to?

13          THE WITNESS:  I didn't understand.

14          THE COURT:  You said, "the truth is I know that he did

15  those things, but the truth is also that I can't remember the

16  names."  What are the things you're referring to?

17          THE WITNESS:  The touching and also saying to others,

18  "my prosti," "my puta."

19          THE COURT:  But you said those things too, right?

20          THE WITNESS:  Yes, I also did.

21          THE COURT:  So that didn't mean with you that you were

22  going to have sex with him, did it?

23          THE WITNESS:  I'm sorry, I don't understand.

24          THE COURT:  When you did those things with

25  Mr. Caravantes, it didn't mean that you were going to have sex

C45kcar3                     Solis - direct

1    with him?

2              THE WITNESS:  I never did those things with

3    Caravantes.

4              THE COURT:  Oh.  Well, when you did those things with

5    Mr. Sotarriba, that didn't mean that you were going to have sex

6    with him?

7              THE WITNESS:  No, because it was a game.

8              THE COURT:  And Mr. Caravantes, all you observed was

9    Mr. Caravantes playing that same game; isn't that correct?

10             THE WITNESS:  Yes.

11             THE COURT:  All right.

12             That won't hold you back.  I'm not suggesting that's

13   enough for the questioning --

14             MR. PARKER:  Thank you.

15             THE COURT:  -- by either party.

16   BY MR. PARKER:

17   Q.  Mr. Solis, just to clarify, when you said you saw

18   Caravantes playing the same -- playing the game with others --

19   A.  Yes.

20   Q.  -- what types of touching did you see him engage in with

21   others?

22   A.  The same, grabbing buttocks, saying to others, my prosti --

23   there was a manager by the name of Brett.  He and Caravantes

24   would say to one another many times, prosti and puta.

25             Also, below in the kitchen with his friends, they

C45kcar3                          Solis - direct

1   would say the same things, they would say things to each other.

2   Q.  As you sit here today, are you able to recall the names of

3   any of Caravantes' friends in the kitchen?

4   A.  No, the truth is, I can't.

5   Q.  Did anyone in management at Remi ever address the subject

6   of the touching game, when you were present?

7   A.  Yes.  Mr. Pistorio did.

8   Q.  When did that occur?

9   A.  He said that all the time in his meetings.

10  Q.  What did he say?

11  A.  That touching each other wasn't correct, that it didn't

12  look right --

13          MR. SAXENA:  I'm sorry, objection to the testimony.

14  This is all hearsay.

15          THE COURT:  You don't want it?

16          MR. SAXENA:  Pardon me?

17          THE COURT:  You're objecting?

18          MR. SAXENA:  Yes.

19          MR. PARKER:  Your Honor, I would disagree that it's

20  hearsay.

21          THE COURT:  Objection overruled.

22  A.  -- and that it could be seen as sexual harassment.

23  Q.  Do you have a recollection of --

24          THE COURT:  Did he say anything more?

25          THE WITNESS:  I don't remember too well, but he did

C45kcar3                       Solis - direct

1    say it all the time.  And there was also a time that

2    Mr. Pistorio asked me to help him find some women because he

3    wanted to change the situation.

4            THE COURT:  When and where did you hear Mr. Pistorio

5    tell anyone that it could be considered sexual harassment?

6            THE WITNESS:  We have those meetings during -- twice a

7    day.  One is in the morning at 11:45, and the second meeting is

8    for dinner, and that's at 4:45.

9            In those two time periods, when he has the

10   opportunity, he would say it.

11           THE COURT:  Did he explain why it could be considered

12   sexual harassment?

13           THE WITNESS:  Because it didn't look right.

14           THE COURT:  Did he explain why it didn't look right?

15           THE WITNESS:  Because it was possible that some person

16   would not like it.

17           THE COURT:  He said that?

18           THE WITNESS:  Yes, yes.

19           THE COURT:  How long ago?

20           THE WITNESS:  I'd say maybe four to five years ago.

21   BY MR. PARKER:

22   Q.  Mr. Solis, have you ever had occasion to report about any

23   incident at Remi to management?

24   A.  Yes.

25   Q.  To whom did you go to report an incident?

1   A.  Mr. Pistorio.

2   Q.  Why did you go to Mr. Pistorio to report something?

3   A.  Because in his meetings, he would also say to us that if

4   there was a problem, that we could report it directly to him.

5   Q.  What did you report to him?

6   A.  Co-workers' aggression toward me.

7   Q.  What did you tell him?

8   A.  I told him that the gentleman had hit me with a metal tray

9   on my forehead, and that afterwards, when I responded to him by

10  saying to be careful not to do that, his response was to strike

11  me again, this time with his head on my forehead.  And so

12  immediately after that incident, I went directly to

13  Mr. Pistorio to report it.

14  Q.  What was the name of the person you reported?

15  A.  Luca Mamfre.

16  Q.  What was his job?

17  A.  He was a waiter.

18  Q.  What was his -- was he Spanish too?  What was his

19  background?

20  A.  He's Italian.

21  Q.  What happened as a result of your complaint about

22  Mr. Mamfre to Mr. Pistorio?

23  A.  Mr. Pistorio went over to him, spoke to him and he was

24  actually fired that same night.  He said that he couldn't have

25  anyone there being aggressive, that no one could be aggressive

1    there.

2    Q.  Who did he say that too?

3              THE COURT:  Who is "he"?

4              THE WITNESS:  Mr. Pistorio told Mr. Mamfre.

5              THE COURT:  In front of you?

6              THE WITNESS:  No.  No, but afterwards he told me that

7    he did.

8              THE COURT:  Who was "he"?

9              THE WITNESS:  Mr. Pistorio, the general manager.

10   BY MR. PARKER:

11   Q.  Mr. Solis, have you ever seen any written materials at Remi

12   relating to sexual harassment?

13   A.  Under the old administration, no, but after the new

14   administration took over at the restaurant, yes.

15   Q.  What did you see?

16   A.  I have seen some posters up.  I've never actually stopped

17   to read them, but I have seen some posters up about labor laws

18   as well as sexual harassment.

19             THE COURT:  Where?

20             THE WITNESS:  There are some where the clock-in is,

21   and there are also some by the locker rooms.

22             THE COURT:  When did you first observe them?

23             THE WITNESS:  I'd say maybe three to four weeks after

24   the new administration took over at the restaurant.

25             THE COURT:  And you still work there?

C45kcar3                         Solis - direct

1          THE WITNESS:  Yes.

2          THE COURT:  Are the same posters up still?

3          THE WITNESS:  Yes, in the same location, they're still

4     there.

5          THE COURT:  They weren't taken down?

6          THE WITNESS:  Yes, because they have been updated each

7     year.

8          THE COURT:  If you didn't read them, how do you know

9     they were updated?

10         THE WITNESS:  I haven't actually stopped to read them

11    specifically, but you can see, and I have seen, the dates on

12    the posters because they're pretty big.  And also on the frame

13    you can see that the tape has been removed.

14         THE COURT:  Was there any meeting about those posters

15    at the restaurant?

16         THE WITNESS:  Not a specific meeting about the

17    posters, but on occasions when Mr. Pistorio had the

18    opportunity, he would mention them.

19         THE COURT:  But Mr. Pistorio left the restaurant a few

20    weeks after new management came in, no?

21         THE WITNESS:  No, no.  No, Mr. Pistorio actually came

22    in under the new administration.  He was in charge for about

23    three to four years.

24         THE COURT:  Thank you.

25         MR. PARKER:  I have no other questions.

1              THE COURT:  Cross-examination?

2    CROSS-EXAMINATION

3    BY MR. SAXENA:

4    Q.  Good afternoon, Mr. Solis.

5    A.  Good afternoon -- I don't know your name.

6    Q.  My name is Mayur Saxena.

7              Mr. Solis, Oscar Velandia was the assistant manager of

8    Remi Restaurant; isn't that right?

9    A.  Under the period in which Mr. Pistorio was there, he was an

10   assistant under him.

11   Q.  So for the entire time that Mr. Pistorio managed Remi

12   Restaurant, was Mr. Velandia the assistant manager?

13   A.  He helped him at the restaurant.

14   Q.  Can you answer that question yes or no:  Was he the

15   assistant manager?

16   A.  I think so.

17             THE COURT:  If he was a manager, could he get tips?

18             THE WITNESS:  If he was a manager, he couldn't receive

19   tips.  He helped Mr. Pistorio, which is something different.

20             THE COURT:  If he's assistant manager, could he get

21   tips?

22             THE WITNESS:  I'm really not familiar with the laws,

23   however.  Mr. Oscar Velandia would also take orders at tables.

24             So I'd say he's still part of the pool.  And he did

25   receive tips, because he also took orders.

C45kcar3                    Solis - cross

1   BY MR. SAXENA:

2   Q.  Did Mr. Pistorio, at a staff meeting, refer to Mr. Velandia

3   as the assistant manager?

4   A.  Mr. Pistorio would call him the headwaiter.

5   Q.  So is your answer no, Mr. Pistorio never referred to

6   Mr. Velandia at a staff meeting as the assistant manager?

7   A.  No.

8   Q.  Never?

9           THE COURT:  Did he ever refer to him as "my

10  assistant"?

11          THE WITNESS:  Yes.

12  Q.  Did Mr. Pistorio ever announce at a staff meeting that

13  Mr. Velandia was going to be an assistant manager at Remi

14  Restaurant?

15  A.  He said he was going to help him, but...

16  Q.  So the answer is no?

17          THE COURT:  Did he -- I'm sorry, your answer?

18          THE WITNESS:  No, no.

19          THE COURT:  Didn't he tell everyone that when he was

20  away, they should do whatever Oscar Velandia told them to do

21  for the day?

22          THE WITNESS:  Mr. Velandia would cover if he had to go

23  out for something, but most of the time Mr. Pistorio was at the

24  restaurant.

25          THE COURT:  When he wasn't at the restaurant, what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C45kcar3                    Solis - cross

1   would Mr. Velandia tell the workers they should do?  What

2   instructions did they say he should follow -- they should

3   follow?

4              THE WITNESS:  At that time, it would be Mr. Velandia.

5   But if there was any much larger problem, Mr. Velandia would

6   have to confirm with Mr. Pistorio whatever should be done.

7              MR. SAXENA:  Your Honor, I'd like to distribute the

8   witness' deposition transcript.

9              THE COURT:  Sure.

10             MR. SAXENA:  Your Honor, actually a question for you:

11  We have video of this witness' deposition.  It was done in

12  English.  I suppose my preference would be to play the

13  appropriate video excerpts rather than to read in the

14  transcripts but I just wanted to ask what you preferred.

15             THE COURT:  Mr. Alonso was only used for

16  clarification?

17             MR. SAXENA:  She was present for clarification but not

18  used.  So I'll --

19             THE COURT:  Page and line?

20             MR. SAXENA:  I'll just introduce the transcript first,

21  your Honor, if you don't mind, to the witness, I mean.

22  BY MR. SAXENA:

23  Q.  Mr. Solis, do you recall having your deposition taken in

24  this case?

25  A.  Yes.

C45kcar3                      Solis - cross

1   Q.  On the very first page of the document that's in front of

2   you, page 1, do you see your name there?  It says "Videotaped

3   Deposition of Pablo Solis."

4   A.  Yes.

5   Q.  And on page 1, do you also see the date April 27, 2011?

6   A.  Yes.

7   Q.  Do you recognize this as a transcript of your --

8           MR. SAXENA:  Strike that.

9   Q.  Do you remember having been deposed on this case in

10  April 2011?

11  A.  Yes.

12  Q.  So let me just ask you --

13          THE COURT:  I'm sorry, but I thought Parker Chapin was

14  the defense lawyer in this case.

15          MR. SAXENA:  Actually defense counsel is Epstein

16  Becker & Green.

17          THE COURT:  I'm sorry, Epstein Becker.  I thought they

18  were counsel in this case.  This says that Mr. Reid A. Rosen of

19  New Rochelle, New York was counsel.

20          MR. SAXENA:  That's correct, your Honor, and I don't

21  know if Mr. Parker wants to explain.

22          THE COURT:  That's a change of counsel here?

23          MR. PARKER:  No, your Honor.  Mr. Rosen is an attorney

24  who serves as a corporate counsel for 53rd Partners, and he's

25  admitted to this court and he defended some of the depositions

C45kcar3                          Solis - cross

 1   in the case.

 2                THE COURT:  OK.

 3                MR. PARKER:  With plaintiffs' counsel's consent.

 4                THE COURT:  What?

 5                MR. PARKER:  With plaintiffs' counsel's consent.

 6                THE COURT:  And with defense counsel?

 7                MR. PARKER:  As defense counsel.

 8                THE COURT:  Because they're not present?

 9                MR. PARKER:  Correct.

10                THE COURT:  Epstein Becker is not present?

11                MR. PARKER:  No, I'm Epstein Becker, your Honor.

12                THE COURT:  I know you are, but according to this

13   deposition, you weren't present, no one was present --

14                MR. PARKER:  That's correct.

15                THE COURT:  -- from Epstein Becker.

16                MR. PARKER:  That's correct, Judge.

17                MR. SAXENA:  I'm sorry, may I proceed, your Honor?

18                THE COURT:  Yes, you can.

19   BY MR. SAXENA:

20   Q.  So, Mr. Solis, I'd like you to refer to your deposition

21   transcript at page 63 line 11.

22                MR. SAXENA:  And, Randall, could you please play clip

23   6.

24                I'm sorry, I'm sorry, before you do, Randall, the page

25   reference is 63 and the line reference is line 6.

1          (Video recording played)

2          MR. SAXENA:  Your Honor, I'd ask that the reading

3    continue for completeness.

4          THE COURT:  How far?

5          MR. PARKER:  To 64, page 64 line 6.

6          THE COURT:  All right.  For completeness.

7          MR. SAXENA:  OK, I'll read the remaining language.

8          MR. DELANEY:  Randall can do it.

9          THE COURT:  Continue to page 64 line 6 for

10   completeness.

11         MR. SAXENA:  So beginning on page 63 line 20:

12   "Q.  In what context?  Was this during a meeting or was

13   Mr. Pistorio -- who was Mr. Pistorio speaking to when he

14   referred to Mr. Velandia as the assistant manager?

15   "A.  Mr. Pistorio was general manager in that time.  It was

16   no -- it was nobody helping him in that time, so Mr. Pistorio

17   told that he was one to helping him because -- and also in that

18   time Oscar wants to be promoted -- Oscar, he wants to be

19   something like -- something -- he wants to be like something

20   else, like a manager."

21   Q.  Mr. Solis, does any of your prior deposition testimony

22   refresh your recollection as to whether Mr. Pistorio referred

23   to Mr. Velandia as an assistant manager?

24   A.  Yes.

25   Q.  So you now remember that Mr. Pistorio did refer to

C45kcar3                    Solis - cross

1    Mr. Velandia as an assistant manager, right?

2    A.  I believe what I said before is he was going to help him as

3    the assistant manager, yes.

4            THE COURT:  And he used the term "manager," the word

5    "manager"?

6            THE WITNESS:  Yes, that Oscar Velandia was going to

7    help Mr. Pistorio as his assistant to the manager but never

8    said that he was going to be the manager.

9            Later he referred to Oscar Velandia as the headwaiter.

10           THE COURT:  Mr. Pistorio speaks Italian?

11           THE WITNESS:  Yes.

12           THE COURT:  Does he speak in Italian?

13           THE WITNESS:  No, in English.

14           THE COURT:  And he used the English word -- which did

15   he use as the English word, "assistant to the manager" or

16   "assistant manager," if you remember?

17           THE WITNESS:  "Assistant to the manager."

18   BY MR. SAXENA:

19   Q.  Mr. Solis --

20           THE COURT:  Oh, I've got to take a call.

21           (Pause)

22           THE COURT:  We'll break for lunch.

23           You're under instructions not to discuss the case

24   during the break, and we will break until 2:00 o'clock.

25           (Luncheon recess)

C45dcar4                          Solis - cross

1                    **A F T E R N O O N   S E S S I O N**

2                              2:18 p.m.

3    PABLO SOLIS,

4         Resumed, and testified further (through the Interpreter)

5         as follows:

6              THE COURT:  All right.  Please be seated.

7    CROSS-EXAMINATION (Resumed through the Interpreter)

8    BY MR. SAXENA:

9    Q.  Mr. Solis, you had never seen Mr. Velandia performing oral

10   sex on Mr. Caravantes in Remi Restaurant, correct?

11   A.  Correct.

12   Q.  And you had never seen Mr. Velandia engaged in anal sex

13   with Mr. Caravantes in Remi Restaurant, correct?

14   A.  No, I've never seen that.

15   Q.  You testified on direct examination that there was a

16   touching game at Remi Restaurant, is that right?

17   A.  Yes.

18   Q.  And you remember that lots of different employees were part

19   of this touching game, is that correct?

20   A.  Yes.

21   Q.  And the touching game happened at many different times of

22   the day during a workday at Remi Restaurant; is that also

23   right?

24   A.  Yes.

25   Q.  But you have a difficult time remembering exactly which

C45dcar4                      Solis - cross

1   employees participated in the touching game when Mr. Pistorio

2   was managing the restaurant; is that right?

3   A.  Yes.

4   Q.  And that's because it was a long time ago, right?

5   A.  Yes.

6   Q.  But you definitely remember that Mr. Caravantes was

7   participating in the touching game?

8   A.  Yes.

9   Q.  And you definitely remember that Mr. Sotarriba was

10  participating in the touching game?

11  A.  Yes.

12  Q.  You still work for Remi Restaurant, right, Mr. Solis?

13  A.  Yes.

14  Q.  You still get paychecks from 53rd Street Partners, is that

15  right?

16  A.  Yes.

17  Q.  And you've been working at Remi Restaurant since 2000,

18  right?

19  A.  Yes.

20  Q.  And since 53rd Street Partners took over Remi Restaurant,

21  you have been promoted twice, right?

22  A.  Yes.

23  Q.  You've also known Mr. Velandia as long as you've worked at

24  Remi, isn't that right?

25  A.  Yes.

C45dcar4                         Solis - cross

1    Q.  And it's not only at Remi that you know Mr. Velandia,

2    right; you meet him outside of work, too, is that correct?

3    A.  Yes.

4    Q.  You testified on direct examination that you shared an

5    apartment with Mr. Velandia, right?

6    A.  Yes.

7           THE COURT:  Together with other people?

8           THE WITNESS:  Yes.

9    Q.  Right.  It wasn't just you; Mr. Velandia's family was

10   there, too, correct?

11   A.  Yes.

12   Q.  And your family was there, too, correct?

13   A.  Yes.

14   Q.  And is it right that you couldn't find your own apartment

15   at the time because you had poor credit?

16   A.  Yes.

17   Q.  Once your credit got better, you moved out and found your

18   own place?

19   A.  Yes.

20   Q.  And today you're still friends with Mr. Velandia, is that

21   right?

22   A.  We're still friends but not too close.

23          MR. SAXENA:  I have nothing further, your Honor.

24          MR. PARKER:  I have no redirect, your Honor.

25          THE COURT:  All right.  You are excused.  Thank you

C45dcar4                    Solis - cross

1    very much.

2              (Witness excused)

3              THE WITNESS:  Thank you.

4              THE COURT:  Next witness.

5              MR. PARKER:  He is coming in from the hallway, your

6    Honor.

7              The defendants call Yullios Donge Meneses.

8     YULLIOS DONGE,

9         called as a witness by the defendants,

10        having been duly sworn (through the Interpreter),

11        testified as follows:

12             THE CLERK:  Please be seated.  You can pull that chair

13    as far forward as you can.

14             Please state your name and spell your first and your

15    last name slowly for the record.

16             THE WITNESS:  Julius Donge, Y-u-l-l-i-o-s D-o-n-g-i,

17    two words.  Yullios first and Donge last name.

18             MR. PARKER:  Your Honor, just to clarify the record, I

19    believe that the last name is spelled D-o-n-g-e, not "i".

20             THE WITNESS:  D-o-n-g-e.

21             THE COURT:  Thank you.

22    DIRECT EXAMINATION (Through the Interpreter)

23    BY MR. PARKER:

24    Q.  Mr. Donge, what is your native language?

25    A.  Spanish.

C45dcar4                          Donge - direct

1    Q.  Do you feel -- how is your English?

2    A.  It's good but for things like this I prefer Spanish.

3    Q.  So you feel more comfortable having an interpreter assist

     with translation as you testify?

5    A.  Yes, sir.

6    Q.  Mr. Donge, where are you from originally?

7    A.  Mexico; Puebla in Mexico.

8    Q.  What is the name of your original city?

9    A.  Atlixco, Puebla.

10            THE COURT:  Could you spell that, please?

11            THE WITNESS:  A-t-l-i-x-c-o.

12   Q.  Where do you currently work?

13   A.  In an Italian restaurant called Remi on 53rd Street, but on

14   my checks it says something like Partners, but it is Remi

15   Restaurant.

16   Q.  What is your job there?

17   A.  Presently I'm a waiter but basically I'm a waiter for

18   parties.  Besides that, I provide regular service.

19   Q.  With whom do you reside, Mr. Donge?

20   A.  With my wife and children.

21   Q.  What year did you start working at Remi?

22   A.  The year 2000.

23   Q.  What was your first job there?

24   A.  I was a dishwasher.

25   Q.  You were a dishwasher then and you are a waiter now, is

C45dcar4                        Donge - direct

1   that right?

2   A.  Yes, sir.

3   Q.  After you were a dishwasher at Remi, what was your next job

4   there?

5   A.  I was promoted to the salad station.  I worked as a

6   dishwasher for approximately six months, and then I was

7   promoted to the salad station.

8   Q.  What is the salad station?

9   A.  Basically you prepare salads and desserts, as well, for

10  regular service, maybe about six different salads and about 10

11  different desserts.

12  Q.  And did your job change from working at the salad station?

13  A.  From dishwasher to salad?

14  Q.  Yes.  After you were -- how long did you serve in the salad

15  station at Remi?

16  A.  Around a year, approximately.

17  Q.  And what was your next job there?

18  A.  From the salad station I was promoted to the coffee

19  station.  But it wasn't just that, I started work at 7 in the

20  morning cleaning the floors, the bathrooms, changing light

21  bulbs, fixing whatever needed to be done in the room.  And at

22  11 I would begin to work at the coffee station up until 3.

23  Q.  Do you remember what year that was when you started in the

24  coffee station?

25           THE COURT:  What did they call you in that position?

C45dcar4                          Donge - direct

1             THE WITNESS:  I was, it was known as the coffee maker.

2             THE COURT:  OK.

3             THE WITNESS:  Coffee boy, coffee guy.

4    BY MR. PARKER:

5    Q.  Do you recall the year when you began in the coffee guy

6    position?

7    A.  I don't remember exactly, but it might have been around

8    2002, maybe the beginning of 2002.

9             THE COURT:  So you weren't a white jacket?  You

10   weren't called a white jacket?

11            THE WITNESS:  No.  White jacket is a different type of

12   position.  As a white jacket you clean cups and you take them

13   up to the room so that they're ready for the regular service.

14   But in the coffee station it was different; I had to clean

15   floors and things like that early and then at 11 I would be

16   ready at the coffee station.

17   BY MR. PARKER:

18   Q.  Now, the job at the coffee station, you said that you

19   arrived at 7 a.m., correct?

20   A.  Yes.

21   Q.  And what time did your workday end?

22   A.  At 3, more or less.

23   Q.  And part of the time you did cleaning, is that right?

24   A.  Yes.  More or less, the cleaning took place between 7 and

25   11; but it wasn't just cleaning, it was whatever had to be done

C45dcar4                    Donge - direct

1   in the day.  Sometimes I had to clean the windows, change light

2   bulbs, different things different days.

3   Q.  And were there times during the workdays where you were

4   stationed at the coffee station?

5   A.  Well, yes.  From 11 to 3, you had to be there at the coffee

6   station waiting for the orders.  I mean, there were other

7   things that needed to be done, like cut butter, but from 11 to

8   3 practically you had to be there at the coffee station.

9   Q.  When you first became a coffee man, coffee guy, in 2002,

10  who was your boss then?

11  A.  My direct boss was Augustine Pena.

12  Q.  What was Mr. Pena's job?

13  A.  He was in charge of the kitchen.  I don't know how to

14  define his position exactly, but he was in charge of the

15  kitchen.  He was in charge of the schedule of the kitchen and

16  deliveries, things like that.

17  Q.  Do you know Francesco Pistorio?

18  A.  Yes.  He was the manager at the restaurant for some time.

19  Q.  Do you recall when Mr. Pistorio started at Remi?

20  A.  No, sir, I don't.  I don't remember.

21  Q.  When Mr. Pistorio was the manager at Remi, was he your

22  boss?

23  A.  Yes.  He was the general manager.

24  Q.  Did you work -- what was your work schedule when you worked

25  in the coffee station area?  Not your hours, but days of the

C45dcar4                          Donge - direct

1    week.  What days of the week did you work?

2    A.  It was from Monday to Friday in the mornings, and Sunday

3    evening.

4    Q.  And what were your responsibilities on Sunday evenings?

5    A.  Just the coffee station.

6    Q.  During the time that you worked in the coffee station area

7    of Remi, were there any times when you performed duties other

8    than what you've described?

9    A.  No.  No.

10   Q.  Did you ever -- did you ever have the title of busboy?

11   A.  Sometimes I worked as busboy, but my primary position was

12   in the coffee station.

13   Q.  How did it come about that you sometimes worked as a

14   busboy?

15   A.  Well, sometimes we had large parties and then I was given

16   the opportunity to work as a busboy.

17   Q.  Who gave you that opportunity?

18   A.  Back then there was a manager named Luigi, whose last name

19   I don't remember right now, and throughout the time I would

20   work occasionally as a busboy.

21   Q.  Do you know when -- are you able to tell me when Luigi

22   worked at Remi?

23   A.  No, I don't remember the dates.  I know that Luigi was

24   already there at the restaurant when I started but I don't

25   remember when he left.

C45dcar4                         Donge - direct

1    Q.   What was Luigi's job?

2    A.   He was in charge of the parties.

3    Q.   Do you recall whether Luigi was working at Remi while

4    Mr. Pistorio was the general manager?

5    A.   Yes, they worked together.

6    Q.   And any of the times that you were given the opportunity to

7    work as a busboy, was that during or not during the time when

8    Mr. Pistorio was general manager?

9    A.   Yes.  It was during the time that Mr. Pistorio was the

10   general manager, and there were also occasions before, when

11   Mr. Pistorio was the manager.

12   Q.   Did you ever hold the job title at Remi of food runner?

13   A.   No.  My main job was the coffee station, and from time to

14   time I would help out the busboys or the food runners.  But my

15   main job was the coffee station.  It's just that whenever there

16   are large parties, we all worked together and -- I mean, we all

17   worked for the same place, so if you have to help the runner,

18   you have to help the runner.

19   Q.   For how long a period of time did you occasionally work to

20   help out the food runners?

21   A.   It was occasionally, whenever there were larger parties.  I

22   don't remember the dates.  It was simply whenever there was a

23   large party there was work to be done.

24          THE COURT:  You didn't work as a food runner or a

25   busboy in the Grand Canal?

C45dcar4                         Donge - direct

1           THE WITNESS:  Sometimes I would help.  But like I

2     said -- and I'll repeat -- my main job was the coffee station.

3     So at times I would help the busboys or the food runners.  I

4     mean, I already knew what to do as far as that job goes.  If

5     you've been working there for a long time, you are doing the

6     same thing.

7     Q.  You became -- at some point you became a waiter at Remi,

8     correct?

9     A.  Yes.  And the fact that I would help out as a busboy and as

10    a food runner helps you out, because you just can't start

11    working as a waiter one day, even though all three positions

12    are different.

13          THE COURT:  Did you ask anyone for the opportunity to

14    work as a food runner or busboy?

15          THE WITNESS:  For example, I did ask Mr. Pistorio to

16    give me more of an opportunity to work as a busboy because you

17    get extra money, but that was never my official job, busboy.

18    My official job was always the coffee station.

19          THE COURT:  Did you also --

20          THE WITNESS:  However, when I was promoted to waiter,

21    Mr. Pistorio is the one that offered to first receive training

22    so that then I could become a waiter.

23          THE COURT:  Did you also ask for the opportunity to

24    run as a food runner besides a busboy?

25          THE WITNESS:  No.  It's just with the food runners, if

C45dcar4                          Donge - direct

1   you had to help them, you would help them.  If you have to help

2   to move something, you move it.  If somebody's missing in one

3   area, you go and you help in that area.

4          But I do recall asking for shifts as a busboy because

5   I needed the money, and not just in the Canal but in other

6   areas called Chef's Table.  That is like another private area.

7   BY MR. PARKER:

8   Q.  All right.  During your testimony a moment ago, you

9   mentioned that Mr. Pistorio spoke with you about a waiter -- an

10  opportunity to become a waiter.

11  A.  Yes.

12  Q.  When did he speak with you about that opportunity for the

13  first time?

14  A.  I don't remember exactly what date.

15  Q.  Did Mr. Pistorio at some point in time leave Remi?

16  A.  Yes.

17  Q.  Can you estimate when your first conversation with

18  Mr. Pistorio about becoming a waiter took place in terms of how

19  long before Mr. Pistorio left the restaurant?

20  A.  Yes.  From when -- from the moment that Mr. Pistorio left,

21  I'd say it might have been six or seven months before that that

22  I had received the training as a waiter.

23          It wasn't every day.  I would work from 7 to 3, and

24  occasionally I would stay in the afternoons to get the training

25  as a waiter.

C45dcar4                    Donge - direct

 1  Q.  Let's go back to, before you started training as a waiter,

 2  to the conversation or conversations that you had with

 3  Mr. Pistorio about the opportunity.

 4          What did he say and what did you say in terms of the

 5  opportunity for you to train as a waiter?

 6  A.  I remember I was working at the coffee station.  He came

 7  over and said that he was thinking about closing the coffee

 8  station so that the waiters, busboys and food runners could

 9  make more tips.  And he offered to give me a position as a

10  waiter.  But he said that I would first need the training

11  before I could become a waiter.

12  Q.  You said the training that you took to become a waiter

13  was -- you said two or three days a week you would stay and

14  train?

15  A.  Yes.  Occasionally I would stay two to three times a week

16  to receive that training.  It's just that I had personal things

17  I had to take care of, and that's perhaps why my training took

18  so long; and also perhaps because there are differences in

19  those positions, I mean, from busboy to food runner or waiter.

20  For example, like a busboy will just clean the table or get

21  water, get bread, things like that.  A runner is different.  He

22  has to have some knowledge about the food, because he's

23  actually putting the food on the table.  He has to know the

24  positioning of things on the table.  He has to know how certain

25  foods are prepared.  The waiter is different because he has to

C45dcar4                          Donge - direct

1    have some training to have knowledge of the wines, how the food

2    is prepared.  He has more contact with the guests.  You just

3    have to know how to approach people a little more.

4            In my case, since English is my second language, I had

5    to pay attention a little more.  But the three positions are

6    different.  I mean, I could probably receive a week of training

7    if I wanted to do the job of a busboy.  If you want to be a

8    food runner, maybe two to three weeks of training.  But as a

9    waiter it takes more time, and I was only staying about two or

10   three days out of the week to get that training so that's

11   probably why it took so long.

12           THE COURT:  How long did it take?

13           THE WITNESS:  I don't remember exactly, but it might

14   have been around six months.  Like I said, I wasn't staying

15   every day.

16           THE COURT:  How long did you work as a waiter under

17   Mr. Pistorio?

18           THE WITNESS:  About a month before he left, more or

19   less.

20           But when I started to work as a waiter, I completely

21   stopped working at the coffee station.

22   BY MR. PARKER:

23   Q.  When you completely stopped working at the coffee station,

24   did anyone replace you in that job?

25   A.  No.

C45dcar4                    Donge - direct

1   Q.  Now, when you were training to be a waiter, where did your

2   training take place, in what areas of the restaurant?

3   A.  The dining room, it's known as the Grand Canal.  The

4   training is basically you follow someone, and that person shows

5   you how to use the computer, where to get the food, where to

6   get the drinks.  Since the wines are numbered, they show you

7   the numbers of the wines.  The training is basically following

8   different people around to learn different things as far as how

9   to deal with the tables.

10  Q.  When you became a waiter, where did you work in the

11  restaurant as a waiter?

12  A.  I don't understand.

13  Q.  You've identified parties and you've identified the Grand

14  Canal.  My question is, when you became a waiter at Remi, did

15  you -- where did you work?  Did you work in the parties?  The

16  Grand Canal?  Both?

17  A.  Basically in the Rialto Room, which is the private room

18  that the restaurant has for parties, and I also had two to

19  three shifts in the Grand Canal, which is where the normal

20  service is offered.

21          THE COURT:  What time are you speaking about?  Two or

22  three shifts a week?  Two or three shifts --

23          THE WITNESS:  Two or three shifts a week.

24          It all depends on how many parties you have during the

25  week, if there are a lot of parties or just two parties.  An

C45dcar4                        Donge - direct

1  effort is made so that everyone has more or less the same

2  amount of shifts.

3  Q.  While Mr. Pistorio was at Remi as the general manager, who

4  prepared the employees' work schedules?

5  A.  He did; Mr. Pistorio did.

6  Q.  Since Mr. Pistorio left, has there -- who replaced him, if

7  anyone?

8  A.  When Mr. Pistorio left the restaurant, Mr. Carlos came in.

9  Q.  And is that Carlo Maggi?

10 A.  Yes.  Carlo Maggi.

11 Q.  And since Mr. Maggi started at Remi, who prepares the work

12 schedules of the employees?

13 A.  That was Mr. Carlo.

14 Q.  While working at Remi, have you had occasion to observe

15 employees engaged in touching one another during work?

16 A.  Yes, I have seen that.

17 Q.  Describe the touching that you observed, please.

18 A.  Well, they passed by each other and they grabbed their

19 buttocks.  They grab their buttocks like that.

20         (Indicating)

21 Q.  You are motioning with your hands.  But could you describe

22 what the touching actually is as you've observed it?

23 A.  Well, as Mexicans we have a custom.  Like, for example, the

24 gentleman that's standing next to me now, he's standing like

25 that; I could just pass by and touch him.  Anyone that could be

C45dcar4                        Donge - direct

1    like that, you just pass by and touch them.

2           I know it may sound a little strange, but it's part of

3    our culture as Mexicans.  Well, not just Mexicans, I mean, I've

4    seen Ecuadorians, Dominicans that work with us doing things

5    like that.  It may sound a little strange but it's part of our

6    culture, Mexicans.

7           THE COURT:  Was that the only place that you observed

8    people touching each other on the body?

9           THE WITNESS:  No.  For example, if somebody has

10   squatted down, you could pass by and just grab their head.

11          I mean, can I say everything?

12          THE COURT:  Yes.

13          THE WITNESS:  For example, if someone has squatted

14   over, you could grab their head and act like they were

15   performing oral sex on you.  Or if someone was standing, you

16   could grab them from behind and pretend like you were having

17   sexual relations with them.  It's just part of what Mexicans

18   have in the culture.  It's not really like an expression of

19   sexual harassment; it's just like something that Mexicans do.

20          I could understand that it sounds a little strange.

21          MR. SAXENA:  Objection, your Honor, and move to strike

22   this testimony.

23          There is no anthropological expert or social expert

24   here to talk about Mexican customs or cultures.  This is lay

25   opinion, and it is improper to the extent that he is talking

C45dcar4                        Donge - direct

1   about things that are outside of his own personal perception

2   and experience.

3            THE COURT:  I don't know that it is outside his own

4   personal perception.

5            I will allow the testimony.

6   BY MR. PARKER:

7   Q.  Had you ever observed that type of conduct, the touching

8   that you've described, prior to when you began working at Remi?

9   A.  Yes.

10  Q.  Where?

11           THE COURT:  I only allowed the testimony in insofar as

12  it relates to the parts of Mexico that the defendant was

13  brought up in, came from.

14  A.  In Mexico.

15  Q.  The city in Mexico where you were raised, were there any

16  other employees that you know of at Remi who came from that

17  area?

18  A.  Yes, sir.

19  Q.  Who else?

20  A.  Julian Galindo is from the same city.  We actually went to

21  the same secondary school.  Mr. Caravantes also was here.

22           Can I also tell you about people that no longer work

23  there, that used to work there but aren't there anymore?

24           THE COURT:  Sure.

25           THE WITNESS:  Antonio Aguilar; Jesus Aguilar -- may he

C45dcar4                    Donge - direct

1    rest in peace, he passed away but he also worked there; Jesus

2    Aguilar, his brother; Augusto Aguilar, Mundo Aguilar.  Those

3    are the people that I can remember that are from the same city.

4    Q.  Now, you said that you observed this type of touching while

5    working at Remi.  When did you observe this type of touching?

6    A.  I don't have the dates but it's been throughout all the

7    time that I've been working there.

8    Q.  Who?  Who?  Which employees have you observed engaged in

9    the type of touching that you've described?

10   A.  All.  All.

11   Q.  Do you know Francisco Sotarriba?

12   A.  Yes, I do know him, sir.

13   Q.  How do you know him?

14   A.  That gentleman was working there with us at the restaurant

15   when I began to work there.  I don't remember exactly how long

16   he worked there, but we did work together for a long time.  Not

17   just him, also one of his brothers.

18   Q.  Well, while Mr. Sotarriba worked at Remi along with you,

19   did you ever see him engage in that type of touching that

20   you've described at Remi?

21   A.  Yes.  Like I said, everyone did.

22   Q.  What can you recall -- what types of touching, based on

23   what you described, have you seen Mr. Sotarriba engage in at

24   the restaurant?

25   A.  Well, he would also pass by people and grab their butts.

C45dcar4                          Donge - direct

1   Q.  Anything else?

2   A.  That's what I mainly remember, him passing by and grabbing

3   people's butts.

4   Q.  Do you recall ever observing people passing by and grabbing

5   his, Sotarriba's, butt?

6   A.  If they grab him?

7   Q.  Yes.

8   A.  I remember, for example, a guy named Sergio.  I don't

9   remember the names of the others, but also runners and people

10  in the kitchen.  But like I said, it was part of the workplace

11  there, throughout the kitchen.

12  Q.  Do you remember Sergio's last name?

13  A.  It was either Martinez or Pastor, something like that.

14           Pastor.  Pastor.

15  Q.  Now, in any of the times when you observed employees

16  touching one another in the ways that you've described, was

17  there ever anything said?

18  A.  Like what?  I mean, yes.  Part of the Mexicanism, you would

19  say words like "wey," "prosti."

20  Q.  Was that it or were there any other words?

21           THE COURT:  What does "wey" mean?

22           THE WITNESS:  It's practically just something Mexican.

23  The "wey" is the cow's husband.  But in Mexico, like I said,

24  it's like the Mexicanism of the culture.  For example, if

25  you're my friend, I can say "wey" to you, or you can say "wey"

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    to me.

2              THE COURT:  Is it an insult?

3              THE WITNESS:  No.  It's just part of the Mexicanism.

4              THE COURT:  Well, does it have any relationship to

5    grabbing the buttocks?

6              THE WITNESS:  No.  I'll repeat, it's just part of the

7    Mexicanism.

8              THE COURT:  Well, why would someone say "wey" and they

9    would grab someone's buttocks?

10             THE WITNESS:  It's just part of the same words, like

11   "prosti" or the other words that were said.  It is just part of

12   the game that's ongoing.

13             THE COURT:  What does "prosti" mean?

14             THE WITNESS:  It's an abbreviation for prostitute.

15             THE COURT:  Is that an insult if it is said in that

16   context?

17             THE WITNESS:  It could be an insult if you say the

18   whole word to somebody, "prostitute."  But within the game that

19   we're discussing, prosti is just a diminutive.  It could be

20   just like saying "wey" to somebody as well.

21   Q.  Was it a joke?

22   A.  Depending on the tone, yes.

23   Q.  Did the topic of employees touching one another ever become

24   discussed at a meeting at Remi?

25   A.  Yes, sir.  I don't remember the exact date but I do

C45dcar4                          Donge - direct

1   remember that Mr. Pistorio had a meeting, and he was upset that

2   people were touching each other.  And he said that it was

3   prohibited, and that anyone found doing that would be

4   suspended.  And he also said that women were going to start to

5   be hired to work there to see if the men would not do that

6   anymore.

7               THE COURT:  When did he have that meeting?

8               THE WITNESS:  I don't remember, sir, but I do remember

9   that it happened.

10              When things like that happen, you don't really think

11  about the date when it happened thinking that in the future you

12  might need the date.

13              MR. PARKER:  No further questions.

14              THE COURT:  Cross-examination.

15  CROSS-EXAMINATION

16  BY MR. SAXENA:

17  Q.  Mr. Donge, you said that you grew up in Atlixco, Mexico; is

18  that right?

19  A.  Yes.  My childhood was there, yes.

20  Q.  And you also said that you know that Mr. Caravantes grew up

21  there as well, right?

22  A.  Yes.  He's originally from Atlixco.  I don't know him from

23  Atlixco, I met him at the restaurant, but I do know that he's

24  from Atlixco.

25              THE COURT:  How do you know that he's from Atlixco?

C45dcar4                         Donge - cross

1        THE WITNESS:  Because he told me that he lived there.

2    He also told me that he had a taco business there.

3        I also know that Mr. Caravantes and another guy that

4    worked at the restaurant, Julian, that they lived in the same

5    area.

6        THE COURT:  Who did you learn that from?

7        THE WITNESS:  That he lived over there?

8        THE COURT:  That he lived in the same area.

9        THE WITNESS:  Julian and I have been friends since our

10   secondary school and sometimes we talk about our childhood, and

11   he mentioned to me that he lived close to where Mr. Caravantes

12   lived.

13       THE COURT:  So you didn't learn that from

14   Mr. Caravantes; you learned that from Julian?

15       THE WITNESS:  No.  Also, Mr. Caravantes mentioned to

16   me that he had a taco business there.

17       THE COURT:  But he didn't say that he knew Julian from

18   there?

19       THE WITNESS:  No.  No.

20   BY MR. SAXENA:

21   Q.  Do you know whether Mr. Sotarriba is from Atlixco?

22   A.  No.  Mr. Sotarriba is from another area called Libres,

23   Puebla.

24   Q.  What about Mr. Velandia, is he from Atlixco?

25   A.  No.  Mr. Velandia is from Colombia.  I'm not sure what

C45dcar4                        Donge - cross

1  city, but he is from Colombia.

2  Q.  And what about Brett Lockard, is he from Atlixco?

3  A.  Who's that?

4  Q.  You don't know who Brett Lockard is?

5  A.  No.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C45kcar5                          Donge - cross

1   BY MR. SAXENA:

2   Q.  You said that it was part of a game at Remi to touch other

3   employees on the butt; is that right?

4   A.  Yes.  That's how Mexicans get along.

5   Q.  But it wasn't only Mexicans that did this at Remi, right?

6   A.  No.  People from other cultures also.  At the restaurant

7   there are many people from different countries, like people

8   from Ecuador or from the Dominican Republic.  Maybe they don't

9   do those things in their countries, but if they have been at a

10  restaurant for a long time, they participate in the game also.

11  Q.  You said you were a coffee man at Remi, right?

12  A.  Yes.  I worked at the coffee station.

13  Q.  And you were a coffee man between -- you were a coffee man

14  until 2008; is that right?

15  A.  I don't remember exactly what date, but all that time I did

16  work as the coffee guy.  But like I said, I don't have the

17  exact date.

18          THE COURT:  You read English?

19          THE WITNESS:  Yes, a little bit.

20          THE COURT:  When Mr. Pistorio made that announcement,

21  saying that the acts in the game were prohibited, was there any

22  written notice?

23          THE WITNESS:  No, sir, I don't remember that.  But I

24  do remember that there was a meeting.

25          THE COURT:  Is there any notice posted now?

C45kcar5                          Donge - cross

1   A.  Not that I have seen, not that I have seen.

2   BY MR. SAXENA:

3   Q.  And you said that Mr. Pistorio, during that meeting, said

4   that he would suspend anyone who touched each other as part of

5   the game, right?

6   A.  Yes, sir, that's correct.

7   Q.  Do you know if he did suspend anyone?

8   A.  Not that I'm aware of.

9   Q.  Do you know if people continued to play the game after that

10  meeting?

11  A.  I suppose they did, but I didn't see it.

12  Q.  When you were a coffee man at Remi, you had to stay in the

13  coffee area for the most of your day; is that right?

14  A.  Half of the day, yes, because the other half I had to

15  clean.

16  Q.  But from the time that Remi Restaurant was open for

17  business, you had to stay in the coffee area, right?

18          THE COURT:  I don't think --

19  A.  Yes, unless someone -- or if I had to clean a window or

20  something like that, then I would just be in the coffee

21  station.  And then from the moment that we opened for lunch, I

22  would have to just stay there in the coffee station.

23          THE COURT:  Until your shift was over?

24          THE WITNESS:  Yes, sir.

25  Q.  And the coffee station is separate from the Grand Canal

C45kcar5                    Donge - cross

1    dining room; is that right?

2    A.  Yes, there are a few meters that separate it.

3    Q.  But there's a door separating the coffee station from the

4    Grand Canal; is that right?

5    A.  Yes.

6    Q.  That door is closed during business hours; is that right?

7    A.  Yes.  It's not locked with a key, but it is a door, and it

8    swings open and closed on its own.

9              MR. SAXENA:  No further questions.

10             MR. PARKER:  I have no further questions, your Honor.

11             THE COURT:  All right.

12             You're excused.  Thank you very much.

13             Next witness.

14             (Witness excused)

15             MR. PARKER:  Jose Ortiz.

16    JOSE LUIS ORTIZ,

17        called as a witness by the Defendant,

18        having been duly sworn through the

19        Interpreter, testified as follows:

20             THE DEPUTY CLERK:  Please state your name, spell your

21    first and the last name slowly for the record, please.

22             THE WITNESS:  My name is Jose Luis Ortiz.  J-o-s-e,

23    last name O-r-t-i-z.

24             THE COURT:  Please go ahead.

25             MR. PARKER:  Thank you, your Honor.

C45kcar5

1    DIRECT EXAMINATION (Through Interpreter)

2    BY MR. PARKER:

3    Q.  Mr. Ortiz, what is your native language?

4    A.  Spanish.

5    Q.  Do you feel more comfortable having the questions

6    translated into Spanish so that you can answer them?

7    A.  Yes, I feel more comfortable.

8    Q.  How would you rate your proficiency in English?

9    A.  Rate it how?

10   Q.  How well do you speak English?

11   A.  More or less, from one to ten, I'd say an eight.

12   Q.  How old are you?

13   A.  31.

14   Q.  Where do you come from originally?

15   A.  From Mexico.

16   Q.  Whereabouts in Mexico did you grow up?

17   A.  In Mexico City.

18   Q.  When did you come to the United States to live?

19   A.  In the year 2000.

20   Q.  Are you employed?

21   A.  Yes.

22   Q.  What do you do?

23   A.  I have a flower company.

24   Q.  Where is your company located?

25   A.  216 Fifth Avenue, between 27th and 28th Street.

C45kcar5                              Ortiz - direct

 1   Q.  In New York City?

 2   A.  Yes, New York City.

 3   Q.  Was there a time when you worked at Remi Restaurant?

 4   A.  Yes.

 5   Q.  When did you begin working at Remi?

 6   A.  I began to work there in the year 2000.

 7   Q.  What was your first job there?

 8   A.  As a busboy.

 9   Q.  And did that change at some point?

10   A.  Yes.

11   Q.  When did it change?

12   A.  After I started as a busboy in the year 2000, I was

13   promoted to food runner and then bartender.

14   Q.  Do you recall when you were promoted from busboy to food

15   runner?

16   A.  Maybe in 2003.

17   Q.  And when were you promoted from food runner to bartender?

18   A.  In 2005.

19   Q.  Who promoted you to the bartender position?

20   A.  Mr. Francesco Pistorio.

21   Q.  What was his job?

22   A.  The general manager.

23   Q.  Prior to becoming a bartender, did you receive any training

24   for that position?

25   A.  Yes, yes.

C45kcar5                          Ortiz - direct

1    Q.  What training did you receive?

2    A.  I trained under the bartender who at the time was the main

3    bartender.  He began to train me.

4    Q.  Do you have a recollection of over what period of time you

5    trained?

6    A.  Perhaps about a month.

7    Q.  During the time that you were training, did you continue to

8    work as a food runner?

9    A.  Yes.

10   Q.  How did it come about that you had the opportunity to

11   become a bartender at Remi?

12   A.  They needed a bartender, and I asked Mr. Pistorio for the

13   opportunity to train as the bartender.

14         THE COURT:  When you trained as a bartender, did you

15   get paid as being trained as a bartender?

16         THE WITNESS:  No.

17         THE COURT:  Where did your pay come from when you

18   trained as a bartender?

19         THE WITNESS:  Well, I was still doing the job of food

20   runner, so I just trained on my free time.

21   BY MR. PARKER:

22   Q.  Do you remember when Mr. Pistorio began working at Remi?

23   A.  Yes.

24   Q.  When was it?

25   A.  That was April of 2005.

C45kcar5                         Ortiz - direct

1  Q.  About how long after Mr. Pistorio started did you begin

2  training for the bartender job?

3  A.  It was basically about two or three months later.

4  Q.  Did there come a time when Mr. Pistorio left Remi?

5  A.  Yes.

6  Q.  Do you remember when that was?

7  A.  That was in May of 2008, if I'm not mistaken.

8  Q.  What was your job at Remi at the time Mr. Pistorio left

9  Remi?

10  A.  I was a bartender.

11  Q.  And did you hold any other positions at Remi, other than

12  the ones you've identified?

13  A.  Afterwards, I worked as a waiter.

14  Q.  When did you leave your job at Remi?

15  A.  December of 2009.

16  Q.  Do you remember when you began to be a waiter at Remi?

17  A.  That was like either August or September of 2008.

18  Q.  And how did it come about that you began to be a waiter

19  there?

20  A.  Well, I was tired of working as a bartender -- I had done

21  it for three years -- and I wanted to work as a waiter.

22  Q.  Now, during the time --

23         THE COURT:  So what did you do to qualify for being a

24  waiter?  What did you do to get to be a waiter?

25         THE WITNESS:  I asked the manager if there was a

C45kcar5                    Ortiz - direct

1  position available, because I already knew the menu, I already

2  knew the drinks.

3  Q.  Who was the manager?

4  A.  Carlo Maggi.

5      THE COURT:  What did he say?

6  A.  Well, he gave me a few shifts as a waiter.  So I was

7  working as a waiter and a bartender up until when I was able to

8  do the work of a waiter full time.

9      THE COURT:  On the shifts you worked as a waiter, the

10  first shifts you worked as a waiter, were you paid as a waiter

11  or a bartender?

12      THE WITNESS:  No, I was already being paid as a waiter

13  because it was in training, I already knew the system, so I was

14  doing the work of the waiter.

15  BY MR. PARKER:

16  Q.  How did you like working at Remi?

17  A.  I liked working at Remi a lot.

18  Q.  Why did you leave?

19  A.  I wanted to open my own flower company.

20  Q.  Would you describe the work environment at Remi while you

21  worked there, in terms of the employees' interactions with one

22  another?

23  A.  It was always a good work environment between the

24  co-workers; we all got along well.  So I liked working at Remi.

25  Q.  Were there times when Remi employees engaged in joking

1   around with one another?

2   A.   What type of joking around?   I don't understand.

3   Q.   Either using oral jokes, verbal jokes, or any sort of

4   physical contact.

5   A.   Yes, everything you mentioned, there were always games like

6   that.

7   Q.   Would you describe what you have just called games?

8   A.   Well, amongst all the employees, we had verbal games, like

9   we spoke to each other in a bad way, we touched each other, all

10  the employees did.

11  Q.   You say you talked to each other in a bad way.   What do you

12  mean by that?

13  A.   We spoke to each other like if we were speaking to each

14  other as women.

15  Q.   Can you give me some examples of things that were said?

16  A.   We would talk to each other and refer to each other as puta

17  or pera.

18          THE COURT:   What does pera mean?

19          THE WITNESS:   Well, when you're joking like that, the

20  word is similar to puta.

21  BY MR. PARKER:

22  Q.   What do you understand puta to mean, in the context in

23  which you've described its being used?

24  A.   Like a prostitute.

25  Q.   Who participated in these verbal exchanges that you've just

C45kcar5                          Ortiz - direct

1   described?

2   A.   All the personnel that worked on the floor, busboys --

3   mainly the busboys but food runners and also the coffee guys.

4          THE COURT:  When you say all the people who worked on

5   the floor, you mean all the different occupations, not every

6   single person engaged in these acts?

7          THE WITNESS:  Exactly, but mainly it was the busboys,

8   the food runners and the coffee guys.  More specifically, the

9   people in the corner that we worked.

10         THE INTERPRETER:  Oh, I'm sorry.  "The Latin people

11  that worked there."

12  BY MR. PARKER:

13  Q.   Would you describe the types of touching that you observed

14  employees engage in while you worked at Remi?

15  A.   You want me to show you?  Or what is the question?

16  Q.   If you could describe it as you're showing it, yes, please.

17         MR. PARKER:  If your Honor would permit?

18         THE COURT:  No objection?

19         MR. DELANEY:  No, I didn't object.

20         THE COURT:  Yes.

21  A.   We would touch people's buttocks.  If someone was squatted

22  down, you could pull them to the part -- and mainly it was

23  touching people's buttocks with your hand as you passed by or

24  they passed by.  Usually that's what it was, touching the

25  buttocks.

C45kcar5                          Ortiz - direct

 1          THE COURT:  What were the other acts besides touching

 2    the buttocks?

 3          THE WITNESS:  Suddenly you could touch the males'

 4    front part, but it was like just to bother them, exactly.

 5    BY MR. PARKER:

 6    Q.  Did the touching that you said occurred on the buttocks or

 7    on the front parts, was it over the clothing or under the

 8    clothing?

 9    A.  Above clothing, over the clothing.

10    Q.  When you stood up to describe one of the types of touching,

11    you said that if someone squats down, you could pull them --

12    I'm paraphrasing -- pull them towards you.  Could you give a

13    more specific description of what that entailed?

14          MR. DELANEY:  Objection; leading --

15          THE COURT:  Stand and show us.

16          THE WITNESS:  If someone was getting something from

17    the floor, or linens, and anyone was near that person that was

18    squatted over, you could grab that person in a joking manner

19    and pull them.

20    BY MR. PARKER:

21    Q.  Grab them where?

22    A.  Grab their heads and pull like this.

23          THE COURT:  I didn't see.

24          THE WITNESS:  Well, the person would be squatted over,

25    and then you would grab them like this and pull them toward

C45kcar5                        Ortiz - direct

1   your part.

2              THE COURT:  I see.

3   BY MR. PARKER:

4   Q.  What did you understand that act to depict?

5   A.  It was like the act of sucking.  It was like to say "suck

6   it."

7   Q.  Was that said or was that just the act?

8   A.  No, it was just act.

9   Q.  Now, you've described the touching with the hands on the

10  butt and also in the front, and you have described what you

11  just stood up and showed us.

12             Are there any other forms of touching that you

13  observed while working at Remi?

14  A.  Yes.  You would pinch people's nipples.

15             THE COURT:  Women?

16             THE WITNESS:  No, men; men to other men.

17  Q.  Now, you said earlier that busboys and food runners and

18  coffee men participated in this type of touching --

19             MR. PARKER:  Let me ask that.

20  Q.  Who participated in the types of touching --

21             THE COURT:  Are you asking for names or are you asking

22  for occupations?

23             MR. PARKER:  Let's start first with -- your Honor,

24  I'll rephrase it.

25  Q.  What types of workers at Remi did you observe engaging in

1   the types of touching you just described?

2   A.  Well, like I had mentioned earlier, mainly it was the Latin

3   employees that understand that type of joking or games.

4   Usually they were the busboys, food runners, at that time the

5   coffee guys; and if there was a Latin bartender or waiter, they

6   would also participate.

7   Q.  Who were the coffee guys during this time frame that you

8   observed touching?

9   A.  Yullios Donge and Arturo Caravantes.

10  Q.  Did you observe Mr. Caravantes engage in the types of

11  touching that you've described?

12  A.  Yes.

13  Q.  What did you see Mr. Caravantes do?

14  A.  With all of us, with all the employees that participated,

15  he touched and also verbally joked, like all of us.

16  Q.  When did he do that?

17  A.  Any time we were able to, we did.

18  Q.  Mr. Caravantes engaged in that -- let's talk about a time

19  frame, if we could.

20          You started in 2000.  You said Pistorio left in May of

21  2008.  During what period of time did you see Mr. Caravantes

22  engaging in that type of behavior at Remi?

23  A.  From when I first met Mr. Caravantes, since then he had

24  always been playing with us, with myself and the others, the

25  same way.

C45kcar5                         Ortiz - direct

1    Q.  Did he touch you?

2    A.  Yes.

3    Q.  How did Caravantes touch you?

4    A.  He touched my buttocks.

5    Q.  Did you touch him?

6    A.  Yes.

7    Q.  How did you touch Caravantes?

8    A.  The same way, touching his buttocks, he would touch me, I

9    would touch him.

10   Q.  Were there any occasions where you heard Mr. Caravantes

11   using the type of comments that you've discussed?

12        THE COURT:  Objection sustained.  "Type of comments"

13   is too broad a question.  He doesn't know -- I don't know what

14   the witness -- how he would interpret that question.

15        MR. PARKER:  I'll clarify, your Honor.

16   BY MR. PARKER:

17   Q.  You've identified, Mr. Ortiz, various types of comments

18   that were made by Remi employees that you heard, including the

19   use of words like "puta" and "pera."  Taking those two words,

20   did you have occasion to hear Mr. Caravantes say them at work

21   to other employees?

22   A.  Yes, both.

23   Q.  Now, what other -- I'm going to ask you for names now --

24   what other employees at Remi did you observe Mr. Caravantes

25   engage in touching and making comments to?

1  A.  I do not remember all of them, but mainly it was used with

2  Oscar Velandia and me -- I'm Jose Ortiz -- busboys whose names

3  I don't remember.  I can't remember their names; there were

4  many of them.

5  Q.  You mentioned earlier in your testimony that --

6          THE COURT:  Did he ever call you any names that

7  suggested you were female?

8          THE WITNESS:  Well, yes, when you're called a puta or

9  a pera, it's referring to you like that as a woman.

10          THE COURT:  Any other?

11          THE WITNESS:  No, usually, that I can remember, it was

12  those two.

13          THE COURT:  I wasn't asking usually.  I was asking any

14  other.

15          THE WITNESS:  Another word or other people?

16          THE COURT:  Other word.

17          THE WITNESS:  Not that I can recall.

18  BY MR. PARKER:

19  Q.  You mentioned earlier that another group of employees who

20  engaged in touching and comments were the food runners,

21  correct?

22  A.  Yes.

23  Q.  What was Mr. Sotarriba's job at Remi while you worked

24  there?

25  A.  He was a food runner.

1    Q.   Did you observe Mr. Sotarriba engage in the types of

2    touching that you've described, including touching employees on

3    the buttocks with his hands or on the front parts with his

4    hands or the pretend oral sex act that you identified?

5    A.   Yes, I did observe it.

6    Q.   During what period of time?

7    A.   In all the time that I've known him, he's done it.

8    Q.   Did Mr. Sotarriba ever touch you in any of those ways?

9    A.   Yes.  We played mutually with other's buttocks.

10   Q.   Did you observe at any time Mr. Sotarriba engage in the

11   types of touching you've described here today, with any other

12   employees of Remi?

13   A.   Yes, with plenty of others; like I said, with a lot of the

14   busboys, the food runners that were working there back then.

15                THE COURT:  Do you remember any of their names?

16                THE WITNESS:  One was Luis Lopez.  I don't remember.

17                THE COURT:  You don't remember Luis Lopez, or you

18   don't remember --

19                THE WITNESS:  No, I mean I don't remember the other

20   names.

21   BY MR. PARKER:

22   Q.   You said a few moments ago that there were mutual -- you

23   used the word "mutual" in describing Mr. Sotarriba and you

24   touching.  What did you mean by that?

25   A.   What I meant was that it was a mutual game, meaning if he

1   touched me on my buttocks, I would touch him on his buttocks;

2   it was mutual.

3         THE COURT:  Were you touching back or would you touch

4   him at another time?

5         THE WITNESS:  Sometimes I would touch him back right

6   at that moment; other times I would touch him later on.  It

7   depended on where we were, if we were in an area where we could

8   play, like in a station or in the back.

9         THE COURT:  So, sometimes it was like a game of tag?

10        THE WITNESS:  Yes.

11        THE COURT:  And sometimes it was somewhat later, that

12  there would be --

13        THE WITNESS:  Yes, exactly.  Sometimes we'd continue

14  playing; other times we'd pick it up later on.

15  BY MR. PARKER:

16  Q.  Did you ever hear any Remi employees talk about, or ask

17  questions about, sex for money?

18  A.  Yes.

19  Q.  In that regard, what did you hear employees say at Remi

20  about that topic?

21  A.  Well, things were said, like how much money would you give

22  to have one night with this person?

23        THE COURT:  Was "this person" named?

24        THE WITNESS:  Yes.

25        THE COURT:  Was that a movie star or someone like

C45kcar5                          Ortiz - direct

1    that?

2              THE WITNESS:  No, it was Mr. Arturo Caravantes.

3              THE COURT:  Who said that about Mr. Caravantes?

4              THE WITNESS:  No, he would say himself, he would say

5    things like that to me and to Oscar Velandia.

6              THE COURT:  What exactly did he say to you?

7              THE WITNESS:  He would say, how much money will you

8    give me to have one night with me or to have relations with me?

9              THE COURT:  When did he say that?

10             THE WITNESS:  While we were joking, while he was

11   working in the coffee area.

12             THE COURT:  Are you bisexual?

13             THE WITNESS:  Yes.

14             THE COURT:  So you have sex with men as well as women?

15             THE WITNESS:  Yes.

16             THE COURT:  Was anyone else present when he said this

17   to you?

18             THE WITNESS:  Oscar Velandia and myself.

19             THE COURT:  Where was the conversation?

20             THE WITNESS:  Sometimes the conversation took place in

21   the coffee station as we were passing by; other times, when we

22   were closing or when the restaurant was closing, if I was

23   waiting for Jose -- I'm sorry, for Oscar Velandia and Arturo

24   Caravantes.

25             THE COURT:  Did you respond when he asked that

1  question?

2         THE WITNESS:  Yes.  We would respond and say that we

3  would pay him -- I don't know about amounts, I mean we were

4  just joking.

5         THE COURT:  It was a joke?

6         THE WITNESS:  Yes.

7         THE COURT:  You never followed up?  You were never

8  serious?

9         THE WITNESS:  No.

10        THE COURT:  You never had sex with him?

11        THE WITNESS:  No, never.

12  BY MR. PARKER:

13  Q.  Did that type of conversation that you have --

14        THE COURT:  Do you remember about when you had that

15  conversation with him?  Mr. Caravantes.

16        THE WITNESS:  It might have been sometime around 2007.

17  I was a bartender already and Oscar was closing the restaurant.

18  Q.  How many times did that particular type of conversation you

19  just described, about sex for money, occur between you and

20  Caravantes and Oscar Velandia?

21        THE INTERPRETER:  You said and Oscar Velandia?

22        MR. PARKER:  Yes.

23  A.  Several times.  I don't remember how many, but plenty of

24  times.

25        THE COURT:  Did Mr. Velandia agree with Mr. Caravantes

1   to have sex with him?  Did he have sex with him?

2           THE WITNESS:  From what I understand, no, they

3   never --

4           THE COURT:  What you heard, not what you understand.

5           THE WITNESS:  No.

6   BY MR. PARKER:

7   Q.  Now, you mentioned earlier that you and Mr. Sotarriba had

8   occasions where you mutually touched one another, correct?

9   A.  Yes.

10  Q.  What was that type of touching?  Would you describe it?

11          MR. DELANEY:  Objection, your Honor; cumulative, he's

12  already testified as to this.

13          THE COURT:  I was trying to get the attention of the

14  deputy.  I can go on for a while.

15          Rephrase the question.  Objection sustained.

16  BY MR. PARKER:

17  Q.  You described the types of touching that you engaged in

18  with Mr. Sotarriba, correct?

19  A.  Yes.

20  Q.  Do you recall where those touchings took place in the

21  restaurant?

22  A.  We would touch each other in the basement, in the kitchen,

23  in the coffee station, and sometimes in the other stations in

24  the restaurant.

25  Q.  Did you ever touch Mr. Sotarriba in the locker room at

1   Remi?

2   A.   The same way, as part of the game, we would touch each

3   others' buttocks.

4   Q.   Did you ever attempt to remove Mr. Sotarriba's pants at any

5   time while in the locker room at Remi?

6   A.   No, never.

7          THE COURT:  Did you observe anyone else trying to

8   remove his pants in the locker room?

9          THE WITNESS:  No.

10  Q.   You testified that there were times when, as bartender, you

11  would wait for Oscar Velandia after the closing of the

12  restaurant, correct?

13  A.   Yes.  Part of my job was to wait for the manager to lock up

14  and wait until that door was locked.

15  Q.   Which door?

16  A.   The front door, the main door that goes out onto 53rd

17  Street.

18  Q.   There's an exhibit book that should say Defendants'

19  Exhibits on it; and if you could look at tab number 62 in the

20  book.

21         THE COURT:  All right, 62.

22  Q.   Mr. Ortiz, do you recognize what is shown in Exhibit 62?

23  A.   Yes.

24  Q.   What is shown there?

25  A.   This is the main entrance to Remi Restaurant.

C45kcar5                           Ortiz - direct

1   Q.  Is this the area that you said needed to be locked at the

2   end of the night?

3   A.  Yes, these are the doors that have to be locked.

4   Q.  You testified that there were times where Oscar Velandia

5   was at the restaurant late to lock the doors and you waited for

6   him, correct?

7   A.  Yes.

8   Q.  During any of those times, was Mr. Caravantes there as

9   well?

10  A.  Yes, he was always waiting for the close of the restaurant.

11  Q.  And on any of those occasions, were you present when the

12  doors -- these doors shown in D62 -- were locked?

13  A.  Yes.  I always waited until the doors were locked.

14            THE COURT:  Where did you wait?

15            THE WITNESS:  By the side of the door.

16            THE COURT:  On the inside or outside?

17            THE WITNESS:  Outside.

18  BY MR. PARKER:

19  Q.  On those occasions, who locked the doors?

20  A.  The manager that was in charge; it was either Francesco

21  Pistorio or Oscar Velandia.

22  Q.  On the occasions that you have identified where you waited

23  and where Oscar Velandia was doing the closing of the doors,

24  did Oscar Velandia lock the doors?

25  A.  Yes.

C45kcar5                         Ortiz - direct

1   Q.  Were there any occasions where that occurred where you

2   waited for Velandia, came outside, he locked the doors, where

3   Mr. Caravantes remained inside the restaurant?

4              MR. DELANEY:  Your Honor, I am going to object to this

5   pattern of questions as very leading.  He's obviously trying to

6   get a story out of this witness.

7              THE COURT:  Let me read your objection.

8              The objection is sustained in the form of the

9   question.

10  BY MR. PARKER:

11  Q.  How does someone lock those front doors that are shown in

12  D62?

13  A.  The lock is on the bottom, close to the floor.  So the

14  person locking the door has to squat down to do it.

15  Q.  Was there ever an occasion where you were standing there,

16  next to Velandia, when he squatted down to lock the doors?

17             MR. DELANEY:  Objection; same objection, your Honor.

18             THE COURT:  Was there a routine that you followed,

19  that was followed every night, at Remi, for closing the doors?

20             THE WITNESS:  Well, yes, the bartender that was in

21  charge that day had to wait for the manager that was in charge

22  that night, to close the doors.

23             THE COURT:  And then what?

24             THE WITNESS:  After the doors were locked, I would go

25  home.

1    THE COURT:  Did anyone else participate in the closing

2    of the doors?

3    THE WITNESS:  No.  The manager would lock the door and

4    Mr. Caravantes would have to wait until the dishwashers

5    finished their shift and exit using the emergency exit.

6    THE COURT:  Did you observe any occasions in which

7    that routine was not followed?

8    THE WITNESS:  No.

9    BY MR. PARKER:

10   Q.  On any of those occasions that you were present and watched

11   this routine occur, did you ever see Mr. Caravantes inside the

12   restaurant while the doors were being locked?

13   A.  Yes.  He was almost always inside, waiting for us to lock

14   the doors.

15   Q.  Where was he --

16   THE COURT:  Did you see the dishwashers also?

17   THE WITNESS:  No.  The dishwashers were in the

18   kitchen, in the basement.

19   Q.  And on those occasions where you saw Mr. Caravantes, where

20   did you see him?  Where was he?

21   A.  He would stand right in front of the doors but on the

22   inside.

23   Q.  Could you see him?

24   A.  Yes.

25   Q.  Through the glass doors?

C45kcar5                      Ortiz - direct

1    A.  Yes, you could see him through the glass doors.

2             THE COURT:  You said you saw him sometimes.  Do you

3    have a date and time?

4             THE WITNESS:  Well, as far as dates, it would be just

5    about every night, when we locked up.  And time?  It would be

6    about 12:30 in the morning or 1:00 in the morning at times.

7             (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C45dcar6                           Ortiz - direct

1   Q.  What did you observe, if anything, Mr. Caravantes do on the

2   other side of the door while the door was being locked?

3          MR. DELANEY:  Objection, your Honor.  He is leading

4   the witness again.

5          THE COURT:  I would have to allow the question.

6   A.  Well, every time I saw him, whenever we were closing the

7   door, when Oscar Velandia would bend over or bend down to lock

8   the door, Mr. Caravantes would be on the other side of the door

9   and get close to the door and put his part up against the door

10  while Mr. Velandia was squatted down and act like if he was

11  having oral sex.

12         THE COURT:  Who would act as if he was having oral

13  sex?

14         THE WITNESS:  Oscar would pretend to be having oral

15  sex with Mr. Caravantes, but when Mr. Caravantes would look

16  down, he would push his part up against the door.

17         Oscar would squat down to close the door, to lock the

18  door.  At that moment Mr. Caravantes would put his part up

19  against the door and would begin to move as if he was having

20  oral sex, and would begin to laugh.

21         THE COURT:  How would Mr. Caravantes move as if he was

22  about to have oral sex?  In what manner?

23         THE WITNESS:  Can I show you?

24         THE COURT:  Yes.

25         THE WITNESS:  (Indicating).

C45dcar6                          Ortiz - direct

 1              THE COURT:  Just show the courtroom.

 2              THE WITNESS:  He would get right in front.  From

 3    outside, Oscar would squat down to lock the door and Caravantes

 4    would begin to move like this (indicating) and begin to laugh.

 5              THE COURT:  Like what?  How would he move?  Like what?

 6              THE WITNESS:  (Indicating) Like this, like if he was

 7    having -- right in front of the door, where Oscar's face would

 8    be, as Oscar was locking the door.

 9              THE COURT:  The witness is allowing his hips to just

10    go back and forth -- according to the witness, his hips would

11    go back and forth, forward and backward.  Mr. Caravantes' hips

12    would go backward and forward towards the door.  All right.

13    BY MR. PARKER:

14    Q.  Can you estimate about how many times you observed that

15    conduct?

16    A.  Every time I locked up with Mr. Velandia.

17              THE COURT:  How many times did you lock up with

18    Mr. Velandia?

19              THE WITNESS:  Once or twice a week.

20              THE COURT:  And what period of time are you talking

21    about?

22              THE WITNESS:  Perhaps two years.

23              THE COURT:  And it happened all during the two-year

24    period?

25              THE WITNESS:  Yes, in my presence.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1        THE COURT:  When you were present?

2        THE INTERPRETER:  I'm sorry?

3        THE COURT:  When you and they were present?

4        THE WITNESS:  Exactly.

5        THE COURT:  Anyone else present?

6        THE WITNESS:  No.  No one else.

7        MR. PARKER:  I have no further questions.

8        THE COURT:  We will break for the day so that you can

9    get ready for tomorrow.

10        How many more witnesses do we have, or you are

11   instructed -- no, you are not instructed; you are not on cross

12   yet.

13        But how many more witnesses, Mr. Parker?

14        MR. PARKER:  Your Honor, I have two -- well, I have

15   three lay witnesses and our expert.  I expect that we will

16   finish Mr. Ortiz and two witnesses tomorrow.

17        I mentioned the other day that the other lay witness,

18   Mr. Pistorio, was away on vacation and he will be here on

19   Tuesday morning.  Our expert is prepared to be here on Monday

20   morning, and I believe that we were going to -- that would not

21   take all day, Judge.  And I spoke with Mr. Delaney, and I

22   believe he's prepared to take his expert out of turn on Monday.

23   I suspect we may have a gap in time, perhaps, on Monday

24   afternoon, because I can't get Mr. Pistorio here any sooner.

25   But I think likely tomorrow will be filled, I believe, and

C45dcar6

1    Monday probably half the day.

2              THE COURT:  How much longer is this case going to

3    take?

4              MR. PARKER:  I will rest as soon as Pistorio's

5    testimony is completed on Tuesday.

6              MR. DELANEY:  And, your Honor, we had better talk.  I

7    don't anticipate calling rebuttal witnesses yet.  But

8    Mr. Parker and I discussed -- and since Mr. Pistorio would be

9    going Tuesday morning, he is a relatively important witness,

10   the one request we would have is if we could do summation on

11   Wednesday morning instead of right after that witness, which

12   would be difficult for both of us.

13             THE COURT:  I am just concerned about the end of it;

14   that is all.

15             MR. DELANEY:  It won't go that long.

16             THE COURT:  We should be over by Thursday or Friday?

17             MR. PARKER:  I believe we should be over by lunchtime

18   on Wednesday at the latest.

19             MR. DELANEY:  Agreed.

20             THE COURT:  Including summations?

21             MR. PARKER:  Yes.

22             MR. DELANEY:  Yes, sir.

23             THE COURT:  OK.  We only go to 1 tomorrow.  All right?

24   You are counting that in?

25             MR. PARKER:  Yes, your Honor.

C45dcar6

1          MR. DELANEY:  Yes, your Honor.

2          THE COURT:  All right.

3          MR. PARKER:  Thank you.

4          THE COURT:  Good luck, and I will wish you a happy

5    Easter tomorrow.

6          You are excused, but be back here 9:30 tomorrow

7    morning.

8          (Adjourned to 9:30 a.m., Friday, April 6, 2012)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION
 2    Examination of:                         Page
 3    OSCAR VELANDIA
 4    Cross By Mr. Delaney . . . . . . . . . . . . 930
 5    Redirect By Mr. Parker . . . . . . . . . . . 951
 6    Recross Mr. Delaney . . . . . . . . . . . . 952
 7    PABLO SOLIS
 8    Direct By Mr. Parker . . . . . . . . . . . . 955
 9    Cross By Mr. Saxena . . . . . . . . . . . . 989
10    YULLIOS DONGE
11    Direct By Mr. Parker . . . . . . . . . . . . 999
12    Cross By Mr. Saxena . . . . . . . . . . . .1017
13    JOSE LUIS ORTIZ
14    Direct By Mr. Parker . . . . . . . . . . . .1023
15                    PLAINTIFF EXHIBITS
16    Exhibit No.                            Received
17     323, 324, and 325  . . . . . . . . . . . . 954
18     86   . . . . . . . . . . . . . . . . . . . 948
19     105  . . . . . . . . . . . . . . . . . . . 948
20                    DEFENDANT EXHIBITS
21    Exhibit No.                            Received
22     62   . . . . . . . . . . . . . . . . . . . 951
23
24
25
```