C46dcar1                          Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    ARTURO CARAVANTES and
3   FRANCISCO SOTARRIBA,

4                    Plaintiffs

5            v.                          09 Civ. 7821 (RPP)

6   53RD STREET PARTNERS, LLC
    d/b/a REMI RESTAURANT and
7   OSCAR VELANDIA,

8                    Defendants
    ------------------------------x      New York, N.Y.
9                                        April 6 2012
                                         9:35 a.m.
10
    Before:
11               HON. ROBERT P. PATTERSON, JR.,

12                                       District Judge

13                        APPEARANCES

14  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
         Attorneys for Plaintiffs
15  1285 Avenue of the Americas
    New York, NY 10019
16  AARON S. DELANEY
    MAYUR P. SAXENA
17  MOIRA KIM PENZA

18  URBAN JUSTICE CENTER
         Attorney for Plaintiffs
19  123 William Street 16th Floor
    New York, NY 10038
20  NICOLE HALLETT

21  EPSTEIN BECKER & GREEN PC
         Attorneys for Defendants
22  KERRY M. PARKER
    ALKIDA KACANI

23
         – also present –
24
    CARLOS CRUZ, LILIANA HALAC – Spanish Interpreters
25  RANDALL CARTER – Plaintiff AV Tech

C46dcar1                      Trial

1           (Trial resumed)

2           THE COURT:  Please be seated.

3           Please recall the witness.

4           MR. PARKER:  Apparently the witness is not here yet,

5   your Honor.

6           THE COURT:  Oh, all right.

7           MR. PARKER:  He certainly is expected at 9:30, but he

8   may have been delayed.

9           THE COURT:  He may have been relying on my being late

10  because I have usually been about five or ten minutes later.

11          THE CLERK:  The witness is on line.

12          THE COURT:  Oh, yes.  Today is immigration day.

13  Normally it is Friday and the lines get terrible out there.  So

14  we may have to pull him out of the line.

15          Can you remember what he looks like?

16          THE CLERK:  Yes.

17          THE COURT:  OK.

18          (Pause)

19          MR. PARKER:  Could I address one trial issue while we

20  are waiting?

21          THE COURT:  Sure.

22          MR. DELANEY:  I can do some housekeeping, too, so.

23          THE COURT:  Sure.

24          MR. PARKER:  Your Honor, as you know, there is a claim

25  in the case by the plaintiffs for punitive damages, and we had

C46dcar1                         Trial

1   not discussed this previously, but I wanted to inquire of the

2   Court as to whether in the typical case, at least in my

3   experience and in the case law, punitive damages, any evidence

4   of financial worth or financial evidence is put on at a later

5   date after the fact finder -- in the event the fact finder

6   decides that a punitive damage award is --

7           THE COURT:  Yes.  What I do in a jury case is I defer

8   the issue of the amount of those punitive damages, but the jury

9   makes a finding that they want to award punitive damages; in

10  other words, that the test has been met, but we defer the issue

11  of what the punitive damages should be, the amount, until after

12  they've heard evidence from the defendants as to assets,

13  generally financial information.  I don't know if that applies

14  here; it is a nonjury case.  But I have never -- I don't think

15  I've tried a nonjury case with punitive damages, as generally

16  they're asked for when you have a jury.

17          Do you want me to look into that?

18          MR. PARKER:  Yes.  I'm not prepared today to introduce

19  that evidence, although the witness I would do it through will

20  be testifying today.  But I could, if necessary, present that

21  evidence on Monday by both defendants.  So that is why I want

22  to inquire of the Court as to whether there is a preference to

23  put the evidence in now or later.

24          THE COURT:  Let me hear from plaintiff.

25          MR. DELANEY:  Yes.  I'm happy to wait until your Honor

C46dcar1                     Trial

1   decides whether you want the evidence in --

2               THE COURT:  I would rather not --

3               MR. DELANEY:  Have to decide it?

4               THE COURT:  I would rather write one opinion rather

5   than two.

6               MR. DELANEY:  I think it would be more efficient to

7   put all the relevant evidence in.

8               THE COURT:  Findings of fact and conclusions of law.

9   I think it would be more efficient to do it in the way that

10  Mr. Parker suggests.

11              MR. DELANEY:  Put it in on Monday, you mean?

12              THE COURT:  Yes.

13              MR. DELANEY:  I am OK with that.

14              THE COURT:  We can use -- we have a gap, maybe, in

15  time.

16              MR. PARKER:  Yes.

17              MR. DELANEY:  And I think that answered one of my

18  questions, which was whether we should put our damages

19  calculations into my summation so it sounds like the answer to

20  that is yes as well.

21              THE COURT:  Yes.  Of course, you would have a chance

22  to cross-examine about any financial information that is put

23  in, or make any points you wanted to on that issue.

24              MR. DELANEY:  OK.  While we are waiting for the

25  witness --

C46dcar1                         Trial

1          THE COURT:  Or contrary evidence, if possible.

2          MR. DELANEY:  While we are waiting for the witness,

3     why don't I mark a few exhibits for identification.  They are

4     the excerpts of the deposition transcripts that were read into

5     the record.

6          THE COURT:  Sure.

7          MR. DELANEY:  So I'll hand up three exhibits marked

8     for identification.

9          (Handing)

10          THE COURT:  326, 327, 328, for identification, are

11     excerpts from Velandia deposition of his -- how would you

12     describe these Plaintiffs' Exhibits, 26, 27 and 28?

13          MR. DELANEY:  Yes, your Honor.  So Plaintiffs' Exhibit

14     326 is an excerpt from Mr. Velandia's deposition, and Exhibit

15     326 is page 69, line 19, through 70, line 9.

16          THE COURT:  All right.

17          MR. DELANEY:  Plaintiffs' Exhibit 327 is again an

18     excerpt from Mr. Velandia's deposition, page 71, line 5,

19     through 73, line 4.

20          THE COURT:  All right.

21          MR. DELANEY:  And Plaintiffs' Exhibit 328 is an

22     excerpt from Mr. Solis' deposition, and, for the record, this

23     was the video excerpt that was played.

24          THE COURT:  Yes.

25          MR. DELANEY:  And Plaintiffs' Exhibit 328 is page 63,

C46dcar1                    Trial

1    line 6, through page 64, line 6.

2            So plaintiffs move 326, 327 and 328 into the record,

3    for identification.

4            THE COURT:  326, '27 and '28, any objection to them?

5            MR. PARKER:  Your Honor, I just am seeing these for

6    the first time, and I'm not sure that I agree with -- just may

7    I have a chance to look at them?

8            THE COURT:  Sure.  Of course.  We are waiting for the

9    witness.

10           THE CLERK:  He wasn't downstairs.

11           THE COURT:  He wasn't downstairs.

12           (Pause)

13           MR. DELANEY:  Your Honor, while we are waiting for

14   Mr. Parker, it was just pointed out to me that Plaintiffs'

15   Exhibit 328 has the wrong caption on top of the transcript.  It

16   was likely a court reporter error at the time of the deposition

17   that neither I nor defendants' counsel caught.

18           So the caption on the top of the Plaintiffs' 328 says

19   "U.S. Bankruptcy Court, New York, Lehman Brothers v. J.P.

20   Morgan," but both myself and Mr. Parker agree that this is in

21   fact Mr. Solis' deposition transcript.  There was just an error

22   in the caption when the court reporter transcribed it -- the

23   court reporter at the deposition, of course.

24           THE COURT:  Lehman Brothers.  Boy.

25           MR. DELANEY:  And, also, it says, "Final - highly

C46dcar1                    Trial

1    confidential" on it, but neither I nor defense counsel assert

2    that this transcript is confidential, highly or otherwise.

3             THE COURT:  All right.  I will just cross those out.

4             It also says Thomas Fontana.

5             MR. DELANEY:  Yes.

6             THE COURT:  That should be crossed, too?

7             MR. DELANEY:  Yes, sir.  As well as the date, I

8    believe.

9             THE COURT:  It makes me curious but I think my

10   curiosity can be contained.

11            MR. DELANEY:  Yes, your Honor.

12            So 328, the date should also be struck.  The date as

13   it reads on the excerpt says May 4, 2011.  The date of

14   Mr. Solis' deposition was in fact April 27, 2011.

15            We apologize for any confusion.

16            THE COURT:  April 27th?

17            MR. DELANEY:  2011.

18            THE COURT:  OK.

19            MR. PARKER:  Your Honor, I reviewed those exhibits,

20   P-326, '27 and '28.  I agree, they are what was read into the

21   record.  So I have no objection.

22            THE COURT:  No objection.  All right.

23            Then they are admitted in evidence.  326, 327, 328 are

24   admitted in evidence.

25            (Plaintiffs' Exhibits 326, 327, 328 received in

C46dcar1                         Trial

1   evidence)

2            THE COURT:  I guess we ought to call the next witness.

3            I think your client just walked out the door,

4   Mr. Parker.

5            MR. PARKER:  Yes.  I will just go out.

6            THE COURT:  All right.

7            (Pause)

8            MR. PARKER:  Your Honor, we are trying to reach

9   Mr. Ortiz by calling a cell phone number, and, if not, then I

10  could put somebody else on the stand --

11           THE COURT:  Sure.

12           MR. PARKER:  -- if we can't reach him.

13           THE COURT:  Well, if he isn't going to be available in

14  the next few minutes.

15           MR. PARKER:  Yes.  OK.

16           THE COURT:  Someone is calling him, then.

17           All right.  Then I will take a break and go upstairs

18  for a second.

19           MR. PARKER:  Thank you.

20           (Recess)

21   JOSE LUIS ORTIZ,

22      Resumed, and testified further (through the Interpreter)

23      as follows:

24           THE COURT:  All right.  Please be seated.

25           Mr. Solis.

C46dcar1                    Trial

1          THE WITNESS:  No.  Ortiz.

2          THE COURT:  I'm sorry.  Mr. Ortiz, you are reminded

3    you are still under oath.

4          THE WITNESS:  Yes.

5          THE COURT:  I do that as a matter of court procedure

6    any day a witness takes the stand on a succeeding day.

7          THE WITNESS:  Thank you.

8          THE COURT:  All right.  Go ahead.

9    CROSS-EXAMINATION (through the Interpreter)

10   BY MR. DELANEY:

11   Q.  Mr. Ortiz, there was new ownership in Remi that took over

12   in April 2005, correct?

13   A.  Yes.

14   Q.  And Mr. Francesco Pistorio was the new general manager

15   starting in April 2005?

16   A.  Yes.

17   Q.  He made you a bartender?

18   A.  Yes.

19   Q.  And you worked with Mr. Velandia at this time, correct?

20   A.  Yes.

21   Q.  And he was a waiter?

22   A.  Yes.

23   Q.  He was a waiter April 2005?

24   A.  Yes.

25   Q.  Now, in those first two months when the new ownership took

C46dcar1                          Ortiz - cross

1   over, Mr. Pistorio started giving Mr. Velandia more

2   responsibility at the restaurant, correct?

3   A.  When saw responsibilities, I don't know.  I know that he

4   wanted Oscar to help with certain things, but as far as

5   responsibilities, I don't know.

6   Q.  Well, at your deposition you testified that Mr. Velandia

7   started getting more responsibilities.  Do you recall that?

8   A.  Yes.

9   Q.  It is true that Mr. Velandia started getting more

10  responsibility in those first few months?

11  A.  He helped with certain things.  I suppose you could refer

12  to that as responsibilities.

13  Q.  And had Mr. Pistorio started giving him more

14  responsibility?

15  A.  What I am aware of is that at the parties he began to

16  assist more.  He was placed in charge of the parties.  That I

17  know.

18  Q.  Mr. Pistorio was the general manager at the restaurant

19  under the new ownership, correct?

20  A.  Yes.

21  Q.  He was in charge of the restaurant?

22  A.  Yes.

23  Q.  So if somebody at the restaurant was given more

24  responsibility, Mr. Pistorio would have given him?

25  A.  Yes.

C46dcar1                    Ortiz - cross

1   Q.  So if Mr. Velandia got more responsibility at the

2   restaurant, as you testified, then Mr. Pistorio would have

3   given him more responsibility.

4   A.  Yes.

5   Q.  Now, Mr. Pistorio eventually promoted Mr. Velandia to

6   assistant manager, correct?

7   A.  Yes.

8   Q.  And Mr. Pistorio announced at a staff meeting that

9   Mr. Velandia would become the assistant manager?

10  A.  Not completely as an assistant, but Mr. Pistorio did say

11  that Mr. Velandia would be helping to close the restaurant at

12  certain times.

13  Q.  Again, at your deposition, didn't you testify that

14  Mr. Pistorio announced at a meeting that Mr. Velandia would

15  become the assistant manager?

16  A.  I remember once that he announced that he was going to be

17  assisting not as the manager but that he would be closing.

18  Q.  Let me read you a portion -- I will hand you your

19  deposition and see if it refreshes your recollection.

20  A.  OK.

21          MR. DELANEY:  Permission to approach, your Honor?

22          THE COURT:  Yes.  All right.

23          Page and line?

24  BY MR. DELANEY:

25  Q.  Mr. Ortiz, I am going to ask you to turn to page 41, line

C46dcar1                          Ortiz - cross

1    3, of your deposition.

2              THE COURT:  First let's establish when the deposition

3    was taken, etc.

4              MR. DELANEY:  Yes, your Honor.

5    Q.  Mr. Ortiz, before I read this to you, do you recall being

6    deposed in this case?

7    A.  Yes.

8    Q.  And you recall that you were under oath when you gave the

9    deposition?

10   A.  Yes.

11   Q.  And you told the truth at your deposition?

12   A.  Yes.

13   Q.  And the transcript I just handed you, the binder with the

14   transcript, do you recognize this as your deposition

15   transcript?

16   A.  Yes.

17   Q.  So, again, turning to page 41, line 3 --

18             THE COURT:  What date was this taken?  Do you remember

19   what date you had your deposition taken?

20             THE WITNESS:  If I'm not mistaken, I remember either

21   August or September of 2010.

22   Q.  If I told you it was August 12, 2010, does that refresh

23   your recollection?

24   A.  Perhaps not, but....

25   Q.  If you turn to the first page of your deposition.

C46dcar1                    Ortiz - cross

1              THE COURT:  That's all right.

2              MR. DELANEY:  Are you OK?  All right.

3    Q.  Turn to page 41, Mr. Ortiz.

4              41, line 3, I'm going to read this to you:

5    "Q   From September or October of 2005 until you left, was

6    Mr. Velandia an assistant manager?

7    "A   Yes.

8    "Q   How do you know Mr. Velandia became an assistant manager?

9    "A   Because Francisco Pistorio, the general manager, in a

10   meeting had it be known."

11             Was that your testimony at your deposition, Mr. Ortiz?

12   A.  Yes.

13             THE COURT:  Were you asked those questions and did you

14   give those answers at your deposition?

15             THE WITNESS:  Yes.

16   BY MR. DELANEY:

17   Q.  And does that refresh your recollection that Mr. Pistorio

18   announced at a meeting that Mr. Velandia was to become the

19   assistant manager?

20   A.  Yes.

21   Q.  Now, once Mr. Velandia became assistant manager, was one of

22   his roles to close up the restaurant every night?

23   A.  Yes.

24   Q.  And was one of his roles to make sure that the busboys did

25   their jobs?

C46dcar1                          Ortiz - cross

1    A.   Yes.

2    Q.   And was one of his roles to make sure the food runners were

3    doing their jobs?

4    A.   Yes.

5    Q.   And Mr. Pistorio, the general manager, there were times he

6    was not at the restaurant, correct?

7    A.   Yes.  Maybe like one day out of the week.

8    Q.   And when Mr. Pistorio was not present in the restaurant, it

9    was Mr. Velandia's job to manage the restaurant, correct?

10   A.   Yes.

11   Q.   Now, when you -- you worked at Remi Restaurant starting in

12   2000, correct?

13   A.   Yes.

14   Q.   And you worked there until 2009?

15   A.   Yes.

16   Q.   And when the new owners took over in April 2005, you didn't

17   receive a handbook, an employee handbook from them?

18           Let me strike that.  It is a bad question.

19           When the new owners took over in April 2005, you

20   didn't receive an employee handbook from the new management,

21   did you?

22   A.   No.

23   Q.   And you never -- under the new management, you never

24   received any training about sexual harassment, did you?

25   A.   No.

C46dcar1                    Ortiz - cross

1    Q.  And Mr. Pistorio never told you how to complain about

2    sexual harassment at the restaurant?

3    A.  He made the comment that if we had any problem, that we

4    could do that.

5    Q.  But he didn't specifically say if you have a problem with

6    sexual harassment, here's how to complain?

7    A.  No.

8            THE COURT:  When was this?  What time period are we

9    talking about?

10           THE WITNESS:  Maybe the rest of the year in 2005,

11   after April, and part of 2006.

12   BY MR. DELANEY:

13   Q.  And Mr. Pistorio left the restaurant in May 2008?

14   A.  Yes.

15   Q.  And so at no point between April 2005 and May 2008 did

16   Mr. Pistorio tell you specifically how to complain about sexual

17   harassment?

18   A.  Could you repeat the question?

19           THE COURT:  Yes.  I will have the question read back.

20           (Question read)

21   A.  Yes.  Perhaps sometime in 2006, close to the area where you

22   punch in, they put posters up about that.

23   Q.  Do you specifically recall they put posters up about sexual

24   harassment?

25   A.  Yes.

C46dcar1                    Ortiz - cross

1    Q.  And what did they say?

2    A.  I never read them.

3    Q.  If you never read them, how do you know they were about

4    sexual harassment?

5    A.  Because I read the first words that were on it.  It was in

6    red lettering about sexual harassment.

7    Q.  And from -- you were made a bartender after April 2005,

8    correct?

9    A.  Yes.

10   Q.  And you were still a bartender in August 2008?

11   A.  No.

12   Q.  You became a waiter in August 2008?

13   A.  I'm sorry.  I still was a bartender after 2008, but after

14   that Pistorio made me a waiter.

15   Q.  What month did Mr. Pistorio make you a waiter?

16   A.  It actually wasn't Mr. Pistorio; it was after Pistorio

17   left, when Carlo Maggi came this, I asked him if I could work

18   as a waiter.

19   Q.  I believe yesterday you testified that it was December 2008

20   that you were made a waiter, is that correct?

21   A.  No.

22   Q.  When did Mr. Maggi make you a waiter?

23   A.  When Mr. Maggi came in in July, I began to ask for the

24   opportunity to work as a waiter, and he began to assign me some

25   shifts up until about September, when I finally started to work

C46dcar1                      Ortiz - cross

1    as a waiter full-time.

2    Q.  While you were working as a bartender, you spent most of

3    your time in the bar in the restaurant, correct?

4    A.  Yes.

5    Q.  And the bar is at the front of the restaurant, by the entry

6    doors?

7    A.  Yes.

8    Q.  And you cannot see the coffee station from the bar, can

9    you?

10   A.  No.

11   Q.  And from the bar you could see the front server station,

12   correct?

13   A.  No, you can't see that there.

14   Q.  There is a computer right beside the bar, correct?

15   A.  Yes.

16   Q.  And the waiters would use that station to enter orders?

17   A.  Yes.

18   Q.  So if I call that the front server station, you'll know

19   what I am referring to?

20   A.  OK.  Yes.

21   Q.  And there were two more server stations on the dining room

22   floor, correct?

23   A.  Yes.

24   Q.  And there was one in the middle of the dining room?

25   A.  Yes.

C46dcar1                    Ortiz - cross

1   Q.  And if I call that the middle server station, you will know

2   what I'm referring to?

3   A.  Yes.

4   Q.  There is one in the back of the dining room, correct?

5   A.  Yes.

6   Q.  And if I call that the back server station, you'll know

7   what I'm referring to?

8   A.  Yes.

9   Q.  Now, from the bar you could not see inside the middle

10  server station, could you?

11  A.  No, you cannot.

12  Q.  And from the bar you could not see inside the back server

13  station?

14  A.  Of course.

15  Q.  To be clear --

16  A.  Yes.

17  Q.  I'm sorry.  You could not see the back?

18  A.  No, you can't see inside.

19  Q.  And you never witnessed Mr. Velandia performing oral sex on

20  Mr. Caravantes?

21  A.  No.

22  Q.  And you never witnessed him having anal sex?

23  A.  No.

24  Q.  So you can't provide any testimony whether Mr. Caravantes

25  welcomed this conduct?

C46dcar1                    Ortiz - cross

1   A.  Well, jokingly we always played like that.

2   Q.  Oral sex wasn't part of the joke, was it?

3   A.  No.  But he would simulate that when Oscar would close the

4   front door.

5   Q.  But actually performing oral sex was not part of the joke?

6   A.  I don't understand the question.

7   Q.  I'll move on.

8        You worked at Remi for nine years?

9   A.  Yes.

10  Q.  And now you run a flower shop?

11  A.  Yes.

12  Q.  And as part of your business running the flower shop, do

13  you provide flowers to Remi?

14  A.  Yes.

15  Q.  And you became friends with Mr. Velandia before you started

16  working at Remi?

17  A.  Yes.

18  Q.  And after you started working at Remi, did you go to bars

19  with Mr. Velandia?

20  A.  Yes.

21  Q.  Did you go out almost every weekend with him to a bar?

22  A.  I don't remember if it was every week but we did go out

23  constantly.

24  Q.  And you met Mr. Velandia's family?

25  A.  Yes.

C46dcar1                    Ortiz - cross

1   Q.  And you're still friends with Mr. Velandia?

2   A.  Not as close as before, but, yes, we still continue to be

3   friends.

4   Q.  And at one point during this case Mr. Velandia specifically

5   asked you certain -- strike that.

6          At one point during this case Mr. Velandia told you

7   that he needed a witness to testify, correct?

8   A.  Yes.

9   Q.  He asked you to be a witness?

10  A.  Yes.

11         MR. DELANEY:  I have no further questions, your Honor.

12         THE COURT:  All right.  Any redirect?

13  REDIRECT EXAMINATION

14  BY MR. PARKER:

15  Q.  Mr. Ortiz, when the deposition was shown to you earlier and

16  your testimony from your deposition where you had said that

17  Mr. Pistorio had made it known at a meeting that Mr. Velandia

18  was an assistant manager, what did he say at that meeting in

19  terms of Mr. Velandia's responsibilities?

20  A.  He didn't say anything about responsibilities.  I was,

21  however, in the restaurant most of the time and I could see

22  that some of the things that Mr. Pistorio did, whenever he

23  wasn't present Velandia would do.

24  Q.  That was what?

25  A.  I don't understand your question.

C46kcar2                      Ortiz - cross

1    BY MR. PARKER:

2    Q.  What did you see Mr. Velandia do in the restaurant that

3    Mr. Pistorio did when he was there?

4    A.  Just to make sure that on the floor that everything was

5    correct, seating people in the front; at the end of the

6    evening, shutting down the computers, making the final report,

7    and making sure that everything was in order for the following

8    day.

9    Q.  On each occasion that Mr. Velandia did that, did he also

10   wait tables?

11   A.  Yes.

12   Q.  Now, you've been a waiter at Remi, correct?

13   A.  Yes.

14   Q.  About how many tables, on average, do you serve during a

15   shift at Remi as a waiter?

16   A.  First station, it's about nine to twelve tables per waiter.

17   Q.  How would you characterize your job, in terms of the

18   busyness of the job, as a waiter?

19            MR. DELANEY:  Objection to the form of the question.

20            THE COURT:  The form of the question?  The objection

21   is sustained.

22            Phrase it slightly differently and more generally.

23   BY MR. PARKER:

24   Q.  Mr. Ortiz, when you take care of nine to twelve tables

25   during a shift at Remi, is it busy?

C46kcar2                          Ortiz - cross

1   A.  Yes.

2   Q.  What else do you have time to do when you're taking care of

3   nine to twelve tables as a waiter, besides taking care of the

4   tables?

5   A.  Nothing.  It's busy.

6   Q.  When you're taking care of nine to twelve tables as a

7   waiter during a shift, do you have enough time to take care of

8   the patrons at those tables?

9   A.  You can't give them all your attention because you're so

10  busy, but you're running around.

11  Q.  You testified earlier that Mr. Pistorio had announced at

12  meetings that if employees had a complaint, they could go and

13  tell him about it.  Do you recall that?

14  A.  Yes.

15  Q.  Was that said once, or was it said more than once?

16          MR. DELANEY:  Objection; leading.

17          THE COURT:  Objection sustained.

18  Q.  How many times did Mr. Pistorio say that to employees at

19  meetings at which you were in attendance?

20  A.  Plenty of times.

21  Q.  As an employee at Remi, how did you feel about the idea

22  of -- let me rephrase.

23          As an employee of Remi, having heard Mr. Pistorio say

24  that many times, that an employee could go to him with a

25  complaint, how did you feel about that procedure at Remi?

C46kcar2                          Ortiz - cross

1              MR. DELANEY:  Object to the form of that question.

2              THE COURT:  I'm having trouble because I'm worried

3    about the translation, how it translates into Spanish.  So I

4    don't know whether it's a valid consideration or not.  I guess

5    I'll allow the question.

6              THE INTERPRETER:  It's allowed?

7              THE COURT:  Yes.

8              THE WITNESS:  I felt fine.  In fact, there were

9    problems that I had, minor problems, with co-workers about

10   work, that I would go to Mr. Pistorio about and he would help

11   resolve them.

12             THE COURT:  Didn't you do that before he made any

13   announcement about going to him with complaints?

14             THE WITNESS:  No, it wasn't until after the

15   announcement was made.

16             THE COURT:  Anything else?  Go ahead.  I wasn't sure

17   you were finished.

18             MR. PARKER:  OK, thank you, Judge.

19   BY MR. PARKER:

20   Q.  Are you saying you had issues with other employees before

21   Mr. Pistorio made that announcement?

22             MR. DELANEY:  Objection; leading.

23             THE COURT:  Objection overruled.

24             THE WITNESS:  Could you repeat the question?

25             THE COURT:  I'll ask you to read it back.

C46kcar2                        Ortiz - cross

1              (Record read)

2              THE WITNESS:  Yes, but work-related problems, like

3       other employees that didn't want to do their jobs.

4       Q.  Are those the types of problems that you brought to

5       Mr. Pistorio's attention?

6       A.  Yes.

7              THE COURT:  Before or after he made the announcement?

8              THE WITNESS:  After.

9       Q.  Did you attend any meetings that were held of employees at

10      the restaurant?

11      A.  One or two meetings.

12      Q.  When Mr. Pistorio was the general manager, did he hold any

13      meetings that you attended, of employees?

14      A.  I don't understand the question.

15      Q.  You testified yesterday that the touching game was played

16      at the restaurant.

17      A.  Yes.

18      Q.  Was the touching game ever discussed at any meeting at Remi

19      that you attended?

20      A.  Yes.

21      Q.  When was that meeting?

22      A.  After -- sometime later, after 2006, when the posters were

23      put up, there were some meetings that were held in which it was

24      discussed that they couldn't -- employees shouldn't touch each

25      other, men shouldn't touch other men, women shouldn't touch

C46kcar2                          Ortiz – cross

1   other women.

2   Q.   And where were those meetings held?

3   A.   Those meetings were held in the dining room, twice a day.

4   Q.   Did you regularly attend those meetings in the dining room

5   twice a day?

6   A.   I wouldn't attend, but I could hear them because

7   Mr. Pistorio spoke loud.

8            THE COURT:  Where were you?

9            THE WITNESS:  At the bar.

10  Q.   At the meetings where touching was discussed and employees

11  were told not to touch one another, who spoke?  Who said that?

12  A.   Mr. Pistorio.

13  Q.   Are you aware of any circumstance in which any Remi

14  employees were ever disciplined for touching one another at the

15  restaurant?

16  A.   Yes.

17  Q.   What is your awareness of that?

18  A.   There were two busboys whose names I don't recall.  There

19  were two busboys playing in the back of the restaurant,

20  touching each other, and Pistorio passed by, he saw them and

21  suspended them for a week.

22  Q.   How did you learn that?

23  A.   Because everybody spoke about that, and he suspended them.

24           THE COURT:  Were you present when he suspended them?

25           THE WITNESS:  Yes.

C46kcar2                         Ortiz - cross

1          THE COURT:  You heard him?

2          THE WITNESS:  I didn't hear him say it, but I saw it.

3          THE COURT:  How did you know if you didn't hear it?

4          THE WITNESS:  Because other employees, other busboys

5     there, made comments about the situation and the following days

6     they were not on the schedule for that week.

7     BY MR. PARKER:

8     Q.  Did you ever see anything in writing at Remi about

9     touching?

10    A.  I don't remember.

11         THE COURT:  You don't remember anything about seeing

12    anything in writing, or you don't remember whether you saw

13    anything in writing?

14         You have no recollection of seeing anything in

15    writing, or you don't remember what the writing was?

16         THE WITNESS:  I don't remember whether there was

17    anything in writing; and I don't remember, if there was, where

18    it might have been.

19         THE COURT:  Well, didn't you say something about

20    posters earlier?

21         THE WITNESS:  Well, yes, those posters were there,

22    about sexual harassment, they were where you punch in.  But as

23    far as Remi having put something up of their own, that I don't

24    recall.

25         THE COURT:  The posters, who were they put up by?

C46kcar2                          Ortiz - cross

1            THE WITNESS:  I don't know.

2            THE COURT:  How did you know they weren't Remi

3       posters?

4            THE WITNESS:  Well, I mean I have information that

5       they're from Remi because they're there, they're in the area

6       where all the regulations are posted, like how much you're

7       supposed to be paid and things like that.

8       BY MR. PARKER:

9       Q.  Mr. Ortiz, if I were to show you your deposition testimony,

10      might that refresh your memory about whether or not there was a

11      writing at Remi concerning the touching between employees?

12      A.  OK.

13           MR. PARKER:  Permission to direct the witness'

14      attention to his deposition testimony, your Honor?

15           THE COURT:  You're going to do it through the

16      deposition?

17      BY MR. PARKER:

18      Q.  Mr. Ortiz --

19           THE COURT:  Well, are these in English or in Spanish?

20      You're going to show it to him or read to him?

21           MR. PARKER:  I'm going to read to him.  It's a brief

22      excerpt but I will read to him in English.  The deposition

23      is --

24           THE COURT:  What lines are you going to read?

25           MR. PARKER:  Page 87 line 21 to 88 line 12.  I'm

C46kcar2                        Ortiz - cross

1    sorry, line 19.  Actually, line 22.

2              MR. DELANEY:  Where did you say you were going to

3    start?

4              MR. PARKER:  87 line 21.

5              MR. DELANEY:  Your Honor, I would just request that

6    the reading start at line 19, 87 line 19.

7              THE COURT:  Start there instead of 21?

8              MR. PARKER:  That's fine, Judge, OK.

9              THE COURT:  I just want to consider this.

10             This is videographed?

11             MR. DELANEY:  Pardon.

12             THE COURT:  This was videographed?

13             MR. DELANEY:  It was videotaped, yes, your Honor.

14             THE COURT:  It was also interpreted?

15             MR. PARKER:  Yes.

16             MR. DELANEY:  In reading the excerpt, your Honor, I

17   also would object to the extent it would refresh far more than

18   just the fact of the memo.  It's a pretty substantive excerpt.

19             THE COURT:  Could I see the earlier question?  I'm not

20   sure how to do that.

21             I don't think -- under what authority can I do that?

22             MR. PARKER:  Your Honor, I think it's to refresh the

23   witness' recollection as to whether or not there was a writing.

24             MR. DELANEY:  Again, your Honor, I object.  This

25   excerpt does far more than refresh about the fact in writing.

C46kcar2                          Ortiz - cross

1          THE COURT:  It seems to me that --

2          MR. PARKER:  Well --

3          THE COURT:  It seems to me that's not appropriate with

4    your own witness.

5          MR. PARKER:  To refresh your own witness'

6    recollection?  I think that's --

7          THE COURT:  Well, refreshing his recollection with

8    something that --

9          MR. PARKER:  Well, he certainly --

10         THE COURT:  He said there was a writing, so I don't

11   see how -- I think he said that there was a writing, a poster.

12         MR. PARKER:  I can ask a predicate question to what I

13   propose to do.

14         THE COURT:  Under the rules of evidence, I'm not sure

15   that I can do that.  I don't think I can, unless you show me

16   some authority.  It's bolstering his testimony by his prior

17   deposition supposedly.

18         MR. PARKER:  Judge, if we shorten the excerpt, very

19   early on in the proposed testimony there's a reference to --

20         THE COURT:  I'll have to look.

21         MR. PARKER:  If we were to end the testimony literally

22   in mid-sentence, on page 88 line 3, after the first word on

23   that line, and it refreshes his recollection, fine; if not,

24   I'll move on.

25         He's already testified --

C46kcar2                         Ortiz - cross

1              THE COURT:  I know his testimony is almost a year and

2      three-quarters ago, about something that happened in 2007 or

3      '8.

4              MR. PARKER:  He's already testified to the first part

5      of that response, beginning on 87.  That's already --

6              THE COURT:  I'm sorry?

7              MR. PARKER:  Mr. Ortiz has already testified to the

8      substance of what he says beginning on page 87 at line 24.  So

9      by repeating it, it would not introduce anything new, and --

10             THE COURT:  But it's not a prior inconsistent

11     statement necessarily.

12             MR. PARKER:  No, it's simply an effort to refresh

13     recollection.  I believe if I could show him a document or --

14             THE COURT:  I'm not sure whether it isn't just

15     bolstering your own witness.  It doesn't seem to me I can do

16     that unless you point me to something in the rules.

17             I'm looking at Rule 612, but you may have some other

18     rule.  615 may also apply.

19             (Pause)

20             THE COURT:  Maybe we can approach it in a different

21     manner.

22             MR. PARKER:  I'll try that.

23             THE COURT:  Supposing -- and I want to hear from both

24     parties -- that the portion of the deposition that you would

25     read, you would first show to Mr. Delaney, and you agree on --

1  if you agree -- on the portion.  Then, instead of being read

2  and translated in open court, it would be given to the

3  interpreter, who would read and translate that portion only to

4  him, and he would state whether that refreshes his recollection

5  about what happened at a meeting with Mr. Pistorio.

6          MR. PARKER:  I can show Mr. Delaney that right now.

7          THE COURT:  But I don't know whether you both agree to

8  that.  Under Rule 612, that sort of seems to comply.

9          MR. DELANEY:  Yes, your Honor, I have no objection to

10  that procedure.  My only objection is going to go to the

11  probative value of this at this point.

12          THE COURT:  There's a question about that too, weight

13  to be given to it.

14          MR. DELANEY:  So even if this goes in, your Honor, I

15  would say it should be given very little weight.

16          (Pause)

17          MR. PARKER:  We have agreement, Judge.

18          THE COURT:  You're just going to show it -- mark it,

19  give it to the interpreter.  So you've got to mark whatever it

20  is as such-and-such for identification.

21          THE INTERPRETER:  I have the transcript here.

22          MR. PARKER:  I don't have an excerpt but --

23          THE COURT:  Just for identification; it wouldn't be

24  admitted in evidence.

25          MR. PARKER:  Sure.

C46kcar2                           Ortiz - cross

1        MR. DELANEY:  What pages?

2        THE INTERPRETER:  I have a copy of the transcript.

3        MR. PARKER:  Page 87 and 88.

4        MR. DELANEY:  Do you want to mark it for

5   identification it first?

6        THE DEPUTY CLERK:  Judge, do you want it marked for

7   identification?

8        THE COURT:  Yes.  It's got to be marked for

9   identification, so it's clear so the interpreter can see it's

10  marked out.  Is it marked out?

11       MR. PARKER:  It's marked as D63.

12       THE COURT:  Is it marked out for the interpreter so he

13  doesn't go beyond or before it?

14       THE DEPUTY CLERK:  Judge, do you want to see it first?

15       THE COURT:  You're handing what to the interpreter?

16       THE DEPUTY CLERK:  Defendants' Exhibit 63.

17       THE COURT:  For identification.  All right.

18       MR. PARKER:  Your Honor, on Defendants' Exhibit 63,

19  which we have handed to the interpreter, the yellow highlighted

20  portion is the portion that counsel and I have agreed upon to

21  be interpreted to the witness.

22       THE COURT:  And you understand, just read --

23       THE INTERPRETER:  The highlighted areas?

24       THE COURT:  The yellow highlighted parts.

25       MR. PARKER:  And for the record, your Honor, that's

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

C46kcar2                          Ortiz – cross

1    page 87 line 19 through the first word on page 88 line 3.

2              THE COURT:  Yes, all right.

3              THE INTERPRETER:  Shall I read it to him now?

4              (Pause for translation)

5    BY MR. PARKER:

6    Q.  Mr. Ortiz, has the interpreter read to you the designated

7    part of your deposition transcript?

8    A.  Yes.

9    Q.  Having heard that read back to you in Spanish, does your

10   testimony in that regard refresh your recollection as to

11   whether or not there were any other writings at Remi concerning

12   touching of employees?

13   A.  Yes.

14   Q.  What is your recollection of any such writing or writings?

15   A.  Mr. Pistorio had posted in the back of the restaurant,

16   where the schedules, are a memo indicating that it's prohibited

17   for men to touch other men and women to touch other women, that

18   all of it was prohibited, just touching.

19   Q.  Do you recall when that memo was posted at Remi?

20   A.  I don't remember the date, no.

21   Q.  What language was the memo printed in?

22   A.  In Spanish and English.

23   Q.  Where at Remi specifically was the memo posted?

24   A.  In the back part of the dining room, as you go down to the

25   kitchen in the basement.  They always post the schedules there,

C46kcar2                          Ortiz - cross

1    and it was next to the schedule.

2              THE COURT:  When you say "schedule," what do you mean?

3              THE WITNESS:  The work schedule for the employees on

4    the floor, the busboys, waiters.

5              THE COURT:  What approximate time are we talking

6    about, in relation to -- I'll let you ask.  It's not clear to

7    me what time we're talking about.

8    BY MR. PARKER:

9    Q.  You said that Mr. Pistorio posted the memo?

10   A.  Yes.

11   Q.  So it was sometime during the time Mr. Pistorio was the

12   general manager of Remi; is that correct?

13   A.  Yes.

14   Q.  Are you able to recall the year in which this memo was

15   posted?

16   A.  If I'm not mistaken, it was either the end of 2005 or

17   sometime in 2006, when the memos began.

18             THE COURT:  Can you place it in time, in conjunction

19   with any other events that occurred at Remi?

20             THE WITNESS:  Well, Mr. Pistorio noticed that all the

21   guys were playing around, touching each other, and that's when

22   he did that, and that's when the touching stopped.

23             THE COURT:  How do you know Mr. Pistorio noticed?

24   What brought to your attention that Mr. Pistorio noticed that

25   people were touching each other?

1    THE WITNESS:  Well, whenever he went to the office, he

2    had to pass by the back area in the restaurant, and he would

3    catch guys playing there.

4    THE COURT:  But what brought to your attention that he

5    had noticed that?

6    THE WITNESS:  Well, when we held one of the meetings

7    and he began to talk about this and mention it, that's when I

8    realized that he had noticed that it was happening.

9    MR. PARKER:  I have nothing further, your Honor.

10   THE COURT:  Recross?

11   RECROSS EXAMINATION

12   BY MR. DELANEY:

13   Q.  Mr. Ortiz, after Mr. Pistorio put this memo up, the

14   touching did not stop in the restaurant, did it?

15   A.  No.

16   Q.  The game continued?

17   A.  Yes.

18   Q.  And you witnessed people touching after the memo went out,

19   did you not?

20   A.  Yes.

21   Q.  You in fact touched other employees after the memo went

22   out?

23   A.  Yes.

24   Q.  Were you ever disciplined for touching anyone?

25   A.  No, because we were more careful now when we played these

C46kcar2                         Ortiz - recross

1   games, so that they wouldn't notice.

2   Q.  The touching didn't stop when Mr. Maggi took over either,

3   did it?

4   A.  No.

5   Q.  And Mr. Maggi was the new general manager for the

6   restaurant?

7   A.  Yes.

8   Q.  He took over after Mr. Pistorio?

9   A.  Yes.

10          MR. DELANEY:  No further questions, your Honor.

11          THE COURT:  Mr. Ortiz, have you had a sexual relations

12  with Mr. Velandia?

13          THE WITNESS:  No.

14          THE COURT:  You haven't had an affair with him?

15          THE WITNESS:  No.

16          THE COURT:  You're excused.

17          If anyone, wants to go into that, I'm not preventing

18  it.

19          MR. PARKER:  No.  Thank you.

20          (Witness excused)

21          THE COURT:  Next witness?  Or you wanted to take a

22  break now?

23          MR. DELANEY:  Actually, I wouldn't mind a five-minute

24  break, your Honor.

25          (Recess)

C46dcar3

1          THE COURT:  Please be seated.

2          Next witness.

3          MR. DELANEY:  Your Honor, before the next witness is

4    called, may I request a sidebar?

5          THE COURT:  Sure.

6          (At the sidebar)

7          MR. DELANEY:  Your Honor, I understand Mr. Parker

8    intends to call Carlo Maggi next, who is the current general

9    manager, and I think I'm going to potentially object to his

10   testimony on the ground that it is irrelevant and prejudicial.

11   I believe it is irrelevant largely because Mr. Maggi did not

12   start at the restaurant until June or July 2008, which was

13   after when Mr. Sotarriba left the restaurant and it's almost

14   certainly after any of the conduct at issue was --

15         THE COURT:  How about Mr. Caravantes?

16         MR. DELANEY:  It is almost certainly after any of the

17   conduct between Mr. Velandia and Mr. Caravantes.

18         I understand, and I am happy to hear from opposing

19   counsel, that he may be planning to testify as to the

20   circumstances of Mr. Caravantes leaving the restaurant.  But,

21   your Honor, we have not made -- we do not have any claim of any

22   tangible employment action.  This is a hostile environment

23   claim, about the terms and conditions of employment.  We have

24   made no retaliation claim.  We are not claiming that there was

25   any termination in retaliation for the filing of the complaint.

C46dcar3

1          And I believe it's potentially unfairly prejudicial to

2     my client, because the circumstances of him leaving the

3     restaurant are incredibly painful for him, as, you know,

4     Dr. Pearson has talked about.  And since we haven't put any of

5     this at issue, I feel like having him sit through this

6     testimony of the circumstances of his termination are going to

7     put him through again what he suffered through and all the

8     things he suffered through and then in the end it was nothing,

9     that he had to leave the restaurant anyway.

10         And so for those reasons I believe we should at least

11    limit his testimony.

12         THE COURT:  I will hear from Mr. Parker.

13         MR. PARKER:  Judge, this is highly relevant to the

14    case.  He had -- Caravantes has -- there is documented evidence

15    of him alleging that he was fired from the restaurant, that he

16    has been caused all sorts of financial hardship, that the

17    restaurant -- that Remi told him that he would never become a

18    waiter at the restaurant; that's what he wanted to be.  This

19    testimony goes to all that, and addresses each one of those --

20         THE COURT:  Weren't those statements made by

21    Mr. Pistorio?

22         MR. PARKER:  Well, that's what Caravantes alleges.

23         THE COURT:  Yes.

24         MR. PARKER:  But --

25         THE COURT:  So his testimony with Mr. Maggi can't

C46dcar3

1    testify about that?

2              MR. PARKER:  No.  But Mr. Maggi can testify to what

3    discussions he and Caravantes had while they were still there.

4    They worked together for approximately seven weeks.  And

5    Caravantes had at least two discussions with -- the evidence

6    would show that he had at least two discussions with Maggi

7    about his job, his employment, and continuing that employment

8    with Remi.

9              THE COURT:  His past employment?

10             MR. PARKER:  No.  His present employment, and what --

11             THE COURT:  I mean by that, his past employment at

12   Remi, he discussed that with him?

13             MR. PARKER:  Well, in the context, yes, in the context

14   of --

15             THE COURT:  What had happened to him?

16             MR. PARKER:  No, no --

17             THE COURT:  Had he been promised a waiter job?

18             MR. PARKER:  No.  In the context of going forward,

19   what job or jobs were made available to him to continue to work

20   at the restaurant.  And it contradicts his testimony that he

21   was never going to be given a waiter job.

22             His psychologist has come in here and said that, you

23   know, one of the stressors is financial hardship because he

24   reported to her that he was fired from Remi.  He said in visits

25   to the Safe Horizons in August and September of 2008, which

C46dcar3

1  counsel put into evidence, he told them that he was laid off

2  for no apparent reason.  These discussions that he had with

3  Maggi directly contradict those statements, and are highly

4  relevant to the case.

5       MR. DELANEY:  Your Honor, I believe the fact of his

6  having to leave the restaurant is what Dr. Pearson was

7  referring to and the fact that he no longer had his job.  But I

8  don't think, again, we put -- Mr. Caravantes certainly didn't

9  testify that the hardship he is suffering is a result of him

10 being terminated; he testified it was a result of him not being

11 at the restaurant anymore and how important the restaurant was

12 to his identity.  The circumstances of his leaving the

13 restaurant have not been put in issue by the plaintiffs and he

14 did not testify about it.

15      THE COURT:  It goes somewhat to the weight I should

16 give to Dr. Pearson's testimony.

17      MR. PARKER:  Absolutely.

18      THE COURT:  I think I have to allow it on damages.

19 Right?

20           (In open court)

21      MR. PARKER:  The defendants call Carlo Maggi, your

22 Honor.

23      THE CLERK:  Please remain standing.  Raise your right

24 hand.

25  CARLO MAGGI,

C46dcar3

1      called as a witness by the defendants,

2        having been duly sworn, testified as follows:

3          THE CLERK:  Please state your name and spell your

4    first and your last name slowly for the record, please.

5          THE WITNESS:  My name is Carlo Maggi.  And C-a-r-l-o,

6    and my last name Maggi, M-a-g-g-i.

7    DIRECT EXAMINATION

8    BY MR. PARKER:

9    Q.  Mr. Maggi, are you employed at Remi Restaurant?

10   A.  Yes.

11   Q.  Where do you live?

12   A.  I live in New York.

13   Q.  With whom do you reside with?

14   A.  Excuse me.

15   Q.  With whom do you reside?  Who do you live with?

16   A.  I'm sorry.  I live with my wife and my daughter.

17   Q.  Where are you from originally?

18   A.  I'm from Italy.

19   Q.  Where were you educated, Mr. Maggi?

20   A.  In Italy.

21   Q.  Just could you summarize for us, please, your educational

22   background?

23   A.  I have a college degree, comparable to a college degree.

24   Q.  In what area?

25   A.  It's aeronautical.

C46dcar3                          Maggi - direct

1    Q.   Where did you study?

2    A.   In Milan.

3    Q.   When did you come to live in the United States?

4    A.   1995, so far, yes.

5    Q.   Where did you settle in the United States?

6    A.   Chicago, Illinois.

7    Q.   Did you attend any schooling in the U.S.?

8    A.   Just English courses.

9    Q.   Did you become employed after coming to the United States?

10   A.   Yes.

11   Q.   What was your first job?

12   A.   Basically I started as a busser in order to, you know,

13   going to school in the morning and be able to maintain myself

14   for my living things.

15   Q.   After that first position, what else did you -- who did you

16   work for?

17   A.   I worked for Bice.

18   Q.   How do you spell that?

19   A.   B-i-c-e.

20   Q.   What is Bice?

21   A.   It's a restaurant.

22   Q.   Was that in Chicago?

23   A.   Yes.

24   Q.   And just since that time, you said 1995, could you just, in

25   summary, take us through your work experience up until when you

C46dcar3                         Maggi - direct

1   joined Remi Restaurant?

2               THE COURT:  When you say a "busser," what is position

3   is that?

4               THE WITNESS:  A busser position basically is the

5   person in charge of cleaning tables, refilling water, iced tea,

6   bringing bread to the table.

7               THE COURT:  The same as a busboy?

8               THE WITNESS:  Yes.  Busboy/busser is the terminology.

9   BY MR. PARKER:

10  Q.  So what did you do after you were a busboy, what did you

11  do?

12  A.  Basically, I was -- I'm coming from a restaurant family.

13  So my father is a chef, my mother, my brother.  So I was in

14  Italy exposed; I lived in a restaurant even in Italy.  You know

15  what I mean?  So this is my background, even if I choose a

16  different college partner.

17              I started.  I like it.  The gentleman who was in

18  charge of Bice asked me if I was interested to take a position

19  in the Bice organization, and I say yes.  So I had been server

20  for a short period of time and training as assistant -- head

21  server or assistant.

22  Q.  And what was your last job with Bice?

23  A.  My last job for Bice was in 2008, and I was -- two years I

24  became general manager of Bice, Chicago.

25  Q.  What type of restaurant is that?

C46dcar3                    Maggi - direct

1  A.  Italian.

2  Q.  When did you begin your employment with Remi Restaurant?

3  A.  With Remi Restaurant, in June, the end of June, the first

4  week of July.  I don't remember the exactly date, but it was in

5  July -- end of June or first week of July 2008.

6  Q.  And what job were you hired to do for Remi?

7  A.  General manager.

8  Q.  Have you been with Remi now since June --

9  A.  Since 2008 I am still employed at Remi Restaurant.

10  Q.  And who hired you at Remi?

11  A.  At Remi, Mr. Roberto Delledonne.

12  Q.  What are your responsibilities as general manager?

13  A.  As a general manager, basically the daily operation,

14  budgeting, scheduling, purchasing, training employees, all the

15  duties that the general manager I believe in a restaurant has

16  to do.

17  Q.  And what employees work at Remi under you?

18  A.  All of them.

19          THE COURT:  Is Bice a chain of restaurants?

20          THE WITNESS:  Yes.  It was.

21          THE COURT:  It has restaurants in other cities?

22          THE WITNESS:  Yes.

23          THE COURT:  All owned by the same company?

24          THE WITNESS:  No.  I don't remember.  I don't know.  I

25  know that Bice is the brand of the name, but I don't know if

C46dcar3                        Maggi - direct

1    they are a corporation that control Bice.  I don't know.

2              THE COURT:  It may be by license.

3              THE WITNESS:  Yes.  Maybe they have different

4    partners.  That I don't know.

5    BY MR. PARKER:

6    Q.  So you said all the employees are under you?

7    A.  Yes.

8    Q.  What types of employees are under you at Remi?

9    A.  All of them.  From the chef to the hostess, the dishwasher,

10   the cleaning crew, I'm the responsible one for them.

11   Q.  Do you have any other managers, people who are employed as

12   managers at Remi?

13   A.  Yes.

14   Q.  And currently who are they?

15   A.  The Chef, Mr. Giovanni Pinato; Ursula Bartel, she is a

16   manager at Remi; and Rachel Lovaglio Canal, which is my party

17   manager.

18   Q.  And how long have those three individuals been with you at

19   Remi?

20   A.  Since 2008, but they were before me employers and manager

21   at Remi.

22   Q.  Since you joined Remi, who prepares the work schedules for

23   employees there?

24   A.  Me.

25   Q.  Does anyone else prepare work schedules?

1    A.   No.   Since I'm at Remi, no.   I am the responsible one.

2    Q.   And since you joined, who does the hiring of new employees?

3    A.   Me again.

4    Q.   Who does the firing of any employees?

5    A.   Me.

6    Q.   Who is in charge, or who has the authority to impose any

7    type of disciplinary action on employees?

8    A.   Me.   It is to be me.

9    Q.   Since you joined Remi, have there been any persons employed

10   in the position of headwaiter?

11   A.   Yes.

12   Q.   Who have they been?

13   A.   When they started, Mr. Velandia was one of them and

14   Mr. Velandia moved to the party section.   So I promote one of

15   the servers as a head server when they came basically to assist

16   me in the daily operation.

17   Q.   And what is the job -- what are the job duties of a head

18   server working under you at Remi?

19   A.   Working under me at Remi, my assistant head server

20   basically has to close the restaurant at night for me; this is

21   one of the tasks.   Cleaning -- I mean, checking that the

22   restaurant is in good standard in term of cleaning, in term

23   of -- I don't know what light bulbs there is broken; if I don't

24   see it, he is going to point it to me.   Waiting tables; you

25   know, he is always working in the front of the restaurant

C46dcar3                              Maggi - direct

1   waiting tables.  So if I need extra help to seating people, he

2   is going to be available.

3           Checking the book -- you know, there is a reservation

4   book -- with me.  So in the Rialto, you know, sometimes the

5   restaurant is busy and you missing something, maybe a VIP

6   coming in or a special customer that requires special

7   attention, so this is why my assistant, he remind me that, oh,

8   today we have this, this and this going on.  This is what he

9   does for me.

10  Q.  When did Mr. Velandia become -- move into the party area of

11  the restaurant?

12  A.  In July 2008, when I started.

13  Q.  And what is his job there?

14  A.  His job there --

15  Q.  Does he still do that?

16  A.  Yes, he still does that.

17  Q.  What is his job working --

18  A.  His job there is to make sure that people that are booking

19  parties and renting our party room, they have a pleasant time.

20  So he is supervising the service.

21  Q.  Who actually books the parties into the restaurant?

22  A.  My party manager, Rachel Lovaglio Canal.

23  Q.  And how are the staff for parties at Remi scheduled to work

24  at those parties?  Could you describe that?

25  A.  Sure.  Ms. Canal give me the parties that we have in

C46dcar3                          Maggi - direct

1   program during the week.  And for each party there are a

2   certain number of people that are required in order to keep our

3   standard and perform and to make sure, doing the schedule, I

4   schedule the right amount of people in order to taking care of

5   the party.

6   Q.  Does Mr. Velandia do any of the scheduling of the people

7   for parties?

8   A.  No.  Absolutely not.  Mr. Velandia is to supervise the

9   service.

10  Q.  Did mr. Velandia have any -- under you have any authority

11  to discipline employees?

12  A.  No.

13  Q.  Does Mr. Velandia have any authority to hire or fire

14  employees?

15  A.  No.

16  Q.  Has he ever under your supervision?

17  A.  Mr. Velandia?

18  Q.  Yes.

19  A.  Yes, of course.

20  Q.  No.  Has he ever had that authority under your supervision?

21  A.  No.  No.  No.  No.  Absolutely not.

22          I understood a different thing.  I'm sorry.

23  Q.  Do you know Arturo Caravantes?

24  A.  Yes.

25  Q.  How do you know him?

1    A.   When I started to work at Remi, he was the gentleman

2    responsible for the coffee station.

3    Q.   Did you, during the time that you worked together at Remi

4    with Mr. Caravantes, have any discussions with him?

5    A.   No.

6    Q.   Did you have any meetings with Mr. Caravantes while he was

7    employed there?

8    A.   Yes.

9    Q.   When did you have meetings with him?

10   A.   Basically every day during the preshift meeting, and also I

11   got a few meetings with Mr. Caravantes regarding his position.

12   Q.   When did the meetings take place with Mr. Caravantes

13   regarding his position?

14   A.   I don't recall exactly time, but I was in the progress to

15   change our coffee system, how we preparing coffee.  So

16   Mr. Caravantes' position was probably, you know, in the near

17   future not available anymore.

18   Q.   What were you doing in the restaurant in terms of changing

19   the coffee station?

20   A.   Basically, we changing the coffee machine, the espresso

21   machine.

22   Q.   What was the change?

23   A.   It's a big change because we passing from grinding the

24   expresso, put the expresso in the group, press it, put it in

25   the machine.  We press into a very small plastic capsule that

C46dcar3                    Maggi - direct

1  you have only to put in the machine and press a button.  So

2  everybody can do that.  The coffee is going to be -- if you do

3  it, everybody can do it -- it is going to be the same

4  consistency.  The right amount of coffee, the coffee is not

5  burned.  So it's perfect.

6  Q.  When you started at Remi, was there anyone else other than

7  Mr. Caravantes who was working at the coffee station?

8  A.  No.

9  Q.  If you could turn in -- there should be a binder there that

10  says "Defendants' Exhibits."

11  A.  OK.

12  Q.  I am going to ask you, Mr. Maggi, if you could turn to Tab

13  No. 14 in the exhibit binder.

14  A.  OK.

15  Q.  There are two pages to the exhibit.  Do you know what they

16  are?

17  A.  We are talking about number D-976, right?

18  Q.  We'll start with that one.  What is D-976?

19  A.  The one dated August 12th?

20  Q.  Yes.  What is it?

21  A.  Basically, it is a letter that testified what's happened on

22  August 12th.

23  Q.  Right.  And the second page, what is that?

24  A.  The second page basically is -- I put in my records in my

25  file to remind me what's happened that day, with more detail,

C46dcar3                          Maggi - direct

1    you know.

2    Q.  When did you prepare page 977?

3    A.  After August 12, but I don't remember the date.

4    Q.  OK.  Let's talk about the discussions or meetings that you

5    had with Mr. Caravantes during the time that you worked with

6    him about his position.

7    A.  Yes.

8    Q.  When did you first have a conversation with him about his

9    position?

10   A.  Right after I start.  I mean, I don't recall the exactly

11   day, if it is a week, three days or four days, but right after

12   I started, one of my goals, one of my, you know, projects was

13   to changing the coffee system.  So I remember that I talked to

14   him because he was the only one work as coffee -- coffee man.

15   Q.  What did you -- what did that first conversation --

16   A.  I just told Mr. Caravantes, I just, you know, tried to

17   notice -- I mean, tried to, you know, let him understand that

18   this new machine was coming.  We are looking forward toward

19   this new system.  So we need to discuss his next position in

20   our organization.

21   Q.  Did he say anything in response at that time, that you

22   recall?

23   A.  No.  Actually, no.

24   Q.  After that first discussion, did you have any other

25   meetings or discussions with Mr. Caravantes about his position?

C46dcar3                        Maggi - direct

1   A.  Yes.  They were not really meetings.  I would just remind

2   him that I was, you know, waiting to talk to him officially

3   because we need to discuss his -- you know, the machine is gone

4   so time is going by, we need to be prepared.  So we need to

5   discuss.

6          But, you know, it was not really -- I don't know if

7   he, you know, tried to avoid me or, you know, but, you know, we

8   keep going.  But he knew that the machine was -- has to be

9   replaced, basically.

10          THE COURT:  What language were you discussing it with

11   him, were you speaking?

12          THE WITNESS:  In Spanish.  My Spanish is not so, you

13   know, bad.  It is not great, but everybody understand me when I

14   talk to them.

15   BY MR. PARKER:

16   Q.  Did there -- you said there were some discussions about

17   reminding him that he needed to have a discussion.  Did you at

18   any time have a discussion with him about his job?

19   A.  Yes.

20   Q.  When did that take place?

21   A.  That take place because I --

22          THE COURT:  When?  He asked when.

23   A.  Ah, when?  Let me try to recall, because I think it was

24   August 11th, which was on a Monday.  Yes.

25   Q.  All right.

C46dcar3                        Maggi - direct

1          THE COURT:  That took place before this Exhibit 14 was

2    written?

3          THE WITNESS:  Yes.  I mean --

4          THE COURT:  You say you have Exhibit 14 in front of

5    you?

6          THE WITNESS:  Yes.

7          THE COURT:  Dated August 12?

8          THE WITNESS:  Yes.  I don't know if it is the 11th or

9    the 12th.  I know that it was Monday.  It was the following

10   Monday.

11         THE COURT:  Oh, the following Monday?  Then it was

12   after the meeting?  After this memo was written?

13         THE WITNESS:  That I talked to him?  No, I wrote the

14   memo after I talked to him.

15         MR. PARKER:  OK.

16         THE COURT:  All right.

17   BY MR. PARKER:

18   Q.  I want to direct your attention to that discussion.

19   A.  Yes.

20   Q.  Whatever date it was.

21         What did you say to him and what did he say to you?

22   A.  Basically, he was not on schedule.  So he show up at work.

23   We went into my office.  And I told him, what are you doing.

24   You know, you're not in schedule.  You never give me, you know,

25   any kind of feedback.  We need to talk to your next position.

C46dcar3                          Maggi - direct

1           So we discuss about his possibility of a move to

2    another position.  I put on the table different options such

3    as, for example, being a food runner or being part of the

4    cleaning crew of the restaurant.  And basically he refuse it.

5    Q.  When you say part of the cleaning crew, what did you tell

6    him about that possibility?

7    A.  Sure.  My first offer was to be a food runner, and he

8    reject it.  So I told him, Look, after so many years that you

9    worked with us, we can find a solution.  We can find another

10   kind of a job for you.  I understand that you going to school.

11   I understand that you have some restriction in time.  Perhaps

12   working as in the cleaning crew is going to give you the time

13   also to attend your school.  Because, you know, a food runner

14   is a full-time job, you have to have a lot of commitment, and

15   sometimes, you know, times they are not going with each other,

16   schools and work; it could be difficult.

17          So I throw also another offer, that he was being part

18   of the cleaning crew.  And he refused that one, too.

19   Q.  Did Mr. Caravantes give you any reasons for refusing the

20   food runner job?

21   A.  He told me that he was already -- he performed it in the

22   past, I guess, this position.  He was not interested to going

23   back.  And, actually, he told me that he wants to be a server.

24   Q.  How would you -- what's the comparison between the income

25   that one can earn at Remi as a coffee operator as compared to a

C46dcar3                          Maggi - direct

1   food runner?

2   A.  Oh, it's a big difference.  We are talking about probably

3   an increase around 40 percent, if it's not 50.  And, of course,

4   depending if the restaurant is busy or not, because it is based

5   on tips.

6            THE COURT:  What about a food runner?  What is the

7   comparison between a food runner and a waiter?

8            THE WITNESS:  The difference is not so big in that

9   case.  There is a difference but it is not so evident like

10  moving from a coffee station to a food runner.

11           THE COURT:  What is the difference between a food

12  runner and a waiter?

13           THE WITNESS:  The difference in percentage could be --

14  it is 25 percent.

15           THE COURT:  How much?

16           THE WITNESS:  25 percent.

17           THE COURT:  12?

18           THE WITNESS:  No.  25, your Honor.

19           THE COURT:  25 percent?

20           THE WITNESS:  Yes.

21           THE COURT:  For who?

22           THE WITNESS:  The difference between a food runner and

23  server.

24           The difference between a coffee man to be a food

25  runner could be 40/45 percent more.

C46dcar3                          Maggi - direct

1    BY MR. PARKER:

2    Q.  More as a food runner?

3    A.  Yeah.  I mean, the food runner making more money than a

4    coffee man.

5              THE COURT:  How much would a waiter make more than a

6    coffee man?

7              THE WITNESS:  A lot more, like 65 percent more.

8    BY MR. PARKER:

9    Q.  Did Mr. Caravantes respond to your offer about the cleaning

10   position?

11   A.  No.  He was not interested.

12   Q.  He said he was not interested?

13   A.  No.  He refused both, actually.

14             THE COURT:  What was the difference in pay on the

15   cleaning position and the coffee man?

16             THE WITNESS:  Your Honor, the -- I have to answer your

17   Honor, right?

18             MR. PARKER:  Yes.  Yes.

19             THE WITNESS:  OK.  Your Honor, basically, the coffee

20   position you have an hourly wage plus tips.  The cleaning is

21   only an hourly wage, that's it; there are no tips involved.

22             THE COURT:  Are they both at the same hourly rate?

23             THE WITNESS:  No.  No.  The cleaning, it's more.

24             THE COURT:  So what did cleaners make in an average

25   week?  What does a coffee man make in an average week?

C46dcar3                          Maggi - direct

1          THE WITNESS:  OK.  A cleaning, starting at $9 per hour

2     or $10 per hour.  It is a 40-hour.  So we can do the math.  So

3     we are talking about 360, maybe, before you take the tax out.

4     Right?

5          The coffee man, he has a percentage on the tips.  So

6     it's around -- if I am recalling good, it was around 3 -- 300

7     or 350 a week so far.

8          THE COURT:  Does he get basic hourly salary, too?

9          THE WITNESS:  Yes.

10          THE COURT:  Is that included in the 300 --

11          THE WITNESS:  No.  I'm talking just about the tips.

12     I'm not talking about the hours.

13          THE COURT:  So what would the total be for a cleaning

14     person and a --

15          THE WITNESS:  Your Honor, if you do overtime, of

16     course it is going to be more.  If you work a 40-hour week

17     at $9 per hour, it is 360, I believe.

18          THE COURT:  If you work a 40-hour week, a cleaning

19     person would make?

20          THE WITNESS:  Around 360.

21          THE COURT:  350?

22          THE WITNESS:  No.  360.  I mean, 40 hours times 9, so

23     far it would be that.

24          THE COURT:  360?

25          THE WITNESS:  Yes, sir.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C46dcar3                         Maggi - direct

1      THE COURT:  What would a coffee man make?

2      THE WITNESS:  In tips, as I told you, they used to

3  make around 3/320, 330, 350.  It depends on the week because,

4  of course, it is based on tips.  So if the restaurant is busy

5  and work well, there are more tips to divide because the coffee

6  gets a percentage.

7      THE COURT:  A 40 hour week?

8      THE WITNESS:  Yes, sir.

9      THE COURT:  300, somewhere?

10      THE WITNESS:  Around 3, 350, 300/350, as, again, it

11  depends on the week.  If it is a very busy week, you might work

12  more; there are more tips to be divided.  So there is a --

13  potentially he can make more or less.

14      THE COURT:  And the hours are the same -- assuming the

15  hours are the same?

16      THE WITNESS:  The hours so far are the same, 40 hours

17  a week.

18  BY MR. PARKER:

19  Q.  Referring to D-14, your memo, it mentions that, "busboy

20  position advance to food runner and then waiter when it becomes

21  available."  Did that discussion take place?

22  A.  Yes, sir.

23  Q.  And was that during the same discussion that you've

24  mentioned?

25  A.  Yes.

C46dcar3                          Maggi - direct

1    Q.  And how did Mr. Caravantes respond to that?

2    A.  No.  He wants to be a waiter.  Basically he wants the

3    position available right away.

4    Q.  Why weren't you willing at the time to just make him a

5    waiter?

6    A.  Because I don't think at the time Mr. Caravantes has the

7    knowledge and the ability to start him to be a server or a

8    waiter.

9    Q.  Why not?

10   A.  Because being a waiter, it takes a few steps, you know.

11   First of all, you have to be knowledge about the food, which is

12   very important.  You have to be knowledge about wine.  You have

13   to be knowledge about service.  You have to have the

14   appropriate language skills in order to interact with your

15   customer.  And, you know, and all these combine together, they

16   can be, you know, earned with experience.

17           So you can learn everything.  You know, learning, it

18   is not so difficult, but you need experience in order to put in

19   place what you learn.  If you don't have experience from one

20   day to another one, it's complicated.  It can't -- it can't be.

21           THE COURT:  Did you offer him a training period?

22           THE WITNESS:  Yes, your Honor.  I offered him -- this

23   is what I offered to him:  Be a food runner.  In the meantime

24   we spending time.  We train you.  First position available as a

25   server, and when I think you're going to be able to handle it,

C46dcar3                        Maggi - direct

1    the position is yours.

2              THE COURT:  As a food runner?

3              THE WITNESS:  No, as a server.  I mean, working as a

4    food runner and train as a server.

5              So after the training, when I think you reach the

6    proper level to keep our standard and a position is going to be

7    available also as a server, I give you the opportunity to be a

8    server in our organization.

9              THE COURT:  If he was being trained, would he be paid

10   for the time he would be trained --

11             THE WITNESS:  Yes.

12             THE COURT:  -- as a waiter?

13             THE WITNESS:  No.  Because, you know, your Honor, a

14   waiter makes $4 an hour so far plus the tips.  So if you want

15   to dedicate time to train somebody, at least you have to pay

16   him the minimum wage.  You know what I mean?  So it's extra

17   hours that he's dedicating, too.  So if he's training, no tip

18   part involved.  If no tip part involved, we have to find

19   another sort of payment.  You know.

20             THE COURT:  So he would get minimum wage, though?

21             THE WITNESS:  Probably, yes.

22             We never discuss about that because, you know, he

23   didn't accept my offer.  So there were no meaning for me to

24   discuss further positions.

25   BY MR. PARKER:

C46dcar3                          Maggi - direct

1    Q.  Would you turn in the exhibit book to Exhibit D-58.

2              THE COURT:  Exhibit 58?

3              MR. PARKER:  58, your Honor.  D-58.

4    A.  Yes.

5              THE COURT:  You are not -- I just want to be sure.  14

6    is not in evidence?

7              MR. PARKER:  Well, I might as well.  I will offer it

8    now.

9              THE COURT:  Well, there are two pages.

10             MR. PARKER:  Yes.

11             THE COURT:  I will hear from plaintiff.  Any

12   objection?

13             MR. DELANEY:  I don't have any objection, your Honor.

14             THE COURT:  What?

15             MR. DELANEY:  I have no objection.

16             THE COURT:  No objection.  All right.  14 is admitted

17   in evidence.

18             (Defendant's Exhibit 14 received in evidence)

19   BY MR. PARKER:

20   Q.  What is D-58, Mr. Maggi?

21   A.  It is a check that we cut for Mr. Arturo Caravantes, dated

22   Friday, August 15, 2008.

23   Q.  What does the check represent?

24   A.  This is represented probably the last week that

25   Mr. Caravantes worked.

C46dcar3                      Maggi - direct

1   Q.  And take a look at D-59.

2   A.  Yes.

3         THE COURT:  I'm sorry.  I just want to see what you

4   are looking at.

5         (Pause)

6         THE WITNESS:  This one was the --

7         THE COURT:  That's the next one.

8         THE WITNESS:  (Indicating).

9         THE COURT:  I see what you are saying.  All right.

10        My looking at the materials indicates it isn't a

11  check.  I mean, I've never seen a check drawn with earnings and

12  withholdings, etc., on the check.

13  BY MR. PARKER:

14  Q.  Perhaps, Mr. Maggi, you could better explain.

15  A.  Your Honor, this is a copy that ADP provide electronically

16  in our records that the check was made for Mr. Caravantes.  So

17  basically it has the amount, the date, and the withholding that

18  they have on the paystub.

19        THE COURT:  All right.

20  Q.  What is D-59?

21  A.  D-59 is a check that I cut to Mr. Caravantes.

22        I have to go back.  Can I explain it?

23  Q.  Yes.

24  A.  OK.  After Mr. Caravantes refused it, I spoke with him and

25  I ask him to reconsider my offer.  Reconsider my offer because

C46dcar3                         Maggi - direct

1    after he working in the organization for, I don't know, ten

2    years or more than ten years, maybe, you know, a little

3    thinking, you know, could help him out.  So I asked

4    Mr. Caravantes why don't you do that.  I pay you a week and we

5    call it vacation.  OK?  With this week that you take, think

6    about it, on my offer, because it's a good offer.  Come back to

7    me after your thinking, and, you know, and we'll see what's

8    going on from there.

9            So basically I gave him a week to think about my job

10   offer.

11           THE COURT:  And what did you do when you gave him one

12   week to think about the job?  I see.  Your testimony is you

13   then gave him this check?

14           THE WITNESS:  Yes.  I prepared for a check for him and

15   I give him this check.

16           THE COURT:  All right.

17   BY MR. PARKER:

18   Q.  After the conversation that you've been discussing where

19   you had a discussion about the food runner and the cleaning

20   position and the training for waiter, did you have any other

21   discussions with Mr. Caravantes?

22   A.  I got a discussion when he came after the week that he was

23   thinking about my job offer.

24   Q.  Where did that discussion take place?

25   A.  It took place in my office.

C46dcar3                        Maggi - direct

1   Q.  When was that?

2   A.  It was -- you know, after he took this week to think about

3   it, basically the following week, I need -- actually, he didn't

4   actually showing up.  I have to call him in order for him to

5   showing up, because I was waiting for an answer.

6          He came the following day, and we have a discussion in

7   my office.

8   Q.  And was that -- what month was that?

9   A.  In August.

10         THE COURT:  Let me go back a second.

11         THE WITNESS:  Yes.

12         THE COURT:  Check 58, that's not $300?

13         THE WITNESS:  No.  Your Honor, it is not $300 because

14  this is the check -- OK, can I show you?  It is going to be

15  easy --

16         THE COURT:  If you can explain.

17         THE WITNESS:  No.  No.  You can check the earnings,

18  you know.

19         On the check, on the top of 58, if you go on "Regular

20  Tip," the very last thing -- do you see it?  "Regular Tip."

21  The check, on earnings, it is going to say "Regular Tip."

22         So Mr. Caravantes worked 36 hour and 51.  OK?  So

23  multiply that by the hourly rate, 261.05, is his earnings in

24  hours.  We are talking about the hours, your Honor.  If you

25  subtract all the deductions, all the withholdings, the check is

C46dcar3                          Maggi - direct

1    162.  But on top of that, Mr. Caravantes that week has

2    $318.49 in tips.  So --

3              THE COURT:  I see.  All right.  Thank you.

4    BY MR. PARKER:

5    Q.  And so staying with that same explanation, what does --

6    looking at D-59, what does that show?

7    A.  No.  It show that it's only 40 hours.  I put it down as a

8    vacation because I don't have any other -- any other, let's

9    say, explanation in my computer.  So I have to justify it with

10   something, and I justify it with vacation time.  And it's 40

11   hours, is 286, minus, of course, the withholdings; the check is

12   248.95.

13             MR. PARKER:  Your Honor, I move to admit Exhibits D-58

14   and -59 in evidence.

15             MR. DELANEY:  Your Honor, I only object to the extent

16   of how they have been characterized.  I believe the accurate

17   way to characterize them would be payroll records, not checks.

18   So with that qualification on the record, I have no objection.

19             THE COURT:  So the exhibits will be called payroll

20   records.

21             MR. PARKER:  I agree with that, Judge.  Thank you.

22             THE COURT:  All right.  Thank you.

23             Exhibits 58 and 59 are admitted in evidence as payroll

24   records for the dates in question.

25             (Defendants' Exhibits 58, 59 received in evidence)

C46dcar3                          Maggi - direct

1    BY MR. PARKER:

2    Q.  Mr. Maggi, I want to direct your attention now to the

3    conversation you said that you had with Mr. Caravantes also in

4    August in your office.

5    A.  The last one?

6    Q.  The last one.

7          What did you say and what did he say at that time?

8    A.  Well, basically he came in.  And very simple.  He give me

9    an ultimatum.  So the ultimatum was, look, I thought about it.

10   I want to be -- you give me back my station, coffee, my

11   position, or I want to be a server.  Nothing in between.  So he

12   didn't give me any space for any, you know, any dealing, any --

13   there was no space for nothing.  It was an ultimatum.

14         I told Mr. Caravantes that I couldn't accept this

15   ultimatum, because the coffee station was not available

16   anymore.  And in order to be a server, like I said before, you

17   need experience and you need training.  So I told

18   Mr. Caravantes, unfortunately, I think I have to let you go

19   because I don't have any other -- I don't know how can I do for

20   you.

21         So, very good.  Mr. Caravantes, you know, take a check

22   and leaving.  He was very aggressive in the end and very

23   confrontational, too, because I didn't accept his offer, and

24   that I recall very well.  He told me that he was seeking

25   justice with his lawyer or with -- or that other organization

C46dcar3                      Maggi - direct

1    or, you know.  And I told Mr. Caravantes, do what you have to

2    do.  You know, I cannot -- what can I do?  I cannot stop you to

3    do anything.

4              So, unfortunately, this is how our working relation

5    ended.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C46kcar4                          Maggi - direct

 1   BY MR. PARKER:

 2   Q.  Since you've had the new coffee machines that you

 3   described, has Remi had a coffee station operator?

 4   A.  No.  I change the organization.  Basically, they take turn

 5   the, busser take turn, and during the shift today there is one

 6   busser taking the coffee, tomorrow is going to be another one.

 7            MR. PARKER:  No further questions.

 8            THE COURT:  Cross-examination.

 9   CROSS-EXAMINATION

10   BY MR. DELANEY:

11   Q.  Now, Mr. Maggi, if you can look at Exhibit D14 again,

12   Mr. Maggi, and in the first sentence there you see it says on

13   August 11th Arturo Caravantes was offered a busboy position.

14   Do you see that?

15   A.  Yes.

16   Q.  And when you say "was offered," you mean you offered him a

17   busboy position?

18   A.  Yes.

19   Q.  Now, do you recall at your deposition that you testified

20   that you never offered him a busboy position?

21   A.  I don't recall.

22   Q.  Well, let me hand you your deposition.

23            First, Mr. Maggi, let me ask you, do you recall being

24   deposed in this case?

25   A.  Yes, I do.

1   Q.  And do you recall that it was on the 8th of April 2011?

2   A.  I don't recall exactly the date, but if you say so.

3   Q.  Sounds right, though?

4   A.  Yes.

5   Q.  Do you recall that you were under oath when you gave that

6   deposition?

7   A.  Yes.

8   Q.  And you told the truth at your deposition?

9   A.  Yes.

10  Q.  I'm going to ask you to turn to page 109 of your

11  transcript, line 8.  I'm going to read that to you.

12  "Q.  Why did you offer him the runner position and not a busboy

13  position?  Because I thought that it goes busboy to runner

14  to --

15  "A.  Because my understanding at the time was that he was a

16  food runner before I came, or he performed some food runner job

17  before.  So if he was a food runner before, why I have to put

18  him back to the busboy position?

19  Q.  Do you recall testifying to that?

20  A.  Yes.

21  Q.  Does that refresh your recollection that you didn't offer

22  him a busboy position?

23  A.  No, I refresh my memory.

24  Q.  Does it refresh your memory that you did not offer him a

25  busboy position?

C46kcar4                          Maggi - cross

1    A.  No.  I offered him the busboy position at the very last

2    minute.

3    Q.  Did you offer him the busboy position at the second

4    conversation you had with him?

5    A.  No, I offered him this -- after he refuse everything, I try

6    even with that.

7    Q.  So this is when he came back and gave you an ultimatum?

8    A.  Yes.

9    Q.  Then you offered him the busboy position?

10   A.  Yes.

11   Q.  But that was after this letter in D14, wasn't it?

12           Was it your testimony before that on August 11th was

13   when you had the first conversation with him?

14   A.  Excuse me?

15   Q.  August 11th was when you had the first conversation with

16   him?

17   A.  Yes.

18   Q.  And at that conversation you did not offer him a busboy

19   position?

20   A.  No, I don't remember.

21   Q.  You offered him a busboy position at the second

22   conversation?

23   A.  Probably, yes.

24   Q.  When he gave the ultimatum?

25   A.  Yes, probably.

C46kcar4                          Maggi - cross

1    Q.  So, in fact, your first sentence in D14 is --

2                THE COURT:  Not "probably."  I want your recollection.

3                THE WITNESS:  Your Honor, I don't remember.

4                THE COURT:  And the second -- at the meeting when he

5    came back?

6                THE WITNESS:  When he came back, I wrote it; it's

7    because I offered that.  When I prepared this memo, this

8    letter, your Honor, D14, I probably offered that position --

9                THE COURT:  No, no, I don't want "probably."

10               THE WITNESS:  OK, so I offered him --

11               THE COURT:  I don't want "probably."  I want your

12   memory.

13               THE WITNESS:  I'm so sorry, your Honor.  So in that

14   case, I offer also the busboy position too.  After he refused

15   the food runner, after he refused the cleaning, I was probably

16   tried to find another way to keep the --

17               THE COURT:  I don't want "probably."  No "probably."

18               THE WITNESS:  So I was trying to --

19               THE COURT:  Do you remember saying?

20               THE WITNESS:  Yes, sir, I remember.  So I --

21               THE COURT:  You remember saying, "I will offer you a

22   busboy position"?

23               THE WITNESS:  I remember that I offered that position

24   as a very last thing, in order to keep him with us.

25               THE COURT:  The very last thing in all these meetings

1    or the very last thing on --

2             THE WITNESS:  No, no, the very last thing, your

3    Honor --

4             THE COURT:  After all the meetings?  At the end of all

5    the meetings?

6             THE WITNESS:  At the end of the last meeting, yes,

7    before I prepared this D14.

8             THE COURT:  When did you prepare this?

9             THE WITNESS:  August the 11th.

10            THE COURT:  Why do you say that?

11            THE WITNESS:  Because it's writed on the letter that I

12   prepared.

13            THE COURT:  But the letter you prepared is the date of

14   the first check you gave him --

15            MR. DELANEY:  Your Honor, if I --

16            THE COURT:  -- isn't it?

17            THE WITNESS:  I think I'm confused.  I'm reading the

18   letter.  Can I read the letter just a moment?

19            THE COURT:  Yes, read the letter.

20            THE WITNESS:  Thank you.

21            I don't recall it.

22            THE COURT:  You don't recall what?

23            THE WITNESS:  The busboy position, I don't recall it.

24            THE COURT:  You don't recall it when?

25            THE WITNESS:  I don't recall if I tell him the busboys

C46kcar4                          Maggi - cross

1    position August 11th or at the very last conversation on this

2    point.

3              THE COURT:  So you just testified you've offered him

4    the busboy position at the very last meeting.

5              THE WITNESS:  I remember the very last meeting I ask

6    him if he wants to be also -- you know --

7              THE COURT:  You don't remember that?

8              THE WITNESS:  No, I remember that, but now I'm confuse

9    if I offer also that position before.

10             THE COURT:  So the memo is wrong maybe?

11             THE WITNESS:  I don't remember, your Honor, I tell you

12   the truth, I don't remember.

13             THE COURT:  And that was prepared the day after the

14   first meeting?

15             THE WITNESS:  Yes.

16   BY MR. DELANEY:

17   Q.  I'll ask you to turn to page 111 of your deposition, line

18   2.

19   A.  OK.

20   Q.  And I will read to you:

21   "Q.  OK, and you never offered him a busboy position?

22   "A.  That I recall, no."

23   Q.  Do you remember giving that testimony?  Sir, do you

24   remember that was the question asked and the answer you gave?

25   A.  Yes, I do recall.

C46kcar4                          Maggi - cross

1        THE COURT:  You better give me the page and line,

2   Mr. Delaney.

3        MR. DELANEY:  Page 111 line 2 through line 4.

4   BY MR. DELANEY:

5   Q.  Do you recall at this time that Mr. Caravantes was going to

6   school?  And by "at this time," I mean during August 2011.

7   A.  Somebody told me that he was going to school, and he

8   confirm it too.

9   Q.  So you recall that at this time you knew that he was going

10  to school?

11  A.  Yes.

12  Q.  And you recall what hours he was going to school?

13  A.  No.  I'm probably thinking the morning, because his shift

14  was nighttime at Remi.

15  Q.  Do you recall that you offered him the cleaner position so

16  he could avoid conflicts with his school hours?

17  A.  Yes.

18  Q.  Do you recall what hours you offered him for the cleaner

19  position?

20  A.  The same hours at night.

21  Q.  You offered him a night cleaner position?

22  A.  Yes.

23  Q.  Can I ask you to turn to Exhibit D58.

24        And you recall testifying about this in response to

25  Mr. Parker's questions?

C46kcar4                         Maggi - cross

1   A.  D58 is the check, right?

2   Q.  The payroll record.

3   A.  Yes.

4   Q.  And you testified that his salary income was $261 a week?

5   A.  The gross?  Yes.

6   Q.  And that his tips were --

7          THE COURT:  The gross?

8          THE WITNESS:  Yes.  The gross salary is 261.05 and the

9   net was 162.23.

10          MR. DELANEY:  That's actually a good clarification.

11  Q.  After deductions, his net was 162.23?

12  A.  Yes.

13  Q.  And then his tips were 318.49?

14  A.  For that week, yes.

15  Q.  So we can agree that that's $480?

16  A.  For that week, yes.

17  Q.  And August is the slow month at the restaurant, correct?

18  A.  No.

19  Q.  But we can agree that $480 was more than $360, correct?

20  A.  I was talking 360 tips, wages.

21  Q.  No, you said for the cleaner position he would make $360 --

22  A.  I'm sorry, for the cleaner position it was $360.

23  Q.  So at least based upon this one check, it would have been a

24  significant cut in pay to be a cleaner, would it not?

25  A.  Yes.

C46kcar4                          Maggi - cross

1    Q.  Now, if you turn back to D14, please, if you look at the

2    last sentence of the second page of D14, and let me know when

3    you're there.  It begins, "Mr. Caravantes then decided to

4    quit."

5    A.  OK.

6    Q.  Is it your testimony today that he quit?

7    A.  There were not job available and he left.

8    Q.  No, that's not what I'm asking.  I'm asking, did he quit?

9    A.  Yes.

10   Q.  OK.  So let me ask you to turn back to your deposition,

11   please.

12            THE COURT:  When did he quit?

13            THE WITNESS:  The day after our last conversation.  So

14   I guess --

15            THE COURT:  How do you know he quit?

16            THE WITNESS:  Because he told me that he was leaving.

17   The job was not available and he was leaving.  So this is the

18   reason why he told me I'm going to go to seek justice with my

19   lawyer.  And he left.

20   BY MR. DELANEY:

21   Q.  Well, let me ask you to turn to your deposition again, page

22   112, please, line 24.

23            THE COURT:  I've got to catch up.

24            MR. DELANEY:  Page 112 line 24.

25   "Q.  So to be clear, did Arturo -- Arturo never said he wanted

C46kcar4                    Maggi - cross

1   to leave Remi, did he?

2   "A.   No, I told Mr. Caravantes I -- if you don't want to be a

3   food runner, and if you don't want to be responsible of the

4   cleaning, I don't have any other position, because the coffee

5   position is not going to be available.  I have to let you go,

6   I'm sorry."

7   Q.  Was that the question you were asked and answer you gave?

8   A.  Yes.

9            MR. PARKER:  Your Honor, I object to the use of the

10  testimony.  In his direct testimony Mr. Maggi specifically said

11  those very words that are in this deposition.  And if

12  Mr. Delaney wants to quibble over semantics of whether he quit

13  because he didn't want the job or whether "I have to let him go

14  because you don't want the job, Mr. Caravantes," there's no

15  difference and it's not inconsistent.

16           MR. DELANEY:  Mr. Maggi just testified that he --

17           THE COURT:  I'll leave that to argument.  I'm not

18  going to make a finding.

19  BY MR. DELANEY:

20  Q.  Was that your testimony at your deposition?

21  A.  Yes.

22  Q.  And did you ever meet Mr. Francisco Sotarriba?

23  A.  No.

24  Q.  Now, when you first took the job, in June or July of 2008,

25  were you made aware of Mr. Caravantes' complaint to the

C46kcar4                          Maggi - cross

1   Division of Human Rights?

2   A.  No, I was not aware of.

3   Q.  When you had these meetings with Mr. Caravantes, did you

4   know that he had filed a complaint with the Division of Human

5   Rights?

6   A.  No.  I barely know Mr. Caravantes; I was starting in July.

7   It happened first week of August, three weeks.  I did not have

8   the advance.

9   Q.  Do you know Mr. Velandia?

10  A.  Yes.

11  Q.  And are you aware of the allegations that are made against

12  him in this lawsuit?

13  A.  Yes.

14  Q.  And does he still work for Remi Restaurant?

15  A.  Yes.

16  Q.  Does he still work for you?

17  A.  Yes.

18  Q.  Did you promote him to party manager?

19  A.  No.

20  Q.  Is he still working as a party manager?

21  A.  He's a party assistant.  My party manager is Rachel

22  Lovaglio Canal.

23  Q.  Is he still working as a party assistant?

24  A.  Yes, sir.

25          MR. DELANEY:  I have no further questions, your Honor.

C46kcar4                          Maggi - cross

1            THE COURT:  Any redirect?

2            MR. PARKER:  No, your Honor.  I'm finished.

3            THE COURT:  You're excused.

4            (Witness excused)

5            THE COURT:  Next witness?

6            Next witness?

7            MR. PARKER:  Roberto Delledonne.

8    ROBERTO DELLEDONNE,

9         called as a witness by the Defendant,

10        having been duly sworn, testified as follows:

11            THE DEPUTY CLERK:  Please state your name and spell

12   your first and your last name slowly for the record, please.

13            THE WITNESS:  My first name is Roberto, R-o-b-e-r-t-o,

14   last name is Delledonne, D-e-l-l-e-d-o-n-n-e.

15            THE COURT:  Please go ahead.

16   DIRECT EXAMINATION

17   BY MR. PARKER:

18   Q.  Mr. Delledonne, where do you reside?

19   A.  Sorry?

20   Q.  Where do you reside?  Where do you live?

21   A.  I live in Rye Brook, New York.

22   Q.  And whom do you live with?

23   A.  I living with my wife and my two kids.

24   Q.  How long have you lived there?

25   A.  I live there for about five years.  Actually, for 11 years,

C46kcar4                        Delledonne - direct

1  | but I change house.

2  | Q.   Where are you from originally?

3  | A.   I'm from Italy.

4  | Q.   When did you begin living in the United States?

5  | A.   In 1993.

6  | Q.   Where were you educated?

7  | A.   In Italy.

8  | Q.   And just could you summarize your educational background

9  | for us?

10 | A.   Yes.  I am equal to college, I have an accountant degree in

11 | college.  And that's about it.

12 | Q.   Did you work after college?

13 | A.   Yes, I did.

14 | Q.   What did you do first after college?

15 | A.   I work as an accountant for a company I started in Italy

16 | and after I move in Africa, I work for about six years over

17 | there.  And after, I move in France for a few more years.  And

18 | finally, in 1993, I came here.

19 | Q.   What was your first job when you came to the United States?

20 | A.   I was a restaurant manager.

21 | Q.   What did you manage?

22 | A.   I manage a restaurant in Los Angeles called Cafe Med.  We

23 | open it, we opened the restaurant, and I managed for about a

24 | year and a half.

25 | Q.   What did you do after that?

C46kcar4                          Delledonne - direct

1   A.  After that, I came to New York and I work for a company

2   called Italian RG.  It was restaurant management, and I was the

3   corporate controller of the company.

4   Q.  Do you remember approximately the years when you did that?

5   A.  Yes.  From '94, end of '94, until 2007.

6   Q.  When you say corporate controller, what basically were your

7   job duties?

8   A.  I was bookkeeping the corporation.  The corporation owns --

9   we were managing -- it was manage like five restaurants, and I

10  was doing, I was in charge of what the accounting was, as far

11  as bookkeeping.

12  Q.  Are you familiar with the company called 53rd Street

13  Partners LLC?

14  A.  Yes, sir.

15  Q.  And what is 53rd Street Partners LLC?

16  A.  It's the corporation who owns the Remi Restaurant.

17  Q.  What is your job today?

18  A.  Today I work at Remi Restaurant.

19  Q.  Since when -- do you work there full time?

20  A.  Yes.

21  Q.  You said 53rd Street Partners is the owner of Remi

22  Restaurant.  When did 53rd Street Partners become the owner of

23  Remi Restaurant?

24  A.  In 2005, when 53rd Street purchased Remi Restaurant.

25  Q.  And was it called Remi before you purchased it?

C46kcar4                      Delledonne - direct

```
 1   A.  Yes.

 2   Q.  It continued the name?

 3   A.  It was Remi Restaurant, and it was another corporation.

 4   Your question is?

 5   Q.  You kept the name?

 6   A.  We kept the name, yes.

 7           THE COURT:  You bought the name?

 8           MR. PARKER:  Bought the name, absolutely.

 9   Q.  When 53rd Street Partners became the owner of Remi

10   Restaurant, what was your role with 53rd Street Partners?

11   A.  I was one of the three partners.

12   Q.  And the names of the other two were what?

13   A.  One name is Stefano Fritella, the other one is Frank

14   Tancredi, he was Frank Tancredi.

15   Q.  And today, who are the partners in 53rd Partners?

16   A.  I'm by myself; I have no partners.

17   Q.  When did that change take place?

18   A.  It change last year, two thousand -- I would say 2011, at

19   the beginning of 2011.

20   Q.  Do you remember when in 2005 53rd Street Partners took over

21   the ownership of Remi?

22   A.  April 11.

23   Q.  And at that time, what was your employment?

24   A.  I was still working for the Italian RG as a corporation --

25   as a corporate accountant, a corporate bookkeeper or corporate
```

C46kcar4                     Delledonne - direct

1  controller, whatever you call.

2  Q.  And where was your job?

3  A.  In Manhattan.

4  Q.  You said you left that job in 2007?

5  A.  Yes.

6  Q.  While you were still working in that position, from April

7  of 2005 until you left in 2007, what was your role with Remi

8  Restaurant?

9  A.  I was still partner, and I was taking care of the

10  accountings, as far as bookkeeping.

11  Q.  When 53rd Street Partners took over Remi, who became the

12  manager?

13  A.  The general manager, you mean?

14  Q.  Yes.

15  A.  It's Mr. Francesco Pistorio.

16  Q.  And had Mr. Pistorio been with Remi prior to April of 2005?

17  A.  No.

18  Q.  What about the other employees of Remi, who worked there

19  before you took over the ownership, or 53rd Street Partners

20  took over the ownership, did they leave, did they remain, did

21  some leave, some leave?  How did that work?

22  A.  They all stayed beside the general manager -- the former

23  general manager move away with the former owner, and we replace

24  him with our general manager, Mr. Francesco Pistorio.

25  Q.  Again, taking the time frame from April of 2005 until when

1   you left your other position in 2007, how much time were you

2   spending at Remi during that time?

3   A.   I would say one hour or two every day, from 2005 until I

4   finally move in 2008.  I was going in just to check the place,

5   to talk with the manager, or we go to get the invoices, you

6   know, to do basic things.

7   Q.   What were the job duties of Mr. Pistorio as general manager

8   during that time?

9   A.   Mr. Pistorio, as far as general manager, he was in charge

10  of the all operation, he was running the day operation, he was

11  taking care of the needs of the restaurant.  If there was a

12  problem, he was there, and he was in charge of the relationship

13  with the clients, the customer, with the relationship with the

14  hotel.

15       The restaurant business is a very wide -- there is a

16  lot of different activity you have to do as far as general

17  manager, besides taking care of your own -- or your stuff.  You

18  have to take care of the customer or potential customer and go

19  to represent the restaurant in the hotels, because in Manhattan

20  the hotels, they are very important to the restaurant business.

21  They give you -- you know, they send you the people all the

22  time, and you really need to please the people when they come,

23  because when they go back, they report back to the hotel.

24       So as far as GM, he has to take care of this, to make

25  sure that the hotel were happy with us and make sure the

C46kcar4                              Delledonne - direct

1   employee were OK; any problem, any little thing he was taking

2   care of it inside the restaurant.  He was in charge of ordering

3   wine, he was overlooking the kitchen, he was overlooking the

4   to-go operation we have, he was overlooking the parties.  He

5   was doing the whole thing.

6           THE COURT:  Besides you, what about Mr. Tancredi, what

7   did he do?

8           THE WITNESS:  At Remi you mean?

9           THE COURT:  What?

10          THE WITNESS:  At Remi Restaurant?

11          THE COURT:  At the restaurant.

12          THE WITNESS:  At Remi Restaurant he was the CPA, he's

13  certified accountant and was doing everything concerning taxes,

14  like tax return, sales taxes, any kind of tax.

15          THE COURT:  What about the other partner?

16          THE WITNESS:  The other partner?  He had no role in

17  the company.

18          THE COURT:  So o one supervised or watched how

19  Mr. Pistorio did his job?

20          THE WITNESS:  I was.

21          THE COURT:  What?

22          THE WITNESS:  I was.

23          THE COURT:  No partner watched him?

24          THE WITNESS:  Beside me, no.

25          THE COURT:  You were only there one hour a day?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C46kcar4                    Delledonne - direct

1           THE WITNESS:  Yeah, two hours a day.

2           THE COURT:  So you couldn't tell whether the customers

3      were being well treated or not?

4           THE WITNESS:  I got the feedback from him all the

5      time.  And we talk a lot with Mr. Pistorio.  All the time I

6      used to go see him, we had an hour of conversation, and he was

7      keeping me updated about if there was any problem, anything

8      else.  But what it is, Mr. Pistorio is a professional guy, he

9      knows his way around, and we basically trust him very much.  So

10     there was not really a reason to doubt about his performance at

11     the restaurant.

12          THE COURT:  But no one of you partners had any

13     experience in managing a restaurant, right?

14          THE WITNESS:  No, I did.  I work for a restaurant

15     business for many years and one of the partners, Stefano

16     Fritella, is also -- also, if he had no part in Remi, he had

17     part in other restaurants.  So Mr. Pistorio worked for

18     Mr. Fritella in another location.  And when he came,

19     Mr. Fritella knew Mr. Pistorio, he knew his capacity of what he

20     could do.

21          THE COURT:  But your skill is in accounting, no?

22          THE WITNESS:  Yes, but I work in restaurant for many

23     years and I develop restaurant skills in day-to-day operation,

24     you...

25

C46kcar4                        Delledonne – direct

1   BY MR. PARKER:

2   Q.  At the time that you took over Remi, in April of 2005, what

3   other employees were employed in management positions there?

4   A.  Management?  Besides Mr. Pistorio?  He moved in with us.

5   And there was Ms. Rachel Lovaglio Canal, which is the party

6   manager; was Ursula Bartel, she was in charge of the to-go; and

7   the chef, Giovanni Pinato, move in as well with us.

8   Q.  Are each of those persons still employed at Remi?

9   A.  All of them, yes.

10  Q.  Are they employed in the same jobs that they had then?

11  A.  Yes.

12          THE COURT:  All right, I guess it is time to break and

13  we will break until 9:30 on Monday.  Have a good Easter.

14          MR. PARKER:  Have a good Easter, your Honor.  Thank

15  you.

16          MR. DELANEY:  Happy Easter, your Honor.

17          (Adjourned to April 9, 2012 at 9:30 a.m.)

18                              * * *

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                           Page

 3   JOSE LUIS ORTIZ

 4   Cross By Mr. Delaney . . . . . . . . . . .1059

 5   Redirect By Mr. Parker . . . . . . . . . .1070

 6   Recross By Mr. Delaney . . . . . . . . . .1085

 7   CARLO MAGGI

 8   Direct By Mr. Parker . . . . . . . . . . .1091

 9   Cross By Mr. Delaney . . . . . . . . . . .1118

10   ROBERTO DELLEDONNE

11   Direct By Mr. Parker . . . . . . . . . . .1129

12                   PLAINTIFF EXHIBITS

13   Exhibit No.                            Received

14    326, 327, 328  . . . . . . . . . . . . .1057

15                   DEFENDANT EXHIBITS

16   Exhibit No.                            Received

17    14    . . . . . . . . . . . . . . . . . .1111

18    58, 59   . . . . . . . . . . . . . . . .1115

19

20

21

22

23

24

25
```