C40kcar1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     ARTURO CARAVANTES and
3    FRANCISCO SOTARRIBA
                    Plaintiffs
4
              v.                        09 CV 7821 (RPP)
5    53RD STREET PARTNERS, LLC
     d/b/a REMI RESTAURANT and
6    OSCAR VELANDIA
                    Defendants
7    ------------------------------x
                                    New York, N.Y.
8                                   April 9 2012
                                    9:40 a.m.
9
     Before:
10                   HON. ROBERT P. PATTERSON, JR.

11                                        District Judge

12                          APPEARANCES
     PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
13        Attorneys for Plaintiffs
     1285 Avenue of the Americas
14   New York, NY 10019
     AARON S. DELANEY
15   MAYUR P. SAXENA
     MOIRA KIM PENZA
16   MICHAEL PALMIERI

17   URBAN JUSTICE CENTER
          Attorney for Plaintiffs
18   123 William Street 16th Floor
     New York, NY 10038
19   NICOLE HALLETT

20   EPSTEIN BECKER & GREEN PC
          Attorneys for Defendants
21   KERRY M. PARKER
     ALKIDA KACANI
22       - also present -

23   CARLOS CRUZ - Spanish Interpreter
     LILIANA HALAC - Spanish Interpreter
24   RANDALL CARTER - Plaintiff AV Tech

25
```

C40kcar1

1           THE COURT:  Is it a next witness or recall?

2           MR. PARKER:  We recall, your Honor, Roberto

3    Delledonne.

4           THE COURT:  All right.

5           You're reminded you're still under oath, sir.

6           THE WITNESS:  Yes.

7     ROBERTO DELLEDONNE, resumed

8           THE COURT:  Go ahead.

9    DIRECT EXAMINATION CONTINUED

10   BY MR. PARKER:

11   Q.  Mr. Delledonne, on Friday we left off talking a little bit

12   about the background of Remi and of the management group at

13   Remi.

14           Did you know a gentleman by the name of Brett Lockard?

15   A.  Yes.

16   Q.  Who is Brett Lockard?

17   A.  Brett Lockard was assistant manager for a few months after

18   we took the place over, in 2005.

19   Q.  And as assistant manager, what were his job duties while he

20   worked at Remi?

21   A.  He used to come in for lunch and for dinner and make sure

22   everything was OK in the dining room, walking through the

23   table, and basically he was doing what Mr. Pistorio also was

24   doing and just making sure all the customers were properly

25   served.  And he has closing duty; sometime he was closing the

C40kcar1                    Delledonne - direct

1   restaurant after service, other time he was opening the

2   restaurant after the service.

3   Q.  Did Mr. Lockard wait tables?

4   A.  No, he didn't.

5   Q.  Did he share in the tip pool?

6   A.  No.

7   Q.  After Mr. Lockard left, was he replaced by anyone?

8   A.  No.

9   Q.  Why not?

10  A.  Because his job is not required anymore, because

11  Mr. Pistorio was taking care of the managing function; he was

12  there all the time, lunch and dinner, six, seven days a week

13  sometimes.

14  Q.  Since Mr. Lockard left Remi, has Remi refilled the

15  assistant manager position?

16  A.  No.

17  Q.  With regard to Mr. Pistorio, you said on Friday that he was

18  the general manager, right?

19  A.  Yes.

20  Q.  Did he report to you as the general manager?

21  A.  Yes.

22  Q.  What were your expectations of him as general manager, in

23  terms of consulting with you?

24  A.  I had no expectation, because Mr. Pistorio is a

25  55-years-old man, he has 35 years of experience in his job.

C40kcar1                        Delledonne - direct

1    But my relationship with him was more professional; if he had

2    any problem and he felt like talking to me, he could talk to

3    me, but I don't recall any input in his management way,

4    assistant -- management way to manage the restaurant.  Sorry

5    about that; it's a little bit confused.

6    Q.  After Mr. Pistorio came in to Remi as general manager, did

7    he hire any management employees to work in the restaurant?

8    A.  No.

9    Q.  Do you know Mr. Velandia?

10   A.  Yes.

11   Q.  How do you know Mr. Velandia?

12   A.  I met him when we took over Remi in 2005.  He was one of

13   the waiters working there.

14   Q.  At some point did his title change?

15   A.  Yes.  After few months -- and I don't recall exactly

16   when -- he became head server.

17   Q.  Did you have any knowledge in advance of him becoming head

18   server, that he would be named head server?

19   A.  No.

20   Q.  Has Mr. Velandia ever been appointed at Remi as an

21   assistant manager?

22   A.  No.

23   Q.  As head server, are you aware of what his responsibilities

24   were?

25   A.  Head server is done from -- I mean you become head server

C40kcar1                         Delledonne - direct

1    because your seniority, your knowledge -- you're practically

2    somehow above the server -- but the real job of the head server

3    is still taking care of customers, still waiting tables, still

4    making sure your station is perfect.  And on top of it, head

5    servers allowed you also to be more helpful in the dining room

6    as far as computer function.  In this case, Mr. Velandia was

7    able to enter with a special card the computer and do some --

8    to access some keys which are keys that allowed you to void

9    checks and to run the closing reports at night.

10   Q.  Did Mr. Velandia ever have the authority to hire or fire

11   employees?

12   A.  Never.

13   Q.  Did Mr. Velandia ever have the authority to discipline

14   employees?

15   A.  Never.

16   Q.  Did Mr. Velandia ever have the authority to set employees'

17   pay rates?

18   A.  No.

19   Q.  Was Mr. Velandia ever in charge of directing the day-to-day

20   activities of employees?

21   A.  No.

22   Q.  Did Mr. Velandia ever have the authority to promote

23   employees?

24   A.  No.

25   Q.  After 53rd Partners purchased Remi, what, if any, measures

C40kcar1                          Delledonne - direct

1   did the restaurant take to inform employees of their rights

2   under the law?

3   A.  What we do, when we took over, we have a general meeting

4   with all the employees.  Mr. Pistorio ran the meeting, and we

5   explained the situation, we were taking over; we kept the food

6   staff because we didn't want to change anything inside the

7   restaurant.  We evaluate every single employee in the next

8   couple of months, and we basically kept the same one.

9           As far as training, we had -- Mr. Pistorio had a

10  conversation with all of them, when it was time to hire people,

11  and we made them aware, we're a new company, we were to

12  accomplish whatever our goal, and to make sure that they knew

13  how to run the job; and if it was any problem, to report

14  straight to Mr. Pistorio, was the only responsible person

15  inside.

16  Q.  Can you turn, please, to the exhibit marked as D20 in the

17  exhibit book.  It should be in the defendants' exhibit book.

18  A.  Yeah.  Which one?  Can you repeat?

19  Q.  Number 20.

20  A.  All right.

21  Q.  Do you recognize D20?

22  A.  Yes.

23  Q.  What is it?

24  A.  This is our poster we had on the wall, and this poster,

25  when we got -- can I go back one second --

1   Q.   Yes.

2   A.   -- to 2005?   Prior 2005, the corporation was different

3   ownership at the restaurant, the Remi Restaurant, and when we

4   took over in April 11, 2005, we bought all the assets and

5   everything the restaurant had already.   So at the restaurant,

6   the posters, when we got the restaurant, the posters, they were

7   already there and we continue the tradition -- how you say --

8   to accomplish and to add the poster over there.   Who was in

9   charge of the poster was Mr. Augustine Pena, which was working

10  there before, and his job was updating the posters every six

11  months, a year.

12  Q.   What was Mr. Pena's job when you took over the restaurant?

13  A.   He was taking care of the kitchen, which was the ordering,

14  the delivering, he was helping the chef to run the business,

15  the daily business.

16  Q.   And you see on D20 where it says -- is this an invoice that

17  you received?

18  A.   I'm sorry?

19  Q.   Is D20 an invoice that you received for posters?

20  A.   D20?   Sorry.   Yes, sir.

21  Q.   Do you see where it says "All On One Workplace" in the

22  middle of the page there?

23  A.   Yes.

24  Q.   Could you go to Defendants' Exhibit 19.

25  A.   Yes.

C40kcar1                          Delledonne - direct

1    Q.  And up in the upper left there of the page, what does it

2    say?

3    A.  This is everything the poster contain, everything written

4    in the poster.

5    Q.  If you look in the upper left corner of the poster, what

6    are the first words?

7    A.  "All On One Workplace Policy Poster."

8    Q.  And was this poster ever posted at Remi?

9    A.  Yes, it was.

10           MR. PARKER:  Your Honor, I move to admit Defendants'

11   Exhibits 19 and 20 in evidence.

12           THE COURT:  Any objection?

13           MR. DELANEY:  No objection.

14           THE COURT:  19 and 20 are admitted in evidence,

15   Defendants' 19 and 20.

16           (Defendant's Exhibits 19 and 20 received in evidence)

17   BY MR. PARKER:

18   Q.  Mr. Delledonne, can you please turn to Exhibit D22.

19   A.  Yes, sir.

20   Q.  What is D22?

21   A.  Sorry, got lost.

22           THE COURT:  What language are 19 and --

23           THE WITNESS:  I believe it's English, sir.

24           THE COURT:  It's in English?

25           THE WITNESS:  I believe so.  I really can't read.

C40kcar1                        Delledonne - direct

1    It's very small.

2              Mr. Parker, I'm lost.

3    BY MR. PARKER:

4    Q.  I'm referring you to D22.

5    A.  OK, I'm sorry.

6    Q.  And I ask you, what is D22?

7    A.  I can't find D22.  I'm sorry.

8    Q.  In the exhibit book there?  It should be a tab 22.

9              THE DEPUTY CLERK:  D22?

10             MR. PARKER:  Yes.

11             THE WITNESS:  I'm sorry, I understood B.  I apologize.

12             That's an invoice from the company where we purchased

13   the poster, Personnel Concept.

14   BY MR. PARKER:

15   Q.  And what is the date of the invoice?

16   A.  It's June 17, '05.

17   Q.  Can you turn over to D20 -- let me just ask you, before you

18   turn away, 22, it says NY Space Saver-1.  Do you know what that

19   is?

20   A.  Yes.

21   Q.  What is that?

22   A.  It's a general poster.

23   Q.  Can you turn over to D21 now, please.

24   A.  Yes.  Yeah, that's what it is.

25   Q.  Is that the Space Saver-1 poster?

C40kcar1                    Delledonne - direct

1    A.  Yes.

2            MR. PARKER:  Your Honor, I think that the copies that

3    are in the exhibit book are -- they appear to be very dark.  We

4    have a clearer copy of that poster, but I'd offer Exhibits D21

5    and 22 in evidence, with the understanding that I will

6    substitute the one in the exhibit book with a clearer photo and

7    I will provide it to counsel.

8            MR. DELANEY:  Your Honor, I am going to object to D21.

9    I believe it's a photo of a bulletin board at Remi, current or

10   at least within the last year or so.  D22 is an invoice from

11   2005.  It's not clear what D21 is.

12           THE COURT:  Objection sustained.

13           MR. PARKER:  I'll follow up on that.  Thank you.

14   BY MR. PARKER:

15   Q.  Mr. Delledonne, D21, you said, is a New York Space Saver-1

16   photo?

17   A.  Yes.

18   Q.  And is that a photograph of a poster that either presently

19   or at some point appeared at Remi?

20   A.  Yes.

21   Q.  Do you know when this photograph was taken?

22   A.  I think it was taken sometime in 2009, 2008, 2009.

23   Q.  The type of poster that it is, the New York Space Saver,

24   when did you first start at Remi posting this particular type

25   of poster in the restaurant?

C40kcar1                    Delledonne - direct

1    A.  We saw, when we first got the place, the poster, they were

2    out, they were already in place.

3    Q.  Is the photograph marked as D21 a fair representation of

4    the type of Space Saver poster that has been posted at Remi

5    since you took over in April 2005?

6    A.  Yes.

7         MR. PARKER:  Your Honor, I move to admit D21 and 22 in

8    evidence.

9         MR. DELANEY:  Your Honor, I'm still going to object to

10   D21; it's not clear what it is, who took it, when it was taken.

11        THE COURT:  Objection sustained.  All I can tell is

12   that this is something that the witness says was on the wall,

13   and I can't tell what it is.

14   BY MR. PARKER:

15   Q.  What is D21?

16   A.  D21 is a poster and it's a -- it's a poster with -- on the

17   poster there is some requirement, law requirement, to make the

18   employee aware of different things.  There is all different

19   kind -- hourly wages, discrimination, there is sexual

20   harassment and different things.

21        MR. PARKER:  Your Honor, may I hand up a clearer copy

22   of the exhibit?

23        THE COURT:  If you have a clearer copy, yes.  If it's

24   clear it's a copy.

25        Can you show it to the plaintiffs' counsel?

1           MR. PARKER:  Yes.

2           THE COURT:  The copy I'm going to see has got to be

3   inspected by the plaintiff.

4           Any objection?

5           MR. DELANEY:  Your Honor, I still don't think we have

6   appropriate foundation for this exhibit.  I don't know --

7           THE COURT:  Objection sustained.  I don't see anything

8   about sexual harassment.

9           MR. PARKER:  No, but I'm not offering it for that,

10  your Honor.

11          THE COURT:  What are you offering it for?

12          MR. PARKER:  I'm offering it to show that the

13  restaurant had postings on equal opportunity law, and other

14  employee rights pursuant to various laws, not specifically on

15  sexual harassment.  I'm getting to that.

16          MR. DELANEY:  Your Honor, I object to foundation.  I

17  also, based on that, I also object based on relevance.  Whether

18  OSHA was --

19          THE COURT:  Those are the relevant issues in this

20  case?  Why are they relevant to the claims of either party?

21  Why are they relevant to the claims of either party?

22          MR. PARKER:  I think it just shows the general

23  background and the efforts on the part of 53rd Street Partners

24  to inform employees of various legal rights, which I believe

25  the plaintiffs are contending they did not do.

1           THE COURT:  Is the testimony just that these were on

2     the wall when they took over?

3           MR. DELANEY:  Your Honor, Mr. Delledonne has testified

4     this was taken maybe in 2009, which is also well after the

5     relevant period.  I don't know how this is probative at all of

6     what was -- first of all, it's not relevant to sexual

7     harassment; and, secondly, it's not from a relevant time

8     period, it's not probative of what was on wall, if anything,

9     from 2005 to 2008, which is the relevant time period here.

10          THE COURT:  Well, that's what I'm trying to ascertain.

11          MR. PARKER:  I think the witness has already testified

12    that this is representative -- it's the same type of poster and

13    it's representative of the types of posters that were on the

14    wall then.

15          THE COURT:  No, but type of posters -- this is a

16    different poster, not a picture of what was on the wall?  In

17    order to have a foundation, you have to have someone who says

18    that this was a poster that was on the wall.  It can't be the

19    type of poster that was on the wall.  You could take that at

20    any restaurant and transfer it over and say -- there's no

21    support for it, if that's what it is.  I thought it was

22    supposedly a copy of what was pictured in the other exhibit, 20

23    or 21, 19.

24          If it's a picture of what was actually on the wall, a

25    clearer picture, that's one thing, but if it's something the

C40kcar1                    Delledonne - direct

1    witness can't testify to as that --

2              MR. PARKER:  Well, your Honor, just comparing

3    Exhibit 19 to proposed Exhibit 21, they're clearly different

4    posters.

5              THE COURT:  They're different.

6              MR. PARKER:  Yeah, I'm not representing that they are

7    the same.  They are different posters.

8              THE COURT:  Well, then I don't see the relevance.

9              MR. PARKER:  I'll move on.

10             THE COURT:  We're not trying an OSHA case, equal

11   employment case, are we?  I see there's a second page.  It

12   might go to the state of mind of the plaintiff or defendant, in

13   terms of intent.

14             MR. PARKER:  I'll ask another question.

15   BY MR. PARKER:

16   Q.  With regard to Exhibit D19 -- D21, I'm, sorry,

17   Mr. Delledonne --

18   A.  Which one?  Sorry.

19   Q.  D21.

20   A.  OK, yes.

21   Q.  -- you said that's a photograph of a poster.  Where was the

22   photograph taken?

23   A.  It was taken at the restaurant.

24   Q.  At Remi?

25   A.  At Remi, yes.

C40kcar1                    Delledonne - direct

1    Q.  Does this depict a poster that was posted somewhere at the

2    restaurant?

3    A.  Yes.

4    Q.  Where do you post your labor posters at Remi?

5    A.  We have two set.  One set is posted next to the clock-in

6    machine, because all the employee use the clock-in machine to

7    clock in and clock out twice a day.  So to keep the poster

8    really visible for everybody, we choose to put it there.

9             The second place where we put it is next to the locker

10   room.  Where the employee have access to the locker room, there

11   is a restroom behind there, so that's where we decided to put

12   it.

13   Q.  If you turn over to Exhibit D26, please --

14   A.  D26?

15   Q.  26.

16   A.  Yes.

17   Q.  That is an invoice?

18   A.  Yes.

19   Q.  What is it?

20   A.  It's an invoice from the company who give us the poster,

21   it's dated August 9, 2007.

22   Q.  OK, that would be 26B?

23             THE COURT:  26A?

24             MR. PARKER:  26B, your Honor.

25             THE WITNESS:  26A, yeah.

C40kcar1                    Delledonne - direct

1   BY MR. PARKER:

2   Q.  It says "Sexual Harassment" in the middle of the page in

3   invoice, in 26B.  What is that?

4   A.  Yes.  It was part of the series of poster we bought, it was

5   also sexual harassment poster.

6   Q.  How many did you buy?

7   A.  We bought two.

8   Q.  If you go over to Exhibit D25, what is Exhibit D25?

9   A.  That's one of the two poster we bought, sexual harassment

10  poster.

11  Q.  And how do you recognize that?

12  A.  Because I see it every day.

13  Q.  Where?

14  A.  We post -- there are two, we said.  One is posted on top of

15  the time clock machine, and the other one is posted in the way

16  to the locker room.

17  Q.  And since you purchased these, pursuant to the invoice

18  marked as 26B, for how long has Remi maintained those posters?

19  A.  All the time, they're still there now.

20          MR. PARKER:  Your Honor, I offer Exhibits D26-B and

21  D25 in evidence.

22          MR. DELANEY:  No objection.

23          THE COURT:  D26-B and D25 are admitted in evidence.

24          (Defendant's Exhibits D26-B and D25 received in

25  evidence)

C40kcar1                    Delledonne - direct

1    BY MR. PARKER:

2    Q.  Mr. Delledonne, since 2005, when your company took over

3    Remi Restaurant, if employees had a problem in the restaurant,

4    how would they be able to address that with management?

5    A.  They approached the general manager, Mr. Francesco

6    Pistorio, from 2005 to 2008.  Mr. Pistorio left, Mr. Carlo

7    Maggi took over, and they approached Mr. Carlo Maggi.

8    Q.  Is that procedure that you just identified anywhere in

9    writing?

10   A.  No.

11   Q.  Have you ever had occasion to have employees visit you or

12   come to you with any issues or problems in the restaurant?

13   A.  They approach me sometime, not about problems, more

14   about -- talking about things in general.  My door is always

15   open, everybody comes in all the time, goes out, we talk about

16   every single thing -- everybody can do that and, you know --

17   few people come, we talk about, you know, family, things.  But

18   for any problem concerning the restaurant, they go straight to

19   the general manager.

20   Q.  What type of hours did Mr. Pistorio work, if you know?

21   A.  Mr. Pistorio used to come in around, I would say

22   9:10 o'clock in the morning and be there until 9:10.  Sometime

23   he was there until the closing until 11:00 12:00.

24   Mr. Pistorio, his family was out of town, so he dedicate a

25   hundred percent of his time into the restaurant.

1   Q.  From the time that you spent at Remi, were you able ever to

2   observe the type of rapport or relationship that Mr. Pistorio

3   had with restaurant employees?

4           MR. DELANEY:  Objection.

5           THE COURT:  I'll allow the question.

6           THE WITNESS:  Yes.

7   Q.  What were your observations of that?

8   A.  That was -- he had a relationship, very strong with his

9   employee because he consider Remi as his family, so he was the

10  head, the guy, the gentleman in charge of the place.  He knew

11  he was responsible for every single person into the restaurant,

12  and he was there all the time for everybody.  So he was

13  encouraging people all the time, "If you have any problem,

14  please come to see me, we talk about it, we find a solution."

15  And everybody pretty much did that all the time.

16          We heard also many employee, overhear, say that.  It

17  was the only person who had the direct -- how do you say --

18  direct contact with all the employee, and everybody knows that.

19  Q.  During the time that you spent at Remi, while Mr. Pistorio

20  was the general manager, did you ever observe any employees

21  engaging in the touching of one another's buttocks or private

22  parts?

23  A.  No.

24  Q.  Did you ever hear employees using language to one another

25  which included the words "prosti" and "puta," "whore" or

C40kcar1                    Delledonne - direct

1    "bitch"?

2    A.  No.

3           THE COURT:  Do you speak Spanish?

4           THE WITNESS:  50 percent, but I understand more than

5    speak.  Italian is very similar to Spanish.

6    BY MR. PARKER:

7    Q.  Did you, at any time while Mr. Pistorio was the general

8    manager, become aware of any circumstance involving employees

9    having touched one another on the buttocks or private parts?

10   A.  You said if Mr. Pistorio did?

11   Q.  No, if you became aware of any situation in which employees

12   were observed doing that.

13   A.  Yes.

14   Q.  How did you become aware of that?

15   A.  Mr. Pistorio reported to me once that he witness few times

16   the employee joking around.  So he was quite upset about it,

17   and he pointed to the meeting, and pointed to the meeting -- I

18   mean he had a meeting about that.  And he said, if I will see

19   something happen like this again, touching or being destructive

20   during the business into the premises, he will take care -- he

21   will take disciplinary act.

22          MR. DELANEY:  Your Honor, move to strike that answer

23   to the extent it has hearsay as well as there's lack of

24   foundation for presence at any meeting where Mr. Pistorio said

25   those things.

C40kcar1                           Delledonne - direct

1           THE COURT:  Yes, it is hearsay.  I'll sustain the

2     objection.

3     BY MR. PARKER:

4     Q.  Without discussing what Mr. Pistorio may have said to you

5     about that occurrence -- just answer yes or no -- did you

6     become aware of any actions that he took in response to

7     witnessing those events?

8     A.  Yes.

9     Q.  Were you satisfied with the actions that he took?

10    A.  Yes.

11    Q.  How many employees does Remi have?

12    A.  About 80.

13    Q.  Has that number changed since 2005?

14    A.  It change like four or five less or more, more or less.

15    Q.  It's always been around --

16    A.  80.

17    Q.  -- 80?

18          In 2005, did you ever become aware of any complaints

19    by any employee of employment discrimination?

20    A.  No.

21    Q.  In 2005, did you ever receive notice of any complaints by

22    any employee of sexual harassment?

23    A.  No.

24    Q.  In 2005, did you ever become aware of any complaints by any

25    former employee of sexual harassment?

C40kcar1                        Delledonne - direct

1   A.  No.

2   Q.  In 2006, did you ever become aware of any complaint by an

3   employee of employment discrimination?

4   A.  No.

5   Q.  In 2006, did you ever become aware of any complaint by an

6   employee of sexual harassment?

7   A.  No.

8   Q.  Were there any complaints in 2006 that you became aware of

9   by a former employee complaining of sexual harassment?

10  A.  No.

11  Q.  Now, if you can turn to Exhibit-- now you're going to go to

12  the Plaintiffs' Exhibit book and turn to Exhibit 18, P18.

13          Do you recognize Exhibit P18?

14  A.  Yes.

15  Q.  What is P18?

16  A.  It's a complaint filed from Mr. Sergio Pastor through the

17  Division of Human Rights.

18  Q.  Now, on the last page of the document there's a date of

19  August 10th of 2007.  Do you see that?  On the left-hand side

20  there, lower section.

21  A.  Yes.

22  Q.  Now, in 2007, up until -- let me ask you:  Did you receive

23  a copy of this complaint at or about this time?

24  A.  Yes.

25  Q.  Up until when you received this complaint by Mr. Pastor, in

C40kcar1                      Delledonne - direct

1   2007, did you receive any complaints by any employees of

2   employment discrimination?

3   A.  No.

4   Q.  And up until you received this complaint in August of 2007,

5   did you receive any complaints by employees of sexual

6   harassment at Remi?

7   A.  No.

8   Q.  What happened with this complaint after it was received at

9   Remi?

10  A.  We have -- we received a complaint, we talked to each

11  other, Mr. Pistorio, we call Oscar, we talk to Oscar, and he

12  denied any allegation against him.  We hire -- we give the case

13  to our attorney, which was Mr. Reid Rosen, which he did his

14  investigation.  He file an answer to the Human Rights, and

15  that's what we did.

16  Q.  Now, the complaint on page -- do you see down at the bottom

17  it says "Plaintiffs' Trial Exhibit"?  If you go to page 4 of 6

18  of Exhibit 18 --

19  A.  Which one, sir?

20  Q.  On the bottom of the page, it says the page numbers of the

21  exhibit.

22  A.  Yes.

23  Q.  It says page 4 of 6.

24  A.  4?

25  Q.  Do you have page 4?

1    A.  I have 4 of 7.

2    Q.  4 of 7?  On the page that you have, does it say in the

3    middle of the page "Description of Discrimination"?

4    A.  Yes.

5    Q.  OK, that's the page I wanted you to be on.

6    A.  OK.

7    Q.  It says "Translated To English" next to it?

8    A.  Yes.

9    Q.  In the middle of the page, there's a sentence that begins

10   after where it says 4:20 p.m., and the sentence reads, "The

11   assistant manager, Oscar Velandia, wanted to have sexual

12   relations with me, and I refused."

13   A.  Yes.

14   Q.  Did you have any conversations with Oscar Velandia about

15   that allegation?

16   A.  Yes.

17   Q.  And what did he say?

18   A.  He said it was -- he said, no, he never done it.

19   Q.  Up until that point, had you ever received any complaints

20   of any kind by anyone at Remi about Oscar Velandia?

21   A.  No.

22   Q.  Now, if you turn, please, in the defendants' exhibit book,

23   it would be Exhibit D47.

24          Do you have 47?

25   A.  Yes.

C40kcar1                     Delledonne - direct

1    Q.  The title in the right-hand column, it says "Determination

2    and Order After Investigation."  Do you have that in front of

3    you?

4    A.  Yes.

5    Q.  What is this document?

6    A.  This is the answer to our letter from the Division of Human

7    Rights.

8    Q.  It appears to be dated on the last page, on page 3.  Can

9    you read that handwritten date there?

10   A.  Yes.  11/19/07.

11   Q.  Did you receive this determination at or about that time?

12   A.  Yes.

13   Q.  And what was the conclusion of the New York Division of

14   Human Rights with regard to Mr. Pastor's complaint?

15   A.  The complaint was dismissed.

16   Q.  When you receive this document, did you read it?

17   A.  Yes, I did.

18                  (Continued on next page)

19

20

21

22

23

24

25

C49Wcar2                         Delledonne - direct

1   BY MR. PARKER:

2   Q.  On the second page, in the middle of the page, the document

3   states that there is no evidence that Mr. Oscar Velandia

4   sexually harassed the complainant and/or that complainant's

5   termination was in any way related to sexual harassment.  Did

6   you read that at the time in 2007?

7   A.  Yes.

8   Q.  If you go over to Exhibit D48.

9   A.  28?

10  Q.  48.

11  A.  48?

12  Q.  Next exhibit.

13  A.  Yes.

14  Q.  What is D48?

15  A.  It's a document from the EEOC.  It's a dismissal and notice

16  of rights.

17  Q.  And in the bottom corner it bears a date of November 23,

18  2007.  Did you receive this at or about that time?

19  A.  Yes.

20  Q.  Did Mr. Sergio Pastor ever file a lawsuit against Remi

21  after this?

22  A.  No.

23          MR. PARKER:  Your Honor, move to admit Exhibits 847

24  and 848 in evidence.

25          MR. DELANEY:  Your Honor, plaintiffs object.  The

C49Wcar2                        Delledonne - direct

 1   defendants moved in in an limine motion to exclude the

 2   complaint from evidence, and your Honor ruled that the

 3   complaint itself was not admissible in evidence.  Either I

 4   request your Honor reconsider the decision and allow the

 5   complaint in as evidence or I object to the admission of these

 6   two documents, which are the resolutions of Mr. Pastor's

 7   complaint.

 8          THE COURT:  Exhibit 48 and Exhibit 47 are not admitted

 9   in evidence, but the testimony is admitted as testimony of what

10   occurred.  As to whether Mr. Pastor followed up on the

11   determinations are hearsay as to what happened.

12          MR. PARKER:  Your Honor, might I be heard on that?

13          THE COURT:  Yes.

14          MR. PARKER:  The plaintiffs raised the issue of the

15   Pastor complaint in their case.  They questioned Mr. Sergio

16   Pastor about it.  They questioned Oscar Velandia about it.

17   They clearly are arguing that this complaint somehow put Remi

18   on notice that there was a problem regarding sexual harassment

19   in the restaurant.  The defendants, I submit, are entitled to

20   rely upon the determination by a state agency, the final

21   determination, as proof that in fact there was no problem, at

22   least with respect to this person, contrary to what the

23   plaintiffs are seeking to infer from or imply from the

24   testimony that they've introduced.

25          So while technically speaking the determination is

1    hearsay, it's a finding of a public agency.  It's a public

2    document, and it should come in under the public records

3    exception to the hearsay rule.  But beyond that, as I said, the

4    restaurant, the defendants should be entitled to rely upon that

5    finding in the furtherance of its business.

6         THE COURT:  It goes to the conclusion, it seems to me,

7    but whether the facts as described in the report are true, it

8    seems to me they're hearsay.  The conclusion that the matter

9    was determined is based in the complaint.  That seems to me

10   it's admissible as the action of a public agency.  But I was

11   trying to make the distinction between that and the factual

12   statements contained therein.

13        MR. PARKER:  I have no issue with removing the factual

14   determinations, the factual findings.  I do, however, press for

15   the conclusion to be admitted because it is a conclusion, and

16   it does exonerate Mr. Velandia of sexual harassment as alleged

17   by Pastor in his complaint.

18        MR. DELANEY:  Your Honor, first of all, it doesn't

19   exonerate.  It says they had no evidence at the time.

20        THE COURT:  I don't know whether it exonerates him,

21   but he seems not to have followed up on it, which seems to me

22   to suggest that he accepted the decision.

23        MR. DELANEY:  Your Honor, Mr. Pastor was pro se at the

24   time.  He had no attorney representation.

25        THE COURT:  We have plenty of pro se people who follow

C49Wcar2                         Delledonne - direct

1    up on these, and generally they do.

2              MR. DELANEY:  Mr. Delledonne has already testified

3    that they received the determination, and we don't contest the

4    fact that they made this determination.  I believe that's

5    already in evidence, and I don't think we need the underlying

6    documents to support that.

7              THE COURT:  I didn't admit the document, only the fact

8    of the determination.  Therefore, the adverse decision was

9    testified to, so I don't see that the document is necessary.

10   And the fact that there was no follow-up, I think, is relevant

11   to Mr. Pastor's state of mind.

12             MR. PARKER:  Very well.  Thank you.

13   Q.  Mr. Delledonne, for the remainder of 2007, after you

14   received the complaint of Sergio Pastor, did you receive any

15   other complaints by employees of employment discrimination at

16   Remi?

17   A.  No.

18   Q.  Did you receive during 2007 any other complaints by

19   employees of sexual harassment at Remi?

20   A.  Yes.

21   Q.  What did you receive?

22   A.  We receive a complaint from Mr. Arturo Caravantes, but it's

23   internal, an internal complaint, not from any agency, that

24   Mr. Caravantes approached Mr. Pistorio.

25   Q.  Before you discuss what those discussions were between

C49Wcar2                    Delledonne - direct

 1    others, what came to your attention?

 2    A.  I'm sorry.  Can you repeat?

 3    Q.  Yes.  I don't want you to go into the discussions that you

 4    were told about.  What I want to know is how you learned of

 5    that event.

 6    A.  I learn it in late in 2008.  That's happening 2007, but we

 7    learn it late -- I did learn it late in 2008.

 8    Q.  When in 2008 did you learn about that?

 9    A.  About March.

10    Q.  From whom did you learn about that event?

11    A.  We receive a complaint.

12    Q.  What complaint was that?

13    A.  It was a complaint from Mr. Caravantes.  He was complaining

14    that Ben Ranieri, one of our waiters, touched him, in 2007.

15    Q.  And if you turn to Exhibit P19, in the Plaintiffs' Exhibit

16    book.

17    A.  The plaintiff.

18    Q.  Plaintiffs' Exhibit book.  Do you have that?

19    A.  Yes.

20    Q.  Is that a copy of the complaint you're referring to?

21    A.  Yes.

22    Q.  When did you first become aware of it?

23    A.  After we received the complaint.

24    Q.  What did Remi do in response to the Caravantes complaint?

25    A.  The touching between Ranieri and Mr. Caravantes happened in

 1   2007, I think November 2007.  When Mr. Caravantes approached

 2   Mr. Pistorio and he point the complaint, he said, What

 3   happened, that Mr. Ben Ranieri touched him in an inappropriate

 4   way.  So Mr. Pistorio called the two of them.  That's what I

 5   learn after that, because I spoke with Mr. Pistorio, and

 6   Mr. Pistorio who was telling me all this, so Mr. Pistorio

 7   approached the two of them.  He sat them down, had a meeting

 8   with them, and he found that it was an accident.  And he said:

 9   Please work together.  Any other problem, come to see me.

10       Nothing else happened, so, for Mr. Pistorio, the problem

11   was solved, until March 2008, when we received the complaint.

12           MR. DELANEY:  Your Honor, I'm going to object to the

13   portion of the answer that is hearsay regarding what

14   Mr. Pistorio said.

15           THE COURT:  Sustained as to hearsay.

16   BY MR. PARKER:

17   Q.  After you received the complaint in 2008, what did you do?

18   A.  We investigated.  We called our attorney, Mr. Reid Rosen,

19   which he investigated.  He spoke with Mr. Pistorio about it.

20   We filed an answer, and that's what we did.

21   Q.  Could you turn to Exhibit D11 in the defendants' book?

22   A.  11?

23   Q.  Yes.  Do you recognize D11?

24   A.  Yes.

25   Q.  What is it?

1  A.  It's a cancellation of an order.

2  Q.  I think you're in the wrong book.

3  A.  Yes.

4  Q.  The Defendants' Exhibit book.

5  A.  Ha, defendant.

6          Yes, now I got the right one.

7  Q.  What is D11?

8  A.  It's Mr. Pistorio affidavit sent back to the New York State

9  Division of Human Rights.

10  Q.  Did you see a copy of that at the time?

11  A.  Yes.

12  Q.  Turn over, please, to D13.

13  A.  Yes.

14  Q.  What is D13?

15  A.  It's Ben Ranieri affidavit as answer to the Division of

16  Human Rights.

17  Q.  Did you see that at the time?

18  A.  Yes.

19          MR. PARKER:  Your Honor, move to admit D11 and D13 in

20  evidence.

21          MR. DELANEY:  No objection.

22          THE COURT:  I'm going to admit 11 and 13 in evidence

23  but not for the truth of the statements contained therein but

24  the fact that those statements were made, and I'm going to

25  amend the ruling to the earlier exhibits with respect to the

C49Wcar2                         Delledonne - direct

```
 1   other documents filed with the Division of Human Rights, the

 2   EEOC, in the same way, for the fact that the statements therein

 3   were made but not for the truth of the statements.

 4             MR. DELANEY:  Just to be clear, your Honor, that only

 5   applies to the ones Mr. Parker entered, correct?  Because, for

 6   example, when I entered Mr. Velandia's affidavit, that comes in

 7   as a party admission.

 8             THE COURT:  That's correct.

 9             MR. PARKER:  I think your Honor's referring to

10   Exhibits D47 and 48, the prior ones that we discussed.

11             MR. DELANEY:  47 and 48 were not admitted.

12             THE COURT:  Right.  They are for the fact that those

13   statements were made but not for the truth of the material

14   contained therein.

15             MR. DELANEY:  I see.

16             (Defendants' Exhibits 11 and 13 received in evidence)

17   BY MR. PARKER:

18   Q.  What became of the complaint filed by Mr. Caravantes in

19   March of 2008?  Did you ever receive any findings?

20   A.  No.  Sorry.  Can you repeat?

21   Q.  We've been talking about the Caravantes complaint that was

22   filed in March 2008 --

23   A.  Right.

24   Q.  -- with the Division of Human Rights?

25   A.  Yes.
```

C49Wcar2                    Delledonne - direct

1   Q.  Did you ever receive any determination from the Division of

2   Human Rights?

3   A.  No.

4   Q.  Now, after March of 2008, when you received the Caravantes

5   complaint, for the remainder of that year, 2008, did you

6   receive any complaints from any employees of employment

7   discrimination?

8   A.  No.

9   Q.  Did you receive any complaints from any employees of sexual

10  harassment?

11  A.  No.

12  Q.  Did you come to learn at some point that Mr. Velandia and

13  Mr. Caravantes had engaged in sexual acts at the restaurant?

14  A.  Yes.

15  Q.  When did you first learn that?

16  A.  I learn, I don't remember the year, but I remember

17  receiving the suit about it, reading it, and getting our

18  attorney again, Mr. Reid Rosen, to make a full investigation

19  about it.

20  Q.  Okay.  Just asking, I don't want to ask you to talk about

21  the conversations between you and Mr. Rosen.

22  A.  Yes.

23  Q.  What I want to know is:  How did you first learn?

24  A.  When I received the lawsuit.

25  Q.  Up until that point, you're talking about the lawsuit that

1    we're in court about today?

2    A.  Yes.

3    Q.  Up until that point, other than the Pastor complaint that

4    we've discussed and the Caravantes complaint that we've

5    discussed, had any other lawsuits been filed against 53rd

6    Street Partners by employees or former employees of Remi?

7    A.  About -- can you repeat?

8    Q.  Yes.  Other than the Pastor complaint and Caravantes

9    complaint, both of which were filed with the Division of Human

10   Rights, were there any other complaints, lawsuits filed by

11   employees or former employees of Remi?

12   A.  Yes.

13           THE COURT:  Which is your question, complaint or

14   lawsuits?

15           MR. PARKER:  My question, your Honor, was meant to be

16   lawsuits.

17           THE COURT:  Did you understand that?

18           THE WITNESS:  Yes.

19           THE COURT:  He's limiting it to lawsuit.

20           THE WITNESS:  Lawsuit.

21   BY MR. PARKER:

22   Q.  What other lawsuits?

23   A.  We received in 2009 a suit but about wages, tips, unpaid

24   wages, overtime, from an employer, former employer.

25   Q.  Who were the employees in that group who filed that suit?

C49Wcar2                        Delledonne – direct

 1   A.  Arturo Caravantes, Francisco Sotarriba, Sergio Pastor,

 2   Moises Pastor, Abel Sanchez, and Angel Soria.

 3              THE COURT:  I didn't get those names.

 4              THE WITNESS:  Would you like me to repeat it?

 5              THE COURT:  I guess the court reporter will get me

 6   those names.

 7   BY MR. PARKER:

 8   Q.  That includes the two plaintiffs in this case?

 9   A.  Yes.

10   Q.  Did it also include Sergio Pastor and Moises Pastor?

11   A.  Yes.

12              THE COURT:  Anyone else?

13              THE WITNESS:  Yes, your Honor.  Two more people.

14              THE COURT:  What are their names?

15              THE WITNESS:  Angel Soria and able Sanchez.

16              THE COURT:  Was it a single suit or were they separate

17   suits?

18              THE WITNESS:  Excuse me?

19              THE COURT:  Was it a single complaint?

20              THE WITNESS:  Yes.

21              THE COURT:  Or was it separate?

22              THE WITNESS:  Yes.  Single.

23              THE COURT:  Did they all belong to the same portion of

24   the work force?  Were they all waiters?

25              THE WITNESS:  Mr. Caravantes was a coffee boy.

C49Wcar2                      Delledonne - direct

1    Mr. Sotarriba was a runner.  Mr. Sergio Pastor was a runner.

2    Mr. Angel Soria was a runner.  And Mr. Abel Sanchez was working

3    for the Remi To Go and part of white jacket.

4    BY MR. PARKER:

5    Q.  And one other, Moises Pastor, what was his position?

6               THE WITNESS:  And Moises Pastor was a busboy.  Sorry.

7               THE COURT:  Wages or tips?

8               THE WITNESS:  Unpaid wages.  Tips and overtime.

9    BY MR. PARKER:

10   Q.  Mr. Delledonne, could you turn in Defendants' Exhibit book

11   to Exhibit 39, D39?

12   A.  Yes.

13   Q.  Do you recognize D39?

14   A.  Yes.

15   Q.  What is it?

16   A.  It's an application for employment.

17              THE COURT:  I'm sorry.  Let me go back.  The unpaid

18   wages claim, when was that filed?

19              THE WITNESS:  It was filed in 2009.

20              THE COURT:  Thank you.

21   BY MR. PARKER:

22   Q.  What is Exhibit D39?

23   A.  It's an application for employment.

24   Q.  Of?

25   A.  Pastor, Moises.

C49Wcar2                        Delledonne - direct

1   Q.  Do you recognize this form?

2   A.  Yes, this is the form we use for it.

3   Q.  Are these documents kept in the regular course of your

    business?

4

5   A.  Yes.

6         MR. PARKER:  Your Honor, I'd move to admit Exhibit D39

7   in evidence.

8         MR. DELANEY:  Your Honor, I object to the extent it

9   contains immigration evidence and it's evidence of Mr. Pastor's

10  immigration status, such as on the page marked D995, so I

11  request that it be redacted from the record.

12        MR. PARKER:  Where is that?

13        MR. DELANEY:  Mine has multiple pages.

14        THE COURT:  How does this reflect his immigration

15  status?  Oh, I see.  Resident alien?

16        MR. DELANEY:  Correct.

17        THE COURT:  They're allowed to work.  They're allowed

18  to work, right?

19        MR. DELANEY:  Yes, your Honor.  Just a motion in

20  limine was made to sort of keep all evidence of immigration

21  status out of the record.  I have no objection to the rest of

22  the form, just request that that be redacted.

23        MR. PARKER:  Your Honor, first of all, I don't agree.

24  I don't see how that relates to immigration status or at least

25  any improper use of immigration status.  I have no interest in

1    the immigration status.  The purpose of both the application

2    and the photocopies of the cards is that Mr. Pastor admittedly

3    lied about his age when he applied to Remi, and both the

4    application itself, which, on page two, contains his birth date

5    and also on the following page, with the copies of the two

6    cards, on the resident alien card, there appears a birth date

7    which is false.

8              THE COURT:  We can black out portions of this,

9    Mr. Delaney.

10              MR. DELANEY:  If it's just for the fact of what the

11    birth date says, we can black out the rest.

12              MR. PARKER:  I have no problem with that, Judge.

13              THE COURT:  All right.  You better designate the

14    portion because you may not be agreed on what Mr. Parker says.

15              MR. DELANEY:  I mean, I guess on page 995, I would

16    just black out the top, the title of the card.

17              THE COURT:  Resident alien and alien number, is it?

18              MR. DELANEY:  Then the low end, which I can barely

19    read, U.S. Department of, something, immigration, if we just

20    blacked out the top and left the rest, I would be fine with

21    that.

22              THE COURT:  Is that satisfactory?

23              MR. PARKER:  That's fine, Judge.

24              THE COURT:  All right.

25              MR. DELANEY:  And, your Honor, one more.  Because this

C49Wcar2                    Delledonne - direct

1    document contains multiple pages, D996 contains, looks like a

2    hearsay statement by Mr. Pistorio, so, again, I might just

3    request from defense counsel that they remove these last two

4    pages of this exhibit and keep the first three pages.

5              MR. PARKER:  That's also acceptable.  I'm really just

6    interested in the first three pages of the exhibit, your Honor.

7              THE COURT:  Those pages do we have them designated on

8    the record, Mr. Delaney.

9              MR. DELANEY:  So, of Defendants' Exhibit D39, we will

10   keep the first three pages, which is D993, 994, and 995, with

11   the redaction we just discussed on 995, and we'll remove pages

12   D996 and 997.

13             THE COURT:  Is that acceptable, Mr. Parker?

14             MR. PARKER:  Yes, your Honor.

15             THE COURT:  All right.

16   BY MR. PARKER:

17   Q.  Mr. Delledonne, could you turn in the defendants' book,

18   please, to Exhibit D65?  Do you recognize D65?

19   A.  Yes.

20   Q.  What is it?

21   A.  It's a 2009 tax return.

22   Q.  Is it a tax return of 53rd Street Partners?

23   A.  Yes.

24   Q.  Was this document filed with the Internal Revenue Service?

25   A.  Yes.

C49Wcar2                        Delledonne - direct

1   Q.   On the first page of the document, line 22 --

2   A.   Yes.

3   Q.   -- what does line 22 show?

4   A.   It shows an income or loss for the business year.

5   Q.   What does this tax return show for 2009?

6   A.   Shows a loss of $444,000.  One for 444,000 and one for

7   $156.

8   Q.   Would you please turn over to Exhibit D64?

9   A.   Yes.

10  Q.   What is D64?

11  A.   It's a 2010 tax return.

12  Q.   Was this document filed with the Internal Revenue Service?

13  A.   Yes.

14  Q.   What is the date?

15  A.   October 17, 2011.

16  Q.   What does this return show on line 22, ordinary business

17  income or loss?

18  A.   Showing the loss of $258,692.

19  Q.   In 2009 and 2010, Mr. Delledonne, how would you describe

20  the business conditions for Remi?

21  A.   The business was, you know, the economy went down in 2008,

22  following the Lehman Brothers problem and Lehman Brothers was

23  one of our best customers at the restaurant for private event

24  and regular business.  It literally was just across the street

25  from us.  So that's one of the major reason, and all the

1  corporate business, it just disappeared.  You know, no more

2  corporations were spending money on lunch or dinner events.

3  That's happening 2009, happening 2010, happening 2011, and it's

4  happening right now.  It's different kind of business now.

5  It's totally different.

6  Q.  How is it different?

7  A.  Different because, you know, we, we are big operation.  We

8  are a big place.  We have a lot of people working there, and in

9  order to function, we have to keep the place consistent.  We

10  cannot just decide to, to cut people or to fire people because

11  otherwise we can't, we can't function, and we don't want to put

12  people on the street.  That's our philosophy.  And we tried to

13  consolidate our people, to do the best we can, to promote as

14  much as we can, to give the best quality and service to, you

15  know, to be competitive and to get more customer from other way

16  and be better than other places.  That's what it's all about,

17  to be competitive in business.

18  Q.  Has the tax return yet been filed for 2011?

19  A.  Not yet.  We are on extension.

20  Q.  Generally, what was the outcome of 2011, from a financial

21  standpoint?

22  A.  As far as businesswise, we are a little bit better in 2010.

23  As far as profit or loss, a little bit better, but we still

24  have to recover, and it's very, very hard for restaurants right

25  now, especially Remi-size restaurant.

1    Q.  If you could turn to Exhibit D67, please.

2    A.  Yes.

3    Q.  Before we address the exhibit, does 53rd Street Partners

4    own any real estate?

5    A.  No.

6    Q.  What are its assets?

7    A.  Assets are just material inside the restaurant.  It's

8    chairs, table, the kitchen equipment, and I don't think about

9    anything, computers.  Equipment, in general.

10   Q.  Are you able to apply an estimated value of those assets in

11   the restaurant?

12   A.  I would say about $200,000, total.

13   Q.  Are there any liens on those assets?

14   A.  No.

15   Q.  Let's look at Exhibit D67.  What is D67?

16   A.  It's a page of a bank account, of 53rd Street bank account.

17   Q.  And it appears there are how many months of bank statements

18   here?

19   A.  It's three months.

20   Q.  What type of an account is this account?

21   A.  This is, we are operating with two accounts.  One is just

22   for the payroll and we allocate the money of the value of the

23   payroll, we pay on weekly basis the payroll.  If the payroll is

24   $20,000 net, we put $20,000 in the account, and that's about

25   it.  And after we have this particular statement, it's about

C49Wcar2                        Delledonne - direct

1   our operating account.  It's the only other account we have.

2   When we get the income from the credit card companies and we

3   wrote our checks, and it's the operation.

4   Q.  It says on the first page of D67, it says in the upper

5   right "statement closing date 3/30/12."  What does that mean?

6   A.  That the statement at the end of March, 2012.

7   Q.  And in the middle of the page --

8           THE COURT:  What page is this?

9           MR. PARKER:  It's on the first page of the exhibit,

10  your Honor.

11          THE WITNESS:  67.

12          THE COURT:  Yes, 67.

13          MR. PARKER:  Yes, your Honor.

14          THE WITNESS:  67.

15  BY MR. PARKER:

16  Q.  In the middle of the page, it has a line, beginning with

17  balance forward, and all the way to the right in the column

18  designated as balance, it says $83,661.35, with a dash next to

19  it.  What does that mean, Mr. Delledonne?

20  A.  It's the bank balance shown on overdraft, so $83,000.

21  Q.  What do you mean by overdraft?

22  A.  Overdraft is when the account is negative.

23  Q.  How long has your bank account for 53rd Street Partners

24  been negative?

25  A.  About three years, four years.

C49Wcar2                        Delledonne - direct

1   Q.  Does 53rd Street Partners own or operate any other

2   restaurant or any other facility?

3   A.  No.

4   Q.  Now if you can turn to Exhibit D66 for identification.

5   A.  Yes.

6   Q.  What is D66?

7   A.  It's a statement for American Express.

8   Q.  And what is 53rd Street Partners' relationship with

9   American Express?

10  A.  American Express is the credit card, big credit card

11  company, which process, we process the money with credit card.

12  So use American Express, the client use, the customer use

13  American Express, we submit the batch, and American Express

14  credit the money to us after three or four days.  That's a way

15  to pay.  It's, this one is program from American Express called

16  Express Merchant Financing, which they do loan based on cash

17  advance for business, and the loan estimated on the, on the

18  volume of business you do with American Express on a yearly

19  basis.  We are in business with them for seven years, eight

20  years now.  Before Remi was in business with them for 15 years,

21  so we are a previous customer, and we were able to get the cash

22  advance from American Express of $300,000 plus six percent

23  interest, which show below that, is total $318,000, and it's a

24  loan for me to reduce my overdraft.

25  Q.  So you took this loan from American Express to reduce your

C49Wcar2                        Delledonne - direct

```
 1   bank overdraft?

 2   A.   That's right.

 3   Q.   And what is the outstanding balance on the American Express

 4   loan?

 5   A.   As of, the statement is dated, let me see, 3/18, to 2/3,

 6   2012, the outstanding balance is $197,149.80.

 7   Q.   Do you know today whether it's more or less than --

 8   A.   Today, it's less because they take 14 percent of my

 9   American Express deposits on a daily basis.

10   Q.   Other than those loans, that loan and the bank overdraft,

11   what, if any, other extraordinary expenses does 53rd Street

12   Partners have at this time?

13   A.   We have substantial amount of legal fees.  We have, and we

14   have everyday operation because we keep, we try to keep our

15   standard in high level, and, you know, it's more difficult than

16   it was, a lot more difficult.  On top of it, like I was

17   mentioning, we have to sustain lawsuit since legal fees to face

18   the lawsuit since 2008, so this didn't help at all.

19           MR. PARKER:  Your Honor, I'd move the admission of

20   Exhibits D64, 65, 66, and 67 in evidence.

21           THE COURT:  64?  I haven't got anything on 64, I don't

22   believe.

23           MR. PARKER:  Pardon?

24           THE COURT:  My notes don't show anything on 64.  I

25   seem to have that as 65.
```

C49Wcar2                            Delledonne - direct

1          MR. PARKER:  I did go through both tax returns.

2          THE COURT:  I see.  It's 2009.

3          Any objection?

4          MR. DELANEY:  I have no objection to 64 and 65.  For

5   66 and 67, I wasn't clear on the foundation for them, whether

6   they were, where they came from.  They don't appear to be Remi

7   documents.  The logos on the top are banks.  If they're bank

8   statements that are kept in the ordinary course of business by

9   Remi, then I have no objection.

10          MR. PARKER:  I can certainly ask those questions.

11          THE COURT:  They're not 53rd Street Partners

12   documents, but they're received.

13          Go ahead.

14   BY MR. PARKER:

15   Q.  Turning to the bank statements, InterAudi Bank.

16   A.  Yes.

17   Q.  That's 53rd Street Partners' bank?

18   A.  That's the bank account, yes.

19   Q.  Do you receive those statements periodically from InterAudi

20   Bank?

21   A.  Monthly basis.

22   Q.  Do you keep those statements in the regular course of your

23   business?

24   A.  Yes, of course.

25   Q.  And D66, this is a statement from American Express

C49Wcar2                         Delledonne - direct

1  regarding the loan?

2  A.  Yes.

3  Q.  Do you receive periodic statements from American Express

4  reflecting the loan balance and payments thereon?

5  A.  Monthly basis.

6  Q.  Do you keep those statements in the regular course of your

7  business?

8  A.  Yes.

9          MR. PARKER:  Your Honor, I move to admit Exhibits D66

10  and 67 in evidence.

11          MR. DELANEY:  I have no objection, but I'd like the

12  record to reflect that both 66 and 67 contain redactions.

13          THE COURT:  They do?

14          MR. DELANEY:  Yes.  I'm assuming those are account

15  numbers, but maybe Mr. Parker can make a representation on the

16  record.

17          THE COURT:  Verify it before we proceed.

18  BY MR. PARKER:

19  Q.  Mr. Delledonne --

20          THE COURT:  Verify that they are.

21          MR. PARKER:  I can verify that it says right on the

22  line account number, and it's blacked out.

23          THE COURT:  I just want agreement, that's all.

24          MR. DELANEY:  Yes.

25          MR. PARKER:  Okay.  Thank you.

1           MR. DELANEY:  No objection.

2           THE COURT:  64, 65, 66, 67 are admitted in evidence.

3           (Defendants' Exhibits 64-67 received in evidence)

4           MR. PARKER:  No further questions.

5           THE COURT:  Cross-examination, or do you want a break?

6           MR. DELANEY:  Yes, just a short one.

7           (Recess)

C49kcar3                    Delledonne - cross

1      MR. DELANEY:  Your Honor, I'm just going to hand out

2  the deposition transcripts.

3      THE COURT:  Yes.

4      OK.

5  CROSS-EXAMINATION

6  BY MR. DELANEY:

7  Q.  Good morning, Mr. Delledonne.

8  A.  Good morning.

9  Q.  So, 53rd Street Partners, that's the company you own,

10  correct?

11  A.  Yes.

12  Q.  And 53rd Street Partners took over Remi Restaurant in

13  April 2005?

14  A.  That's correct.

15  Q.  When it took over Remi Restaurant, you were one of the

16  owners?

17  A.  Yes.

18  Q.  Now, you were still working at Bice Corporation at the

19  time, correct?

20  A.  That's correct.

21  Q.  You were working as a controller there?

22  A.  As a corporate controller, right.

23  Q.  Now, in April 2005, when you took over, you spent

24  approximately one or two hours per day at Remi Restaurant?

25  A.  Yes.

C49kcar3                    Delledonne - cross

1    Q.  And that changed in approximately 2008?

2    A.  That's correct.

3    Q.  And starting in 2008, you started spending essentially a

4    full day there?

5    A.  Full-time, yeah.

6    Q.  Now, in April 2005, your role in running Remi Restaurant

7    was limited to administration, correct?

8    A.  That's correct.

9    Q.  You did the bookkeeping?

10   A.  Yes.

11   Q.  And the accounting?

12   A.  Yes.

13   Q.  In April 2005, you were not responsible for any of the

14   day-to-day operations of Remi?

15   A.  No, I was never.

16   Q.  You still are not in charge of the day-to-day operations?

17   A.  That's correct.

18   Q.  Prior to 2008, when you were there full time, you didn't

19   spend much time on the dining room floor at Remi, did you?

20   A.  No.

21   Q.  And after 2008, do you spend much time on the dining room

22   floor?

23   A.  No.

24   Q.  Now, when you took over in April 2005, Francesco Pistorio

25   was the general manager?

C49kcar3                    Delledonne - cross

1   A.  Yes.

2   Q.  And you were not responsible for supervising him?

3   A.  No.

4   Q.  And Carlo Maggi is the current general manager?

5   A.  Yes.

6   Q.  And you aren't not responsible for supervising him either?

7   A.  No.

8   Q.  The other two members of 53rd Street Partners in April 2005

9   were Frank Tancredi?

10  A.  Yes.

11  Q.  And Stefano Fritella?

12  A.  Yes.

13  Q.  Now, Frank Tancredi was not responsible for supervising

14  Mr. Pistorio either, was he?

15  A.  No.

16  Q.  Neither was Mr. Fritella?

17  A.  No.

18  Q.  And there are no other members of 53rd Street Partners?

19  A.  No.

20  Q.  Now, you testified about posters that were posted at Remi

21  Restaurant?

22  A.  Yes.

23  Q.  And your testimony was that some of those posters contained

24  information about sexual harassment?

25  A.  Yes.

C49kcar3                          Delledonne - cross

1    Q.  But other than those posters, there is no written policy at

2    Remi Restaurant regarding sexual harassment, is there?

3    A.  No written policy, no, besides the posters.

4    Q.  And in April 2005, there was no employee handbook that

5    discussed sexual harassment?

6    A.  No.

7    Q.  And in 2008, when you started full time, there was still no

8    handbook discussing sexual harassment?

9    A.  No.

10   Q.  In April 2005, Remi had no training program for its

11   managers regarding sexual harassment, correct?

12   A.  No.

13   Q.  And to this day, there still is no training for managers

14   regarding sexual harassment?

15             MR. PARKER:  Objection; relevance.

16             MR. DELANEY:  I'll rephrase.

17             THE COURT:  Is that relevant, to this day?

18             MR. DELANEY:  I can ask a different question, your

19   Honor.  I believe it is but --

20             THE COURT:  If it is, you ask --

21             MR. DELANEY:  -- I'll ask an interim question.

22   BY MR. DELANEY:

23   Q.  In 2008, when you started full time at the restaurant, was

24   there any training program for managers --

25   A.  No.

C49kcar3                    Delledonne - cross

1   Q.  -- regarding sexual harassment?

2   A.  No.

3   Q.  Or employees?

4   A.  No.

5   Q.  And to this day, is there any training program for managers

6   regarding sexual harassment?

7   A.  Can you repeat that one?  Sorry.

8   Q.  To this day, is there any training program for managers

9   regarding sexual harassment?

10             MR. PARKER:  Objection.

11             THE COURT:  I think you should slow down with this

12   witness because his native language is Italian, as I understand

13   it.

14             MR. DELANEY:  OK.  Could you read back the last

15   question four me.

16             (Record read)

17             THE WITNESS:  No at this days, but --

18             MR. PARKER:  Your Honor, I object to the question on

19   relevance grounds.

20             MR. DELANEY:  Your Honor --

21             MR. PARKER:  It's four years later.

22             MR. DELANEY:  I believe the current state of the

23   training and policies is directly relevant to the issue of

24   whether Remi Restaurant has condoned sexual harassment in

25   particular given the repeated testimony we have from current

C49kcar3                         Delledonne - cross

1    employees about how the game and the touching still goes on to

2    this day.

3            MR. PARKER:  The issue is not whether a defendant in a

4    harassment case condones anything into the future.  It's

5    whether up at the point in time that the events occurred,

6    whether it condoned those events.

7            THE COURT:  I think Mr. Parker is right on the

8    limitation.  It is not relevant to my determination.  Something

9    that isn't in suit I can't make findings about, it seems to me.

10   It's relevant to your expert's testimony, but the -- the other

11   testimony is relevant to your expert testimony.

12   BY MR. DELANEY:

13   Q.  Now, I want to return to the posters that you testified are

14   posted at Remi Restaurant.  Actually, let me hand you a

15   document.

16           MR. DELANEY:  31.

17           THE COURT:  Are you handing him an exhibit?  Exhibit

18   No.?

19           MR. DELANEY:  Plaintiffs' Exhibit 331.

20           THE COURT:  Plaintiffs'?

21           MR. DELANEY:  Plaintiffs' 331, your Honor.

22   BY MR. DELANEY:

23   Q.  Mr. Delledonne, do you recognize Plaintiffs' 331 as

24   invoices from Personnel Concepts?

25   A.  It's invoice from Personnel Concepts, yes.

C49kcar3                         Delledonne - cross

1    Q.  And you see there are multiple pages in this document?

2    A.  What?

3    Q.  There are multiple pages in this document, this exhibit?

4    A.  Yes, yes.

5    Q.  And you recognize these as a series of invoices from

6    Personnel Concepts, correct?

7    A.  Yes.  But I don't recognize the first one because it's

8    dated January 4, 2005, and we were not part of Remi back then.

9    Q.  Although your name is on the top left corner, correct?

10   A.  I don't know why.

11   Q.  Now, Personnel Concepts is the company that Remi orders its

12   workplace posters from?

13   A.  Yes.

14   Q.  Now I'm going to ask you to turn to the last page of this

15   exhibit.

16   A.  Yes.

17   Q.  And if you look towards the bottom, right above the

18   merchandise invoice total line, there are two lines, the first

19   one says "NY Space Saver-1 Spanish Laminated."

20           Do you see that?

21           THE COURT:  Where are we?

22           MR. DELANEY:  On the last page of Plaintiffs' Exhibit

23   331, your Honor.

24   A.  Yes, I see.

25           MR. PARKER:  Your Honor, I am going to object to

C49kcar3                          Delledonne - cross

1   questioning on this particular page.  Mr. Delaney has included

2   a page --

3            THE COURT:  Are you talking about the back page?

4            MR. PARKER:  The back page.

5            MR. DELANEY:  Yes, your Honor.

6            MR. PARKER:  The last two pages postdate any of the

7   alleged conduct in the case.  And for the same reasons we

8   discussed earlier, I submit that it's not relevant.

9            MR. DELANEY:  Your Honor, it's relevant solely for the

10  issue of notice to the defendants regarding when they ordered

11  the first Spanish language poster.  There's been testimony so

12  far to date that the posters were in Spanish, and I believe

13  this document is necessary to show that the first Spanish

14  poster was not ordered until after the relevant time period.

15           THE COURT:  Well, what evidence is there that these

16  are all the invoices that were issued by Personnel Concepts to

17  the Remi Restaurant?

18           MR. DELANEY:  Your Honor, I can ask that question, but

19  these documents were obtained as a result of a subpoena to

20  Personnel Concepts for all invoices to Remi Restaurant, and we

21  have also requested similar documents from Remi Restaurant.

22  They have not produced any additional invoices.

23           THE COURT:  I'm sorry?

24           MR. DELANEY:  We also made a similar subpoena request,

25  a document request --

C49kcar3                    Delledonne - cross

1      THE COURT:  I don't know where these came from or
2 anything.
3      MR. DELANEY:  Your Honor, these are from Personnel
4 Concepts.  They're from the company that Mr. Delledonne just
5 testified to provided the posters.
6      THE COURT:  Were they subpoenaed?
7      MR. DELANEY:  They were subpoenaed and they have been
8 stipulated as --
9      THE COURT:  Have you got a copy of the subpoena?
10      MR. DELANEY:  I don't know that I have one on me, but
11 I can certainly get them.  I can copy a copy of them.
12      THE COURT:  Maybe it will be stipulated, I don't know.
13      MR. DELANEY:  Your Honor, the defendants and
14 plaintiffs have stipulated that these are authentic business
15 records from Personnel Concepts, so there's no issue there.  I
16 understand Mr. Parker has an admissibility objection to this
17 last page --
18      THE COURT:  What?
19      MR. PARKER:  We have stipulated that they're business
20 records of Personnel Concepts.  We certainly have not
21 stipulated that these constitute any and all invoices that were
22 ever submitted by Personnel Concepts to Remi Restaurant.
23      MR. DELANEY:  And I didn't make that representation,
24 your Honor, that they are all.  I was describing the process
25 where we subpoenaed the records from Personnel Concepts, and we

C49kcar3                          Delledonne - cross

 1    subpoenaed similar records from Remi and the sum total is

 2    what's here.

 3              THE COURT:  You have a problem of foundation.

 4              MR. DELANEY:  But, your Honor, the foundation of these

 5    has been stipulated to, that they are businesses records from

 6    Personnel Concepts.  So I understand that Mr. Parker's reserved

 7    his rights to make a relevance objection, but foundation has

 8    been stipulated to between the parties.

 9              THE COURT:  But foundation of all the documents.  The

10    subpoena would require all bills.  And without it, I can't tell

11    whether this is the return on the subpoena.  Usually you get

12    the subpoena with the documents from the person subpoenaed.

13              MR. DELANEY:  OK, your Honor, we'll get a copy of

14    that.  May I proceed subject to that connection, that I can

15    provide a subpoena?

16              THE COURT:  Subject to connection, go ahead, yes.

17    BY MR. DELANEY:

18    Q.  So, Mr. Delledonne, I was asking about the word "Spanish"

19    here, the "New York Space Saver-1 Spanish Laminated."  Do you

20    see that?

21    A.  Yes.

22    Q.  And right below it, do you see a second line that says "FD

23    Space Saver-2 Spanish Laminated"?

24    A.  Yes, I do.

25    Q.  And is it your belief -- well, first let me ask you a

C49kcar3                    Delledonne - cross

1   question.  Is your name on the top left-hand corner of this

2   page?

3   A.  Yes, it is.

4   Q.  And the date, do you see as 7/01/09?

5   A.  Yes, it is.

6   Q.  Now, at this time, in July 1st, '09, were you responsible

7   for ordering these workplace posters?

8   A.  I was responsible.  Can I explain to you better what -- you

9   know --

10  Q.  Let me just -- were you responsible?

11  A.  Yes, I was.

12  Q.  Is it your belief that the two lines that I have

13  highlighted have the word "Spanish" in them, that those refer

14  to Spanish language posters you ordered?

15  A.  I ordered that.  But the one I ordered before, they were

16  coming in English and Spanish in the same poster.

17  Q.  Well, let me turn back two pages.  Actually, sorry, let me

18  turn back -- yes, let me turn back two pages.

19           Now, again, the date on this, if you look at the top

20  right, is November 20th, 2007.  Do you see that?

21  A.  Which document is that?  I'm sorry.

22  Q.  Can you turn back two pages.  The numbers on the bottom

23  right are two PCONCEPTS 228.  If you just go back --

24           THE COURT:  Where are you?  I don't know where you

25  are.

C49kcar3                          Delledonne - cross

1              MR. DELANEY:  Let me start again.

2    Q.  So we were on the last page, correct?

3              THE COURT:  Still there.

4    Q.  Now, if you turn back two pages from the last page, the

5    number on the bottom right corner should be 228.

6              THE COURT:  Yes.

7    Q.  My first question is:  Is this an invoice that you received

8    on November 20th, 2007?

9    A.  Yes.

10   Q.  And if you look at the listing of posters under the word

11   "Description" there --

12   A.  Yes.

13   Q.  -- there's no word Spanish, correct?

14   A.  No Spanish.

15   Q.  And if you go to -- it's a document that Mr. Parker showed

16   you as D26-B.  It's Defendants' Exhibits D26-B.

17   A.  Yes.

18   Q.  My only question again is:  This says "FD Sexual

19   Harassment."  Do you see that?

20   A.  Yes.

21             THE DEPUTY CLERK:  D26-D?

22             MR. DELANEY:  D26-B.

23   Q.  And, again, it doesn't say the word "Spanish," correct?

24   A.  It doesn't say "Spanish."

25   Q.  You can put those documents away, Mr. Delledonne.

1          MR. DELANEY:  Your Honor, I would move Plaintiffs'

2   Exhibit 331 into evidence subject to providing the subpoena.

3          THE COURT:  All right, subject to connection, 331 is

4   admitted.

5          (Plaintiff's Exhibit 331 received in evidence)

6   BY MR. DELANEY:

7   Q.  Now, Mr. Delledonne, in April 2005, you were not

8   responsible for ordering the workplace posters, correct?

9   A.  No.

10  Q.  Mr. Pena was responsible --

11  A.  Mr. Pena --

12  Q.  Just let me finish my question.

13         And he was responsible for ordering the posters until

14  approximately 2008?

15  A.  I don't recall exactly, but about 2007/2008.

16  Q.  When you took over full time in the restaurant in 2008, did

17  you become responsible for ordering the workplace posters?

18  A.  Since Mr. Pena left, yes.

19  Q.  Now, I'm going to focus on this time period from April 2005

20  until 2008, when you took over.

21  A.  Yes.

22  Q.  You were not responsible for putting up the posters either,

23  in the restaurant, correct?

24  A.  No.

25  Q.  And, in fact, before this lawsuit was filed, you had never

1    read these posters, had you?

2    A.  I didn't.

3    Q.  You didn't?

4    A.  I did not read the whole thing but the contents.

5    Q.  Well --

6           THE COURT:  But the contents what?

7           THE WITNESS:  The title, what they were talking about,

8    human rights, sexual harassment, employee discrimination,

9    pretty much, you know, what the poster they were about.

10   BY MR. DELANEY:

11   Q.  So you believe you understood the content of the posters,

12   correct?

13   A.  I did, yes.

14   Q.  But you never actually read the posters that were --

15   A.  I never read a hundred percent.

16   Q.  No, you never read them at all?

17   A.  No, I read the top, the basic -- I did not read it

18   carefully, the whole thing, if that's what you mean.

19   Q.  And you don't know whether Mr. Pistorio, your general

20   manager, ever informed the employees about the posters,

21   correct?

22   A.  I don't know that.

23          THE COURT:  Where did you read the posters,

24   Mr. Delledonne?

25          THE WITNESS:  The posters, they are posted next to the

1   entrance of the office, the office door, there is the clock

2   machine, the office door.  So when I walk in, I see it every

3   day on my left and on my right, so I...

4            THE COURT:  When you say the door, that's the door,

5   the entrance door for the employees?

6            THE WITNESS:  For the office, just the office.  The

7   employees, they go to clock in there every day and they have

8   the poster just in front of them.

9            THE COURT:  When you read them, did you notice whether

10  they were in English or in Spanish?

11           THE WITNESS:  These posters, they are different kind

12  of posters.  The main poster we have about the sexual

13  harassment is, there is line in English and a translation in

14  Spanish, English and Spanish.

15           THE COURT:  Was that true in 2005 and 2007?

16           THE WITNESS:  I don't recall 2005, but since when I

17  start to be there, yes.

18           THE COURT:  It was true when?

19           THE WITNESS:  I'm sorry?

20           THE COURT:  When did you see that?

21           THE WITNESS:  2007, 2008.  Because when we took the

22  restaurant over, they were already there, some posters they

23  were already there.  So that's why we didn't order day one; we

24  just refresh it time by time, because this company, they call

25  us with they have update and they say we got new law, do you

1   want to buy new poster and add it.  We always say yes.

2   BY MR. DELANEY:

3   Q.  And you also don't know if Carlo Maggi, the new general

4   manager, has ever spoken to the employees about the posters,

5   correct?

6   A.  I don't know.

7   Q.  And other than these posters, from 2005 to 2008, Remi did

8   not communicate any sexual harassment policy to its employees,

9   did it?

10  A.  I'm aware that general manager used to talk about them at

11  meetings.  Now, I don't know when and at what time, but he did.

12  Q.  You were not present at these meetings, were you?

13  A.  I'm not present at the meeting.

14          THE COURT:  When you say "that general manager," you

15  mean Mr. Pistorio?

16          THE WITNESS:  Mr. Pistorio, yes.  Mr. Maggi after him.

17  Q.  Now, you've described an open-door complaint process,

18  correct?

19  A.  Excuse me?  Sorry.

20  Q.  You've described an open-door complaint process?

21  A.  Yes.

22  Q.  And this is the process where employees can come to you

23  with complaints?

24  A.  To me or to general manager.

25  Q.  And when the general manager was Mr. Pistorio they could

C49kcar3                          Delledonne - cross

1   come to Mr. Pistorio, correct?

2   A.  Of course, yes.

3   Q.  Now, you personally never told the employees of Remi that

4   they could come to you with complaints about sexual harassment,

5   correct?

6   A.  No.

7   Q.  And, in fact, no employee has ever come to you to complain

8   about a problem with another employee, correct?

9   A.  No.

10  Q.  And no employee has ever come to you to complain about a

11  problem with a manager, correct?

12  A.  No.

13  Q.  Now, you've heard the testimony in this case about the

14  game, correct?

15  A.  Yes, I heard that, yes.

16  Q.  And you understand it involves touching of the penis?

17  A.  Yes, I do.

18  Q.  And touching of the buttocks?

19  A.  Yes, I do.

20  Q.  And you've heard testimony about how many people are

21  involved in this game?

22  A.  Yes, I do.

23  Q.  And you've also heard testimony that it still is going on

24  today, correct?

25  A.  I don't know about that.  I never saw them but...

C49kcar3                        Delledonne - cross

1   Q.  Have you heard that testimony?

2           MR. PARKER:  Objection.

3           THE WITNESS:  No.

4           THE COURT:  Objection sustained.

5   Q.  And this conduct that you've heard described, the touching,

6   that's not appropriate in a restaurant, is it?

7   A.  It's not appropriate anywhere in the restaurant also; yes.

8           THE COURT:  I would slow down because this witness'

9   native language is Italian.

10          MR. DELANEY:  I'll try to slow down, your Honor.

11  BY MR. DELANEY:

12  Q.  So, despite the fact that this conduct is not appropriate,

13  you've never received one complaint, you personally have never

14  received one complaint, about this touching in the restaurant,

15  have you?

16          MR. PARKER:  Objection.

17          THE COURT:  Objection overruled.

18          THE WITNESS:  No.

19  Q.  Other than the complaint that Mr. Caravantes made to

20  Mr. Pistorio, about Ben Ranieri, you're not aware of any

21  complaints made to Mr. Pistorio about this kind of touching,

22  are you?

23  A.  No.

24  Q.  Now I want to talk about Mr. Sergio Pastor's complaint that

25  was filed in August 2007.

C49kcar3                    Delledonne - cross

1   A.  Yes.

2   Q.  You received a copy of it at the time?

3   A.  Yes.

4   Q.  And you read it?

5   A.  Yes.

6   Q.  But at the time, you did not believe it concerned any

7   allegations of sexual harassment, did you?

8   A.  No.

9   Q.  And, in fact, you never talked to Mr. Velandia about the

10  allegations Mr. Pistorio made, did you?

11  A.  Not personally.

12  Q.  Now, you had Mr. Rosen, your attorney, do the

13  investigation, correct?

14  A.  Yes.

15  Q.  But at the time he did this investigation, you were not

16  aware of who he talked to, correct?

17          THE COURT:  I think you misspoke when you said

18  Mr. Pistorio made --

19          MR. DELANEY:  Sorry, I'll ask it --

20          THE COURT:  The transcript reads that, in fact, you

21  never talked to Mr. Velandia about the allegations Mr. Pistorio

22  made.

23          MR. DELANEY:  Sorry.

24  BY MR. DELANEY:

25  Q.  You never talked to Mr. Velandia about the allegations

C49kcar3                    Delledonne - cross

1    Mr. Pastor made in his complaint, did you?

2    A.  Not personally.

3    Q.  Now, you had Mr. Reid Rosen, your attorney, do the

4    investigation, correct?

5    A.  Yes.

6    Q.  The investigation into Mr. Pastor's complaint?

7    A.  Mr. Sergio Pastor's complaint, yes.

8    Q.  At the time of the investigation, you were not aware of who

9    Mr. Rosen spoke to, were you?

10   A.  No.

11   Q.  And you yourself did not conduct any other investigation,

12   other than what you asked Mr. Rosen to do?

13   A.  No.

14   Q.  Now I want to talk about the Division of Human Rights

15   complaint that Mr. Caravantes filed in March 2008.

16   A.  Yes.

17   Q.  Now, you were aware of that complaint when it was filed,

18   correct?

19   A.  Yes.

20   Q.  And, again, you had Mr. Rosen conduct an investigation into

21   that complaint?

22   A.  That's correct.

23   Q.  And you yourself did not do any other investigation?

24   A.  I did not.

25   Q.  And you didn't ask Mr. Pistorio to do any other

C49kcar3                           Delledonne - cross

1    investigation?

2    A.  Mr. Pistorio was involved with Mr. Rosen to do it.

3    Q.  But I'm asking, did you, Mr. Delledonne, direct him?

4    A.  No.

5    Q.  And actually my same question for Mr. Sergio Pastor's

6    complaint:  Did you direct Mr. Pistorio to do any other

7    investigation?

8    A.  No.

9    Q.  Now, again, at the time Mr. Rosen conducted this

10   investigation, you did not know who he spoke to, correct?

11   A.  Can you repeat, please?

12   Q.  At the time Mr. Rosen did his investigation into the

13   March 2008 complaint, you did not know who Mr. Rosen spoke to,

14   correct?

15   A.  No.

16   Q.  After this complaint was filed, in March 2008 -- I want you

17   to focus on the time period of March/April 2008.  At that time

18   period, were you aware that the game was going on in your

19   restaurant?

20   A.  No.

21   Q.  Did you become aware of that prior to the filing of this

22   lawsuit?

23   A.  No.

24   Q.  Now, at your deposition, you testified that you would fire

25   people if you found out they were showing pornographic videos

C49kcar3                      Delledonne - cross

1   at Remi Restaurant.  Do you recall giving that testimony?

2   A.  Yes.

3   Q.  Now, would you have also fired people if you found out they

4   were performing oral sex on other employees at the restaurant?

5   A.  It depend in which case.

6   Q.  Would you fire them if you found out they were performing

7   nonconsensual oral sex at the restaurant?

8   A.  It depend on which case.

9   Q.  And what about anal sex, would you have fired them if you

10  found out they were having anal sex in your restaurant?

11  A.  Same answer.

12  Q.  Now, you received a copy -- let me rephrase.

13          You're aware that Mr. Caravantes filed an amended

14  complaint with the Division of Human Rights in 2009, correct?

15  A.  Yes.

16  Q.  And you're aware that in that complaint he made allegations

17  against Mr. Velandia, correct?

18  A.  Yes.

19  Q.  And when you received that complaint, the 2009 complaint,

20  you did not speak to Mr. Velandia about those allegations, did

21  you?

22  A.  We had no idea what happened, so we had to investigate it

23  first.

24  Q.  My question is:  Did you personally speak to Mr. Velandia

25  after you received that complaint?

1   A.  We didn't know about it.  No, I didn't speak with him.

2   Q.  Did you read the complaint?

3   A.  I sure did.

4   Q.  So you're aware of the allegations that Mr. Caravantes

5   made?

6   A.  In June 2009, yes.

7   Q.  And at that time, you did not speak to Mr. Velandia about

8   those allegations?

9   A.  We had to verify the complaint was true.

10  Q.  Did you speak to Mr. Velandia --

11  A.  No.

12  Q.  Now, you did speak to Mr. Velandia after this lawsuit was

13  filed, correct?

14  A.  Yes.

15  Q.  But you did not speak to him about the allegations in the

16  complaint until six months after it was filed, correct?

17  A.  About.

18  Q.  When you spoke to Mr. Velandia, when you had this

19  conversation with Mr. Velandia, did he tell you that he had

20  performed oral sex on Mr. Caravantes?

21  A.  Yes, he did.

22  Q.  Did he tell you about the anal sex?

23  A.  Yes, he did.

24  Q.  Did he also tell you that he was involved in touching other

25  employees' genitals?

C49kcar3                    Delledonne - cross

1    A.  No, he did not.

2    Q.  And you did not discipline him after this conversation, did

3    you?

4    A.  No.  I gave him a second chance.

5    Q.  And he is still working at Remi, correct?

6    A.  Still working.

7    Q.  Now I wanted to talk briefly about the tax returns --

8    A.  Sure, sir.

9    Q.  -- that you spoke about earlier.

10            I believe you testified that Mr. Fritella and

11   Mr. Tancredi are no longer members of the 53rd Street Partners

12   LLC.

13   A.  They're not.

14   Q.  And they left in early 2011; is that correct?

15   A.  Yeah, January 2011.

16   Q.  Now, as I understand it, the LLC has shares, correct?

17   A.  That's correct.

18   Q.  And when it was formed in April 2005 -- when it was formed

19   in April 2005, you, Mr. Tancredi and Mr. Fritella all had

20   shares, correct?

21   A.  Yes.

22   Q.  You all had equal shares?

23   A.  Yes.

24   Q.  And there was a hundred shares, correct?

25   A.  Yes.

C49kcar3                    Delledonne - cross

1  Q.  So you all had 33-1/3 shares?

2  A.  That's correct.

3  Q.  Now, when Mr. Fritella and Mr. Tancredi left 53rd Street --

4  A.  Yes.

5  Q.  -- are you now the 100 percent owner of all the shares?

6  A.  So far, yes.

7  Q.  Did they receive anything in exchange for giving back their

8  shares?

9  A.  No.

10 Q.  Did they receive any distributions from the LLC when they

11 left the LLC?

12 A.  No distribution.

13 Q.  Did they receive any other form of compensation from the

14 LLC when they left the LLC?

15 A.  No, from the LLC -- from 53rd Street Partners, no.

16 Q.  Are you aware whether they received any compensation from

17 anyone in connection with their leaving 53rd Street Partners

18 LLC?

19 A.  They got my partnership in another company.

20 Q.  So in exchange for them giving back their shares, they were

21 now partners in another company?

22 A.  They took my part of the other company.

23 Q.  What company was that?

24 A.  Rugfritt LLC, which is Mr. Milano, it's a restaurant called

25 Bistro Milano.

C49kcar3                        Delledonne - cross

1   Q.  Other than taking over your part in Rugfritt, did they

2   receive any other compensation when they left?

3   A.  No compensation.

4   Q.  Now, you testified about the wage-and-hour lawsuit that was

5   filed against Remi?

6   A.  Yes, sir.

7   Q.  And it was filed by -- some of the plaintiffs in that

8   lawsuit were also plaintiffs in this lawsuit?

9   A.  Yes.

10  Q.  Now, you settled that case, did you not?

11  A.  Yes.

12  Q.  So you paid compensation to the plaintiffs as part of that

13  settlement?

14          MR. PARKER:  Objection.

15  A.  Yes, sir.

16  Q.  What year, what tax year --

17          THE COURT:  I'm sorry, there was an objection, and I

18  didn't rule on it.

19          MR. DELANEY:  Your Honor, I have limited questions

20  here, but I believe they did put it at issue, and I am trying

21  to find out when the distribution that was part of that

22  settlement, what tax year it appeared in.  That's the limit of

23  my questions.

24          MR. PARKER:  It's relevance, Judge.

25          MR. DELANEY:  Your Honor --

C49kcar3                          Delledonne - cross

 1              THE COURT:  It's relevant to the tax returns, I guess.

 2              MR. DELANEY:  I'm trying to determine from the tax

 3      returns what are part of the operating expense of the

 4      restaurant and what are extraordinary --

 5              THE COURT:  This was a suit against Remi for wage and

 6      hours?

 7              THE WITNESS:  Yes.

 8              THE COURT:  I'll allow the question as to what tax

 9      year it occurred in.

10              THE WITNESS:  I believe it was 2010.

11              THE COURT:  To what degree --

12              THE WITNESS:  Not sure about 2010.  2009.

13      BY MR. DELANEY:

14      Q.  It was either 2009 or 2010?

15      A.  Yeah.

16              THE COURT:  Not sure what -- that caused the loss in

17      2010?

18              THE WITNESS:  It's part of it.

19              THE COURT:  What?

20              THE WITNESS:  It's part of it.  2009, I think, more

21      than 2010.  Now I don't recall anymore.  The suit was filed in

22      2008 -- no, 2009, so it was 2010 probably.

23              MR. DELANEY:  I believe it was 2010, if that refreshes

24      your recollection.

25              THE WITNESS:  Yeah.

C49kcar3                    Delledonne - cross

1    BY MR. DELANEY:

2    Q.  The lawsuit was filed in 2009?

3    A.  Yeah, in 2010, I would say.

4           THE COURT:  This only caused part of the loss?

5           THE WITNESS:  Part of the loss.

6           THE COURT:  What part?  A substantial part?

7           THE WITNESS:  I would -- I don't recall now.  It was

8    recorded to the books, because I thought that the restaurant --

9    as far as cash flow, we were already in trouble, so there was

10   some contribution of the partners to pay the settlement.  We

11   had no money into the company to be able to pay the settlement,

12   so the partners put some money on it.

13   BY MR. DELANEY:

14   Q.  If you look at Plaintiffs' Exhibit 64 -- sorry, Defendants'

15   Exhibit 64 --

16          THE COURT:  This doesn't have any number on it.  You

17   have to have a number on it.

18          THE DEPUTY CLERK:  It has one.

19          THE COURT:  Oh, OK.

20          THE DEPUTY CLERK:  64?

21          MR. DELANEY:  Defendants' Exhibit 64.

22          THE WITNESS:  Yes.

23   BY MR. DELANEY:

24   Q.  And if you look on the first page of Defendants' Exhibit 64

25   line 22 --

1    A.  Yes.

2    Q.  -- and it says negative -- it's ordinary business income,

3    paren loss, correct?

4    A.  Yes.  Which number?  Sorry, which exhibit?

5    Q.  Defendants' 64.

6    A.  OK.

7    Q.  You see on line 22 there's a negative $258,692?

8    A.  Exactly.

9    Q.  But part of that loss was the settlement in the

10   wage-and-hour lawsuit?

11   A.  I'm not sure about that.  I didn't prepare that.

12   Q.  Who did prepare this?

13   A.  Frank Tancredi.

14   Q.  Now, you also testified about the Interaudi bank account,

15   correct?

16   A.  Yes, sir.

17   Q.  And is that the only bank account that Remi uses for its --

18   A.  We have two accounts, one for the payroll and one for the

19   operating.  The payroll, it just goes with the payroll; the

20   amount of the payroll, we put it there.  And employees, they

21   are able to cash the checks.  For the regular operation, yes,

22   it's the only one.

23   Q.  And what bank is the payroll --

24   A.  HSBC.

25   Q.  So other than the HSBC payroll account and the Interaudi

C49kcar3                        Delledonne - cross

1   account, there are no other bank accounts Remi uses?

2   A.  Yes, no other bank.

3   Q.  Now, you discussed that the Interaudi bank account was an

4   overdraft, correct?

5   A.  Yes.

6   Q.  And it was overdraft currently in 2012?

7   A.  Yes.

8   Q.  It was in overdraft in 2011?

9   A.  Yes.

10  Q.  Now, prior to the Lehman crash in 2008, was it in

11  overdraft?

12  A.  I don't recall now, going back to 2008, but at one point

13  there was no overdraft.  That came later with the operation

14  start shaking a little bit.

15  Q.  Do you recall if it was in overdraft in 2007?

16  A.  I don't recall that.

17  Q.  Now, you also testified about a $300,000 cash advance that

18  you got from the American Express company?

19  A.  Yes, sir.

20  Q.  Was that the first cash advance Remi has received from

21  American Express?

22  A.  Yes, sir.

23  Q.  Now, you worked as a controller for Bice Corporation,

24  correct?

25  A.  Yes.

C49kcar3                          Delledonne - cross

1   Q.  And you supervised many restaurants in that role?

2   A.  I used to do, until 2008, yes.

3   Q.  And in those other restaurants you supervised, are you

4   aware of any of them taking cash advances from --

5   A.  When I was there, no, I'm not aware of anything.

6           MR. DELANEY:  Can I get --

7           THE COURT:  I thought all restaurants got cash

8   advances.

9           THE WITNESS:  No, it's -- cash advance, there are

10  problems with different companies; and different companies,

11  most of it, they're loan with a very high interest rate because

12  they -- you know, they take money from the receipt day by day.

13  With American Express, it's different because they do it to

14  help the business, so the rate is just 6 percent.  Other

15  company, you go to 15 to 20 percent.  It's very expensive,

16  very, very expensive, and if you start to borrow money here or

17  there, you just don't go anywhere.

18          THE COURT:  I thought they all rented all the

19  equipment, I thought restaurants generally rented their

20  equipment from a rental place or borrowed money --

21          THE WITNESS:  You can lease it, you can do a leasing

22  program.

23          THE COURT:  Leasing?

24          THE WITNESS:  Yeah, at the time you open the

25  restaurant you can lease and pay little by little, but most of

1    the restaurant, they do that; you're right, your Honor, yes.

2    They do that but --

3              THE COURT:  But you don't?

4              THE WITNESS:  No, because when we took Remi over, the

5    restaurant was ready to operate.  We just went in in the

6    morning and we just opened for lunch, it was great.  We knew

7    very well the former owner, and we had a good opportunity

8    there.

9    BY MR. DELANEY:

10   Q.  I'm going to hand you a document that's been marked

11   Plaintiffs' Exhibit 337.

12   A.  Thank you.

13   Q.  My only question, Mr. Delledonne, is:  Do you recognize

14   this as the declaration of Frank Tancredi that he made in

15   connection with this lawsuit regarding Remi's financials?

16   A.  Yes.

17             MR. DELANEY:  Your Honor, I move Plaintiffs' Exhibit

18   337 into evidence.

19             MR. PARKER:  No objection.

20             THE COURT:  337 is admitted in evidence.

21             (Plaintiff's Exhibit 337 received in evidence)

22   BY MR. DELANEY:

23   Q.  Now, Mr. Delledonne, you testified that when 53rd Street

24   Partners took over Remi Restaurant in April 2005, you didn't

25   lay off any staff, correct?

C49kcar3                    Delledonne - cross

1   A.  We did not?

2   Q.  You did not lay off any staff?

3   A.  No.

4   Q.  So the restaurant, in terms of the number of employees

5   there, remained approximately the same size, correct?

6   A.  I don't know about that, but -- I don't have the exact

7   number employee that we had before.  But we kept -- beside a

8   couple of employee, we kept all of them, because the employee

9   left us because they want to go to other jobs, so we really

10  didn't get rid of anybody.

11  Q.  Now, one of the business decisions that you made in

12  April 2005 was you extended the hours of Remi, correct?

13  A.  Yes.

14  Q.  Now, under the old management, Mr. Lockard was an assistant

15  manager, correct?

16  A.  Yes.

17  Q.  Was there also another assistant manager?

18  A.  I don't know that.

19  Q.  So you kept the same number of employees, and you extended

20  the hours, but after Mr. Lockard left, you did not replace him

21  as assistant manager, correct?

22  A.  We did not replace who?  Oh, no, the -- no, we did not.

23  Q.  So you never hired another assistant manager?

24  A.  We never did.

25          MR. DELANEY:  I have no further questions.

C49kcar3                          Delledonne - cross

1              THE COURT:  All right.

2              Redirect?

3    REDIRECT EXAMINATION

4    BY MR. PARKER:

5    Q.  Mr. Delledonne, if you could turn to Exhibit D64, please.

6    A.  Defendant?

7    Q.  Defendants'.

8              THE DEPUTY CLERK:  64?

9              MR. PARKER:  64, yes.

10             THE WITNESS:  Yes.

11   Q.  If you can turn, go past the tax form itself, you'll

12   come -- I don't have the pages numbered, but you'll come to the

13   first Schedule K-1, 2010.  Do you see the reference in the top

14   left corner of the page?

15   A.  Yes.

16             THE COURT:  Page 4?  This is the different page.  Page

17   4?

18             MR. PARKER:  No, Judge.

19             THE COURT:  Schedule K, but --

20             MR. PARKER:  It's the 11th page of the document, your

21   Honor.

22             THE COURT:  Thank you.  K-1, 2010 Partner Share of

23   Income Deductions?

24             MR. PARKER:  That's it.  Thank you.

25   Q.  Mr. Delledonne, do you recognize this form?

C49kcar3                    Delledonne - redirect

1    A.  Yes.

2    Q.  On this, the first Schedule K-1 you're looking at, do you

3    see the partner's name, it has Frank Tancredi's name there?

4    A.  That's correct.

5    Q.  If you look down on the page, down the column, at section

6    L, towards the bottom of the page, it has the partner's capital

7    account analysis, and it says, "Beginning Capital Account:

8    Minus 298,162"; on the next line it says, "Capital Contributed

9    During The Year:  $50,000"?

10   A.  Yes.

11   Q.  Do you know what that refers to?

12   A.  Yes.  It's capital contribution that Mr. Tancredi did for

13   the corporation, 53rd Street Partners.

14   Q.  That was a capital contribution made during the year 2010?

15   A.  That's correct.

16   Q.  Did the other partners, including yourself, make the same

17   capital contribution?

18   A.  Yes, we did the same.

19          MR. PARKER:  I have no other questions.

20          MR. DELANEY:  Your Honor, I just have the subpoena for

21   Personnel Concepts.

22          THE COURT:  All right.

23          MR. DELANEY:  Your Honor, I've handed up a document

24   marked Plaintiffs' Exhibit 339, which is a subpoena under Rule

25   45 of the Federal Rules of Civil Procedure, to Personnel

C49kcar3                        Delledonne – redirect

1   Concepts, dated December 29th, 2010.  The first page of 339 is

2   a notice pursuant to Rule 45.  The subpoena starts on page 2 of

3   Plaintiffs' 339, and the requests are defined on Exhibit A,

4   page 1, under the heading "Documents Requested."

5           THE COURT:  All right.

6           MR. DELANEY:  So I move Plaintiffs' 339 into evidence

7   in connection with Plaintiffs' 331.

8           THE COURT:  All right.  Any objection?

9           MR. PARKER:  No, I have no objection to the subpoena

10  being admitted in evidence.  I just object to the use of

11  invoices that postdate the events that are involved in the

12  case.

13          MR. DELANEY:  Your Honor, again, it was for the sole

14  purpose for showing the Spanish posters did not appear until

15  after the relevant time period, so for that limited purpose,

16  that's why we're submitting the last page of 331.

17          (Continued on next page)

18

19

20

21

22

23

24

25

C49Wcar4

1          THE COURT:  I'm going to allow the return.  What

2     weight I give to it is another matter.  But I'll allow Exhibit

3     339 in evidence.  It contains, as I see it, responsive

4     Personnel Concepts documents attached to it.

5          MR. DELANEY:  No, your Honor.  Exhibit B are documents

6     regarding Personnel Concepts that were produced from Remi's

7     files.

8          THE COURT:  Oh, these are from Remi's files?

9          MR. DELANEY:  Yes.  We provided Exhibit B to Personnel

10    Concepts so it would be clearer what kind of documents we were

11    requesting.  Plaintiffs' 331 --

12         THE COURT:  They were produced from defendants' file?

13         MR. DELANEY:  Correct.  The documents that were

14    produced from Personnel Concepts' files were Bates numbered on

15    the bottom, P. Concepts, and those are the documents contained

16    in Exhibit 331, in part.  That's not the entirety of the

17    production.  It was a 450-page production, but that was what we

18    believed to be the relevant part of P. Concepts' production in

19    response to the subpoena in Plaintiffs' 339.

20         THE COURT:  Thank you for straightening that out.

21         MR. DELANEY:  We have no further questions, your

22    Honor.

23         THE COURT:  All right.  You're excused.

24         THE WITNESS:  Thank you very much.

25         (Witness excused)

C49Wcar4

1           THE COURT:  Next witness.

2           MR. PARKER:  Your Honor, our next witness is

3    Dr. Goldstein.  He's probably out in the hallway.  I'll go

4    fetch him.

5           THE COURT:  It might be a good time for me to tell you

6    that I want to recall Mr. Maggi for a short questioning, just a

7    few questions at some point.  You have today and tomorrow.  It

8    won't take long.

9           MS. KACANI:  I'll tell Mr. Parker, your Honor.

10   ROBERT L. GOLDSTEIN,

11       called as a witness by the Defendants,

12       having been duly sworn, testified as follows:

13          THE COURT:  Please proceed.

14   DIRECT EXAMINATION

15   BY MR. PARKER:

16   Q.  Good afternoon, Dr. Goldstein.

17   A.  Good afternoon.

18   Q.  What is your profession?

19   A.  I'm a medical doctor specializing in the field of

20   psychiatry.

21   Q.  How long have you been in psychiatry?

22   A.  I've been a psychiatrist since around 1970.

23   Q.  Where do you practice?

24   A.  I practice in Manhattan.

25   Q.  Would you give us the benefit of your educational

1    background?

2    A.   Yes.  I graduated from Chicago Medical School in 1965, with

3    an M.D. degree.  I did a medical internship at New York

4    Downtown Hospital, just a few blocks from here.  I did two

5    years of psychiatric residency at Downstate Medical Center, in

6    Brooklyn.  The last, third year of psychiatric residency at

7    Bellevue, NYU-Bellevue Medical Center.  I took a fellowship in

8    child and adolescent psychiatry also at NYU-Bellevue, also

9    another postgraduate fellowship in psychoanalytic psychotherapy

10   in Hillside Hospital in Queens.

11        That comprised my education.  Do you want the work

12   background too, or --

13   Q.   Yes.  Do you hold any board certifications?

14   A.   Yes, I do.

15   Q.   What are you certified in?

16   A.   Certified by the American Academy of, American Board of

17   Psychiatry/Neurology, in psychiatry.

18   Q.   Let's talk about your background and experience in the

19   practice of psychiatry.  Would you tell us what that has been,

20   please?

21   A.   I've been in continuous private practice of psychiatry

22   since approximately 1971.  I was medical director of the

23   forensic psychiatry clinic, the Supreme Court of the State of

24   New York in Manhattan from approximately '70 to '74.  I was the

25   deputy director of the Bellevue Forensic Psychiatry Service

1   from '74 to '75.  From about the end of '75 until '81, I was

2   the director of outpatient psychiatry at the New York V.A.

3   Medical Center in Manhattan.  From approximately '87 through

4   '91, I was the director of psychiatric education and research

5   at Long Island College Hospital.  And I've had, held various

6   academic positions, first at the NYU Medical Center, from about

7   '70 through '84 as an assistant professor of psychiatry, and

8   since '84 to date, I'm on the faculty of Columbia College of

9   Physicians and Surgeons, where I'm a clinical professor of

10  psychiatry.

11  Q.  Where are you licensed to practice?

12  A.  I'm licensed to practice in New York.

13  Q.  As of today, what does your practice consist of?

14  A.  As of today, I'm in full time private practice of

15  psychiatry.  I treat and evaluate patients in my private office

16  in Manhattan.  I also teach and do research at Columbia in my

17  capacity as a clinical professor there.

18  Q.  What has been your experience in the forensic side of

19  psychiatry?

20  A.  Well, as I noted earlier, I was medical director of the

21  forensic psychiatry clinic at the state Supreme Court here in

22  Manhattan for four years.  I was the deputy director of the

23  Bellevue Forensic Psychiatry Service for one year, and from

24  time to time, I'm called on as a consultant of psychiatric

25  expert by various governmental agencies and private law firms

C49Wcar4                      Goldstein - direct

1   to participate in the legal process.

2   Q.  What types of matters have you been called upon to act as a

3   psychiatric expert in legal matters?

4   A.  Well, on the criminal side, I've been involved in various

5   psychiatric defenses, not-responsible defenses, extreme

6   emotional disturbance defenses, issues of competency to stand

7   trial.

8         On the civil side, I've been involved in cases

9   involving various forms of litigation, matrimonial and custody

10  cases, malpractice cases, personal injury cases, employment

11  discrimination cases and so forth.

12  Q.  Have you published any scholarly articles?

13  A.  Yes, I have.

14  Q.  Can you tell us how many?

15  A.  Roughly about 85 publications in the professional

16  literature.

17  Q.  Dr. Goldstein, have you ever had any experience in

18  examining or treating patients with posttraumatic stress

19  disorder?

20  A.  Yes, I have.

21  Q.  Could you tell us what your experience has been in that

22  regard?

23  A.  Well, in my five or six years at the V.A., I had occasion

24  to evaluate, treat, and supervise the treatment of probably

25  well over a thousand patients who were suffering from

C49Wcar4                     Goldstein – direct

1    posttraumatic stress disorder.  In my private practice over the

2    years, I've evaluated and treated a fair number of patients

3    suffering from that disorder.  I've written some articles on

4    stress-related psychiatric conditions and given a number of

5    presentations on that subject.

6    Q.  Have you been retained by the defendants in this matter to

7    serve as a psychiatric expert?

8    A.  Yes, I have.

9    Q.  What were you asked to do in this case?

10   A.  Basically, I was asked to review relevant records and other

11   materials and to evaluate, perform psychiatric examination of

12   Mr. Caravantes, ascertain whether he suffers from a psychiatric

13   condition, if any, put into context whether that psychiatric

14   condition is in any way related to the allegations in this

15   lawsuit of sexual harassment.

16          MR. PARKER:  Your Honor, I tender Dr. Goldstein as an

17   expert in the field of psychiatry, qualified by reason of his

18   education and experience and training to provide an expert

19   opinion in this case.

20          MR. SAXENA:  Plaintiffs have no objection.

21          THE COURT:  There being no objection, Dr. Goldstein is

22   qualified to tender an expert opinion on whether the plaintiff

23   suffers from a psychiatric condition in this case.

24   BY MR. PARKER:

25   Q.  Dr. Goldstein, you said that you were asked to evaluate

1   Mr. Caravantes and to provide opinions with respect to his

2   condition and issues relating to the causation thereof.  Have

3   you done that?

4   A.  Yes, I have.

5   Q.  Did you have occasion to meet Mr. Caravantes?

6   A.  Yes, I did.

7   Q.  When did you meet him and how many times?

8   A.  I conducted a psychiatric examination of Mr. Caravantes

9   over the course of two sessions, June 17 of 2011, and June 20

10  of 2011, for a total of about four and a half hours.

11  Q.  There is in front of you, one of those binders is called

12  Defendants' Exhibits.  I'm just going to ask if you can turn to

13  tab 49 in that binder.  Dr. Goldstein, what is contained in

14  Exhibit D49?

15  A.  That contains the psychiatric report I prepared in this

16  case, dated July 14 of 2011, as well as appendices to the

17  report, and my curriculum vitae.

18  Q.  We'll come back to your examination of Mr. Caravantes, but

19  in addition to your examination of Mr. Caravantes, what else,

20  if anything, did you review in connection with your involvement

21  in this case?

22  A.  In addition to my examination, I reviewed the -- well, let

23  me just refer to the appendix, if I may.  In appendix one to my

24  report sets forth what I reviewed in this matter, in addition

25  to my exam, which included the complaint.

1           MR. SAXENA:  Your Honor, I'm just going to object.

2      Dr. Pearson wasn't permitted to refer to her report while

3      describing the nature of her analysis.  I'm not sure why

4      Dr. Goldstein should be permitted to refer to the report.

5           THE COURT:  I thought I didn't admit the report.

6           MR. SAXENA:  You did not admit the report, correct,

7      but Dr. Pearson was also not permitted to refer to the report

8      while she was describing the components of her analysis.

9           MR. PARKER:  Your Honor, Mr. Saxena --

10          THE COURT:  Is he opening it up?  I can't see what

11     he's doing.

12          MR. PARKER:  He's simply referring the Court to the

13     appendix of the matters that he reviewed.

14          THE COURT:  Oh, all right.  Let's just have him

15     testify without using the report.

16          MR. PARKER:  All right.

17     A.   Okay.  What I reviewed are the psychiatric and mental

18     health and medical records of Mr. Caravantes from various

19     sources, Safe Horizon, a Dr. Cervantes from his primary care

20     physician, from his ophthalmologist, and also from the Karen

21     Horney Clinic, where he was and has been a patient, also

22     records from a recent hospitalization at Payne Whitney, where

23     he was a patient in March for a few days, and also a report by

24     a doctor, a psychologist, Dr. Owen, which was performed in

25     March of this year, the report of Dr. Pearson, which was

1    referred to, the report of her psychological evaluation, the

2    report of Dr. Sanford Drob, who performed a critique of

3    Dr. Pearson's report and conclusions, two complaints that were

4    submitted by Mr. Caravantes to the New York State Division of

5    Human Rights, one in 2008, one in 2009.  I think I mentioned

6    the complaint in this lawsuit, some affidavits in support of

7    the defendants' response to some motions in this lawsuit.

8         And, basically, I think that's everything that I reviewed

9    prior to preparing my report and some of them following my

10   report.  I also listened to some audio clips of the

11   conversations between Mr. Caravantes and other individuals.

12              THE COURT:  You didn't review the testimony in this

13   case?

14              THE WITNESS:  No, sir.

15              THE COURT:  Or the depositions?

16              THE WITNESS:  I did review three depositions.  I'm

17   sorry.  Yes.

18              THE COURT:  What depositions did you review?

19              THE WITNESS:  I reviewed the deposition of

20   Mr. Caravantes.  I reviewed the deposition of Oscar Velandia,

21   one of the defendants, and I reviewed the deposition of Jose

22   Ortiz.

23              THE COURT:  That was before you interviewed

24   Mr. Caravantes?

25              THE WITNESS:  Yes, sir.

C49Wcar4                           Goldstein – direct

1           THE COURT:  All right.

2   BY MR. PARKER:

3   Q.  Now, when you saw Mr. Caravantes, what did your time with

4   him consist of?

5   A.  I conducted a standard routine psychiatric examination

6   which comprised a complete psychiatric history, and a so-called

7   mental status evaluation.  Psychiatric history was essentially,

8   consists of gathering data about his past history, including

9   his family history and background, educational, work history,

10  marital and sexual history, social history, past medical, past

11  psychiatric history, substance abuse, if any, and so forth, to

12  get a chronological set of data going back from essentially

13  back to birth to the time I saw him.  And then the mental

14  status evaluation, which is an assessment of his thought

15  processes, his mood, his general appearance and demeanor, the

16  presence of any significant psychopathology, and his cognitive

17  processes and so forth.

18      That comprised the psychiatric examination with one further

19  caveat, and that is that I did spend time addressing the

20  allegations he made in this lawsuit and his information he

21  provided about how he felt that impacted on his functioning and

22  on his mental state.

23          THE COURT:  Are you about to move on to something

24  else?

25          MR. PARKER:  Yes.

1233

C49Wcar4                        Goldstein – direct

1           THE COURT:  Seems to be 1:00, so let's break for lunch

2     and come back at two.

3                (Luncheon recess)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C49Wcar4                          Goldstein - direct

1                           AFTERNOON SESSION

2                               2:00 p.m.

3              (In open court)

4              THE COURT:  Be seated.

5    BY MR. PARKER:

6    Q.  Dr. Goldstein, before the break, you testified that you

7    conducted on Mr. Caravantes a comprehensive psychiatric

8    examination and, as part of that, you took an in-depth

9    psychiatric history.  What does taking an in-depth psychiatric

10   history mean?

11   A.  It means that you're gathering data which will, in

12   combination with other material, enable you to make a reliable

13   and valid psychiatric diagnosis.

14   Q.  What type of background information did you obtain from

15   Mr. Caravantes?

16   A.  In terms of his past history?

17   Q.  Yes.

18   A.  I learned that he was born in Mexico, into an intact

19   family, that his father died when he was a child, and his

20   mother subsequently remarried.  He was one of 12 siblings.  He

21   said that he had an average, normal childhood, that he was

22   never physically or sexually abused as a child, that his

23   mother, as I said, remarried and he got along quite well with

24   his stepfather.  The family ran or operated a tacos business in

25   which he worked until the time he came to the States, sometime

C49Wcar4                     Goldstein - direct

1    in the early -- about 1990 or so.  After he came to the States,

2    he worked as a -- by the way, he completed tenth grade in

3    Mexico.

4            When he came to the States, he worked initially as a

5    dishwasher, a busboy, and came to commence employment at

6    Remi's, back in July of '91.  He worked at Remi's in various

7    capacities, initially as a busboy, a delivery boy, a runner,

8    eventually becoming a coffee machine operator, which is the

9    position he held most of the time until he left Remi's in

10   August of 2008.

11           He married in 1993.  He has two daughters -- I'm

12   sorry, three daughters.  He indicated he had a normal, average

13   social life prior to the events in question in this lawsuit,

14   that he socialized with friends and family.  The significant

15   points that were elicited during my psychiatric history were

16   that Mr. Caravantes alleges that starting in 2005, he was

17   sexually harassed by Mr. Velandia at work.  This involved

18   sexual acts, sexual touching, suggestive sexual remarks, that

19   began approximately in 2005 and escalated the following year,

20   2006, and persisted until the beginning of 2008, approximately,

21   and that these sexual acts consisted of having oral sex and at

22   times anal sex with Mr. Velandia under circumstances that

23   Mr. Caravantes alleged involved some degree of psychological

24   coercion on the part of Mr. Velandia, the situation being, in

25   simple terms, as follows:  That Mr. Caravantes believed his job

C49Wcar4                         Goldstein - direct

1    may have been in jeopardy, that Mr. Velandia wielded a good

2    degree of power and influence at the restaurant because he was

3    the so-called right hand of the general manager, a

4    Mr. Pistorio, and Mr. Caravantes believed that if he failed to

5    submit or go along with the demand for sexual favors that his

6    job might be in jeopardy, he might even be fired, and,

7    secondarily, that there was some desire on his part to be

8    promoted to the position of a waiter, and he alleged that

9    Mr. Velandia promised him that he would assist him or exert his

10   influence to get this promotion to the position of waiter for

11   Mr. Caravantes.  So under this alleged situation,

12   Mr. Caravantes said that he engaged in sexual acts with

13   Mr. Velandia, over the course of the next two, two and a half

14   years, as I said, consisting of oral sex and anal sex,

15   according to Mr. Caravantes, on numerous occasions, oral sex

16   being almost daily, he alleged, and anal sex, anal intercourse

17   being somewhat less frequent.

18        He further alleged that he being neither homosexual

19   nor bisexual found these sexual acts to be repugnant and

20   distasteful and traumatic, but he felt he had no choice because

21   he feared losing his job at the restaurant and, furthermore,

22   wanted to get a promotion, which he felt this would be useful

23   in that regard, and that this continued up until sometime in

24   early 2008, when it became clear to him that he wasn't going to

25   get a promotion, that he was never going to become a waiter,

C49Wcar4                    Goldstein - direct

1   and so approximately in February of 2008, he says that he told

2   Mr. Velandia that there was going to be no more sexual

3   interaction between them.

4           Over the next few months, there was some indications

5   that, or he says that he was being retaliated against by

6   Mr. Pistorio and eventually he was fired, he says, in August of

7   2008.

8           During this period, he alleged that he suffered a

9   great deal of psychological stress and developed psychiatric

10  symptoms because of the stress he was under in regard to the

11  sexual conduct that he felt he engaged in under duress.  He

12  didn't seek any mental health treatment during that period,

13  however, until months after the alleged sexual interaction had

14  stopped.  He says he had no prior psychiatric history, prior to

15  the events in question, but developed psychiatric symptoms

16  during the course of these sexual encounters and that he sought

17  psychiatric or mental health treatment anyway sometime in the

18  middle of 2008, some counseling at Safe Horizons, saw a

19  psychiatrist once in 2009 for a consultation, and a few months

20  after that began treatment at the Karen Horney Clinic, which is

21  a private psychiatric clinic in Manhattan, where he has been

22  under care for psychotherapy, receiving psychotherapy and

23  psychotropic medications, including an antidepressant and a

24  sleeping medication, ever since.

25          He has a number of medical conditions, which he

C49Wcar4                         Goldstein - direct

1    attributes to the stress accompanying the alleged sexual

2    harassment at work, which he claims -- including intermittent

3    chest pains, back pains, headaches, some eye problems, which he

4    says are stress related.  He doesn't drink.  He doesn't abuse

5    drugs.  He apparently has no prior history or involvement with

6    the legal system.  He says that since the incidents that he

7    described took place, the aftermath was that he made complaints

8    to the New York State Division of Human Rights on two separate

9    occasions, approximately a year apart and, in September of

10   2009, commenced this lawsuit for sexual harassment and

11   employment discrimination.

12       He says that the situation as it evolved not only resulted

13   in psychiatric difficulties requiring treatment, but that it

14   caused difficulties in his marriage, when his wife learned

15   about the sexual activity, the aforementioned homosexual

16   activity with Mr. Velandia, which he says caused marital

17   conflicts.  His wife was depressed and angry, threatened or

18   talked about leaving him, and he feared that she might leave

19   and might never forgive him, and that he became increasingly

20   depressed as a result of that and other factors.  And as I

21   said, sought treatment.

22           That was what I learned during the course of my

23   eliciting the psychiatric history.

24   Q.  Now, you also administered a mental status examination of

25   Mr. Caravantes?

C49Wcar4                          Goldstein - direct

1   A.   Correct, yes.

2   Q.   Could you describe how you went about administering a

3   mental status examination?

4   A.   The mental status examination is basically carried out

5   through closely observing the individual during the, you know,

6   entire psychiatric exam and observing his demeanor, his

7   posture, his general appearance, the quality and nature of his

8   thought processes, his mood and affect, and asking specific

9   questions at times about particular psychiatric symptoms that

10  are significant, such as depression, anxiety, insomnia,

11  nightmares, flashbacks, hallucinations, delusions, assessing

12  his concentration level, his attention level, his memory, his

13  insight and judgment, feelings about himself in terms of

14  self-esteem, self-image, feelings of guilt or worthlessness,

15  and so forth.

16       So those are the two components of the psychiatric

17  examination, the psychiatric history and the mental status

18  evaluation, and with the help of collateral information or

19  objective data that may also be available, the goal of all of

20  this process is to reach a psychiatric diagnosis.

21  Q.   Based upon your review of the materials and your

22  examinations of Mr. Caravantes, do you have an opinion that you

23  hold with a reasonable degree of medical certainty in the field

24  of psychiatry with respect to Mr. Caravantes's condition?

25  A.   Yes, I do.

C49Wcar4                          Goldstein - direct

1    Q.  What is that opinion?

2    A.  My opinion, in terms of the psychiatric issues per se, is

3    that he's suffering from a clinical depression, specifically

4    major depressive disorder, single episode, and of a moderate,

5    mild to moderate degree.  The entity of malingering has to be

6    ruled out in this particular case, and that the prognosis would

7    be guarded or uncertain based on the course of his condition.

8    Q.  Now you testified that in your opinion, he, Caravantes,

9    suffers from a mild to moderate major depressive disorder.  Can

10   you explain what you mean by mild to moderate?

11   A.  Well, a major depressive disorder is a serious form of

12   depression, where it's persistent symptoms of depression and

13   social withdrawal, insomnia, lowered energy level, impaired

14   concentration, perhaps suicidal thoughts, sleep disturbance,

15   appetite disturbances, etc., and it can be further

16   characterized in terms of mild, moderate, and severe.  I

17   classified it as mild to moderate because Mr. Caravantes,

18   although he had most of the symptoms associated with that

19   condition, was able to function at an acceptable level of

20   functioning in terms of his occupational functioning throughout

21   the worst, allegedly worst, parts of the depression and had a

22   fairly good response to psychiatric intervention and treatment.

23   So that I felt that the symptoms or the diagnosis was in the

24   mild to moderate range rather than the severe range.

25   Q.  Did Mr. Caravantes describe as part of your psychiatric

C49Wcar4                    Goldstein - direct

1  history the activities he had engaged in professionally,

2  workwise, since leaving Remi?

3  A.  Yes, he did.

4  Q.  And what did he tell you about that?

5  A.  He told me that after leaving Remi, there was a period of

6  inactivity.  He felt that -- he was collecting unemployment for

7  a period of time, was thinking about getting other jobs, was

8  looking for jobs, but nothing came through, and at some point

9  during that period he decided he was going to go back to school

10 and learn a new trade.  And so he enrolled in a place called

11 the Apex School of Technology, I believe it's called, in

12 Manhattan, where he took a course of approximately one year in

13 automotive technology, which required attendance approximately

14 30, 35 hours a week for approximately a year.  He completed

15 that course successfully; in other words, was able to maintain

16 the course of study and complete it successfully, get a

17 certificate, even went back for a refresher course at some

18 point thereafter, was able thereafter to look for work, was

19 unsuccessful in getting a job in automotive, as a mechanic or

20 in automotive technology, worked at a couple of jobs as a

21 busboy, and eventually did get a job as a busboy where I think

22 he's currently working today.

23 Q.  What, if any, impact on your opinion of his psychiatric

24 condition did the attendance at and completion of the

25 automotive technology curriculum at Apex Business School play?

C49Wcar4                          Goldstein - direct

A.  Well, individuals who are suffering from major depression
can function, but generally as they get towards the severe end
of the spectrum, their functioning becomes markedly compromised
in most areas, socially, occupationally, and other important
areas, so, an individual that is able to, you know, sustain
enrollment and completion of what sounded like a pretty
rigorous and demanding course of study over a year would
probably most likely be more towards the mild to moderate end
of the spectrum rather than the severe end of the spectrum.
That kind of functioning capacity would not be compatible with
a severe form of major depression.

        Another index of considering whether it was mild,
moderate, or severe was his response to treatment, which, at
the Karen Horney Clinic, which was the most sustained period of
treatment he received, was characterized as that he was
improving and responding progressively well to the treatment
measures during the time I reviewed the records for.  And one
other incidental perspective on that is that entertaining the
suspicion of malingering, which often includes an exaggeration
of symptoms or a deliberate examination of impairment, has to
be taken into account, and that also would discount labeling
him as severely impaired considering his level of functioning
which contradicted that.

        MR. SAXENA:  Objection and move to strike the
testimony as to a suspicion of malingering to the extent that

C49Wcar4                    Goldstein - direct

 1  there is no foundation laid at all as to whether anybody has

 2  determined that Mr. Caravantes is malingering.

 3          THE COURT:  I would like to read how the doctor

 4  phrased that.

 5          THE WITNESS:  I'm sorry, sir?

 6          THE COURT:  I just want to read your testimony for a

 7  second.

 8          THE WITNESS:  Oh.

 9          THE COURT:  I think I'll sustain the objection.

10  BY MR. PARKER:

11  Q.  Dr. Goldstein, in reviewing Mr. Caravantes's psychiatric

12  condition, what, if any, stressors did you identify with

13  respect to his condition?

14  A.  Well, there are numerous stressors that are impacting on

15  him or have impacted on him, which would include, first of all,

16  the possible influence of the allegations he's made in this

17  lawsuit about being the target of sexual harassment.  I

18  certainly can't, it's not my province to reach a conclusion

19  about whether that did or did not happen as he alleges, but

20  that's one possible or potential source of stress, if it did

21  occur as he alleges.

22          Secondly, there would be the intense feelings of shame

23  and guilt and emotional distress about engaging in homosexual

24  activities for a number of years on hundreds of occasions,

25  considering his insistence that he is neither homosexual nor

C49Wcar4                    Goldstein – direct

1   bisexual, for whatever reason he engaged in those activities,

2   whether voluntarily, consensually, or under some duress, there

3   would still be a great deal of shame and guilt and distress

4   about it for those reasons.  The shame and guilt and distress

5   about it in terms of his own feelings about his own sexual

6   identity, whether or not having done so, having engaged in this

7   pattern of activity, his own doubts about whether he wasn't

8   indeed perhaps a latent homosexual himself.

9           MR. SAXENA:  Objection.  I'm sorry.  There is no

10  foundation laid as to any sort of sexual identity doubts.

11  Nothing has been testified to that's come out in

12  Dr. Goldstein's assessment of Mr. Caravantes that establishes

13  any doubts as to his sexual identity.  So I object on that

14  ground.

15          MR. PARKER:  Your Honor, the question asked the doctor

16  to identify those stressors and he --

17          THE COURT:  But he hasn't testified, as I understand

18  it, that Mr. Caravantes did have or expressed that he had

19  worries about his latent homosexuality.

20          MR. PARKER:  I can ask.

21          THE COURT:  I don't think he's testified to that.

22  BY MR. PARKER:

23  Q.  Dr. Goldstein, what, if anything, did Mr. Caravantes say to

24  you with respect to concerns over sexual identity issues?

25  A.  Well, in that regard, he gave me information to the effect

C49Wcar4                        Goldstein - direct

1    that he insisted a number of times during my examination that

2    he was definitely not homosexual or bisexual.  He stated that

3    he was worried that people might think he is because if they

4    found out what happened, he was reluctant to reveal what

5    happened to his wife who, predictably, as he prophesied, had a

6    very negative reaction and said he's dirty and why did you do

7    this and how could you have done this, etc.  He had feelings of

8    reluctance to face his relatives and friends and have to talk

9    about or discuss the events that had occurred, so there was a

10   good deal of indication on his part that it was something that

11   he felt very ashamed of, guilty of, and conflicted about, and

12   that inevitably, particularly somebody who is insisting they're

13   not homosexual, who comes from a cultural background that is

14   not favorably disposed to a heterosexual engaging in that kind

15   of activity, leads to a very firm inference that that's

16   something he would be conflicted about.

17   Q.  What other, if any, stressors did you determine existed, or

18   that Mr. Caravantes had at the time you examined him?

19   A.  Well, the shame and guilt about the sexual activities that

20   he engaged in, in terms of revealing them and discussing them

21   with his wife, who he feared would have an intense negative

22   reaction to them, which, in fact, she did, became angry and

23   depressed, I think went to see a mental health professional for

24   herself at that time, threatened to leave him, and left him

25   with the feeling she might well leave him and never forgive him

C49Wcar4                        Goldstein - direct

1    for what he had done; the stressor of his own feelings of anger

2    and distress about losing or the job being eliminated that he

3    held at Remi's as a coffee machine operator, and losing that

4    position, and also his, in association with that, either his

5    inability or his unwillingness to pursue other job

6    opportunities that were offered to him at Remi's to become a

7    waiter or to advance himself, which led to another stressor,

8    which is what he claims is economic hardship because he lost

9    his job and had trouble relocating at another position, his

10   concerns about his physical health, the health of his youngest

11   daughter who suffers from some sort of esophageal condition

12   which causes worrisome symptoms and might require surgery, and

13   the concern about his mother's health who came to the States

14   about a year and a half ago and required some kind of surgery,

15   and he indicated to me he was very worried about her health as

16   well.  So there are a number of factors that are impinging on

17   his life which could easily, in combination or separately even,

18   account for a depressive type of reaction.

19   Q.  Doctor, did you have occasion to review the report of

20   Dr. Jessica Pearson?

21   A.  Yes, I have.

22   Q.  Do you recall in that report Dr. Pearson opined a diagnosis

23   of posttraumatic stress disorder?

24   A.  Yes.

25   Q.  Do you agree or disagree with that opinion?

1    A.  I disagree completely with that diagnostic assessment.

2    Q.  And why do you disagree with that assessment?

3    A.  Well, there's, there's no basis in science, in psychiatric

4    terminology to reach a diagnosis of posttraumatic stress

5    disorder in any case where the critical missing ingredient is

6    the absence of the requisite type of stress, traumatic stress,

7    that is required to make the diagnosis.  In posttraumatic

8    stress disorder, what is required as a threshold, let's say, is

9    the presence of an extreme, life threatening, traumatic,

10   stressful event which the person is exposed to or experiences,

11   which can cause death or serious physical injury or a threat to

12   the physical integrity of that individual, and all of those

13   elements require some sort of physical violent force, not

14   merely distaste or repugnance or psychological queasiness about

15   the event that occurred.  But it has to require actual physical

16   violent force, or the threat thereof, to qualify as a traumatic

17   stressor, without which there can be no traumatic, there can be

18   no posttraumatic stress disorder.

19   Q.  Do you have an opinion within a reasonable degree of

20   medical certainty in the field of psychiatry as to whether

21   Mr. Caravantes ever suffered from posttraumatic stress

22   disorder?

23   A.  There's -- yes, I do.

24   Q.  What is that opinion?

25   A.  He never suffered from posttraumatic stress disorder, and

C49Wcar4                    Goldstein – direct

1   there's no basis to conclude that he ever did.

2   Q.  You mentioned in your testimony the question of, or the

3   factor of the threat of, the threat to one's physical

4   integrity.  What does that mean in psychiatric terms?

5   A.  As a term of art, so to speak, it designates physical,

6   actual or threatened physical, forceful sexual assault.  And,

7   in other words, there has to be some sort of physical force

8   involved in the either actual sexual assault or the threat of

9   sexual assault, which was not present in, obviously not present

10  in this case.

11  Q.  In your opinion, as a practicing psychiatrist, can unwanted

12  sexual activity provide the basis for a finding of a traumatic

13  stressful event sufficient for a posttraumatic stress disorder

14  diagnosis?

15  A.  Unwanted sexual activity which is not accompanied by

16  physical force?

17  Q.  Yes.

18  A.  No, it cannot.

19  Q.  Now you mentioned earlier Dr. Sanford Drob.  Who is

20  Dr. Drob?

21  A.  Dr. Drob is a clinical and forensic psychiatrist who is on

22  the faculty at NYU School of Medicine.  He's formerly chief

23  psychologist for psychological assessment at NYU–Bellevue

24  Medical Center and was a senior psychologist on the forensic

25  psychiatry service at Bellevue for many years.  He's written a

1   number of publications on the subject that's involved here in

2   terms of assessing malingering and other clinical issues, and

3   he was, I requested input from him in this case to review the

4   psychological data that Dr. Pearson had relied on.

5   Q.  And why did you seek Dr. Drob's input on that data?

6   A.  Essentially, the way a, you know, an internist would

7   request x-rays to aid him in a diagnosis because he's not a

8   radiologist and can't interpret with any degree of expertise

9   the x-rays, psychiatrists are generally unable to interpret

10  psychological testing; they don't have that expertise or

11  training.  And so I needed an evaluation by an experienced

12  psychologist to evaluate Dr. Pearson's conclusions,

13  interpretations of the data, and her findings.  And that's why

14  I requested a consultation with Dr. Drob.

15  Q.  Is this the type of analysis that you would regularly rely

16  on in matters involving underlying psychological testing?

17  A.  It's a customary part of my practice in that regard, yes.

18  Q.  What specifically did you ask Dr. Drob to do?

19  A.  In the most simple terms, to review Dr. Pearson's report,

20  the raw data, the testing data upon which she based her

21  findings and conclusions and to critique, you know, her

22  methodology and her method -- her conclusions and

23  interpretations.

24  Q.  And did he do that?

25  A.  Yes.

1   Q.  Did he write a report?

2   A.  Yes, he did.

3   Q.  Is his report, if you turn to Defendants' Exhibit 50, in

4   the book?

5   A.  Yes.

6   Q.  Do you have that in front of you?

7   A.  Yes.  Want me to --

8   Q.  Yes, if you turn to tab 50.

9   A.  Which volume is that?  I'm sorry.

10  Q.  It should say Defendants' Exhibits on it.

11  A.  No. 50?

12  Q.  Yes, sir.

13  A.  Okay.  Yes.

14  Q.  Is that a copy of Dr. Drob's report, dated July 5, 2011?

15  A.  Yes, it is.

16  Q.  Now, you mentioned earlier that in a diagnosis of clinical

17  depression that one must rule out malingering.  Is that

18  accurate?

19  A.  In the diagnosis of -- in many different psychiatric

20  diagnoses, when there's litigation involved, malingering has to

21  be ruled out, yes.

22  Q.  What did you find out on review of Dr. Drob's analysis of

23  the psychological data accumulated by Dr. Pearson?

24  A.  The main points that Dr. Drob concluded or raised and

25  discussed in his report were that the two psychological tests

C49Wcar4                    Goldstein - direct

1    that were administered by Dr. Pearson, the personality

2    assessment inventory, No. 1, and the structured interview of

3    reported symptoms, No. 2, which she concluded showed that her

4    diagnostic assessments of Mr. Caravantes were valid and

5    accurate and that malingering was not present, Dr. Drob, for

6    reasons he explained in detail, took issue with that and found

7    that both tests, the psychological inventory -- psychological

8    assessment inventory and the structured interview of reported

9    symptoms, both raised rather significant issues about the

10   presence of malingering or the likelihood of malingering, for

11   various technical reasons that he goes into detail about, and I

12   can explain, if you wish.

13           THE COURT:  How do you define the term "malingering"?

14   What's encompassed in that term?

15           THE WITNESS:  Malingering is the intentional

16   production of either psychiatric or physical symptoms, or both,

17   or the exaggeration of already present but not quite as severe

18   as the individual would indicate, of psychiatric and/or

19   physical symptoms, or the attribution of those symptoms to a

20   particular causation when the individual knows that they're

21   related to some other causations, deliberately done for the

22   motivation of some external benefit, some external gain,

23   whether it's to get out of something or to get something, in

24   the latter case, perhaps to get compensation from an insurance

25   company or lawsuit.  So some external benefit to be gained by

C49Wcar4                    Goldstein - direct

1   exaggerating or actually feigning those false symptoms that the

2   patient is claiming.

3   BY MR. PARKER:

4   Q.  Based on your review, do you have an opinion as to whether

5   or not malingering, in this case, can be ruled out by the data

6   that was accumulated by Dr. Pearson in the performance of the

7   psychological tests you've mentioned?

8         MR. SAXENA:  Objection.  Dr. Goldstein has already

9   testified that he is not a psychologist and is not in the

10  position to opine on the implications of the testing data, so I

11  don't think he should be permitted to testify in response to

12  that question.

13        THE COURT:  Let me see the question.

14        MR. PARKER:  Your Honor, if I may.

15        THE COURT:  All right.  Do you want to reframe the

16  question?  Or do you want to argue?

17        MR. PARKER:  No.  I wanted to make a response to

18  Mr. Saxena.

19        THE COURT:  Yes.

20        MR. PARKER:  This is really a Rule 703 issue, and

21  Dr. Goldstein already has testified that he regularly relies on

22  the work of other professionals, including psychologists, in

23  analyzing matters such as this.  He's testified to Dr. Drob's

24  report, which he received, and Rule 703, I believe, your Honor,

25  squarely addresses this and allows testimony of this nature.

C49Wcar4                         Goldstein - direct

1           MR. SAXENA:  I think Rule 703 allows him to state his

2    conclusions and to rely on the data, but not to act like he's a

3    psychologist and explain the actual details of the data.

4           THE COURT:  He hasn't been asked to state his

5    testimony on the psychology, as I understand it.  The question,

6    I think, is permitted under the rule.  I'll double-check.

7           I think that he can rely on it.  As he said, he did

8    turn the issue of testing over to Dr. Drob and he did rely on

9    him for his conclusion, so I'm going to allow the question.

10          MR. PARKER:  May I have it read back, please.

11          THE COURT:  All right.  You can have it read back.

12          (Record read)

13   A.  Yes, I do.

14   Q.  What is that based on?

15   A.  Malingering definitely can't be ruled out by Dr. Pearson's

16   testing, no.

17   Q.  What is the basis for that opinion?

18   A.  That according to the report from Dr. Drob that I relied

19   on, that Dr. Pearson's findings and conclusions were somewhat

20   misleading and incomplete in the sense that she either

21   discounted or ignored specific findings in the testing

22   protocols that raised a very strong suspicion and a high index

23   of likelihood that malingering was, in fact, present.

24   Q.  Based on your review of this matter, did you reach any

25   opinion with respect to the cause or causes of Mr. Caravantes's

C49Wcar4                     Goldstein - direct

1   psychiatric conditions?

2   A.  Well, as I said, I'd say psychiatric condition rather than

3   conditions because there's no basis to reach any diagnosis of

4   posttraumatic stress disorder, so the only diagnosis in play is

5   major depressive disorder, and there's a plethora of stressors

6   in his life that could account for that, which I enumerated, in

7   addition to his claims, his allegations about alleged sexual

8   harassment.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. PARKER:  Thank you.  No further questions.

2           MR. SAXENA:  Your Honor, we are going to pass out the

3    witness' deposition.

4           And, your Honor, we're also going to pass out the

5    deposition of Dr. Sanford Drob.

6    CROSS-EXAMINATION

7    BY MR. SAXENA:

8    Q.  OK, Dr. Goldstein, I'd like you first to identify these two

9    deposition transcripts that are in front of you, to the extent

10   that you can, starting with yours.

11          Do you see on the first page, page 1 --

12   A.  I'm sorry, I don't have --

13   Q.  Did you not get -- OK, Dr. Goldstein, I'd like is to start

14   with your deposition, which is in its own binder.  As you see,

15   on page 1, the date is September 27th, 2011.  Do you see that?

16   A.  Yes, I do.

17   Q.  And do you see your name on the first page, Robert

18   Goldstein M.D.?

19   A.  Yes.

20   Q.  Do you recognize this as a transcript of your deposition?

21   A.  Apparently it is, yes.

22   Q.  Now I'd like you to look at the other binder quickly.  Just

23   take a look at page 1.  Do you see the date October 14th, 2011?

24   A.  Yes.

25   Q.  Do you see the name Sanford Drob Ph.D.?

1    A.  Yes.

2    Q.  I'd like you just to turn to page 6.

3           THE COURT:  Of which one?

4           MR. SAXENA:  Of the Drob deposition, your Honor.

5    Q.  And look at lines 5 through 7.

6           Do you see the text:

7    "Q.  And have you prepared a report?

8    "A.  I prepared a memo or a report to -- to Dr. Goldstein,

9    yes"?  Do you see that?

10   A.  Page 5 lines 5 through 7?

11   Q.  Page 6 lines 5 through 7.

12   A.  Yes.

13   Q.  Do you have any reason to doubt that this is the deposition

14   transcript of Sanford Drob?

15   A.  None whatsoever.

16   Q.  Dr. Goldstein, you just testified with regard to Dr. Drob's

17   findings that they raise a high index of suspicion that

18   Mr. Caravantes is malingering; is that correct?

19   A.  Yes.

20   Q.  By that term, "high index of suspicion," do you mean a high

21   likelihood?

22          THE COURT:  Is this Dr. Drob's deposition you're

23   talking about?

24          MR. SAXENA:  I'm just asking him about the testimony

25   that he just gave, your Honor.

C49kcar5                       Goldstein - cross

1           THE COURT:  What are you asking about?

2           MR. SAXENA:  I'm asking what he means --

3           THE COURT:  What page, line, et cetera?

4           MR. SAXENA:  OK, let's do it this way.

5           Just bear with me for a second, your Honor.

6           Your Honor, I will refer to Dr. Drob's deposition

7   testimony in a second, but I just wanted to ask Dr. Goldstein

8   about the testimony that he just gave on direct examination.

9           THE COURT:  What he just gave us about Dr. Drob?

10          MR. SAXENA:  Yes, that's right.

11          THE COURT:  I'm lost.  That's why I'm asking the

12  question.

13          MR. SAXENA:  I don't actually want to refer to the

14  deposition transcripts right now.  I just wanted to have him

15  identify them at the beginning of the deposition, that's all.

16          THE COURT:  He's identified them, as I understand it.

17  I don't understand where you're going, is my problem.

18          MR. SAXENA:  OK.

19          THE COURT:  I don't understand what you're doing.  I

20  have to have a page and line to something, to ground me.

21          MR. SAXENA:  OK, let's do it this way then:

22  BY MR. SAXENA:

23  Q.  I'd like you to please turn in the defendants' exhibit

24  binder to Defendants' Exhibit 49, which is your report,

25  Dr. Goldstein.  And please turn to page 14.  I'd like you to

C49kcar5                         Goldstein - cross

1   look at the paragraph numbered 5.

2   A.  Yes.

3   Q.  And I'd like you to look five lines down.  Do you see the

4   sentence, "There are significant findings (as set forth in

5   Dr. Drob's report) that suggest that Mr. Caravantes may be

6   malingering."  Do you see that?

7   A.  Yes.

8   Q.  If you can turn the page, Dr. Goldstein, to page 15, I'd

9   like you to look at paragraph numbered 7.  The last sentence of

10  that paragraph reads:  "In the context of litigation, there are

11  findings that raise a high index of suspicion that secondary

12  gain (i.e., obtaining financial compensation in this lawsuit)

13  may be a likely motivating factor in this case."

14          Do you see that?

15  A.  Yes.

16  Q.  So I'd like to ask you, Dr. Goldstein, whether you mean

17  when you use the phrase "high index of suspicion," that there

18  is a high probability that Mr. Caravantes is malingering?

19  A.  I think perhaps we're getting lost in the semantics.  I

20  never said that there's a high index -- that he's malingering.

21  I said there's a high index of suspicion that he may be or that

22  the tests raise a question about a high index of suspicion that

23  possible malingering is present.  No one's reached a conclusion

24  that there's a high index of suspicion that he definitely is

25  malingering.

C49kcar5                       Goldstein - cross

 1   Q.  So, Dr. Goldstein, in this sentence that we are focusing on

 2   in paragraph 7, when you use the phrase "high index of

 3   suspicion," what do you mean?

 4   A.  That there is data obtained by Dr. -- obtained by me also

 5   in my psychiatric -- we haven't gone into that -- but in terms

 6   of Dr. Drob's findings that the psychological testing itself,

 7   in contrast to what Dr. Pearson concluded, that they

 8   demonstrate there is no malingering, Dr. Drob interpreted them

 9   to indicate that there is a high index of suspicion that they

10   may indicate malingering.

11   Q.  Is a high index of suspicion more than just a mere

12   possibility of malingering?

13   A.  Yes.  It's a significant possibility, yes.

14   Q.  It's a significant possibility?

15   A.  Yes.

16   Q.  I'd like you to please open Dr. Drob's deposition

17   transcript and turn to page 100.

18             THE COURT:  Do we have an exhibit number for this, for

19   the transcript?

20             MR. SAXENA:  For the binder, Judge --

21             THE COURT:  It's a deposition binder?

22             MR. SAXENA:  Yes, it's a deposition binder.

23             THE COURT:  OK.

24   BY MR. SAXENA:

25   Q.  I'd like you to turn to page 100 and look at line 18, and

C49kcar5                      Goldstein - cross

1    I'd like to play a video of Dr. Drob's testimony.

2              MR. SAXENA:  Randall, can you please play trial clip

3    10.  It's to 101/13.

4              MR. PARKER:  Your Honor, before we begin, there's an

5    objection in the record of the deposition, to the form of the

6    question that Mr. Saxena seeks to show on video, on page 101 of

7    the deposition.  I maintain that objection.

8              (Pause)

9              THE COURT:  I'll allow the question.

10             MR. SAXENA:  You can play it Randall.  Thanks.

11             (Video playback)

12   BY MR. SAXENA:

13   Q.  So, Dr. Goldstein, you are not a psychologist, right?

14   A.  Correct.

15   Q.  And you have not determined that Mr. Caravantes is

16   malingering, right?

17   A.  Correct.

18   Q.  And Dr. Pearson has not determined that Mr. Caravantes is

19   malingering, right?

20   A.  She concludes that he's not malingering.

21   Q.  And Dr. Drob has also not determined that Mr. Caravantes is

22   malingering, right?

23   A.  Correct.

24   Q.  You mentioned the SIRS-2 test conducted by Dr. Pearson?

25   A.  Yes.

C49kcar5                    Goldstein - cross

1   Q.  Do you understand that that's a test for exaggeration and

2   feigning?

3   A.  That is a test to evaluate the possible presence of

4   feigning or exaggeration in a forensic setting, yes.

5   Q.  And Dr. Pearson administered the SIRS-2 to Mr. Caravantes,

6   right?

7   A.  Yes.

8   Q.  And Dr. Pearson scored the SIRS-2 and concluded that

9   Mr. Caravantes' results fell within the indeterminate general

10  range, right?

11  A.  Correct.

12  Q.  And Dr. Drob agrees that Dr. Pearson correctly scored the

13  test, right?

14  A.  I wouldn't make that sweeping assertion.  He agreed that it

15  was in the indeterminate general range, yes.  But that other

16  subsets were not scrutinized as they should be according to the

17  directions.  I believe that was his position.

18  Q.  Do you know whether Dr. Drob agrees that Dr. Pearson

19  properly scored the test?

20  A.  Only as I said, insofar as he agreed that the results were

21  in the general indeterminate range.

22  Q.  And Dr. Drob agrees that the indeterminate general range

23  means that there is no higher probability of Mr. Caravantes

24  malingering than anyone else; isn't that right?

25  A.  I believe he called attention to the fact that individuals

C49kcar5                    Goldstein - cross

1    in that range should be -- the results should be scrutinized in

2    terms of findings on some of the subscales, which he proceeded

3    to do.

4    Q.  Right, but that's not my question, Dr. Goldstein.  My

5    question is:  Does Dr. Drob agree that an indeterminate general

6    result means that there is no higher probability of

7    Mr. Caravantes malingering than anyone else?

8    A.  I'm not sure about that.

9    Q.  I'd like you to open up Dr. Drob's deposition transcript

10   again.

11          THE COURT:  I'm sorry?

12          MR. SAXENA:  Dr. Drob's deposition transcript.

13          THE COURT:  You're not talking into the microphone.

14          MR. SAXENA:  I'm sorry, Judge.  I'll move up.

15          THE COURT:  That microphone in front of you.

16          MR. SAXENA:  This one?  All right, got it.

17   Q.  I'd like you to turn to page 60 in Dr. Drob's deposition

18   transcript.

19   A.  Six-owe?

20   Q.  Six-zero.  And focus on lines 2 through 7.

21          MR. SAXENA:  Randall, can you please play trial clip

22   number 5.

23          MR. PARKER:  Your Honor --

24          (Pause)

25          THE COURT:  All right, where are you going to read

C49kcar5                          Goldstein - cross

1    from?

2              MR. SAXENA:  I'm going to go from page 60, line 2 to

3    line 7.

4              MR. PARKER:  Your Honor, I object to the use of the --

5    I don't see a legitimate purpose for using the deposition

6    testimony, this deposition testimony, based upon any testimony

7    that Dr. Goldstein has given.  He simply said he's not sure.

8    It doesn't impeach or affect his credibility.

9              THE COURT:  I don't see how I'm going to be able to

10   understand anything from bits and pieces.  If you're going to

11   read his testimony or want his testimony given to

12   Dr. Goldstein, that means you have to give a segment of it so

13   it can be put into context.  You can't just pick and choose one

14   little bit.  I've got to understand the context of what you're

15   trying to get at.  And what I see here is, it's in the course

16   of a discussion of a number of factors that the man goes on to

17   explain what he means by these things, what he's trying to say.

18   That's why I'm having trouble understanding what is going on.

19             MR. SAXENA:  OK, Judge.  The only purpose I was using

20   it for is the meaning of the result of an indeterminate general

21   score on the test.

22             THE COURT:  He goes on.  I see he goes on on page 61

23   line 16.  I don't know what goes on after that.

24             MR. SAXENA:  He goes on in more detail after that,

25   talking about the subscales that Dr. Goldstein mentioned.

1           We can move on, Judge.  That's fine.  I won't detain

2      you with that.

3      BY MR. SAXENA:

4      Q.  Dr. Goldstein, you diagnosed Mr. Caravantes with major

5      depressive disorder, correct?

6      A.  Yes.

7      Q.  And as of the last time you saw him, Mr. Caravantes was

8      still suffering from major depressive disorder, right?

9      A.  Yes, that's correct.

10     Q.  And in your opinion, the onset of Mr. Caravantes' major

11     depressive disorder was no later than mid-2008; is that right?

12     A.  I don't think I opine when the onset was, because that was

13     difficult to ascertain.  I would say, in answer to your

14     question, it most likely started before 2008, yes, but I'm not

15     a hundred percent positive about that.

16     Q.  You diagnosed Mr. Caravantes with certain specifiers,

17     right, single episode, mild to moderate?

18     A.  Yes.

19           THE COURT:  What does a single episode mean?

20           THE WITNESS:  Well, since this form of depression is a

21     recurrent illness, like most forms of depression, if there is

22     an onset and then a complete or significant remission of

23     symptoms so the person is symptom-free for a period of time,

24     and then it comes back again, that would be recurring.  In this

25     case, there was no significant intermission where there was a

C49kcar5                        Goldstein - cross

1   remission of symptoms; it appeared that it's continued straight

2   through.

3           THE COURT:  But didn't you say that he appeared to

4   benefit from treatment?

5           THE WITNESS:  Yes, he did, but only partially.  There

6   was no complete remission.

7           THE COURT:  I see.  So single episode means --

8           THE WITNESS:  Continuous.

9           THE COURT:  -- a period of time --

10          THE WITNESS:  Yes.

11          THE COURT:  -- not just an event?

12          THE WITNESS:  Exactly, over a period of time.

13  BY MR. SAXENA:

14  Q.  Dr. Goldstein, you did not apply the specifier "severe" to

15  Mr. Caravantes' diagnosis, correct?

16  A.  No.  It's not warranted to be termed severe.

17  Q.  And the reason you didn't apply it is because you did not

18  find there to be sufficient impairment across multiple periods;

19  is that correct?

20  A.  That was one of the reasons, yes.

21  Q.  But that is a reason, right?

22          THE COURT:  One of the reasons.

23  Q.  And it's your opinion that in order to warrant a "severe"

24  label, a person must be impaired in not one but a number of

25  important areas of function, including occupational, social and

C49kcar5                        Goldstein - cross

1    marital, right?

2    A.  I never said that, no.

3    Q.  You never said that?

4    A.  No.

5    Q.  Well, do you believe that the label "severe" could apply if

6    a person is impaired in only a single area of functioning?

7    A.  It could, yes.

8    Q.  And you found that Mr. Caravantes was not impaired in the

9    occupational domain, correct?

10   A.  He wasn't sufficiently impaired in that area to be

11   compatible with a diagnostic impression of severe impairment.

12   Q.  One of the reasons you found that he was not sufficiently

13   impaired was that he was able to complete a course at the Apex

14   Technical School, right?

15   A.  That was one of the bases of that opinion, yes.

16   Q.  And in addition, he was able to complete a refresher

17   course, right?

18   A.  Yes.

19   Q.  But you never asked him why he needed to take that

20   refresher course, did you?

21   A.  No.

22   Q.  And you don't know why he needed to take that refresher

23   course, right?

24   A.  No.

25   Q.  You have also --

C49kcar5                         Goldstein - cross

 1            THE COURT:  Do you know what the job of a busboy
 2   consists of?
 3            THE WITNESS:  I'm sorry, sir?
 4            THE COURT:  Do you know what the job of a busboy
 5   consists of?
 6            THE WITNESS:  Having worked as one in my youth, I do,
 7   yes.
 8            THE COURT:  All right.
 9   BY MR. SAXENA:
10   Q.  You have also reviewed Mr. Caravantes' medical records as
11   part of your assessment, right?
12   A.  Yes, I have.
13   Q.  And mental health records as well?
14   A.  Yes, I have.
15   Q.  And it's your preference to review as many of the mental
16   health records that are available at the time, for any
17   particular patient, right?
18   A.  I would prefer to review all available records, yes.
19   Q.  And one of the key factors for you in making your diagnosis
20   of mild to moderate depression was that there were other
21   treating or evaluating mental health professionals who also
22   made a diagnosis of Mr. Caravantes in the same ballpark as
23   yours, right?
24   A.  Well, I make my own diagnoses, and I compare them to others
25   with a grain of salt.

C49kcar5                         Goldstein - cross

1  Q.  So you're saying it was not one of the key factors in your

2  diagnosis, that other mental health professionals had also made

3  a diagnosis of Mr. Caravantes in the same ballpark?

4  A.  Other mental health workers' clinical assessments I take

5  into account as important but don't feel the necessity of

6  adhering to them with as much reliability, let's say, as I

7  attach to my own conclusions.

8  Q.  But you didn't review all the available medical records

9  before submitting your expert report, did you?

10 A.  Yes.

11 Q.  You did?

12 A.  All the ones that I have available, yes.

13 Q.  Are you aware of records that were available at the time

14 but not provided to you?

15 A.  No.

16 Q.  Did you obtain the medical records from counsel for

17 defendants?

18 A.  From what?  I'm sorry.

19 Q.  From counsel for defendants.

20        THE COURT:  Where did the medical records come from?

21        THE WITNESS:  Yes, from the defendant, correct.

22 Q.  And you submitted your expert report after Dr. Pearson had

23 already submitted her expert report, right?

24 A.  Correct.

25 Q.  Did you look at the materials that Dr. Pearson reviewed in

C49kcar5                         Goldstein - cross

1    making her assessment?

2    A.  I probably did at the time, but I don't recall the litany

3    of materials she reviewed at this point.

4    Q.  Are you aware that she reviewed the Karen Horney Clinic

5    records?

6    A.  I believe she did, yes.

7    Q.  But you did not review those records before submitting your

8    expert report, right?

9    A.  No, I saw them afterwards.

10   Q.  So you were not aware, at the time that you submitted your

11   expert report, that Mr. Caravantes had been diagnosed with

12   major depressive disorder with a severe specifier?

13   A.  Not specifically at that time, no.

14   Q.  Do you know who Martina Caravantes is?

15   A.  Martina Caravantes?

16   Q.  Yes.

17   A.  I'm not sure.  Perhaps it's the wife of Mr. Caravantes.

18   Q.  She is the wife of Mr. Caravantes; is that your response?

19   A.  I said I'm not sure.

20           THE COURT:  He said perhaps.

21   Q.  So you don't know?

22   A.  Not with a hundred percent reliability, no.

23   Q.  But you found that one of Mr. Caravantes' social

24   relationships that was impaired was his marital relationship,

25   right?

C49kcar5                          Goldstein - cross

1   A.  Based on what he related to me and what was contained in

2   some of the records, that's correct.

3   Q.  But you never interviewed his wife?

4   A.  No.

5   Q.  Are you aware that his wife has given deposition testimony?

6   A.  Yes, I am.

7   Q.  Have you reviewed that deposition testimony?

8   A.  No.

9   Q.  Were you provided with that deposition testimony?

10  A.  No.

11  Q.  But you did review the deposition testimony of Jose Ortiz,

12  right?

13  A.  Yes.

14  Q.  And you did review the deposition testimony of Oscar

15  Velandia, right?

16  A.  Correct.

17  Q.  Would you consider it appropriate to apply the severe

18  specifier in a diagnosis of major depressive disorder to a

19  patient who had such intense and pervasive emotional upset that

20  he had to be institutionalized?

21  A.  That, in the absence of certain other factors, might be a

22  guide to making such a determination, yes.

23  Q.  Are you aware of whether Mr. Caravantes has been

24  institutionalized?

25  A.  I believe on the eve of trial he was, yes.

C49kcar5                    Goldstein - cross

1  Q.  Do you know if he's been admitted to a hospital for

2  psychiatric care?

3  A.  He was admitted to Payne Whitney at the beginning of March.

4  Q.  Are you aware of whether he was admitted because he was

5  considered a suicide risk?

6  A.  I believe that was the factor that triggered his admission,

7  yes.

8  Q.  In your opinion, Mr. Caravantes cannot be diagnosed with

9  PTSD because he does not claim to have been sexually assaulted

10  in a violent or forceable manner, right?

11  A.  Based on the criteria for PTSD that the American

12  Psychiatric Association has established, that's correct.

13  Q.  Well, it's your testimony that there is no basis to reach a

14  PTSD diagnosis where the requirement of a traumatic stressor is

15  absent, right?

16  A.  That would be inherent in the diagnosis, that there has to

17  be the requisite traumatic stressor.

18  Q.  So you can never reach a PTSD diagnosis without a traumatic

19  stressor that qualifies under criterion A; is that correct?

20  A.  Anyone that uses the correct diagnostic criteria could not,

21  that's correct.

22  Q.  Are you familiar with Dr. Robert Simon, Dr. Goldstein?

23  A.  Dr. Robert Simon?

24  Q.  Yes.

25  A.  Yes.

C49kcar5                       Goldstein - cross

1   Q.  Who is he?

2   A.  He's a psychiatrist.

3   Q.  Do you consider him an authority in the field?

4   A.  I respect him greatly.  I don't think he is an authority,

5   no.

6   Q.  Well, have you read his book "Posttraumatic Stress Disorder

7   In Litigation"?

8   A.  I believe I have read it.  It's a -- I don't know how far

9   back it goes, but I did read it at some point, yes.

10  Q.  Do you consider it a reliable source with regard to

11  posttraumatic stress disorder?

12  A.  There are some things in it that are reliable and some

13  things that I would disagree with.

14  Q.  But you specifically mentioned this book at your

15  deposition, right?

16  A.  Did I?  I don't recall.

17  Q.  You don't recall mentioning it at your deposition?

18  A.  No.

19  Q.  I'd like you to open, please, to your deposition

20  transcript, page 166 line 11, and then reading down to page 167

21  line 16.

22  A.  Yes.

23  Q.  Do you see that you do refer to this particular book at

24  your deposition?

25  A.  Yes.

1  Q.  So I'd like to show you what's been previously marked as

2  Plaintiffs' Exhibit 405.

3           MR. PARKER:  Your Honor, Dr. Goldstein has testified

4  that he does not consider Dr. Simon to be an authority.

5           THE COURT:  I'm going to let the question go.  You can

6  play it.  Is that what you're going to do, play it, or read it?

7  How far are you going to read?

8           MR. SAXENA:  We're going to read a couple paragraphs,

9  your Honor.

10           THE COURT:  Page and line.

11           MR. SAXENA:  The deposition transcript, all right.

12           THE COURT:  Or show it, whatever you want.

13  BY MR. SAXENA:

14  Q.  Let's do page 166 of the deposition transcript, starting on

15  line 24.  And I will read.

16  "Q.  I mean sitting here today, can you name any one treatise

17  that you would go to to sort of talk about the diagnostic

18  impropriety?

19  "A.  There's the chief of psychiatry at University of Oregon

20  Medical Center, Landi Sparr, S-p-a-r-r, has written extensively

21  about the inappropriate and watered-down diagnosis of PTSD

22  that's made by uninformed mental health professionals.

23           "Robert Simon, professor at Johns Hopkins has written

24  a book called 'Posttraumatic Stress Disorder In Litigation,'

25  which generally in many different places advances the same

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C49kcar5                        Goldstein - cross

 1   opinion."

 2          MR. SAXENA:  Your Honor, we're going to hand out

 3   Plaintiffs' Exhibit 405.

 4          THE COURT:  What's 405?

 5          MR. SAXENA:  Yes, your Honor.

 6          THE COURT:  The excerpt, is that it?

 7          MR. SAXENA:  Yes, your Honor.  It's an excerpt from

 8   the book.

 9          THE COURT:  Oh, from the book?

10          MR. SAXENA:  Yes.

11          THE COURT:  I'm sorry, I'm going to have to read back

12   in this deposition.

13          This is all referring to his report, page 13.  And if

14   you don't get to his report, page 13 and you put in this, it's

15   completely misleading to the Court.

16          MR. SAXENA:  We can do this, Judge.  We'll do that

17   now.

18   BY MR. SAXENA:

19   Q.  So, Dr. Goldstein, if you could please turn in the

20   defendants' exhibit binder to Exhibit 49, which is your

21   report --

22   A.  OK.

23   Q.  -- there's one large paragraph on page 13.

24   A.  Yes.

25   Q.  I'd like you to start about two-thirds of the way down.

 1   There's a sentence beginning, "The scientific literature."

 2   A.  Yes.

 3   Q.  Do you see that?

 4   A.  Yes.

 5   Q.  Do you see it says, "The scientific literature on PTSD

 6   raises concerns about the diagnosis impropriety and the abuse

 7   of this diagnostic entity especially in cases where the

 8   diagnosis is made in a loose fashion without any adherence to

 9   the rigorous diagnostic criteria that are required"?  Do you

10   see that?

11   A.  Yes, sir.

12   Q.  Is that the literature that you're referring to in the

13   deposition excerpt that we just read?

14   A.  I'm sorry, I don't understand your question.

15          THE COURT:  You have to read the previous page, line

16   11 through 15.

17          MR. SAXENA:  Right.  So we'll start there.

18   Q.  Page 166 of your deposition, Dr. Goldstein, starting at

19   line 11:

20   "Q.  On page 13 of your report, about two-thirds of the way

21   down the page, there is a sentence that begins, 'The scientific

22   literature on PTSD.'  Do you see that?

23   "A.  Yes."

24   A.  Correct.

25          THE COURT:  Go ahead.  "What literature are you

1    referring to."

2    "Q.  What literature specifically are you referring to here in

3    this sentence?

4    "A.  It's persuasive throughout the literature.  I mean I, I'm

5    not singling out any one treatise or one article.  It's pretty

6    pervasive."

7    "Q.  I mean sitting here today, can you name any one treatise

8    that you would go to to sort of talk about the diagnostic

9    impropriety?

10   "A.  There's the chief of psychiatry at University of Oregon

11   Medical Center, Landi Sparr, S-p-a-r-r, has written extensively

12   about the inappropriate and watered-down diagnosis of PTSD

13   that's made by uninformed mental health professionals.  Robert

14   Simon, professor at Johns Hopkins, has written a book called

15   'Posttraumatic Stress Disorder In Litigation,' which generally

16   in many different places advances the same opinion."

17          THE COURT:  Do you have a question for him?

18   Q.  So, Dr. Goldstein, I'd ask you to look at Plaintiffs'

19   Exhibit 405.

20   A.  Yes.

21   Q.  And is that the book by Dr. Simon that you referred to in

22   your deposition testimony --

23   A.  Yes.

24   Q.  -- or an excerpt?

25          THE COURT:  It's an excerpt comprised of --

1   Q.  I'd like you to --

2            THE DEPUTY CLERK:  Hold on.

3            THE COURT:  -- the table of contents and the first

4   page -- well, page 63 and 169.

5            MR. SAXENA:  Thank you.

6   BY MR. SAXENA:

7   Q.  So, Dr. Goldstein, I'd like you to turn to page 163.  Do

8   you see that there begins a chapter called "PTSD In Employment

9   Litigation"?

10  A.  Yes.

11  Q.  I'd like you to turn to page 16 --

12           THE COURT:  This is in the article?

13           MR. SAXENA:  Yes, your Honor.

14           The volume is edited by Dr. Simon, your Honor.

15           THE COURT:  Yes, I understand.

16  BY MR. SAXENA:

17  Q.  I'd like you to turn to page 169, Dr. Goldstein.

18           THE COURT:  I interrupted you.  You didn't get a

19  chance.

20           MR. SAXENA:  All I was saying, Judge, is that that's

21  where the chapter begins --

22           THE COURT:  Oh, all right.

23           MR. SAXENA:  -- on "PTSD In Employment Litigation" by

24  Liza H. Gold M.D.  I was hoping to turn to page 169.  And there

25  are two paragraphs in the middle of that page.  And I'd just

C49kcar5                      Goldstein - cross

1    like to go through this with Dr. Goldstein.

2    Q.  The first sentence begins "DSM's list of traumatic

3    stressors was not meant to be exclusive."

4           Do you agree with that statement, Dr. Goldstein?

5    A.  The enumerated list in DSM 3 of stressors is not meant to

6    be exclusive, that's correct.

7    Q.  "The development of PTSD following low magnitude and

8    atypical stressors is reported in the professional literature."

9    Do you see that sentence?

10   A.  Yes.

11   Q.  "Some individuals under certain circumstances can develop

12   PTSD without meeting the stressor criterion."  Do you see that

13   sentence?

14   A.  Yes.

15   Q.  But you don't agree with that sentence, correct?

16   A.  Well, as I said, I don't regard this book as authoritative.

17   And one of the reasons is, it's a book that has about 20

18   different authors with several chapters that have a variety of

19   opinions.  And the book is not regarded by me as authoritative.

20   It has a lot of information and misinformation in it, as far as

21   I believe.

22   Q.  Moving to the next sentence:  "For example, exposure to

23   multiple events appears to increase the risk for the

24   development of PTSD."  Do you see that?

25   A.  Yes.

C49kcar5                         Goldstein - cross

1          MR. PARKER:  Is Mr. Saxena going to complete that

2     sentence or just end the question in mid-sentence?

3     Q.  "Even if the last stressor does not meet all the elements

4     of criterion A."  I apologize.

5          THE COURT:  I think you should read the full

6     paragraph.

7     Q.  "The more vulnerable victim, the less severe is the

8     stressor needed to precipitate PTSD (Simon 1995).  Typically,

9     however, the further the traumatic event strays from

10    acknowledged criterion A traumatic stressors, the greater the

11    burden for demonstrating both the subjective and objective

12    traumatic nature of the exposure."

13         MR. SAXENA:  Your Honor --

14         THE COURT:  Are you going to ask a question now?

15         MR. SAXENA:  Pardon me?

16         THE COURT:  Are you going to ask a question now?

17         MR. SAXENA:  I was going to ask if Plaintiffs' 405

18    could be moved into evidence.

19         MR. PARKER:  I am going to object to hearsay, Judge.

20         THE COURT:  Well, it's been read into the record.  I

21    don't think --

22         MR. PARKER:  I understand it was read --

23         THE COURT:  But I think you've got to ask a question

24    of some sort.

25    BY MR. SAXENA:

C49kcar5                          Goldstein - cross

1   Q.  Dr. Goldstein, do you agree that the more vulnerable

2   victim, the less severe is the stressor that is needed to

3   precipitate PTSD?

4   A.  Not necessarily, no.

5            THE COURT:  Do you agree with the statement that was

6   made in this article by that is contained in Dr. Simon's

7   guideline for forensic assessment posttraumatic stress disorder

8   indication?

9            THE WITNESS:  We're talking about the entirety of

10  Exhibit 405, your Honor?

11           THE COURT:  Yes.  The part that was read into the

12  record.

13           THE WITNESS:  As I said earlier, I disagree with the

14  portions that were read into the record, as being one

15  psychiatrist's idiosyncratic interpretation with a handful of

16  studies, which completely contradicts the position of the

17  American Psychiatric Association, who created the DSM, which is

18  the official diagnostic guide to making the diagnosis of PTSD.

19  BY MR. SAXENA:

20  Q.  Dr. Goldstein, you have asserted that, just moving on to a

21  different area, you have asserted that Mr. Caravantes' major

22  depressive disorder may be caused by his shame, distress and

23  confusion about his sexual identity and being forced to

24  confront possible homosexual or bisexual tendencies in himself;

25  is that right?

1    A.  Yes.

2    Q.  And that assertion is based entirely on what you have

3    learned directly from Mr. Caravantes; is that right?

4    A.  You're saying -- I'm sorry, did you say entirely?

5    Q.  Entirely, yes.

6    A.  Well, it's based on my clinical experience and clinical

7    practice over the years with individuals in similar situations

8    as he found himself in, who've had similar reactions in terms

9    of doubting their sexual identity as a result of either being

10   sexually assaulted or voluntarily engaging in homosexual acts.

11   Q.  But in terms of the information that you were presented

12   with in this particular case, it's entirely based on what you

13   have learned directly through Mr. Caravantes, right?

14   A.  In part, yes.

15   Q.  In part or entirely?

16   A.  I said in part it was based on my previous clinical

17   experience with individuals in similar circumstances and in

18   part by what Mr. Caravantes told me during my exam.

19   Q.  Well, Mr. Caravantes never told you that he was homosexual,

20   right?

21   A.  No.  He adamantly denied, many times, that he was

22   homosexual.

23   Q.  He never told you that he liked the conduct that

24   Mr. Velandia subjected him to, right?

25   A.  Correct.

C49kcar5                    Goldstein - cross

1    Q.  He never told you that he was bisexual, right?

2    A.  Correct.

3    Q.  He never told you he was sexually conflicted, right?

4    A.  Correct.

5    Q.  In fact, he told you that he found the experiences to be

6    traumatic, right?

7    A.  Yes, he did.

8    Q.  He told you that he found them to be repugnant?

9    A.  Yes.

10   Q.  He told you that he had nightmares of Velandia sexually

11   attacking him, right?

12   A.  Yes, he did.

13          MR. SAXENA:  Nothing further, your Honor.

14          THE COURT:  All right.  Any redirect?

15          MR. PARKER:  Thank you, your Honor.

16   REDIRECT EXAMINATION

17   BY MR. PARKER:

18   Q.  Dr. Goldstein, you, on cross-examination, indicated that

19   you had first seen the records from the Karen Horney Clinic

20   after you prepared your report, correct?

21   A.  That's correct, yes.

22   Q.  And did you review those records at sometime after you

23   prepared your report?

24   A.  Yes, I did.

25   Q.  What effect, if any, did those records have on your opinion

1    in this case?

2    A.   The records from Horney I reviewed had no effect, in terms

3    of causing me to change or alter any of my opinions or

4    conclusions in this case.

5              THE COURT:  Why not?

6              THE WITNESS:  I'm sorry, sir?

7              THE COURT:  Why not?

8              THE WITNESS:  Because they were consistent with what I

9    viewed as the major depressive disorder that Mr. Caravantes has

10   suffered from, dating back to at least 2008; the diagnosis and

11   treatment for that condition was appropriate.  And apparently

12   he was responding favorably to that treatment for major

13   depressive disorder.

14   BY MR. PARKER:

15   Q.   And you also indicated on cross-examination that you had

16   occasion to review the records of Caravantes' recent

17   hospitalization in March of 2012, correct?

18   A.   Yes.

19   Q.   What effect, if any, do those records have on the opinion

20   that you've rendered in this case?

21   A.   Likewise, there was nothing in those records that caused me

22   to change or alter my previous opinions and conclusions.

23             THE COURT:  Do you have an opinion as to the length of

24   time treatment would have to go on for a depressive disorder of

25   the sort that you have diagnosed here?

C49kcar5                        Goldstein - redirect

1            THE WITNESS:  Well, based on Mr. Caravantes' extremely

2     favorable response to treatment at Payne Whitney recently, and

3     based on the information that seemed to suggest that the stress

4     of this litigation and going to trial has had a negative impact

5     on his condition, I would suggest that once the litigation is

6     over and the stress of litigation has been removed, that

7     there's a very good chance his condition will improve

8     substantially and the need for further treatment will be rather

9     brief.

10           THE COURT:  What do you mean by that --

11           THE WITNESS:  I mean that --

12           THE COURT:  -- by "brief"?

13           THE WITNESS:  I mean that he should probably be

14    maintained on medication and have some sort of supportive

15    psychotherapy for an additional period of perhaps three to six

16    months, to monitor his condition and ensure that he's returned

17    to a stable, normal level of functioning.

18           MR. PARKER:  No further questions.

19           THE COURT:  Did I raise something that you wanted to

20    address?

21           MR. SAXENA:  No recross.

22           THE COURT:  No recross?

23           Thank you, Doctor.

24           THE WITNESS:  OK, thank you.

25           THE COURT:  All right.

C49kcar5                          Goldstein - redirect

1             (Witness excused)

2             THE COURT:  How many more witnesses do you have?

3             MR. SAXENA:  We have another witness, Judge.  She

4    should be very quick.  It's Dr. Michele Paludi.

5             MR. DELANEY:  I know you have something after, your

6    Honor --

7             THE COURT:  I've got more than one.

8             MR. DELANEY:  She's come from Upstate New York, and

9    she's not available to us again for the rest of the week.

10            THE COURT:  How long will she be?

11            MR. SAXENA:  The direct will be very short.  There's

12   only one thing to cover.

13            THE COURT:  Rebuttal witness?  I see Mr. Parker is up.

14            MR. PARKER:  I'm up because --

15            THE COURT:  Because I'm raising the question?

16            MR. PARKER:  No, Judge.  I'm up because we have an

17   in limine motion on this witness, and I have several issues

18   with -- I don't know what the direct is going to encompass, but

19   I have several issues with statements in the report that this

20   proposed expert submitted.  Again, I don't know what they're

21   going to ask --

22            THE COURT:  Where does she come from?  I'm Upstate.

23   Where does she come from.

24            MR. SAXENA:  She's from Schenectady, Judge, pretty far

25   Upstate.

C49kcar5

1           THE COURT:  I know where it is.

2           (Pause)

3           THE COURT:  I've got two pleas here.  They're going to

4    take some time, and I've got to get them in.

5           MR. DELANEY:  Your Honor, I think given your time

6    constraints, I'm not sure that we can be fair to everyone,

7    including the witness and Mr. Parker, to try to rush it in 15,

8    20 minutes.

9           THE COURT:  I think it would be better if you set it

10   for tomorrow morning and we can start at 9:30.  So let's break

11   and get to these pleas.  Also I have to take a break, so it

12   will be delayed anyway.

13           (Adjourned to April 10, 2012 at 9:30 a.m.)

14                             * * *

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                      INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   ROBERTO DELLEDONNE

 4   Direct By Mr. Parker . . . . . . . . . . .1140

 5   Cross By Mr. Delaney . . . . . . . . . . .1187

 6   Redirect By Mr. Parker . . . . . . . . . .1220

 7   ROBERT L. GOLDSTEIN

 8   Direct By Mr. Parker . . . . . . . . . . .1224

 9   Cross By Mr. Saxena  . . . . . . . . . . .1255

10   Redirect By Mr. Parker . . . . . . . . . .1282

11                      PLAINTIFF EXHIBITS

12   Exhibit No.                           Received

13    331   . . . . . . . . . . . . . . . . .1199

14    337   . . . . . . . . . . . . . . . . .1218

15                      DEFENDANT EXHIBITS

16   Exhibit No.                           Received

17    19 and 20  . . . . . . . . . . . . . . .1146

18    D26-B and D25  . . . . . . . . . . . . .1154

19    11 and 13  . . . . . . . . . . . . . . .1170

20    47, 48 . . . . . . . . . . . . . . . . .1170

21    39 . . . . . . . . . . . . . . . . . . .1177

22    64-67  . . . . . . . . . . . . . . . . .1186

23

24

25
</pre>