UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ARTURO CARAVANTES and
FRANCISCO SOTARRIBA,

                                    Plaintiffs,

                 - against -

53RD STREET PARTNERS, LLC d/b/a REMI
RESTAURANT and OSCAR VELANDIA,

                                    Defendants.
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8/23/12_

09 Cv. 7821 (RPP)

**OPINION & ORDER**

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On September 10, 2009, Plaintiffs Arturo Caravantes ("Caravantes") and Francisco

Sotarriba ("Sotarriba") (collectively, "Plaintiffs")[1] filed a complaint against Defendants 53rd

Street Partners, LLC d/b/a Remi Restaurant ("53rd Street Partners"), and Oscar Velandia

("Velandia") (collectively, "Defendants").  Plaintiffs alleged six causes of action.  The First

Cause of Action is for sexual harassment in violation of Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"), alleging that Defendant 53rd Street

Partners discriminated against Plaintiffs in the terms and conditions of their employment on the

basis of their sex, and that 53rd Street Partners subjected them to a severe and pervasive hostile

work environment and failed to provide a reasonable mechanism for Plaintiffs to complain of the

sexual harassment.  (Compl. ¶¶ 74-77.)  The Second and Third Causes of Action assert the same

claims against both 53rd Street Partners and Velandia pursuant to the New York State Human

Rights Law, N.Y. Exec. Law § 290, et seq. ("NYSHRL"), and the New York City Human Rights

---

[1] As noted in this Court's decision denying summary judgment, Moises Pastor was originally named as a plaintiff in
the Complaint.  However, the parties have since settled his claims, and thus Pastor is no longer a party to the case.
See Caravantes v. 53rd Street Partners, LLC, No. 09 Cv. 7821 (RPP), 2012 WL 96474, at *1 n.1 (S.D.N.Y. Jan. 12,
2012).

Law, N.Y.C. Admin. Code § 8-101, et seq. ("NYCHRL"), respectively.  (Compl. ¶¶ 78-87.)

Plaintiffs' Fourth Cause of Action alleges that Velandia is liable for aiding and abetting the

illegal acts of 53rd Street Partners in violation of the NYSHRL, and Plaintiffs' Fifth Cause of

Action asserts the same claim pursuant to the NYCHRL.  (Id. ¶¶ 88-91.)  Plaintiffs' Sixth Cause

of Action is for intentional infliction of emotional distress against both Defendants.  (Id. ¶¶ 92-

96.)

On May 26, 2011, Defendants filed a motion for summary judgment.  On January 12,

2012, the Court issued a decision granting Defendants' motion with respect to Plaintiffs' claim

for intentional infliction of emotional distress, but denying it in all other respects.  See

Caravantes v. 53rd Street Partners, LLC, No. 09 Cv. 7821 (RPP), 2012 WL 96474 (S.D.N.Y.

Jan. 12, 2012).  A bench trial was held in this matter beginning on March 26, 2012 and

concluding on April 11, 2012.  What follows are the findings of fact and conclusion of law by

the Court.

## I.       FINDINGS OF FACT

### A.      The Parties

Defendant 53rd Street Partners is a New York limited liability company that acquired

Remi Restaurant ("Remi") on April 11, 2005.  Remi is an upscale Italian restaurant located in

Manhattan at 145 West 53rd Street.  Roberto Delledone ("Delledone") is currently the sole

member of 53rd Street Partners, and thus the sole owner of Remi.[2]  (1132.)[3]

Defendant Oscar Velandia is 42 years old, (740), and has worked at Remi since 1997,

(741).  In 2005, he was promoted to the position of head waiter at Remi, a position that he held

---

[2] Delledone testified at trial that, from 2005 until 2011, Stefano Frittella and Frank Tancredi were also members of
53rd Street Partners. (1132.)

[3] All citations to ([page no.]) are to the Trial Transcript in this case.

until mid-2008, when he was transferred to his current position of party manager. (950, 1097-98.) Velandia is openly gay, (979), and lives with his sister, nephew, and partner in Queens, New York, (739). He is originally from Colombia, (740), and he speaks both Spanish and English, (739).

Plaintiff Arturo Caravantes is 43 years old, (276), and worked at Remi from approximately 1991 until August 2008, primarily as a coffee station worker, (280-81). Caravantes identifies as heterosexual, and has been married to his wife, Martina Caravantes, for 19 years. (278-79.) He lives with her and their three daughters in Queens, New York. (277-78.) He is originally from Atlixco, Puebla, Mexico, and his first language is Spanish. (276-77.)

Plaintiff Francisco Sotarriba is 39 years old, (29), and worked at Remi as a busboy from approximately 1999 until 2004, and then as a food runner from 2004 until May 2008, (31-32). Sotarriba identifies as heterosexual, and has been married for four years. (30-31.) He lives with his wife and daughter in Queens, New York. (30.) Sotarriba is originally from Mexico City, Mexico, and his first language is Spanish. (29-30.)

**B.   Background**

**1.   Remi Restaurant**

Remi is located on 53rd Street between 6th and 7th Avenues in Manhattan. The restaurant has two floors. (43.) The main floor, which is situated at street level, contains the main dining area, known as the "Grand Canal," as well as the "Rialto Room," which houses private parties. (1010.) The basement level of the restaurant is located directly below the main floor, and houses the kitchen, as well as the manager's office, the owner's office, the staff locker room, and a private room called the "Chef's Table," which is used for smaller private parties. (41, 43.) Delledone testified that Remi was acquired by 53rd Street Partners on April 11, 2005,

3

and has been continuously owned and operated by them ever since. (1132.) 53rd Street Partners has consistently employed around 80 employees at Remi since taking over ownership of the restaurant. (1158.)

### 2.   Velandia's Supervisory Authority

When 53rd Street Partners took over ownership of Remi, virtually the entire restaurant staff was kept in place. (1133, 1219.) The only major personnel change that 53rd Street Partners made was to hire Francesco Pistorio ("Pistorio") as general manager, in charge of the day-to-day operation of the restaurant. (1133-35, 1295.) As general manager of Remi, Pistorio was in charge of all personnel decisions, including the hiring, firing and promotion of employees, imposing disciplinary action on employees, training employees, and creating weekly employee work schedules. (1296-97.) Pistorio worked at Remi six or seven days a week, and rarely took time off. (1141, 1351.)

Brett Lockard ("Lockard") remained at Remi in the role of assistant manager for a few months after Pistorio took over as general manager in April of 2005, in order to ease the transition from the old ownership to the new. (79, 757, 1219.) As assistant manager, Lockard performed only managerial duties – he did not wait tables or share in the tip pool. (1140-41.) Soon after Lockard left Remi in mid-to-late 2005, Velandia was promoted to the position of head waiter. (81, 876, 1299.) As head waiter, Velandia continued to wait on tables and to share in the tip pool at Remi – unlike a manager who would receive a fixed salary, and would not share in the tip pool. (150, 1355-56.) However, in many respects, Velandia acted like a manager. According to Sotarriba and Caravantes, as well as current and former Remi employees Sergio Pastor ("Sergio"), Pablo Solis ("Solis"), and Jose Ortiz ("Ortiz"), sometime shortly after

4

Velandia's promotion to head waiter, Pistorio announced at a staff meeting[4] that Velandia was an "assistant manager," or an "assistant to the manager."[5]  (54, 237, 315, 994-95, 1063.)  At other meetings, Pistorio told the staff that Velandia had the power to hire and fire people, and that he was "the guy in charge."  (56-57; PX 28; PX 28T-REV at 2.)[6]  Velandia testified that, on occasion, Pistorio would refer to him as the "manager on duty."  (899, 902.)

Velandia testified that he was also given a special card which allowed him to "void" orders on the computer system.  (793.)  Only Velandia and Pistorio had such a card.  (794.)  In certain cases, the letters "MGR" would appear next to Velandia's name on employee work schedules.  (338, 781; PX 110.)  Velandia also took steps to ensure that other employees at Remi were aware of his elevated position in the restaurant.  For example, Sotarriba, Caravantes, and Velandia each testified that after Velandia was appointed head waiter, he began wearing a suit to work every day, (764), unlike the rest of the waiters, (74, 238).

Velandia's duties also changed.  Pistorio testified that Velandia began assisting him in opening and closing the restaurant, organizing the daily staff meetings, organizing the parties in the dining room, printing out the daily sales report, and distributing tips to the employees.  (1299, 1304.)  Velandia testified that if he was closing the restaurant, he would collect all the cash tips, bring the tips into the manager's office at the end of the night with a copy of the daily sales report, and place the tips and the sales report in a safe, for which he had been given the combination.  (870, 895.)  He would then turn off all the lights in the restaurant and lock the

---

[4] Pistorio held staff meetings twice a day – once before the lunch shift and once before the dinner shift – which the waiters, food runners, busboys, white jackets, bartenders, and coffee makers would attend.  (758.)

[5] Pistorio testified that he never announced that Velandia was "an assistant manager," (1299-1300).  However, Pistorio, whose first language is Italian, testified that he does "not speak Spanish," (1322) and that he used English when communicating with the Spanish-speaking staff at Remi, (1322, 1334; see PX 28).  This language barrier seems to have contributed to a certain amount of confusion within the restaurant, and led to discrepancies in the trial testimony.

[6] All citations to (PX [no.]) are to Plaintiffs' Trial Exhibits in this case.

front door, taking the key home with him. (870.) Velandia and Pistorio both testified that, on occasions when Pistorio was not present, Velandia would take on the responsibilities of the general manager, including leading the staff meetings, and assigning employees to their work areas. (887, 1070-71, 1307; see PX 29). Velandia also testified that he would occasionally sit in on job interviews for prospective employees, either to translate or to act as a witness for Pistorio. (894.)

Velandia had at least the apparent authority to fire people himself. Both Sotarriba and former Remi employee Sergio Pastor ("Sergio") described a fight between Sergio and another employee which took place in 2007. Velandia happened to be out of the office when the fight occurred. (87, 244.) After it had ended, Pistorio called Sergio into his office. (87, 244.) Sergio testified that Pistorio told him to take his break and forget about the fight, which Sergio did, believing the issue to be settled. (244.) However, when Velandia returned to Remi the following week, he called Sergio downstairs into the manager's office. (87, 245.) Sergio testified that Velandia told him that Velandia was going to fire him, and then called Pistorio and two other individuals into the office. (245, 264-67.) Sergio testified that Pistorio then told Sergio that he had to leave because Oscar had fired him. (264.)

Sergio told Sotarriba and Caravantes that Velandia had fired him. (87, 245, 329.) Sotarriba testified that, later that day, Velandia told Sotarriba that he had given Sergio "86," and drew his hand across his throat, which Sotarriba understood to mean that Velandia had fired Sergio. (88.) Caravantes testified that, Pistorio later told Caravantes that Sergio had been fired because he had "pressed the wrong buttons." [7, 8] (331.) Caravantes also understood that

---

[7] The preceding statements, which were made in the presence of Plaintiffs, are only considered in so far as they bear on the Plaintiffs' state of mind.

[8] Both Pistorio and Velandia testified that it was Pistorio who made the decision to fire Sergio. However, this testimony was contradicted by the testimony of Sergio, as well as that of Sotarriba and Caravantes. It is possible

Velandia had the ability to suspend people, or send them home during their shift.  He testified

that he witnessed Velandia send home a busboy named Hector Dominguez.  (325.)

On May 31, 2008, Pistorio left Remi, and a few weeks later Carlos Maggi ("Maggi") took

over as the new general manager.  (1094.)  Velandia testified that, in the interim, Delledonne

acted as the general manager, with assistance from Velandia.  (769-70.)  Soon after Maggi took

over as general manager, however, Velandia's position changed, and he became the party

manager at Remi, in charge of setting up for parties and supervising the service in the Rialto

Room.  (777, 1097-98.)

### 3.      The "Game"

There was extensive testimony at trial regarding a "game" played by many of Remi's

male employees.[9]  (847, 983, 996.)  As part of this game, male employees would call each other

names such as "mami," "puta," "prosti," or "flower."  (842, 964, 978, 1028.)  They would also

grab or slap each other on the buttocks or on the genitals, (806, 968, 1011), and jokingly simulate

sex acts with one another.  For example, if "Employee A" had to bend down to pick something

up off of the floor, as part of the game, "Employee B" might come up behind Employee A, grab

Employee A around the waist, and pull Employee A's buttocks towards Employee B's crotch, as

if to simulate anal sex.  (845, 969-70, 1012, 1030-31.)  Or, if Employee A was bent down, or

---

that the language barrier played a part in this confusion.  (See supra at 5 n.5.)  Nevertheless, this factual dispute need
not be resolved, as the Court finds that Plaintiffs genuinely held the belief that Velandia had the power to fire them,
and that this belief was a reasonable one in view of all the other evidence presented as to the role of Velandia at the
restaurant.

[9] The witnesses providing this testimony included several individuals who are not parties to the case -- namely:
Pablo Solis, a heterosexual current employee of Remi who has worked there since 2000 as a busboy, food runner,
waiter, and bartender, (955-56); Yullios Donge, a heterosexual current employee of Remi who has worked there
since 2000 as a dishwasher, salad station worker, coffee maker, cleaner, and waiter, (1000-01); and Jose Ortiz, a
bisexual, former employee of Remi who worked there from 2000 until 2009 as a busboy, food runner, bartender, and
waiter, (1023-24, 1037).

kneeling on the floor, Employee B might come up in front of Employee A, grab Employee A's head, and push it towards Employee B's genitals, as if to simulate oral sex. (845, 970-71, 1012.)

Velandia testified that this game, which has been played at Remi since before 53rd Street Partners took over in 2005, was usually played before or after restaurant service, or between lunch and dinner, when the restaurant was empty except for the employees. (802-05, 841.) Many of the Latin American employees at Remi participated in the game, and it was specifically associated with a certain culture that existed in Mexico,[10] though employees from other countries participated as well. (849, 964, 1020, 1032.) Caravantes and Sotarriba each denied participating in the game, however there was credible testimony at trial by Solis, Donge, and Ortiz, that both of them participated to a certain extent. (971-74, 977, 981, 983, 1014, 1032-35.) Velandia admitted to touching Caravantes, Sotarriba, Sergio, and Moises Pastor, among others, on their genitals, over the clothes, as part of this game. (909-10.) Velandia also testified that, while Caravantes and Sotarriba engaged in the game, they never touched him on the genitals. (918, 838.)

### 4.    Remi's Sexual Harassment Policy

Remi admits that it did not have a written sexual harassment policy, nor did it provide sexual harassment training to any of its employees. (124-25, 1190.) Instead, as Delledone testified, Remi had an "open door" complaint policy, whereby any employee who had any sort of

---

[10] Solis, who is originally from Atlixco, Puebla, Mexico (the same city as Caravantes), (956, 967), testified regarding the game: "If there are Mexicans in the workplace, this is conduct that we bring with us; this is part of our culture. . . . [T]his is a game that we play even as children. This is a game that as children you play with your very close friends." (964, 966.) When asked what game he was referring to, Solis responded: "Touching each other's rear ends and sometimes simulating sex." (966.)

Donge, who is also from Atlixco, Puebla, Mexico, (1000), testified about the game as well: "Well, as Mexicans we have a custom. Like, for example, the gentleman that's standing next to me now, he's standing like that; I could just pass by and touch him. Anyone that could be like that, you know just pass by and touch them. I know it may sound a little strange, but it's part of our culture as Mexicans." (1012.)

The Court allowed this testimony "insofar as it relates to the parts of Mexico that the [witness] was brought up in, came from." (1013, 1484.)

issue could bring it up with him, or with the general manager of the restaurant. (1155, 1202.) However, even this policy was not adopted in writing by Remi. (1155.)

Pistorio testified that, in 2005, shortly after 53rd Street Partners took over ownership of Remi, he witnessed two male busboys "touching" each other in a sexual manner on the restaurant's premises. (1314, 1370-71.) After witnessing this incident, Pistorio had a discussion with Lockard, who told him that this type of conduct was "normal at Remi." (1314, 1371.) Pistorio responded by bringing the issue up at a staff meeting, stating that the conduct was not permissible, and by posting a memo on a bulletin board at Remi. (1314-15, 1372-73.) The memo, which was typewritten in English, explained that it was inappropriate for employees to touch one another. (1314-15, 1372-73.) Subsequently, Pistorio terminated two busboys whom he observed "touching" each other during a work shift. (1316.)

Delledone testified that 53rd Street Partners also put up posters in the restaurant, which informed employees of their rights under the law, and included the right to be free from harassment and discrimination based on sex or gender. (1149; see DX 19; DX 25.) These government-issued posters were updated on a biannual basis, (1145, 1376), and were printed in English, (1146; see DX 19; DX 25). It is unclear whether Spanish versions of these posters were also displayed at the Restaurant. (1196-1200.)

## C.    Sexual Harassment by Oscar Velandia

### 1.    Arturo Caravantes

Caravantes testified that he worked as a coffee maker[11] at Remi after 53rd Street Partners took over ownership of the restaurant in 2005. (281.) As a coffee maker, Caravantes would spend the majority of his time in the restaurant working in the "coffee station," which was

---

[11] When asked what he "actually did as a coffee worker," Caravantes responded, "I would prepare the coffee. I had to clean my station. That was it, mainly. To make coffee for the restaurant." (287.)

located off of a hallway which connected the Grand Canal to the Rialto Room. (283.) Initially, Carvantes worked from Monday through Friday, 4:00 p.m. to 12:00 a.m. (389.) However, in 2006, Pistorio gave Caravantes the extra responsibility of watching over the bar and staying in the restaurant until all of the employees had left. (392.) This required Caravantes to stay at Remi until 2:00 a.m. each night. (389-90.) Caravantes maintained these hours until the beginning of 2008. (391.)

Caravantes testified that Velandia began touching him in a sexual manner in 2005. (289.) The first time this happened was in the coffee station at Remi. (289.) Velandia approached Caravantes while he was working and grabbed at his genitals. (289.) Caravantes told Velandia not to touch him, and Velandia apologized. (289-90.) However, Velandia persisted, becoming more aggressive. He began to stick his hand down Caravantes' pants and touch his genitals directly. (292.) Caravantes testified that, after Velandia had finished touching him, "he would always smell his hand. At times, I even saw him with his hand in his mouth, in his nose. And I thought that he might be doing that to other people as well, because I knew he did it to me." (293.) This conduct was corroborated by a video, taken by Caravantes and admitted into evidence at trial, which shows Velandia entering the coffee station where Caravantes is working, turning off the lights, placing his hand down Caravantes' pants, and then smelling his hand. (PX 31; 306-07.)

Caravantes testified that Velandia would generally touch him while he was working in the coffee station. (293.) Customers were present in the restaurant during this time, but they could not see into the coffee station from the dining room. (294.) It escalated to the point that Velandia would grope Caravantes several times a day. (291, 296.) Caravantes testified that he "told [Velandia] not to touch me. I told him to leave. But he wouldn't listen. He would stay

there. I would move his hand and tell him I didn't like that. He didn't understand." (293.)
Caravantes also testified that Velandia began to make comments to him, such as "How big it is,"
"Let me kiss it," and "Let me suck it." (293.)

Towards the beginning of 2006, Velandia began to perform oral sex on Caravantes.
(400-01.) This occurred in the coffee station, as well as in other areas of the restaurant, including
the coat check of the Grand Canal, the bathroom in the Rialto Room, and in the manager's office
downstairs. (299-302.) By the beginning of 2007, Velandia was performing oral sex on
Caravantes on a nearly daily basis. (403.) Caravantes would force himself to ejaculate, as he
believed that this was the only way to get Velandia to stop.[12] (354, 406-07.) Caravantes never
performed oral sex on Velandia. (410.)

In mid-2007, Caravantes spoke with Pistorio about his desire to become a waiter. (348-
49, 405.) Caravantes testified that Pistorio responded by saying that "he was going to sit and
think about it." (350.) Subsequently, Caravantes told Velandia about the conversation he had
had with Pistorio, and affirmed to Velandia his desire to become a waiter. (351.) Velandia
responded by saying that Caravantes could become a waiter "in exchange for something." (352.)
Later that night, Velandia took Caravantes into the coat check of the Grand Canal and had him
sit down on a chair. (353.) Velandia began performing oral sex on Caravantes, and then forced
Caravantes to penetrate him anally. (353.) Thereafter Velandia and Caravantes engaged in anal
sex several other times, either in the coat check of the Grand Canal or in the coat check of the
Rialto Room. (356.) This would often take place after midnight, while Caravantes was waiting
to close up the restaurant. (357.) Each time, Caravantes would penetrate Velandia. (408.) Each
time, the pair would use a condom, which Velandia supplied. (832.)

---

[12] Caravantes testified at trial: "I would force my mind more and more just to finish quicker. That would be the only
way he would leave me alone, when I would finish." (354.)

Caravantes testified that he never complained of Velandia's conduct to anyone because he was afraid that he would lose his job if he did. (310, 364.) Caravantes also believed that he would never be promoted to the position of waiter if he did not continue to submit to Velandia's sexual advances. In October 2007, Caravantes did complain to Pistorio about inappropriate touching by Ben Ranieri ("Ranieri") (a waiter at Remi), (363), a complaint that was largely ignored, (365, 1168). At the beginning of 2008, upon hearing that the coffee station job would be eliminated, Caravantes once again asked for an opportunity to work as a waiter at Remi. (1337.) Caravantes testified that in response to this inquiry, Pistorio "turned very aggressive," and told Caravantes that he would "was never going to be a waiter there or in any other restaurant."[13] (362.) After this incident, Caravantes finally ended his sexual relationship with Velandia. (310, 362.)

Velandia testified that Caravantes was the one who initiated the touching in approximately 2005, and that it was Caravantes who escalated the touching from something that was part of the game, to something more serious. (808-09.) Velandia also claimed that it was Caravantes who initiated the commencement of oral sex between them, (817), and that thereafter "[i]f Caravantes wanted to initiate it, he would come and touch me and tell me that he would wait for me at the coat check. Or if I was going to initiate it, I would ask him, do you want me to stay?" (825). He testified that he performed oral sex on Caravantes on approximately ten occasions in total. (824.) Velandia testified that "weeks" after he started performing oral sex on Caravantes, "Caravantes asked me whether I had a condom and wanted to have anal sex, and I said yes." (829-30.) Velandia testified that he and Caravantes engaged in anal sex "a little bit

---

[13] Pistorio testified that during this discussion in early 2008, he told Caravantes that he would just have to work as a food runner before working a waiter, but that Caravantes refused. (1334-42.) However, this conversation was in English, (1334), and thus it is possible that its substance was lost in translation, (see supra at 5 n.5).

more than ten times" in total, (827-28), and that sometime in 2007, "[a]ll of a sudden" the encounters ended, and neither he nor Caravantes spoke about it. (833.)

The Court finds that Velandia's claim that the relationship was initiated by Caravantes, and his description of how the relationship escalated from touching to consensual oral and anal sex, was not credible. As Plaintiffs point out in their post-trial brief, Velandia's testimony at trial was inconsistent with his deposition testimony with respect to certain critical details about Caravantes' alleged initialization of the sexual relationship. (See Pls.' Post-Trial Mem. at 16 n.14.)[14] Moreover, it seems unlikely that Carvantes, a self-identifying heterosexual father of three who had been married for over a decade, would suddenly initiate a homosexual relationship with a superior at his job without some sort of prompting from Velandia. The Court credits Caravantes' version of the events.

On March 10, 2008, Caravantes submitted a complaint to the New York State Division of Human Rights ("NYSDHR") which was cross-filed with the Equal Employment Opportunity Commission ("EEOC") against 53rd Street Partners and Ranieri. (PX 19.) The complaint stated, inter alia, that "[o]n or about October 11, 2007, I was working and Ben Ranier, [sic] Waiter, inappropriately touched me on my penis. I complained to Mr. Pistorio, he said it might have been by accident. I told him that Mr. Rainer [sic] has in the past sexually harassed other employees. No action was taken." (Id. ¶ 5.) Caravantes testified that he did not make any

---

[14] First, Velandia testified at trial that Caravantes' erect penis was inside of his pants when he pressed it against Velandia. (Tr. 813:8-814:6; 925:12-17.) At his deposition however, he testified that Caravantes' penis was outside of his pants and that when Velandia touched it, he "could feel the skin." (Tr. 925:18-926:12.) Second, Velandia testified at trial that shortly thereafter, Caravantes exposed his penis to Velandia from behind a milk jug and Velandia, with his "heart beating wildly," immediately touched it. (Tr. 815:11-816:6; 931:4-19.) Yet at his deposition, Velandia testified that "[t]hat day, there was no touching" but that he only "saw what was happening." (Tr. 931:22-20.) (Pls.' Post-Trial Mem. at 16 n.14.)

allegations against Velandia in the complaint because he was still working at Remi, and was afraid he would lose his job if he did. (369.)

In the summer of 2008, shortly after Carlos Maggi took over as the general manager at Remi, Velandia became the party manager. (1097-98) Around the same time, Maggi decided to change the coffee system at Remi, by replacing the manual espresso machine with a new one that used pods. (1099-1100.) This change meant that the position of coffee station operator was no longer necessary, since the busboys and waiters could easily prepare the coffee themselves. (1099-1100; DX 14.)[15] Maggi testified that he notified Caravantes that his position was going to be eliminated. (1099, 1101-02.) In August 2008, Maggi spoke with Caravantes and offered him a job as a food runner, or as part of the cleaning crew of the restaurant. (1104.) Caravantes responded that the only position he would accept was waiter or coffee station operator. (1104; see DX 14.) Maggi asked Caravantes to reconsider, and gave him a week-long paid vacation to think about the offer. (1113.) Caravantes returned to Remi the following week, and reiterated his desire to either return to his old job, or become a waiter. (1116.) Maggi told Caravantes that his old job was no longer available, and that he did not have the experience to become a waiter. (1116.) Since Caravantes was not willing to compromise, he was let go. (1116.) Caravantes' last day of work at Remi was August 11, 2008. (424.)

On January 15, 2009, Caravantes filed an amended charge with the EEOC alleging discrimination on the basis of sex by Velandia. (PX 96.)[16] On June 2, 2009, Caravantes filed an amended verified complaint with the NYSDHR, which was cross-filed with the EEOC, against 53rd Street Partners, Ranieri, and Velandia. (PX 21.) The amended complaint contained

---

[15] All citations to (DX [no.]) are to Defendants' Trial Exhibits in this case.

[16] Defendants never received a copy of this charge. (See 1171.)

numerous allegations of sexual harassment by Velandia. (See id.) On June 12, 2009, the EEOC

issued Caravantes a Notice of Right to Sue on the charges in the amended complaint. (PX 98.)

### 2.     Francisco Sotarriba

Sotarriba testified that, from 1999 until 2004, he worked as a busboy[17] at Remi

Restaurant. (31-32.) In 2004 he became a food runner,[18] and remained in that position until

2008 when he left Remi. (32.) Velandia, Solis, and Donge, among others, testified that Sottariba

participated in the game throughout his tenure at Remi, engaging in touching and name-calling

with other Remi employees, including Velandia. (838-40, 916-17, 971-74, 977, 1014.) Velandia

also testified that Sotarriba and he were friendly with each other, and socialized outside of Remi,

going out to bars or clubs together, along with other employees. (837, 962.) Sotarriba testified

that, beginning in 2001, Velandia began to sexually harass him. (67.)

In the Grand Canal at Remi there were "server stations," where linens, utensils, cutlery,

water, condiments, and other items were kept. (41.) Sotarriba testified that, while working at

Remi both as a busboy and as a food runner, he would enter both the back and the middle server

stations multiple times during his shifts.[19] (44-46.) Waiters would also use the server stations in

order to enter customer orders into the computers that were located there. (48, 58.) Occasionally

when Sotarriba entered one of the server stations, Velandia would be there. (48.) Sotarriba

testified that during these encounters, Velandia would frequently grab at Sotarriba's genitals

(over the clothes), grind his buttocks into Sotarriba, or grab Sotarriba's shirt and pull him close.

---

[17] As Sotarriba testified, "[t]he work of a busboy is to bring bread to the table, place water, and keep it clean. After the people are done, to set up the table again." (32.)

[18] As Sotarriba testified, "[t]he food runner brings the food from the kitchen to the table because the kitchen is below in the basement. Just wait for the food to be ready and bring it up to the table. . . . I would serve the food. I could offer them pepper. If a customer asked what the food was prepared with, I had to give them a small explanation. And then return to the kitchen and get more food." (33.)

[19] Sotarriba testified that he would use each of the server stations approximately 10 to 15 times per shift while working as a busboy, and approximately five times per shift while working as a food runner. (44-46.)

(48, 58, 234-35.) Velandia would also make sexually-explicit comments to Sotarriba such as "Let me suck it," "Let me touch it," or "I want to see how big it is." (48, 58-59.) Sotarriba responded by pushing Velandia away from him, and exiting the server station. (49.) Sotarriba testified that despite his resistance, Velandia continued to touch him. (57.)

Sotarriba testified that this behavior occurred in other areas of the restaurant as well, such as the coffee area. (60-61.) He testified that Velandia would intentionally drop his pen in front of Sotarriba, and grind his buttocks into Sotarriba's groin as he went to pick it up. (374-76.) Sotarriba responded by telling Velandia to stop, or pushing him away and leaving the server station. (49, 57, 59.) Sotarriba testified that he even threatened to strike Velandia if he did not cease this conduct, though he never followed through on these threats. (57, 176-77, 206.) Sotarriba testified that he never complained to anyone about Velandia's conduct, in part because he was afraid of retaliation by Velandia. (50, 53-56, 60, 62, 72-73.) However, Velandia's behavior made Sotarriba feel "ashamed," (50, 60), and "isolated," (131-32.)

By the time 53rd Street Partners took over ownership of Remi, Sotarriba was working as a food runner, and thus Velandia had fewer opportunities to touch him. (70.) However, Sotarriba testified that Velandia's comments toward him became more aggressive, including telling Sotarriba at one point: "F you. Stick me with it. I promise you I will shit on it." (70.) Sotarriba testified that, at some point after the new management took over, Velandia and another Remi employee named Jose Ortiz approached Sotarriba while he was changing in the staff locker room. (70-71.) As Sotarriba testified:

> I was changing my pants in the locker room when Oscar [Velandia] entered. Then he started yelling, "oh, manita,[20] come over" and then Jose Ortiz entered. And they jumped on me, and then Oscar started pulling down my pants. Then I

---

[20] When asked what "manita" meant at trial, the interpreter responded: "The interpreter's understanding, it's like little sister, like a term of endearment. Little sister." (71.)

> fell down, and then while I was on the floor, they were pulling me off, and I was
> very mortified because there were people there.

(70.) Sotarriba testified that he was able to prevent Velandia and Ortiz from pulling off his

pants, but that he was "mortified" by the incident. (73.) Sotarriba testified that Velandia and

Ortiz attempted to remove his pants while he was changing in the locker room yet again on

another occasion. (70.)

Sotarriba testified that, in December of 2007, Velandia stopped touching him. (115.)

During that same month, Pistorio told Sotarriba that he wanted Sotarriba to become a waiter.

(116.) Sotarriba responded that he could not become a waiter because he did not speak English.

(116.) Shortly thereafter, Velandia had a conversation with Sotarriba in which he told Sotarriba,

"You're going to be a waiter." (116.) When Sotarriba protested, Velandia told him: "I don't

care. I'm the manager here and I make the decisions, [and] my decision will be that either I

lower your pay or I fire you." (116.) Velandia denies ever having this conversation. (850.)

Sotarriba testified that, after this conversation, Velandia began assigning Sotarriba extra

work, such as carrying large dinner tables or cases of wine up from the basement – tasks that

Sotarriba testified were usually performed by multiple workers, but which Velandia required him

to perform alone.[21] (117-18.) Velandia would also order Sotarriba to perform tasks that were

not part of his job, such as taking trays of dirty dishes down to the kitchen, (120), and sometimes

refused to allow Sotarriba to take his break, (119-20). Velandia threatened to fire Sotarriba if he

did not comply with these directives. (119.) Sotarriba testified that this behavior persisted until

May 31, 2008, when he stopped working at Remi. (121.)

---

[21] On cross-examination, Sotarriba admitted that cases of wine were generally transported from the basement to the
main floor by loading them onto hand trucks and then using the restaurant's freight elevator. (160.)

17

While Velandia admits that he and Sotarriba engaged in mutual sexual touching as part of the game, he disputes that his actions went beyond to parameters of the game, and also disputes the frequency of the touching. Velandia testified that "[a]ll these games were sporadic. They were not daily. It is in the same manner that one jokes with friends, we don't joke around every day with friends." (843.) Velandia also testified that when he did touch Sotarriba, Sotarriba never pushed him away or asked him to stop. (847-48.) Velandia and Ortiz both deny ever attempting to pull Sotarriba's pants down in the locker room at Remi. (846, 1040.)

As Defendants point out in their post-trial brief, Sotarriba gave inconsistent testimony regarding the frequency and duration of Velandia's sexual touching and comments towards him.

> During his direct trial testimony, on two separate days, Sotarriba testified that the alleged sexual touching stopped when the new company took over in April of 2005. (TT 49, 67). On day three of his trial testimony and in his deposition, he claims the touching stopped in December of 2007. (TT 69). . . . Similarly, Sotarriba alleged that from 2000 or 2001 until the new company took over in April 2005, Velandia touched him only a few times a day. ( TT 180-181). During his deposition, however, Sotarriba testified that Velandia touched him 10-15 times a day (TT 178-180), and finally at trial he testified the alleged touching occurred 7, 8, or 10 times a day. (TT 49).

> Sotarriba again could not keep his story straight regarding the frequency of the touching once the new company took over until 2008. During trial, he claims the touching stopped (TT 49, 67), in a sworn affidavit he alleged the touching increased to 10-15 times per day ( TT 181). Lastly, during cross examination, he testified the touching decreased to 3-4 times a day after April 2005. (TT 177). Sotarriba's description of the conduct he claims constitutes sexual harassment is irreconcilable and cannot be given any credence.

(Defs.' Post-Trial Mem. at 4-5.)

The Court finds that Sotarriba was unreliable as a witness, and that his testimony regarding Velandia's touching of him at Remi was not credible in many respects. The Court does not credit Sotarriba's claims that he was groped multiple times a day, for years, during work hours, in the server stations at Remi restaurant located right off of the main dining room, while

customers dined a few feet away.  While the evidence presented at trial showed that Velandia

was a predator, it also showed that he was careful to ensure that the sexual activity he engaged in

on the premises of Remi did not take place in view of the restaurant's customers.  While

Velandia was irresponsible with regards to his sexual trysts, he was also ambitious when it came

to his professional career, and it is not credible that he would have acted as recklessly as

Sotarriba claims.  Furthermore, the Court does not credit Sotarriba's claim that Velandia

assigned him extra work after he stopped touching Sotarriba.

Neither does the Court credit Sotarriba's testimony regarding the two incidents that took

place in the locker room in which Velandia and Ortiz supposedly attempted to pull down

Sotarriba's pants in the presence of other staff members.  Velandia and Ortiz both denied

involvement in these incidents.  Furthermore, Sotarriba's testimony with respect to these

incidents was inconsistent with the testimony of Sergio Pastor, who purportedly witnessed them.

When asked about the locker room incidents, Sergio testified that he saw Sotarriba take his own

pants off, and that "after he took his pants off," Velandia and Ortiz "would grab his parts."  (232-

34.)  However, when the Court asked Sotarriba if Velandia and Ortiz "pulled your pants off you

entirely or only partway," he responded, "I – yes, they tried to pull them down, but I was holding

on to them like this so they weren't able to pull them off."  (73.)  Sotarriba never testified that

Velandia or Ortiz grabbed his genitals during these incidents in the locker room.  The evidence

presented does not prove by a preponderance of the evidence that these locker room incidents

occurred.

On January 20, 2009, five days after Caravantes had filed an amended complaint with the

EEOC alleging sex discrimination by Velandia, Sotarriba filed a charge of employment

discrimination with the EEOC alleging that 53rd Street Partners discriminated against him on the

basis of sex, and making specific allegations of sexual harassment with regards to Velandia. (129-30.) On August 7, 2009, the EEOC issued Sotarriba a Notice of Right to Sue. (PX 99.)

### 3.   Sergio & Moises Pastor[22]

Sergio Pastor testified that he began working at Remi in February of 2004 when he was 15 years old, (221), and worked there until 2007 when he was fired. (221.) He started as a white jacket, and then was promoted to busboy, and subsequently to food runner. (221.) Sergio testified that he first time Velandia performed oral sex on him was in 2004. (228.) Sergio had gone to get candles from the mechanical room in the basement of Remi, (228), and after he entered the room, Velandia came in behind him and closed the door. (229.) Velandia proceeded to lower Sergio's pants and perform oral sex. (229.) After he finished, he told Sergio not to say anything to anyone about what had happened. (229.) Sergio, who was 15 at the time, (228), was a virgin with no prior sexual experience, (230). Sergio testified that Velandia continued to perform oral sex on him two or three times a week for the next three years. (231.) Also, while in the restaurant, Velandia would put his hand down Sergio's pants, then take his hand out and smell it. (232.)

In August of 2007, after he was fired from Remi, Sergio filed a complaint with the NYSDHR. (269-71.) The complaint was brought against 53rd Street Partners and Velandia, and alleged that Velandia wanted to have sexual relations with Sergio, but that Sergio refused. (271-72.) On November 23, 2007, the EEOC issued Sergio a Notice of Right to Sue on the charges in the complaint. (DX 48.) Sergio, however, never filed suit. (1163.)

Moises Pastor ("Moises") is Sergio's brother.[23, 24] (455.) He worked at Remi from mid-2005 until November of 2007. (446.) When he began working at Remi, he was just 14 years

---

[22] The testimony of Sergio and Moises Pastor was admitted solely as background information to describe the culture of sexual harassment that existed at Remi during the time period that the Plaintiffs were working there. (See 224.)

old. (See 443, 456.) Moises worked both as a white jacket and a busboy. (461.) The first time

Velandia touched Moises inappropriately was in the locker room of Remi. (477-78.) When

Moises was asked to describe what Oscar Velandia did to him, the following exchange took

place:

> Q: What did he do, what did Oscar do?
>
> A: He would sit on my lap and then he would act like a – like a young woman and
> he would turn off all the lights. And then I would feel very uncomfortable. He
> would come and sit over here. I'm a man. And then I was a young man. I was a
> boy. And he would come and he would sit higher (indicating).
>
> Q: And this occurred in the locker room?
>
> A: Yes, in the chair.
>
> Q: How many times did that take place where Oscar came into the locker room
> and sat on your lap?
>
> A: There were many times. There were many times. And there were many times
> that – that he wouldn't leave me alone. That he wouldn't leave me.

(479.) Moises testified that other people would sometimes be present in the locker room while

this was occurring. (480.) Moises testified that Velandia also touched him inappropriately in the

manager's office several times, as well as in the coffee station and in the coat check. (481.)

Moises also testified that Velandia performed oral sex on him more than 20 times while he was

working at Remi. (487.)

---

[23] Moises testified by designation at trial. (442.)

[24] Defendants moved to utilize extrinsic evidence contained in Defense Exhibits 42, 44, and 45 (records from the
Phoenix House treatment center) to contradict Moises Pastor's deposition testimony, and to impeach his credibility
by evidence of his illegal drug use and gang membership and based on prior inconsistent statements contained in the
records. (See Defs.' Mem. in Opp. to Pls.' Mot. in Limine #2, ECF No. 92.) The Court finds that Moises' illegal
drug use during the period of his employment at Remi is irrelevant to his credibility and that his gang membership is
also irrelevant. The Court also finds that Moises' deposition testimony is not inconsistent with his prior statements
contained in the Phoenix House records, and thus the extrinsic evidence is not admissible. Furthermore, even if the
Court were to admit this evidence, it has a minimal impact on Moises's credibility regarding his testimony about the
work environment at Remi.

Moises indicated that Velandia used his authority as the individual in charge of distributing tips to coerce Moises into unwanted sexual activity. (See 483, 487, 496-98.) In order to receive an advance on his tips, Moises first had to allow Velandia to perform oral sex on him. (See 487.) Moises testified that Velandia also directed inappropriate sexual comments towards him, including telling Moises that he was "sexy" and that he "love[d]" him. (512.)

Velandia testified that he never propositioned or engaged in any sort of sexual act with Sergio or Moises, but that they would occasionally touch each other as part of the game. (852-53, 866-67.) However, Velandia had an extreme motive to lie about sexual exploits involving two individuals who were under 16 years of age at the time. The Court found Sergio and Moises to be credible witnesses, and did not find Velandia's testimony on this issue to be credible.

## II.    CONCLUSIONS OF LAW

### A.    Jurisdiction and Venue

The Court has original jurisdiction over Plaintiffs' First Cause of Action for Sexual Harassment under Title VII of the Civil Rights Act of 1964 pursuant to 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over Plaintiffs' Second, Third, Fourth, and Fifth Causes of Action under the New York State Human Rights Law and the New York City Human Rights Law pursuant to 28 U.S.C. § 1367(a).

Venue is proper in the Southern District of New York pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.SC. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District.

Defendant 53rd Street Partners, LLC is an "employer" subject to Title VII, NYSHRL, and NYCHRL. See 42 U.S.C. § 2000e-2(a) to 2(b) (providing that Title VII prohibits discrimination by an "employer," which is "a person engaged in an industry affecting commerce

22

who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person"); N.Y. Exec. Law §§ 292(5), 296(1) providing that (NYSHRL prohibits discrimination by an "employer" who has at least "four persons in his or her employ"); N.Y.C. Admin. Code §§ 8-102(1), 8-107(l)(a) (same as NYSHRL).

**B.     Statute of Limitations**

As mentioned supra, Defendants' statute of limitations arguments under Title VII were not accepted by the Court at summary judgment, see Caravantes, 2012 WL 96474, and the evidence presented at trial has not changed the Court's opinion with respect to Caravantes. Thus, 53rd Street Partners is liable under Title VII for all actions which violated Caravantes' rights from the date that Velandia initiated the sexual relationship in 2005 (after 53rd Street Partners had take over ownership of Remi), until Caravantes ceased working at Remi in 2008, since the acts complained of were part of a continuing violation. See id., at *7-8.

However, the same cannot be said of Sotarriba's claims. As the Court noted in its previous opinion, Sotarriba filed his charge with the EEOC on January 20, 2009, and thus the 300-day statutory period dates back to March 26, 2008. Id., at *8. While the Court acknowledged that Velandia's physical harassment of Sotarriba ceased in December 2007, it found that his action was not time-barred under Title VII because Plaintiffs asserted that Velandia continued to discriminate against Sotarriba until May 2008, and thus an act contributing to the hostile environment claim took place within the statutory time period. Id. However, the evidence presented at trial was not sufficient to prove these allegations by a preponderance of the evidence. Instead, as discussed in more detail infra, the evidence showed that Sotarriba was a willing participant in the game at Remi, which involved sexual touching,

23

and, thus, that he welcomed much of the touching that he alleged to be sexual harassment. Furthermore, the evidence presented was not sufficient to demonstrate that Velandia continued to discriminate against Sotarriba by assigning him extra work after the physical touching ceased. Therefore, Sotarriba's Title VII claim is time-barred. See Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 220 (2d Cir. 2004) ("To bring a claim within the continuing violation exception, a plaintiff must at the very least allege that one act of discrimination in furtherance of the ongoing policy occurred within the limitations period.") However, as Defendants have not pled the affirmative defense of timeliness as to Plaintiffs' claims under the NYSHRL and NYCHRL, these claims survive.

**C.    Sexual Harassment Hostile Work Environment**

Title VII of the Civil Rights Act of 1964 states: "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his . . . terms[ or] conditions . . . of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a). Courts will "review discrimination claims brought under the NYSHRL according to the same standards that [they] apply Title VII discrimination claims." Pucino v. Verizon Commc'ns, Inc., 618 F.3d 112, 117 n.2 (2d Cir. 2010). Thus, to prove a prima facie case for sexual harassment under Title VII and the NYSHRL, a plaintiff must show by a preponderance of the evidence that (1) he was subjected to sexual conduct in the workplace that constituted discrimination based on his sex, and (2) that such conduct was unwelcome. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64-68 (1986). In addition, a plaintiff claiming he was the victim of a hostile work environment must demonstrate that "the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment." Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003).

24

In order to prove a prima facie case under the NYCHRL, a plaintiff need not demonstrate that he was subjected to "severe and pervasive" sexual harassment; only that he "has been treated less well than other employees because of h[is] gender."[25] Williams v. New York City Hous. Auth., 61 A.D.3d 62, 78 (N.Y. App. Div. 1st Dep't 2009) (holding that the NYCHRL's "uniquely broad and remedial purposes . . . go beyond those of counterpart State or federal civil rights laws"). Courts must "construe [the NYCHRL] . . . broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." Albunio v. City of New York, 16 N.Y.3d 472, 477-78 (N.Y. 2011). "Thus, while federal discrimination caselaw is still applicable to NYCHRL claims, it should be considered as a 'floor below which the [NYCHRL] cannot fall, rather than a ceiling above which [it] cannot rise.'" Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., No. 09 Cv. 1251 (DAB), 2011 WL 3586060, at *5 (S.D.N.Y. July 29, 2011) (quoting Williams, 61 A.D.3d at 66-67)).

While "Williams held that courts should not restrict NYCHRL claim analysis to the traditional analytical frameworks for sexual harassment, . . . in the absence of any guidance on an alternative framework for applying the NYCHRL," courts "will begin with the traditional . . . hostile work environment analyses, and then incorporate the special considerations articulated in Williams." Mihalik, 2011 WL 3586060, at *6; see also Leibowitz v. Cornell Univ., 584 F.3d 487, 498 n.1 (2d Cir. 2009) ("gender discrimination claims brought pursuant to the . . . NYCHRL are analyzed under the Title VII framework"); Winston v. Verizon Servs. Corp., 633 F. Supp. 2d 42, 48 (S.D.N.Y. 2009) (noting lack of clarity about contours for the application of the NYCHRL post-Williams and applying Title VII framework).

### 1.   Caravantes

---

[25] Though not relevant to the liability inquiry under the NYCHRL, "questions of [the] 'severity' and 'pervasiveness' [of the sexual harassment] are applicable to consideration of the scope of permissible damages." Williams, 61 A.D.3d at 76 (citing Farrugia v. N. Shore Univ. Hosp., 13 Misc. 3d 740, 748-49 (N.Y. Sup. Ct. 2006)).

a.    *Discrimination on the Basis of Sex*

"Sex discrimination consisting of same-sex sexual harassment is actionable under Title

VII . . . ." Redd v. New York State Div. of Parole, 678 F.3d 166, 175 (2d Cir. 2012) (quoting

Oncale v. Sundower Offshore Servs., 523 U.S. 75, 80 (1998)). "In same-sex harassment cases . .

. an inference that physical contact was because of an employee's sex may be less evident." Id.

However, "it is reasonable to assume" that a harasser's "explicit or implicit proposals of sexual

activity" were "because of" the victim's sex if there is "credible evidence that the harasser was

homosexual." Oncale, 523 U.S. at 80-81.

Here, it is undisputed that Velandia self-identifies as a homosexual, and exhibited sexual

desire toward Caravantes. Velandia engaged in sexual acts with Caravantes on the premises of

Remi, including sexually explicit comments and oral and anal sex. Thus, Velandia's harassment

of Carvanates was based on sex.

b.    *Conduct was Unwelcome*

"The gravamen of any sexual harassment claim is that the alleged sexual advances were

'unwelcome.'" Meritor, 477 U.S. at 68. "The correct inquiry is whether [the plaintiff] by [his]

conduct indicated that the alleged sexual advances were unwelcome, not whether [his] actual

participation in [the conduct] was voluntary." Id. Thus, "the fact that the sex-related conduct

was 'voluntary,' in the sense that the complainant was not forced to participate against h[is] will,

is not a defense to a sexual harassment suit brought under Title VII." Id. As the Second Circuit

has held in Karibian v. Columbia Univ., 14 F.3d 773, 778 (2d Cir. 1994), a "supervisor's conduct

is equally unlawful under Title VII whether the employee submits or not . . . . We do not read

Title VII to punish the victims of sexual harassment who surrender to unwelcome sexual

encounters. Such a rule would only encourage harassers to increase their persistence." As noted

by the Supreme Court, "[t]he question of whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." Meritor, 477 U.S. at 68.

There was ample evidence to demonstrate that Caravantes did not welcome Velandia's sexual conduct. Caravantes testified credibly at trial that Velandia was the one who initiated the sexual relationship, and escalated it from occasional touching to something far more serious. Though Caravantes did not complain to anyone while the sexual abuse was occurring, it was his fear of losing his job that prevented him from doing so. And while Caravantes' participation in the oral and anal sex was not necessarily forced, neither was it invited. Caravantes testified that he actively resisted Velandia's sexual advances at first, and went out of his way to avoid making contact with Velandia. (356-59.) He also testified that, while Velandia was performing oral sex, "I felt dead. I couldn't respond. I felt like I was being injected with something that paralyzed me." (300.) His testimony was corroborated by a video recording, made by Caravantes, showing Velandia turning off the lights in the coffee station, reaching into Caravantes' pants to touch his genitals, and then taking out his hand and smelling it, all as Caravantes stood motionless. (See PX 31.) Thus, the evidence demonstrated by a preponderance of the evidence that Velandia's sexual advances were unwelcome.

          c.    *Conduct was Severe and Pervasive*

"For sexual harassment to be actionable [under Title VII and the NYSHRL], it must be sufficiently severe or pervasive – both subjectively and objectively – to alter the conditions of the victim's employment and create an abusive working environment." Redd, 678 F.3d at 175 (internal citations and quotations omitted). While "[o]rdinary socializing in the workplace – such as male-on-male horseplay or intersexual flirtation," does not constitute discriminatory

27

conditions of employment, the Second Circuit has recognized that "[d]irect contact with an intimate body part constitutes one of the most severe forms of sexual harassment." Id., at 176, 177. "When entering a workplace, reasonable people expect to have their autonomy circumscribed in a number of ways; but giving up control over who can touch their bod[ies] is usually not one of them." Id. at 179 (quoting Patton v. Keystone RV Co., 455 F.3d 812, 816 (7th Cir. 2006)). A court must use "[c]ommon sense, and an appropriate sensitivity to social context . . . to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." Oncale, 523 U.S. at 82.

> i.    Objective Hostility

"The objective hostility of a work environment depends on the totality of the circumstances viewed from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances including the social context in which particular behavior occurs and is experienced by its target." Redd, 678 F.3d at 176 (internal citations and quotations omitted). Thus, the question is whether or not a reasonable person in Caravantes' position at Remi would find Velandia's actions sufficiently severe and pervasive to create a hostile work environment.

As an initial matter, Plaintiffs have failed to prove by a preponderance of the evidence that the game played by the employees at Remi was anything more than horseplay. However, Caravantes testified that he was subjected to an unwanted sexual relationship with Velandia which included oral and anal sexual intercourse on the premises of Remi. It is clear that this behavior extended beyond the parameters of the game. By virtue of this relationship, Caravantes was placed in a position where he was forced to compromise his sexual autonomy in order to get

28

through the work day.  Accordingly, Velandia's conduct rendered Caravantes' work environment objectively hostile.

*ii.*     *Subjective Hostility*

Defendants contend that, even if the Court finds that Plaintiffs' work environment was objectively hostile, Plaintiffs' "failure to complain to anyone at [Remi] regarding Velandia's alleged behavior is conclusive evidence that Plaintiffs subjectively did not view their work environment as sufficiently hostile as to alter the terms and conditions of their employment." (Defs.' Post-Trial Mem. at 7 (emphasis in original).)  However, the cases cited by Defendants in support of their argument are distinguishable.  In Chan v. New York City Transit Auth., No. 03 CV 6239, 2004 WL 1812818 (E.D.N.Y. July 19, 2004), the plaintiff's 15-month delay in reporting a single incident of inappropriate sexual conduct led the court to conclude that the plaintiff's claim was time-barred.  In Fierro v. Saks Fifth Ave., 13 F. Supp. 2d 481 (S.D.N.Y. 1998), the Court determined that defendants had established the Faragher/Ellerth affirmative defense to liability due to plaintiff's failure to take advantage of his employers clearly stated anti-harassment policy and complaint procedure.  Thus, neither case stands for the proposition that a plaintiff's delay in filing a complaint is sufficient to prove that he did not subjectively view his work environment to be hostile.

Furthermore, Defendants' statement that "Plaintiffs' desire to continue employment with 53rd Street, even after the alleged sexual harassment with Velandia, conclusively demonstrates that they did not subjectively perceive the work environment to be hostile," (Defs.' Post-Trial Mem. at 7), is simply not the law.  Caravantes' silent endurance of Velandia's sexual harassment can be attributed to a number of factors, including the reality that he had a family to take care of,

29

and had been working at Remi for almost two decades in a job that provided him with much-needed financial stability.

Caravantes testimony at trial clearly established that he viewed Velandia's behavior as hostile.  With respect to his sexual relationship with Velandia, Caravantes testified that, "I felt like when a prey is captured by a predator.  For me Oscar was like an anaconda, like he would just capture his prey and use it, and when he's done with it, he kills you.  That's what it felt like to me." (303.)  He testified that after he and Velandia had engaged in a sexual act, "I felt dirty.  I felt bad.  I wouldn't want to leave my station.  I wouldn't want to speak to anyone.  I felt dirty." (303.)  The record is clear that Velandia's unwanted sexual conduct altered the conditions of the Caravantes' employment and that he viewed his work environment as severely abusive.  This sexual harassment was sufficiently severe and pervasive to create a hostile work environment under Title VII, the NYSHRL, and the NYCHRL.

### 2.    Sotarriba[26]

#### a.    *The NYSHRL*

As noted supra, a court must use "[c]ommon sense, and an appropriate sensitivity to social context . . . to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." Oncale, 523 U.S. at 82.  This is so because "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Id.

---

[26] As Sotarriba's Title VII claim is time-barred, this analysis applies only to his NYSHRL and NYCHRL claims.

The evidence at trial demonstrated that there was a culture of male-on-male sexual horseplay at Remi, which Sotarriba participated in. Sotarriba willingly subjected himself to a certain amount of sexual touching by virtue of his involvement in the game, and Velandia's touching of Sotarriba did not extend beyond the parameters of this game. Thus, Sotarriba's claim under the NYSHRL fails, as Velandia's actions were not sufficiently severe and pervasive to create an <u>objectively</u> hostile work environment.[27] See, e.g., <u>Jones v. Potter</u>, 301 F. Supp. 2d 1, 11-12 (D.D.C. 2004) (male supervisor's alleged harassing conduct towards employee, which consisted of rubbing his penis against employees buttocks on one occasion in front of co-workers was not severe or pervasive enough to create sexually hostile work environment).

> b.    *The NYCHRL*

"[A]ll that is required to sustain a NYCHRL 'hostile work environment claim' is 'unequal treatment'" based upon [gender]." <u>Fattoruso v. Hilton Grand Vacations Co., LLC</u>, No. 12 Cv. 911 (KBF), 2012 WL 2102394, at *6 (S.D.N.Y. June 11, 2012) (quoting <u>Williams</u>, 61 A.D.3d at 79)). As the <u>Williams</u> court noted, however, "the broader purposes of the [NYCHRL] do not connote an intention that the law operate as a general civility code." 61 A.D.3d at 79. (internal quotation marks and citation omitted). Thus, "defendants can . . . avoid liability [under the NYCHRL] if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences. <u>Id.</u> at 80 (internal quotation marks omitted).

In this case, Plaintiffs have failed to demonstrate that Velandia's actions with respect to Sotarriba constituted more than "trivial inconveniences." While the game itself was boorish and juvenile, Sotarriba was a willing participant. Thus, his work environment cannot be considered

---

[27] As such, the Court need not determine whether Sotarriba <u>subjectively</u> viewed his work environment as sufficiently hostile as to alter the terms and conditions of his employment.

hostile, even under the more lenient standards of the NYCHRL.  Sotarriba's claims fail in their entirety.

**D.      Liability of 53rd Street Partners**

"An employer is subject to vicarious liability of an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998) (Title VII); see Zarkzewska v. New Sch., 14 N.Y.3d 469, 479 (N.Y. 2010) (finding that the NYCHRL imposes strict liability on the employer if "the offending employee 'exercised managerial or supervisory responsibility'"). "Employers are not, by contrast, vicariously liable for hostile work environment created by a mere co-worker of the victim." Mack, 326 F.3d at 123.  Thus, a defendant-employer's liability hinges on the supervisory status of the harassing employee.

"An employee is deemed to possess supervisory status if he or she has 'the authority to affect the terms and conditions of the victim's employment.'" Prince, 427 F. Supp. 2d at 382 (quoting Mack, 326 F.3d at 125).  However, "in order to be deemed a supervisor, an individual need not be a 'nominal supervisor.'" Id. at 383 (quoting Hernandez v. Jackson, 997 F. Supp. 412, 417 (S.D.N.Y. 1998)).  As the district court recognized in Prince,

> The Second Circuit has held that supervisory authority should not be narrowly defined as simply "the power to hire, fire, demote, promote, transfer, or discipline an employee." [Mack, 326 F.3d] at 126. Rather, the question Courts must ask is whether "the authority given by the employer to the employee enabled or materially augmented the ability of the latter to create a hostile work environment for his or her subordinates." Id.

Id. at 382.  Thus, "whether an individual is a supervisor turns on the nature of the relationship and whether in practice the individual can wield the power that alters the employee's conditions of employment . . . ." Id. at 383 (citing Mack, 326 F.3d at 126-27).  Furthermore, a defendant-employer may be held vicariously liable for the actions of the harassing employee under the

"apparent authority" rule even if the defendant-employee does not have supervisory authority, as long as the plaintiff has a "false impression that the actor was a supervisor," and "the [plaintiff's] mistaken conclusion [is] a reasonable one." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 759 (1998).

A review of the case law illustrates this point. In Prince, the district court found that the defendant-employee's ability to "affect [the plaintiff's] compensation and other terms and conditions of employment, including the authority to assign [the plaintiff] to potentially valuable public appearances" was sufficient to create liability for the defendant employer. 427 F. Supp. 2d 372. Similarly, in Mack, the Second Circuit held that the employee defendant was the plaintiff's supervisor for purposes of vicarious liability where the employee defendant "had and exercised the authority to make and oversee the daily work assignments of the [plaintiff]." Mack, 326 F.3d at 127. In Karibian, the Second Circuit found vicarious liability where defendant employee had the authority to alter the plaintiff's work schedule and assignment, to give the plaintiff promotions and raises (subject to approval), and had at least the apparent authority to fire the plaintiff.  14 F.3d at 775.[28]

Here, there was credible testimony that, as head waiter, Velandia supervised Remi's dining room employees, was referred to as an "assistant manager" or "assistant to the manager," was placed in charge of the restaurant when Pistorio was absent, and threatened to fire Remi employees or send them home on multiple occasions. Caravantes' fear of Velandia's authority was sufficient to stifle his complaints and enable Velandia to continue his harassment. Thus,

---

[28] Defendants' reliance on Feliciano v. Alpha Sector, Inc., No. 00 Cv. 9309 (AGS), 2002 WL 1492139, at *10 (S.D.N.Y. July 12, 2002) is misplaced, as that case was decided before Mack, and concluded that the harasser employee-defendant did not have supervisory authority because "he was not endowed with the typical (and for Title VII purposes, relevant) trappings of authority – the power to hire and fire or set schedules and vacations." Contra Mack, 326 F.3d at 126 ("The question in [hostile work environment] cases is not whether the employer gave the employee the authority to make economic decisions concerning his or her subordinates.").

Velandia was a supervisor for the purposes of Title VII liability, since the authority given by Remi to Velandia "enabled or materially augmented the ability of" Velandia to sexually harass Caravantes. Mack, 326 F.3d at 326.

The <em>Faragher/Ellerth</em> Defense

An employer is not liable under Title VII or the NYSHRL for sexual harassment committed by a supervisory employee if it can prove that (1) no tangible employment action "such as discharge, demotion, or undesirable reassignment" was taken as part of the alleged harassment, (2) "the employer exercised reasonable care to prevent and correct promptly any sexual harassing behavior," and (3) "the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 542 U.S. at 765; Faragher, 524 U.S. at 807. Plaintiffs argue that Defendants cannot assert the Faragher/Ellerth defense, as they have not satisfied the reasonable care prong. (See Pls.' Post-Trial Mem. at 21.) This prong of the defense is satisfied by the establishment of "an anti-harassment policy and an accompanying complaint procedure," although the existence of such a policy is "not necessarily dispositive" of the issue. Leopold v. Baccarat, Inc., 239 F.3d 243, 245 (2d Cir. 2001).

In Equal Emp't Opportunity Comm'n v. KarenKim, Inc., No. 5:08-CV-1019 (NAM/DEP), 2010 WL 3810160 (N.D.N.Y. Sept. 22, 2010), defendant – a grocery store with more than 55 employees – did not have a written handbook or harassment policy with respect to employee complaints. Instead it had an "open door" policy for employee complaints, a policy which all employees were advised of at the time they were hired. Id. The court determined that defendant's policy

> might have been sufficient to have alerted employees concerning their rights to bring concerns to management. However, defendant has not presented sufficient

34

evidence that its oral policy of telling employees that complaints could be brought to a manager or owner on an "open door" basis specifically included a statement that sexual harassment would not be tolerated.

Id., at *6.

Here it is undisputed that Remi did not have a written sexual-harassment policy, nor did it provide employees with any formal training on how to recognize or complain about sexual harassment. (124-25, 1190.) The workplace posters that were posted at Remi do not constitute an effective policy either, as Defendants were unable to establish that a Spanish-language version of the posters even existed, or that anyone ever explained the content of the posters to the employees. Furthermore, Pistorio's comments at a couple of shift meetings regarding sexual touching, accompanied by the posting of a single memo, in English, falls far short of an effective workplace sexual harassment policy. Remi's complaint process was also inadequate, as the "open door" policy instituted by Pistorio did nothing to combat the sexual harassment that was occurring. For example, in October of 2007, when Caravantes complained to Pistorio that Ranieri had touched him and two other employees inappropriately, Pistorio responded that it was probably just an accident. (363-65, 1168, 1319, 1322.) Caravantes testified that no further action was taken, and Defendants offered nothing to the contrary. (1168, 1320.) Also, Remi did not change its policy in response to the complaints it received from the NYSDHR. (1190, 1204-07; PX 18; PX 19.)

Accordingly, Defendants have failed to demonstrate that 53rd Street Partners "exercised reasonable care to prevent and correct promptly any sexual harassing behavior" taking place at Remi, and thus cannot avail themselves of the Faragher/Ellerth defense. Ellerth, 542 U.S. at 765; Faragher, 524 U.S. at 807. As a result, 53rd Street Partners will be held liable under Title VII and the NYSHRL for the hostile work environment created by Velandia, and suffered by

35

Caravantes.  Furthermore, as the Faragher/Ellerth defense does not apply to claims under the

NYCHRL, Zakrzewska, 14 N.Y.3d at 479 ("the plain language of the NYCHRL precludes the

Faragher-Ellerth defense"), the Court finds that 53rd Street Partners may be held liable for

Velandia's sexual harassment of Caravantes under that statute as well.

**E.      Velandia's Personal Liability**

Individuals are not subject to liability under Title VII.  Wrighten v. Glowski, 232 F.3d

119, 120 (2d Cir. 2000) (per curiam).  However, an individual defendant may be held liable

under § 296(6) of the NYSHRL[29] or § 8-107(6) of the NYCHRL[30] for aiding and abetting an

employer's violation of the laws "if he participates in the conduct giving rise to the

discrimination claim," Schanfield v. Sojitz Corp. of Am., 663 F. Supp. 2d 305, 344 (S.D.N.Y.

2009), "even if that defendant has neither an ownership interest nor the power to hire and fire,"

Perks v. Town of Huntington, 251 F. Supp. 2d 1143, 1160 (E.D.N.Y. 2003); see Kato v. Ishihara,

239 F. Supp. 2d 359, 365 (S.D.N.Y.2002) (A claim for aider and abettor liability is cognizable

under the NYCHRL and is susceptible to the same standard as under the NYSHRL, as the

language of the two laws is "virtually identical").  "Aiding and abetting is only a viable theory

where an underlying violation has taken place."  Falchenberg v. New York State Dept. of Educ.,

338 F. App'x 11, 14 (2d Cir. 2009); Sowemimo v. D.A.O.R. Sec., Inc., 43 F. Supp. 2d 477, 490

(S.D.N.Y. 1999) (liability under the NYSHRL and the NYCHRL must first be established as to

the employer before an individual may be considered an aider and abettor").

---

[29] NYSHRL § 296(6) provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."  N.Y. Exec. Law § 296(6).

[30] NYCHRL § 8-107(6) provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so."  N.Y.C. Admin. Code. § 8-107(6).

Defendants argue that, because Velandia's conduct forms the basis of 53rd Street

Partners' liability, he cannot be subject to aiding and abetting liability.  While it is true that "an

individual cannot aid and abet his own discriminatory conduct, a co-worker/non-employer may

be liable as an aider-and-abettor if he 'primarily and directly perpetrated the harassment.'"

Nicholson v. Staffing Auth., No. 10 Cv. 2332 (JLC), 2011 WL 344101, at *3 (S.D.N.Y.  Feb. 1,

2011) (quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995)); see also Prince, 427

F. Supp. 2d at 385 (recognizing that, in Tomka, "the Second Circuit interpreted Section 296(6) as

holding individually liable those within the employment relationship who primarily and directly

perpetrated the harassment").

In Tomka, the Plaintiff brought suit against her former employer, as well as three male

co-workers, alleging hostile work environment sexual harassment and retaliatory discharge.

Tomka, 66 F.3d at 1299, abrogated on other grounds by Ellerth, 524 U.S. 742.  The claims

against the individual coworkers were brought under § 296(6) of the NYSHRL, and stemmed

from an alleged sexual assault perpetrated by all three of them.  Id.  After the district court

dismissed the claims against the individual defendants at the summary judgment stage, the

Second Circuit reversed in part and remanded the case, holding that the plaintiff's allegations

that three of her co-workers assaulted her and thereby created a hostile work environment were

"sufficient to satisfy § 296(6)."  Id. at 1317.   In New York State courts, Tomka has been the

subject of controversy, Hicks v. IBM, 44 F. Supp. 2d 593, 599 n.3 (S.D.N.Y. 1999) (collecting

cases), and the "New York Court of Appeals has not decided whether section 296(6) allows an

employee to be held liable as an aider or abettor if he participates in the discriminatory conduct

but does not have any power to do more than carry out personnel decisions made by others."

Chamblee v. Harris & Harris, Inc., 154 F. Supp. 2d 670, 677 (S.D.N.Y. 2001).  At least one

federal district court has held that, under <u>Tomka</u>, "[a]n individual may not be held liable . . . merely for aiding and abetting his own discriminatory conduct but only for assisting another party in violating the [NYSHRL]." <u>Virola v. XO Commc'ns, Inc.</u>, No. 05 Cv. 5056 (JG) (RER), 2008 WL 1766601, at *20 (E.D.N.Y. Apr. 15, 2008) (Gleeson, J.).

Unlike in <u>Tomka</u>, where three co-workers allegedly aided and abetted each other in the harassment, here Velandia acted alone with respect to his harassment of Caravantes.  Under these circumstances, Courts have been reluctant to impose individual liability for aiding and abetting under the NYSHRL or NYCHRL.  <u>See</u> <u>Ranieri v. McCarey</u>, 712 F. Supp. 2d 271, 282 (S.D.N.Y. 2010) ("As [the perpetrator's] alleged actions give rise to the discrimination claim, he cannot be held liable for aiding and abetting."); <u>Strauss v. New York State Dept. of Educ.</u>, 26 A.D.3d 67, 73 (N.Y. App. Div. 3d Dep't 2005) ("Where no violation of the Human Rights Law by another party has been established, we find that an individual employee cannot be held liable for aiding or abetting such a violation.").

In view of the foregoing, Velandia is not individually liable under the NYSHRL or NYCHRL for aiding and abetting 53rd Street Partners with respect to the sexual harassment of Caravantes, as their liability is predicated solely upon his actions.  However, individual liability may be imposed on Velandia pursuant to § 8-107(1)(a) of the NYCHRL,[31] which "expressly provides that it is unlawful for 'an employer or an <u>employee</u> or agent thereof' to engage in

---

[31] NYCHRL § 8-107(1)(a) provides, in pertinent part:

> It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

N.Y.C. Admin Code § 8-107(1)(a)

discriminatory employment practices."[32] Bind v. City of New York, No. 08 Cv. 11105 (RJH),

2011 WL 4542897, at *20 (S.D.N.Y. Sept. 30, 2011) (emphasis added); see also Murphy v. ERA

United Realty, 251 A.D.2d 469, 472 (N.Y. App. Div. 2d Dep't 1998).

"In 2005, the New York City Council amended the NYCHRL to require a more liberal

construction than its state and federal analogs." Nicholson, 2011 WL 344101, at *3.[33] As noted

supra, courts are now required to undertake an "analysis . . . targeted to understanding and

fulfilling . . . the [NYCHRL's] 'uniquely broad and remedial purposes,' which go beyond those

of counterpart State or federal civil rights laws." Williams, 61 A.D.3d at 66 (quoting Local Law

85 § 7). Subsequent to these amendments, at least one federal district court has held that the

NYCHRL "provides for the individual liability of employees regardless of ownership or

decision-making power." Banks v. Corr. Servs. Corp., 475 F. Supp. 2d 189, 200 (E.D.N.Y.

2007) (Feuerstein, J.). In view of the unique scope of the NYCHRL as amended, this Court

agrees. Thus, Velandia is liable in his individual capacity for his harassment of Caravantes

pursuant to § 8-107(1)(a) of the NYCHRL.[34]

**F.      Damages**

Caravantes seeks $500,000 in compensatory and punitive damages, as well as

prejudgment interest and attorney's fees. (Pls.' Post-Trial Mem. at 24.) Damages under Title

VII are subject to a statutory cap based on the defendant employer's size. Compensatory and

---

[32] Plaintiffs do not argue that Velandia is subject to liability as an "employer" under § 296(1) of the NYSHRL or § 8-107(1)(a) of the NYCHRL. (See Pls.' Post-Trial Mem. at 17.)

[33] The Nicholson court did not reach the issue of whether employees could be held liable as a "primary violators" under § 1-807(1)(a), though it did state that, "[i]n light of the 2005 amendment, . . . it is [now] unclear" whether such an action could be sustained. Id., at *4.

[34] This Court disagrees with the statement in Ballard v. Children's Aid Society, 781 F. Supp. 2d 198, 211 (S.D.N.Y. 2011), that a finding that the harassing employee "had the ability to hire or fire" the plaintiff is a "prerequisite for holding a corporate employee liable under the . . . NYCHRL." The text of NYCHRL § 8-107(1)(a) clearly states that "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived . . . gender . . . to discriminate against such person in . . . terms, conditions or privileges of employment." (emphasis added).

punitive damages are capped at $50,000 where the employer has over 14 and under 101

employees, as is the case here. 42 U.S.C. § 1981a(b)(3)(A). Although there is no cap on the

amount of damages that can be recovered under the NYSHRL and NYCHRL, "the federal cap

nonetheless provides guidance on what is considered an appropriate civil penalty for comparable

misconduct." Thomas v. iStar Fin., Inc., 508 F. Supp. 2d 252, 263 (S.D.N.Y. 2007). However,

where Title VII claims are pled alongside NYSHRL and NYCHRL claims, courts have awarded

damages in excess of the Title VII statutory cap by allocating the excess award to the state and

city law claims. See Bick v. City of New York, No. 95 Cv. 8781 (KMW)(MHD), 1998 WL

190283, at *22 (S.D.N.Y. Apr. 21, 1998) (collecting cases). This is because, "Title VII was not

intended to preclude a plaintiff from recovery under state law," and "the Second Circuit has

endorsed the notion of permitting a successful plaintiff to recover under 'the theory of liability

that provides the most complete recovery.'" Id. (quoting Magee v. United States Lines, Inc., 976

F.2d 821, 822 (2d Cir. 1992)).

## 1.   Compensatory Damages[35]

A plaintiff who prevails on a claim of sexual harassment under Title VII, the NYSHRL,

or the NYCHRL, may recover compensatory damages for "emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses."

Bergerson v. N.Y. Office of Mental Health, Cent. New York Psychiatric Ctr., 652 F.3d 277, 286

(2d Cir. 2011) (Title VII); see Mendez v. Starwood Hotels & Resorts Worldwide, Inc., 746 F.

Supp. 2d 575, 600-01 (S.D.N.Y. 2010) (Title VII, NYSHRL & NYCHRL). The precise amount

of compensatory damages in any given case "depends on a unique set of facts and

circumstances." Olsen v. Cnty. Of Nassau, 615 F. Supp. 2d 35, 45 (E.D.N.Y. 2009) (quoting

Scala v. Moore McCormack Lines, 985 F.2d 680, 684 (2d Cir. 1993)).

---

[35] Plaintiffs' have presented no evidence of monetary damages in this case.

However, the mere fact that a constitutional deprivation has occurred does not justify the award of such damages; the plaintiff must establish that []he suffered an actual injury caused by the deprivation. The damage award must be supported by competent evidence concerning the injury. A plaintiff's subjective testimony, standing alone, is generally insufficient to sustain an award of emotional distress damages. Rather, the plaintiff's testimony of emotional injury must be substantiated by other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's distress, or the objective circumstances of the violation itself.

Patrolmen's Benevolent Ass'n of City of New York v. City of New York, 310 F.3d 43, 55 (2d

Cir. 2002) (internal quotations and citations omitted).

Emotional distress awards within the Second Circuit can generally be grouped into three categories of claims: "garden-variety," "significant" and "egregious." In "garden variety" emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury. Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration. "Garden variety" emotional distress claims generally merit $30,000 to $125,000 awards.

"Significant" emotional distress claims differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses. Finally, "egregious" emotional distress claims generally involve either "outrageous or shocking" discriminatory conduct or a significant impact on the physical health of the plaintiff. In "significant" or "egregious" cases, where there is typically evidence of debilitating and permanent alterations in lifestyle, larger damage awards may be warranted.

Olsen, 615 F. Supp. 2d at 46-47 (internal quotations and citations omitted).

As a result of Velandia's sexual harassment, Caravantes has suffered significant

emotional distress since 2005, continuing to this day. (380-83.) As he testified at trial, during

the period that he and Velandia were engaging in sexual acts: "I felt dirty. I felt bad. I wouldn't

want to leave my station. I wouldn't want to speak to anyone." (303.) "I had no strength. I felt

like every day; I felt like every day dead. I was dead on the inside. I didn't want to do anything

else anymore." (353.) This experience has had a lasting effect on Caravantes. He testified that

41

he used to play soccer and hang out with friends, which he cannot bring himself to do anymore. (377.) He also testified that he has trouble sleeping, and when he is able to sleep, often has nightmares about Velandia accosting him. (378.) His despair was evident from his testimony: "I don't want to dream anymore. I want to go to sleep and never wake up again." (378.)

The harassment has also effected Caravantes's marriage and family life. He feels distant from his wife and daughters. (380, 383.) He testified that, while he used to have sexual relations with his wife on a regular basis, that he is now unable to do so. (383-84.) Caravantes was admitted to the hospital for a week with suicidal thoughts in March of 2012, a month before the trial. (382-83.) As he testified, "[w]hen I left the hospital, my wife sat inside there destroyed. Now my wife is helping me to rebuild myself, to recuperate what I've lost – my morals, my heart, my mind, my positive attitude." (384.)

Caravantes' testimony was corroborated by his wife of 19 years, Martina, who testified that after 53rd Street Partners took over ownership of Remi in 2005, her husband "became distant, sad, preoccupied. He changed a lot." (436.) She testified that Caravantes "[h]as a lot of nightmares," and that "[h]e's very nervous, very distant from everything. He wants to be alone." (438.) She also testified that their sexual relationship is "bad," and that "[s]ometimes he doesn't function." (438-39.) They no longer share a bed. (438.)

This testimony was also corroborated by Dr. Jessica Pearson, a licensed psychologist who was qualified at trial as an expert in forensic psychological assessment. (555.) Dr. Pearson conducted a clinical interview with Caravantes over five sessions, amounting to over 10 hours total. (558-59.) The first four sessions all took place within a two-month period at the beginning

of 2010, and the last session took place almost a year after the first session, in January 2011.[36]

(559, 564, 566.) As Dr. Pearson described:

> during the clinical interview, I obtained my symptom report from [Caravantes]. I had behavior observations in how he was behaving in that moment or during those evaluations. I got a narrative of what he was describing had happened to him. And I also took a history, a clinical history. So in addition to that, I also did psychological testing, and I reviewed collateral information[37] that was provided to me.

(559.) After evaluating Caravates, Pearson diagnosed him as suffering from Major Depressive

Disorder ("MDD"), "single episode, severe without psychotic features," and "chronic"

Posttraumatic Stress Disorder ("PTSD"). (555-56.) Dr. Pearson opined that Caravantes' MDD

symptoms were caused by Velandia's sexual harassment, and were consistent with his narrative.

While Pearson diagnosed Caravantes with "severe" MDD, Plaintiffs' expert, Dr. Robert

L. Goldstein, M.D.,[38] found Caravantes to be suffering from "mild to moderate" MDD.

However, two other mental health professionals who evaluated Caravantes also diagnosed him

with "severe" MDD, and thus Dr. Pearson's diagnosis does have some corroboration. (See PX

25; PX 113). While both experts testified that Caravantes suffers from symptoms typically

associated with PTSD, such as nightmares, flashbacks, and intrusive memories, (565), Dr.

Pearson diagnosed Caravantes as suffering from that disorder, while Dr. Goldstein did not. (See

---

[36] The dates of the interviews were February 4, 2010, February 17, 2010, February 24, 2010, April 2, 2010, and January 13, 2011. (572.)

[37] Dr. Pearson testified that her sources of collateral information included Martina Caravantes, whom she interviewed in 2010, (585, 587), and a number of Caravantes' medical and mental health records, spanning from 2008 to 2012, (585), including: the records of Hilda Castillo, a counselor at "Safe Horizon," (589; PX 22); a psychiatric evaluation completed by Dr. Lober Cervantes, M.D. dated July 28, 2009, (598; PX 24); the records of licensed social worker Hannah Emmerich at the Kareny Horney Clinic, (609; PX 25; PX 25A); a psychiatric evaluation completed by Dr. Henry Paul dated June 16, 2010, (618; PX 26); records from the psychiatric unit at New York Presbyterian Hospital, where Caravantes was hospitalized for six days beginning on March 2, 2012, (624-25; PX 113; PX 113A); and an evaluation completed by Dr. Elizabeth Owen, a clinical psychologist, dated March 19, 2012, (627; PX 114; PX 114A).

[38] Dr. Goldstein is a licensed psychiatrist who was "qualified to tender an expert opinion on whether [Caravantes] suffers from a psychiatric condition in this case." (1228.)

43

1247.) Though Pearson's diagnosis of PTSD also have some corroboration as well, (see PX 26), based on the testimony at trial, the Court is not convinced by a preponderance of the evidence that the diagnosis of PTSD is appropriate in this case, and thus does not take that diagnosis into account when calculating the damages award for Caravantes.

Caravantes seeks $400,000 in compensatory damages in this case. (Pls.' Post-Trial Mem. at 27.) As mentioned supra, the cap for damages under Title VII is $50,000. However, the Court may impose additional damages by apportioning the reward to the Plaintiffs' NYCHRL and NYSHRL claims. Indeed, damages awards far exceeding the statutory cap have been awarded in cases involving similar circumstances. See, e.g., Katt v. City of New York, 151 F. Supp. 2d 313, 370 (S.D.N.Y. 2001) ($400,000 in compensatory damages for emotional distress where plaintiff suffered from permanent mental disabilities, was unable to work, unable to maintain sexual intimacy, and unable to even perform household chores as a result of sexualized atmosphere, sexual comments, and sexual touching); Watson v. Sutton, Inc., No. 02 Cv. 2739 (KMW), 2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005) ($120,000 in compensatory damages for emotional distress where plaintiff became depressed after being fired for complaining when her co-worker came into her office on one occasion and directed sexually explicit comments toward her).

Here, there is little doubt that Velandia's harassment of Caravantes falls into the "egregious" category of emotional distress claims, given the extensive nature of Velandia's discriminatory conduct, and the significant impact on Caravantes' mental health that resulted from it. See Olsen, 615 F. Supp. 2d at 47. Furthermore, Caravantes' own compelling testimony was "supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." Id. at 46-47. Even the Defendants' own expert testified that after examining Caravantes, he found him to

44

be suffering from MDD, which he characterized as "a serious form of depression, where it's

persistent symptoms of depression and social withdrawal, insomnia, lowered energy level,

impaired concentration, perhaps suicidal thoughts, sleep disturbance, appetite disturbances, etc."

(1240.) Thus, Carvantes is entitled to substantial damages in this case. However, the evidence

does indicate that Caravantes' condition is treatable, (see 1283-84), and that he is currently

working in a restaurant, (278). After considering all the relevant factors in front of it, the Court

has determined that Defendants 53rd Street Partners and Velandia are jointly and severally liable

to Caravantes for $150,000 in compensatory damages.

## 2.    Punitive Damages

Punitive damages may be awarded under Title VII and the NYCHRL where the

Defendant "has engaged in intentional discrimination and has done so 'with malice or with

reckless indifference to the federally protected rights of an aggrieved individual.'"[39]  Kolstad v.

Am. Dental Ass'n, 527 U.S. 526, 530 (1999) (quoting 42 U.S.C. § 1981a(b)(1)). "Malice and

reckless indifference refer to 'the [defendant's] knowledge that it may be acting in violation of

federal law, not its awareness that it is engaging in discrimination.'"  Farias v. Instructional Sys.,

Inc., 259 F.3d 91, 101 (2d Cir. 2001) (quoting Kolstad, 527 U.S. at 535).  "A plaintiff can satisfy

this burden by presenting evidence that [1] the employer discriminated (or retaliated) against him

with 'conscious knowledge it was violating the law,' or [2] that it engaged in ''egregious' or

'outrageous' conduct from which an inference of malice or reckless indifference could be

drawn.'"  Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 573 (2d Cir. 2011)

(quoting Farias, 259 F.3d at 102).  It is the plaintiff's burden to prove by a preponderance of the

evidence that the employer acted with malice or reckless indifference, or engaged in egregious

---

[39] Title VII and the NYCHRL impose the same burden of proof on a plaintiff seeking punitive damages. Farias v.
Instructional Sys., Inc., 259 F.3d 91, 101 (2d Cir. 2001). The NYSHRL does not provide for punitive damages. Id.

and outrageous conduct – and not the employer's burden to disprove it. Id. As the Supreme

Court has noted, "Congress plainly sought to impose two standards of liability – one for

establishing a right to compensatory damages and another, higher standard that a plaintiff must

satisfy to qualify for a punitive award." Kolstad, 527 U.S. at 534.

Under Title VII, punitive damages are available against a defendant employer, and under

the NYCHRL, punitive damages are available against both the employer and the individual

harasser. See id. at 539; Sier v. Jacobs Persinger & Parker, 714 N.Y.S.2d 283, 285 (N.Y. App.

Div. 2d Dep't 2000) (affirming an award of punitive damages for sexual harassment against an

individual law firm partner). "[I]n the punitive damages context, an employer may not be

vicariously liable for the discriminatory employment decisions of managerial agents where these

decisions are contrary to the employer's good-faith efforts to comply with Title VII." Kolstad,

527 U.S. at 545 (internal quotations and citation omitted). "An employer can avoid liability for

punitive damages by showing that it '[1] had an antidiscrimination policy and [2] made a good

faith effort to enforce it.'" Tepperwien, 663 F.3d at 573 (quoting Zimmermann v. Assocs. First

Capital Corp., 251 F.3d 376, 385 (2d Cir. 2001)). However, under the NYCHRL "an employer

is strictly liable for the unlawful . . . conduct of an employee where . . . that employee 'exercised

managerial or supervisory responsibility.'" Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.,

824 F. Supp. 2d 573, 579 (S.D.N.Y. 2011) (quoting N.Y.C. Admin. Code § 8-107(13)).

"[T]he purpose of punitive damage awards is to punish the defendant and to deter him

and others from similar conduct in the future." Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir.

1992). An award should be limited to the amount reasonably necessary to achieve that end, and

"should not be so high as to result in the financial ruin of the defendant." Chisholm, 824 F.

46

Supp. 2d at 579 (quoting Vasbinder, 976 F.2d at 121).  Caravantes seeks $100,000 in punitive

damages in this case.  (Pls.' Post-Trial Mem. at 29.)

Here, although there was no showing that 53rd Street Partners was specifically aware of

the sexual relationship that was occurring between Caravantes and Velandia, 53rd Street Partners

was aware that sexual touching was occurring within the restaurant, and failed to take

appropriate action despite the fact that it received complaints directly from employees, as well as

from the NYSDHR.  As discussed supra, Remi never had any written sexual harassment policy

or training, and Pistorio's "open door" complaint policy was not effective.  (See supra pp. 34-

35.)  As a result, 53rd Street Partners acted with reckless indifference in failing to protect its

employees from the egregious and malicious violations of the law perpetrated by Velandia.

Accordingly, the Court finds that punitive damages are appropriate in this case.  After

considering all the relevant factors in front of it, the Court has determined that Caravantes is

entitled to $25,000 in punitive damages from 53rd Street Partners and $15,000 from Velandia.

### 3.    Prejudgment Interest

The following statement from DeCurtis v. Upward Bound Int'l, Inc., No. 09 Cv. 5378

(RJS), 2011 WL 4549412, at *6 n.4 (S.D.N.Y. Sept. 27, 2011), applies in equal force to this

case:

> Awarding prejudgment interest on compensatory damages is within the discretion
> of the Court, but "[u]nlike awards of prejudgment interest on backpay, awards of
> prejudgment interest on emotional distress damages is not the norm for New York
> federal courts," and, instead, are only granted when necessary to "make the
> plaintiff whole." E.E.O.C. v. Everdry Mktg. and Mgmt., Inc., 556 F. Supp. 2d
> 213, 223-24 (W.D.N.Y.2008). In this case, the Court has set the amount of
> compensatory damages at a reasonable rate to make Plaintiff whole, and
> therefore, prejudgment interest is not necessary. Reiter v. Metro. Transp. Auth. of
> N.Y., No. 01 Cv. 2762 (JGK), 2003 WL 22271223, at *15 (S.D.N.Y. Sept. 30,
> 2003).

Accordingly, Plaintiffs are not entitled to prejudgment interest in this case.

4.    **Attorney's Fees**

Plaintiffs' counsel may submit a fee petition to the Court within 30 days of the date that this Opinion is filed.

### III.    CONCLUSION

As outlined <u>supra</u>, the Court finds Defendant 53rd Street Partners liable for discriminating against Plaintiff Caravantes on the basis of his sex under Title VII, the NYSHRL, and the NYCHRL.  The Court also finds Defendant Oscar Velandia individually liable for discriminating against Caravantes on the basis of his sex under the NYCHRL.  Caravantes is awarded $150,000 in compensatory damages, and $40,000 in punitive damages.  Plaintiff Sotarriba's claims are dismissed.


IT IS SO ORDERED.

Dated: New York, New York
       August 23, 2012



                                        Robert P. Patterson, Jr.
                                        U.S.D.J.

48

**Copies of this Opinion were sent via email to:**

*Counsel for Plaintiffs:*
Aaron Sean Delaney
Paul, Weiss, Rifkind, Wharton & Garrison LLP (NY)
1285 Avenue of the Americas
New York, NY 10019
(212)-373-3000
Fax: (212)-492-0119
Email: adelaney@paulweiss.com

Amber Nicole Hallett
Urban Justice Center
123 William St.
New York, NY 10038
(646)-459-3003
Fax: (212)-533-4598
Email: nhallett@urbanjustice.org

*Counsel for Defendants:*
Daniel Robert Levy
Epstein Becker & Green, P.C. (NJ)
One Gateway Center
13th Floor
Newark, NJ 07102
(973)-642-1900
Fax: (973)-642-0099
Email: dlevy@ebglaw.com